**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02005

SRS ACQUIOM INC., a Delaware corporation, and
SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company,

      Plaintiffs,

v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania corporation,
PNC BANK, N.A., a national association,
HEATHER KELLY, an individual, and
ALEX TSARNAS, an individual,

      Defendants.

---

**NOTICE OF FILING VERIFIED FIRST AMENDED COMPLAINT**
**AND JURY DEMAND**

---

Pursuant to D.C.COLO.LCivR 15.1, Plaintiffs SRS Acquiom, Inc. and Shareholder Representative Services LLC, by and through their undersigned attorneys, respectfully submit this Notice of Filing Verified First Amended Complaint and Jury Demand.

Attached hereto as Exhibit 1 is a copy of SRSA's Verified First Amended Complaint and Jury Demand which strikes through (e.g., ~~strikes through~~) the text to be deleted and underlines (e.g., <u>underlines</u>) the text to be added, vis-à-vis SRSA's Verified Complaint and Jury Demand (ECF No. 1), filed July 11, 2019.

Defendants have not yet been formally served in this matter.

//

//

Respectfully submitted,

Dated:  July 12, 2019

By:  s/ *Benjamin D. Rothstein*
   Warren A. Braunig
    *wbraunig@keker.com*
   Benjamin D. Rothstein
    *brothstein@keker.com*
   Maya Karwande
    *mkarwande@keker.com*
   Victor H. Yu
    *vyu@keker.com*
   KEKER, VAN NEST & PETERS LLP
   633 Battery Street
   San Francisco, CA 94111-1809
   Telephone:  415-391-5400
   Facsimile:   415-397-7188

   Scott R. Bialecki
    *sbialecki@sheridanross.com*
   Matthew C. Miller
    *mmiller@sheridanross.com*
   SHERIDAN ROSS P.C.
   1560 Broadway, Suite 1200
   Denver, Colorado 80202
   Telephone:  303-863-9700
   Facsimile:   303-863-0223
   Email:  *litigation@sheridanross.com*

   ATTORNEYS FOR PLAINTIFFS
   SRS ACQUIOM INC. AND SHAREHOLDER
   REPRESENTATIVE SERVICES LLC

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. l:19-cv-02005

SRS ACQUIOM INC., a Delaware corporation, and

SHAREHOLDER REPRSENTATIVE REPRESENTATIVE SERVICES EEC, a Colorado limited

liability company., Plaintiffs,

v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania Corporationcorporation,- PNC BANK, N.
N.A., a Pennsylvania Corporationnational association,
HEATHER KELLY, an individual, and ALEX TSARNAS, an individual.,

Defendants.

## VERIFIED FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs SRS Acquiom Inc. and Shareholder Representative Services EEC (collectively,

"SRSA"), by way of tOheir their Verified First Amended Complaint against Defendants PNC Financial

Services Group, Inc. and PNC Bank, N.ANA. (collectively "PNC"), Heather Kelly, and Alex Tsarnas,

allege the following:

## I.  INTRODUCTION

1.      Over six years of hard work and innovation, SRSA built a one-of-a-kind suite of

software products for managing payments to shareholders, employees, and vendors during the mergers-

and-acquisitions (M&A) process. These products, called Acquiom Clearinghouse, Acquiom Compensation

Payments ("ACP"), Pre-Closing Solicitation, and Deal Dashboard, streamline and simplify the process for

collecting and processing documents and information from shareholders, determining who is eligible to be

paid as part of the acquisition, and processing the payments to those shareholders, along with any future

payments based on their respective securities holdings. By incorporating legal and industry know-how with technology built from the ground up, SRSA's proprietary products have made SRSA an essential partner for companies that are a party to an M&A transaction, the lawyers who work with them, and shareholders large and small. In large part due to Clearinghouse, Pre-Closing Solicitation and ACP, SRSA has built a stable and profitable business.

2.     Defendant PNC knew that SRSA had developed something unique and valuable, and set out to copy SRSA's technology and processes. But it didn't know how. This was especially important to PNC since, in or about December 2017, PNC had paid a substantial sum to acquire Fortis Advisors, a firm that competed with SRSA in the related field of shareholder representation services but had no products to compete in the online M&A "payments and escrow" business that SRSA had developed. So PNC hired two disgruntled SRSA employees, Defendants Alex Tsamas and Heather Kelly, one of whom (Tsarnas) had recently been terminated by SRSA for embezzling more than $35,000 through an expense account. Tsarnas, SRSA's former head of sales, and Kelly, an experienced relationship manager who reported to him, both had intimate knowledge of how Clearinghouse and ACP worked, how they made money, how to sell them, and to whom. Tsarnas and Kelly were both also subject to strict confidentiality agreements with SRSA (as well as provisions prohibiting the solicitation of SRSA's customers and employees). After being fired, Tsarnas quickly began soliciting Kelly to leave SRSA too, and he found a willing partner. Before Kelly had even left SRSA, she and Tsarnas developed a presentation for potential new employers, bragging that they knew how to develop the "holy grail" of an M&A payments platform.

3.     When Kelly resigned on March 8, 2018, as a recent forensic investigation has uncovered, Kelly took with her a trove of SRSA confidential information. In the days immediately before and after

2

she resigned, she printed and emailed to herself highly confidential SRSA documents for how to build an online M&A payments platform. In the week following her resignation, Kelly deleted the contents of her SRSA-issued laptop before returning it to SRSA, in an attempt to cover her tracks. She also appears to have surreptitiously retained, and continued utilizing, an older SRSA computer the company didn't know she still had, and on which she had downloaded thousands of SRSA documents.

4.      SRSA only became aware of Kelly's brazen and wholesale misappropriation last month, after PNC brought to market a product strikingly similar to SRSA's product offerings. When Kelly and Tsamas joined PNC in March 2018, PNC had no online M&A payments product in market and, according to Kelly in contemporaneous text messages, PNC was still at the earliest stages of product development. With the encouragement and knowledge of PNC, Kelly and Tsarnas used their knowledge of SRSA's confidential information and trade secrets to accelerate PNC's development of its new product, called PNC Paid, which was released on or about April 2019. In fact, PNC Paid is so thoroughly based upon SRSA technology that the public marketing materials for PNC Paid, meant to showcase PNC's new technology, literally include an image of an SRSA document taken by Kelly when she resigned from SRSA.

5.      With the benefit of confidential information from Kelly and Tsarnas about SRSA's top customers and pricing, PNC has now begun to target SRSA's customers, representing that PNC can do everything SRSA can, but at a lower price. PNC has won a number of competitive deals that otherwise would have gone to SRSA, and successfully encouraged two of SRSA's most loyal customers to terminate their relationships with SRSA. Of course, the reason PNC can offer an identical product at a lower price, just a year after it began product development, is due to the massive head start PNC received from SRSA's stolen trade secrets. PNC's conduct, and that of Kelly and Tsamas, is anti-competitive, unlawful and

Case 1:19-cv-02005-Document 1 Filed 07/11/19 USDC Colorado Page 2 of 56

unfair.

6.      SRSA brings this action to obtain the return of all stolen information and prevent PNC's continued use of a product built on stolen SRSA information. SRSA has no problem with competition in the M&A payments space. But PNC, Kelly, and Tsamas leveraged the research and development (R&D) and hard work of SRSA to compete unfairly. In doing so, they breached contracts, misappropriated trade secrets, and committed numerous other common law torts. Their behavior is wrong, unethical and must be halted at once.

## II.     PARTIES

7.      SRSA is an industry leader in the online M&A payments space. SRSA operates a successful online platform that facilitates payments to shareholders in association with mergers and acquisitions.

8.      Plaintiff SRS Acquiom Inc. is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is located at 950 17th St, Suite 1400, Denver, Colorado, 80202.

9.      Plaintiff Shareholder Representative Services LLC is a corporation limited liability company organized and existing under the laws of the state of Colorado. Its principal place of business is located at 1900 W. Littleton Boulevard950 17th St, LittletonSuite 1400, CO 80120Denver, United StatesColorado, 80202. Plaintiff Shareholder Representative Services LLC is indirectly wholly owned by Plaintiff SRS Acquiom Inc.

10.     Defendant PNC Financial Services Group, Inc. is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

1335171
1335284

11.     Defendant PNC Bank, N.A., is a national banking association organized under 28 U.S.C. § 1348. PNC Bank, N.A.'s Articles of Association designate the place of its main office as Pittsburgh, Pennsylvania. On information and belief, PNC Bank, N.A. is a wholly-owned subsidiary of PNC Financial Services Group, Inc.

12.     SRSA will refer to both PNC Financial Services Group, Inc. and PNC Bank, N.A. collectively as "PNC."

13.     Defendant Heather Kelly was employed by SRSA as Senior Vice President and Relationship Manager from June 2014 through March 2018. While employed by SRSA, Kelly had regular access to confidential information regarding SRSA's technology, business strategies, and operations. On information and belief, Kelly is currently employed by PNC. On information and belief, Kelly works from and resides in Wisconsin.

14.     Defendant Alex Tsarnas was employed by SRSA as Managing Director - Global Business Development, an executive level position and the senior-most position in SRSA's sales organization, from September 2014 to January 2018. While employed as an executive at SRSA, Tsarnas also had regular access to confidential information regarding SRSA's technology, business strategies, and operations. On information and belief, Tsarnas is currently employed by PNC. On information and belief, Tsarnas works from and resides in New Jersey.

### III.     JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over each of the named Defendants. As alleged herein, each of the Defendants has had continuous and systematic contacts with the State of

Colorado, and/or has purposely directed activities at the State of Colorado, and this action arises out of and

1335171
1335284

relates to those activities.

16.     The vast majority of SRSA's staff and business operations are located in its Denver headquarters.

17.     Defendants Kelly and Tsamas had a continuing relationship with the State of Colorado. Kelly and Tsarnas entered into employment relationships with SRSA, which is headquartered in Colorado, pursuant to employment agreements with Plaintiff Shareholder Representative Services LLC ("SRS LLC"). Kelly signed and dated her employment agreement with SRS LLC on June 9, 2014. Tsarnas signed and dated his employment agreement with SRS LLC on August 23, 2014. As part of their job responsibilities, Kelly and Tsamas visited SRSA's Denver headquarters on a regular basis. And to perform their responsibilities, Kelly and Tsamas were required to communicate with members of SRSA's Denver office on a daily or near-daily basis. Kelly and Tsarnas also received regular benefits from SRSA's Denver headquarters. SRSA's Denver office disbursed payments to their bank accounts, and SRSA paid for home offices for both former employees. Finally, under the terms of her agreement, Kelly agreed to litigate any disputes arising from her agreement under Colorado law.

18.     Defendant Kelly purposefully directed her activity towards the State of Colorado. As alleged herein, Kelly had access to confidential information stored in SRSA's online databases that are controlled from its Denver headquarters. Moreover, Kelly received confidential information about SRSA's products and business strategies through in-person meetings at SRSA's headquarters. On information and belief, Kelly misappropriated this information by using knowledge obtained during her time at SRSA, including copying files from SRSA's online databases, to aid PNC in building a competitor to SRS A's payments platform. On information and belief, Kelly has also used confidential information about SRSA's

6

customers to help PNC solicit their business. Through her actions, Kelly specifically intended to interfere with and harm SRS A's business operations in Colorado.

19.     Defendant Tsamas also purposefully directed his activity towards the State of Colorado. Tsarnas obtained confidential information about SRSA's products and business plan through in-person meetings at SRSA's Denver headquarters. On information and belief, Tsamas misappropriated this information by using confidential knowledge obtained during his time at SRS A to aid PNC in building a competitor to SRSA's payments platform and targeting SRS A customers. Through his actions, Tsamas specifically intended for SRS A to suffer harm in Colorado from lost business to PNC.

20.     Defendant PNC has purposefully directed its activities towards the State of Colorado. As alleged herein, PNC developed a competing product while knowingly using confidential information developed by SRSA in Colorado. Moreover, PNC misappropriated SRSA's trade secrets with the specific intent to interfere with and harm SRSA's operations in Colorado by taking existing SRSA clients and reducing SRSA's share of the M&A payments market. PNC has also purposefully directed its activities towards the State of Colorado by ratifying the conduct of Kelly and Tsarnas. After hiring both of the individual Defendants, PNC used information that Kelly and Tsarnas obtained from SRSA in Colorado to develop PNC Paid. In doing so, PNC, through its agents, has misappropriated information physically located in the State of Colorado.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 of SRSA's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and supplemental jurisdiction over the other claims asserted herein pursuant 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over the entirety of the action pursuant to 28 U.S.C. §

1332 because SRSA is a citizen of a different state than any of the Defendants, and the amount in controversy exceeds $75,000.

22.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to SRSA's claims occurred within the District of Colorado. SRSA's trade secrets were developed and maintained in Colorado. SRSA's contracts with Defendants Kelly and Tsarnas were executed by SRSA in Colorado and substantially performed in Colorado. Kelly and Tsarnas also accessed and downloaded SRSA's confidential, proprietary, and trade secret information developed and possessed within this judicial district. Defendant PNC later ratified this action by developing a competing product using information Kelly and Tsarnas obtained from this judicial district. Defendant PNC also has a significant banking presence in Colorado, including, upon information and belief, a permanent office located at 1144 15th Street, Suite 3650, Denver, CO 80202.

## IV.     FACTUAL ALLEGATIONS

23.     SRSA is an industry leader in a highly complex business: M&A escrow and payments. When one company acquires another, the buyer must pay the shareholders of the company being acquired (or the "target" company). The payment process in an M&A deal can be incredibly cumbersome, due to factors that include the sheer number of shareholders owning stock in the target company, the different types of outstanding target company stock, the numerous

different forms and documents that must be custom-tailored for each shareholder and class of stock, the myriad tax forms and related withholding obligations that must be analyzed and completed, and the numerous steps involved in verifying the identity of shareholders and disbursing payments, to the right person or entity, in the right amount. However, using its proprietary technology and operational expertise,

SRSA has been able to disrupt the traditional M&A escrow and payments industry by offering a simple and paperless solution to M&A payments.

24.     There are two components to the M&A escrow and payments business. First, there is the payment process, described above. SRSA competes in this space by selling its industryleading online services and products, including Clearinghouse and ACP, which handle payments to shareholders, employees, and vendors. Second, there is the escrow process, which SRSA helps its customers to administer. When an acquiring company consummates an M&A deal, it typically must then pay out the money that it will use to acquire the target company (called the "merger consideration"). Usually, a portion of that consideration is paid at the time of acquisition; but a portion often must be held back in a corporate escrow account with a third-party bank until any shareholder disputes, litigation, or other disputes are resolved. These two services—escrow and payments—go hand in hand. SRSA has developed proprietary processes and documentation around both payment and escrow management.

1335171
1335284

### A.   Paying Shareholders of an Acquired Company Was Traditionally a Cumbersome and Difficult Process.

25.    Whether a small private entity or a large publicly-traded conglomerate, all companies must be owned by shareholders. And naturally, if a buyer acquires a company, it must pay the shareholders for their interest in the firm.

26.    To pay shareholders in a company being acquired, a buyer must undertake several steps, three of which are most pertinent to this Verified First Amended Complaint. *First,* the target company's shareholders must consent to the acquisition. In order to obtain agreement, the buyer or acquired company must send out "shareholder consents" to the shareholders in the acquired company. This process involves sending letters and consent documents to shareholders that ask for their approval of the transaction, and then waiting for the requisite number of shareholders necessary to approve the transaction to return their signed consents. Someone must then review the consents for accuracy and completeness and tabulate the results. Different consents may be required for different groups of shareholders, and the same shareholder may be required to execute multiple documents, making it a highly individualized process.

27.    *Second,* after the shareholders consent and the deal closes, the buyer must send out letters of transmittal to all of the shareholders in the acquired company, which each shareholder must complete as a prerequisite to payment. A letter of transmittal typically contains contractual provisions in favor of the buyer (customized in each transaction), as well as shareholder information, tax forms, and payment instructions to be completed by the shareholder. This process can also involve sending additional agreements to shareholders that may be required for payment (e.g. joinders, spousal consents, IRS 280G consents, etc.). The buyer must then wait for the shareholders to return completed and signed documents and review the documents and information for completeness. Different versions of a letter of transmittal,

10

and different additional agreements, may be required for each transaction and may be required for different groups of shareholders within the same transaction, again making it a highly individualized process.

28.     *Third,* after the deal closes, the buyer must pay out the money or other consideration that it will use to acquire the target company and pay off the outstanding debts and invoices of the acquired entity (from the "merger consideration"). To execute this step, many buyers will deposit the merger consideration into an account maintained by a third-party hired to process the related payments (a "paying agent"). The paying agent typically will send paperwork to each shareholder that the shareholder must sign and return in order to complete the payment transaction. Upon receipt of a shareholder's returned paperwork, the paying agent confirms everything is in order and then pays the target company's shareholders, vendors and lenders on the buyer's behalf from the funds in the paying account.

29.     Traditionally, each of these steps was done manually. The merger parties would engage law firms to draft the forms necessary for each shareholder to sign, and a retained "paying agent" would mail paper copies of the required forms. As individual shareholders returned the required, completed documentation, the paying agent would manually review what each shareholder had submitted. The paying agent would then process payments for those shareholders that had correctly completed all required documents. In the common event that shareholders returned materials with errors, the paying agent would have to return the materials by mail, which would prolong the process further.

30.     Under the traditional model, this process is extremely time-consuming, slow, error- prone, and expensive. It also provides a poor customer experience because it requires significant shareholder action and can take weeks for shareholders to receive their merger proceeds. Even small acquisitions can require massive amounts of physical paperwork and an enormous amount of attorney and paying agent

1335171
1335284

manpower. Large acquisitions exacerbate these considerable burdens, because large selling companies in M&A may have thousands of unique shareholders, located in different states and countries, some of whom may have been divorced or passed away (in the case of individual shareholders) or ceased to exist (in the case of entity shareholders) since making their initial investment. These shareholders often hold different types of shares, all of which could require the paying agent to customize different sets of forms for each shareholder, thousands of times over, and then manually review all of the many thousands of returned documents.

### B. To Address Inefficiencies in the M&A Payments Market, SRSA Spent Several Years Developing an Industry-Leading Online-Payments Platform.

31.     SRSA was founded in 2007 in Denver, Colorado, as a shareholder-representative firm, meaning that it represented shareholders in issues that arose between selling shareholders and the buyer after the closing of M&A transactions. In this role, SRSA worked in close proximity to hundreds of M&A deals and became familiar with the common inefficiencies and burdens plaguing the shareholder-payment and escrow industry.

32.     Viewing the inefficiencies in the M&A-payments process up close, SRSA realized that there was a significant opportunity around shareholder payments. Instead of paying shareholders using a manual, pen-and-paper route—which took weeks to execute, involved a huge amount of human labor, and was highly error prone and expensive—SRSA realized that M&A payments could be streamlined onto one platform: an online document-collection and payments service.

33.     In 2012, SRSA began development in its Colorado headquarters of an online M&A-payments platform, which came to be known as "Acquiom Clearinghouse" or just "Clearinghouse." Clearinghouse presents shareholders with an intuitive and personalized user interface that they can access

through a web browser and through which they can conduct the entire acquisition payments process online, from executing shareholder consents to completing payment paperwork and giving payment instructions, including bank account information and desired form of payment (check, wire or ACH). Clearinghouse collects and processes data that is made available to acquiring companies and their attorneys, so that they can track the progress of shareholders' completion of required documents and receipt of payment. At the time SRSA released Clearinghouse, no other company had ever before offered an online-payments platform for M&A transactions.

34.    Although Clearinghouse is easy to use for shareholders, developing Clearinghouse presented a number of complicated engineering, regulatory and legal challenges that SRSA had to overcome. For example, SRSA had to determine how to authenticate the true identity of shareholders over an online platform, and how to convince them to provide sensitive personal and financial information to SRSA when SRSA had no prior relationship with many of these shareholders. This was referred to as a "mutual authentication" problem. SRSA's innovative solution to the mutual authentication problem is a homegrown set of processes and algorithms designed and optimized to ensure proper payment. Another challenge was how to ensure that the right consent and signature documents were provided to and collected from each individual shareholder, and that such documents were filled out accurately. Other challenges included: how to process payments to different kinds of entities and individuals, such as venture capital funds, trusts, estates of deceased holders, and married couples with joint ownership; how to avoid the errors associated with individuals having to submit multiple forms on behalf of multiple shareholders; how to make sure that the right tax forms were processed, depending on the type of shareholder and its location; how to handle exception processing if the holder and the company disagreed on securities holdings or

1335171
1335284

amounts of disbursements; and how to process compensation payments to option-holders or service providers.

35.     In addition to all of these challenges of how the system interacts with the shareholders using it, SRSA also put considerable effort into designing how that information would be integrated into its back-end databases and what steps the data would need to undergo in order to validate that everything was properly completed and payment could be processed. The back-end systems supporting the Clearinghouse platform are highly complicated, and they are based on proprietary technology and multiple SRSA trade secrets. SRSA's methods of solving these problems on both the "front end" and the "back end" are highly complex and proprietary to SRSA.

36.     Shortly after releasing Clearinghouse, SRSA also began development of a related product known as "Acquiom Compensation Payments" or "ACP." ACP solves the unique problems posed in making payments treated as compensation to employee option-holders of the target company. These payments create a series of payroll-related complications (employee withholdings, payroll tax payments, W-2 tax reporting, etc.) not otherwise associated with paying out merger compensation. SRS A's ACP product enables SRS A to manage the payout of the target company's current and former employees on behalf of the buyer, without the need to involve the buyer or acquired company's payroll.

37.     As with Clearinghouse, it was quite difficult to develop ACP. In addition to all the challenges of building a payments platform (described above), SRS A had to engage in significant operational and legal research to develop a system that comported with state and federal regulations without turning SRSA into a full-fledged payroll company.

38.     It took SRSA years to create the versions of Clearinghouse and ACP that existed at the

time of Tsamas' and Kelly's departures. In 2015, SRSA released a commercially viable version of its Clearinghouse online shareholder payments platform and released its ACP compensation-payments platform later that year. Since releasing the first version of those platforms in 2015, SRSA has continued to improve its technology, adding new functionality and further back-end integration. SRSA has invested roughly six years of continuous R&D, has gathered thousands of hours of feedback from customers and users in order to refine and enhance the product, and has spent many millions of dollars on product development.

39.     SRSA also spent years developing two other products related to Clearinghouse and ACP: one called Deal Dashboard, and another called Pre-Closing Solicitation. Deal Dashboard provides detailed intelligence, data, and information to acquiring companies, attorneys, and acquisition partners across multiple deals in which they are involved. SRSA did not publicly disclose the existence of Deal Dashboard until November 2018 and has never publicly detailed its specific features and functionality. Pre-Closing Solicitation automates the process of distributing, collecting and tabulating pre-closing documents (shareholder consents and other agreements) by using the Clearinghouse Platform. The Pre-Closing Solicitation product launched in November 2017.

40.     As a result of its investments in intellectual property and sweat equity, SRSA has built the industry-leading products for M&A payments processing: an integrated and seamless set of tools that allow shareholders to be paid in hours, instead of weeks, and allow acquirers access to wide-ranging data and analytics about their transactions. From its headquarters in Denver, SRSA has provided services to over 225,000 shareholders in 100 countries, while overseeing payments on more than 1,400 acquisitions, with a combined $145 billion in payments processed.

15

1335171
1335284

41.     SRSA achieved this success because sophisticated M&A deal professionals and multinational companies who regularly acquire other companies recognized the superiority of the technology and products developed by SRSA. SRSA is a relatively new entrant to the M&A escrow and payments field, competing against financial institutions with far greater resources than SRSA and who have been providing M&A escrow and payments services for decades (albeit without SRSA's innovative online platform). If SRSA had only been as good as the incumbent competitors, it never would have gained traction. It had to have a product offering that was significantly superior.

### C.     Alex Tsarnas and Heather Kelly Stole SRSA's Trade Secrets and Confidential Information and Used them to Help PNC Develop a Competing Product.

42.     Between January and March 2018, two of SRSA's key employees with responsibility for its Clearinghouse product—Alex Tsarnas and Heather Kelly—departed SRSA under highly suspicious circumstances and joined PNC. SRSA fired Tsarnas, SRSA's former head of sales, on January 23, 2018, shortly after SRSA discovered that Tsarnas had embezzled over

$35,000 from the company through deliberate misuse of multiple credit cards and falsification of his expense reports. But even before SRSA terminated his employment, Tsarnas and his friend Kelly—a key relationship manager for SRSA with deep knowledge of the technical backbone and future direction of the Clearinghouse product—had been plotting to leave the company and create a competing product. In early March 2018, Kelly abruptly quit SRSA and joined PNC. Tsarnas joined Kelly at PNC within the month.

43.     Prior to hiring Tsarnas and Kelly, PNC acquired Fortis—a competitor of SRSA's in the shareholder representation business—in or about December 2017. At that time, on information and belief, Fortis had a solid reputation in the shareholder-representation business but did not have a product that competed with SRSA's escrow and payments offerings and had not announced its intent to develop one.

Yet, on information and belief, by April 1, 2019 and possibly earlier, PNC had introduced products and services that purport to replicate all of SRSA's products and services: (1) PNC Paid, a shareholder-payments platform that obviously competes with Clearinghouse; (2) Optionholder Compensation Payments, which appears to mimic Acquiom Compensation Payments; (3) Deals Dashboard, which purports to deliver the same functionality as SRSA's Deal Dashboard, with the same name no less; and (4) Pre-Closing Solicitation, which seems to be the same service as SRSA's Pre-Closing Solicitation service, again using a name that SRSA itself coined. PNC's ability to launch these products so rapidly—less than a year and a half after acquiring Fortis, and approximately one year after hiring Tsarnas and Kelly—aroused SRSA's suspicion. As the innovator in the automated payment processing space, SRSA knows that navigating the technical and legal complexities of developing online M&A payments and related products (without the benefit of SRSA's proprietary know-how and information) would require considerably more time.

44.     In SRSA's ensuing investigation, SRSA uncovered evidence of widespread and brazen misappropriation of its highly confidential and trade secret information by Kelly and, upon information and belief, assisted by Tsamas. SRSA also uncovered evidence indicating that Kelly and Tsarnas unlawfully used SRSA's trade secret information to assist PNC in developing its competing products.

1.     <u>2014 - 2017</u>: Tsarnas and Kelly Take Positions of Trust and Responsibility at SRSA.

45.     In 2014, SRSA sought a senior manager for its business development group and considered Alex Tsarnas for that role. As part of checking Tsarnas's background, SRSA discovered that Tsamas misrepresented that he graduated from Fordham University in 1993. When SRSA confronted Tsarnas about this discrepancy, Tsarnas acted confused and pleaded it was an honest mistake. In reliance

on Tsarnas's explanation, SRSA hired him on September 14, 2014 as Managing Director - Global Business Development, to lead SRSA's sales, business development, and relationship management functions.

46.     As a condition of his employment, Mr. Tsarnas entered into SRSA's Employee Invention Assignment and Confidentiality Agreement ("EIAC Agreement"), pursuant to which Tsarnas agreed to protect and never disclose SRSA's proprietary information and that he would not—for a one-year period after his separation from SRSA—solicit or take away any SRSA employees, consultants, suppliers, or customers. Tsamas's signed EIAC Agreement with SRSA is appended hereto as Exhibit A. SRSA would not have employed Tsamas in any capacity but for his undertaking of these contractual obligations.

47.     Tsarnas's role at SRSA was a critical and sensitive one. Tsarnas was a member of the senior management at SRSA. In this capacity, Tsarnas managed SRSA's entire sales force, was actively involved in setting SRSA's pricing strategy, participated more broadly in SRSA's strategic decision-making, and held ultimate decision-making authority for offering special pricing on unique deals or for key customers. By necessity of his high-level, senior management position at SRSA, Tsamas had deep knowledge regarding SRSA's product features and product development, profitability of various products and offerings, marketing and market differentiation, strategic partner relationships, client contacts, and client development, among other information.

48.     Heather Kelly joined SRSA on June 9, 2014 as a Senior Vice President and Relationship Manager. Like Tsarnas, Kelly signed SRSA's EIAC Agreement upon joining the company. Kelly's signed EIAC Agreement with SRSA is appended hereto as Exhibit B.

49.     Kelly's responsibilities at SRSA included working with SRSA's customers to identify product needs and help customers implement the Clearinghouse product. In this role, she became

intimately familiar with the Clearinghouse and ACP products. Since these offerings did not exist before SRSA invented them, SRSA taught Kelly, during her tenure with the company, how these products worked and were designed, their value proposition for customers, and best practices for bringing them to market. As a result, Kelly had access to SRSA's most secret and critical business information regarding those products, including technical details of the products. She also had access to, and knowledge of, SRSA's future product strategies and product roadmaps (including the plans for Deal Dashboard), customer lists and pricing information. She also participated in SRSA corporate strategy meetings at which SRSA defined the future direction of its escrow, payments, and data products.

## 2.   **January 2018**: SRSA Fires Tsarnas Following Discovery of Tsarnas Embezzling More than $35,000 from the Company.

50.     While employed by SRSA, Tsarnas intentionally and repeatedly defrauded SRSA by using SRSA-issued corporate credit cards for various expenses, and then submitting falsified expense reports suggesting he had paid for them with personal monies. In order to create a confusing paper trail, Tsarnas utilized *twenty* different personal and corporate cards, as well as cash and a PayPal account, to pay for corporate expenses, sometimes duplicating and cancelling expenses on multiple cards that were nonetheless submitted for reimbursement. As Tsarnas became more aggressive in his behavior, his improper reimbursement amounts gradually increased. In December of 2017—the month Tsarnas got caught—he sought reimbursement for approximately $4,400 in falsified expenses. In total, during the two-year period spanning December 2015 through December 2017, Tsarnas embezzled $35,050.98 from SRSA using these techniques.

51.     SRSA discovered Tsarnas's misconduct in December 2017, investigated it over the ensuing weeks, and terminated Tsarnas on January 23, 2018. When SRSA confronted Tsarnas with proof

of that he had embezzled tens of thousands of dollars from the company, Tsarnas initially feigned confusion (as he had when confronted years prior about misrepresenting his educational background). But after seeing the overwhelming evidence of his intentional misconduct, recorded in the pattern of falsified expense reports he submitted over a lengthy period of time, he eventually admitted he had submitted false statements for reimbursement and agreed to (and did) repay the fraudulent reimbursements he had embezzled from SRSA. Tsarnas's illegal and unethical past misconduct demonstrates his dishonesty and malicious intent to harm SRSA in order to further his own personal interests. Following his termination, this only intensified.

     3.     **<u>January - March 2018</u>: Tsarnas and Kelly Plot To Start a Competing Payments Business and Join PNC.**

52.     Even before SRSA terminated Tsarnas on January 23, 2018, Tsarnas's friend Kelly was coordinating with him to leave SRSA and start a competing automated escrow and payment service at another financial institution. Between January 5 and 11, 2018, Kelly used her SRSA- issued laptop to correspond with both the General Counsel and CFO of Western Alliance Bank regarding a position in which, on information and belief, she would spearhead the development of a competing automated escrow and payment product. In this correspondence, she highlighted her ability to *"move. . . clients"* from one company to another and to *"innovate the product from a technology standpoint"* On January 12, 2018, Kelly forwarded this correspondence to Tsarnas.

53.     Tsarnas and Kelly continued plotting to leave SRSA and build a competing product in the weeks following Tsarnas's termination from SRSA on January 23, 2018.

54.     On January 26, 2018, Tsarnas received an email from Wilmington Trust, which is a competitor to SRSA, regarding a job opportunity. He forwarded that email to Kelly with a note saying,

*"Game on."* On information and belief, in subsequent interviews with Wilmington Trust for a senior sales
position, Tsarnas bragged that he would "bring the SRS team with him" if hired— despite his clear
contractual obligation not to solicit SRSA employees for twelve months after leaving.

55.     On February 8, 2018, Kelly asked SRSA director of human resources Hannah Lee to send
Kelly her SRSA offer letter and EIAC Agreement (stating that her financial planner had requested them)
and then forwarded the documents to her personal email address.

56.     On February 14, 2018—three weeks after SRSA fired Tsamas—Kelly introduced Tsarnas
to her contacts at Western Alliance by email.

57.     By February 15, 2018, Tsarnas had started employment negotiations with PNC and, upon
information and belief, was soliciting Kelly to join him at PNC. As Kelly told SRSA's human resources
director in her exit interview, Tsarnas told Kelly she could expect a job offer from PNC and urged Kelly to
"hear them out." On February 15, 2018, Tsarnas sent Kelly a draft email to PNC regarding his contract
negotiations, indicating that he hoped to be paid upwards of $1 million per year by PNC, and including
language that states: *"/'</ also like assurances that any legal or threatening correspondence from SRA
Acquiom will be managed/responded to through PNC legal (which should probably apply to Heather
as well)"* Tsarnas and Kelly's coordinated request for legal indemnification in the event of a lawsuit by
SRSA shows consciousness of their coordinated and corrupt intent to compete unfairly against SRSA.

58.     Then, on February 21, 2018, Tsamas sent a PowerPoint presentation to Kelly called
"Building the E&P Platform 022018." The presentation is geared towards convincing a bank to enter the
escrow and payments business. It notes that "a« *automated platform than can dissect SellCo fi.e., target
company] cap tables, aggregate data for payments processing — integrate the LOT and tax form*

*approval process — with limited human intervention — and create the required tax reporting"*—in other words, replicate SRSA's Clearinghouse product—"is *the holy grail of payments engines for the M&A market."* Tsarnas's cover email to Kelly attaching the presentation stated: "I want to get it right with respect to the order of building things and a reasonable expectation re timing. They [upon information and belief, PNC] are interested in the broader 'escrow' opportunity with M&A as the anchor." On information and belief, Tsarnas and Kelly did not know from their pre-SRSA experience how to build the "holy grail"—but they knew how SRSA had done it, and they could use SRSA confidential information and documents to teach PNC how to build a copycat product.

59.     On February 23, 2018—two days after receiving the draft presentation from Tsarnas and two weeks before her resignation—Kelly accessed and printed from SRSA's corporate share drive two critical SRSA documents that are themselves SRSA trade secrets and include numerous independent SRSA trade secrets: one called "Payment Product Specifications vol.2.docx," and one called "Imports process and procedures.docx." These documents contain trade secret information regarding the functionality and back-end processes of the SRSA product that Tsarnas's presentation referred to as "the holy grail of payments engines for the M&A market." These are not documents that Kelly would have needed to access in the ordinary course of her business in February 2018.

60.     Kelly resigned from SRSA on March 8, 2018, and, on information and belief, began work at PNC on or before March 19, 2018. On information and belief, Tsarnas began employment at PNC shortly thereafter, on or around March 21, 2018. As detailed below—but obviously unbeknownst to SRSA at the time—Kelly kept and took with her an SRSA laptop that contained thousands of SRSA confidential documents and trade secrets that, combined with the documents she had printed and the knowledge she and

Tsarnas already possessed in their minds, would provide a competitor an enormous head start in building a competing product from scratch and commercializing that product.

> **4.** **March 8,2018 - March 16,2018: Kelly Downloads and Emails Herself Thousands of SRSA Confidential and Trade Secret Files and Attempts to Cover Her Tracks.**

61.     At the time Kelly resigned from SRSA on March 8,2018, she was in possession of the SRSA-issued work laptop she had been using since June 2017 (hereinafter, Kelly's "new MacBook"). SRSA issued the new MacBook to Kelly in June 2017 to replace her former SRSA- issued laptop (Kelly's "old MacBook"). At that time, SRSA instructed Kelly, who worked remotely, on how to transfer her SRSA user profile and files from her old SRSA MacBook to the new MacBook. Kelly never returned her old MacBook to SRSA after executing this transfer— even though she was contractually obligated to cease using all SRSA-issued equipment upon the termination of her employment and return it to SRSA, and SRSA's human resources director specifically admonished Kelly of these obligations during her exit interview. SRSA did not realize Kelly still maintained the old MacBook or that it still contained confidential SRSA information.

62.     Although Kelly resigned on March 8 and her final day of employment with SRSA was March 9, 2018, Kelly did not return the new MacBook to SRSA until March 16, 2018. A forensic analysis, conducted in the last few weeks, has indicated that on or around March 12, 2018, mere days after departing SRSA, Kelly booted up her *old* SRSA MacBook and used it to access her SRSA-issued Google Drive account—a cloud-based document management account that allowed Kelly, during her employment with SRSA, to store and save SRSA documents in the cloud and to "sync" her work laptop to ensure that it locally saved the Google Drive's complete contents. In short, on information and belief, Kelly kept her old

SRSA-issued MacBook after leaving the

company, used it to access her SRSA Google Drive account, downloaded thousands of SRSA confidential, proprietary, and trade secret documents from her Google Drive account as it apparently existed in March 2018, and surreptitiously kept them in her possession after joining PNC.

63.     Kelly' s actions were only discovered because, when Kelly booted up her old SRSA MacBook on or about March 12, 2018, the old MacBook also backed up into an SRSA-licensed cloud-based disaster recovery platform called CrashPlan. CrashPlan creates back-ups of SRSA- issued machines registered with a "token." Since Kelly's new MacBook (the one she was using immediately before leaving the company) was a copy of the old MacBook, the two SRSA-issued computers shared the same CrashPlan token.

64.     SRSA only learned last month that Kelly apparently still possesses the old SRSA- issued MacBook and has continued to use it. SRSA has withheld from opening any files saved to CrashPlan from Kelly's old MacBook (because it appears from the directory of files that Kelly may have also comingled PNC documents or information on the old MacBook with the SRSA documents and information she downloaded onto that computer). However, SRSA and its forensic analyst have been able to review, via the CrashPlan administrator tool, a directory of all files that Kelly's old MacBook saved to CrashPlan on or about March 12, 2018, and continued saving in subsequent backups. That review indicates that Kelly's old MacBook retrieved thousands of confidential, proprietary, and trade secret documents from Kelly's Google Drive account when Kelly booted it up after leaving SRSA, and that those documents remained in Kelly's possession on her old MacBook as recently as May 2019.

65.     Upon information and belief, Kelly's unlawful retention of SRSA's confidential,

24

1335171

1335284

proprietary, and trade secret information was knowing and intentional. The limited forensic information available to SRSA from viewing the file directory of the CrashPlan backup for Kelly's old SRSA MacBook indicates user activity that postdates Kelly's departure from SRSA on March 8, 2018. Upon information and belief, this user activity includes the creation of a file on or about March 20, 2018 (when Kelly started at PNC) entitled "PNC Escrow and Payment.pptx"—a file that may include Kelly and Tsarnas's plan for how to build a knock-off version of SRSA's products. Moreover, the directory listings indicate that, between May 2 and May 4, 2019—more than a year after failing to return her SRSA laptop and downloading thousands of files through Google Drive—Kelly deleted the entire SRSA Google Drive folder from the old SRSA-issued MacBook. Not coincidentally, this deletion activity occurred on the day, or the day after, outside counsel visited SRSA headquarters to investigate potential trade secret misappropriation by Kelly, Tsarnas, and PNC. On information and belief, Kelly's activities constituted intentional spoliation of evidence relevant to potential litigation.

66.     Kelly's retention of her old SRSA-issued MacBook and her accessing of SRSA files on that computer was a direct violation of the terms of Kelly's employment agreement. Paragraph 4 of Kelly's employment agreement strictly required the return, upon Kelly's departure from the company, of all "SRS Property," including all SRSA "documents" and "computers":

> During and after your employment, you will not use any SRS Property for any purpose other than for the benefit of SRS. ... In the event of your termination of employment, or at any time at the request of SRS, you will return all SRS Property. You will also return all copies of SRS Property, and any work product derived from SRS Property.

67.     On March 12, 2018, SRSA's head of human resources, Hannah Lee, conducted an exit interview with Kelly in which Ms. Lee specifically admonished Kelly that she was contractually obligated to immediately return to SRSA all company-issued equipment and all proprietary information and

documents.

68.     Kelly's misconduct runs even deeper. *After* Kelly resigned from SRSA on March 8, 2018, and *after* SRSA demanded the return of her SRSA Property, but before Kelly returned her new MacBook on March 16, Kelly accessed the new MacBook in order to email SRSA documents from one of her personal accounts (hckelly@gmail.com) to another account that, upon information and belief, is also one of her personal accounts (heather@vlpaintdesign.com). Kelly transmitted at least a dozen SRSA files to herself in this manner on March 13, 2018—five days after her resignation. Most of these files were confidential to SRSA. One of them, entitled "SRSA Payments Spreadsheet 1.25.18," is an SRSA trade secret document that includes detailed templates for collecting relevant information from deal parties. The templates, internally developed over multiple years of iteration, identify the precise shareholder, employee or recipient information SRSA needs from customers to accurately process payments and tax reporting for all types of payments, including compensation payments.

## 5.     <u>March 2018 - Present</u>: Tsarnas and Kelly Use SRSA's Trade Secret Information to Build, Launch, and Sell PNC's Competing Products.

69.     By April 2019, and possibly much earlier, PNC released a product called PNC Paid. According to public marketing information, PNC Paid purports to provide the same services as SRSA's Clearinghouse and ACP products. PNC even uses SRSA-created terminology to describe those products and services, such as "Pre-Closing Solicitation" and "Deals Dashboard"—the latter a new product that was under development at SRSA when Kelly and Tsarnas left but not yet publicly announced. Without the benefit of discovery, SRSA cannot yet establish precisely how Kelly, Tsarnas and PNC utilized SRSA trade secrets in developing PNC Paid. But there is compelling inferential evidence that the PNC product is based on purloined SRSA information.

70.     *First,* PNC brought PNC Paid to market very quickly. On information and belief, PNC had no M&A escrow and payments product at all when they hired Kelly and Tsarnas, and certainly not an online M&A payments product. That they brought a competitive product to market within a year or less is highly suspicious. SRSA has spent six years of continuous R&D and refinement to overcome not only complicated engineering and operations hurdles, but also legal and regulatory issues, challenging issues of personal authentication, and process/workflow issues. With only twelve months of development, PNC Paid purports to have accomplished all the major features of SRSA's platform. On information and belief, that is simply too short a period for PNC to have built from scratch an online-payments business that is technically sophisticated and legally and operationally sound.

71.     On information and belief, other major banks have tried unsuccessfully to release M&A payments products that can achieve what SRSA does. For example, on information belief, both JP Morgan and U.S. Bank were actively trying for years to build a payments platform that could accomplish what SRSA does; they have never released commercially viable products. Another bank, Wilmington Trust, attempted to release an online-payments platform called "FASTTRACK" in or around 2017. On information and belief, Wilmington Trust spent years trying to develop FASTTRACK, but to date does not appear to have had meaningful commercial success with it.

72.     *Second,* evidence discovered recently, since PNC's launch of PNC Paid, indicates that Kelly's knowledge of how to build Clearinghouse (if not also the documents she stole) was critical to the development of PNC's product. On April 4, 2018—three weeks after Kelly left SRSA—she sent the following chain of text messages to a former colleague at SRSA: *"PNC hired me but they weren't ready for me, my day is like: review [PNC's] draft of EA, tell Them [sic] what system I need them to buy for*

1335171
1335284

escrows. *waits for system and bakes pies. Or yesterday 3 hours with developers. *waits for output and bakes pies Lol! Or Friday. Reviews kyc, proposes modifications, *waits and bakes pies[] I'm not going to sell anything until it's perfect, so until then I have no deals to do... it's lovely. " This text message demonstrates Kelly's integral role in directing the development of PNC's competing escrow and payments product, less than *four weeks* after departing SRSA.

73.     *Third,* on or about March 6, 2018, while Tsarnas was (on information and belief) negotiating a compensation package with PNC, Tsarnas sent an unsolicited text message to SRSA's Chief Data Scientist, Glenn Kramer, inquiring whether Kramer might be looking for new job opportunities. Kramer was one of the primary technical architects of Clearinghouse and was instrumental in numerous aspects of SRSA's escrow and payments technology. Tsarnas and Kramer were not friends and had minimal interaction at SRSA. On information and belief, Tsarnas reached out to Kramer not only because PNC needed additional technical resources to create a competitive product, but also because PNC would need to understand SRSA's development history—and what routes SRSA purposefully abandoned or chose not to pursue—to develop a competing product in short order.

74.     *Fourth,* Kelly and Tsarnas possessed enough knowledge concerning the details of SRSA's products and technology (not to mention the information in the documents Kelly stole from SRSA when she departed) to provide PNC with a critical head start on key development decisions, needed features, operational integration, and sales/pricing strategy.

75.     *Fifth,* PNC's own marketing materials reveal that PNC relied on stolen SRSA confidential information, and reveal PNC's intent to compete unfairly against SRSA. Specifically, PNC's marketing materials purport to show a screenshot of a form that PNC Paid publishes for its customers. But the form in

Case 1:19-cv-02005 Document 1 Filed 07/11/19 USDC Colorado Page 2 of 56

the image on the screen, in PNC's own materials, is a non-public, internal draft version of an SRSA document, a Letter of Transmittal (LOT) form *developed to be compatible between SRSA's Clearinghouse product and its back-end systems* (which explains the SRSA-specific field tags "SI)", "S2)", etc.). Defendants did not even bother to change the font style, the distinctive formatting, or SRSA's custom language at the top of the form. SRSA's nonpublic form is reproduced first below, followed by the form from PNC Paid marketing materials.



By signing you acknowledge that you have read and understand this entire Letter of Transmittal and agree to all of its terms. Please carefully read this entire Letter of Transmittal, which includes the accompanying forms and instructions.

51) Signature:

x _____

52) Date:

53) Name (Printed):

54) Title (If signing on behalf of entity):

ssi Additional Signature (If applicable)

x _____

Date:

57) Name (Printed);

sa Tide (If signing on behalf of entity):


*SRSA LOT document [Full Letter of Transmittal Example.pdf]*

1335171
1335284



# Review and sign deal documents

**Please review the deal documents below, and provide your
signature or initials.**

Signature Page to Letter of Transmittal



*PNC Paid Marketing Material, found at* https ://www.pnc .com/content/dam/pnc-
~~com/pdf/corporateandinstitutional/TreasurʌlOManagement/pnc-paid-brochure.pdf~~
com/pdf/corporateandinstitutional/Treasurv%20Management/pnc-paid-brochure.pdf (last visited July
10,2019)

In other words, PNC is literally palming off SRSA materials as its own work product. Not surprisingly, the

SRSA document above is the same internal draft version that Kelly had in her possession.

### D.   PNC's Use of Trade Secrets Gives It an Unfair and Illegal Advantage in the Marketplace.

76.     PNC's use of SRSA trade secrets to develop PNC Paid has enabled PNC to compete for,

and win, business that would have otherwise gone to SRSA. On information and belief, PNC has

represented to customers (both existing and potential customers of SRSA) that it can provide all the

services SRSA does, but at a lower price. That is a direct result of PNC's misappropriation of trade secrets,

both because such misappropriation enabled PNC to get to market with a competitive product more

quickly and because the R&D savings from PNC's misappropriation enable PNC to price its services more

competitively.

77.     Moreover, on information and belief, Defendants (with information known to and/or

provided by Tsarnas and Kelly) have used SRSA's trade secret knowledge of SRSA's customers and

SRSA's pricing schedules and strategies, to compete more aggressively in the M&A market. That includes

not only customer lists and pricing schedules that were among the documents stolen by Kelly but also

information known to Tsarnas and Kelly about how SRSA's customers prefer to operate, their key

characteristics, preferences, and points of contact, and what is required to win their business (information

obtained by them while at SRSA).

78.     To be clear, at the time SRSA terminated Tsamas's employment, no one at the company

had deeper knowledge regarding SRSA's prices and pricing strategies. As the head of SRSA's sales

~~1335171~~
1335284

organization, Tsarnas was directly involved in setting SRSA's pricing strategy and had primary responsibility for educating SRSA's sales force regarding that strategy. By necessity, he had intimate familiarity with SRSA's fee and discount schedules, including the factors used by SRSA to determine when to lower prices or offer greater incentives or benefits for a particular product or deal. Tsarnas also had a deep understanding of the profit margins for each of SRSA's different product offerings. All of this information would provide a critical advantage to an unscrupulous competitor seeking to undercut SRSA's prices in ways SRSA could not match and/or in ways designed to preserve maximum profit margins for the competitor.

79. To date, SRSA has lost at least eight deals to PNC as a result of Defendants' trade secret misappropriation.

80. SRSA was in negotiations with Customer 1 for SRSA to provide payment and escrow services, as well as compensation payments. SRSA spent significant time with Customer 1's management team, and all indications were that SRSA would be retained. At the last minute, another provider, hinted and believed to be PNC, came in and took all of the business. Customer 1 told SRSA "you aren't the only game in town anymore," and that the other provider had come in with prices "quite a bit" lower.

81. SRSA had a Master Services Agreement (MSA) with Customer 2, a frequent acquirer of smaller companies and a loyal customer of SRSA, whereby SRSA would be Customer 2's dedicated provider for M&A services, including payment, escrow, and compensation payments. Customer 2 had entered into the MSA in May 2017, and renewed the agreement in October 2018. SRSA had invested significant time in developing its relationship with Customer

2 and had received nothing but positive feedback from them over the course of 18 deals. It was not publicly known that Customer 2 was one of SRSA's leading customers, but Tsarnas and Kelly knew that information. In or around April 2019, on information and belief, PNC, Tsamas and Kelly specifically targeted Customer 2 and, with the benefit of SRSA confidential information and trade secrets, convinced Customer 2 to end the MSA and commit its business to PNC instead. Customer 2 told SRSA that PNC's prices were significantly better than SRSA's.

82.     SRSA also had an MSA with Customer 3, which is also a frequent acquirer of smaller companies. Customer 3 signed the MSA in March 2018, but the contract was in the works for many months before, and Tsamas and Kelly were involved in its negotiation. SRSA had likewise invested significant time in developing its relationship with Customer 3 and been rewarded with nothing but positive feedback and additional business. It was not publicly known that Customer 3 was one of SRSA's leading customers, but Tsamas and Kelly knew that information. Since about August 2018, Customer 3 has stopped working with SRSA. On two separate occasions, SRSA has bid on payments and escrow and compensation business for Customer 3, but Customer 3 indicated it was giving the business to PNC instead. Upon information and belief, PNC, Tsamas and Kelly, with the benefit of SRSA confidential information and trade secrets, specifically targeted Customer 3 and convinced Customer 3 to stop working with SRSA.

83.     SRSA has lost out to PNC on at least five other opportunities to serve as the payments platform on M&A transactions this year. On two of those occasions, SRSA placed a bid to handle payments and escrow for the transaction, and the customer told SRSA that PNC won the business on the basis of their lower price. On three other occasions, SRSA placed a successful bid to serve as the

34

shareholder representative for a deal but was informed that PNC had already been retained for the payments and escrow part of the transaction, and there was no reason for SRSA to bid on it.

84.     Unless PNC is enjoined, PNC (assisted by Tsarnas and Kelly) will continue to use misappropriated SRSA trade secret information, and products derived therefrom, to compete unfairly against SRSA in the sale of such products, which are now being marketed by PNC as a lower-priced alternative.

85.     In the same spirit, and in order to obtain an unfair competitive advantage, PNC is aggressively recruiting SRSA's relationship managers. Within the last three months, PNC has successfully recruited two additional SRSA valued employees, Luda Semenova and Lisa Kremers. On information and belief, it is the misappropriation of SRSA trade secrets that has enabled PNC to recruit these employees—because without a product derived from SRSA's trade secrets, they would not have a working product that could entice SRSA's employees to leave. Discovery will confirm whether Kelly and/or Tsarnas violated their contractual agreements in soliciting those additional employees to leave SRSA.

### E.     The Trade Secrets at Issue.

86.     The trade secrets stolen by Tsarnas and Kelly and brought to PNC include trade- secret aspects of the functionality and back-end systems supporting Clearinghouse, ACP and Deal Dashboard ("Technical Trade Secrets"), including: (1) mutual authentication methods and supporting algorithms; (2) processes for creating a shareholder-specific M&A homepage; (3) automated methods for generating customized packets of documents for signature in the M&A process (including customized agreements for particular deals and shareholders); (4) methods for providing entry privileges to shareholders without a registered email address; (5) the functionality, interface and product development plans for "Deal

35

Dashboard"; (6) methods for generating new document forms for "Enhanced Document Collection"; (7) payment processing work flows; (8) methods for generating customized Letter of Transmittal forms; (9) methods for spreadsheet conversion and for extracting data from transaction documents to support the back-end operations of its platforms; (10) methods and workflows for SRSA's Pre-Closing Solicitation product; (11) methods for managing vesting schedules for future payments; (12) methods for processing offline physical documents for integration into SRSA's back-end online systems; (13) processes for servicing transactions involving target companies that did not issue stock certificates to shareholders (uncertificated deals) and for target companies that used only book-entry for recording shareholdings; and (14) the legal and financial structure for its ACP product.

87.      SRSA's Technical Trade Secrets are detailed in documents misappropriated by Kelly, including by copying the contents of her SRSA-issued laptop to a new computer before returning it to SRSA, such as SRSA's confidential product roadmaps and product specification documents. Additionally, Tsarnas and Kelly each possessed knowledge (in their heads) of some or all of SRSA's Technical Trade Secrets by virtue of their roles at SRSA prior to joining PNC. SRSA takes reasonable efforts to protect the secrecy of this information and the documents containing this information, and the information generates economic value from being kept secret because a competitor could use it to accelerate development of a competing product—as PNC did.

88.      The misappropriated trade secrets also include SRSA's confidential financial information, business plans and go-to-market strategies, pricing, and customer information (collectively, "Commercial Trade Secrets"), such as: (1) confidential aspects of SRSA's finances; (2) SRSA's pricing strategies; (3) business and marketing plans; (4) SRSA's individual customer prices; (5) SRSA's customer lists and

sources of business referral; and (6) SRSA's institutional knowledge regarding key characteristics of its

customers, such as their loyalty to SRSA, their volume of M&A activity, their contracting and product

preferences, and whether they have entered into a master services agreement with SRSA.

89.     SRSA's Commercial Trade Secrets are contained in documents misappropriated by Kelly,

such as SRSA's financial statements and audits, fee schedules, individual customer contracts, and lists of

SRSA's customers and sources of business referral. Additionally, Tsamas and Kelly each knew some or all

of SRSA's Commercial Trade Secrets by virtue of their customerfacing roles at SRSA prior to joining

PNC.  SRSA  takes  reasonable  efforts  to  protect  the  secrecy  of  this  information  and  the  documents

containing this information, and the information generates economic value from being kept secret because

a competitor could use it erode SRSA's market share and revenue by, for example, targeting and winning

the business of SRSA's most valuable customers, and undercutting SRSA's prices in ways that SRSA

cannot match and/or while maximizing potential profit margin. SRSA is still evaluating the full scope of

misappropriated trade secrets and will continue to identify additional relevant trade secrets as discovery

progresses.

## F.      SRSA Protects the Secrecy of Its Confidential Information and Trade Secrets.

90.     To preserve its trade secrets and other sensitive information, SRSA maintains a variety of

policies and practices to protect its confidential information. Within the company, SRSA restricts access to

confidential  internal  documents  to  only  employees  who  have  the  job  duties  to  view  confidential

information. Outside the company, SRSA does not reveal confidential information to its customers or

competitors.

### 1. SRSA Employees, Including Heather Kelly and Alex Tsarnas, Are Bound by Confidentiality Agreements.

91. SRSA requires all of its employees to sign an "Employee Invention Assignment and Confidentiality Agreement" (the "Confidentiality Agreement") as a condition to their employment agreement.

92. In paragraphs seven, eight, nine, and twelve of this agreement, SRSA employees agree to the following:

> 7. <u>Trade Secrets</u>. During and after my employment, I will hold all Trade Secrets of Company in confidence; I will not disclose these Trade Secrets to anyone.... "Trade Secrets" means the information described in the Description of Trade Secrets (Attachment A hereto), as pertaining to SRS or any of its affiliates, and any other information that from time to time may be identified by Company as confidential or is otherwise known to me as being confidential, whether embodied in memoranda, manuals, letters, or other documents, computer disks, tapes or other information storage devices, hardware, or other media or vehicles.
>
> 8. <u>Proprietary Information</u>. I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to me by the Company that relates to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence ("Proprietary Information"). Such Proprietary Information includes but is not limited to Trade Secrets, Inventions, marketing plans, product plans, business strategies, financial information, forecasts, personnel information and customer lists. Proprietary Information does not include information generally known or that is or becomes public domain information through no fault of mine.
>
> 9. <u>Confidentiality</u>. At all times, both during my employment and after its termination, I will keep and hold all such Proprietary Information in strict confidence and trust, and I will not use or disclose any of such Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company for the benefit
>
> 39
>
> of the Company. Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and

materials of any nature pertaining to my work with the Company and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.

12. <u>Return of Company Documents</u>. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Proprietary Information of the Company. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement.

93.     Attachment A of the SRS A Confidentiality Agreement further defines trade secrets to include, among other items: customer and prospective customer lists; marketing plans and strategies; income statements and financial information; research and development projects; software and hardware documentation, and more.

94.     On June 9, 2014, Kelly agreed to the terms of SRSA's Confidentiality Agreement as part of her employment agreement. On August 23,2014, Tsamas agreed to the terms of SRSA's Confidentiality Agreement as part of his employment agreement.

**2.     SRSA's Internal Policies Prohibit the Unauthorized Sharing of Confidential Information.**

95.     In addition to the Confidentiality Agreement in its employee contracts, SRS A also has a Corporate Information Security Policy ("CISP") and an Acceptable Use Policy for all of its employees. SRSA's CISP is appended hereto as Exhibit C. All employees undergo mandatory training on these policies. SRSA's CISP makes clear that confidential information must be shared in a secure manner. It states that:

Documents with confidential information must be stored in a secure manner either within locked cabinets or secured facilities.

39
1335284

> Electronic documents with confidential information, including stored images, must be transmitted encrypted where possible and stored in systems that are subject to access control.

(Exhibit C at 5.)

96.    SRSA's CISP also provides the following additional security measures for keeping confidential information secure:

i)     Employees must enter a user ID and authentication to access confidential information;

ii)    Employees may send confidential information only by secure email system;

iii)   Remote access to SRSA's shared network resources requires multifactor authentication;

iv)    SRSA maintains physical security at all company sites; and

v)     SRSA imposes limitations on the use of external storage devices.

97.    Similarly, SRSA's internal Acceptable Use Policy mandates "clean desk" and "clean screen" requirements that require employees to secure sensitive physical documents and files away from plain sight. SRSA's Acceptable Use Policy requires that "All data should be stored in the appropriate SRSA record repositories" and that *"Accessing or viewing SRSA information without a business reason to do so is strictly prohibited"*

### 3.    Within the Company, SRSA Restricts Access to Confidential Documents.

98.    Beyond the written limitations in place in SRSA's contracts and its policies, SRSA's internal systems restrict employees who do not have the appropriate level of authorization from accessing particularly sensitive (or "highly confidential") documents.

99.    SRSA restricts access to many of its highly confidential operational, product, and technological documents on a "need-to-know" basis—i.e., SRSA provides access only to employees whose job duties requires it. For an SRSA employee to get access to the database storing these documents, a senior manager in SRSA's operations team must invite the employee to access it. Otherwise, such

information is accessible only to select SRSA's employees who are in SRSA's product-development and operations team.

100.     Because of the importance of these highly confidential documents to the company, only a limited group of employees are allowed broad access to confidential documents relating to SRSA's technology and its business strategies, including members of the company's executive team, developers and others that would need to know such information. Tsarnas and Kelly were in positions of trust and responsibility that would have given them access to substantial sensitive and confidential information regarding SRSA's technology and business for which access is limited even internally within SRSA.

### 4.     SRSA Does Not Reveal Confidential Information to Its Shareholder Users.

101.     SRSA maintains the secrecy of the back-end processes that enable its products to function. While individual shareholders have access to the Clearinghouse platform, their user experience is limited to the user interface accessible through their web browser and does not enable them to view how SRSA authenticates its shareholders, how it stores information provided by them, and how its platform processes information given to it by those shareholders. These backend functions are viewable only by specific SRSA employees and partners.

102.     Additionally, SRSA takes reasonable and significant measures to limit access even to its user interface. In order to access Clearinghouse, a shareholder must receive an invitation from SRSA, create an account (with login credentials), and agree to Terms and Conditions of use that limit the use of information and forms available through Clearinghouse to the purpose of finalizing the acquisition involving that shareholder. All shareholders must agree that they will not engage in unauthorized use of SRSA's website, including the "misuse of any information posted to a site." Users also specifically agree that:

> Works may not be copied, transmitted, displayed, performed, distributed

1335284

(for compensation or otherwise), licensed, altered, framed, stored for subsequent use or otherwise used in whole or in part in any manner without SRS Acquiom's prior written consent, except to the extent permitted by the Copyright Act of 1976 (17 U.S.C. § 107).

103.  Finally, SRSA does not publicly share product roadmaps or the details of products in design until they are ready for release. Instead, unfinished products are kept in an offline testing location that is not accessible to the public. Among other things, this practice prevents SRSA competitors from gaining competitive intelligence on forthcoming products.

### 5. SRSA Does Not Reveal Confidential Information to Its Customers and Partners.

104.  SRSA keeps competitively sensitive business information confidential. This information includes documentation related to SRSA's business strategy, financial information, customer lists and pricing information for its products and services. Most of this business confidential information is never shared outside of SRSA. Even for pricing information, while deal-specific prices are shared with specific customers in the sales process, SRSA does not publish price lists or otherwise make them publicly available or disclose its policies or practices regarding discounts or adjustments to pricing.

### G. Defendants Acted with Oppression and Malice in a Willful Attempt to Harm SRSA.

105.  As set forth above, Defendants Tsarnas and Kelly acted with intent, oppression and malice, knowingly misappropriating and using SRSA's confidential, proprietary, and trade secret information for their own benefit and the benefit of their new employer, Defendant PNC, and in conscious disregard for SRSA's rights and their own duties of loyalty and contractual obligations to SRSA.

106.  Upon information and belief, Defendant PNC authorized and ratified their misconduct as described herein, including by utilizing information that PNC knew or should have known constituted or was derived from SRSA trade secrets.

## V.     FIRST CAUSE OF ACTION

### Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act
### (18 U.S.C. § 1836, *et seq.*)

### (Against All Defendants)

107. SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint as if fully set forth herein.

108. SRSA owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.

109. SRSA has taken reasonable measures to keep such information secret and confidential.

110. This confidential, proprietary, and trade secret information relates to products and/or services used, sold, shipped or ordered in, or intended to be used, sold, shipped or ordered in, interstate or foreign commerce.

111. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

112. SRSA's confidential, proprietary, and trade secret information was made available to Defendants Heather Kelly and Alex Tsarnas during their employment with SRSA under circumstances requiring them to maintain the information in confidence. Defendant PNC acquired SRSA's confidential, proprietary and trade secret information from or through Kelly and Tsarnas, and knew or had reason to know that the information was acquired by improper means.

113. Defendants misappropriated SRSA's confidential, proprietary and trade secret information for their own benefit in the improper and unlawful manner alleged herein. Each Defendant committed acts in furtherance of their misappropriation on or after March 8, 2018. On information and belief, Defendants remain in improper and unlawful possession of SRSA's confidential, proprietary, and trade secret

43

1335284

information, and products derived therefrom.

114.    As a direct and proximate result of Defendants' misappropriation of SRSA's confidential, proprietary, and trade secret information, SRSA has suffered and, if Defendants' conduct is not enjoined, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

115.    Asa further direct and proximate result of Defendants' misappropriation of SRS A's confidential, proprietary, and trade secret information, Defendants have been or will be unjustly enriched in an amount to be proven at trial.

116.    Defendants' misappropriation of SRSA's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

117.    SRSA has been damaged by Defendants' misappropriation of its confidential, proprietary, and trade secret information, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

118.    Because SRSA's remedy at law is inadequate, SRSA is further entitled to preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

## VI.    SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets in Violation of the Colorado Uniform Trade Secrets Act
### (C.R.S. § 7-74-101, *et seq.*)

### (Against All Defendants)

119.    SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint as if fully set forth herein.

120.    SRSA owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.

121.    SRSA has taken reasonable measures to keep such information secret and confidential.

122.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

123.    SRSA's confidential, proprietary, and trade secret information was made available to Defendants Heather Kelly and Alex Tsarnas during their employment with SRSA under circumstances requiring them to maintain the information in confidence. Defendant PNC acquired SRSA's confidential, proprietary and trade secret information from or through Kelly and Tsarnas, and knew or had reason to know that the information was acquired by improper means.

124.    Defendants misappropriated SRSA's confidential, proprietary and trade secret information for their own benefit in the improper and unlawful manner alleged herein. Each Defendant committed acts in furtherance of their misappropriation on or after March 8, 2018. On information and belief, Defendants remain in improper and unlawful possession of SRSA's confidential, proprietary, and trade secret information, and products derived therefrom.

125.    As a direct and proximate result of Defendants' misappropriation of SRSA's confidential, proprietary, and trade secret information, SRSA has suffered and, if Defendants PNC and Kelly's conduct is not enjoined, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

126.    As a further direct and proximate result of Defendants' misappropriation of SRSA's confidential, proprietary, and trade secret information, Defendants have been or will be unjustly enriched in an amount to be proven at trial.

127.    Defendants' misappropriation of SRSA's confidential, proprietary, and trade secret

information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

128.    SRSA has been damaged by Defendants' misappropriation of its confidential, proprietary, and trade secret information, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

129.    Because SRSA's remedy at law is inadequate, SRSA is further entitled to preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

## VII.    THIRD CAUSE OF ACTION Breach of Contract - Confidentiality Obligation under EIAC Agreement (Against Defendants Heather Kelly and Alex Tsarnas)

130.    SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint SRSA as if fully set forth herein.

131.    Defendant Heather Kelly entered into an "Employee Invention Assignment and Confidentiality Agreement" ("EIAC Agreement") as part of her employment agreement with SRSA.

132.    Defendant Alex Tsarnas entered into an EIAC Agreement as part of his employment agreement with SRSA.

133.    The EIAC Agreement is a valid and enforceable contract to which Defendants Tsarnas and Kelly agreed to be bound.

134.    SRSA has at all times fully performed its obligations under its EIAC Agreements.

135.    As set forth herein, Defendants Tsarnas and Kelly breached the EIAC Agreement by disclosing SRSA's Trade Secret, proprietary, and confidential information to Defendant PNC, and failing to return company documents and property upon the conclusion of their employment.

136.    Asa direct and proximate result of Tsarnas's and Kelly's breach of contract, SRSA has

suffered irreparable injury and significant damages, in an amount to be proven at trial.

137.    SRSA will continue to be directly and proximately harmed if Defendants Tsamas and

Kelly are not enjoined from further violating the terms of the EIAC Agreement by continuing to possess

use, and disclose documents and proprietary information pertaining to their work with SRSA.

138.    SRSA is entitled to damages sufficient to compensate for Tsarnas's and Kelly's breaches.

139.    Because SRSA's remedy at law is inadequate, SRSA is also entitled to preliminary and

permanent injunctive relief to prevent irreparable harm to its legitimate business interests.

## VIII.    FOURTH CAUSE OF ACTION Breach of Contract - Non-Solicitation Obligation Under EIAC Agreement (Against Defendant Alex Tsarnas)

140.    SRSA repeats and incorporates by reference all prior allegations of this Verified First

Amended Complaint as if fully set forth herein.

141.    Defendant Alex Tsarnas entered into an EIAC Agreement as part of his employment

agreement with SRSA.

142.    Paragraph seventeen of Defendant Tsarnas's EIAC Agreement provides:

> 17. Non-Solicitation: During, and for a period of one year after termination of, my employment with the Company, I will not directly solicit or take away suppliers, customers, employees or consultants of the Company for my own benefit or for the benefit of any other party.

143.    The EIAC Agreement is a valid and enforceable contract to which Defendant Tsarnas

agreed to be bound.

144.    SRSA has at all times fully performed its obligations under the EIAC Agreement with

Defendant Tsarnas.

145.    As set forth herein, Defendant Tsarnas breached the EIAC Agreement by soliciting

Heather Kelly to leave SRSA and join one or more banks at which they would start a payments and escrow

business, including Western Alliance Bank, Wilmington Trust and PNC Bank. Tsarnas's solicitation occurred within one year of Tsarnas's termination from SRSA and while Kelly was still employed at SRSA.

146.    As a direct and proximate result of Tsarnas's breach of contract, SRSA has suffered irreparable injury and significant damages, in an amount to be proven at trial.

147.    SRSA is entitled to damages sufficient to compensate it for Tsarnas's breach.

## IX.    FIFTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations
### (Against All Defendants)

148.    SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint as if fully set forth herein.

149.    SRSA entered into a Master Services Agreement with one of its primary customers (Customer 2) in May 2017.

150.    On information and belief, Defendants Tsarnas and Kelly, and later Defendant PNC, knew that SRSA and Customer 2 were in a valid contractual relationship.

151.    Defendants intentionally interfered with SRSA's contractual relationship with Customer 2 by using SRSA's confidential, proprietary, and trade secret information—and products improperly derived therefrom—to induce that customer to terminate its Master Services Agreement with SRSA and shift its business to PNC.

152.    SRSA entered into a Master Services Agreement with one of its primary customers (Customer 3) on March 30, 2018.

153.    On information and belief, Defendants Tsarnas and Kelly, and later Defendant PNC, knew that SRSA and Customer 3 were in a valid contractual relationship.

154.    Defendants intentionally interfered with SRSA's contractual relationship with Customer 3 by using SRSA's confidential, proprietary, and trade secret information—and products improperly derived therefrom—to induce that customer to ignore its Master Services Agreement with SRSA, cease working with SRSA and shift its business to PNC.

155.    Defendants' intentional interference with SRSA's contractual relations was willful, malicious, and oppressive.

156.    SRSA has suffered damages as a result of Defendants' intentional interference with its contractual relations, and is entitled to damages in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

## X.    SIXTH CAUSE OF ACTION
## Colorado Unfair Competition
## (Against Defendant PNC)

157.    SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint as if fully set forth herein.

158.    Defendant PNC has unfairly competed by misrepresenting SRSA's work, including SRSA's LOT forms, as its own.

159.    SRSA is entitled to damages for harm caused by PNC's efforts to compete against SRSA unfairly, and restitution of the amount that PNC unjustly enriched itself by palming off SRSA's work as its own.

## XI.    SEVENTH CAUSE OF ACTION
## Violation of Computer Fraud and Abuse
## Act (Against Defendants Kelly and PNC)

160.    SRSA repeats and incorporates by reference all prior allegations of this Verified First Amended Complaint as if fully set forth herein.

161.    As set forth above, Defendant Kelly accessed an SRSA-issued computer without

authorization by retaining that computer and accessing SRSA company documents and information stored on it after the termination of her employment with SRSA.

162.    The SRSA-issued laptop that Kelly accessed without authorization was used in and affected interstate commerce.

163.    Kelly was acting as PNC's agent at the time she accessed an SRSA-issued computer without authorization.

164.    Upon information and belief, by accessing an SRSA-issued computer without authorization and by retaining that computer and accessing SRSA company documents and information stored on it after the termination of her employment with SRSA, Kelly caused losses to SRSA exceeding $5,000 in a one-year period.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SRSA respectfully requests the following relief:

1.    Judgment in favor of SRSA and against Defendants on each cause of action alleged herein;

2.    All damages caused by Defendants' unlawful actions in an amount to be determined at trial, such damages to include actual loss and unjust enrichment;

3.    Exemplary and punitive damages as provided by law;

4.    Disgorgement of all proceeds Defendants have received as a result of their misappropriation of SRSA's confidential, proprietary, and/or trade secret information;

5.    Specific performance by Kelly and Tsarnas of their contractual obligations;

6.    Pre-judgment and post-judgment interest on awarded damages;

7.    Attorneys' fees, costs, and expenses incurred by SRSA in investigating this misconduct

and litigating this action;

8.      Temporary, preliminary and permanent injunctive relief pursuant to which Defendants, and each of them, and their employees or representatives, and all persons acting in concert or participating with them are ordered, enjoined, or restrained, directly or indirectly, by any means whatsoever:

i)      From disclosing or using SRSA's confidential, proprietary, and trade secret information;

ii)     From making, testing, using, promoting, offering to sell, marketing, commercializing, or selling any products that utilize, embody, or were developed, in whole or in part, with the benefit or use of any of SRSA's confidential, proprietary, and/or trade secret information;

iii)    To immediately preserve and return to SRSA: (a) all copies of all SRSA documents and information, including without limitation any trade secret and other confidential or proprietary information acquired from SRSA; and (b) all copies of all materials (in paper, electronic, or any other form) containing any, or derived from any, SRSA information, trade secrets, or other confidential or proprietary information; and

iv)     To identify each individual and entity to whom or to which Defendants and any of them, and their employees or representatives, and all persons acting in concert or participating with them, disclosed: (a) any SRSA documents or other materials (in paper, electronic, or any other form); and (b) any of SRSA's confidential, proprietary, and/or trade secret information; and

v)      To turn over to the Court any proceeds Defendants have received from the misappropriation of SRSA's confidential, proprietary, and/or trade secret information, which proceeds would be held in constructive trust until the conclusion of this litigation;

9.      Granting SRSA such other and further relief as this Court deems just and proper.

1335284

## XIII.   JURY DEMAND

SRSA demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: July ~~11~~12, 2019                    By: s/ *Warren A. Braunig* _____

Warren A. Braunig
*wbraunig@keker. com*
Benjamin D. Rothstein
*brothstein@keker. com*
Maya Karwande
*mkarwande@keker. com*
Victor H. Yu
*vyu@keker. com*
KEKER, VAN NEST & PETERS LLP
633 Battery Street San Francisco, CA
94111-1809 Telephone: 415-391-5400
Facsimile: 415-397-7188
Scott R. Bialecki
*sbialecki@sheridanross. com*
Matthew C. Miller
*mmiller@sheridanross. com*
SHERIDAN ROSS P C.
1560 Broadway, Suite 1200
Denver, Colorado 80202
Telephone: 303-863-9700
Facsimile: 303-863-0223
Email:        *litigation@sheridanross. com*

ATTORNEYS FOR PLAINTIFFS SRS
ACQUIOM INC. AND SHAREHOLDER
REPRESENTATIVE SERVICES EEC

1335284

# VERIFICATION

I, William Paul Koenig, am the Chief Executive Officer of SRS Acquiom Inc. and Managing Director for Shareholder Representative Services LLC (collectively, "SRSA"), and I am authorized to sign this verification on SRSA's behalf. I have read the foregoing Verified First Amended Complaint. The facts set forth therein are true and accurate to the best of my knowledge based on the information available to me.

I declare                                                                                              under penalty of perjury                                                                          that the foregoing is true                                                                         and correct.    Executed                                                                      this 11th 12th day of July, 2019.

William Paul