**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02005-DDD-SKC

SRS ACQUIOM INC., a Delaware corporation, and
SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company,

      Plaintiffs,

  v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania corporation,
PNC BANK, N.A., a national association,
HEATHER KELLY, an individual, and
ALEX TSARNAS, an individual,

      Defendants.

---

**PLAINTIFFS' DISCOVERY BRIEF REGARDING
THE PARTIES' SEPARATE MOTIONS TO COMPEL**

---

Pursuant to Fed. R. Civ. P. 37 and this Court's September 20, 2019 Order Setting Discovery Hearing (ECF No. 47), Plaintiffs SRS Acquiom Inc. and Shareholder Representative Services LLC (collectively, "SRSA") submit the following Discovery Brief in support of their motion to compel the production of documents from Defendants PNC Financial Services Group, Inc., PNC Bank, N.A., Heather Kelly, and Alex Tsarnas (collectively, "PNC"), and in opposition to PNC's motion to compel.

**I.    INTRODUCTION**

SRSA moves to compel production of targeted, critical discovery that is highly relevant to SRSA's claims and forthcoming motion for preliminary injunction. SRSA is a Denver-based industry leader in the online M&A payments-and-escrow space. It brought this action on July 11, 2019 after discovering that former employees Heather Kelly and Alex Tsarnas left the company

1

with a trove of SRSA trade-secret and confidential information and put it to work for their new employer, PNC. With PNC's knowledge, Kelly and Tsarnas used SRSA's information to develop "PNC Paid," a set of products and services designed to directly compete with SRSA in the payments-and-escrow market.

Shortly after SRSA filed this action, the Court ordered PNC to return all SRSA information in its possession and ordered the parties to engage in limited, expedited discovery relevant to SRSA's request for a preliminary injunction. Notwithstanding the fast-approaching expedited discovery deadlines, PNC refuses to produce two categories of key information: (1) documents sufficient to show the financial performance of the products and services that PNC developed using SRSA trade secrets; and (2) documents sufficient to identify customers targeted by PNC for sale of the same. That information bears directly on SRSA's claim for misappropriation and the likelihood that SRSA will suffer irreparable harm absent an injunction.

Though PNC has disregarded its own discovery obligations, it has simultaneously embarked on a burdensome fishing expedition for SRSA documents that are neither relevant to any party's claims or defenses nor proportional to the needs of the case. PNC unreasonably seeks documents related to SRSA trade secrets created *after* the misappropriation at issue, and "all communications" that relate in any way to SRSA's trade secrets or SRSA products that embody those trade secrets.

SRSA has already produced documents in response to each of PNC's requests. To the extent SRSA did not provide every document called for by a request, it is because the request is overbroad, unduly burdensome, or disproportional to the needs of this case. PNC's motion is a transparent attempt to distract from its own refusal to produce two narrow categories of highly-

relevant information. PNC should be ordered to produce the information SRSA requests, and PNC's motion should be denied.

## II.   BACKGROUND

SRSA filed this action on July 11, 2019 alleging that Defendants misappropriated SRSA trade secrets reflecting the operation and design of SRSA's products and services, as well as its business and sales strategies. On July 25, 2019, SRSA agreed to forgo a TRO on the condition that the parties stipulate to expedited discovery and a briefing schedule for SRSA's motion for preliminary injunction. (ECF 24.) The Court adopted the parties' stipulation and entered an order allowing SRSA to serve 10 requests for production ("RFP") to PNC and five RFPs to each individual defendant; allowing Defendants to serve 15 RFPs to SRSA; permitting each side to take seven depositions, to be completed by October 30, 2019; and requiring SRSA to file its motion for preliminary injunction by November 5, 2019. (*See* ECF 26, 46.)

The parties exchanged RFPs on August 2, and responses and objections thereto on August 20, 2019. Although many of PNC's RFPs are facially overbroad or compound in excess of the Court's 15-RFP limit, SRSA agreed to produce responsive documents to each request subject to its objections and reasonable limitations. Between September 11 and September 25, 2019, SRSA produced over 11,000 documents in response to PNC's requests, while meeting and conferring with PNC over the scope of those requests in parallel.[1] On September 19, 2019, the

---

[1] Though SRSA attempted to meet and confer in good faith, PNC repeatedly refused SRSA's overtures for telephonic meet and confers, contending instead that SRSA had waived all objections to PNC's requests because SRSA's written responses were technically deficient. Despite PNC's failure to identify any authority from this Circuit in support of its waiver argument, SRSA served amended written responses to address PNC's complaints.

parties jointly called the Court to inform it of their discovery disputes.[2] These discovery briefs followed.

## III. ARGUMENT

### A. SRSA is entitled to discovery into PNC's financial performance and customers.

SRSA moves to compel production of two discrete categories of information: (1) the financial performance of PNC's M&A payments-and-escrow products (RFP 9); and (2) the identities of PNC's actual and potential customers (RFP 8).

#### 1. PNC's financial performance is relevant to irreparable harm. (SRSA RFP 9)

SRSA alleges that prior to hiring Kelly and Tsarnas in early 2018, PNC "had no products to compete [with SRSA] in the online M&A 'payments and escrow' business," and PNC knowingly accepted and used SRSA trade secrets supplied by Kelly and Tsarnas in order to grow its business. (First Amended Verified Complaint, ECF 12, or "FAC" ¶ 2). Accordingly, SRSA's RFP 9 seeks

> Documents sufficient to show the monthly, quarterly and annual revenues, expenses and profits for PNC's M&A Payments and Escrow Products, from January 1, 2018 to the present.

*See* Ex. A at 7. PNC's sole objection is that financial information is not relevant to SRSA's preliminary-injunction motion. *See id.* That argument is without merit.

In a trade-secret dispute, evidence that a defendant obtained commercial advantage from its misappropriation is direct "grounds for finding irreparable harm." *Brocade Commc'ns Sys.,*

---

[2] To aid the Court, SRSA attaches as exhibits an excerpted version of PNC's August 20, 2019 responses and objections to SRSA's RFPs (Exhibit A) and an excerpted version of SRSA's September 10, 2019 amended responses and objections to PNC's RFPs (Exhibit B).

4

1346436

*Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013). PNC's financial data will reveal basic facts about PNC's commercial success, such as the "trajectory of growth of [PNC's] business," as compared with SRSA's corresponding "loss of market share over time." *LegalForce RAPC Worldwide P.C. v. Demassa*, No. 18-CV-00043-MMC (TSH), 2019 WL 2232580, at *3 (N.D. Cal. May 23, 2019). Courts have repeatedly recognized that such information is relevant to a claim for injunctive relief. *See id.* (finding information about defendant's financial performance relevant to request for injunctive relief and ordering production of same); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1265 (10th Cir. 2004) (noting that "loss of goodwill or competitive market position" are classic examples of irreparable harm suffered by a corporate plaintiff).

PNC's financial performance is similarly probative of whether PNC obtained an unfair head start in its development of competing products. Courts in this Circuit have long recognized that a head start advantage resulting from trade secret misappropriation constitutes irreparable harm warranting injunctive relief. *See, e.g., Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07-CV- 02324-WYD-MEH, 2008 WL 2185882, at *16 (D. Colo. May 23, 2008) ("The irreparable harm that I find to exist is that [defendant] stands to gain, via [the individual defendant's] actions, a head start into the marketplace based on [plaintiff's] work, money, and trade secrets."); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149 (D. Kan. 2007) (If a competitor "cut corners in the research and development process the competitor will attain a competing product much sooner, and this is the harm that is irreparable." (ellipses omitted)). Here, SRSA alleges that PNC's misappropriation allowed it to develop its competing PNC Paid products and services on an exceedingly fast timeline, giving PNC an unfair head start in the

marketplace. FAC ¶ 70. Financial information regarding PNC Paid will reveal whether PNC's misappropriation allowed it to enjoy reduced research and development costs and greater profitability, to SRSA's detriment. Accordingly, PNC should be ordered to produce all documents responsive to RFP 9.

### 2. The identity of PNC's customers is probative of misappropriation and irreparable harm. (SRSA RFP 8)

SRSA also seeks discovery into the identity of customers that PNC targeted for sale of products PNC built using SRSA trade secrets. SRSA alleges that by leveraging SRSA's trade secrets, PNC has been able to unfairly compete in the market—including by targeting a number of competitive deals for existing and potential SRSA customers and representing that PNC can provide services identical to SRSA's at a lower price. (FAC ¶¶76-77.) SRSA's RFP 8 seeks

> Documents sufficient to show the identity of all potential or actual customers targeted by PNC for PNC's M&A Payments and Escrow Products, the first date such customer was contacted about PNC's M&A Payments and Escrow Products, and the PNC employee who served as the primary contact for such customer.

Ex. A at 6. Again, PNC's sole objection to this request is relevance. PNC contends that responsive information is discoverable only as to the customers SRSA *already knows have been targeted* because they are identified in SRSA's complaint. *See id.* Alternatively, PNC argues that *SRSA* should identify which PNC customers it believes are relevant. PNC's arguments fail for at least three reasons.

*First*, the identity of PNC's actual and potential customers is probative of misappropriation and irreparable harm. "Customer information is a trade secret," including "inside information about customer issues that would be useful to a competitor that did not know those concerns." *Xantrex*, 2008 WL 2185882, at *18. Moreover, a competitor's use of a

6

1346436

plaintiff's proprietary customer information will cause irreparable harm where it causes "loss of goodwill as well as a loss of trade that cannot be remedied by money damages." *Atlas Biologicals, Inc. v. Kutrubes*, No. 15-CV-00355-CMA-MEH, 2015 WL 996368, at *5 (D. Colo. Mar. 3, 2015). Here, SRSA alleges that PNC misappropriated SRSA's customer lists, information about customer preferences, and sales strategies for existing and potential SRSA customers, eroding SRSA's market share. (FAC ¶¶ 77, 88.) The customers PNC targeted, when they were targeted, and by whom is information directly relevant to SRSA's claims.

*Second*, the identity of PNC's customers is relevant regardless of whether they were previously customers of SRSA. PNC's customer list is probative of the market penetration and success it has enjoyed in the M&A payments-and-escrow space as a result of its misappropriation. Evidence of such commercial success is "grounds for finding irreparable harm." *Brocade*, 2013 WL 890126, at *9.[3] And the identity of customers that PNC targeted with its competing products will reveal the extent to which PNC has leveraged SRSA's technology to gain an unfair head start in the marketplace.

*Finally*, PNC's insistence that *SRSA* identify PNC's relevant customers is similarly unhelpful. Doing so would artificially limit the requested discovery to PNC customers currently known to SRSA, which masks the extent to which PNC's unlawful head start has facilitated its success. PNC should be ordered to produce documents sufficient to comply with RFP 8.

    **B.**    **The discovery PNC seeks is burdensome, vague, and has little probative**

---

[3] Moreover, this Court has previously held that "[s]imply because there is no current evidence that customers have been lost, or sales lost, does not mean that irreparable injury is lacking." *Xantrex*, 2008 WL 2185882, at *16. It follows that discovery here should not be limited to customers SRSA actually lost, but should include all PNC customers.

**value.**

After numerous, lengthy and confusing meet-and-confer letters from PNC, SRSA believes that PNC intends to move to compel on two issues:

- PNC's request for discovery into SRSA trade secrets created after Kelly's and Tsarnas's departure from SRSA, and which are not at issue in this case (RFPs 1, 3, 5, and 6); and

- PNC's request for all email communications with third-parties that broadly "concern" SRSA's trade secrets or SRSA products that embody those trade secrets (RFP 4).

As explained further below, PNC's requests are improper, and its motion should be denied.

### 1. PNC is not entitled to discovery regarding SRSA trade secrets not at issue in this case. (RFPs 1, 3, 5, 6)

PNC's RFPs 1, 3, 5, and 6 seek the production of multiple categories of documents related to "each Trade Secret," *see* Ex. B at 3, 8, 12, 14, which PNC has defined to include any trade secret that SRSA "contends was disclosed, use [sic], or otherwise misappropriated by any or all Defendants." SRSA specifically objected to each request as overbroad, unduly burdensome, and not proportional to the needs of the case insofar as it seeks discovery of any "Trade Secret," regardless of whether SRSA has identified it as at issue in this action.[4] *See* Ex. B at 3. PNC contends that it is entitled to discovery into trade secrets that post-date Kelly's and Tsarnas's departures from SRSA, even though SRSA has never alleged that Kelly or Tsarnas misappropriated trade secrets that were created after they left the company.[5] SRSA has already

---

[4] On July 31, 2019, SRSA served defendants with a detailed Identification of Trade Secrets, as required by the Court's July 26, 2019 order. (ECF No. 26)

[5] Based on the information currently available to it, SRSA does not believe that Kelly or Tsarnas had the ability to misappropriate SRSA's trade secrets created after March 16, 2018, the last day that Kelly lawfully had access to any SRSA materials.

produced versions of its trade secrets created prior to that date, including extensive documentation regarding its technical trade secrets, spanning more than five years. But SRSA objects to discovery into trade secrets created after Kelly's and Tsarnas's departures.[6] PNC's arguments to the contrary are meritless.

*First*, as stated in its August 2, 2019 RFPs, PNC's own definition of "Trade Secret" is limited to any trade secret that SRSA "contends was disclosed, use [sic], or otherwise misappropriated by any or all Defendants." On their face, PNC's requests do not seek versions of those trade secrets created after March 16, 2018 because SRSA does not allege trade secrets created after that date were misappropriated. PNC's motion asks the Court to order discovery that PNC failed to request, and it should be denied on this basis alone.

*Second*, PNC argues that discovery into *current* versions of SRSA's trade secrets will establish that SRSA's technology has "aged" or become "obsolete" and thus lacks the requisite value to qualify for trade secret protection at all. But the existence of a "later generation of a technology does not necessarily render a prior generation obsolete." *Dow Corning Corp. v. Jie Xiao*, 283 F.R.D. 353, 360-61 (E.D. Mich. 2012) (concluding that discovery into subsequent generations of trade-secret technology was inappropriate). Indeed, "whether some entity was willing to pay for the first-generation technology during the period of time relevant to this action determines whether that technology has economic value."[7] *Id.* Later versions of SRSA's trade secrets are similarly irrelevant here.

---

[6] In an effort to compromise and to avoid raising this dispute with the Court, SRSA offered to produce versions of its commercial trade secrets that post-date Tsarnas's and Kelly's departure. PNC rejected that compromise.

[7] To the extent that PNC suggests that a plaintiff's failure to use its own trade secrets renders

9

*Finally*, PNC fails to cite any authority for the proposition that a trade secret loses value when its owner creates another iteration. The value of the formula for Coca Cola does not change because the manufacturer starts making New Coke. Nor would the value of the formula *to a competitor* plummet should Coke decide to shutter operations altogether; theft of the Coke formula would still give the competitor an unfair head start in the marketplace and render it liable for trade secret misappropriation. The same is true of SRSA's trade secrets, regardless of whether SRSA is currently developing version 2 or version 10. Accordingly, PNC's requests for discovery into trade secrets developed after Kelly's and Tsarnas's departures should be denied.

### 2. SRSA has already produced documents provided to third-parties that concern its trade secrets. (RFP 4)

PNC's RFP 4, *see* Ex. B at 10, instructs SRSA to

> Produce ***a copy*** of all Documents, including, but not limited to, PowerPoint presentations, demonstrations, webinars, marketing, advertising, or promotional materials, or other materials distributed, provided or available to third-parties, customers, potential customers, investors, or potential investors Concerning any product or service that SRS contends is a Trade Secret, practices a Trade Secret, or otherwise embodies a Trade Secret.

SRSA objects to this request as overbroad and unduly burdensome because it seeks "all Documents" provided to third-parties that in any way "Concern" SRSA trade secrets or a product

---

them ineligible for trade secret protection, PNC is mistaken. Neither Colorado law nor the DTSA requires that a plaintiff use their own trade secrets in order for the information to qualify for trade secret protection. *See, e.g., Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1224 (Colo. App. 2001), *as modified on denial of reh'g* (Sept. 6, 2001) ("Section 7–74–102(4) [of the Colorado Uniform Trade Secret Act] does not contain a continuous use requirement."); *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1086 (D. Colo. 2018) (reciting the DTSA definition of trade secret) (citing 18 U.S.C. § 1839(3)). In any event, SRSA continues to use the trade secrets it identified.

10

or service that embodies them. SRSA's products and services have been on the market for over five years and used by thousands of customers and users, making the universe of potentially responsive documents exceedingly broad. For example, on its face, RFP 4 would require the production of every document sent to an SRSA customer that merely mentions Clearinghouse, SRSA's flagship product for distributing payments to shareholders after a merger or acquisition—even though those documents would have no probative value to the issues in dispute.

Instead of producing a copy of "all documents" ever exchanged with a third-party, SRSA performed a reasonable search of shared-drive locations and the individual hard drives of key sales and marketing employees to produce responsive sales and marketing documents that are regularly disseminated to third parties. SRSA also produced documents SRSA shared with investors that specifically relate to SRSA products and trade secrets; and, in response to PNC's follow-on requests, has agreed to conduct additional limited searches. But PNC now demands that SRSA also produce all *communications* that attach or include these documents. PNC's request should be denied.

*First*, PNC's "kitchen-sink" request seeking "all documents" or "all communications" is overbroad and inappropriate. *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650 (10th Cir. 2008) (Gorsuch, J.). This Court regularly denies motions to compel concerning similar requests, and for good reason: requests for "all documents" or "all communications" are precisely the kinds of burdensome, disproportionate requests that Rule 26 was intended to preclude. *See Bottoms v. Liberty Life Assur. Co. of Bos.*, No. 11-CV-01606-PAB-CBS, 2011 WL 6181423, at *9 (D. Colo. Dec. 13, 2011) (request for "all documents" on a topic was overbroad and likely to lead to the

discovery of only tangential information.); *Montano v. Chao*, No. 07-CV-00735-KMT, 2008 WL 5377745, at *11 (D. Colo. Dec. 19, 2008) (concluding that request for "all documents" "extremely vague and unduly burdensome.").

To that end, District Courts overseeing document production should "prevent indiscriminate, overly broad, or unduly burdensome demands such as those for 'all documents relating or referring to a claim." *Regan-Touhy*, 526 F.3d at 650 (citations and ellipses omitted). This principle is particularly important during expedited-discovery, in which requests should be "limited" and "narrowly tailored to seek information necessary to support expedited or preliminary relief." *Avaya, Inc. v. Acumen Telecom Corp.*, No. 10-CV-03075-CMA-BNB, 2011 WL 9293, at *2 (D. Colo. Jan. 3, 2011). Here, PNC's demand for "all communications" is neither narrowly tailored nor feasible within the current expedited-discovery period.

*Second*, SRSA has already produced responsive communications to the extent they were also stored in central repositories, and PNC's demand that SRSA undertake costly, time-consuming email collection and review is unreasonable. SRSA regularly interacts with hundreds of clients, potential investors, vendors, and other "third parties" that fall within the scope of this request, and the probative value of the cover emails attaching copies of documents already in PNC's possession is vastly outweighed by the enormous expense such a production would entail. As SRSA explained during the parties' meet and confer, SRSA has no unified system that would enable it to efficiently search the files and emails of approximately 150 SRSA employees. Instead, for each custodian, SRSA would have to collect and search the employee's documents and emails—which are typically voluminous and costly to review—on an individual basis.

*Finally*, PNC's RFP 4 seeks only "a copy" of documents distributed to third parties, not every related email. Had PNC wished to serve a focused request seeking communications between SRSA and third-parties on specific issues or to determine the scope of SRSA's customer base, it could have done so. It should not be permitted to redraft the request now. PNC's request to compel further production should be denied.

**IV.    CONCLUSION**

For the foregoing reasons, SRSA requests that the Court order PNC to produce documents responsive to SRSA's RFPs 8 and 9 and deny PNC's motion to compel in its entirety.

1346436

Respectfully submitted,

Dated: October 3, 2019

By: s/ *Michelle S. Ybarra*
Warren A. Braunig
*wbraunig@keker.com*
Michelle S. Ybarra
*mybarra@keker.com*
Benjamin D. Rothstein
*brothstein@keker.com*
Maya Karwande
*mkarwande@keker.com*
Victor H. Yu
*vyu@keker.com*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415-391-5400
Facsimile:     415-397-7188

SHERIDAN ROSS P.C.
Scott R. Bialecki
*sbialecki@sheridanross.com*
Matthew C. Miller
*mmiller@sheridanross.com*
1560 Broadway, Suite 1200
Denver, Colorado 80202
Telephone:     303 863 9700
Facsimile:     303 863 0223
Email:    litigation@sheridanross.com

Attorneys for Plaintiffs
SRS ACQUIOM INC. AND
SHAREHOLDER REPRESENTATIVE
SERVICES LLC

1346436