1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
     Case No. 19-cv-02005-DDD-SKC
3    _____

4    SRS ACQUIOM, INC., et al.

5         Plaintiffs,

6    vs.

7    PNC FINANCIAL SERVICES GROUP, INC., et al.,

8         Defendants.
     _____
9
10            Proceedings before S. KATO CREWS, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 1:32 p.m., October 10,

13   2019, in the United States Courthouse, Denver, Colorado.

14   _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                        APPEARANCES

19            MICHELLE YBARRA, SCOTT BIALECKI and VICTOR YU,

20   Attorneys at Law, appearing for the Plaintiffs.

21            SARAH WALLACE, Attorney at Law, appearing

22   for the Defendants.

23   _____

24                     DISCOVERY HEARING

25
```

2

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3   proceedings are herein transcribed, pursuant to order of

 4   counsel.)

 5              THE COURT:  We will go on the record in

 6   19-cv-2005, SRS Acquiom Incorporated v. PNC Financial

 7   Services Group, et al.

 8              I will take appearances of counsel, please.

 9              MR. BIALECKI:  Good morning, Your Honor, Scott

10   Bialecki from Sheridan Ross.  I also have with me co-counsel

11   Michelle Ybarra and Victor Yu from Keker Van Nest &

12   Peters --

13              THE COURT:  Okay.

14              MR. BIALECKI:  -- appearing on behalf of

15   plaintiffs.

16              THE COURT:  Okay, all right.  Good afternoon,

17   Counsel.

18              MS. WALLACE:  Good afternoon, Your Honor.  I'm

19   Sarah Wallace on behalf the PNC Bank, Alex Tsarnas and

20   Heather Kelly.  And with me is in-house counsel for PNC

21   Natalie Moritz.

22              THE COURT:  All right, great.  Good afternoon,

23   Counsel.

24              And, Counsel, you can -- if you more comfortable

25   where you are seated in addressing the Court, feel free to
```

1    stay seated.  If you are more taking the podium, though,

2    that's available to you, as well.

3            All right, Counsel, so we are here on a discovery

4    dispute.  I have reviewed your respective briefs, the

5    attachments to your briefs.  I have pulled some of the cases

6    cited in your respective briefs, and I have considered

7    those, so I feel informed on the issues that are currently

8    before me.

9            Mr. Bialecki, let me ask you a few questions.

10   With respect to the issue on discovery of or production of

11   SRS's current or modified trade secrets, as indicated in the

12   briefs in good faith as part of your conferral, your client

13   agreed to provide the commercial trade secrets, I guess, as

14   responsive to that request, but not the technical trade

15   secrets.

16           If I have that correct, can you explain to me the

17   difference between the commercial trade secrets and the

18   technical trade secrets.

19           MR. BIALECKI:  Your Honor, might I be able to

20   defer to my co-counsel --

21           THE COURT:  Yes.

22           MR. BIALECKI:  -- on that issue.

23           Thank you, Your Honor.

24           MS. YBARRA:  Yes, good morning, Your Honor,

25   Michelle Ybarra from Keker Van Nest & peters for plaintiffs.

4

1          And, yes, I would be happy to explain that

2     distinction.

3          What we are calling the commercial trade secrets

4     are SRSA's trade secrets, such as customer lists, customer

5     preferences, and that's not all of them, but that's -- those

6     are good examples, versus technical trade secrets, which are

7     technical documents describing how our platform, which is an

8     online mergers and acquisition payments and escrow platform,

9     a very complex and innovative product, these technical

10    documents describing how that system works as there are

11    documents related to the system, architecture and the like.

12         And so that is the distinction that we intended to

13    convey in the papers.

14         THE COURT:  Okay, thank you.

15         And I probably should have had you start there.

16    Can you explain to me the platform so I have an

17    understanding of what the technology is or practically --

18    from a practical standpoint, operators of or users of the

19    technology.  What are we talking about from exactly?

20         MS. YBARRA:  Yes.  So there are -- there are

21    several different products that SRSA makes and that are at

22    issue in this case.

23         But, fundamentally, we -- our client makes and has

24    innovated -- has developed for years the product called

25    Clearinghouse.  And it is an online mergers and acquisitions

1    platform that is difficult to explain in a few sentences,

2    Your Honor, and it has various services and features

3    attendant to that related to mergers and acquisitions.

4              We were the only -- the only company really doing

5    this in this space for a long time and built it in-house,

6    you know, based on the feedback of thousands of customers

7    and users.  And this is something that we have kind of been

8    out in the field -- a leader in the field on innovating in

9    this space.

10             So when you have a merger, a merger or an

11   acquisition, one company wants to acquire another, this

12   platform facilitates all of the transactions in the payments

13   to shareholders and the various necessary transactions that

14   go into a merger and acquisition.  It facilitates all of

15   that online.  As opposed to a legacy way of doing this work,

16   you might have somebody actually physically writing a check

17   and mailing a check to somebody, or getting actual

18   signatures on hard-copy documents and the like.

19             This is -- and, as you can imagine, there is a lot

20   of complexity built into -- or a lot of complexity baked

21   into these procedures, including compliance with regulations

22   and laws and verifying who the actual shareholders of the

23   company that's being acquired are, authenticating users in

24   that manner.

25             There's a -- I could go on for quite a while --

```
 1              THE COURT:  Sure.

 2              MS. YBARRA:  -- but I hope that gives you an

 3   overview of what we are talking about here.

 4              THE COURT:  So as a general matter, there's a

 5   merger or acquisition taking place.  The entities and the

 6   shareholders are the individuals, the principals who would

 7   be involved in facilitating that transaction can go to this

 8   database portal, something to that effect, but it's

 9   available online.  Documents related to that transaction are

10   there, signatures that may by needed on documents can be

11   done electronically through that service.

12              But is it kind of a portal and a communication

13   type of place --

14              MS. YBARRA:  Yes.

15              THE COURT:  -- related to a transaction of that

16   sort?

17              MS. YBARRA:  But I should clarify, it's not --

18   it's not a consumer facing -- we get hired by banks, we get

19   hired by law firms that are representing entities in a M&A

20   transaction.  Sometimes we come in as a payments and escrow

21   agent.

22              THE COURT:  Uh-huh.

23              MS. YBARRA:  Sometimes we act as shareholder

24   represent -- the shareholder representative in a

25   transaction.
```

1          These transactions, as you can imagine, are --

2     usually there is a lot of money at issue; they are

3     enormously complex.  But we -- we serve as these different

4     roles in the online platform, makes all of this happen a lot

5     faster than it does the old way.

6          THE COURT:  Right, okay.  Great, that's helpful.

7     Thank you.

8          Let me see.  And so it's the technical -- the

9     technical trade secrets related to that platform is -- is

10    what you are resisting, I guess, disclosing?

11         MS. YBARRA:  Yes, Your Honor.  And I should

12    clarify, we offered to produce -- we don't think that any of

13    our later iterations or later generations of our trade

14    secrets are relevant to this dispute.  We offered to produce

15    all of our commercial trade secrets without the date

16    limitation because we were trying to extend an olive branch

17    and, hopefully, avoid burdening the Court with this issue,

18    but that offer was rejected.

19         The real issue here, I think, is that the

20    defendants are trying to inject a use requirement into the

21    definition of trade secret under the Colorado Trade Secret

22    Act or the Federal Trade Secret Act that simply does not

23    exist.  And it's actually a use requirement requiring a

24    trade secret plaintiff to actually be using the trade

25    secrets that they are trying to protect in litigation has

1    been squarely rejected by the courts.

2            It is -- a trade secret owner is not required to

3    keep a trade secret frozen in time and never iterate or

4    never innovate in order to protect that trade secret's

5    value, and that's sort of what the defendants are suggesting

6    here.

7            THE COURT:  But you have said -- you have said and

8    -- but in any event, you are continuing to use --

9            MS. YBARRA:  But we are, yes.

10            THE COURT:  -- the technology that is ultimately

11    at issue in this case?

12            MS. YBARRA:  Yes.

13            THE COURT:  Okay.

14            MS. YBARRA:  I understand that the defendants to

15    be arguing that if they can show that we are also using

16    something else, a later iteration of our technical trade

17    secrets or have somehow, you know, let our foot off the gas

18    on using the trade secrets that were misappropriated by

19    defendants, that that goes to the value of the trade secret.

20    And that's -- that's just flatly incorrect, Your Honor.

21            The courts in this district have rejected that

22    premise and I would be happy to provide Your Honor

23    additional authority on that point --

24            THE COURT:  That's okay.

25            MS. YBARRA:  -- if you would like.

1          THE COURT:  I'm good on that point.  Let me -- let

2     me -- let's move on to another point.

3          MS. YBARRA:  Okay.

4          THE COURT:  Am I correct -- am I correct that this

5     case does involve allegations of a customer list that was

6     misappropriated by the defendant?

7          MS. YBARRA:  You are correct on that point, Your

8     Honor.

9          THE COURT:  Okay.  And I think maybe it was in the

10     briefs, or it might have been a complaint, but there might

11     be a reference to customer lists in the plural.  Does it

12     involve more than one list?

13          MS. YBARRA:  It does, Your Honor.

14          THE COURT:  Okay.  And has that list been

15     disclosed to the defendant?

16          MS. YBARRA:  Yes, Your Honor.

17          THE COURT:  Or at least a list?

18          MS. YBARRA:  We produced examples of all of the

19     trade secrets that we are claiming at issue here, in

20     connection with our trade secret identification, which was a

21     disclosure made to the defendants some time ago.

22          THE COURT:  Okay.

23          MS. YBARRA:  And -- and since then, we have also

24     -- we -- we have completed a -- except for these issues, I

25     think we've -- the parties have completed document

10

1   production in the expedited discovery brief schedule ahead

2   of this PI briefing that we are looking at.  We completed

3   that in September, so we have now -- plaintiffs have

4   produced, I think, 11,000-something documents.

5           THE COURT:  Okay.  And have -- has the plaintiff

6   asked the defendant, based on those customer lists, to

7   identify any customers on those lists that the defendant has

8   targeted?

9           MS. YBARRA:  Yes, we have, Your Honor.  That's --

10  that's -- I think you transitioned to our request to

11  defendants, which my colleague, Mr. Yu, would be happy to

12  address.

13          THE COURT:  Okay.  So, yeah, perhaps, I have

14  transition -- I guess part of my question around that is --

15  let's see.  Yeah, so this would get at your RFP Number 8,

16  your request that they -- the defendant produce documents

17  showing the identity of various customers.

18          I guess my question is, why is the request not --

19  well, I think I understand the argument because your

20  argument then gets -- you have the head-start argument,

21  commercial advantage argument, so I -- perhaps that's the

22  answer.

23          But the question is:  Why are you requesting

24  information about so many customers of the defendant when

25  the allegation in the case is that they have misappropriated

1    -- misappropriated specific customer lists?

2              Isn't what is relevant, which customers from that

3    list were solicited or targeted by the defendant?

4              MS. YBARRA:  No, Your Honor, I don't think the

5    relevance is limited to that.  And so a couple things here.

6              The defendant's full customer list that they have

7    targeted with our product is what's relevant here.

8              Our allegation is they took our technology, as

9    well as our customer list, built a competing product in

10   record time and launched it in record time and have been

11   immensely successful with that product.  And how successful

12   they have been in the market and how much they have

13   penetrated the market, generally is relevant to irreparable

14   harm.

15             On top of that, we don't actually know who we are

16   competing -- which customers we are competing against PNC

17   with.  Because of the nature of these transactions, they are

18   very secretive.

19             THE COURT:  I'm sorry, let me -- let me interrupt

20   you because my --

21             MS. YBARRA:  Yes.

22             THE COURT:  -- my mind is still hung up on the

23   first thing you said.

24             So you say, your argument is their customer list

25   is relevant because the argument is they have used your

1    client's technology and trade secret, which has given them a

2    head-start in the market.  But how is the entirety of their

3    customer list pertinent to that argument?

4            MS. YBARRA:  Because it's -- it's -- it is

5    relevant to the breadth of the commercial success they've

6    had in the market.

7            You know, SRSA was, for many years, not -- did not

8    have a competitor like PNC in the market because they were

9    -- have been so innovative, they were out there doing this

10   thing and selling this product that no one else was doing.

11   I mean, it took them years to develop that product.

12           Then, you know, our -- our former employees depart

13   for PNC, they take a bunch of information and documents with

14   them.  And a year later, PNC is competing with us

15   head-to-head on deals where we have never seen them offering

16   products or services like this before and their product and

17   services are nearly identical to ours and appear to be built

18   using our technology.

19           And how successful they have been in penetrating

20   the market as a whole is relevant to irreparable harm.  We

21   have cited some authority in our briefing where courts have

22   said the same thing.

23           So this is a separate issue from the liability

24   question:  How are they using our customer list and who are

25   they going after that we previously had relationships with?

1   This is -- this is getting at the irreparable harm question.

2          And also, as Your Honor mentioned earlier, how

3   successful PNC has been with a product built on our

4   technology speaks directly to the head-start that they have

5   been able to obtain using our technology and the value of

6   our trade secrets.

7          THE COURT:  The agreement in this case, or I guess

8   the order that I think that I issued on expedited discovery

9   for the purpose of the preliminary junction hearing, there's

10  no dispute between the parties that this discovery was -- is

11  limited to issues that are pertinent to the preliminary

12  injunction hearing, right?

13         MS. YBARRA:  That's correct.

14         THE COURT:  Okay.

15         MS. YBARRA:  If I may make one additional point,

16  Your Honor.

17         THE COURT:  Sure.

18         MS. YBARRA:  On irreparable harm, the -- we --

19  SRSA contends that it has lost several deals or transactions

20  to PNC where it was competing with PNC and PNC Bank was

21  competing unfairly with the product that it built using our

22  technology.  Because of the nature of how these deals unfold

23  and how they work, we don't always know who we are going up

24  against.

25         We -- Mr. Yu and I just left three hours of a

14

1    30(b)(6) deposition this morning of an SRSA witness, who is

2    designated on a topic that PNC drafted on what deals we have

3    lost to PNC.  And we have a suspicion about many of them and

4    we have -- you know, we have a reason to believe that we

5    lost certain deals to PNC, but the only definitive

6    documentary evidence on that belongs to them.

7             And it is really troubling to us that we are going

8    to file a PI motion in a few weeks, and we believe that we

9    have lost several deals to PNC while they were competing

10   unfairly and we are being deprived of our kind of best

11   evidence of irreparable harm because they won't turn over

12   documents sufficient to identify their customers.

13            It's not an answer for us to give them all of the

14   people we've -- or all of the entities that we -- the deals

15   that we think we have lost to them because we don't know

16   where we are competing against them all the time.  That's

17   the nature of how these things work.

18            And, so if we were to say, Give us Customers A

19   through E, that's artificially limiting the universe of lost

20   deals to the ones where we know PNC was on the other side.

21   But we have been quite surprised to see them turn up very

22   frequently competing with us in this space, and it's

23   necessary for us to litigate our PI motion to have this

24   information.

25            THE COURT:  So I think I'm with you, but let me

1   flush this out a little bit to make sure I am.

2          So in the trade secret cases I have been

3   accustomed to being involved with that involve a customer

4   list, the general scenario has been a plaintiff who claims

5   that a defendant has misappropriated the customer list,

6   plaintiff produces a customer list in the course of

7   litigation, defendant then sets about to identify anybody

8   from that list that they are either currently doing business

9   with or that they solicited for business within some period

10  of time; thus, the plaintiff argues, There's the evidence

11  that my list has been misappropriated because, you know, 20

12  of the 25 people on my trade secret customer list have

13  either been contacted by or are now doing business with the

14  defendant.

15          That's the typical scenario I'm familiar with,

16  which is why I asked the question with respect to your list:

17  Have you all done that?  Because that all seems relevant to

18  me.

19          But I think what you are further saying to that is

20  that, based on your theory, you're saying the argument is

21  that the defendant is misappropriating our technology and,

22  thus, our trade secrets and using that in the marketplace;

23  therefore, the plaintiff wants to see all of the customers

24  that are being serviced by the defendant by way of that

25  technology so that the plaintiff can say, Well, they have

16

1    identified A, B and C customers, those are deals that we had

2    in the works and we lost to the defendant, or those are

3    deals we were getting ready to target and we lost to the

4    defendant, and that's unlawful or improper because the only

5    way they got those deals is by using our technology that

6    they misappropriated?

7              MS. YBARRA:  That -- that's correct, Your Honor.

8              THE COURT:  Okay, so I get that.

9              I'm not quite with you on your arguments regarding

10   head-start and commercial advantage.  In part, I tend to

11   agree with the defendants that it almost appears that, by

12   focusing on that at this stage of the case, you are maybe

13   arguing against yourself in terms of irreparable harm

14   because that information really seems to go to a monetary

15   loss and monetary damages.

16             In the cases that you cited -- or one side cited,

17   I believe it was the plaintiff -- for this -- these

18   propositions, I'm looking at Dominion Video, for example,

19   where, I think it was Judge Daniel -- but the Court talks

20   about acknowledging certainly there are cases that have

21   found findings of irreparable harm based on the loss of

22   unique rights protected by contract.  But those cases are

23   distinguishable from the controversy here because they focus

24   on harm to a unique market position, based on evidence of

25   loss of a unique product or goodwill or difficulty in

1    calculating damages.

2            Later on in that case, the Court says -- or draws

3    a distinction between the facts in that case and the Court

4    says:  The line of cases in which courts have found

5    irreparable harm only after determining the existence of

6    such intangible factors as the inability to calculate

7    damages for the loss of goodwill or competitive market

8    position.

9            And in the Zantrex (ph) case, the Court references

10   the result is that Zantrex will lose market share and

11   customer business.  Finally, I find that it appears

12   difficult to calculate how the use of this information,

13   especially engineering information, will contribute to

14   future sales.

15           MS. YBARRA:  Your Honor, my colleague, Mr. Yu, I

16   didn't mean to usurp his art piece, so I'm going to turn

17   this over to him.

18           THE COURT:  I haven't quite posed the question,

19   but my -- and I don't know if I have words to the question

20   just yet, but I'm not quite -- I feel like your -- with what

21   you are seeking, you are lending some definiteness to

22   showing some monetary damages, which doesn't go to

23   irreparable harm.

24           And further, if you have evidence or if you are

25   presenting evidence at your hearing that this various

1    information has been misappropriated, that the other side is

2    using it in various ways, I don't quite understand why it is

3    that you would need all of this financial information that

4    you have requested for purposes of the hearing.

5           MR. YU:  Sure, Your Honor, I would be happy to

6    address that, but I just want to clarify, I think we have

7    moved on to SRSA's RFP 9 --

8           THE COURT:  Yes.

9           MR. YU:  -- financial information?

10          THE COURT:  Right.

11          MR. YU:  So I think there's a couple big picture

12   points I would like just to clarify.

13          First, we absolutely are going to introduce

14   evidence as to the difficulty of calculating damages.  For

15   similar reasons of how kind of opaque the market this M&A

16   bidding process is that Ms. Ybarra's outlined in RFP 8,

17   those -- those characteristics of the market also make it

18   quite difficult to calculate -- to, like, put a finite

19   dollar amount on the value of a lost sale.

20          That's simply because, for example, for -- using

21   the example Your Honor gave, sometimes SRSA may just be in

22   the works for a deal in the very beginning and it's unclear,

23   it doesn't have any insight into kind of nonpublic

24   information about the deal after it's lost it to PNC, for

25   example, like the total amount of deal was priced at, which

19

1   is sometimes revealed publicly and sometimes not revealed

2   publicly.

3           That's the type of evidence we would use to

4   actually show why, while there's numbers at play; i.e.,

5   like dollar amounts, financials, those numbers really can't

6   be used to calculate the damages -- calculate damages.

7           As to the kind of the specific cases we cite we

8   have authority, again, I think you have the defendant's

9   position here as kind of missing the forest for the trees.

10          Yeah, in those cases, information like financials

11  can be used to show damages in some contracts, but that's

12  not the only use.  We are using them for more fundamental

13  basis to show kind of the commercial gain and the head-start

14  that was achieved.

15          And I think, you know, I would cite the Brocade

16  case, the Northern District of California that we have cited

17  in our brief, as a pretty good example.  That is a trade

18  secrets case, or at least one of the -- one of the major

19  claims in that case was a trade secrets allegation on a PI

20  motion.  And the Judge there did find that evidence of the

21  defense commercial success squarely -- squarely went to the

22  plaintiff's claim of irreparable harm.

23          You know, I think, just to -- just as a few

24  housecleaning measures, the Dominion Video satellite case we

25  cited is a Tenth Circuit case, we just cited that as a

1   general proposition for kind of the types of irreparable

2   harm.  That's why it's at the end of this screen site.  We

3   don't do anything more with that.

4           And I think with the Zantrex case, that, again, we

5   are just citing that for the general proposition of what

6   type of general -- what type of general evidence goes to

7   support -- supporting irreparable harm.

8           THE COURT:  Real quick, you mentioned the Brocade

9   case, but in that case the finding of commercial advantage

10  wasn't based on financial data, right?

11          MR. YU:  So I think that's the defense argument,

12  but I would actually disagree with that characterization.

13  If you look at Judge Grewal's opinion in Brocade, my reading

14  of it is Judge Grewal simply says, I think the plaintiff's

15  positions in the brief are well pled, and I agree with all

16  of their arguments.

17          THE COURT:  Because I --

18          MR. YU:  If you look at --

19          THE COURT:  Because I read the case, too.  I'm not

20  saying that just because of their argument.  I read the

21  case --

22          MR. YU:  Sure.

23          THE COURT:  -- and it appeared to me that they

24  were correct; that the Judge didn't make any specific

25  findings, or there wasn't a discussion about financial data

1    being the basis of the Court's finding of commercial

2    advantage.

3              So what -- did I miss something?

4              MR. YU:  Yeah, I just have a slightly different

5    reading of the case, Your Honor.

6              I think, as I read that paragraph of Judge

7    Grewal's opinion, I read it in more in just saying I agree

8    with the arguments raised in the plaintiff's brief.  And if

9    you look -- and he is just citing generally to the arguments

10   raised.

11             If you look at arguments raised in the plaintiff's

12   brief, they do present fairly sophisticated evidence of the

13   defendant's sales and -- and loss of market share.

14             THE COURT:  Okay.

15             MR. YU:  So I think -- yeah, that is my reading of

16   the Brocade case.

17             THE COURT:  And so further in that case, the Court

18   said that there were two witnesses who testified that the

19   various trade secrets allow Server -- ServerIron, the party,

20   to process faster --

21             MR. YU:  Uh-huh.

22             THE COURT:  -- and more efficiently with less

23   problems from system failures, et cetera; that the trade

24   secrets improve performance of this product.

25             MR. YU:  Uh-huh.

22

1          THE COURT:  So in your case, are you presenting

2     evidence or have you taken discovery on things like how long

3     it took your client to develop this program versus how long

4     it took the defendant to develop their competing program?

5          MR. YU:  Uh-huh.

6          THE COURT:  Or the timing associated with when the

7     defendants started to develop this program in relation to

8     when these two employees left?  Have you taken discovery on

9     things like that on the subject or on this argument of

10     head-start or commercial advantage?  Or are you solely

11     focused on the financial data right now?

12          MR. YU:  Your Honor, we have taken other -- we

13     have taken other types of discovery, based on head-start

14     such as development timeline.

15          Again, I would emphasize, though, I think that

16     absolutely, Your Honor, we have.  I would again emphasize

17     the fact that I think financial information is still really

18     valuable for those claims.  It doesn't -- just because we

19     have taken other discovery doesn't moot the need for

20     financial information.  And that's particularly because, you

21     know, for example, financial -- other types of kind of

22     qualitative ratios, so to speak, such as testimony in a

23     deposition setting or kind of e-mails, wouldn't necessarily

24     reveal, for example, the scope of PNC's engagement in this

25     matter.  It wouldn't necessarily reveal how much money they

23

1    have sunk in to develop -- to cut corners, so to speak, in

2    developing the product.  And that's something that would

3    probably be best gained from the numbers.

4              THE COURT:  Okay, go ahead.

5              MR. YU:  And, Your Honor, I would again just

6    emphasize that RFP 9 is quite limited, again, only limited

7    to development of the financials related to PNC Pay, which

8    is kind of the impeding product that we have alleged that

9    was used to develop our -- from SRSA'S trade secrets.  We

10   obviously are not seeking all of the financials from PNC

11   bank, we recognize that's a large financial entity and most

12   -- and that other set of information would not be relevant

13   in this case.

14             So, Your Honor, I think, unless there are further

15   questions on RFP 9 or 8, which I'm happy to address, I

16   think -- again, I think those are the requests plaintiffs

17   seek information relevant to SRSA's claim of irreparable

18   harm, information related to SRSA's claims liability that we

19   think that our motion should be granted on those.

20             THE COURT:  Okay, thank you.

21             Ms. Wallace, let me ask you a few questions.

22             MS. WALLACE:  I'm going to stand at the podium, if

23   that's okay.

24             THE COURT:  Sure.

25             First, I want to confirm that my reading of -- and

1   so your -- I mean, nobody's filed motions and I haven't

2   authorized the filing of motions to compel yet, but I will

3   refer to these issues as motions.

4           But your motion only involves RFP 4; is that

5   correct?  Or it's kind of -- it's RFP 4 -- well, I will

6   start there.

7           It's just RFP 4; is that correct?

8           MS. WALLACE:  The temporal one?

9           THE COURT:  Yeah.  I mean, there's two -- there's

10  two issues.  Are they both encompassed by 4, I guess is the

11  question?  Or we are dealing with 4 and that second issue is

12  not directly addressed by RFP 4?

13          MS. WALLACE:  Yes, I'm sorry.  So the -- one is

14  4 --

15          THE COURT:  The cover communications and the

16  temporal --

17          MS. WALLACE:  And then the --

18          THE COURT:  -- issue.

19          MS. WALLACE:  -- the temporal issue.

20          THE COURT:  Yes.

21          MS. WALLACE:  Correct.

22          THE COURT:  Are both part of 4?

23          MS. WALLACE:  No, no.

24          THE COURT:  Okay.

25          MS. WALLACE:  No.  I think the temporal issue

1   actually covers a number of the discovery requests because,

2   you know, they are essentially saying that any -- any

3   documentation that they have given to date regarding these

4   alleged trade secrets stops at the time the employee left.

5          And if I may answer one of the questions you asked

6   before to plaintiffs.

7          THE COURT:  Go ahead.

8          MS. WALLACE:  On the temporal objection, if this

9   -- we are not trying to impose a use requirement on the

10  plaintiffs.

11         The issue here is value.  And the fact that in

12  order to have a trade secret, you obviously have to have

13  some competitive edge and value, and I don't think anybody

14  disputes that.  And they have pierced -- subsequent to the

15  employees leaving, they have put out a Version 2 of this

16  software, presumably to correct or to change some of the

17  features to make them more competitive.

18         And so the reason that we want the changes, what

19  they have hacked and what they have disregarded, and we are

20  not looking to have, you know, the source code or the full

21  architecture; it's literally what features have you changed

22  and -- so that we can pursue whether or not the reason for

23  those changes was because of the lack of value or

24  competitive edge on the product that they had before.

25         And, you know, they repeatedly have said that they

26

1   were the only product in town until we came along and in a

2   year, we are able to put out a new one.

3           I would posit to you, Your Honor, a year is not

4   that short a period of time.  And when you put enough money

5   into a development and hire a third-party software company

6   to do it, a lot can happen in a year.

7           But the heart of the issue is, you know, we are

8   not looking for their -- we are not looking for the

9   architecture, we are not looking for the source code.  We

10  just want to know what changes they made so we can pursue an

11  argument that the case that they cite in opposition makes

12  clear is relevant, which is -- is there -- was there value

13  in the first place?

14          And, you know, this burdensome objection, you

15  know, I don't even really understand it.  And I certainly

16  don't understand the distinction that they are making

17  between the -- the commercial -- the commercial trade

18  secrets and the technical trade secrets here.

19          THE COURT:  So I was -- I'm warned to the Dow

20  Corning case that the plaintiff cites, which says the value

21  of the information contained in the trade secrets associated

22  with generation, one technology depends on how much someone

23  is willing to pay for it.

24          How do you respond to that notion, that the

25  subsequent iterations don't ultimately evidence a lack of

1   value in the first iteration of a trade secret, so long as

2   someone is willing to pay for it?  And further, in this

3   instance, where, at least, the plaintiff claims that they

4   are still using the first iteration of the technology?

5         MS. WALLACE:  And that, frankly, is something I

6   think we are entitled to -- entitled to do discovery on.  I

7   mean, she said today that they use -- they still use the

8   first iteration.  In the limited documentation we have seen,

9   in reality what has happened is they have released a Version

10  2 and that's what they are using.  Does that incorporate

11  some of the original version?  I'm sure it does.

12        Usually, you don't just completely start from

13  scratch when you do a Version 2, but the Dow case doesn't --

14  it doesn't say -- it -- as I read the case, what it's saying

15  is just because you have a second iteration doesn't mean

16  that there wasn't value in the first iteration.  It doesn't

17  hold that the -- there can be no discovery into the question

18  of whether there's value.

19        And you know, I mean, that's the argument that

20  they can make.  They can say, you know, we could have gone

21  out into the marketplace and sold this for $3 million or

22  $5 million, or whatever they want, but that shouldn't

23  preclude us from, you know, exploring what they have done

24  since they -- since our, you know, our clients allegedly --

25  the individual defendants allegedly saw this information and

1   brought it to PNC.

2          THE COURT:  And then so -- so I don't necessarily

3   disagree with what you just said.  I think part of what I

4   have to -- part of my struggle and part of what I have to

5   consider here is -- so the analysis or my considerations

6   might be different if this was a discovery dispute in the

7   middle of a case; but we have a discovery dispute over an

8   expedited and limited amount of discovery specific for an

9   injunction hearing.

10         So on some of these things I hear you say, I don't

11  necessarily disagree with you; but, yet, that may be

12  relevant proportional for purposes of discovery in light of

13  the claims and defenses in the case.  And the comment

14  essentially kind of goes for both sides here.

15         But, I need to figure out where the lines are, or

16  at least where they appear to be to me in terms of what is

17  relevant and proportional for purposes of the preliminary

18  injunction hearing.

19         And so whatever anyone can do in their discussions

20  with me to help me find those lines, or at least understand

21  those lines from your respective positions, that would be

22  helpful to me.

23         MS. WALLACE:  Well --

24         THE COURT:  And I think I get it, Ms. Wallace, on

25  this issue for you.  Because you're saying -- so correct me

1   where I'm wrong -- but I think you're saying that you feel

2   this issue of the subsequent versions goes to whether or not

3   the trade secrets -- claimed trade secrets have value.

4           And the definition of trade secret, I think under

5   both the federal and the state statute, have this component

6   of a trade secret is something that has value or is of

7   value; is that correct?

8           MS. WALLACE:  Yes, Your Honor.

9           THE COURT:  Okay.

10          MS. YBARRA:  Your Honor, may I address that point

11  specifically because I think it's a little different under

12  the Federal Trade Secret Act?

13          THE COURT:  Let me just finish my time with Ms.

14  Wallace and then I will give you another opportunity.

15          Before I shift topics with you, Ms. Wallace, did

16  you have anything else to add on that -- on that point

17  regarding the --

18          MS. WALLACE:  On the --

19          THE COURT:  -- subsequent versions that you see?

20          MS. WALLACE:  On the subsequent versions?

21          No.

22          THE COURT:  Okay.  Now, RFP 4 ends with, you know,

23  produce a copy of, et cetera, and then it ends with:

24  Concerning any product or service that SRS contends is a

25  trade secret, practices as a trade secret or otherwise

1   embodies a trade secret.

2           Am I correct that this request is not limited to

3   just the trade secrets that the plaintiff claims were

4   misappropriated by the defendant?

5           MS. WALLACE:  Well, Your Honor, to be perfectly

6   candid, I haven't seen this trade secret disclosure document

7   that the plaintiffs have prepared.  They pretty much

8   consider every single aspect of this business to be a trade

9   secret.  But, yes, we are just limiting it to what they

10  actually allege to be a trade secret, but that is very, very

11  broad.

12          THE COURT:  But the language of RFP 4 doesn't seem

13  to so limit.  Am I reading it correctly?

14          MS. WALLACE:  In which -- in which -- if you could

15  direct me to what part you think --

16          THE COURT:  It's the last sentence of RFP 4.

17          MS. WALLACE:  So, it's the second --

18          THE COURT:  Well, concerning -- where it starts

19  with:  Concerning --

20          MS. WALLACE:  Right.  Any product or server that

21  they contend is a trade secret in this litigation,

22  obviously.

23          THE COURT:  Well, that's -- that's -- it doesn't

24  say -- it says: concerning any product or server that SRS

25  contends is a trade secret, practices as a trade secret or

1    otherwise embodies a trade secret.

2              Or did you define -- trade secret is in capital,

3    it's capitalized.  Is that a defined term, to limit the

4    request to the trade secrets involved in this case?

5              MS. WALLACE:  Yes, it is.

6              THE COURT:  Okay.

7              MS. WALLACE:  And, I mean, we -- we are not

8    looking just -- just what they -- all -- all we want to know

9    in this one is, You say all of this stuff is a trade secret,

10   of all the stuff that you're saying is trade secret, did you

11   or did you not send it out to customers, investors, various

12   other people?  Because when you disclose a trade secret to

13   people like customers, it's no longer a trade secret.

14             They have given us, you know, all of these

15   PowerPoint presentations that have, you know, stuff in there

16   that goes to their alleged trade secrets.  But they have

17   told us that they won't give us the, you know, e-mail

18   communications when they -- if and when they send it to a

19   customer.

20             And we said, Well, can we come to an agreement, if

21   you are not -- if you don't want to go through the trouble

22   of looking through your e-mails and giving us the

23   transmission, then, you know, can we agree that the various

24   documents that you have produced are -- have been

25   disseminated?  And they refused to do that.

1          And, you know, their argument is because we say a

2    copy of all the documents, that somehow that means that they

3    don't need to give us what the communication is, but the

4    document request says:  A copy of all documents in which you

5    distributed or provided to these people.  Obviously, without

6    the distribution or the evidence of providing, all we have

7    got is a spreadsheet where they can say, Well, we made the

8    spreadsheet, but we never sent it to anyone -- or I mean,

9    this PowerPoint presentation, but we never sent it to

10   anyone.

11          And, in all honesty, I mean, you know, I think

12   they say in their papers, 100 -- they have 150 employees.

13   I'm pretty sure that 150 employees aren't sending, you know,

14   PowerPoint presentations to investors and customers.

15          And, frankly, I mean, it goes to the heart of the

16   case.  You know, they have to prove a violation of a trade

17   secret, various elements of trade secret.  One is that it's

18   actually secret.  One is that it has the value, and they are

19   resisting, you know, giving us information in their

20   possession that enables us to defend.

21          THE COURT:  I was looking for it -- and I thought

22   they said in their brief that they -- what they provided to

23   you in response to the interrogatory was information that is

24   routinely disseminated to third parties and customers and so

25   forth.

1            MS. WALLACE:  They say -- they said that there was

2      a -- was a repository.  But, I mean, we specifically said,

3      We can drop this if you will -- you know, if you will

4      stipulate that these -- that these various documents were

5      all widely disseminated, and they would not do that.

6            Do you mind, Your Honor, if I grab a glass of

7      water.

8            THE COURT:  No.  Please do.

9            So, on page 11, they say:  SRSA performed a

10     reasonable search of shared drive locations on the

11     individual hard drives of key sales and marketing employees

12     to produce responsive sales and marketing documents that are

13     regularly disseminated to third parties.  SRSA also produced

14     documents SRSA shared with investors that specifically

15     relate to SRSA products and trade secrets.

16            MS. WALLACE:  As I said, I mean, if they are -- if

17     they'll take -- I mean, if they will agree the documents

18     that have been produced with this SRSA custodian were widely

19     disseminated, which they expressly wouldn't agree to when we

20     asked them to do that, you know, then I guess they can forgo

21     giving us the places in which they actual transmitted it.

22            But, you know, we -- obviously -- obviously, were

23     simultaneous briefings and that is not something that they

24     were willing to do -- to agree to prior.

25            THE COURT:  Is that -- for any of you on the -- at

1   this table, is that something you can agree to, based on

2   what you have indicated here in your brief?

3          MS. YBARRA:  Your Honor, the -- I think that we

4   are talking past each other a little bit here.

5          We -- as you pointed out, RFP -- PNC's RFP 4, it's

6   -- it's not -- it's not just about documents shared with

7   third parties that contain or reflect our trade secrets.  It

8   is documents that --

9          THE COURT:  Before you go there, what I hear Ms.

10  Wallace saying is that we got all of this stuff that you

11  produced, they want the communications associated with it;

12  however, if you all will confirm that that information was

13  widely distributed to third parties, there may not be an

14  issue.

15         So I get you still may have issues with the

16  verbiage, but we might actually get this resolved if -- and

17  to me, you have said as much already in your brief.  You

18  have acknowledged you've produced information.  You are

19  complaining that you don't want to have to produce the cover

20  communications.  You have indicated in here that what you

21  have produced has been disseminated to third parties and

22  investors and so forth.

23         So as I understand it, if that's true and if

24  that's what the situation is, Ms. Wallace might be satisfied

25  with response to RFP 4.

35

1        So before you go on arguing about other problems

2   with the interrogatory, we might have a resolution, if you

3   all can confirm what Ms. Wallace has just indicated.

4        MS. YBARRA:  I can't confirm here -- I could

5   stipulate that they are widely disseminated.  It is a

6   different thing for SRSA to share, let's say, a presentation

7   that talks about its flagship product Clearinghouse, which

8   embodies a bunch of trade secrets, but doesn't, you know,

9   share the secret sauce in that presentation.

10        It's a different thing for SRSA to share that with

11   a third party than an actual trade secret document that we

12   keep under lock and key.  And the stipulation that PNC is

13   seeking is that we widely disseminate anything related to

14   our trade secrets.

15        THE COURT:  So maybe I'm wrong, you can let me

16   know.  I think what she is saying -- you actually gave them

17   documents, right?

18        MS. YBARRA:  Yes.

19        THE COURT:  Can you confirm that what you gave

20   them is something that is distributed to other third

21   parties?

22        I don't think the question is getting at the

23   secret sauce.  It's saying, Look, you gave me stuff, but I

24   don't know who you gave this stuff -- who else you gave this

25   stuff to or how you use this stuff with third parties.

1        So, can you confirm what you have given them, how

2   that's used or disseminated to third parties.  Not the

3   underlying secret sauce around the documents; it's just the

4   tangible things you actually gave them, where does it go

5   with third parties?

6        MR. YU:  I think we are 90 percent there, but I

7   just want to clarify one thing if we agree to the

8   stipulation, which is one of the issues we had was the words

9   "widely disseminated themselves" they are a little vague in

10   the sense that we are not stipulating that, you know, every

11   document that was sent was sent to every single one of our

12   customers.

13        In other words, you know, one of the issues we

14   had, I mean, for a very long -- spent too long on it -- is

15   that we wouldn't agree to stipulate that, for example,

16   marketing document was shown to every single customer on

17   SRSA's customer lists because that's simply not how our

18   business operates.

19        So I think, in general terms, we would be willing

20   to stipulate that the documents that we've produced in

21   response to RFP 4 are widely disseminated, but with the

22   caveat, we are not going to -- that's not to stipulate to

23   further evidentiary point, such as the number of the

24   customers or the -- the quality or the type.

25        THE COURT:  Ms. Wallace, for example, they say in

1   their brief that what they have produced, that they have

2   produced responsive sales and marketing documents that are

3   regularly disseminated to third parties.

4         MS. WALLACE:  And that's exactly what we asked

5   for, Your Honor, but we also -- there's also just an

6   evidentiary issue, which it's not like they've given us a

7   pile of documents they say are responsive to requests for.

8         So in order for a stipulation to work, they have

9   to identify which ones were responsive to 4 and which ones

10   they are now agreeing that were widely disseminated.

11         I honestly think that the easier thing to do, and

12   what has happened in every other litigation I have been in,

13   is you look at the e-mails and you know it went to what

14   customers and when.

15         THE COURT:  And so my -- my only concern with

16   going there is you didn't ask for e-mails, you didn't ask

17   for communications with RFP 4.

18         MS. WALLACE:  Well, I guess I -- from my

19   perspective, when you ask for all documents that have been

20   communicated, you either have to identify the set of

21   documents that are responsive, which would get us to the

22   same point because those have been communicated, or you have

23   to show how they were communicated.

24         But what we have now is 11,000 documents, many of

25   which, I think about 5- or 6000 which are stand-alone

38

1  documents without any e-mail communication and, you know, no

2  idea what, how -- or -- how or whether they were

3  disseminated or distributed.

4          THE COURT:  So if -- if from the documents that

5  they gave you, they can go back and identify by Bates Number

6  or folio stamp and say, you know, documents in this range

7  were regularly disseminated to third parties and documents

8  in some other range were shared with investors --

9          MS. WALLACE:  And I guess, there is a little bit

10  of the thing is, you know, we don't need them to be

11  regularly disseminated.  We need them tabbed and

12  disseminated.

13          If they sent it to -- if they sent -- if they sent

14  their trade secret documents to ten customers or a thousand

15  customers, and I don't know what they would consider

16  regularly to be, you know, it's -- it -- it still goes to

17  whether or not they are keeping this stuff secret.

18          So you know, I guess -- you know, if they want to

19  say "regularly," that's fine, but what I don't want them to

20  do is, well -- to say, Well, we are not going to include on

21  our list of Bates labels the ones that we sent to less ten

22  customers, because that's not regular.

23          THE COURT:  So, Mr. Yu, in order to write this in

24  your brief that you have produced documents that are

25  regularly disseminated to third parties and shared with

1  investors, you should be able to go back and identify

2  specifically which documents fall into those categories,

3  right?

4          MR. YU:  Well, Your Honor, I actually think

5  there's no other RFP that they have served that actually

6  seeks this type of information.  So I think, you know, by

7  process of elimination, they have -- they actually could

8  tell what type of documents are in response to this.

9          I don't think they have served us a request, for

10  example, seeking marketing documents in any other capacity.

11          THE COURT:  So that didn't directly --

12          MS. WALLACE:  So you'll --

13          THE COURT:  -- answer my question, which was you

14  have said it here in your brief --

15          MR. YU:  Uh-huh.

16          THE COURT:  -- that you have produced information

17  that falls into these two categories.

18          So it would seem you should be able to go back to

19  those documents and identify by Bates Number which documents

20  fall in each of those categories that are responsive to RFP

21  4.

22          MR. YU:  That's correct, Your Honor.

23          THE COURT:  Okay.

24          MR. YU:  With the caveat that, you know, with a

25  reasonable -- given the thousands of documents that, you

1    know, a reasonable -- a reasonable search and production of

2    the Bates range would entail, especially given the expedited

3    discovery period in this case.

4          THE COURT:  Say that again.

5          MR. YU:  With the -- with the caveat that we have

6    produced thousands of documents and that, you know, we are

7    under kind of a time crunch with the expedited discovery

8    period, so --

9          THE COURT:  Right.  So that's the heart of what

10    I'm trying to work with.

11          MR. YU:  Yeah.

12          THE COURT:  I mean, either you guys can go back

13    and do a search of all of these customers you say you don't

14    want to do to find the cover e-mails, or you can identify by

15    Bates numbers which documents, using your words, were

16    regularly disseminated and given to investors so that they

17    have information that they can work with for purposes of

18    this hearing.

19          MS. WALLACE:  And, Your Honor, we are taking a

20    deposition in exactly two weeks on this issue, so we would

21    need to have that in advance of the deposition.

22          THE COURT:  So Ms. Wallace, recognizing that I'm

23    trying to find and maneuver lines, given where we are

24    currently in discovery, if you received information from the

25    plaintiffs as I have described, identifying these two

1   categories by Bates Number as being responsive to RFP 4, in

2   your mind, at least at this stage of the case, does that

3   take this issue -- your issues with RFP 4 off the table?

4           MS. WALLACE:  Let me just confer with my client

5   for just a second.

6           THE COURT:  Sure.

7           (Pause).

8           MS. WALLACE:  Yes, Your Honor.

9           THE COURT:  Okay.

10          MR. YU:  And, Your Honor, I just want to clarify

11  that if -- whether we were still going to enter into a

12  stipulation of the words "regularly disseminated" or

13  "disseminated," because if so, I would like to clarify one

14  thing.  But everybody thinks the stipulation is moot, given

15  fact that they can identify it by Bates range, that's all

16  they have to do, but I wouldn't -- I don't need to speak

17  further on this issue.

18          THE COURT:  What is your clarification?

19          MR. YU:  Just -- you know, just the fact that the

20  document is regularly disseminated, doesn't necessarily mean

21  there is a nondisclosure agreement attached to it.

22          So in response to Ms. Wallace's point, just

23  because we send it to five shareholders or a thousand

24  doesn't make a difference.  Actually, sometimes we send

25  documents to shareholders with a nondisclosure agreement

42

1  attached to it so, therefore, by stipulating that document

2  was -- was regularly sent does not mean we have waived our

3  trade secret protections over it.

4          MS. WALLACE:  But now they don't want to -- now,

5  they don't want to give us the nondisclosure agreement, so

6  you know -- I mean, that's why all of this, if they just

7  looked for the communications in the first place, would have

8  been obviated.

9          MR. YU:  And respectfully, I think that's a

10  separate discovery request as to why whether we haven't

11  produced the NDAs, they haven't raised that to us in

12  immediate conferral process, so I that that is premature.

13  If they have specific NDAs they think we haven't produced,

14  we are happy to consider that.

15          THE COURT:  Mr. Yu, I'm not quite following the

16  first part of what you said, though.

17          Are you -- are you concerned that by producing

18  this argument, you don't want to waive any claim to,

19  what? -- protection over that information?

20          MR. YU:  That's -- that's -- that's correct, Your

21  Honor.

22          Simply by, if we stipulate -- if we stipulate that

23  the documents were disseminated, that doesn't mean that we

24  have waived our trade secret's protection over the -- in

25  other words, we weren't diligent in guarding our trade

1    secrets because the document could have had, for example, a

2    nondisclosure agreement attached to it.

3              THE COURT:  And that wouldn't be the function of

4    the stipulation, is to waive any --

5              MR. YU:  Yes.

6              THE COURT:  -- any arguments that --

7              MR. YU:  Uh-huh.

8              THE COURT:  -- the plaintiff wants to make around

9    any of those materials continuing to have a trade secret

10   status?

11             It's the function of the stipulation, or the order

12   of the Court in this regard is simply to -- for discovery

13   purposes, getting information to the defendant that appears

14   to be relevant and proportional to the preliminary

15   injunction hearing.

16             MR. YU:  Thank you, Your Honor.  I just wanted to

17   clarify that.

18             THE COURT:  Sure.

19             MS. WALLACE:  Your Honor, if -- so then they give

20   us -- you know, they give us a list of a thousand documents

21   that they admit they widely disseminated or generally

22   disseminated and then, you know, we go -- we go to the

23   30(b)(6) deponent on the same subject and we say, So you

24   know, you have agreed that you have widely disseminated this

25   document?  And they say, Yes, but, you know, we may have had

1   a nondisclosure agreement with the people whom we

2   disseminated it to, right?  And then I say, Well, okay, did

3   you or did you not?  Who did you disseminate it to, and do

4   you have nondisclosure agreement with them?  And I can

5   pretty much promise you the answer will be, I don't know.

6           So you know, essentially, it's -- it's just

7   playing games.  Mr. Yu is essentially saying that, you know,

8   We won't tell you who we gave it to and we won't tell you

9   when we gave it or how we gave it.  We will say we gave it

10  to people, but because we won't give you the communication,

11  we have no ability to ask them, you know, whether -- whether

12  or not there was an NDA.

13          And I -- I understand that we are trying to -- to

14  limit this in a way that's reasonable, but certainly the

15  intent -- and they have known this for a month because we

16  have been talking about this discovery request for a month.

17          The intent of this discovery request was to elicit

18  to whom they gave the documents that they allege are trade

19  secrets so that we could pursue -- give us the documents you

20  gave to trade secrets so that we can pursue with them, you

21  know, under what circumstances it was done so we can

22  ascertain whether there has been a waiver of trade secrets.

23          And you know, Mr. Yu's, well -- and I'm not -- I'm

24  not asking that they -- that they admit that it was a waiver

25  of trade secrets; that's a legal argument for the Court to

1   decide.  But, you know, I think incumbent in this is

2   understanding who they gave it to so that we can ascertain

3   whether or not it was a waiver or not.

4          THE COURT:  And you are talking about in the

5   context of a deposition asking the deponent how the document

6   was disseminated, to whom it was disseminated, questions to

7   that effect?

8          MS. WALLACE:  Yeah.  And I mean, because they are

9   just saying, Well, these thousand documents were widely

10  distributed, there's no way that a 30(b)(6) witness is going

11  to be able to answer that question because they are not

12  going to have the evidence of the distribution.

13         THE COURT:  Right.  So I -- I -- I think you are

14  not going to be in a position to get as specific as to what

15  individuals on what date was this information sent to, but

16  presumably, they can prepare a 30(b)(6) designee to look at

17  the nature of these documents who will understand that, Oh,

18  we usually send that document to X type of customer, or we

19  send that type of document to investors and we do that for

20  purpose of educating our investors on the product, or

21  whatever those circumstances are.

22         I think you can get information from a deponent

23  about how those documents, them being business records or

24  what have you, how they are used in the context of how they

25  are disseminated.  But getting down to every single person

1    they have sent this type of communication to, I get

2    concerned that that level of depth get -- starts to get an

3    afield of the issues in play for an injunction hearing.

4            MS. WALLACE:  Right.  And I -- I -- I understand

5    where you are going.

6            But at the same time, if we can't test them on,

7    you know -- if -- if there's truly going to be a person who

8    is going to be able to say, of these thousand documents, I

9    can sit here and under oath say that I know that this

10   document, every single person we sent it to was subject to

11   an NDA, that's one thing.

12           But I think that likely what's going to happen is

13   there's going to be, you know, this large number of the

14   documents that they have produced that are all these sales

15   presentations and marketing presentations and they are not

16   going to be able to have that and then we are deprived of

17   the ability to test who they went to and under what

18   circumstances.  And it's all because they are refusing to

19   give us the e-mail communications in which they went out.

20           THE COURT:  Okay.  I understand -- I understand

21   your argument and your concern.

22           MS. WALLACE:  Thank you, Your Honor.

23           THE COURT:  Let me just finish -- or I'm going to

24   -- I'm just -- so I think the other issue we need to close

25   out --

1          MS. WALLACE:  Okay.

2          THE COURT:  -- from your client's perspective, or

3    with your client's brief, is the -- is it the temporal issue

4    of the technical trade changes so that technical trade

5    secrets to the present?  We talked about that a moment ago,

6    I don't know if we closed that out.

7          MS. WALLACE:  Yeah.  And I mean, I would just say,

8    you know, I -- and I'm -- kind of the objection that when I

9    read the arguments of plaintiff's counsel is this kind of

10   burdensome, you know, the reason they can't give us the

11   commercial trade secrets and not the technical trade secrets

12   has something to do with like the burden.

13         And I guess what I would say is that, you know,

14   first of all, you know, they are trying to shut down a

15   business here.  So, I mean, proportionally, we are talking

16   about, a pretty big deal.  I mean, this is an entire

17   business that they are trying to shut down.

18         But even taking that aside, we are not looking for

19   every single development document on these changes.  I mean,

20   a document that -- a comprehensive document that shows the

21   differences between, you know, the version that existed at

22   the time our clients left and the version that exists today

23   is -- would suffice.

24         So I mean, we are not looking for thousands of

25   documents.

1          THE COURT:  Okay.

2          MS. WALLACE:  May I -- you had asked them a bunch

3     of questions on -- regarding their, you know, about this

4     irreparable harm issue, I --

5          THE COURT:  If you have things to add that aren't

6     just redundant of what you have already briefed for me, I

7     will entertain that.

8          MS. WALLACE:  Well, I guess what I would say is --

9     well, first of all, it was news to me today that there is

10    allegations of having stolen customer lists.  From my

11    reading of the complaint, which I have read numerous times,

12    it has always been my understanding the issues were more

13    that these two employees knew who the customers were and,

14    therefore, you know, wouldn't know who to go after anyway.

15          But as a little bit background about how this

16    industry works, you know, you have people, tons and tons of

17    various customers who do one-off deals, right?  You know,

18    people who aren't in the business of buying companies.  And

19    those customers are -- in these kind of deals, marginally

20    end up hiring the shareholder -- shareholder

21    representatives, which is a line of business that both of

22    our clients have done for years.

23          And, so they already -- they know what the deals

24    are because everybody goes to these two companies and asks

25    for a bid, and they both bid on them.  So that's the large

1    majority of deals that we are talking about.

2            And then what you have here is the smaller subset

3    of clients who are, you know, the companies who are

4    perpetually buying other companies, a Google or a Facebook

5    or, you know, there's -- there's a handful of them, probably

6    less than 20 in the country.  And what they are -- what they

7    are seeking here is -- they are not just asking for the

8    customers that they had that we have also done work for.

9    They are not even just asking for the customers that we have

10   actual done deals with.  They are asking for every single

11   customer or potential customer that we have approached in

12   the last, you know, last year.

13           And you have got to remember that people -- I

14   think that this has been lost a little bit in the pleadings,

15   but our client, PNC -- my client PNC -- they bought a

16   company Fordis (ph), who has been in this business for a

17   dozen years, okay, and they have just as many contacts in

18   this business, in this M&A business, as SRSA does.

19           And what they want in this incredibly -- these two

20   are direct competitors, they want us to give them a list of

21   every single lawyer, customer, anybody who we have

22   contacted, you know, since we -- since PNC bought Fordis.

23   And they want us to not -- that successfully, if they

24   went -- if they called up their contact at Google and they

25   said -- and they went out for coffee, they want us to tell

50

 1    them that and they want us to tell us who at Google they

 2    went out to.  I mean, this is so far beyond what one would

 3    expect in a kind of case like this.  And we are talking

 4    about competitors here.

 5            There is no relevance to the fact that my guy from

 6    Fordis, you know, dug up the contact information of a lawyer

 7    at Google and had -- took him out to lunch.  I mean, that is

 8    just so beyond the pale.  And they -- and because they want

 9    this information so bad -- and it's just competitive intel,

10    nothing else.  Because they want it so bad, they are trying

11    to like wrap it into this irreparable injury thing.

12            The cases that they cite universally, there's not

13    one single case that they have cited that says that it goes

14    to irreparable injury, the customer information.  So they

15    cite these Yovay (ph) cases that mention, Oh, a head-start

16    or a commercial success.

17            You will find, Your Honor, that every single one

18    of these cases falls into two categories.

19            It's either a contract of exclusivity, right?  So

20    there is a contract between the parties at issue that they

21    will -- only one of them will sell a product that's breached

22    and they want to say, Well, look, what kind of head-start

23    have you gone by breaching the contract?  That isn't here.

24    These -- these were just competitors.  There's no noncompete

25    in this case, there is no exclusivity.  There is nothing

1   like that.

2            You just have one company who is mad that another

3   company is competing with them and now wants, you know,

4   their confidential customer information.  And then the

5   revenues, like, how does revenue -- the revenues doesn't

6   tell them anything relevant to this case.  Revenues are,

7   Your Honor, called lost profits.

8            So we heard today for first time, this has -- this

9   has never -- this was certainly not said in the pleadings

10  that they can't prove damages.  That is, for lack of a

11  better word, it's just baloney.  This -- this a lost profits

12  case.

13           If we somehow stole a customer of theirs or if our

14  product enabled us to steal a customer of theirs and they

15  can prove that, but for us having this product, they would

16  have got the customer, they find out what our revenues is

17  after the preliminary injunction when we are talking about

18  damages, we give it to them and that's their lost profits.

19  End of story.

20           But at this stage of the case of irreparable

21  injury, it just doesn't happen.  So the other category where

22  you see these kind of -- these vague terms of irreparable

23  injury, can go to commercial success or head-start, they are

24  noncompete cases, right?

25           So Employer A is asking Employer B for your

1    revenues because -- or your head-start because you stole our

2    employee.  That didn't -- an employee, mind you, with a

3    noncompete.

4          This is no noncompete here; these people are

5    entitled to work.  And they are entitled to -- they are --

6    they -- and -- they are entitled to work and they are

7    entitled -- and we are entitled to compete, but PNC doesn't

8    have any contractual agreements with SRSA.

9          And so what they are essentially trying to do is

10   find out what customers we were approaching, whether it was

11   successful or not, which goes to nothing; every past

12   customer, many of which they know and -- and -- and our

13   revenues, which just goes to nothing.

14         I mean, it's -- it's maddening, Your Honor.  But,

15   you know, the cases that they cite absolutely do not stand

16   for the provision that in any run-of-the-mill case of a

17   trade secret case that just because one company has, you

18   know, quote/unquote, commercial success, that they then have

19   to turn over their customer lists or their revenues.

20         And the one thing that I will say, and the only

21   thing that really I agree that they can have is the

22   head-start.  And I think you brought this up with

23   head-start, like how much did it cost you to build this

24   product?  Right.

25         You know, if we built it for $500,000, you know,

53

1    we have already told them that we will give them that

2    information, we very specifically have told them.  So that

3    is something I agree, you know, if we were able to really --

4    you know, to really -- to really build it on the cheap,

5    sure, they can have that and they can find out -- they

6    already know, you know, when we started to build it and how

7    long and what statements of works we used and what

8    third-party vendor we used.

9            But this idea -- that's -- that's the head-start.

10   And that's -- and we are more than willing to give it to

11   them.  We have told them that we will give them that

12   information.  There's a 30(b)(6) topic, we have specifically

13   said we will put forth the person who will tell -- talk to

14   you about the costs of the development of the product.  And

15   we have given countless documents on how the product was

16   developed, about 7000 documents.

17           THE COURT:  Okay.  Anything else?

18           MS. WALLACE:  I know I ran on, Your Honor, and I'm

19   sorry.

20           THE COURT:  That's all right.

21           MS. WALLACE:  No, unless you have any other

22   questions for me, I'm good.

23           THE COURT:  Okay, great.  Thank you, counsel.

24           Ms. Ybarra.

25           MS. YBARRA:  Your Honor, I won't -- I don't want

1   to belabor points we have already addressed, but briefly

2   respond to what Ms. Wallace said.

3         It is a misstatement of our request on the

4   customer documents sufficient to identify customers they

5   have targeted to suggest that we are asking for their entire

6   customer list or everybody who went out to coffee with

7   somebody at Google.

8         We are asking for documents sufficient to identify

9   customers they targeted for the sale of a competing product

10   built with our technology.  It's very limited in scope.

11         And I will state again, central to our irreparable

12   harm argument, are these lost deals, which are very

13   difficult to quantify because of the bidding nature of the

14   deal, because of the secrecy involved in the parties

15   participating.

16         We are going to leave Your Honor's courtroom and,

17   at least Mr. Yu and I, are going to go back into a

18   conference room for three or four of our 30(b)(6) witness on

19   lost deals.  And the PNC's office topic was important enough

20   to notice an entire one of our -- an entire topic on this

21   issue.

22         And we have a witness we have prepared, to the

23   best of our ability, who is testifying on deals we believe

24   we have lost to PNC, but our information is one-sided and

25   imperfect.  And they have the complete information about who

1    we went head to head with.  Or we need to bring our

2    information together to know who we went head to head with

3    and lost to PNC.

4            I will also note Ms. Wallace is -- is incorrect

5    that we did not allege in our complaint that -- that damages

6    were hard to quantify.  We said we don't have an adequate

7    remedy at law for violation of the trade secret or for

8    violation of trade secret laws.

9            But I wanted to return to -- to a couple of other

10   things.

11           On the temporal issue and the idea that because we

12   iterated our technical trade secrets somehow affects the

13   value of the trade secrets that were actually

14   misappropriated by defendants, that is actually, just --

15   and, you know, Ms. Wallace said the changes go to the

16   relevant, to lack of value, lack of competitive edge.

17           That is a fundamental misstatement of both the

18   Colorado Trade Secret Act and the Federal Trade Secret Act.

19   Both of those statutes talk about the economic value from

20   not being generally known -- and I will read you from the

21   DTSA:  The information that all business trade secret

22   derives independent economic value from not being generally

23   known and not being readily ascertainable through proper

24   means by another person who could obtain economic value from

25   the disclosure of the information.

1          We use this example in our brief.  Coke is a

2     famous -- the formula for Coke is a famous trade secret.

3     Coke, you know, iterates and makes Coke 2, the Coke Zero.

4     The formula for Coke is still extremely valuable to software

5     -- or soft drink maker who wants to enter the market and

6     doesn't know how to make Coke.  That's where the value comes

7     in, by a competitor having it in their hands.

8          And so I think that -- I think that PNC's

9     positions on the law there are just flatly contradicted by

10    both the statutes and the case law interpreting them.

11         The -- on RFP 4 Ms. Wallace represented that --

12         THE COURT:  I feel I have resolved RFP 4, so is

13    there a reason to go back to it?

14         MS. YBARRA:  Just -- yes, yes.  Because she said

15    PNC's request limited trade secrets by defining trade

16    secrets to those misappropriated in the case.  That's not

17    correct.

18         It was SRSA's objection, we limited to trade

19    secrets actually misappropriated at issue in the case.  If

20    you look at Exhibit B to our motion, it's on the first page

21    of the excerpts there.  But I want to make sure if we are

22    going to resolve this, our position is that this should be

23    limited to trade secrets in the case.

24         And, finally, Your Honor has asked a couple times

25    about burden, and I take it you want some more information

1    about how -- how we can get things done, what's actually

2    going on here.  And I will tell you, you know, we have -- in

3    addition to this lost profit 30(b)(6) witness today, we have

4    another -- another 30(b)(6) who is testifying today.  The

5    parties have 18 witnesses to be deposed by October 30.

6    Today is the first day anyone is actually getting deposed.

7    And those depositions are happening in Denver and Pittsburgh

8    and San Diego and Minneapolis and New York.

9              This is an incredibly busy time and we have our --

10   SRSA has its PI motion due November 6 and we are committed

11   to making this work and making this happen.  But going back

12   to the drawing board on some of these discovery issues where

13   the relevance -- or the burden is vastly outweighed by the

14   relevance, you know, of the documents sought by PNC is going

15   to be really challenging for us.

16             THE COURT:  Okay.

17             MS. YBARRA:  That's all.

18             THE COURT:  Okay, thank you.

19             MS. WALLACE:  Your Honor, just on the burden, as I

20   said, I mean, this injunction is asking, not just to have

21   the two employees who did not have a noncompete to not be

22   able to work at PNC.  They are asking to shut down a

23   business, okay.  There are dozens of people who work for

24   this business.  PNC has made millions of dollars of

25   investment and, you know, now I'm hearing about the case

58

1    that they filed, with the expedited discovery that they

2    requested, is somehow too much for them to be able to, you

3    know, comply with rules of discovery and give us what we

4    have asked for so we can defend the case so that the Court

5    doesn't shut down a business.  Okay.

6            And I just think that they are the plaintiffs here

7    and you have to take that into consideration when you are

8    talking about burden.

9            THE COURT:  Okay, thank you.

10           All right, Counsel, I appreciate the briefing on

11   this.  It was well done.  I appreciate the arguments of

12   counsel which were also well done.  I'm going to take this

13   under advisement.  I'm going to try to get you something, I

14   will say quickly, which may be in relative terms for courts.

15   But, quickly, because I recognize you're moving and shaking

16   and you need to which can or can't get into.

17           So I'll endeavor that out as quickly as possible,

18   trying to be sensitive to what is occurring for you all.  It

19   may be -- because of the speed in which I'm trying to --

20   will try to get this out, you know, it may be fairly

21   cursory, in terms of the order, but it will at least let you

22   know what is allowed and what is not.

23           So I will take it under advisement.  I will get

24   something out.

25           Is there anything else we need to take up?

1          MS. YBARRA:  Yes, Your Honor, one other issue.

2          PNC has served a 30(b)(6) topic asking for the --

3     asking us, SRSA, to present a witness to testify on the

4     factual basis for our allegations that their product

5     incorporates or misappropriates our trade secrets, which

6     actually involves the culmination of all of the testimony

7     and evidence that we are going -- discovery that we doing

8     this month.

9          We can't present a witness on that topic.  We --

10    if Your Honor would like us to brief it or, this discovery

11    issue, I think we are obligated to move for protective

12    order.  And I'm -- we are looking for some guidance from you

13    on how we can do this rather quickly, given the schedule and

14    how you would like this presented to you.

15         THE COURT:  And why can't you produce somebody on

16    that topic?

17         MS. YBARRA:  The topic asks for our factual basis

18    -- all factual bases for our allegation that their competing

19    product incorporates or otherwise misappropriates our trade

20    secrets.

21         We are still learning that information through the

22    testimony of PNC witnesses, which start next week.  But it's

23    -- it's -- we have depositions double-tracked, you know,

24    through the next two weeks.  And this is like the catchall;

25    this is our case, this is our trade secret case:  Tell us

1    everything that you know that supports your contention --

2    contention, deposition topic, essentially.  And it's -- it

3    seems, actually, physically impossible for a witness to be

4    downloading all of the depositions as they are happening in

5    real-time and then testify on all of the discovery that we

6    -- we are learning over the course of these depositions.

7            THE COURT:  So you may not -- or there may not be

8    somebody who can testify currently as to all of the ways in

9    which their competing product incorporates your client's

10   technology.  But in order to file the case, didn't you have

11   some semblance understanding or -- or evidence that their

12   competing product incorporated, at least, certain things

13   that -- that -- for which the case --

14           MS. YBARRA:  Yes.

15           THE COURT:  I assume the case was filed on that

16   basis, so couldn't somebody at least testify as to that --

17           MS. YBARRA:  Absolutely.  Your Honor, we offered

18   to -- we offer to put up a witness who would testify about

19   the factual bases for our allegations in the first amended

20   complaint and they rejected that proposal.  But I think

21   that's an extremely appropriate way to do this and we are

22   happy to put up a witness on that.

23           That was not sufficient for PNC.

24           MS. WALLACE:  Your Honor, first, they have had --

25   we've -- we've produced our documents regarding the

1   development of documents the NCA -- the product that they

2   say allegedly was appropriated.  We produced those documents

3   over four weeks ago.  So they have had plenty of time to

4   assimilate for sure the documents.  And there's absolutely

5   nothing preventing them from producing a witness who could

6   testify as to, not only what they knew at the complaint, but

7   what they think relative to our documents that would support

8   this allegation that our product incorporates something from

9   their product.

10          This -- in our main conferral, what they really

11   said was, Well, that's our work product, only the lawyers

12   know it because only the lawyers have reviewed the

13   documents.

14          And that -- that -- that position has been

15   squarely rejected by the Tenth Circuit in Oklahoma v. Tyson

16   Foods, in which the court -- in which the court said

17   attorneys often refuse to disclose during discovery those

18   facts they have acquired through their investigative efforts

19   and assert, as a basis of their refusal, the work product

20   doctrine.  Where such facts are concerned, they must be

21   disclosed to the opposing party in response to a proper

22   request for discovery.

23          And then the case goes on to talk about how one of

24   those proper requests is a 30(b)(6) deposition.

25          They have -- as you pointed out, they have sued

1    PNC on the basis that PNC Pay is a copycat of our -- their

2    product.  She said that multiple times, that it is a

3    copycat.

4         What I can tell you is, is that my client spent

5    around $3 million developing it and hired a third-party

6    developer to do it.  So we are very anxious to hear in what

7    ways our product was developed on the basis of theirs.  And

8    they -- and they essentially are refusing to tell us.

9         And so, you know, we are not -- you know, if a --

10   if a 30(b)(6) witness hasn't had a chance to read the

11   deposition of the day before, we get that.  But that doesn't

12   -- that doesn't obviate the -- the requirement that they

13   respond to discovery, including the factual basis of their

14   claims, and the fact that it's the crux doesn't make it any

15   -- if anything, it makes it more relevant.

16        They want to shut down our business on the -- on

17   the actual allegation that our product incorporates their

18   product and all we are asking for is tell us what facts

19   support that -- that claim.

20        End of story.

21        THE COURT:  When is this 30(b)(6) scheduled?

22        MS. YBARRA:  It has not been scheduled, Your

23   Honor, because we --

24        MS. WALLACE:  They --

25        THE COURT:  Okay.

1          MS. WALLACE:  -- they.

2          MS. YBARRA:  -- bring this dispute to you.

3          And one correction to Ms. Wallace's

4   representation.

5          They did hire a third-party developer, CGI, to

6   build their competing product at the direction and close

7   involvement of the two ex-SRSA employees.  CGI we served a

8   subpoena on.  We still don't have their document production

9   and we are taking their deposition -- or sorry, CGI is going

10  to be a 30(b)(6) designee for PNC on the development issue

11  on October 24.  So it's -- it's not correct to suggest that

12  we have had complete information and had time to digest it.

13         THE COURT:  So two things.  One, it seems that if

14  it hasn't yet been scheduled, perhaps it can be scheduled at

15  a time slightly later in time to afford anyone from SRSA who

16  needs to review deposition transcripts or other things to be

17  able to prepare to answer those questions.  There's still

18  time for that to occur, it would appear.

19         Secondly, in order to show reasonable likelihood

20  of success on the merits of the hearing, SRSA is going to --

21  well, it would seem anyway, SRSA is going to have to put on

22  evidence of misappropriation, which would include, if the

23  contention in the case is that the defendant is using a --

24  has developed a copycat product using the trade secrets of

25  the plaintiff, then evidence is going to have to be put on

64

1    in that regard.  And the defendant is entitled, in the

2    course of discovery, to understand what exactly it is that

3    the plaintiff contends has been misappropriated by the

4    defendant and misappropriated in such a way that it's been

5    incorporated into the defendant's product.

6           And then -- I may have said two points, but I will

7    add a third, which is that, as you have indicated,

8    Ms. Ybarra, or we have discussed, the case in being filed in

9    first instance necessarily suggests that the plaintiff had

10   evidence and information upon which it filed a complaint to

11   make the allegation in the first place.

12          So at a minimum in a 30(b)(6), it appears there

13   should be a designee to be able to provide that information.

14          As you all know, you have an ongoing obligation to

15   supplement disclosures and discovery and so forth.  So if

16   there's a designee who -- well, I mean there is the

17   obligation to adequately prepare a designee, so I would

18   start there.

19          But if, for some reason, there is good reason that

20   the designee wasn't able to become sufficiently informed,

21   there would be an obligation to supplement discovery.  And

22   on this particular issue, it being the critical issue in the

23   case, as Ms. Ybarra has described, it would potentially

24   warrant keeping a 30(b)(6) deposition open until such time

25   as a designee is able to review whatever the host of

1    information is that might be necessary to be fully informed.

2              So having not myself seen this 30(b)(6) topic to

3    see the words, it doesn't appear there's disagreement as to

4    the scope of that question.

5              So rather than have you all -- well, if you have

6    more arguments to make, I guess you should make them because

7    otherwise, I'm planning to order that that 30(b)(6) topic

8    would be allowed; that the plaintiff prepare a 30(b)(6)

9    designee, one or more designees, based on whatever

10   information is available, recognizing that there's potential

11   to keep that open if the designee is not sufficiently

12   prepared, based on the flurry of discovery trying to be

13   accomplished in a fast way in light of the hearing.

14             MS. YBARRA:  Your Honor, if you are so inclined to

15   so order, we would ask that you at least order that the --

16   that a designee be prepared based on information reasonably

17   available to them, as we have got -- as I said, we have

18   double-tracked depositions multiple a week, and we still

19   don't have a critical document production from the

20   third-party developer who actually developed PNC Pay, the

21   competing product in close -- at the close direction of the

22   individual defendants, the SRSA employees.

23             That's going to be a big part of our case, and

24   that's -- those are documents that have not come in yet.

25             THE COURT:  I mean, you can only prep the designee

1   based on information you have available to you, which is

2   where the supplementation piece comes into play.

3          So if you don't have this critical information --

4   and that's why I'm suggesting that maybe there's a way that

5   the 30(b)(6) can be scheduled to allow some of this other

6   stuff to be done or come in so that you have that

7   information to prepare a 30(b)(6) designee.  But if you all

8   are setting that deposition at a point earlier in time and

9   you still don't have information, the designee can only prep

10  with whatever information the designee has available.

11         But that's where I'm saying it might warrant

12  keeping that deposition open because, if you get a whole

13  bunch of other stuff, including what you are saying is maybe

14  the most critical thing, the defendant, I think, should be

15  entitled to take a deposition on how any of that additional

16  information informs or changes any prior testimony of the

17  30(b)(6) designee, based on, you know, new and different or

18  additional information that wasn't available at the time.

19         Does that make sense?

20         MS. YBARRA:  It does make sense.  And if it -- if

21  the schedule so requires, that it may be that we need to do

22  this just outside the current deposition deadline, which is

23  October 30.  The depositions are actual heavily stacked

24  towards end of the schedule, as you can imagine, as we have

25  been trying to observe all of the glory of discovery.

1          THE COURT:  Right.  And I know you are trying to

2   fast-track it and I know preliminary injunctive relief is

3   emergency relief.  But, you know, you all might want to

4   consider, in light of what each side says at different times

5   or critical things and you are stressed out trying to get it

6   all crammed in, maybe you want to think about trying to push

7   some deadlines back to get some of this additional stuff.

8          MS. YBARRA:  And we will discuss with our client.

9          THE COURT:  Sure.  I have a 3:00 meeting in my

10   Chambers with some lawyers.  So if you have critical things,

11   I'm happy to entertain additional critical things.  If it's

12   not critical, I would like to adjourn.

13          MS. YBARRA:  Nothing from plaintiffs, Your Honor.

14   Thank you.

15          MS. WALLACE:  Nothing, Your Honor.  Thank you so

16   much.

17          THE COURT:  All right.  Thank you, Counsel, I

18   appreciate your time.

19          (Whereupon, the within hearing was then in

20   conclusion at 3:04 p.m.)

21

22

23

24

25

68

```
 1                    TRANSCRIBER'S CERTIFICATION

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Carol Patterson                 October 15, 2019

 8    Signature of Transcriber                    Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```