# EXHIBIT 44
# TO DECLARATION OF MICHELLE S. YBARRA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

PNC FINANCIAL SERVICES GROUP, INC.,   :
PNC BANK, N.A., and PNC               :
INVESTMENTS, LLC,                  :
                                 :
            Plaintiffs,       :
                                 :   No. 14-50089
            v.                :
                                 :
KRISTIE J. CURTISS, MARIA POSTON,   :
CHRISTOPHER STOECKLIN, FIFTH    :
THIRD SECURITIES, INC., and FIFTH   :
THIRD BANK,                 :
                                 :
            Defendants.    :

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

James M. Crowley, Esquire
Monica Forte, Esquire
CROWLEY & LAMB, P.C.
221 N. LaSalle Street
Suite 1550
Chicago, Illinois 60601
(312) 670-6900

*Attorneys for Plaintiffs*

Of Counsel:

A. Richard Feldman, Esquire
Christina M. Reger, Esquire
Michael A. Shapiro, Esquire
BAZELON, LESS & FELDMAN, P.C.
One South Broad Street, Suite 1500
Philadelphia, PA  19107
(215) 568-1155

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

THE PROCEDURAL POSTURE OF THIS CASE .......................................................... 2

STATEMENT OF FACTS ................................................................................................... 3

A.  The Individual Defendants and Their Roles at PNC. .......................................................3

B.  The Defendants' Agreements and the PNC Code of Business Conduct and
Ethics. ...............................................................................................................................4

C.  PNC's Efforts to Safeguard Its Confidential Information and the
Individual Defendants' Access to It. ...............................................................................7

D.  The Resignations and the Unlawful Solicitation of Customers and
Employees. .......................................................................................................................8

E.  PNC's Efforts to Persuade the Individual Defendants and Fifth Third to Cease
and Desist from Their Conduct. .................................................................................... 13

COUNTS PERTINENT TO PNC'S MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION ........................................................... 14

ARGUMENT ...................................................................................................................... 15

I.  THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER AND A
PRELIMINARY INJUNCTION ENJOINING THE DEFENDANTS TO CEASE THEIR
UNLAWFUL CONDUCT. ............................................................................................. 15

A.  The Legal Standard for Issuance of Temporary Restraining Order and
Preliminary Injunction. ..................................................................................................15

B.  PNC Is Likely to Succeed on the Merits of Its Claims. ..................................................16

1.  PNC Is Likely to Succeed on Its Breach-of-Contract Claims. ...................................16

a)  The Operative Clauses in Curtiss's and Poston's Agreements Are
Enforceable under Ohio Law. ...............................................................................16

b)  The Operative Clauses in Curtiss's 2003 and 2007 Agreements Are
Enforceable Under Illinois Law. ..........................................................................18

c)  The Operative Clauses In Poston's 2013 Agreement Are
Enforceable Under Pennsylvania Law. .................................................................20

d)  PNC's Code Is Likewise Enforceable. .................................................................22

e)  PNC Is Likely to Succeed on Its Breach-of-Contract Claims. .............................23

2.  PNC Is Likely to Succeed on Its Misappropriation of Trade Secrets
Claim against Defendants. ..........................................................................................25

a)  The Confidential Information at Issue in this Case Constitutes
Trade Secrets under ITSA. ...................................................................................26

b)  The Defendants Have Misappropriated PNC's Trade Secrets. .............................29

i

    3.   PNC Is Likely to Succeed on Its Claim for Tortious Interference with
Prospective Economic Advantage. ............................................................................31

C.  PNC Has Suffered and Continues to Suffer Irreparable Injury for which
No Adequate Remedy at Law Exists. ...........................................................................33

D.  The Balance of Equities Favors PNC. ...........................................................................34

E.  The Injunction Is In the Public Interest.........................................................................34

RELIEF REQUESTED ............................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Accordia of Ohio, LLC v. Fishel*,
 978 N.E.2d 823 (Ohio 2012) ..................................................................................6

*Arpac Corp. v. Murray*,
 226 Ill.App.3d 65, 168 Ill.Dec. 240, 589 N.E. 2d 640 (1992) ...............................19

*Arcadia Health Serv., Inc., v. A+ Health Care, Inc.*,
 1997 WL 24737 (N.D.Ill. Jan.17, 1997)..................................................................35

*Anderson v. Vanden Dorpel*,
 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296 (Ill. 1996)...............................31

*Basicomputer Corp. v. Scott*,
 973 F.2d 507 (6th Cir. 1992) ...................................................................................17

*Brown & Brown, Inc. v. Ali*,
 494 F.Supp.2d 943 (N.D.Ill. 2007) ............................................... 15-16, 33, 34, 35

*Capgemini Fin. Services USA Inc. v. Infosys Ltd.*,
 2014 WL 340206 (N.D.Ill. Jan. 30, 2014)............................................... 15, 21, 23

*Capsicum Group, LLC v. Rosenthal*,
 2013 WL 6667822 (E.D.Pa. Dec. 17, 2013)................................................... 20, 21

*Century Bus. Services, Inc. v. Urban*,
 900 N.E.2d 1048 (Ohio Ct. App. 2008) .......................................................16-17

*Cherekos v. Lindoo Installations, Inc.*,
 2014 WL 1004188 (Ill.App. 2 Dist. March 12, 2014).........................................22

*Cincinnati Ins. Co. v. Ralston Brown, Inc.*,
 2011 WL 2149421 (N.D.Ill. June 1, 2011).......................................................16

*Cook Inc. v. Boston Scientific Corp.*,
 2002 WL 31236289 (N.D.Ill. Oct.1, 2002) .......................................................35

*Dames & Moore v. Baxter & Woodman, Inc.*,
 21 F.Supp.2d 817 (N.D.Ill. 1998) .....................................................................32

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
 420 F.Supp.2d 866 (N.D.Ill. 2006) ...................................................................33

*Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*,
 115 Ill.2d 482, 505 N.E.2d 314, 106 Ill.Dec. 8 (Ill. 1987) ...................................22

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................................................15

*Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*,
    2013 WL 1446425 (N.D.Ill. April 9, 2013)...................................................................19, 23

*Fitch v. Continental Cas. Co.*,
    2002 WL 31834877 (N.D.Ill. Dec. 16, 2002).......................................................................22

*Garon Foods, Inc. v. Montieth*,
    2013 WL 3338292 (S.D.Ill. July 2, 2013) ...........................................................................26

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ...........................................................................................15

*Goodman v. Illinois Dept. of Fin. & Prof'l Regulation*,
    430 F.3d 432 (7th Cir. 2005) .................................................................................................3

*Hall v. Spring Spectrum L.P.*,
    376 Ill.App.3d 822, 315 Ill.Dec. 446, 876 N.E.2d 1036 (Ill.App. 5 Dist. 2007) ...................16

*Hess v. Gebhard Co. & Inc.*,
    808 A.2d 912 (Pa. 2002)......................................................................................................20

*Hexacomb Corp. v. GTW Enterprises, Inc.*,
    875 F. Supp. 457 (N.D. Ill. 1993) .........................................................................................6

*Huawei Technologies Co., Ltd. v. Motorola, Inc.*,
    2011 WL 612722 (N.D.Ill. Feb. 22, 2011) ..........................................................................34

*In re Estate of Henry*,
    2012 WL 7037433 (Ill.App. 4 Dist. Sept. 5, 2012)...............................................................23

*Insulation Corp. of Am. v. Brobston*,
    667 A.2d 729 (Pa. Super. 1995)...........................................................................................21

*Integrated Genomics, Inc. v. Kyrpides*,
    2010 WL 375672 (N.D.Ill. Jan. 26, 2010)...........................................................................19

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ...............................................................................................15

*Lee v. Orr*,
    2013 WL 6490577 (N.D.Ill. Dec. 10, 2013)........................................................................15

*Lifetec, Inc. v. Edwards*,
    377 Ill.App.3d 260, 880 N.E.2d 188 (Ill.App. Ct. 2007).......................................................23

*Lincoln Park Sav. Bank v. Binetti*,
    2011 WL 249461 (N.D.Ill. Jan. 26, 2011)...........................................................................28

*Lumenate Techs., LP v. Integrated Data Storage, LLC*,
   2013 WL 5974731 (N.D.Ill. Nov. 11, 2013) ................................................................. 29, 32

*Mainline Infor. Sys., Inc. v. Benkendorf*,
   2010 WL 2011618 (N.D.Ill. May 20, 2010) .................................................................. 31, 32

*Mintel Intern. Group, Ltd. v. Neergheen*,
   2008 WL 2782818 (N.D.Ill. July 16, 2008) ......................................................................... 33

*Mintel Intern. Group, Ltd. v. Neergheen*,
   2010 WL 145786 (N.D.Ill. Jan. 12, 2010) ............................................................................ 19

*Morgan's Home Equip. Corp. v. Martucci*,
   136 A.2d 838 (Pa. 1957) ...................................................................................................... 20

*MP TotalCare Services, Inc. v. Mattimoe*,
   648 F.Supp.2d 956 (N.D. Ohio, 2009) ............................................................................. 17, 18

*Multiut Corp. v. Draiman*,
   359 Ill.App.3d 527, 295 Ill.Dec. 818, 834 N.E.2d 43 (Ill.App. 1 Dist. 2005) ...................... 28

*Nat'l Bus. Servs. Inc. v. Wright*,
   2 F.Supp.2d 701 (E.D.Pa. 1998) ................................................................................ 20-21, 22

*National Interstate Ins. Co. v. Perro*,
   934 F.Supp. 883 (N.D. Ohio 1996) .................................................................................. 17-18

*Nesselrotte v. Allegheny Energy, Inc.*,
   615 F.Supp. 2d 397 (W.D.Pa. 2009) ..................................................................................... 21

*OGIA/Rogers Agency, Inc. v. Estep*,
   1990 WL 174100 (Ohio Ct. App. 1990) ................................................................................ 18

*Optionmonster Holdings, Inc. v. Tavant Technologies, Inc.*,
   2010 WL 2639809 (N.D.Ill. June 29, 2010) ......................................................................... 34

*PepsiCo, Inc. v. Redmond*,
   54 F.3d 1262 (7th Cir.1995) .......................................................................................... 26, 34

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. Health*,
   699 F.3d 962 (7th Cir. 2012) ............................................................................................... 15

*Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*,
   149 F.3d 722 (7th Cir. 1998) ............................................................................................... 16

*Raimonde v. Van Vlerah*,
   325 N.E.2d 544 (Ohio 1975) ............................................................................................... 16

*Reinders Bros. Inc. v. Rain Bird E. Sales Corp.*,
   627 F.2d 44 (7th Cir.1980) .................................................................................................. 33

v

*Reliable Fire Equip. Co. v. Arredondo*,
   358 Ill.Dec. 322, 965 N.E.2d 393 (Ill. 2011) .......................................................................19

*RKI, Inc. v. Grimes*,
   177 F.Supp.2d 859 (N.D.Ill. 2001) .......................................................................................30

*SBS Worldwide, Inc. v. Potts*,
   2014 WL 499001 (N.D.Ill. Feb. 7, 2014) ............................................................... 26, 29, 30

*SEC v. Cherif*,
   993 F.2d 403 (7th Cir. 1991) ...................................................................................................3

*SMC Corp. Ltd. v. Lockjaw, LLC*,
   481 F.Supp.2d 918 (N.D. Ill. 2007) ......................................................................................35

*Strata Marketing, Inc. v. Murphy*,
   317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166
   (Ill.App. 1 Dist 2000) ...........................................................................................................28

*Ty, Inc. v. GMA Accessories, Inc.*,
   132 F.3d 1167 (7th Cir. 1997) .................................................................................................3

*UZ Engineered Products Co. v. Midwest Motor Supply Co.*,
   770 N.E.2d 1068 (Ohio Ct. App. 2001), *app. denied*,
   766 N.E.2d 1002 (Ohio 2002) ..............................................................................................18

*Victaulic Co. v. Tieman*,
   499 F.3d 227 (3rd Cir. 2007) ................................................................................................20

*Voyles v. Sandia Mortgage Corp.*,
   196 Ill.2d 288, 256 Ill.Dec. 289, 751 N.E.2d 1126 (Ill. 2001) .............................................31

*Zambelli Fireworks Mfg. Co., Inc. v. Wood*,
   592 F.3d 412 (3d. Cir. 2010) .......................................................................................... 20, 21

**Statutes**

                                                                                          **Page(s)**

Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* .......................................................... 14, 25


   765 ILCS 1065/2(a) ...............................................................................................................29

   765 ILCS 1065/2(b) ...............................................................................................................29

   765 ILCS 1065/2(b)(2)(B)(I) .................................................................................................30

   765 ILCS 1065/2(b)(2)(B)(III) ..............................................................................................30

   765 ILCS 1065/2(d) ...............................................................................................................26

vi

765 ILCS 1065/3(a)...................................................................................................26

**Other Authorities**

**Page(s)**

FINRA Rules 13100(aa) ...........................................................................2

FINRA Rules 13200 ..................................................................................2

FINRA Rule 13804 ....................................................................................2

FINRA Rule 13804(a) ...............................................................................2

FINRA Rule 13804(b)(1) ..........................................................................2

Restatement (Second) of Conflict of Laws,
    § 188 (1971)..........................................................................................23

Restatement (Second) of Torts, §768 (1979) ...........................................32

## PRELIMINARY STATEMENT

Kristie Curtiss was a financial advisor to hundreds of customers in the Rockford, Illinois area.  In multiple agreements she had signed over the last dozen years, Curtiss agreed to maintain the confidentiality of client information and further promised that, while employed and for a year afterwards, she would not solicit on behalf of a competitor any customers with whom she had come in contact while working at PNC.[1]  Upon deciding to leave PNC and work for Fifth Third Securities, Inc., a subsidiary of Fifth Third Bank (collectively, "Fifth Third"), and while still employed by PNC, Curtiss nonetheless began using PNC's confidential trade secret information to surreptitiously call certain of the PNC customers she served, notify them of her plans, and solicit them to transfer their PNC accounts to Fifth Third after her resignation.  Another PNC employee, Christopher Stoecklin, who had also agreed to maintain the confidentiality of PNC's customer information and not to use it for personal gain, also made calls to PNC customers, while still at work for PNC, seeking to schedule appointments for them with Curtiss after her planned departure.  Once they had thus primed the pump, Curtiss, Stoecklin and a third PNC employee, Maria Poston, simultaneously resigned without notice on Friday, April 4, 2014, and redoubled their efforts to solicit dozens, if not hundreds, of PNC customers over the following weeks.  Curtiss also attempted to induce at least two PNC employees to join her new team at Fifth Third.

PNC wrote repeatedly to the three ex-employees, with copies to Fifth Third, demanding that they cease this conduct, but to no avail – as of this writing, more than 36 PNC customers or known customer prospects, representing 57 accounts, have transferred their investments to Fifth

---

[1] We use the term "PNC" to refer collectively to PNC Bank, N.A. ("PNC Bank"), PNC Investments, LLC ("PNCI"), and PNC Financial Services Group, Inc. ("PNC FSG") – as well as a predecessor, National City Corporation ("Nat City Corp.") and its subsidiaries (collectively, "Nat City").

Third, comprising assets totaling $8.1 million, with additional transfers coming to light on a daily basis.  Fifth Third has done nothing to put a stop to this misconduct, and has chosen instead to stand behind the threesome's flat denials of any wrongdoing, despite PNC's considerable evidence to the contrary.

Plaintiffs have accordingly filed this action, and now seek a temporary restraining order and preliminary injunction prohibiting any further poaching of their customers or employees by defendants.

## THE PROCEDURAL POSTURE OF THIS CASE

The broker-dealer parties in this case – PNC Investments, LLC on plaintiffs' side and Fifth Third Securities, Inc. on the defendants' – are members of the securities industry.  As such, the Financial Industry Regulatory Authority ("FINRA") requires that disputes between members of the industry and associated persons be submitted to arbitration under the FINRA Rules.  FINRA Rule 13200.   FINRA Rules provide, however, that a party may seek temporary injunctive relief, including a temporary restraining order and/or preliminary injunction, "from a court of competent jurisdiction."   *See* FINRA Rules 13804, Temporary Injunctive Orders; Requests for Permanent Injunctive Relief; 13100(aa) (defining "temporary injunctive order" to mean, *inter alia*, a temporary restraining order or preliminary injunction).  FINRA Rules further provide that a plaintiff seeking a temporary injunctive order from the Court must at the same time file a statement of claim with FINRA for "permanent injunctive relief and all other relief with respect to the same dispute."   FINRA Rule 13804(a).  "If a court issues a temporary injunctive order, [a FINRA] arbitration hearing on the request for permanent injunctive relief will begin within 15 days of the date the court issues the [order]." FINRA Rule 13804(b)(1). [2]

---

[2] The cited FINRA Rules are attached hereto as Exh. 4.

In accordance with these procedures, Plaintiffs have today filed in this Court a Complaint against Curtiss, Poston, Stoecklin, Fifth Third Securities, Inc, and Fifth Third Bank, together with the accompanying Motion for Temporary Restraining Order and Preliminary Injunction. Separately, plaintiff PNC Investments, LLC is simultaneously filing a Statement of Claim with FINRA against Fifth Third Securities, Inc. and associated parties Curtiss, Poston, and Stoecklin, seeking permanent injunctive relief and damages.  Once the TRO and/or preliminary injunction proceedings are completed in this Court,  PNC anticipates filing a Motion for Stay of further court proceedings, pending the outcome of the FINRA arbitration proceedings.

## STATEMENT OF FACTS

### A.    The Individual Defendants and Their Roles at PNC.

PNCI employs Financial Advisors who are authorized to buy and sell securities on behalf of PNC customers.  (*See* Declaration of Adam Peirce ("Peirce Decl."), Exh. 1 hereto at ¶8; Declaration of Georgia Ruggles ("Ruggles Decl."), Exh. 2 hereto at ¶¶3-4).[3]   In this case, defendant Kristie J. Curtiss became a Financial Advisor in 2007 at NatCity Investments, Inc. ("NatCity Investments"), before its merger with PNCI and was assigned to the Bank's Rockford, Illinois Branch.  (Exh. 1, Peirce Decl. at ¶4).  Curtiss was responsible for providing investment advice to PNC customers from six branches in the Rockford area, and regularly traveled to the different branches for meetings with clients.  (Exh. 1, Peirce Decl. at ¶6; Exh. 2, Ruggles Decl. at ¶6).

---

[3] This Court can consider declarations, including hearsay statements, in ruling on a motion for temporary injunctive relief.   *See Goodman v. Illinois Dept. of Fin. & Prof'l Regulation,* 430 F.3d 432, 439 (7th Cir. 2005), quoting *Ty, Inc. v. GMA Accessories, Inc*., 132 F.3d 1167, 1171 (7th Cir.1997) ("Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary injunction proceedings."); *SEC v. Cherif*, 993 F.2d 403, 412 n.8 (7th Cir. 1991) ("hearsay can be considered in entering a preliminary injunction.").

Defendant Maria Poston served at Nat City and PNC as a Financial Sales Consultant from 2007 until 2012, when she became Curtiss's assistant and ultimately a PNCI Financial Advisor in 2014. (Exh. 1, Peirce Decl. at ¶5).

The Financial Advisors work closely with other PNC employees, such as Financial Specialists. (Exh. 1, Peirce Decl. at ¶9). The third individual defendant, Christopher Stoecklin, was a Financial Specialist, stationed in PNC Bank's Belvidere, Illinois Branch. (Exh. 2, Ruggles Decl. at ¶3). Stoecklin was an employee of both PNC Bank and PNCI. (*Id.*) He worked closely with Curtiss and Poston. (Exh. 1, Peirce Decl. at ¶¶10-11; Exh. 2, Ruggles Decl. at ¶4).

**B.** **The Defendants' Agreements and the PNC Code of Business Conduct and Ethics.**

Curtiss and Poston both signed multiple agreements during their years at Nat City and PNC. These agreements prohibited them from using PNC's trade secret and confidential information to benefit themselves or other entities. They further prohibited them – while employed and for the year following termination – from soliciting business from PNC customers or known prospects on behalf of another company. Curtiss signed three such agreements with various Nat City entities.[4] Poston signed two agreements with Nat City entities, and one with PNC.[5] The relevant terms of the various agreements are very similar.

---

[4] Curtiss signed a 2003 Restricted Stock Award Agreement with National City Corp. and a 2005 Non-Disclosure/Non-Solicitation and Dual Service Agreement with National City Bank, attached hereto as Exhibits 3a and 3b. In 2007, Curtiss signed an "Employment Agreement" with NatCity Investments, Inc., a copy of which is attached as Exhibit 3c hereto.

[5] Poston's Agreement with PNC, entitled "PNC Investments Covenants," was executed by her on December 26, 2013. Poston's two prior agreements, dated 2003 with National City Bank and 2007 with National City Corp., are both titled "Non-Disclosure/Non-Solicitation and Dual Service Agreement." Poston's Agreements are attached hereto as Exhibit 5a (Covenants), 5b (2003 Agreement), and 5c (2007 Agreement), respectively.

First, the confidentiality clauses stated that during employment with Nat City, as well as afterwards, Curtiss and Poston were obligated to "keep in strict confidence" and not to "disclose, furnish or disseminate . . . or use" (except for Nat City's benefit) any of the trade secret or confidential information relating to Nat City's "customers or prospective customers . . . customer list [and] contract information, including terms, pricing and services provided . . . ."[6]

Second, the Agreements contained a non-solicitation clause, providing that, while employed, and for one year after termination, Curtiss and Poston would not "solicit, divert, entice or take away any" of Nat City's existing or potential customers with whom they had "contact, involvement or responsibility" while employed at Nat City.[7]

Third, the Agreements provided that Curtiss and Poston would not, during or after the term of the agreement "solicit, induce, confer, or discuss with any employee of [Nat City] the prospect of leaving the employ of [Nat City] . . . or the subject of employment by some other person or organization."[8]

Fourth, the Agreements provided that upon termination of employment, Curtiss and Poston would return to PNC all of its property, including trade secret and confidential information.[9]

---

[6] *See, e.g.*, Exh. 3a at ¶12c; Exh. 3b at ¶9; Exh. 5b at ¶9; Exh. 5c at ¶7. Similar language is contained in Curtiss's 2007 Agreement, Exh. 3c at ¶6(a) and in Poston's 2013 PNC Agreement, Exh. 5a at ¶5.

[7] *See, e.g.*, Exh. 3a at ¶12(a); Exh. 3b at ¶6(i-ii); Exh. 3c at ¶7(a); Exh. 5a at ¶3; Exh. 5b at ¶6; Exh. 5c at ¶4.

[8] *See, e.g.*, Exh. 3a at ¶12(b); Exh. 3b at 6(iii); Exh. 3c at 7(b); Exh. 5a at 3(b); Exh. 5b at ¶7; Exh. 5c at ¶5.

[9] *See, e.g.*, Exh. 3a at ¶12(c); Exh. 3b at ¶9; Exh. 3c at ¶5; Exh. 5a at ¶5; Exh. 5b at ¶9; Exh. 5c at ¶7.

With one exception, the Agreements also mandated the application of a specific state's law. Curtiss's 2005 Agreement specified Ohio law – the state in which Nat City was incorporated and had its principal place of business.[10]  Curtiss's 2003 Agreement did not contain a choice-of-law provision, and we assume Illinois law would control it.   Curtiss's 2007 agreement specified Illinois law.[11]  Poston's Nat City agreements likewise specified Ohio law, whereas her PNC agreement from 2013 specified that Pennsylvania law would apply.[12]

When Nat City Corp. merged into and became part of PNC Financial Services Group, Inc., PNC FSG succeeded by operation of law to all the rights of National City Corp., and the contractual duties that Curtiss and Poston owed to National City Corp. pursuant to the National City Corp. Agreements became duties they henceforth owed to PNC FSG.[13]  Similarly, when National City Bank merged into and became part of PNC Bank, and NatCity Investments, Inc. merged into and became part of PNC Investments, LLC, PNC Bank and PNC Investments, respectively, succeeded by operation of law to all of the rights of their predecessor entities, and the contractual duties owed to the predecessor became duties owed to the successor entity.

In addition to the six agreements governing Curtiss and Poston, all three of the individual defendants were bound to comply with PNC's Code of Business Conduct and Ethics ("the

---

[10] *See*, *e.g.,* Exh. 3b at ¶18.

[11] *See* Exh. 3c at ¶17.

[12] *See*, *e.g.,* Exh. 5a at ¶6(a); Exh. 5b at ¶17; Exh. 5c at ¶15.

[13] As a successor by merger to Nat City, PNC has the right to enforce the Nat City Agreements under Ohio law.  *Accordia of Ohio, LLC v. Fishel*, 978 N.E.2d 823, 827 (Ohio 2012) (in merger, "employee non-compete agreements transfer by operation of law to the surviving company"). The same analysis applies in Illinois.  *See, e.g., Hexacomb Corp. v. GTW Enterprises, Inc.*, 875 F. Supp. 457, 464 (N.D. Ill. 1993) ("A successor corporation in an asset purchase can enforce confidentiality agreements and covenants not to compete that an employee signed with its predecessor corporation").

Code").[14]  The Code has a definition of PNC's "Confidential Information," which is substantially the same as its definition in the Agreements.  (Exh. A to Exh. 1, Peirce Decl. at p. 26).  The Code reminds employees of their obligation to safeguard PNC's Confidential Information, not to disclose it to third parties and not to use it for personal financial gain.  (*See id.* at pp. 17-18).  The Code prohibits PNC employees from taking PNC's Confidential Information with them when they leave PNC.  (*Id.* at pp. 17, 22).  Curtiss, Poston and Stoecklin were required each year to acknowledge that they had reviewed the Code, understood it, and agreed to comply with it.[15]

### C.   PNC's Efforts to Safeguard Its Confidential Information and the Individual Defendants' Access to It.

PNC's Confidential Information is not available from any public sources, and PNC takes numerous steps to keep it that way.  (Exh. 1, Peirce Decl. at ¶¶17-18, 22-26).  Under the Code, PNC Bank and PNCI employees are contractually prohibited from disclosing this information to third parties, using it for personal benefit, and retaining it once they leave PNC.  (*Id.* at ¶¶19-21).  In addition, certain employees, like Curtiss and Poston, have similar obligations pursuant to the kinds of agreements described above.  (*Id.* at ¶23).

Confidential investment data, such as customers' names, contact information and their personal and financial information, are restricted to a password-protected computer database.  (*Id.* at ¶24).  Each employee's access to the information in that database is limited to a need-to-know basis.  (*Id.* at ¶¶24-25).  PNC also prohibits unauthorized emailing, downloading or printing of certain types of clients' personal and financial information, such as social security numbers or account numbers.  (*Id.* at ¶26).  If an employee violates these prohibitions, PNC's

---

[14]  The Code is attached in relevant part as Exh. A to Exh. 1, Peirce Decl.

[15]  Copies of the individual defendants' February 2014 acknowledgements of their obligations under the Code are attached as Exh. B to Exh. 1, Peirce Decl.

7

computer systems automatically send an electronic message to a supervisor, alerting him or her to the unauthorized employee activity.  (*Id.*) In addition, much of PNC's email communications with customers is now encrypted, and like any major financial institution today, PNC spends a great deal of money in protecting its computer systems and confidential customer information from hackers spread all over the globe.

As PNCI Financial Advisors, Curtiss and Poston had access to a great wealth of PNC confidential customer information.  For example, they had access to the names, contact information and the personal and financial details for the more than 650 PNCI customers whose approximately 1,175 PNC accounts they managed.  (*Id.* at ¶30).  They were also privy to PNC's pricing information and strategies, including discretionary discounts granted by PNC to particular customers.  (*Id.* at ¶¶16d, 27c).  In addition, Stoecklin, an employee of both PNC Bank and PNCI, had access to a great deal of confidential information concerning PNC Bank's banking customers and their accounts with PNC.  (Exh 2, Ruggles Decl. at ¶5).

### D.   The Resignations and the Unlawful Solicitation of Customers and Employees.

As noted above, Curtiss, Poston and Stoecklin all resigned on the same day – April 4, 2014.  (Exh. 1, Peirce Decl. at ¶33; Exh. 2, Ruggles Decl. at ¶¶10, 12).  Even before the resignations, defendants had begun personally soliciting PNC customers to move to Fifth Third, while still employed by PNC.  (Exh. 2, Ruggles Decl. at ¶¶13-14, 16, 18).  The solicitations increased after the resignations took place. (*See* Ruggles Decl. at ¶¶15, 17, 19-24; Declaration of Mindy Petty ("Petty Decl.") attached hereto as Exh. 6 at ¶¶6-8; Declaration of Paulina Sihakom ("Sihakom Decl.") attached hereto as Exh. 7 at ¶¶5-6).

Curtiss is known to have personally solicited the following PNC customers:

- A PNC customer we shall refer to as D.2[16] was called by Curtiss prior to her resignation. (Exh. 2, Ruggles Decl. at ¶14).  Curtiss informed the customer that she was leaving PNC and moving to Fifth Third, and that PNC had no one available to replace her, with the result that the customer would not be able to meet with a financial advisor.  (*Id.*).  Curtiss asked the customer to move her investments to Fifth Third, so that she could continue to manage them.  (*Id.*).

- Also prior to her resignation, Curtiss called customer F.F. and asked to take her and the man to whom she is engaged to dinner the following week to discuss moving F.F.'s investments to Fifth Third.  (*Id.* at ¶16).

- On April 7, 2014, a PNC representative spoke to customer W.W. to inform him of Curtiss's resignation. W.W., who has since moved his investments to Fifth Third, responded that he knew "a couple of weeks ago" – *i.e.,* weeks before Curtiss resigned – that Curtiss was leaving.  (Exh. 7, Sihakom Decl. at ¶6).

- On April 7, 2014, Curtiss called PNC customer E.E., and left a message advising that she had left PNC, and asked that E.E. call her back.  (Exh. 2, Ruggles Decl. at ¶15).

- Curtiss called G.G., also a PNC customer, who had expressed an interest in investing additional funds with PNC, informed him that she had left PNC and that she wanted to discuss the investment of the additional funds with him.  (*Id.* at ¶17).

- Curtiss called K.2 to set up an appointment for lunch.  (*Id.* at ¶21).  In the call, Curtiss told K.2 that PNC no longer had a financial advisor at her branch who would be able to service her and her husband's investment needs.  (*Id.*).

---

[16] To protect the privacy of these customers, we shall not refer to them by name.

9

- Curtiss also called U.U., a PNC customer who had met with Curtiss before her resignation and had discussed a problem with his brokerage account. (*Id*. at 24). In the call, Curtiss told the customer that she would be able to resolve the account problem at Fifth Third more quickly than PNC. (*Id*.)

Curtiss has also been soliciting PNC customers indirectly, using Stoecklin as her go-between. Like Curtiss, Stoecklin is known to have made calls both before and after he resigned:

- On April 1, before he resigned from PNC, Stoecklin called H.H., a PNC customer, in the evening, said that he knew H.H. had investments with PNC, and inquired whether he would be interested in moving them to Fifth Third. (Exh. 2, Ruggles Decl. at ¶18). The caller ID showed that Stoecklin, who was working in the PNC branch that evening, was calling from a PNC phone. (*Id*.)

- On April 2, before he resigned, Stoecklin left a voicemail for PNC customer C.C. in the evening. (*Id*. at ¶13). The voicemail stated that Stoecklin was calling from Fifth Third. (*Id*.) This confused the customer, who knew that Stoecklin worked with Curtiss at PNC. (*Id*.) The customer thereafter went to his PNC branch looking for Curtiss to find out about the confusing call from Stoecklin. (*Id*.)

- Stoecklin called PNC customer T.T., did not say where he was calling from, and did not reveal that he and Curtiss had left PNC. (*Id*. at ¶23). Stoecklin told the customer to call Curtiss once he received his statement, to see if she could do better. (*Id*.). Stoecklin provided the customer with a number at which he could reach Curtiss. (*Id*.)

- In the week following his resignation, Stoecklin called PNC customer M.M. and asked him to transfer his accounts to Fifth Third. (Exh. 6, Petty Decl. at ¶6).

- On April 15, 2014, Stoecklin called a potential PNC customer, I.I., who had met with Curtiss in late March to discuss making investments with PNC.  (Exh. 2, Ruggles Decl. at ¶19).  Stoecklin did not mention that he and Curtiss were no longer at PNC.  (*Id*.).  In the call, Stoecklin attempted to schedule a follow-up appointment for I.I. with Curtiss.  (*Id*.).  When I.I. inquired at the PNC branch, he learned that Curtiss and Stoecklin had resigned.  (*Id*.)  I.I. was upset that Stoecklin had called from a non-business number and that he evidently had I.I.'s personal information in his possession despite having left PNC.  (*Id*.).

- On April 15, Stoecklin also called PNC customers N.1 and N.2 in the evening, told them that he and Curtiss had moved to Fifth Third, and asked whether N.1 and N.2 wanted to move to Fifth Third as well.  (Exh. 6, Petty Decl. at ¶7).  N.1 and N.2 expressed concern to PNC that Stoecklin had their confidential contact information in his possession, even though he no longer worked for PNC.  (*Id*.)

- On April 15, Stoecklin called J.2, informed her that he and Curtiss had left PNC, and inquired whether she and her husband, customer J.1, were interested in meeting with Curtiss about moving their accounts to Fifth Third.  (Exh. 2, Ruggles Decl. at ¶20).  J.2 also expressed concern that Stoecklin had her personal information and her husband's personal information in his possession, despite no longer working for PNC.  (*Id*.).

Poston has likewise been soliciting PNC customers in violation of her three agreements:

- On April 5, 2014, Poston told customer V.V. that she and Curtiss had left PNC and moved to Fifth Third. (Exh. 7, Sihakom Decl. at ¶5).  Poston further told V.V. that PNC did not have anyone local to service her accounts and that PNC would assign her to a Financial Advisor in Chicago.  (*Id*.).

- On April 17, PNC customers A.1 and A.2 came to the branch to perform banking services. (Declaration of Michelle Jaraczewski ("Jaraczewski Decl.") attached hereto as Exh. 8 at ¶¶5-7). When told that Curtiss and Poston were no longer with PNC, the customers replied that they were well aware because Poston had reached out to them "around the time it was happening," and that they had already submitted paperwork to move their accounts. (*Id.*).

- Poston contacted PNC customer P.P. in mid-April and left a telephone number and message instructing the customer to call her so that Poston could sit down with her to review her investments. Poston did not disclose where she was calling from, and it was only when P.P. came into the branch that she learned that Poston was no longer with PNC. (Declaration of Jessica Hernandez ("Hernandez Decl.") attached hereto as Exh. 9 at ¶4).

As discussed above, the defendants' efforts have been effective in inducing substantial numbers of PNC customers and customer prospects to leave PNC and move to Fifth Third. As of April 28, 2014, PNC had received notice of transfers to Fifth Third of 57 accounts, owned by 36 different customers, representing assets totaling $8.1 million.

Curtiss has not limited her solicitation efforts to PNC customers. She is also known to have solicited PNC employees to join her at Fifth Third, a type of solicitation that her agreements with PNC also prohibit. (Exh. 3a at ¶12b; Exh. 3b at ¶7; Exh. 3c at ¶7(b)). On April 4, 2014, Curtiss called and spoke with Georgia Ruggles, a PNC Vice President and general manager of the Belvidere Branch of PNC Bank. (Exh. 2, Ruggles Decl. at ¶12). Over her long career, Ruggles had referred numerous banking customers to Curtiss. (*Id*. at ¶8). In the call, Curtiss informed Ruggles of her own and Poston's resignations, and asked Ruggles if she wanted

12

to work with her as a banker at the bank she was joining.  (*Id.* at ¶12).  Curtiss attempted to entice Ruggles by stating that she could double her salary and not have the stress and responsibility of managing a branch office.  (*Id.*).

Subsequently, on April 22, 2014, PNC learned that Fifth Third had hired Nancy Hohn, a Customer Service Associate at PNC's Loves Park branch, to work at the same branch as Curtiss.  (Exh. 1, Peirce Decl. at ¶¶39-41).  Hohn told PNC that she was offered double her salary at PNC, and that she had been recommended to Fifth Third by Curtiss.  (*Id.* at ¶42).

### E.   PNC's Efforts to Persuade the Individual Defendants and Fifth Third to Cease and Desist from Their Conduct.

Shortly after learning of the resignations, PNC began to receive feedback from customers that they had been solicited by defendants. PNC immediately took steps to remind the individual defendants of their duties under their agreements and the Code and to demand compliance with their obligations.  Thus, on Tuesday, April 8 – the second business day after the resignations were received – PNC's Legal Department overnighted letters to Curtiss and Poston, with copies overnighted to Fifth Third, demanding that they cease and desist from soliciting customers and misappropriating PNC's trade secret customer information, among other things.  (*See* Exhs. 10 and 11).  A like letter to Stoecklin followed on April 14, 2014.  (Exh. 12).  Outside counsel was promptly retained and he overnighted a second, more detailed round of such letters on April 17-18, 2014.  These letters were copied to Fifth Third's Chief Legal Officer in Cincinnati. All were received the day after being sent.  (*See* Exhs. 13, 14, and 15).

The letters seem to have had no effect on the individual defendants, except perhaps to accelerate their efforts to corral as many PNC customers as possible before a TRO could be entered.  As for Fifth Third, its counsel's initial response was that it knew nothing about any such improprieties, as if a sudden mass exodus of the sort taking place could occur

13

spontaneously, without any planning or coordination. PNC's outside counsel accordingly emailed a detailed summary of the solicitation evidence set forth above to Fifth Third on April 23, 2014, with copies to the three individual defendants (Exh. 16). Fifth Third counsel promised to investigate PNC's averments, and reported back to PNC's counsel as to his findings on April 28.

The investigation apparently consisted of asking the three individual defendants whether there was any truth to what PNC was hearing from its customers. According to Fifth Third counsel, all three individual defendants vehemently denied that they had talked with any customers about leaving PNC before their resignations, and further denied that they had solicited any customers to switch to Fifth Third at any time. They likewise denied having any customer information in their possession. No explanation was offered as to how so many customers could be so mistaken about what the individual defendants had said to them just weeks before.

PNC accordingly has filed the accompanying Motion for A Temporary Restraining Order and Preliminary Injunction to put an immediate stop to defendants' unlawful activities, while this action proceeds forward.

## COUNTS PERTINENT TO PNC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

PNC's Complaint includes ten counts. The counts pertinent to this Motion for Temporary Restraining Order and Preliminary Injunction include Count One for breach of contract against Curtiss; Count Two for breach of contract against Poston; Count Three, for breach of contract/promissory estoppel against Stoecklin; Count Four, against all defendants for violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq*.; and Count Seven against all defendants for tortious interference with PNC's business relationships with its customers.

14

**ARGUMENT**

I.     **THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ENJOINING THE DEFENDANTS TO CEASE THEIR UNLAWFUL CONDUCT.**

       A.     **The Legal Standard for Issuance of Temporary Restraining Order and Preliminary Injunction.**

In this District, "[t]he standard governing temporary restraining orders is the same as that for preliminary injunctions." *Capgemini Fin. Services USA Inc. v. Infosys Ltd.,* 2014 WL 340206, *1 (N.D.Ill. Jan. 30, 2014), *Lee v. Orr*, 2013 WL 6490577, at *2 (N.D.Ill. Dec. 10, 2013) ("The standards for issuing [a TRO] are identical to the standards [for] preliminary injunctions.")

In order to obtain temporary injunctive relief, "the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets these threshold requirements, "the district court weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. Health*, 699 F.3d 962, 972 (7th Cir. 2012). "The Seventh Circuit uses a sliding scale when weighing the harm to a party against the merits of the case." *Capgemini*, 2014 WL 340206 at *1. That is, "[t]he more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Planned Parenthood*, 699 F.3d at 972, quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008).

"In deciding whether to grant injunctive relief, the Court must bear in mind that the purpose of a preliminary injunction is 'to minimize the hardship to the parties pending the

15

ultimate resolution of the lawsuit.'"  *Brown & Brown, Inc. v. Ali,* 494 F.Supp.2d 943, 950

(N.D.Ill. 2007), quoting *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d

722, 726 (7th Cir. 1998).

PNC satisfies all of the requirements for immediate injunctive relief in this case.

**B.      PNC Is Likely to Succeed on the Merits of Its Claims.**

**1.      PNC Is Likely to Succeed on Its Breach-of-Contract Claims.**

**a)      The Operative Clauses in Curtiss's and Poston's Agreements
Are Enforceable under Ohio Law.**

Under Ohio law, which governs the interpretation of Curtiss's 2005 Agreement and

Poston's 2003 and 2007 Agreements with Nat City,[17] "nonsolicitation agreements that are

reasonable are enforced, and those that are unreasonable are enforced to the extent necessary to

protect an employer's legitimate interest." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio

1975).

*Raimonde* articulated various factors to be weighed in determining whether a covenant is

reasonable, including: (i) "the absence or presence of limitations as to time and space;" (ii)

"whether the employee is possessed with confidential information or trade secrets;" (iii)

"whether the covenant seeks to eliminate competition which would be unfair to the employer or

merely seeks to eliminate ordinary competition;" (iv) "whether the covenant seeks to stifle the

inherent skill and experience of the employee;" (v) "whether the covenant operates as a bar to the

---

[17] "Ordinarily, Illinois courts rely on §187(2) of the Restatement (Second) of Conflict of Laws to
enforce a contractual choice of law provision, unless the chosen state has no substantial
relationship to the parties or the transaction, or applying the law of the chosen state would violate
a fundamental policy under Illinois law." *Cincinnati Ins. Co. v. Ralston Brown, Inc.*, 2011 WL
2149421, *3 (N.D.Ill. June 1, 2011), citing *Hall v. Sprint Spectrum L.P.*, 376 Ill.App.3d 822,
825–26, 315 Ill.Dec. 446, 876 N.E.2d 1036 (Ill.App. 5 Dist. 2007).  Here, the "substantial
relationship" element is satisfied because Nat City was headquartered in Cleveland, Ohio.
Applying Ohio law will not violate any fundamental Illinois policies as the relevant covenants
are valid and enforceable under the laws of both states.  *See* pp. 18-19, *infra*.

employee's sole means of support;" and (vi) "whether the benefit to the employer is disproportionate to the detriment to the employee." *Century Bus. Services, Inc. v. Urban*, 900 N.E.2d 1048, 1053 (Ohio Ct. App. 2008) (quoting *Raimonde*).  The relevant clauses in the Agreements are reasonable and enforceable against Curtiss and Poston under this test.

Covenants like defendants' non-solicitation and non-acceptance covenants, which last for one year beyond the termination of employment, are reasonable as to duration.  *See, e.g.*, *MP TotalCare Services, Inc. v. Mattimoe*, 648 F.Supp.2d 956, 964 n.4 (N.D. Ohio, 2009) (restrictive covenants exceeding 18 months reasonable); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 513 (6th Cir. 1992) (one-year restrictive covenant reasonable under Ohio law).  These provisions are likewise reasonable in their geographic scope — the PNC customers they place off limits are nearly all located in the area surrounding Rockford, Illinois.  (Exh. 1, Peirce Decl. at ¶6).

There can be no question that Curtiss, Poston and Curtiss's assistant, Stoecklin, are in possession of PNC's confidential and trade secret customer information.  They have already used customer names and contact information in their efforts to induce PNC's customers to terminate their relationships with PNC and move to allegedly greener pastures at Fifth Third.  (*See* generally, Exh. 2, Ruggles Decl.; Exh. 6, Petty Decl.; Exh. 7, Sihakom Decl.; Exh. 8, Jaraczewski Decl.; Exh. 9, Hernandez Decl.).

The covenants at issue do not deter ordinary competition.  Rather, they only bar defendants from soliciting business from the very PNC customers whose relationships with defendants were built by virtue of their employment with PNC and at PNC's expense.  Employers have legitimate business interests in protecting themselves from this kind of cutthroat competition.  *See, e.g.*, *National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 890 (N.D. Ohio

17

1996) (employer has legitimate business interest in "preventing its employees from exploiting the customer relationships developed at its expense and in its name").[18]

The Agreements' provisions requiring confidentiality are also enforceable. Ohio recognizes that an employer has a legitimate business interest in protecting confidential information. *See, e.g.*, *UZ Engineered Products Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068, 1080 (Ohio Ct. App. 2001), *app. denied*, 766 N.E.2d 1002 (Ohio 2002) (employer has legitimate interest in preventing a former employee from disclosing its confidential business information). *Accord MP TotalCare*, 648 F.Supp.2d at 964.

The Agreements' provisions prohibiting solicitation of PNC's employees are similarly valid and enforceable under Ohio law. *See, e.g.*, *MP TotalCare*, 648 F.Supp.2d at 963 (defendant's hiring of three employees away from her former employer violated non-solicitation clause); *OGIA/Rogers Agency, Inc. v. Estep*, 1990 WL 174100, *2 (Ohio Ct. App. 1990) (a non-competition agreement containing a provision against the solicitation of employees by former employees is valid).[19]

> **b)**    **The Operative Clauses in Curtiss's 2003 and 2007 Agreements Are Enforceable Under Illinois Law.**

Curtiss's 2003 and 2007 Agreements with Nat City are governed by Illinois law, which does not depart significantly from Ohio law in any relevant regard.

---

[18] The other *Raimonde* factors also require a finding of reasonableness. The covenants in question do not seek to prevent Curtiss and Poston from using their skills or experience at a competitor or otherwise to suppress them; they do not deprive them of their sole means of support; nor do they confer a benefit on PNC that is disproportionate to the hardship on Curtiss and Poston. They are free to continue their employment at Fifth Third with respect to any customers except those they came in contact with at PNC. In contrast, if they are allowed to continue to flagrantly ignore the covenants they signed, the harm they have already caused to PNC's goodwill will only continue to mount.

[19] The same result would apply under Illinois law. *See* §b, infra.

In Illinois, a restrictive covenant is reasonable and enforceable where it "(1) is no greater than is required for the protection of a legitimate business interest of the employer…; (2) does not impose undue hardship on the employee…, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill.Dec. 322, 325, 965 N.E.2d 393, 396-97 (Ill. 2011).  The interests at issue in this case – confidentiality obligations, and preventing ex-employees from solicitation of customers and current employees – clearly are legitimate business interests under Illinois law.  *See, e.g., Reliable Fire*, 965 N.E.2d at 401 (post-termination restraints justified on the ground that "the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade information, or (2) customer relationships"); *accord Fisher/Unitech, Inc. v. Computer Aided Tech., Inc*., 2013 WL 1446425, *3 (N.D.Ill. April 9, 2013) ("no question that protecting confidential … customer information is a legitimate, protectable business interest"); *Integrated Genomics, Inc. v. Kyrpides*, 2010 WL 375672, *10 (N.D.Ill. Jan. 26, 2010) ("legitimate interest in preventing the solicitation of their employees by a former coworker"), citing *Arpac Corp. v. Murray*, 226 Ill.App.3d 65, 168 Ill.Dec. 240, 589 N.E.2d 640, 650 (1992) ("maintaining a stable workforce [is] a legitimate business interest protectable by a restrictive covenant").

The duration of the covenants in Curtiss's 2003 and 2007 Agreements is also reasonable under Illinois law.  *See Mintel Intern. Group, Ltd. v. Neergheen*, 2010 WL 145786, 14 (N.D.Ill. Jan. 12, 2010) (one-year non-solicitation provision reasonable as to duration).  The covenants do not impose any undue hardship on Curtiss – she is free to continue her employment at Fifth Third with respect to any customers except the customers of PNC at the time of her resignation and customer prospects with whom she had some connection at PNC during the year before her departure.  (Exh. 3c, ¶7(a)).

19

    c)  **The Operative Clauses In Poston's 2013 Agreement Are Enforceable Under Pennsylvania Law.**

Pennsylvania law governs the interpretation of Poston's 2013 Agreement.  (Exh. 5a at ¶6(a)) "In Pennsylvania, a covenant not to compete is valid and enforceable when it is 'incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent.'"  *Capsicum Group, LLC v. Rosenthal*, 2013 WL 6667822, *7 (E.D.Pa. Dec. 17, 2013), citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007), quoting *Hess v. Gebhard Co. & Inc*., 808 A.2d 912, 917 (Pa. 2002).

  "To be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests." *Capsicum Group, LLC,* 2013 WL 6667822 at *7, quoting *Victaulic*, 499 F.3d at 235.  "[L]egitimate business interests include confidential information, goodwill, unique or extraordinary skills, and specialized training that would benefit competitors." *Id*., quoting *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 424 (3d. Cir. 2010).

  Pennsylvania law recognizes that customer lists and information are "highly confidential" and constitute "a valuable asset … for which an employer is [also] entitled to protection." *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838, 842 (Pa. 1957); *see also, Zambelli*, 592 F.3d at 424 (employee's "considerable amount of client contact, and attendant familiarity with [employer's] confidential business information, are both legitimate and protectable parts of a business' goodwill relationship with its clients"); *Capsicum Group*, 2013 WL 6667822 at *9 ("Where employees have longstanding relationships with customers and access to confidential information regarding customer lists … those relationships likely implicate goodwill of the employer"); *Nat'l Bus. Servs. Inc. v. Wright*, 2 F.Supp.2d 701, 708 (E.D.Pa. 1998) (employer's

goodwill interests were implicated where the former employee had "wide-ranging contact with [the employer's] customers and potential customers over a significant period of time ... [and] had access to confidential information regarding [the employer's] customers, products, technical details, and marketing strategies.").

There can be no dispute that the covenants in Poston's 2013 Agreement, which prohibit her from soliciting PNC's customers and disclosing PNC's confidential information, protect PNC's legitimate business interests.  In the course of her fourteen-year employment, in various positions with PNC (and its predecessors), Poston had wide-ranging contacts with PNC's customers and was granted access to PNC's confidential customer information and lists.  (Exh. 1, Peirce Decl. at ¶¶9-13; Exh.2, Ruggles Decl. at ¶7)  PNC has a legitimate business interest in protecting a goodwill relationship with its customers through the contractual restrictions imposed on Poston.  *See Zambelli, Capsicum Group, Nat'l Bus. Servs., supra*.  Similarly, it has a recognized business interest in protecting its confidential information from disclosure.  *See, e.g.*, *Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 737-38 (Pa. Super. 1995) (enjoining former employee from disclosing employer's confidential information); *Nesselrotte v. Allegheny Energy, Inc.*, 615 F.Supp. 2d 397, 407-8 (W.D.Pa. 2009) (granting summary judgment for breach of contract against terminated employee who took company's confidential information).

Furthermore, a one-year restriction imposed in the 2013 Agreement on Poston's solicitation of PNC's customers is reasonable in both duration and geographic extent under Pennsylvania law.  "Courts applying Pennsylvania law routinely enforce covenants lasting for at least two years and/or covering broad geographic regions when those terms are … matched to a relationship between the employer's interests and the employee's duties."  *Capsicum Group*, 2013 WL 6667822 at *9; *see also Zambelli*, 592 F.3d at 412 (upholding two year, nationwide

21

non-solicitation covenant); *Nat'l Bus. Servs.*, 2 F.Supp.2d at 708 (upholding one year, nationwide non-solicitation covenant).

### d)     PNC's Code Is Likewise Enforceable.

In addition to their signed Agreements, Curtiss and Poston were also contractually bound by the provisions of the PNC's Code of Business Conduct and Ethics.  Stoecklin, who does not have a written agreement with PNC of the sort that Curtiss and Poston signed, was also bound by the provisions of the Code, with which he agreed to comply.  *See Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 490, 505 N.E.2d 314, 318, 106 Ill.Dec. 8, 12 (Ill. 1987), ("an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present"); *Fitch v. Continental Cas. Co.*, 2002 WL 31834877, *8 (N.D.Ill. Dec. 16, 2002) (employer's ethics guide created an implied-in-fact contract with employee).[20]

The Code, like the Agreements, prohibited individual defendants from disclosing PNC's confidential information to third parties, from using such information for personal financial gain, or from retaining it in their possession after the termination of their employment with PNC.  (*See* Exh. A to Exh. 1, Peirce Decl. at pp. 17-18, 22 and 26).  Like Ohio and Pennsylvania, Illinois recognizes that an employer has a legitimate business interest in protecting its confidential

---

[20] Even assuming, for the sake of argument, that the Code did not contractually bind Stoecklin, its provisions would still be binding on him under the doctrine of promissory estoppel.  "The elements of a promissory estoppel claim are (1) the defendant's unambiguous promise to the plaintiff, (2) the plaintiff's reliance on the promise, (3) the plaintiff's reliance was expected and foreseeable by the defendants, and (4) the plaintiff's reliance was detrimental to it." *Cherekos v. Lindoo Installations, Inc.*, 2014 WL 1004188, *5 (Ill.App. 2 Dist. March 12, 2014).  Here, the elements of promissory estoppel are satisfied.  Each year, Stoecklin averred to PNC that he had read the Code, understood it, and agreed to comply with its terms.  (Exh. B to Exh. 1, Peirce Decl. at ¶18).  PNC justifiably relied upon those representations; if Stoecklin had not made those averments, then PNC would have terminated him.  (Declaration of Shannon Wells, attached hereto as Exh. 17 at ¶6).  Clearly, Stoecklin expected and foresaw that PNC would rely on his representations as it continued to employ him.

information.[21]  *See e.g., Capgemini Fin. Services USA Inc. v. Infosys Ltd.*, 2014 WL 340206, *3 (N.D.Ill. Jan. 30, 2014), citing *Lifetec, Inc. v. Edwards*, 377 Ill.App.3d 260, 880 N.E.2d 188, 200 (Ill. App. Ct. 2007) ("It is well settled that protecting confidential … customer information is a legitimate, protectable interest of an employer."); *Fisher/Unitech, Inc.*, 2013 WL 1446425 at *3 (same).  Accordingly, the Code's confidentiality provisions are also enforceable.

### e)    PNC Is Likely to Succeed on Its Breach-of-Contract Claims.

The evidence submitted by PNC demonstrates that it is likely to succeed on the merits of its breach-of-contract claims against the individual defendants.  As explained at length above, non-solicitation and confidentiality provisions in the various Agreements and the Code governing defendants' conduct are valid and enforceable under applicable law.  Further, PNC has submitted declarations setting forth abundant evidence that Curtiss, Poston, and Stoecklin have each materially breached their obligations to PNC.

That evidence shows that Curtiss, in violation of non-solicitation clauses in her Agreements with PNC, has personally solicited at least seven PNC customers on behalf of Fifth Third.  Curtiss contacted at least three customers shortly before she resigned from PNC to discuss her impending change of employer and moving customers' investments to Fifth Third. (Exh. 2, Ruggles Decl. at ¶14).  Since her resignation on April 4, she personally contacted at least four other PNC customers advising them of her departure from PNC.  In some of these calls, she told the customer that PNC would no longer be able to serve the customers' investment

---

[21] In this case, Illinois law governs PNC's Code, since the Code does not identify any governing law, and the defendants Curtiss, Poston, and Stoecklin are all Illinois resident who left PNC's offices in Illinois for defendant Fifth Third's Illinois office. *See In re Estate of Henry*, 2012 WL 7037433, *4 (Ill.App. 4 Dist. Sept. 5, 2012) ("If a contract claim is raised, courts utilize 'the most significant contacts test'"); Restatement (Second) of Conflict of Laws § 188 (1971) (law of state with most significant relationship governs).

23

needs.  In another, she represented that she could solve a problem the customer was having more quickly than PNC could.  (Exh. 2, Ruggles Decl. at ¶24).

PNC's evidence also demonstrates that Curtiss has been soliciting PNC customers indirectly, using Stoecklin as her messenger.  Like Curtiss, Stoecklin began soliciting PNC customers for Fifth Third even before he resigned from PNC.  (Exh. 2, Ruggles Decl. at ¶13 and 18).  Since his resignation on April 4, Stoecklin contacted at least five PNC customers, in some cases specifically requesting customers to transfer their accounts to Fifth Third, and in others seeking to set up a meeting with Curtiss to gauge customers' interest in moving their investments to Fifth Third.  (Exh. 7, Sihakom Decl. at ¶¶6, 7).

Poston has also been soliciting PNC customers in violation of her Agreements.  For example, two customers advised PNC that Poston had reached out to them "around the time" she and Curtiss resigned and that they had already submitted paperwork to move their accounts to Fifth Third.  (Exh. 8, Jaraczewski Decl. at ¶6).  Poston also recently contacted another PNC customer and left a message instructing the customer to call her to review the customer's investments.  The customer did not know that Poston was no longer with PNC and Poston did not disclose where she was calling from.  (Exh. 9, Hernandez Decl. at ¶4).  And, all three individual defendants have clearly been using confidential customer information in breach of their duties under PNC's Code.

Overall, defendants' concerted efforts to poach PNC customers are bearing significant fruit.  As noted above, between April 4 and April 28, 2014, $8.1 million in customer assets have been transferred by customers served by Curtiss from PNC to Fifth Third.  (Exh. 1, Peirce Decl. at ¶43).  Logic dictates that, in all probability, many more customers either were contacted but demurred, have not yet made up their minds, or have not yet completed the necessary paperwork

to transfer their accounts.  The sheer magnitude of the transfers already effectuated belies any suggestion that this sudden exodus occurred spontaneously.  And, it is unthinkable that defendants' well-coordinated campaign to induce PNC's customers to move their business to Fifth Third would be feasible without the use of PNC's confidential customer contact information.

The evidence also shows that Curtiss is in breach of her obligations under multiple agreements not to solicit, directly or indirectly, PNC employees.  (*See* Exh. 3a, 2003 Agmt. at ¶ 12(b); Exh. 3b, 2005 Agmt. at ¶7.)  On April 4, 2014, Curtiss solicited Vice President and Branch Manager Georgia Ruggles intimating that Ruggles could double her salary.  A short while later, Fifth Third made an offer of employment to PNC employee Nancy Hohn, doubling her salary, and offering to have her join Curtiss, Poston and Stoecklin at Fifth Third working with Curtiss at the McFarland Road branch in Rockford.  Hohn candidly admitted Curtiss's role in recommending Hohn to Fifth Third for the new position. (Exh. 1 Peirce Decl. ¶¶38-41).  PNC believes that the evidence will likely show that Curtiss likewise breached her contractual commitment not to solicit employees by inducing Poston and Stoecklin to join her in the move to Fifth Third.

Accordingly, the evidence shows that PNC is likely to succeed on the merits of its breach-of-contract claims against the individual defendants.

**2. PNC Is Likely to Succeed on Its Misappropriation of Trade Secrets Claim against Defendants.**

In Count Four of its Complaint, PNC asserts that Fifth Third, Curtiss, Poston, and Stoecklin have been misappropriating PNC's trade secrets in violation of ITSA, 765 ILCS 1065/1, *et seq.*

25

The ITSA provides that a court may enjoin the "actual or threatened misappropriation" of a trade secret.  765 ILCS 1065/3(a).  "Accordingly, a movant seeking an injunction must 'prove both the existence of a trade secret and the misappropriation.'"  *Garon Foods, Inc. v. Montieth,* 2013 WL 3338292, 6 (S.D.Ill. July 2, 2013)*,* quoting *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1268 (7th Cir.1995).  PNC's evidence satisfies this standard.

a)      **The Confidential Information at Issue in this Case Constitutes Trade Secrets under ITSA.**

PNC asserts trade secret protection for PNC's customer lists and customer information (including customers' names, contact, personal and financial information and the terms of customers' investment management agreements with PNC), and PNC's lists of customer prospects and customer information regarding those prospects. PNC's evidence amply establishes the trade secret nature of this information.

Section 2 of the ITSA defines a "trade secret" as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, ***or list of actual or potential customers*** or suppliers, that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d) (emphasis added).  *See also SBS Worldwide, Inc. v. Potts*, 2014 WL 499001, *3 (N.D.Ill. Feb. 7, 2014) (citing "customer lists that are not readily ascertainable" as an example of "information that often fulfills the ITSA's secrecy requirement").

The evidence shows that PNC's customer and prospective customer information is sufficiently secret to derive economic value from not being generally known to its competitors

26

who can obtain economic value from its disclosure or use.   Specifically, PNC invested substantial resources to create and/or compile and maintain this information.  (Exh. 1, Peirce Decl. at ¶¶10-11, 16-27).   The information is not known outside of PNC and cannot be replicated, compiled or recreated by a competitor from public sources, if at all, without very substantial time, effort and expense.  (*Id.* at ¶16).

There can be no dispute that the PNC customer and prospective investment customer information would be highly valuable to PNC's competitors like Fifth Third.   Armed with knowledge of personal and financial information of PNC's investment customers, including the nature of their investments, investment returns, and other similar information, a competitor would be able to target PNC's investment customers for solicitation and entice them away from PNC.  (Exh. 1 Peirce Decl. at ¶28).   In fact, Curtiss, Poston, and Stoecklin have used precisely that kind of information to successfully induce PNC customers to switch to Fifth Third.  (*See* Exh. 2, Ruggles Decl. at ¶22; Exh. 8, Jaraczewski Decl. at ¶5-7, Exh. 7, Sihakom Decl. at ¶6).

ITSA's requirement of reasonable efforts to maintain secrecy is also satisfied.   PNC carefully safeguards the identities of PNC's customers, which are not publicly available.   For example, PNC Code prohibited all employees from disclosing customers' identities to third parties or from using this information for personal benefit, and they are also prohibited from retaining it after the termination of their employment.   Employees in highly sensitive positions like Curtiss and Poston are also required to enter into agreements that spell out their duties regarding confidential information trade secrets, and solicitation.  (Exh. 1, Peirce Decl. at ¶23).   The same protections apply to the personal and financial information of PNC's customers, including the nature of the customers' investments, their investment returns, and other similar information.  (*Id.*).

27

As another safeguard, PNC carefully limits access to computerized information about investment customers, including customers' names and their contact, personal and financial information. (*Id.* at ¶24). These types of information are available only through a password-protected computer database. (*Id.*) Employee access to the information on the database is further limited to only those customers whose information the employee needs in order to perform the duties of his or her employment. (*Id.* at ¶25).

PNC also prohibits employees from downloading certain kinds of personal and financial client information, such as social security numbers or account numbers, to unauthorized portable storage devices (such as thumb drives). (*Id.* at ¶26) Emailing and printing of such highly sensitive information is also monitored. (*Id.*) If an employee violates this prohibition, PNC's computer systems will automatically send an electronic message to a PNC supervisor, alerting him or her to the unauthorized downloading or printing of client information. (*Id.*).

Under similar circumstances, Illinois courts have found confidential information of this sort to qualify as trade secrets. *See, e.g.*, *Lincoln Park Sav. Bank v. Binetti,* 2011 WL 249461, *2 (N.D.Ill. Jan. 26, 2011) (bank adequately alleged trade secret status for customer information where it made extensive efforts to ensure information remained secret and confidential; confidential business information was available only to select employees on need-to-know basis and where defendants agreed not to retain, use, or disclose this confidential information); *Multiut Corp. v. Draiman,* 359 Ill.App.3d 527, 295 Ill.Dec. 818, 834 N.E.2d 43, 50 (Ill.App. 1 Dist. 2005) (customer lists were trade secrets under ITSA where access to customer data was limited, and employees had to sign confidentiality agreements); *Strata Marketing, Inc. v. Murphy*, 317 Ill.App.3d 1054, 1069, 251 Ill.Dec. 595, 740 N.E.2d 1166, 1176–77 (Ill.App. 1 Dist 2000) (ITSA

claim properly pleaded where customer lists took considerable time, effort and expense to create and were protected by limiting computer access and using confidentiality agreements).

Accordingly, PNC has established that the information at issue in this case qualifies as trade secrets under ITSA.

### b)       The Defendants Have Misappropriated PNC's Trade Secrets.

"Under the ITSA, misappropriation occurs by improper acquisition, unauthorized disclosure, or unauthorized use." *SBS Worldwide*, 2014 WL 499001 at *5, citing 765 ILCS 1065/2(b); *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, *5 (N.D.Ill. Nov. 11, 2013). "Misappropriation by improper acquisition entails acquisition by improper means, which the ITSA defines as [*inter alia*] '. . . breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use . . .'" *Id.*, citing 765 ILCS 1065/2(a).  "Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others 'for purposes other than serving the interests of the owner of the trade secrets.'"  *Id.*, quoting *Lumenate Techs.*, 2013 WL 5974731, at *4.

Here, the individual defendants misappropriated PNC's trade secrets because, being under a duty to maintain their secrecy, they instead used (and continue to use) them, without PNC's consent, for their own and for Fifth Third's benefit. *See SBS Worldwide*, 2014 WL 499001 at *5 (allegations that former employee used his former company's trade secrets to poach business from company's multiple customers states a claim for misappropriation); *Lumenate Techs.*, 2013 WL 5974731 at *5 (same).  In this case, it is clear that the individual defendants contacted and solicited a great number of PNC's customers on behalf of Fifth Third immediately after (and in some cases even prior to) leaving PNC on April 4, 2014.  Indeed, before they resigned, Curtiss, Poston, and Stoecklin serviced 1,174 PNC customer accounts, representing

29

more than 650 customers.  There is only one way for them to have contacted numerous customers — the misappropriation and use of PNC's confidential, trade secret customer information.  *See RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 876 (N.D.Ill. 2001) (plaintiff can rely on circumstantial evidence to prove misappropriation of trade secrets).

Fifth Third misappropriated PNC's trade secrets because it used, and continues to use, PNC's trade secrets despite knowledge that these secrets were acquired by improper means by Curtiss, Poston, and Stoeklin. This conduct also constitutes misappropriation under the ITSA. *See* 765 ILCS 1065/2(b)(2)(B)(I), (III) ("[m]isappropriation means ... (2) disclosure or use of a trade secret of a person without express or implied consent by another person who ... at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was ... (I) derived from or through a person who utilized improper means to acquire it" … "or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy. . ." ).  *See SBS Worldwide*, 2014 WL 499001 at *6 (allegations that company used and continues to use its competitor's trade secrets despite knowledge that the secrets were acquired by improper means state a claim for misappropriation).

Even if Fifth Third was not aware of the individual defendants' contractual commitments on the day it hired them, it certainly became aware of those commitments when it received letters from PNC's counsel to individual defendants sent on April 8, 2014 (Curtiss and Poston) and April 14, 2014 (Stoecklin). (Exhs. 10, 11 and 12, respectively).  Moreover, Fifth Third cannot credibly deny that it was not aware that the individual defendants have been exploiting PNC's trade secrets for its benefit.  It is obviously aware that dozens of PNC's Rockford customers transferred their accounts to Fifth Third in the weeks since the individual defendants joined Fifth Third.  Fifth Third was also advised by PNC's counsel of the individual defendants' concerted

efforts to solicit numerous PNC customers in the same time period.  (Exh. 16)  In the face of this evidence, it defies reason to believe that so many PNC customers would suddenly decamp to Fifth Third were it not for a coordinated campaign to contact PNC customers and solicit them to switch.

PNC has accordingly established that it is likely to succeed on its claim for trade secret misappropriation under the Illinois Trade Secrets Act.

### 3.  PNC Is Likely to Succeed on Its Claim for Tortious Interference with Prospective Economic Advantage.

PNC is also likely to succeed on Count Seven of its Complaint, which sets forth a claim against Fifth Third and the individual defendants for tortious interference with prospective economic advantage based upon PNC's relationships with its investment customers and prospects.[22]

To prove an intentional interference with prospective economic advantage claim under Illinois law, a plaintiff must establish: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Mainline Infor. Sys., Inc. v. Benkendorf*, 2010 WL 2011618, 10 (N.D.Ill. May 20, 2010), quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill.2d 288, 256 Ill.Dec. 289, 751 N.E.2d 1126, 1133-34 (Ill.2001) (quoting *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 217 Ill.Dec. 720, 667 N.E.2d 1296 (Ill.1996)).

---

[22] Although PNC has established (and often long-term) contractual relationships with its banking and investment customers, the contracts were for the most part at will, and the law of tortious interference treats such contracts as creating a prospective economic advantage only.

"A plaintiff will generally not have a cause of action for interference with a prospective business relationship against a bona fide competitor unless the circumstances indicate unfair competition." *Dames & Moore v. Baxter & Woodman, Inc*., 21 F.Supp.2d 817, 825 (N.D.Ill. 1998). To prove that the competition is "unfair," Illinois courts require plaintiff to show that defendant employed "wrongful means." *Id*., citing Restatement (Second) of Torts, § 768 (1979). In *Dames & Moore*, for example, plaintiff alleged that Golden, its former employee, and his new employer improperly caused a disruption or termination of plaintiff's business relationships or expectancies with its employees and clients. The District Court held that allegations of Golden's solicitation of plaintiff's clients and employees while he was still employed with plaintiff, Golden's misappropriation of confidential information about the clients and employees, defendants' conspiratorial agreement to have Golden perform these acts, and the new employer's use of misappropriated confidential information sufficiently alleged that defendants' actions were wrongful and unjustified. 21 F.Supp.2d at 825-26. *See also Lumenate Techs*., 2013 WL 5974731, *9 (recognizing a claim for tortious interference against former employees and their new employer where defendants diverted clients using former employer's confidential information); *Mainline*, 2010 WL 2011618 at *11 (employer stated a claim for tortious interference where it alleged that a former employee "engaged in a covert scheme to unlawfully obtain [employer's] customer lists . . . and steal [employer's] customers").

In this case, substantial evidence supports all the elements of PNC's tortious interference claim under Illinois law. PNC has established (and in many cases long-term) contractual relationships with its investment customers and obviously expected that these relationships would continue. The defendants were well aware of these relationships. Fifth Third successfully induced 36 of those customers, all of whom had been serviced at PNC by the individual

defendants, to terminate their contracts with PNC within the last three weeks.  (*See* Exh. 1, Peirce Decl. at ¶43).  Defendants' actions were also wrongful and unjustified.  The evidence uncovered by PNC shows, at the very least, that it will likely prove that the individual defendants solicited PNC's customers for Fifth Third while they were employed at PNC and thereafter in violation of their contractual and common law obligations to PNC; that defendants, also in violation of their contractual duties, used PNC's confidential information to solicit PNC customers; and that defendants conspired to commit these and other acts injurious to PNC.  (*See* Exh. 2, Ruggles Decl. at ¶13, 14, 16, 18; Exh. 7, Sihakom Decl. at ¶6).  Accordingly, PNC is likely to succeed on the merits of its tortious interference claim.

### C.   PNC Has Suffered and Continues to Suffer Irreparable Injury for which No Adequate Remedy at Law Exists.

This Court has held that a loss of customers and associated goodwill constitutes irreparable harm.  *See, e.g., Mintel, supra,* 2008 WL 2782818 at *5 ("The loss of clients and sales and the continuing threat of further loss due to the distribution of [plaintiff's] client lists and marketing data are sufficient to constitute irreparable injury"); *Brown, supra,* 494 F.Supp.2d at 955 (irreparable harm exists where former employee's "active solicitation of Brown's customers has the potential to weaken Brown's relationships and goodwill with these customers" and damages for lost commissions do not "resolve Brown's alleged loss of customers and goodwill, nor [do they] address the fact [a former employee] is contacting other . . . customers"); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.,* 420 F.Supp.2d 866, 872 (N.D.Ill. 2006) (plaintiff "will suffer irreparable harm without an injunction: should Defendants be allowed to continue to pilfer [plaintiff's] customers and employees, [plaintiff] will lose goodwill, competitive position, and continuity of business relationships with its customers and employees."); *accord  Reinders Bros. Inc. v. Rain Bird E. Sales Corp.,* 627 F.2d 44, 53 & n. 7

(7th Cir.1980) (loss of small but valuable portion of clientele not compensable in monetary damages).

In this case, PNC has already lost and is threatened with future losses of customers and customer goodwill.  It has accordingly met its burden of showing irreparable injury.[23]

**D.      The Balance of Equities Favors PNC.**

Absent immediate injunctive relief, defendants will continue to use PNC's trade secrets and confidential information to poach PNC's customers, causing further irreparable injury to PNC.  In contrast, temporary injunctive relief will cause no hardship to defendants: it will merely force defendants to do what they are already obligated to do.  The individual defendants can continue to work for Fifth Third, with their ability to earn a living unimpaired.  Similarly, Fifth Third can compete with PNC, provided it does so fairly, without misappropriating PNC's trade secrets, engaging in tortious interference, or aiding and abetting the individual defendants.

**E.      The Injunction Is In the Public Interest.**

ITSA's explicit authorization of injunctive relief for trade secret misappropriation shows that an injunction here will promote the public interest.  *See PepsiCo, Inc.*, 54 F.3d at 1268 ("Trade secret law serves to protect 'standards of commercial morality'…"); *Huawei Technologies Co., Ltd. v. Motorola, Inc.*, 2011 WL 612722, *10 (N.D.Ill. Feb. 22, 2011) ("public interest favors granting an injunction to ensure that [plaintiff's] trade secrets are protected"); *Optionmonster Holdings, Inc. v. Tavant Technologies, Inc.*,  2010 WL 2639809, *10 (N.D.Ill. June 29, 2010) (same).

Enforcing contractual commitments is also in the public interest. *See Brown*, 494 F.Supp.2d at 955 (N.D.Ill. 2007) ("Courts in this District have recognized that the public interest

---

[23] Indeed, in their Agreements, Curtiss and Poston themselves recognized that their breach of restrictive covenants will cause PNC irreparable harm and acknowledged that PNC is entitled to preliminary injunctive relief to protect its interests. (*See, e.g.*, Exh. 3b at ¶11; Exh. 5a at ¶6(b), respectively).

34

is served by enforcing valid contracts"), citing *SMC Corp., Ltd. v. Lockjaw, LLC*, 481 F.Supp.2d

918, 929 (N.D.Ill.2007); *Cook Inc. v. Boston Scientific Corp.*, 2002 WL 31236289, *6 (N.D.Ill.

Oct.1, 2002); *Arcadia Health Serv., Inc., v. A+ Health Care, Inc.*, 1997 WL 24737, *5 (N.D.Ill.

Jan.17, 1997).

**RELIEF REQUESTED**

For the foregoing reasons, and based upon the evidence set forth in the attached

declarations and exhibits, PNC Plaintiffs respectfully request that this Court issue a Temporary

Restraining Order and Preliminary Injunction.  The proposed forms of Order are included with

this Motion.

Respectfully submitted,

PNC Financial Services Group, Inc., PNC Bank,
N.A. and PNC Investments, LLC

/s/   James M. Crowley
James M. Crowley, Esq.
Monica A. Forte, Esq.
Crowley & Lamb, P.C.
221 N. LaSalle Street, Suite 1550
Chicago, Illinois 60601
Phone: (312) 670-6900
Facsimilie: (312) 494-6610
jcrowley@crowleylamb.com
mforte@crowleylamb.com

Of Counsel:

A. Richard Feldman, Esquire
rfeldman@bazless.com
Christina M. Reger, Esquire
creger@bazless.com
Michael A. Shapiro, Esquire
mshapiro@bazless.com
BAZELON, LESS & FELDMAN, P.C.
One South Broad Street, Suite 1500
Philadelphia, PA  19107

35