# EXHIBIT 10

Page 1

```
 1                        -   -   -

 2              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 3                        -   -   -

 4  SRS ACQUIOM, INC., a        )Civil Action No.
    Delaware corporation, and   )1:19-cv-02005-DDD-SKC
 5  SHAREHOLDER REPRESENTATIVE  )
    SERVICES, LLC, a Colorado   )
 6  limited liability company,  )
                                )
 7                              )
                                )
 8              Plaintiffs,     )
                                )
 9       vs.                    )
                                )
10  PNC FINANCIAL SERVICES      )
    GROUP, INC., a Pennsylvania )
11  corporation, PNC BANK, N.A.,)
    a national association,     )
12  HEATHER KELLY, an           )
    individual, and             )
13  ALEX TSARNAS, an individual,)
                                )
14                              )
                Defendants.     )
15
16          VIDEOTAPED DEPOSITION OF HEATHER KELLY
17
18
19
20        ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT
21
22
23
24
25
```

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                                    October 23, 2019

| | |
|---|---|
| 1  periods of time.  I don't know for sure if it | 1     Q.     Between March 8, 2018, when you left |
| 2  wasn't on my phone. | 2  SRSA and the time that Ms. Semenova accepted |
| 3     Q.     What periods of time did you not use | 3  employment at SRSA, did you text message with |
| 4  What'sApp? | 4  her? |
| 5     A.     I don't recall. | 5     A.     Yes. |
| 6     Q.     Who did you communicate with over | 6     Q.     How frequently? |
| 7  What'sApp? | 7     A.     I don't know.  Every so often she |
| 8     A.     Alex -- this is to the best of my | 8  would text to complain about the culture and |
| 9  recollection.  Alex, Amanda Jackson, | 9  the environment there. |
| 10  reservation host in Punta Cana.  Ryan Simkin. | 10     Q.     Did you ever at any point delete |
| 11     Q.     How about Luda Semenova? | 11  your text messages with Luda Semenova? |
| 12     A.     I don't recall. | 12     A.     I don't know. |
| 13     Q.     Did you text with Luda Semenova? | 13     Q.     Does it seem possible? |
| 14     A.     Yes. | 14     A.     Yes, it seems possible. |
| 15     Q.     Who is Luda Semenova? | 15     Q.     Why -- why did you delete your texts |
| 16     A.     A long-time friend of mine in the | 16  with Luda Semenova? |
| 17  industry and my current colleague at PNC. | 17           MR. PETRIE:  Object to the |
| 18     Q.     Was she also a former colleague at | 18  form. |
| 19  SRSA? | 19           THE WITNESS:  I didn't say I |
| 20     A.     Yes. | 20  did. |
| 21     Q.     You were there together? | 21  BY MR. BRAUNIG: |
| 22     A.     For a brief time. | 22     Q.     Why do you think you might have |
| 23     Q.     Did you text with Ms. Semenova while | 23  deleted your texts with Luda Semenova? |
| 24  she was -- while you were both at SRSA? | 24     A.     Because as I mentioned before, there |
| 25     A.     I don't recall.  Are you asking me | 25  is no rhyme or reason to why I decide to try to |
| Page 34 | Page 36 |

| | |
|---|---|
| 1  to guess? | 1  organize my inbox. |
| 2     Q.     I'm asking to the best of your | 2     Q.     How did your discussions first begin |
| 3  recollection. | 3  with PNC Bank? |
| 4     A.     No. | 4     A.     I was contacted by Ryan Simkin. |
| 5     Q.     You described Ms. Semenova as | 5     Q.     When was that, approximately? |
| 6  somebody who was a long-time friend; correct? | 6     A.     Between the fourth and the first |
| 7     A.     Yes.  We've known each other for | 7  quarter of the year.  Fourth quarter of 2017 |
| 8  years. | 8  and first quarter of 2018. |
| 9     Q.     Did you have the kind of friendship | 9     Q.     How did Mr. Simkin reach out to you |
| 10  where you text messaged each other? | 10  initially? |
| 11     A.     Yes.  Not as frequent as others, but | 11     A.     He sent me an E-mail and said, I |
| 12  I'm sure we shared texts. | 12  have a question about a deal, and as he is a |
| 13     Q.     To the best of your recollection, | 13  shareholder rep on many of my transactions, I |
| 14  did you share texts with Ms. Semenova while you | 14  gave him the same immediate response I give to |
| 15  were both employed at SRSA? | 15  most of my clients and gave him a call back. |
| 16     A.     I don't know. | 16     Q.     And when you spoke to him in |
| 17     Q.     Did you continue to text with | 17  response to that E-mail, what did he say to |
| 18  Ms. Semenova after you left SRSA? | 18  you, to the best of your knowledge, best of |
| 19     A.     Well, continue, I don't know if I | 19  your recollection? |
| 20  originally did. | 20     A.     I don't recall the entire |
| 21     Q.     Fair enough.  I'll ask it again. | 21  conversation, but I was asked if I would be |
| 22  Did you text message with Ms. Semenova between | 22  interested in joining PNC. |
| 23  March 8, 2018, and the time that she accepted | 23     Q.     And presumably there were -- were |
| 24  employment at PNC? | 24  there additional followup calls for meetings |
| 25     A.     What was that date? | 25  that came out of that phone call? |
| Page 35 | Page 37 |

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                              October 23, 2019

| | |
|---|---|
| 1   about the team. | 1   50878, does that reflect the financial terms of |
| 2      Q.   **Were there discussions about** | 2   your employment arrangement with PNC? |
| 3   **building a payment software platform at PNC?** | 3      MR. PETRIE:   Warren, is there |
| 4      A.   There was -- there was a discussion | 4   -- excuse me, forgive me for interrupting.   Is |
| 5   about taking paper process like everyone else | 5   there a reason why 50877 isn't in this |
| 6   in the industry and looking at ways to be | 6   document? |
| 7   efficient.   But I don't recall if there was | 7      MR. BRAUNIG:   Not |
| 8   specific discussion about online. | 8   intentionally. |
| 9      Q.   **Was -- did PNC seem very excited** | 9      MR. PETRIE:   I'm sorry, would |
| 10   **about the opportunity to hire you?** | 10   you repeat your question. |
| 11      A.   Well, I should hope so. | 11      MR. BRAUNIG:   Yeah.   I'll ask |
| 12      Q.   **Were they also very excited about** | 12   a new question. |
| 13   **the opportunity to hire Alex Tsarnas?** | 13   BY MR. BRAUNIG: |
| 14      A.   We didn't discuss that.   At that | 14      Q.   **Does this -- does Kelly 4 accurately** |
| 15   meeting we did not discuss Alex Tsarnas. | 15   **reflect the terms of the financial agreement** |
| 16      Q.   **Did you discuss -- when did you** | 16   **that you reached with PNC?** |
| 17   **first discuss Alex Tsarnas with PNC?** | 17      A.   No. |
| 18      A.   I initially, on that first call, | 18      Q.   **What's different between the offer** |
| 19   told Ryan Simkin I wasn't interested, but that | 19   **that you accepted and what's in Kelly 4?** |
| 20   Alex Tsarnas had separated from SRSA and they | 20      A.   The terms of my compensation. |
| 21   should speak with him. | 21      Q.   **Which ones in particular?** |
| 22      Q.   **And did -- did you and Alex ever** | 22      A.   That I can identify would be the |
| 23   **jointly talk to PNC before you were hired** | 23   corporate performance bonus. |
| 24   **there?** | 24      Q.   **What's different about the corporate** |
| 25      A.   No. | 25   **performance bonus from what's reflected in** |
|                          Page 42 |                          Page 44 |
| 1      Q.   **Do you know who received an offer** | 1   Kelly 4? |
| 2   **from PNC first, you or Alex Tsarnas?** | 2      A.   The single lump sum cash payment. |
| 3      A.   I did. | 3      Q.   **Was -- okay.   Did the -- the amount** |
| 4      Q.   **Did you communicate about your offer** | 4   **of the single lump sum cash payment is** |
| 5   **with Alex?** | 5   **different?** |
| 6      A.   Yes. | 6      A.   That paragraph is different.   I just |
| 7      Q.   **Did Alex encourage you to go back to** | 7   -- I don't know, specifically, what exactly is |
| 8   **PNC and ask for more money?** | 8   different without looking at my form that I |
| 9      A.   I don't recall. | 9   signed. |
| 10      Q.   **Do you recall if PNC did,** | 10      Q.   **Were you paid -- are you receiving a** |
| 11   **ultimately, offer you more money than they** | 11   **salary of $300,000 per year?** |
| 12   **originally had?** | 12      A.   Yes. |
| 13      A.   They did. | 13      Q.   **Did you receive a signing bonus of** |
| 14      (Deposition Exhibit No. 4 was | 14   **$150,000 when you signed?** |
| 15   marked for identification.) | 15      A.   I did. |
| 16   BY MR. BRAUNIG: | 16      Q.   **Does your agreement with PNC include** |
| 17      Q.   **Kelly 4 is PNC 50874 through 881.** | 17   **a 1.825 million retention, set of retention** |
| 18   **There are some E-mails back and forth on the** | 18   **payments?** |
| 19   **top of it.   But do you recognize, starting on** | 19      A.   I don't know the exact dollar figure |
| 20   **Page 5878, the offer that you received from --** | 20   of what we finally signed. |
| 21   **that you accepted from PNC?** | 21      Q.   **Something in that ballpark?** |
| 22      A.   I recognize the format.   I don't | 22      A.   Something potentially in that |
| 23   know for sure if this is the exact offer that I | 23   ballpark. |
| 24   signed. | 24      Q.   **As a retention incentive, is that --** |
| 25      Q.   **Does the offer on, starting on** | 25   **those are payments that you receive for just** |
|                          Page 43 |                          Page 45 |

Pages 42 to 45

4      Q.      Did SRS publish Kelly 10 on its
5   website, to your knowledge?
6      A.      I don't know.
7              MR. BRAUNIG:  I will move to
8   strike the prior answer as non-responsive.
9   BY MR. BRAUNIG:
10     Q.      Why did you E-mail it to yourself on
11  March 13, 2018?
12     A.      To do what I told SRSA I would do.
13     Q.      What had you told SRS that you would
14  do?
15     A.      I told Eric Martin I would be
16  available to help Ali or any other RM in the
17  transactions that I was leaving them to handle.
18     Q.      When did you tell them that?
19     A.      I don't recall.
20     Q.      Before or after you, in your words,
21  were terminated?
22     A.      I don't recall.
23     Q.      Did your -- is it your testimony
24  that you needed Kelly 10 in order to support
25  SRSA after you left?

Page 90

1      A.      It could have been a document I
2   needed to reference to help them do their job,
3   yes.
4      Q.      If it was such a meaningless
5   document, why did you need it?
6      A.      Well, when you are looking at
7   agreements, you generally need to see the
8   exhibits.
9      Q.      This was not an exhibit to a
10  specific agreement; was it?
11     A.      Yes, it was.
12     Q.      What agreement?
13     A.      The payments administration
14  agreement, Exhibit A.
15     Q.      Exhibit A to what?
16     A.      Payments administration agreement.
17     Q.      For a particular deal?
18     A.      No.  Standard template.
19     Q.      Did you ask anyone at SRSA whether
20  you could send this to your personal E-mail
21  after you had been terminated?
22     A.      Not that I recall.
23     Q.      Why not?
24     A.      I don't know.
25     Q.      Did you tell anyone at SRSA that you

Page 91

1   had a copy of their payment spreadsheet after
2   you had resigned?
3      A.      I don't recall.
4              (Deposition Exhibit No. 11 was
5   marked for identification.)
6   BY MR. BRAUNIG:
7      Q.      On March 13, 2018, did you also send
8   yourself a tender admin agreement dated 8/31?
9      A.      It looks like it.
10     Q.      This is also a document that is
11  created by SRSA?
12     A.      I -- it's hard to answer that
13  because their agreements were, basically,
14  copied from other banks.  So I don't know that
15  you could say they created it.
16     Q.      This was Acquiom's tender
17  administration agreement, correct, that you
18  sent to yourself on March 13th?
19     A.      It is the form that they would
20  provide to clients as a template, yes.
21     Q.      And this version also includes some
22  fee information on the back page, 26305; do you
23  see that?
24     A.      I do.
25     Q.      And that was something -- this is

Page 92

1   part of what you sent to yourself on March
2   13th?
3      A.      Okay.
4      Q.      Is that true?
5      A.      I didn't realize it was their --
6   their form of agreement would have active fee
7   schedule on the back, but it appears it did.
8      Q.      Do you know what this is a fee
9   schedule for?
10     A.      It looks like a schedule of
11  contracted services.
12     Q.      Do you know who the client was,
13  customer was for this --
14     A.      This is a template form of
15  agreement.  The offerer is blank so this
16  wouldn't have been a client's agreement.  It
17  would have been, again, a point of reference to
18  assist anyone unfamiliar with these types of
19  transactions, as Ali Bryson would have been, in
20  doing her job.
21     Q.      Why did you send this to yourself on
22  March 13th after you had been terminated?
23     A.      Anything sent to myself would have
24  been used to assist SRS in completing
25  transactions that I left from my clients.

Page 93

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                                    October 23, 2019

| | |
|---|---|
| 1  information as well; is that correct? | 1      Q.    A few weeks later? |
| 2      A.    Can you repeat your question? | 2      A.    When I was asked to. |
| 3      Q.    Yeah.  I'll draw your attention to | 3      Q.    Weren't you asked by SRS to return |
| 4  Paragraph 8. | 4  documents directly to SRS when you left the |
| 5      A.    What page, please? | 5  company? |
| 6      Q.    26332.  You see on -- | 6      A.    I don't recall. |
| 7      A.    263 -- | 7      Q.    You -- is it fair to say that when |
| 8      Q.    Do you see at the end of the | 8  you sent back your computer, you sent back your |
| 9  Paragraph 8, proprietary information includes, | 9  current SRS computer, you did not include any |
| 10  but is not limited to, trade secrets, | 10  of the documents that you had printed or had |
| 11  inventions, marketing plans, product plans, | 11  E-mailed to yourself? |
| 12  business strategies, financial information, | 12      A.    I -- I -- say the question one more |
| 13  forecasts, personnel information and customer | 13  time. |
| 14  lists? | 14      Q.    When you sent back the computer to |
| 15      A.    I see that. | 15  SRS and you filled the FedEx box and put that |
| 16      Q.    Did you understand that you, in | 16  in there, you did not include the Kelly 6 or |
| 17  signing this agreement, took on an obligation | 17  Kelly 8 in that return; did you? |
| 18  not to disclose proprietary information or to | 18      A.    I did not. |
| 19  use proprietary information after you left SRS? | 19      Q.    Nor did you return any of the |
| 20      A.    Yes. | 20  documents that you had E-mailed to yourself a |
| 21      Q.    And turning your attention to | 21  couple of days earlier on March 13th; correct? |
| 22  Paragraph 12, did you understand that, upon | 22      A.    Correct. |
| 23  ending your employment with the company, you | 23      Q.    When you resigned from SRS, how many |
| 24  would need to return any proprietary | 24  SRS computers were you in possession of? |
| 25  information of the company? | 25      A.    One. |
| Page 106 | Page 108 |

| | |
|---|---|
| 1      A.    Yes. | 1      Q.    Did you have a laptop that had been |
| 2      Q.    When you had your exit interview | 2  given to you by SRS that you are not including |
| 3  with Ms. Lee, did you tell her that you had | 3  within that? |
| 4  recently printed out the payment product | 4      A.    Can you repeat the question? |
| 5  specification and the import procedures | 5      Q.    How many laptops did you have in |
| 6  document that we looked at as Kelly 6 and Kelly | 6  your possession as of March 9, 2018, that had |
| 7  8? | 7  been provided to you by SRS? |
| 8      A.    No. | 8      A.    I had been assigned two laptops in |
| 9      Q.    Why not? | 9  my time there at SRS. |
| 10      A.    I didn't think to. | 10      Q.    Was one an older laptop that was |
| 11      Q.    You didn't think it was relevant | 11  ultimately replaced by a newer laptop? |
| 12  that you were still in possession of SRS | 12      A.    Yes. |
| 13  information at the time of your exit interview? | 13      Q.    If I called the older laptop the |
| 14      A.    I -- repeat your question again. | 14  first laptop, will you understand what I'm |
| 15      Q.    Did you think it was relevant in | 15  saying? |
| 16  your exit interview to mention that you had | 16      A.    I will. |
| 17  recently printed off the payment product | 17      Q.    And if I call the newer one the |
| 18  specification and the import procedures | 18  second laptop, you will understand what I'm |
| 19  documents that we looked at as Kelly 6 and | 19  saying? |
| 20  Kelly 8? | 20      A.    I will. |
| 21      A.    I don't know if I printed those | 21      Q.    After your termination, did you |
| 22  documents, so I wouldn't have thought to tell | 22  return the first laptop to SRS? |
| 23  her that they were printed. | 23      A.    No. |
| 24              Everything in my possession, I | 24      Q.    In your exit interview with Ms. Lee, |
| 25  turned over to the -- to my lawyer. | 25  did you mention to her that you were still in |
| Page 107 | Page 109 |

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                    October 23, 2019

1   possession of the first laptop?
2        A.   I wasn't required to, no.
3        Q.   Why were you not required to?
4        A.   That was personal property.
5        Q.   Why do you think it was personal
6   property?
7        A.   Paul Koenig gave it to me.
8        Q.   How did Paul Koenig give it to you?
9        A.   He -- how do you want me to answer
10  that question, like give it to me?  He said,
11  keep it.
12       Q.   Did he -- did Paul Koenig tell you
13  that you could keep it after you ended
14  employment at SRS?
15       A.   No.
16       Q.   Did anyone at SRS tell you that you
17  could keep the first laptop after the end of
18  your employment?
19       A.   It was personal property, so they
20  didn't have -- there was no reason for them to
21  tell me to keep it or not to keep it.
22       Q.   Did Paul Koenig tell you you could
23  keep it as personal property?
24       A.   He told me to keep it.
25       Q.   But he didn't tell you you could
                                        Page 110

1   keep it even after you were no longer employed
2   at SRS; did he?
3        A.   I understood our conversation to be
4   that I could personally keep the laptop, it
5   would become my personal property at that
6   point.
7        Q.   That's not -- he didn't write that
8   down, that's not in an E-mail; is it?
9        A.   I don't know.
10       Q.   Have you looked to see whether you
11  have such an E-mail?
12       A.   No.
13       Q.   Are you aware of any correspondence
14  or written documentation that said you were
15  allowed to keep this first laptop indefinitely
16  as a personal computer?
17       A.   No.
18       Q.   The first laptop, that was a laptop
19  that you had worked on for SRSA; correct?
20       A.   Yes.
21       Q.   Did it contain SRSA documents on it?
22       A.   Yes.
23       Q.   Did it contain SRSA customer
24  information on it?
25       A.   What do you mean by "customer
                                        Page 111

1   information"?
2        Q.   Information about SRSA's customers.
3        A.   Yes.
4        Q.   Did it include information that
5   SRSA's customers would expect to be treated
6   confidentially?
7        A.   Ever in its existence or for a
8   period of time?
9        Q.   Ever in its existence, let's start
10  there.
11       A.   Yes.
12       Q.   And on March 9, 2018, did that
13  laptop still contain information that was
14  sensitive to SRSA's customers?
15       A.   What was the date again you just
16  said?
17       Q.   March 9, 2018.
18       A.   I don't recall.
19       Q.   Did you talk to Paul Koenig a number
20  of times around your departure from SRS?
21       A.   Yes.
22       Q.   In any of those conversations -- how
23  many times, do you think?
24       A.   I don't recall.
25       Q.   In any of those conversations, did
                                        Page 112

1   you remind him that you still had the first
2   laptop?
3        A.   No.
4        Q.   Did you ask him whether you needed
5   to return the first laptop?
6        A.   No.
7        Q.   Did you ever seek to find out
8   whether Mr. Koenig was comfortable with you
9   retaining the first SRSA laptop after you left?
10       A.   It was given to me about a year
11  prior, so it didn't even cross my mind to ask.
12       Q.   Do you think if you had asked
13  Mr. Koenig, he would have told you it was just
14  fine to keep that laptop?
15            MR. PETRIE:  Object to the
16  form.
17            THE WITNESS:  It sounds like a
18  hypothetical question.  If you're asking me to
19  respond to that, I wouldn't know how he would
20  react to that.
21  BY MR. BRAUNIG:
22       Q.   Turning your attention now to the
23  second laptop, you did eventually return the
24  second laptop to SRS; correct?
25       A.   I did.
                                        Page 113

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                    October 23, 2019

---

**Page 186**

1  Q.   And that's SRSA's trade secrets?

2  A.   Yes.

3  Q.   So I'm trying to get at what is it

4  that you thought you couldn't share with CGI?

5  A.   I answered that, trade secrets.

6  Q.   And what does that mean to you?

7  What does that mean; what did you, in practice,

8  think you couldn't share with CGI?

9  A.   I don't know any trade secrets, so I

10  don't have an example for you.

11  Q.   Was there -- was there any time in

12  the meetings with CGI that you said, that's not

13  something I can share?

14  A.   I didn't say exactly that.

15  Q.   What did you say?

16  A.   I said, I'm going to go get a drink

17  of water, or excuse myself.

18  Q.   What was the situation in which you

19  excused yourself from a meeting with CGI?

20  A.   It -- we were in large group

21  sessions.

22  Q.   What was the topic that was being

23  discussed when you felt the need to excuse

24  yourself and get a glass of water?

25  A.   I don't recall.

---

**Page 187**

1  Q.   No idea at all?

2  A.   No.

3  Q.   How many times did you excuse

4  yourself from meetings because you thought it

5  was -- what was being discussed implicated

6  something that you had worked on at SRS?

7  A.   Just the once.

8  Q.   Where was that meeting?

9  A.   In Pittsburgh.

10  Q.   Did Alex Tsarnas excuse himself from

11  that meeting?

12  A.   He wasn't in attendance.

13  Q.   As you sit here today, no idea

14  whatsoever what the nature of that was?

15  A.   I couldn't guess.

16  Q.   Were there ever any occasions where

17  you started to share information and someone

18  from PNC said, wait, wait, we don't want to

19  hear that?

20  A.   No.

21  Q.   Were you ever asked to --

22  A.   Let me rephrase that.  I don't

23  recall.  That doesn't mean that someone didn't

24  say that.

25  Q.   So to the best of your recollection,

---

**Page 188**

1  there were no occasions in which you started to

2  share information and someone from PNC said,

3  wait, stop, we shouldn't hear that?

4  A.   No.  I did not share information

5  that caused someone to say that.

6  Q.   Did -- were you ever asked by PNC to

7  recuse yourself from any meetings because the

8  topical area overlapped with what you had done

9  at SRSA?

10  A.   No.

11  Q.   You said you have participated in

12  meetings every other week with CGI?

13  A.   Yeah.

14  Q.   Do you recall that there was --

15  those meetings started in or around April of

16  2018?

17  A.   That sounds about right.

18  Q.   And in those meetings, would they --

19  would CGI ask questions about how should we do

20  this, how should we do that?

21  A.   No.

22  Q.   Would CGI -- what sort of questions

23  would CGI ask in those meetings?

24  A.   That's pretty broad.  Can you be a

25  little more specific?

---

**Page 189**

1  Q.   Give me an idea, what are we talking

2  about, what was CGI interested in?

3  A.   Every single paper process.  Like

4  there's so many deviations of it.  So we would

5  spend a lot of time walking through this is the

6  paper process here, and here's how it deviates,

7  and here's how the screen should look.

8  Q.   And were you only talking about the

9  paper process, or were you also talking about

10  how an online process ought to be developed?

11  A.   The paper process defines the online

12  process for sure.  So it's always the base,

13  always.

14       (Deposition Exhibit No. 25 was

15  marked for identification.)

16  BY MR. BRAUNIG:

17  Q.   Do you recognize Kelly 25 is an

18  E-mail from Rick Kotermanski at CGI to various

19  people at PNC and CGI?

20  A.   Is that a question?  Sorry.

21  Q.   Yes, that is a question.

22  A.   Yes.  Second E-mail from Rick.

23  Q.   And who is Rick?

24  A.   Rick works for CGI.

25  Q.   What was his role in the development

---

Pages 186 to 189

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

ATTORNEYS' EYES ONLY - CONFIDENTIAL TRANSCRIPT

Heather Kelly                                                          October 23, 2019

| | |
|---|---|
| 1 questions. | 1      Q.     So if you were to compare a customer |
| 2      Q.     Did you search through your SRS | 2  -- I mean a contacts list that you had from |
| 3  E-mail in order to create this HK contacts | 3  your Wilmington Trust days, you would expect to |
| 4  list? | 4  see everybody's name on that list, everybody |
| 5                MR. PETRIE:  Object to the | 5  who is listed here as one of the lawyers? |
| 6  form. | 6      A.     I don't know.  They are all easily |
| 7                THE WITNESS:  My answer is the | 7  accessible online with vCards so -- |
| 8  same.  I don't know. | 8      Q.     Have you used this HK contacts file |
| 9  BY MR. BRAUNIG: | 9  since you left SRSA? |
| 10      Q.     Did you review SRS files in order to | 10      A.     Yes. |
| 11  create this list of customers and lawyers? | 11      Q.     When have you used it? |
| 12      A.     I -- no.  This is a disorganized | 12      A.     I don't recall. |
| 13  pish posh of non-clients, potentially clients, | 13      Q.     Did you -- did you take the HK |
| 14  business cards, contacts that I attempted to | 14  contacts file with you to San Diego when you |
| 15  get into a spreadsheet. | 15  met with Fortis in March of 2014? |
| 16      Q.     Did you do this shortly before you | 16      A.     Well, you said it was on my computer |
| 17  left SRS? | 17  and we established that I may have brought my |
| 18      A.     From the meta file it appears such, | 18  computer there, but, to my knowledge, other |
| 19  but I didn't recall until I saw the date. | 19  than that -- |
| 20      Q.     Was there a period of time where you | 20      Q.     Do you have a recollection that you |
| 21  were working on your two SRS laptops | 21  opened the HK contacts file while you were at |
| 22  simultaneously? | 22  Fortis? |
| 23      A.     Yes. | 23      A.     I don't have a recollection of that. |
| 24      Q.     Were you creating this list on one | 24      Q.     Do you know whether that happened? |
| 25  laptop while you searched for SRS information | 25      A.     I don't have a recollection of that. |
| Page 254 | Page 256 |
| 1  on the other laptop? | 1      Q.     Did you make any modifications to |
| 2      A.     I don't know. | 2  the HK contacts file while you were at Fortis' |
| 3      Q.     Is that something you would normally | 3  headquarters in San Diego? |
| 4  do? | 4      A.     I don't know. |
| 5      A.     I -- I don't know. | 5      Q.     Did you ever go down the HK contacts |
| 6      Q.     Is that something you have any | 6  list, Kelly 40, and call or leave messages for |
| 7  recollection of doing, creating a customer list | 7  the people who were on this list? |
| 8  on one computer while you were searching for | 8      A.     No. |
| 9  SRS documents on the other computer? | 9                (Deposition Exhibit No. 41 was |
| 10      A.     It's not a customer list.  It's my | 10  marked for identification.) |
| 11  personal contact list, and I do not know.  I am | 11  BY MR. BRAUNIG: |
| 12  a frequent multitasker, but I don't have a | 12      Q.     Kelly Exhibit 41 is a document HK |
| 13  point of reference for what you're asking me. | 13  Crash Plan 560 with the native Excel file and a |
| 14      Q.     The list of lawyers that's part of | 14  metadata page at the end.  I'm not sure why |
| 15  Kelly Exhibit 40, are those primarily lawyers | 15  that's in a different format. |
| 16  who you worked with at SRSA? | 16      A.     Okay. |
| 17      A.     Same question as before, many of | 17      Q.     Okay.  Do you see on the lawyers |
| 18  them worked with me prior to. | 18  page there are -- there is a new column here |
| 19      Q.     And some of them you worked with | 19  that's got message, message, live, message |
| 20  only at SRS or for the first time at SRS? | 20  transferred, message; do you see that? |
| 21      A.     I don't know that. | 21      A.     I do see that. |
| 22      Q.     You don't know if there's anybody on | 22      Q.     Does this refresh your recollection |
| 23  this list who you worked with for the first | 23  as to whether or not you went down the list in |
| 24  time at SRS? | 24  Kelly Exhibit 40 and made -- and called the |
| 25      A.     I don't know. | 25  various people on this list? |
| Page 255 | Page 257 |