# EXHIBIT 14

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 2
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 1 of 22

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Wilmington Trust, N.A., | Civil File No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Gregory Nelson, | |
| Defendant. | |

## COMPLAINT

Plaintiff Wilmington Trust, N.A. ("Wilmington Trust"), by its undersigned attorneys, hereby brings the following Complaint against Defendant Gregory Nelson ("Nelson") and alleges as follows:

### I.     INTRODUCTION

1.     This dispute arises from the confidentiality and other violations by Nelson, a former highly-compensated Client Development Officer for Wilmington Trust.  In fact, for months leading up to his resignation in November 2018, Nelson intentionally engaged in a series of acts antagonistic to the best interests of Wilmington Trust, and the threat that Nelson will continue to violate his obligations in the future is both acute and very real.

2.     A headhunter first contacted Nelson as early as March 2018 about working for a competitor, SRS Acquiom ("SRS").

3.      By email dated May 7, 2018, this same headhunter followed up with Nelson about being SRS' new head of sales and business development.  (*See* Exhibit A).

4.      In the ensuing five to six months before ultimately resigning in November 2018, Nelson emailed highly confidential information belonging to Wilmington Trust to his personal email address on at least two separate occasions.

5.      On the first such occasion, August 15, 2018, Nelson emailed to his personal email address a complete list of all deals he had worked on at Wilmington Trust since 2012.  This list included the entity, external referral source, market value, total fees, closing date, and account number for every one of these approximately 1000 deals.

6.      Upon information and belief, the same month Nelson emailed this confidential information to his personal email address, he also flew to Boston, Massachusetts to meet with an SRS employee named Amanda Jackson.

7.      Ms. Jackson now works for and/or with Nelson at SRS.

8.      On October 24, 2018, only about two weeks before giving notice of his resignation, Nelson also emailed to his personal email address a list of approximately 2000 Wilmington Trust clients and/or referral sources with their accompanying mailing addresses, email addresses, and/or contact persons.

9.      Nelson's emailing of Wilmington Trust's highly confidential information to his personal email address also directly violated company policy.

10.      On May 24, 2018, in fact, Nelson completed a "Cybersecurity" training module emphasizing, in pertinent part, that "Information Security is a critical part of

2

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 4
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 3 of 22

protecting and safeguarding M&T's information" and that employees "must NEVER send confidential, non-public customer or corporate information to unauthorized individuals or to/from a personal email account such as Gmail or Yahoo." (Capitalization in the original). (Exhibit B; pertinent excerpts from the "Cybersecurity" training module and confirmation of Nelson's completion).[1]

11.     At the outset of his employment, Nelson also e-signed a <u>Nondisclosure of Customer Information Agreement</u>, providing in relevant part that he could not "utilize any of the Customer Information for any purpose, except for the purpose of performing my duties for M&T" or "attempt to access any Customer Information unless such access is required for the purpose of performing my duties for M&T." (Exhibit C).

12.     Upon information and belief, prior to resigning, and while still on Wilmington Trust's payroll, Nelson also advised at least one of the larger clients he covered of his intent to resign.

13.     After commencing his negotiations with SRS, and contrary to Wilmington Trust's procedures and well-established protocol, Nelson also failed to disclose the existence of a potentially very large revenue-producing deal.

14.     This deal dwarfed in size any other deal Nelson was involved in during his last year at Wilmington Trust and had the possibility of generating $1.5 million or more in revenues for Wilmington Trust in the next year alone.

---

[1] Wilmington Trust is a wholly-owned subsidiary of M&T Bank.

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 5
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 4 of 22

15.    On information and belief, Nelson's failure to disclose this potential deal to Wilmington Trust was intentional, and Nelson intended to usurp this opportunity for his own benefit and for the benefit of SRS.

16.    Only after a co-employee heard about this deal through other sources, and only after Nelson was confronted about why he had not entered it into the company's standard business records, did Nelson enter it into the company's SalesLogix Opportunity system.

17.    Nelson did not enter this deal into the SalesLogix Opportunity system until November 13, 2018, after he already had given notice of his resignation from Wilmington Trust.

18.    Nelson actually was one of eight Wilmington Trust employees to announce their resignations in virtually simultaneous fashion to join SRS.

19.    In yet a further violation of his duties to Wilmington Trust, Nelson indicated to a co-employee (Nicholas Adams) that he orchestrated and/or led the "lift out" of these employees.

20.    Wilmington Trust paid Nelson an incentive payment of $172,440 for the third quarter of 2018 alone. For all intents and purposes, however, during this entire time, Nelson was working to serve his own interests, and those of SRS, not the interests of Wilmington Trust.  Stated otherwise, Nelson was a "traitor in the midst."

21.    After months of undermining the best interests of Wilmington Trust, and at the same time being paid very generously by the company, Nelson finally gave notice of

his resignation from Wilmington Trust on November 9, 2018, the very same day he received this $172,440 incentive payment.

22.     Upon resigning, Nelson returned his company-issued phone from which Nelson, or someone on his behalf, had deleted all emails, voicemails, and texts.

23.     Nelson also attempted to delete all of his Outlook email folders (which would be stored on bank systems, not the phone itself).

24.     Upon information and belief, Nelson attempted to delete over 15,000 items from his various Outlook folders, inbox, and the like.

25.     Nelson now works for SRS as a Managing Director, Head of Sales.

26.     Based on Nelson's conduct preceding his resignation, Wilmington Trust likewise has very little faith that Nelson will abide by his post-termination covenants not to solicit clients or employees, as contained in his Client Development Officer Incentive Compensation Program (the "Agreement") (*see* Exhibit D) or otherwise honor his legal obligations to Wilmington Trust.

## I.     PARTIES

27.     Wilmington Trust is a national association headquartered in Wilmington, Delaware.

28.     Nelson is a citizen of the state of Minnesota and resides at 10849 Andes Circle, Inver Grove Heights, Minnesota, 55077.

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 7
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 6 of 22

## III.      **JURISDICTION AND VENUE**

29.      Jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. §1332. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, against Nelson.

30.      Venue is proper in this district because it is the district in which Nelson resides and in which the conduct complained of occurred.

## IV.      **FACTS COMMON TO ALL COUNTS**

31.      Nelson joined Wilmington Trust in 2011 as a Client Development Officer.

32.      Nelson was part of the sales team within the "Global Capital Markets" unit of Wilmington Trust.

33.      Nelson's duties and responsibilities included sourcing new business, primarily in the mergers & acquisitions and public finance arenas, and enhancing existing relationships.

34.      Nelson worked as part of the same unit at Wilmington Trust with Timothy Martin ("Martin").

35.      Nelson and Martin worked collectively on numerous deals.

36.      Martin also resigned to join SRS as part of the "lift out" that Nelson indicated to a co-employee he orchestrated and/or led.

37.      As noted above, in 2011 and as a condition of his employment, Nelson e-signed the <u>Nondisclosure of Customer Information Agreement</u>.

6

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 8
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 7 of 22

38.    As a condition of his employment, Nelson also agreed to comply with the Employee Handbook providing, in pertinent part, as follows: "Employees must maintain the confidentiality of confidential information entrusted to them by M&T Bank Corporation or its customers, except when disclosure is authorized or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to M&T Bank or its customers, if disclosed." (*See* Exhibit E at 3, ¶ 9).

39.    The Employee Handbook further makes clear that "[t]he obligation to preserve confidential information continues even after employment ends." (*Id*.).  In the ensuing paragraph 10, entitled "Protection and Proper Use of Company Assets," the Employee Handbook states: "The obligation of employees to protect M&T Bank Corporation's assets includes its proprietary information.  Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business, marketing and service plans, engineering and manufacturing ideas, designs, databases, records, salary information and any unpublished financial data and reports." (*Id*. at ¶ 10).

40.    Paragraph 10 of the Employee Handbook concludes by stating: "Unauthorized use or distribution of this information would violate M&T Bank Corporation policy.  It could also be illegal and result in civil or even criminal penalties." (*Id*.).

41.  Wilmington Trust provided Nelson with a host of benefits throughout his employment.  Nelson was very handsomely compensated and received numerous other benefits.  Wilmington Trust also incurred substantial costs in supporting his business development efforts.

42.  Earlier this year, for instance, Wilmington Trust paid for Nelson to attend the Super Bowl with two representatives from one of Wilmington Trust's clients.

43.  This happened to be the same client referred to in paragraph 12 above to whom Wilmington Trust believes Nelson gave advance notice of his departure.

44.  Wilmington Trust also paid for Lon LeClair, who at the time also worked for Wilmington Trust, to attend the Super Bowl with Nelson and these client representatives.

45.  Mr. LeClair now serves as the President and COO of SRS.

46.  On February 26, 2018, in consideration of his participation in the incentive compensation program, Nelson signed the Agreement containing his covenants not to solicit any employees, or clients whose identities he learned during his employment, to leave the company for a period of six months following the termination of his employment.  (Exhibit D at 8).

47.  The Agreement also made clear that Nelson's right to receive any incentive compensation was strictly conditioned on his loyalty to Wilmington Trust at all times while on the company's payroll.

8

48.     Specifically, the Agreement provides that "incentive plan payments are subject to good-faith determination that M&T employees eligible to receive incentive awards have not engaged in conduct harmful to M&T Bank Corporation, such as but not limited to … (ii) disclosure of confidential information or trade secrets." (*Id.* at 5).

49.     The Agreement further provides that "violating a policy contained in the M&T Bank or Wilmington Trust SP Services (London) Ltd. Employee Handbook (as applicable)" is another ground for non-payment of an incentive award.

50.     The Employee Handbook, as previously noted, contains strict confidentiality provisions. (*See* Exhibit E).

51.     Less than six months after acknowledging in the Agreement that the "disclosure of confidential information or trade secrets" is "conduct harmful to M&T Bank Corporation," and notwithstanding his other confidentiality provisions, Nelson emailed to his personal email address a list of all deals he had worked on at Wilmington Trust since 2012.

52.     Nelson then emailed to his personal email address the above-referenced list of approximately 2000 Wilmington Trust clients/referral sources with accompanying mailing addresses, email addresses, and/or contact persons.

53.     The Agreement provides as yet another basis for non-payment of an incentive award "engagement in direct competition with M&T Bank Corporation or any affiliate or subsidiary." (Exhibit D at 5-6).

Case No. 1:19-cv-02005-DDD-SKC   Document 122-6   filed 12/23/19   USDC Colorado   pg 11
of 23
CASE 0:18-cv-03299-PJS-DTS   Document 1   Filed 11/30/18   Page 10 of 22

54.     Nevertheless, while still being compensated by Wilmington Trust, upon information and belief Nelson informed one of the larger clients he covered that he would be resigning.[2]

55.     Upon information and belief, Nelson also advised one or more of Wilmington Trust's referral sources of his intention to resign prior to doing so.

56.     Particularly in the case of the M&A transactions Nelson was involved with, these referral sources were the individuals/entities that steered the business to Wilmington Trust.

57.     While still on the Wilmington Trust payroll, Nelson also failed to disclose the existence of a potentially very large revenue-producing deal until after giving notice of his resignation.

58.     The deal was of such a size that it ordinarily would have received a significant amount of immediate attention and discussion internally between Nelson, Martin, and others at Wilmington Trust such as Patrick Trainor (Nelson's former supervisor) and Laron Galea.

59.     During the course of his employment at Wilmington Trust, Nelson typically entered a potential deal into the SalesLogix Opportunity system on or before the time he first priced it.

60.     Nelson priced this particular deal on or around September 20, 2018.

---

[2] In the interest of maintaining confidentiality, Wilmington Trust is not identifying any specific clients herein.  Wilmington Trust, however, is separately identifying for Nelson's counsel both this client and the potential client involved in the deal which Nelson failed to disclose until after giving notice of his resignation.

61.     Nelson failed to enter the deal into the SalesLogix Opportunity system when he priced it.

62.     At the very latest, based on his actions in prior deals, Nelson typically would have entered the deal into the system by October 30, 2018, when Martin was providing comments on documents related to the deal.

63.     Nelson failed to enter the deal into the SalesLogix Opportunity system by October 30, 2018.

64.     Nelson similarly failed to disclose the existence of this potential deal at either of the weekly new business meetings held on November 1 and 8, 2018, respectively.

65.     Wilmington Trust only learned of the existence of this deal on the evening of November 12, 2018 when a shareholder representative on the deal advised another Wilmington Trust employee, John Deleray, that Wilmington Trust had been appointed to the deal.

66.     The following morning, November 13, 2018, another Wilmington Trust official (John Beeson) asked Martin about the deal and why it had not been disclosed.

67.     In their initial phone call, Martin denied knowing about the transaction.

68.     In a follow-up phone call that same morning, after Mr. Beeson had provided additional details on the potential deal, Martin admitted knowing about it.

69.     Very shortly thereafter, according to Wilmington Trust's records only a matter of minutes, Nelson entered the deal into the SalesLogix Opportunity system.

70.     Upon information and belief, Martin advised Nelson of one or both of his calls with Mr. Beeson prior to the time Nelson entered the deal into the SalesLogix Opportunity system.

71.     Nelson's failure to enter this deal into the SalesLogix Opportunity system until so late in the process was inconsistent with his conduct in prior cases.

72.     For example, Nelson entered into the SalesLogix Opportunity system a smaller deal he was advised about on April 30, 2018 the very next day, May 1, 2018.

73.     Another recent deal that Nelson was contacted about on Saturday, June 16, 2018 was entered into the SalesLogix Opportunity system by Nelson on Tuesday, June 19, 2018.

74.     Upon information and belief, Nelson's plan was to hide the existence of this deal from anyone else at Wilmington Trust, apart from Martin who also resigned to join SRS, in an attempt to ultimately shift the deal to SRS.

75.     Upon information and belief, even Mr. LeClair, SRS' President and COO, commented to a third party words to the effect that "there is a right way to leave a company and a wrong way" and that he thought Nelson was "smarter than that."

## COUNT I
## (BREACH OF THE DUTY OF LOYALTY)

76.     The allegations of Paragraphs 1 through 75 are incorporated herein by reference with the same force and effect as if set forth in full below.

77.     At all times throughout his employment, Nelson owed Wilmington Trust a duty of loyalty to act in the best interests of the company.

78.     Nelson violated his duty of loyalty by, among other things, (i) emailing to his personal email address a list of approximately 2000 Wilmington Trust clients/referrals sources and their mailing addresses, email addresses, and/or contact persons; (ii) emailing to his personal email address a listing of all deals he worked on at Wilmington Trust since 2012 and detailed information pertaining to these approximately 1000 deals; (iii) upon information and belief, advising one or more of Wilmington Trust's clients of his intention to leave the company in advance of his resignation; (iv) upon information and belief, advising one or more of Wilmington Trust's referral sources of his intention to leave the company in advance of his resignation; (v) orchestrating and/or leading a "lift out" of other key Wilmington Trust personnel; (vi) hiding from Wilmington Trust a potentially very large revenue-producing deal; and (vii) deleting emails, voicemails, and texts from his phone which may have further proven his misconduct and/or which related to Wilmington Trust's business operations.

79.     In fact, Nelson's violations of his duty of loyalty continued up to the very moment he left Wilmington Trust.

80.     On his way out the door on November 13, 2018, his final day of employment, Nelson whispered to another Wilmington Trust employee (Brandon Horak) to "be sure to answer your phone tonight."

81.     That evening, Mr. Horak received a call from Ken Newcomer of SRS.

82.     In early May 2018, Nelson had disclosed to Mr. Trainor that this very same individual, Mr. Newcomer, had reached out to another Wilmington Trust employee.  (*See* Exhibit F).

83.     On that prior occasion, Nelson expressed concern, asking if the contacted employee had a "non-solicitation with us."  (*Id.*).

84.     Nelson also stated that "they [SRS] could be taking advantage of some proprietary knowledge" in soliciting this other Wilmington Trust employee.  (*Id.*).

85.     When he left Wilmington Trust on November 13, 2018, however, far from expressing concern for the company or looking out for Wilmington Trust's best interests, Nelson made sure to notify Mr. Horak, in a hushed tone, that a solicitation call from SRS would be forthcoming that evening.

86.     As a consequence of Nelson's actions, Wilmington Trust has suffered monetary damages and also will suffer irreparable harm and loss.

## COUNT II
## (FRAUD)

87.     The allegations of Paragraphs 1 through 86 are incorporated herein by reference with the same force and effect as if set forth in full below.

88.     Nelson engaged in a series of material omissions in the months leading up to his resignation which, had they been disclosed to Wilmington Trust, would have led to further investigation on the part of Wilmington Trust and, in all likelihood, Nelson's

termination from the company. These material omissions include items (i) – (vii) in paragraph 78 above.

89.     In addition to these material omissions, Nelson also engaged in affirmative misrepresentations deliberately designed to lead Wilmington Trust into believing he was loyal to the company when he was anything but.

90.     In a July 12, 2018 email, for instance, Nelson assured his supervisor, Mr. Trainor, that he "could not think of more reason to get MOTIVATED to dominate Boston and everywhere else Murphy [a recently-hired salesman at PNC] will be selling." (*See* Exhibit G).

91.     By the time Nelson sent the email attached as Exhibit G, he already had emailed to his personal email address a list of all deals he had worked on at Wilmington Trust since 2012 and also had met in Boston with Ms. Jackson of SRS.

92.     In a July 31, 2018 email, Nelson then told Mr. Trainor he intended to schedule an upcoming medical procedure around his duties for Wilmington Trust, stating: "I would like to get Boston going and we have the National Housing Conference in early October as well." (*See* Exhibit H (redacted to exclude medical information)).

93.     In fact, in an October 5, 2018 email, only about a month before resigning, Nelson told Mr. Trainor that "I will do whatever is right. I have enough deals!" (See Exhibit I).

94.     The emails attached as Exhibits G-I, and Nelson's other conduct in the months preceding his resignation, were designed, at least in part, to have Wilmington Trust believe he was loyal to the company and would continue to be in the future.

95.     Nelson's statement that he "will do whatever is right" is particularly ironic. At the time Nelson sent this email, he already had (i) emailed to his personal address the listing of all deals he had worked on at Wilmington Trust since 2012; (ii) emailed to his personal address the list of approximately 2000 Wilmington Trust clients and/or referral sources with their accompanying mailing addresses, email addresses, and/or contact persons; and (iii) failed to disclose to Wilmington Trust the existence of a potentially large deal he already had priced.

96.     Upon information and belief, at the time of his October 5, 2018 email, Nelson also was in active negotiations with SRS and already had solicited one or more co-employees to leave Wilmington Trust as well.

97.     Wilmington Trust justifiably and reasonably relied on Nelson's above-referenced material omissions and material representations in continuing to employ him.

98.     Wilmington Trust has been harmed as a result of Nelson's fraudulent conduct.  Among other things, Wilmington Trust continued to compensate Nelson and paid him the third quarter incentive compensation payment.

99.     Had Nelson disclosed to Wilmington Trust the above-referenced material omissions and material misrepresentations, Wilmington Trust had the right to decline to

16

pay Nelson the third quarter incentive compensation payment due to his violations of the non-disclosure and non-competition provisions contained therein.

100.    But for Nelson's material omissions and material misrepresentations, Wilmington Trust could have, and would have, terminated his employment prior to November 9, 2018.  Under the Agreement, Nelson would not have been eligible for the third quarter incentive payment had he been terminated prior to the payment date of November 9, 2018.

101.    As a consequence of Nelson's fraudulent actions, Wilmington Trust has suffered monetary damages of at least of $172,440.

## COUNT III
## (MISAPPROPRIATION OF TRADE SECRETS)

102.    The allegations of Paragraphs 1 through 101 are incorporated herein by reference with the same force and effect as if set forth in full below.

103.    Information relating to Wilmington Trust's business dealings, including the information contained in the emails Nelson sent to his personal email address on August 15 and October 24, 2018, respectively, derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value by its disclosure or use.

104.    Wilmington Trust takes reasonable measures to protect the secrecy of its confidential information including, without limitation, that contained in the emails Nelson sent to his personal email address on August 15 and October 24, 2018.   These

measures include requiring its employees, including Nelson, to e-sign the Nondisclosure of Customer Information Agreement and to agree to comply with the Employee Handbook. Wilmington Trust's employees, including Nelson, also only could access confidential information on the SalesLogix Opportunity system through the use of a password and, if they attempted to access the system remotely, additional security measures were in place to protect Wilmington Trust's confidential information.

105.   The information Nelson emailed to his personal email address on August 15 and October 24, 2018 qualifies as trade secret under the Minnesota Trade Secrets Act, Minn. Stats. Chptr. 325C.01, *et seq*. (hereafter the "Act").

106.   Nelson acquired Wilmington Trust's trade secret information by improper means and in violation of the Act.

107.   On November 15, 2018, after becoming aware of Nelson's October 24, 2018 email, in-house counsel for M&T Bank/Wilmington Trust sent a letter to Nelson demanding, among other things, that "to the extent that you have in your possession any other confidential information belonging to Wilmington Trust, N.A., whether written, computer-generated or in any other form, I demand that you immediately return same to me at the above address, or confirm it has been permanently destroyed."  (Exhibit J at 2) (emphasis deleted).

108.   In a November 20, 2018 response, Nelson's attorney claimed that Nelson "does not have any of M&T Bank's confidential and proprietary information and he has returned to M&T Bank all M&T Bank property, including the documents enclosed with

this letter.  (Exhibit K at 1).  Nelson's attorney then reiterated: "Mr. Nelson is aware of his ongoing obligations regarding the company's confidential and proprietary information." (*Id.* at 2).

109.   Nelson, however, returned the information he emailed himself in August and October 2018 only after being demanded to so by counsel for M&T Bank/Wilmington Trust.

110.   In addition, although Nelson's counsel represented in connection with the information Nelson emailed himself in October 2018 that "[h]e has not provided this information to anyone and has deleted this information" *id.*, he offered no such assurances with respect to the information Nelson emailed to his personal email address in August 2018.

111.   Nelson's attorney also did not offer any assurances whatsoever, either with respect to the information Nelson emailed himself in August or October 2018, that Nelson had not used the information contrary to the best interests of Wilmington Trust.

112.   Under the Act, "[a]ctual or threatened misappropriation may be enjoined."

113.   Nelson's conduct as described above is malicious and willful, entitling Wilmington Trust to attorneys' fees and exemplary damages under the Act.

114.   As a consequence of Nelson's actions, Wilmington Trust has suffered monetary damages and irreparable harm and loss.

115.   Wilmington Trust will continue to suffer irreparable harm and loss unless and until Nelson is enjoined from using and disclosing Wilmington Trust's trade secrets, and is ordered to return them to Wilmington Trust.

## COUNT IV
## (BREACH OF CONTRACT)

116.   The allegations of Paragraphs 1 through 115 are incorporated herein by reference with the same force and effect as if set forth in full below.

117.   Upon information and belief, and in violation of his <u>Nondisclosure of Customer Information Agreement</u>, Nelson attempted to access and/or utilize Wilmington Trust's confidential information for purposes of competing with, not performing his duties at, Wilmington Trust.

118.   Since joining SRS, Nelson also has met with Wilmington Trust referral sources that steer clients and business to Wilmington Trust.   This includes a law firm/referral source in Denver, Colorado.

119.   The Agreement expressly prohibits Nelson for a six-month period from soliciting any clients whose identities became known to him at the company, either "directly or indirectly." (Exhibit D at 8).

120.   Nelson's contacts with referral sources are indirect solicitations of Wilmington Trust clients in violation of the Agreement.

121.   The Agreement also prohibits Nelson for a six-month period from soliciting other Wilmington Trust employees.   (*Id*.).   Based on Nelson's conduct to date, he has

breached this covenant, and Wilmington Trust believes he will continue to breach this covenant unless enjoined.  Nelson's breaches include his "heads up" to Mr. Horak on his way out the door on November 13, 2018 to expect a call from SRS.

122.   As a consequence of Nelson's actions, Wilmington Trust has suffered monetary damages and irreparable harm and loss.

123.   Wilmington Trust will continue to suffer irreparable harm and loss unless and until Nelson is enjoined from soliciting Wilmington Trust's clients and employees in breach of his contract with Wilmington Trust, and from retaining, using, or disclosing its confidential information.

WHEREFORE, by virtue of the foregoing acts complained of above, which are outrageous, willful, and malicious, Wilmington Trust demands judgment in its favor and against Nelson for compensatory damages in an amount to be determined at trial but in excess of $2,500,000; additional damages against Nelson arising from his fraudulent conduct in the sum of $172,440; punitive damages in an amount to be determined at trial; exemplary damages and attorneys' fees as provided for under the Act; and temporary and permanent injunctive relief.

Dated: November 30, 2018          DORSEY & WHITNEY LLP


By: /s/JoLynn M. Markison_____
JoLynn M. Markison (#0386876 )
markison.jolynn@dorsey.com
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 492-6143
Facsimile: (612) 677-3346

Christopher C. Coss (to be admitted pro hac vice)
Thomas J. Momjian, Esq.
COSS & MOMJIAN, LLP
111 Presidential Boulevard, Suite 214
Bala Cynwyd, PA 19004
610-667-6800
610-667-6620 (fax)

*Attorneys for Plaintiff, Wilmington Trust, N.A.*