# EXHIBIT 15

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Wilmington Trust, N.A., | Case No. 18-cv-3299 (PJS/DTS) |
| Plaintiff, | |
| vs. | **DECLARATION OF PAUL KOENIG** |
| Gregory Nelson, | |
| Defendant. | |

Paul Koenig makes the following Declaration pursuant to 28 U.S.C. § 1746:

1. I submit this Declaration in opposition to the Motion for Temporary Restraining Order and Expedited Discovery brought by the plaintiff in the above-captioned matter, Wilmington Trust, N.A. ("WT"), against current SRS Acquiom employee Gregory Nelson ("Nelson").

2. I am CEO and co-founder of SRS Acquiom. I have worked for years in Mergers and Acquisitions ("M&A") both with SRS Acquiom and in legal practice. I am very familiar with industry practices as it relates to maintaining confidential information and respecting the confidential information of competitors, as well as non-solicitation provisions.

3. I am also very familiar with industry practices as it relates to recruiting talented employees. Businesses in the M&A field are constantly competing to land top

talent.  WT itself has been aggressively trying to recruit members of SRS Acquiom's team through at least 2018, if not earlier.

4.      In 2018, SRS Acquiom engaged in efforts to recruit several WT employees to work for SRS Acquiom, just as WT engaged in efforts to recruit several employees of SRS Acquiom to work for WT.  We engaged in these efforts independently, and while we sometimes told Nelson who we were recruiting, we did not ask him to solicit those employees to leave WT, and to my knowledge he did not do so.  All of WT's insinuations that Nelson was covertly working to help SRS Acquiom acquire WT's employees are false.  We acquired these employees ourselves through our own hard work in recruiting them, by building a quality reputation in the industry, and by making attractive offers.

5.      Members of my team, including myself, met with Nelson at various times starting in late May or early June of 2018 to discuss his potential employment with SRS Acquiom, but we did not reach a final agreement on the terms of Nelson's employment until early November 2018.

6.      Based on what we know of WT and the industry, we knew the employees we were recruiting away from WT were, or likely were, subject to confidentiality and non-solicitation obligations to WT.  Because we are aware of such obligations, we took affirmative steps to ensure our recruiting efforts would not put the departing WT employees, including Nelson, in a situation where they would violate those obligations.

7.     When Nelson started with us, we instructed him that he was to comply with his non-solicitation agreement with WT.  For six months following the end of his employment at WT, Nelson was not to solicit WT employees, nor was he to solicit any clients or potential clients who he became aware of through his work at WT.  However, the non-solicitation agreement did not prohibit Nelson from contacting the M&A attorneys who serve as our primary referral sources.  The M&A attorneys represent clients, but they are not the clients.  Nelson could contact the M&A attorneys so long as he did not attempt to steer WT business to SRS Acquiom through those contacts.

8.     We also instructed Nelson that he was not to bring with him or use any confidential WT documents in his work at SRS Acquiom, and we included his compliance with this requirement as a term in an "Employee Invention Assignment and Confidentiality Agreement" with Nelson, which states as follows:

> I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of a former employer that are not generally available to the public or have not been legally transferred to the Company.

9.     To my knowledge, Nelson has complied with this agreement and all the aforementioned instructions, as we have expected him to do.  He has not solicited any WT employees.  He has not solicited any clients or potential clients whose identity he learned through his work at WT.  We have not requested, and he has neither shared nor offered to share, any confidential WT information, be it lists, documents, or spreadsheets, let alone the spreadsheets to which WT refers in its Complaint and motion papers.  Nor

did Nelson ever imply that such information would be made available to SRS Acquiom if he joined.

10. Based on the description of the spreadsheets at issue in WT's lawsuit, we would not see value in the information in those documents. The major M&A firms are well-known in the industry, and M&A attorneys and all their contact information can be easily found through simple internet searches. Private equity firms are all easy to identify and contact. The other major M&A clients are well-known in the industry, and many of them are public companies, so details of any of their mergers or acquisitions are also public for many transactions. There are a host of other smaller M&A clients, but they typically have rare or one-off deals, so their contact information or information about their deals is not valuable to us. I also fail to see what value SRS Acquiom or any other WT competitor could glean from the information contained in the list of Nelson's deals at WT. We already generally know what our competitors are charging for fees—it is no secret. Indeed, SRS Acquiom has been separately engaged to provide other services on many transactions on which WT was engaged to provide escrow or payments services over the years and therefore likely already would have had information about WT's fees. And as I mentioned, we already know who the major M&A firms and potential clients are.

11. SRS Acquiom has no interest in hiring Brandon Horak, and has no intent to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _12/13/18_____        By:  _____
                                    Paul Koenig