# EXHIBIT 17

# SRS ACQUIOM INC

# VS.

# PNC FINANCIAL SERVICES GROUP

Deposition

## GREGORY PAUL NELSON

*10/24/2019*

---

**AB Court Reporting & Video**
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**Page 65**

1  run through the ins and outs, but that's my
2  understanding, my personal understanding.
3      Q   Okay.  So your personal understanding
4  is that the entity who is a customer for paying
5  agent services is the entity paying the bill?
6          MR. MILLER:  Object to form.
7      A   Yeah, and a private equity would -- I
8  would say they would be a customer because if they
9  are not paying the bill, the company that they own
10 is paying the bill.  That's how I treated it.
11     Q   (By Ms. Jacobs) Is your understanding
12 that the customer for escrow services is the entity
13 paying the bill?
14         MR. MILLER:  Object to form.
15     A   We call them clients.  Are we using
16 clients and customers interchangeably here or . . .
17     Q   (By Ms. Jacobs) So let's say, sure,
18 that for purposes of this deposition "client" and
19 "customer" are synonymous.
20     A   Okay.  Then yes.
21     Q   Okay.  So because that last question
22 got really broken up, I would like to ask it this
23 way:  Your understanding is that the customer for
24 escrow services is the entity paying the bill?
25         MR. MILLER:  Object to form.

**Page 66**

1      A   It is my personal understanding, yes.
2      Q   (By Ms. Jacobs) And M&A transaction
3  for which there are payment paying agent and escrow
4  services, which entity, the buyer or the seller, is
5  actually paying the bill?
6          MR. MILLER:  Object to form.
7      A   That can be a variety.  It can be paid
8  by one side or the other or it can be split.  That's
9  their negotiation.
10     Q   (By Ms. Jacobs) So in an M&A
11 transaction, there are times when the seller may pay
12 the bill for paying agent and escrow services?
13     A   I don't know that.  I never got into
14 who was paying.  I never got into the billing.
15     Q   In an M&A transaction, is it the buyer
16 or the seller who is selecting who will provide the
17 paying agent and escrow services?
18         MR. MILLER:  Object to the form.
19     A   It can be both.  At Wilmington we
20 didn't differentiate, quite honestly.  There were
21 some -- the buyer -- excuse me -- the buyer was more
22 in tune sometimes to appoint the escrow and paying
23 agent, but we had many where the sales side did that
24 as well.
25         The way I did my job is I talked to --

**Page 67**

1  there's two sets of lawyers in every deal.  I was
2  hoping that one side or the other was going to push
3  to have us do those services, whether they are sales
4  side or buy side.  I didn't know what transaction
5  they were going to work on next, but if they were
6  either side, I wanted us to work on that
7  transaction.
8      Q   (By Ms. Jacobs) As part of SRS's
9  paying agent and escrow services, does SRS require
10 the buyer and the M&A -- in the M&A transaction to
11 sign a confidentiality agreement with SRS?
12     A   I don't know.  Can you rephrase that.
13     Q   Sure.
14         ==When a buyer in an M&A transaction==
15 ==hires SRS to provide paying agent and escrow==
16 ==services --==
17     A   ==Uh-huh.==
18     Q   ==-- is the buyer required to sign a==
19 ==confidentiality agreement with SRS to keep SRS's==
20 ==information confidential?==
21         ==MR. MILLER:  Object to form.==
22     A   ==I don't believe so.  I don't -- I==
23 ==don't know.  I don't believe so.==
24     Q   (By Ms. Jacobs) As part of SRS's
25 paying agent and escrow services, does SRS require

**Page 68**

1  the seller in the M&A transaction to sign a
2  confidentiality agreement with SRS to keep SRS
3  information confidential?
4          MR. MILLER:  Object to form.
5      A   Same answer.  I don't know.  I don't
6  believe so.
7      Q   (By Ms. Jacobs) During your
8  employment with SRS, have you ever seen a
9  confidentiality agreement where SRS required a buyer
10 to keep SRS information confidential?
11     A   I don't recall.  Once again, a lot
12 stuff floats by my desk, but I don't recall.  I've
13 never signed one, no, or been a party to one, no.
14     Q   And during your employment with SRS,
15 have you ever seen a confidentiality agreement where
16 SRS required a seller to keep SRS information
17 confidential?
18     A   Same answer.  I don't recall seeing
19 one, and I've never been a party to one.  But it
20 could have been by my desk or something, but I
21 wasn't a party to it.
22         (Pause in the proceedings.)
23     Q   (By Ms. Jacobs) Tell me how -- let's
24 start first with your experience at Wilmington
25 Trust.  How did you as client development officer

Page 125

1  I think I stated here I deleted all of it. There
2  was one in the sent items that was found later, and
3  I believe this was done prior to that, and I would
4  ask my attorney, I guess, if that's a fact.
5      Q   (By Ms. Jacobs) I'm going to do this
6  slightly differently, understanding to save time and
7  because I -- you know, I have to be -- as I
8  mentioned, I have to get out of here to be on a
9  flight today.
10     A   And I don't --
11         MR. MILLER: I do think, though, that
12 if it requires him to know the contents of a
13 document that you characterize as, you know, being
14 filed in the Federal District Court of Minnesota, he
15 should have the opportunity to refresh his
16 recollection of what the contents of that document
17 are.
18     Q   (By Ms. Jacobs) So what I'm going to
19 do instead is I'm going to direct your attention to
20 specific paragraphs to speed this up --
21     A   Okay.
22     Q   -- because it's a long document. I
23 think we can all agree, it's a document that's over
24 20 pages long, so I'm just trying to use the time
25 most expeditiously.

Page 126

1         MR. MILLER: I apologize, but if -- I
2  also believe that if he needs time to review the
3  document, not necessarily in whole, but so that he
4  understands the context of the specific provisions
5  you want him to focus on, he should be allowed to do
6  that as well.
7          MS. JACOBS: Sure. I'm not going to
8  stop him from doing that.
9          MR. MILLER: Okay. Thank you.
10     Q   (By Ms. Jacobs) Mr. Nelson, pricing
11 for escrow services is not confidential, is it?
12     A   Can you be more specific, I guess. I
13 mean, like in the market, what pricing is, or a
14 specific transaction?
15     Q   I'm going to direct your attention to
16 Paragraph 84 --
17     A   Okay.
18     Q   -- of the Declaration, which is
19 Page 24. Actually, let me refer your attention
20 first to Paragraph 81.
21     A   Okay.
22     Q   Paragraph 81 says, "Regarding the list
23 of deals to which WT refers" --
24     A   Uh-huh.
25     Q   -- "I maintained a running spreadsheet

Page 127

1  with information from all my deals dating back to
2  probably 2012."
3          Do you see that?
4      A   I do.
5      Q   Is that the spreadsheet that we
6  discussed earlier that you explained that you had
7  created in order to check your compensation?
8      A   Correct.
9      Q   You go on to say, The data I tracked
10 included the client, the referring M&A attorney, the
11 estimated amount of the cash to be exchanged in the
12 transaction, the total fees, perhaps the closing
13 date, and the internal reference number assigned to
14 the deal.
15         So this is probably the document that
16 was attached to the August 15, 2018 e-mail, assuming
17 the date is correct.
18         Do you see that?
19     A   Yes.
20     Q   Now, directing your attention to
21 Paragraph 84: Much of the information in this
22 document is not confidential.
23         Do you see that sentence?
24     A   I do.
25     Q   That sentence is referring to your

Page 128

1  running spreadsheet with information from all your
2  deals dating back to 2012?
3      A   I believe so.
4      Q   Is that, "I believe so" or "Yes"?
5      A   Yes. Sorry.
6      Q   You go on to state, M&A attorney
7  information is all public and available on the
8  Internet.
9          Is that statement true or false?
10     A   To my knowledge, I believe if it's a
11 public transaction, that you could find information
12 on that on the Internet, yes.
13     Q   That's not what that sentence says.
14 The sentence says, M&A attorney information --
15     A   Okay.
16     Q   -- is all public and available on the
17 Internet.
18         Do you see that?
19     A   Yes.
20     Q   So is information concerning M&A
21 attorneys all public and available on the Internet?
22     A   This is talking about the M&A attorney
23 information. I believe so.
24     Q   Okay. Any --
25     A   I believe so.

Page 129

1   Q   Okay.  So that statement is true?
2   A   To the best of my knowledge, yes.
3   Q   Okay.  Any deals involving public
4   companies would be public record.
5       Is that statement true?
6   A   To my knowledge, I believe so, yes.
7   Q   Okay.  Well, this is all to your
8   knowledge --
9   A   Yeah.
10  Q   -- because it's your declaration.
11  A   Yeah.
12  Q   The vast majority of private deals
13  involved private equity companies, the contact
14  information for which is publicly available.
15      Is that true?
16  A   The contact information for private
17  equity companies is available on the Internet for --
18  yes, for the private equity companies that I've
19  researched.
20  Q   Okay.  Let's start with the first
21  clause.
22      The vast majority of private deals
23  involved private equity companies.
24      Do you see that clause?
25  A   Yes, I do.  Yep.

Page 130

1   Q   Is it a true statement that the vast
2   majority of private deals in your experience
3   involved private equity companies?
4   A   Can you restate that.  I'm sorry.  I
5   lost you.
6   Q   Yes.  In your experience -- okay?
7   A   Uh-huh.
8   Q   -- are the vast majority of private --
9   do the vast majority of private deals involve
10  private equity companies?
11  A   In my experience, yes.
12  Q   Okay.  And the contact information for
13  private equity companies is publicly available,
14  correct?
15  A   Yes.
16  Q   The next sentence is the amount of
17  cash exchanged varies from deal to deal --
18      Is that true?
19  A   True.
20  Q   -- and is not necessarily indicative
21  of future deals.
22      Is that true?
23  A   That is true.
24  Q   Okay.  Competitors know how much we
25  charge in fees --

Page 131

1       Is that true?
2   A   To my knowledge, yes.
3   Q   -- just as we know how much they
4   charge.
5       Is that true?
6   A   From my experience, yes.
7   Q   And fees do not vary much from deal to
8   deal or among competitors.
9       Is that true?
10  A   That is true in the Wilmington Trust
11  products.  That is very true.  Yeah, I would say so.
12  Q   So the Wilmington Trust products are
13  paying agent services, correct --
14  A   True.
15  Q   -- and escrow services, correct?
16  A   True.
17  Q   The last sentence says:  Most of the
18  information on the spreadsheet is not confidential,
19  and to the extent it is not generally known, it is
20  not of any value.
21      Is that statement true?
22  A   To me, yes.
23  Q   Okay.  I'm going to direct your
24  attention now to Paragraph 88.  The first -- the
25  first sentence of Paragraph 88 says, Moreover, the

Page 132

1   information in the spreadsheet is either not
2   confidential or secret, not of any value, or both.
3       Do you see that?
4   A   Yes.
5   Q   The spreadsheet being referred to in
6   the first sentence of Paragraph 88 --
7   A   Excuse me, Paragraph --
8   Q   Of Paragraph 88.
9   A   Yeah.
10  Q   Is which spreadsheet?
11  A   I have to read through this.
12      (The deponent perused the document.)
13  A   This -- I'm assuming -- I'm referring
14  to the spreadsheet I used to track my deals.
15  Q   (By Ms. Jacobs)  Okay.
16      MR. REDDEN:  You might want to direct
17  him to a specific paragraph.
18      MS. JACOBS:  Yes.
19  Q   (By Ms. Jacobs)  And I wasn't sure
20  when I read this, but is the spreadsheet being
21  referred to in Paragraph 88 the document being
22  discussed in Paragraph 85?
23  A   I don't have that document in front of
24  me.  I wish I did.  Sorry.
25  Q   The document that you're alleged to

### Page 133

1  have sent to your personal e-mail address was a
2  document largely consisting of contact
3  information --
4      (Multiple people speaking
5  simultaneously.)
6      Q   M&A attorneys?
7      A   That's a totally different document.
8      Q   Okay. So the spreadsheet you believe
9  is the spreadsheet --
10     A   I'm sorry.
11     Q   That was originally referenced in
12 Paragraph 81, which is the spreadsheet that you kept
13 that had information from all your deals dating back
14 to about 2012 that you stated that you created to
15 check your compensation?
16     A   I would have to go back and make sure
17 the numbers are -- to read this a little bit because
18 there's two different spreadsheets. One was a
19 client contact list that was basically a download
20 off of our Sales Logic system. It basically just
21 had -- and when I say "client" it was 90 percent --
22 99 percent referral sources. It was basically the
23 law firm, the name, an e-mail address if we had it,
24 a phone number, and then kind of the location of the
25 office and possibly an address. That's the contact

### Page 134

1  list.
2      MR. REDDEN: Can I make a
3  suggestion --
4      MS. JACOBS: Yes.
5      MR. REDDEN: -- to speed things up.
6      MS. JACOBS: You bet.
7      MR. REDDEN: Mr. Nelson, you may want
8  to read all of Paragraph 88.
9      THE DEPONENT: Yeah.
10     A   Okay. I believe in 88 I'm talking
11 about the client list because I'm going back to 87
12 where it says I was authorized to have information
13 in the spreadsheet, which was e-mailed to me on
14 occasion. I used the data in the spreadsheet in the
15 course of --
16     Q   (By Ms. Jacobs) Okay.
17     A   Yeah.
18     Q   So starting again, the first sentence,
19 Moreover, the information in the spreadsheet is
20 either not confidential or secret, not of any value,
21 or both.
22         What document does that sentence refer
23 to?
24     A   I believe that refers to the client
25 list that was downloaded out of the Sales Logic

### Page 135

1  system.
2      Q   Okay. And what information was on
3  that list?
4      A   That's the information that would
5  be -- it would have the law firm or private equity
6  company, mainly law firms, and then it would have
7  the name of the M&A lawyers within that firm,
8  mainly, or general counsel's private equity firms or
9  such.
10         And then contact information for those
11 folks, and maybe the address of what office they're
12 in or what location that office is in.
13     Q   Okay. So going back to the first
14 sentence: Moreover, the information in the
15 spreadsheet is either not confidential or secret,
16 not of any value, or both.
17         Is that a true statement?
18     A   As the list persisted, it wouldn't be
19 anything that anybody couldn't find. There's no
20 information, no specific information about anybody
21 other than just their name and contact information.
22     Q   Mr. Nelson, is the first sentence of
23 Paragraph 88, Moreover, the information in the
24 spreadsheet is either not confidential or secret,
25 not of any value or both, a true statement?

### Page 136

1      MR. MILLER: Asked and answered.
2      MS. JACOBS: No, he didn't. "Yes" or
3  "no." Is it a true statement?
4      MR. MILLER: He answered it the best
5  he could.
6      MS. JACOBS: No. He can answer this
7  "yes" or "no." It's a "yes" or "no" question.
8      MR. MILLER: Excuse me. He can answer
9  it the way he sees fit.
10     MS. JACOBS: I'm asking for a "yes" or
11 "no" answer.
12     MR. MILLER: Mr. Nelson, answer the
13 question however you can.
14     A   To my knowledge, yes.
15     Q   (By Ms. Jacobs) All or nearly all of
16 the information in the spreadsheet is readily
17 available on public Websites.
18         Is that a true statement?
19     A   From that spreadsheet that I don't
20 have in front of me, from my recollection, yes.
21     Q   The major M&A firms are well known in
22 the industry.
23         Is that true?
24     A   That is true.
25     Q   The M&A attorneys and their contact