# EXHIBIT 32

| | |
|---|---|
| **From:** | Heather Kelly <hckelly@gmail.com> |
| **Sent:** | Wednesday, November 13, 2019 2:40 PM |
| **To:** | Kelly, Heather (Escrow) |
| **Subject:** | EXTERNAL: Fwd: Can you send me form agreement and fees? |
| **Attachments:** | PA Agreement WT (May2013).docx; Records Template M A XLSX.XLSX; MAEscrowAgmtForm.doc |

**\*\* This email has been received from outside the organization – Think before clicking on links, opening attachments, or responding. \*\***

Sent from my iPhone

Begin forwarded message:

> **From:** Heather Kelly <hckelly@gmail.com>
> **Date:** May 12, 2016 at 4:39:05 PM CDT
> **To:** rsubramanian@srsacquiom.com, sarend@shareholderrep.com
> **Subject: Fwd: Can you send me form agreement and fees?**

Here are the WT agreement templates.

Sent from my iPhone

Begin forwarded message:

> **From:** "Kelly, Heather" <HKelly@wilmingtontrust.com>
> **Date:** June 15, 2013 at 12:53:29 PM CDT
> **To:** Heather Kelly <hckelly@gmail.com>
> **Subject: FW: Can you send me form agreement and fees?**

-----Original Message-----
From: Soper, Aaron R.
Sent: Friday, June 14, 2013 5:03 PM
To: Kelly, Heather
Subject: RE: Can you send me form agreement and fees?

-----Original Message-----
From: Kelly, Heather
Sent: Friday, June 14, 2013 5:00 PM
To: Soper, Aaron R.
Subject: Can you send me form agreement and fees?

EXHIBIT 27
Koenig
AGREN BLANCO REPORTING
11-13-19

1

I don't have access to any.

HK

## WILMINGTON TRUST, NATIONAL ASSOCIATION

# PAYING AGENT AGREEMENT

This Paying Agent Agreement dated as of _____20___ (this "Agreement") is entered into by and among _____, a _____ [insert type of legal entity and state of formation] (the "Parent"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as paying agent (the "Paying Agent").

**WHEREAS,** pursuant to the terms of a Merger Agreement dated _____ (the "Merger Agreement") by and between _____, a _____ [insert type of legal entity and state of formation, and _____, a _____ [insert type of legal entity and state of formation], _____("the Company") will be merged with and into _____ (the "Merger") with _____ to be the surviving entity (the "Surviving Corporation") in the Merger;

**WHEREAS,** by virtue of the Merger, at the Effective Time (as such term is defined in the Merger Agreement) of the Merger, among other things, the Company _____Capital Stock *[list any other types of securities entitled to exchange or payment]* (other than any shares of Company Capital Stock with respect to which dissenters' rights have been properly exercised) has been converted to the right of the Company Stockholders [Option holders, Warrant Holders] to receive cash in the manner set forth in the Merger Agreement and Merger Sub has been merged into the Company, with the Company surviving the merger and becoming a wholly owned subsidiary of Parent.  Together the Company Capital Stockholders "Stockholders", Option Holders who were not employed by the Company " Non Employee Optionholders", Option Holders who were employed by the Company as of Effective Time "Employee Optionholders" , Warrant Holders "Warrantholders" referred to herein as "Company Securityholders"

**WHEREAS,** pursuant to the Merger Agreement, Parent is required to pay certain amounts to Company Securityholders *[list any other types of security holders entitled to exchange or payment]* in accordance with the terms and conditions set forth therein.

**WHEREAS,** distributions made to certain Company Securityholders  under this Agreement may be subject to reduction in accordance with income and employment tax withholding requirements or Non Resident Alien withholding under the Code and any other applicable Legal Requirement ("Withholding Amounts"), as applicable.

**WHEREAS**, pursuant to the Merger Agreement, the Surviving Corporation and the Representative have appointed Wilmington Trust, National Association as "Escrow Agent" under that certain Escrow Agent Agreement dated of even date herewith by and among Surviving Corporation, Representative and the Escrow Agent.

**WHEREAS,** Parent desires that the Paying Agent act as its special agent for the purpose of distributing cash to Company Securityholders; and

**WHEREAS,** the contents of this Agreement shall be treated as Confidential Data as defined herein,

**NOW THEREFORE,** in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

Modified 2011

**Section 1.1.   Securityholder Records and Payment Information:**

(a) At least five business days prior to Effective Time,  Parent will deliver or cause to be delivered to the Paying Agent a schedule substantially the form attached hereto as **Schedule A** including:

   i)   a complete and correct list of the Company Securityholders  as of Effective Time identifying each Company Securityholder by name, address, Tax Identification Number ("T.I.N."), if applicable,

   ii)  for Stockholders and Warrantholders: the number of shares, and/or warrants owned, including any share and/or warrant ownership information necessary for the Paying Agent to perform its duties pursuant to this Agreement. Such share or warrant ownership information shall include, but shall not be limited to certificate and/or warrant numbers, the number of whole shares or warrants represented by each certificate or warrant, the date of issuance for each certificate or warrant, book-entry share amounts and book-entry share issuance dates, Plan share balances, if applicable, and for any  "covered securities" (defined in IRC §6045) the Acquisition Date and Acquisition Price of such securities for the to ensure accurate cost basis reporting for covered securities and whether any shares are to be considered excluded and if stop transfer instructions or adverse claims are outstanding against such certificates, and

   iii) for Optionholders, total number of options and grant date for each option held by each Optionholder and indication as whether the holder of such options is an Employee Optionholder or Non-Employee Optionholder.

**(b)** Directly prior to Effective Time, Parent will deliver an updated form of **Schedule A** to include:

   (i)   the payment amount for each Company Securityholder expressed in dollar amounts.

   (ii)  the Withholding Amount (if applicable) for each NRA Non Employee Optionholder and the Withholding Amount for each Employee Optionholder. Such Withholding Amount from payments to Employee Optionholders will be withheld from payment in order to satisfy the employer's income and employment tax withholding requirements with respect to former Employee Optionholders of Company Options. The Paying Agent will remit such Withholding Amounts to the company's payroll department or payroll provider for further remittance to the proper tax authorities wire transfer instructions set forth below:

   Name of Bank [                              ]
   ABA Routing Number [                        ]
   Bank Account Name [                       ]
   Bank Account Number [                      ]
   Further Credit Information [                     ] and,

   (iii) the pro rata percentage ownership for each Securityholder, which will be used for subsequent distributions under this Agreement,

(c) After Effective Time the Company and its counsel shall work with the Paying Agent to ensure the accuracy of **Schedule A** and both the Company and its counsel are authorize to correct any inaccuracies or inconsistencies (if any) to **Schedule A.**

**Section 1.2.   Merger Agreement.** Parent acknowledges that the Paying Agent is not a party to the Merger Agreement and as such is assumed to be wholly unfamiliar with, and not bound by, the terms

2                                                                                                           Modified 2011

contained therein; the Surviving Corporation will provide the Paying Agent will a copy of the Merger Agreement.

**Section 1.3.  Dissenters**.  Parent will deliver or cause to be delivered to the Paying Agent a complete and correct list of dissenters ("Dissenters") along with instructions as to the disposition of such Dissenters' Shares should they be presented to the Paying Agent for exchange.  If no list of Dissenters is provided to the Paying Agent, the Paying Agent shall assume there are no Dissenters. The Paying Agent shall have no obligation to notify Dissenters of the effectiveness of the merger or otherwise any other form of notice or direction as may be required by law.

**Section 1.4.  Payment Fund.**  At or before the Effective Time, Parent shall deposit with the Paying Agent, for the benefit of Company Securityholders (such fund being hereinafter referred to as the "Payment Fund"), cash in immediately available funds   sufficient to pay the initial Merger Consideration (such amount being herein referred to as the Closing Merger Consideration)  to be paid in respect of each share of Common Stock issued immediately prior to the Effective Time, less any Excluded Shares and Dissenters' Shares (if any), and any options, warrants and [other types of securities entitled to exchange or payment]   The Payment Fund shall not be used for any other purpose except for additional deposits (such additional deposits being herein referred to as "Additional Amounts") by the Escrow Agent or Surviving Corporation pursuant to the Merger Agreement. Additional Amounts shall be disbursed based on the percent allocation expressed within **Schedule A** (as defined in Section 2.4 below) and as directed in writing by Parent. No interest will be paid or accrued on any Payment Fund amount(s) for the benefit of the Company Securityholders.

## ARTICLE II

The Paying Agent covenants and agrees that:

**Section 2.1.  Letter of Transmittal Mailing.**  As soon as practicable after the Effective Time of the Merger, the Paying Agent shall send a Letter of Transmittal, in substantially the form attached as **Exhibit A**, to each Company Stockholder and/or Warrantholder and an Option Cancellation Agreement, in substantially the form attached as **Exhibit B**, to Employee Optionholders and Non Employee Optionholders. Both the Letter of Transmittal and Option Cancellation Agreement contain the option to have funds remitted via bank wire transfer ("Optional Wire Instructions") as election by each Company Securityholder and shall advise such Securityholder of the terms of the procedure for surrendering to the Paying Agent share or warrant certificate or certificates and/or book-entry shares, or option agreements in exchange for cash.

**Section 2.2.  Request for Information by Company Securityholders**.  The Paying Agent will promptly respond to any telephone, email or mail requests for information relating to the surrender of stock certificates and/or book-entry shares and the payment of cash therefor.

**Section 2.3  Proper Form**.  The Paying Agent will examine the Letters of Transmittal, the Option Cancellation Agreements, the share or warrant certificates and/or book-entry positions for shares or warrants and/or the option agreements delivered or mailed to the Paying Agent by Company Securityholders to ascertain that (i) the Letters of Transmittal and/or Option Cancellation Agreements are properly completed and duly executed in accordance with the instructions set forth therein, (ii) no stop transfer instructions are outstanding against such certificates or book-entry positions (which determination shall be based solely on the information provided to the Paying Agent under Section 1.1 above), (iii) the certificates or shares held in book-entry form have been duly endorsed or assigned for transfer or have been delivered to the Paying Agent, where required, and are otherwise in proper form for surrender, (iv) any other documents contemplated by a Letter of Transmittal or Option Cancellation Agreement are properly completed and duly executed in accordance with the Letter of Transmittal or Option Cancellation Agreement, (v) such Shares do not constitute Dissenters' Shares or Excluded Shares, and (vi) no payment pursuant to the Merger Agreement was previously made with respect to

Modified 2011

such shares, warrants or options.   In cases where the Letter of Transmittal or Option Cancellation Agreement has been improperly completed or executed or where the shares or warrants presented are not in proper form for transfer, or if some other irregularity exists in connection with their surrender, including any irregularity relating to stop transfer instructions, the Paying Agent will consult with Parent, the Company or its counsel on taking such actions as are necessary to cause such irregularity to be corrected.

## Section 2.4.  Payment of Closing Merger Consideration.

a) Parent hereby directs the Paying Agent, consistent with this Agreement and the Letter of Transmittal or Option Cancellation Agreement, Optional Wire Instructions (if applicable)  and Schedule A, to promptly mail by first class mail to each Securityholder who has surrendered exchangeable shares, warrants or options a check drawn, or remit a bank wire transfer (if applicable) in an amount, less any Withholding Amount, set forth on **Schedule A** directly across from such Securityholder's registration.   Wire transfer instructions will be provided by each stockholder electing a bank wire transfer and a $50.00 wire fee will be deducted from the amount set forth on Schedule A for any stockholder requesting payment by wire transfer. Parent hereby directs the Paying Agent to make payment by wire transfer in accordance with the Securityholder's completion of the Optional Wire Instructions box within the Letter of Transmittal or Option Cancellation Agreement without any further documentation, authentication or verification from the Company Securityholder or other party.   Checks shall be made payable to the Securityholder provided on Schedule A or  to the person whose name has been specified in the New Registration Instructions contained in the Letter of Transmittal received by the Paying Agent with respect to payment of Closing Merger Consideration.

(b) Any payments of Additional Amounts will be paid to   Company Securityholders who have surrendered exchangeable shares, warrants or options upon delivery of the funds from the Escrow Agent or Surviving Corporation to the Paying Agent for purpose of payment to Company Securityholders and receipt by the Paying Agent of an updated form of Schedule A to include the pro-rata portion of each Additional Amount expressed as a dollar amount for each Securityholder.  Any Withholding Amounts shall be calculated by the Surviving Corporation and expressed as a dollar amount directly across from each Securityholder's name for which such Withholding Amount is applicable. The Paying Agent will remit such Withholding Amount by wire transfer to the bank account provided in Section 1.1 (c) (ii).   Paying Agent will make payment to each Company Securityholder using the payment instructions provided by the Company Securityholder within the Letter of Transmittal or Option Cancellation Agreement, Notwithstanding the foregoing, any payments of Additional Amounts will be made in accordance with written direction from Parent. If any portion of any Additional Amount(s) is to be characterized as interest, Parent will provide a breakdown of the dollar amount of principal and the dollar amount to be characterized as interest prior to the payment by the Paying Agent to any Company Securityholder under this Agreement Parent will also provide indication prior to payment if any amount characterized as interest is not considered portfolio interest. If no such breakdown is provided by Parent, the Paying Agent will assume the entire payment is not portfolio interest or any other type of interest or other income that is exempt from Non Resident Alien "NRA" tax withholding under any provisions of the IRC.

(c) Changes to Payment Instructions.   If a Company Securityholder wants to change payment instructions on file for payments of Additional Amounts, the Paying Agent will require the Company Securityholder to complete a blank Letter of Transmittal or Option Cancellation Agreement to update the payment method.  The Company Securityholder may direct the Paying Agent to make payments to a transferee by assigning the right to receive additional amounts to another person or entity in a letter of direction or blank Letter of Transmittal.  The Paying Agent will require the Company Securityholder to

Modified 2011

obtain a medallion guarantee or provide other documentation to support its capacity to sign.

(d) Security Procedures.  In the event any other funds transfer instructions are directed outside of the Optional Wire Instructions within the Letter of Transmittal or within this Agreement, the Paying Agent is authorized to seek confirmation of such funds transfer instructions by a single telephone call-back to one of the Authorized Company Representatives, and Paying Agent may rely upon the confirmation of anyone purporting to be that Authorized Company Representative. The persons and telephone numbers designated for call-backs may be changed only in a writing executed by Authorized Representatives of the applicable Party and actually received by Paying Agent via facsimile or as a PDF attached to an email. No funds will be disbursed until an Authorized Company Representative is able to confirm such instructions by telephone callback.  The Paying Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by the Parties and confirmed by an authorized company representative.

The Parties acknowledge that there are certain security, corruption, transmission error and access availability risks associated with using open networks such as the Internet and the Parties hereby expressly assume such risks.

The Parties acknowledge that the security procedures set forth in this Section 2.4(d) are commercially reasonable.

**Section 2.5.  Lost, Stolen or Destroyed Certificates.**  If any Stockholder shall report that his or her failure to surrender any certificate or certificates representing shares registered in his or her name is due to the loss, theft, misplacement or destruction of such certificate or certificates, the Paying Agent may require such Stockholder to furnish an affidavit of lost certificate  ("Affidavit of Lost Certificate" ) in substantially the form attached as **Exhibit C** before delivering to such Company Securityholder or its transferee the merger consideration to which it is entitled.  The Paying Agent may deduct a one-time $100.00 processing fee from the merger consideration payment for such Company Securityholder. Parent acknowledges the requirement for "sufficient indemnity bond" under Uniform Commercial Code 8-406 and acknowledges the sufficient indemnity bond to be zero so that upon receipt of a notarized, original, Affidavit of Lost Certificate executed by the Company Securityholder, Paying Agent is directed to make payment without further review or authorization by Parent.

**Section 2.6.  Tax Certifications and Reporting.**

Parent agrees and acknowledges that the Paying Agent is a "Payer," "Withholding Agent," "Middleman" or "Broker" as defined in Chapters 3, 4, 24 and 61 of the Internal Revenue Code ("IRC"), Title 26, United States Code except for payments of amounts paid to Employee Optionholders, Non Employee Option Holders or payments characterized as interest by Parent. The Paying Agent is bound by any applicable state laws regarding backup withholding requirements. Therefore:

(i)      The Company certifies that for any Shareholders who are U.S. persons for which the Shareholders Taxpayer Identification Number is listed on Schedule A, that the Company is in receipt of Taxpayer Identification Number certification documentation on an IRS Form W-9 (or valid substitute form) pursuant to the requirements found in IRC §3406 and the Treasury regulations promulgated thereunder. The Paying Agent will solicit Company Securityholders with a substitute W9 as part of the Letter of Transmittal or Option Cancellation Agreement mailing.

Modified 2011

(ii)     The Paying Agent will solicit an applicable Form W-8 (including any required additional documentation) from any NRA individuals or foreign entities that are Company Securityholders pursuant to Chapters 3 and 4 of the IRC, as amended and effective, and the Treasury regulations promulgated thereunder;

(iii)    The Paying Agent will apply federal and state backup withholding as required by federal and state law and regulations on the applicable reportable date for any Company Securityholder who has not provided a TIN or certified TIN, as required, for the solicitations under Section 2.7(i) above.  With the exception of payments to  Employee Option Holders reportable on IRS Form W-2, or payments referenced in Section 2.4 above for which the Parent has provided additional information as to the characterization thereof, Parent acknowledges that, as the Payer or Withholding Agent, the Paying Agent has full, complete and final authority regarding all determinations concerning withholding requirements and responsibilities in accordance with applicable federal and state tax certification and reporting regulations;

(iv) The Paying Agent and Parent agree that the following specific transactions will be reported as indicated:

> (1) Payments to Stockholders.  The Paying Agent will prepare and file Internal Revenue Service ("IRS") Form 1099-B for any US persons (actual or presumed) who are  Stockholders unless otherwise directed by Parent.

> (2) Payment to Non-Employee Option Holders:  Paying Agent will prepare and file IRS Form 1099-MISC (further qualifying amounts as non-employee compensation) for any payments made by the Paying Agent to Non Employee Optionholders who are U.S. persons (actual or presumed) and Form 1042-S for  NRA holders pursuant to this Section 2.7 as applicable unless otherwise directed by Parent.  Parent acknowledges the receipt of options in lieu of wages for work was performed within the United States (including any territories thereof) and is not considered foreign sourced income and therefore will provide applicable Withholding Amounts on **Schedule A** as described under Section 1.1 of this Agreement for any NRA Non Employee Optionholder.

> (3) Payment to Employee Option Holders: For the avoidance of doubt, Surviving Corporation will complete or cause to be completed any employer tax reporting of income and employment taxes withheld on any amounts paid with respect to Employee Option Holders. Accordingly, the Paying Agent will have no reporting, withholding or remittance obligation (except to the Company payroll department or payroll provider as contemplated in Section 1.1 (b) ii above).Parent will handle or cause to be handled any tax reporting that must be done on W-2's. If applicable, the Surviving Corporation will be responsible for any Form 3291 or Form 3922 reporting; and

(v) Parent, if applicable for organizational actions that impact cost basis of any Shareholder, will provide the Paying Agent with the issuer return required pursuant to IRC §6045B and the regulations promulgated thereunder;

(vi)Pursuant to Section 1.1 above, the Surviving Corporation, its predecessor or its prior agent (as an "applicable person" defined in IRC §6045A and the Treasury regulations promulgated thereunder) shall, but only if applicable, provide transfer statements that

identify noncovered and covered security positions held by all Stockholders. For covered securities, the cost basis and other information required to ensure accurate cost basis reporting will be included in Schedule A hereof. The Paying Agent may rely on the cost basis information provided to it by Surviving Corporation, its predecessor or its prior agent and the Paying Agent shall have no responsibility whatsoever to verify or ensure the accuracy of the cost basis information provided to it. Any securities listed on Schedule A that are not identified as "covered" securities, as defined in Internal Revenue Code ("IRC") §6045(g) shall be treated as noncovered securities.

**(b) Indemnification.** Parent shall indemnify, defend and hold the Paying Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Paying Agent arising out of or in connection with the performance of the Paying Agent's obligations under the terms of this §2.6 unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Paying Agent. The indemnification provided by this § 2.6(b) is in addition to the indemnification provided in § 4.6 and shall survive the resignation or removal of the Paying Agent and the termination of this Agreement..

**Section 2.8. Submission of Certificates and/or Book-entry Shares by Stockholders or Warrantholders Not of Record but Who Have Acquired Their Shares or Warrants in Due Course.** Certain stock certificates and or book-entry shares and/or warrants may be tendered by Stockholders or Warrantholders who are holders in due course but are not registered holders. Upon submission of such a certificate or book-entry shares duly endorsed or with assignments duly executed by the registered holder (or his duly appointed agent, attorney, executor, administrator, guardian or other fiduciary), together with the requisite medallion guarantee of signature (and evidence of authority if appropriate) if such certificate or book-entry share(s) is accompanied by a duly completed and executed Letter of Transmittal, the Paying Agent will be entitled to treat such certificate or book-entry share(s) as if surrendered by the registered holder thereof. The same process will be required for any subsequent assignments after the initial closing payments have been made.

**Section 2.9. Cancellation of Surrendered Certificates and/or Book-entry Shares, Warrants or Options, Company Securityholders Lists.** At the time of the Paying Agent's issuance of a check or wire as described in Section 2.4 above, the Paying Agent will cancel each stock certificate and/or book-entry share(s) warrant or option agreement surrendered in exchange for such check or wire. For the term of this Agreement the Paying Agent will maintain on a continuing basis a list of those Company Securityholders who have surrendered their stock or warrant certificates, option agreements or book-entry shares, and at the request of Parent or the Company provide this list to the Company or Parent. The Paying Agent will also make available to Parent and the Company such other information as it may have in its possession and as they may reasonably request from time to time.

**Section 2.10. Canceled Stock.** Subject to applicable law and regulation, the Paying Agent shall maintain (i) in a retrievable database electronic records or (ii) in hard copy form physical records of all cancelled or destroyed stock certificates which have been canceled or destroyed by the Paying Agent. The Paying Agent shall maintain such electronic records or physical records for the time period required by applicable law and regulation. Upon written request of Parent (and at the expense of Parent), the Paying Agent shall provide to Parent or its designee copies of such electronic records or physical records relating to stock certificates cancelled or destroyed by the Paying Agent.

**Section 2.11. Mailing of Second Letter of Transmittal and Unexchanged Shareholder Program.** The Paying Agent shall send a second Letter of Transmittal or Option Cancellation

Modified 2011

Agreement to all Company Securityholders that have failed to send in their stock, warrant or options for exchange at a time deemed appropriate by the Paying Agent, which will typically not be earlier than four (4) and not later than eight (8) months after the Effective Time of the Merger. At the time deemed appropriate by the Paying Agent, which will typically be ten (10) or more months after the Effective Time of the Merger, the Paying Agent may utilize the services of an unexchanged shareholder search company (a "Search Company") for the purpose of locating unexchanged shareholders and assisting them in exchanging their shares. An additional agreement may need to be signed at that time, and the Paying Agent is hereby authorized and directed by Parent to enter into such an agreement. Such Search Company may charge the shareholder a fee which shall not exceed 10% of the total value of the merger consideration; it will not charge Parent a fee; it may compensate the Paying Agent for processing exchanges and for other work it does to enable the Search Company to implement its search program. If Parent requires the Paying Agent to work with an unexchanged shareholder search company other than the one it has selected, additional fees may apply.

**ARTICLE III**

**Section 3.1.  Unclaimed Property Administration.**  Subject to applicable unclaimed property laws, the Paying Agent will initiate unclaimed property reporting services for unclaimed shares and related cash distributions, which may be deemed abandoned or otherwise subject to applicable unclaimed property law or regulation. Such services may include preparation of unclaimed property reports, delivery of abandoned property to various states, completion of required due diligence notifications, responses to inquiries from owners, and such other services as may reasonably be necessary to comply with applicable unclaimed property laws or regulations.

**Section 3.2.  Information about Unclaimed Property.** Parent shall assist the Paying Agent and provide such cooperation as may reasonably be necessary in the performance of the services hereunder including delivery to the Paying Agent of any and all such unclaimed property related to the shareholders transaction which may not otherwise be in the Paying Agent's possession.

**Section 3.3.  Inquiries about Unclaimed Property.**  The Paying Agent shall assist Parent or the Company in responding to inquiries from administrators of state unclaimed property law or regulation regarding reports filed on the Company's behalf or in response to requests to confirm the name of a reclaiming owner. The Paying Agent shall exercise reasonable efforts to obtain release agreements from the various states offering such release agreements with respect to reports and abandoned property delivered to them and indemnification agreements from those states willing to provide them.

**Section 3.4.  Remittance of Unclaimed Property.** The Paying Agent or its duly appointed agent shall timely remit unclaimed funds to the appropriate state or jurisdiction, as provided for under applicable unclaimed property law or regulation. The Paying Agent shall provide such reports regarding unclaimed property services hereunder as Parent may reasonably request from time to time.

**Section 3.5.  Lost Security Holder Search Services.**  Pursuant to Securities and Exchange Commission ("SEC") rules (See SEC Rule 240.17Ad-17, as amended), the Paying Agent is required to provide the following services regarding lost security holder accounts, which together constitute Standard Search Services: a) Conduct a national database search between three and twelve months after a lost security holder account is identified; b) If the first national database search is not successful in locating the holder, conduct a second search between six and twelve months later; c) Report to the SEC in required filings, information about the age of lost security holder accounts and amounts escheated to the various states.

**Section 3.6.  Exceptions to SEC Lost Security Holder Search Requirements.**  Exceptions to the SEC search requirements include deceased security holders, security holders that are not natural persons (e.g., corporations, partnerships), and cases where the value of all amounts due to the security holder are less than $25.

Modified 2011

# ARTICLE IV

## Section 4.1.  Advice of Counsel.

**(a)  Advice in Case of Defective Submission**.  The Paying Agent is authorized to cooperate with and furnish information to Parent and shall seek and follow, and may rely upon, advice of Parent or its counsel with respect to any action to be taken by the Paying Agent if the Paying Agent receives any of the following:

(i)     any request for payment with respect to certificates claimed to be lost or stolen;

(ii)    any submission of stock certificates not accompanied by a duly completed and executed Letter of Transmittal;

(iii)   any request that payment be made with respect to any Common Shares to any person other than the registered holder thereof (except as provided for in Section 2.8 above); or

(iv)    any request by a Stockholder that the Paying Agent take any action other than that specified in this Agreement with respect to the exchange of his or her Common Shares for cash, payments to former holders of options, warrants, and other types of securities entitled to exchange or payment, or payments of Escrow Amounts or Deferred Merger Consideration.

**(b)   Advice in Other Cases**.  Notwithstanding the provisions of Section 4.1(a) above, the Paying Agent may, when the Paying Agent deems it desirable and after prior consultation with Parent or the Company, seek advice of the Paying Agent's own counsel in connection with the Paying Agent's services as Paying Agent hereunder and the Paying Agent shall be entitled in to rely in good faith upon any such advice received in writing and to be compensated for the fees and expenses of such counsel as provided in Section 4.2 below.

## Section 4.2.  Fees and Expenses.  [    ] will pay or cause to be paid to the Paying Agent fees for the Paying Agent's services hereunder as set forth in **Exhibit D** attached hereto, payable upon Closing.  All out-of-pocket costs not contemplated by Exhibit D will be reimbursed to the Paying Agent by Parent upon invoice to [insert billing address and contact name].  Such costs may include, but are not limited to, postage, mail insurance, stationery and supplies, checks, envelopes, paper stock and fees and expenses of counsel.  Paying Agent agrees that it will endeavor to obtain competitive rates for out-of-pocket costs; however, these costs as passed on to Parent or Surviving Corporation may include charges to cover the cost of receipt and handling of invoices.

## Section 4.3.  Timeliness and Accuracy of Records.  The Paying Agent's agreement to the terms and conditions of this Agreement and the fee schedule attached assumes that the records of the Company or its transfer agent are accurate, received in a timely fashion and in good order so that conversion of the records may be completed efficiently and additional balancing and/or correcting of the records shall not be not required.  If the records are received late, or are inaccurate, incomplete and/or otherwise not in good order, the mailing of materials  and payments to Company Securityholders may need to be delayed and additional fees may apply as appropriate for time spent correcting and/or balancing the records.

Modified 2011

**Section 4.4. Authorized Company Representatives**.  Each of the following is authorized by Parent to give the Paying Agent any further instructions in connection with the Paying Agent acting as Paying Agent hereunder:

<u>Name</u>                              <u>Title</u>/Entity Name                              <u>Phone Number</u>

Each of the following is authorized by Parent to correct any inconsistencies as it relates to the records provided in Section 1.1 hereto:

<u>Name</u>                              <u>Title</u>/Entity Name                              <u>Phone Number</u>

**Section 4.5   Reliance upon Certificates, Instructions.**  The Paying Agent shall be protected in relying and acting, or refusing to act, without further investigation upon any certificate or certification, instruction, direction, statement, request, consent, agreement, records, or other instrument (collectively "Certificates and Instructions") whatsoever furnished to the Paying Agent by an authorized representative of Parent or the Company, not only as to its due execution and validity and the effectiveness of its provisions, but also as to the truth and accuracy of any information therein contained, which the Paying Agent shall in good faith believe to be genuine or to have been signed or presented by a proper person or persons.  The Paying Agent shall have no responsibility or liability for the accuracy or inaccuracy of such Certificates and Instructions.

**Section 4.6   Indemnification**.  Parent will indemnify, defend, protect and hold harmless the Paying Agent from and against any and all losses, liabilities, costs, damages or expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred or made, arising out of or in connection with the performance of the Paying Agent's obligations under the provisions of this Agreement, including but not limited to, acting, or refusing to act, in reliance upon any signature, endorsement, assignment, certificate, order, request, notice, report, instructions, record, including but not limited to records concerning tax certification and cost basis information provided to it, or other instrument or document believed by the Paying Agent in good faith to be valid, genuine and sufficient; provided, however, such indemnification shall not apply to any such act or omission finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Paying Agent.  The Paying Agent shall be under no obligation to institute or defend any action, suit, or legal proceeding in connection herewith or to take any other action likely to involve the Paying Agent in expense, unless first indemnified to the Paying Agent's satisfaction.  The indemnities provided by this paragraph shall survive the resignation or discharge of the Paying Agent or the termination of this Agreement.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Paying Agent or Parent be liable under or in connection with the Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Paying Agent or Parent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

**Section 4.7.  Term**.  Parent and the Paying Agent agree that, unless terminated in writing by either party with 30 days notice, this Agreement shall terminate either upon completion of the exchange of all shares, options and warrants and other payments subject to this Agreement and all payments of Additional Amounts have been made or upon completion of all unclaimed property reporting and escheatment obligations arising in connection with the Merger and the duties of the Paying Agent pursuant to this Agreement.   If after seven [7] years any shares, warrants or options remain unexchanged or other payments remain unpaid and moneys and/or securities on deposit hereunder are not escheatable in accordance with unclaimed property laws and regulations, then the Paying Agent

may terminate this Agreement and any remaining property may be delivered to the Surviving Corporation.   Thereafter, Parent shall be responsible for compliance with unclaimed property obligations.

**Section 4.8. Amendments, etc.**   No provision of this Agreement may be changed, waived, discharged or terminated except by an instrument in writing signed by the party against which enforcement of the provision which is the subject of such change, waiver, discharge or termination is sought.  Any inconsistency between this Agreement on the one hand and the Merger Agreement and the Letter of Transmittal on the other shall be resolved in favor of the Merger Agreement and the Letter of Transmittal, with the qualification that (a) the Paying Agent is not a party to the Merger Agreement and as such is not subject to its terms, as noted in Section 1.2 above, and (b) the rights and obligations of the Paying Agent shall be governed solely by the provisions of this Agreement.  In the absence of written notice from Parent to the effect that an inconsistency exists between the Merger Agreement or Letter of Transmittal and this Agreement, the Paying Agent shall be entitled to assume that no such inconsistency exists.

**Section 4.9. Notices.**  All notices to be given by one party to the other under this Agreement shall be in writing and shall be sufficient if made to such party at their respective address set forth below by:

    (a)  personal delivery (including delivery by any commercial delivery service);

    (b)  registered or certified mail, postage prepaid, return receipt requested; or

    (c)  facsimile transmission ("Fax") followed by mail delivery pursuant to subsection (b);

If notice to the Surviving Corporation:

        [Parent's legal name ]
        [Street address for overnight delivery]

        Attention:  [Name and Title of Authorized Officer]

        Telephone:
        Facsimile:

If notice to the Paying Agent:

        Wilmington Trust, N.A.
        Attn:


        Telephone:
        Facsimile:

These addresses may be changed by giving written notice to the other party.

All notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or, if by other means, including electronic mail delivery  and facsimile capable of transmitting or creating a written record directly to the office of the recipient, when received by the recipient party at the address shown above, or at such other addresses as may hereafter be furnished to the parties by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt, or in the case of facsimile, the date noted on the confirmation of such transmission).

Modified 2011

**Section 4.10.  Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

**Section 4.11. Law**.  This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Delaware.

**ARTICLE V**

**Section 5.1.  Confidential Data.**  The Paying Agent and Parent acknowledge that during the course of this Agreement, the parties hereto may make confidential data available to each other or may otherwise obtain proprietary or confidential information regarding the Company, its shareholders or other rights owners, or the Paying Agent (collectively, hereinafter "Confidential Data").  Confidential Data includes all information not generally known or used by others and which gives, or may give the possessor of such information an advantage over its competitors or which could cause Parent or the Paying Agent injury, loss of reputation or loss of goodwill if disclosed.  Such information includes, but is not necessarily limited to, data or information which identifies past, current or potential customers, shareholders, business practices, financial results, research, development, systems and plans; and/or certain information and material identified by the Company, Parent or the Paying Agent as "Proprietary" or "Confidential"; and/or data the Paying Agent furnishes to Parent from the Paying Agent's database; and/or data received from the Company or Parent and enhanced by the Paying Agent.  Confidential Data may be written, oral, recorded, or maintained on other forms of electronic media.  Because of the sensitive nature of the information that Parent or the Paying Agent and its employees or agents may obtain as a result of this Agreement, the intent of the parties is that these provisions be interpreted as broadly as possible to protect Confidential Data.

**Section 5.2.  Relief.**  The Paying Agent acknowledges that all Confidential Data furnished by the Company or Parent is considered proprietary and strictly confidential.  The Paying Agent also acknowledges that the unauthorized use or disclosure of any Confidential Data may cause irreparable harm to the Company or Parent.  Accordingly, the Paying Agent agrees that the Company or Parent shall be entitled to equitable relief, including injunctive relief, in addition to all other remedies available at law for any threatened or actual breach of this agreement or any threatened or actual unauthorized use or disclosure of Confidential Data.  Parent agrees that the provisions and remedies of this section shall also apply to Confidential Data received by the Company or Parent relating to the Paying Agent.

**Section 5.3.  Security Measures.**  The Paying Agent will employ the same security measures to protect Confidential Data received from the Company or Parent that it would employ for its own comparable confidential information (but in no event less than a reasonable degree of care in handling Confidential Data). Without limiting the foregoing, the Paying Agent further agrees, subject to applicable law and regulations, that: (i) Confidential Data shall not be distributed, disclosed, or conveyed to any third party except by prior written approval of the Surviving Corporation; (ii) no copies or reproductions shall be made of any Confidential Data, except as needed to provide the services described in this Agreement; and (iii) the Paying Agent shall not use any Confidential Data for its own benefit or for the benefit of any third party.

**Section 5.4.  Subpoena, Summons or Legal Process.**  Except as prohibited by applicable law or regulation, the Paying Agent shall promptly notify Parent in writing of any subpoena, summons or other legal process served on the Paying Agent for the purpose of obtaining Confidential Data (i) consisting of a shareholder list, such as an identified class of shareholders, or (ii) relating to significant regulatory action or litigation that would have a material effect on the performance of the Paying Agent or corporate status of the Surviving Corporation.  In such cases, Parent shall have a reasonable opportunity to seek appropriate protective measures; provided, however, that this subsection shall not require the Paying Agent to notify Parent of its receipt of any subpoena, summons or other legal process seeking Confidential Data for a single shareholder or group of related shareholders in connection with

Modified 2011

routine tax levies or other routine third party litigation involving a shareholder or if the Paying Agent is prohibited by law or regulation from making such disclosure.  Parent will indemnify the Paying Agent for all reasonable expenses incurred by the Paying Agent in connection with determining the lawful release of the Confidential Data.

**Section 5.5.   Exceptions.**  The obligations set forth in Sections 5.1 through 5.4 above shall not apply to:

(a)     any disclosure specifically authorized in writing by Parent or the Paying Agent;

(b)     if this transaction is publically announced, the Paying Agent may disclose that it acted in capacity as Paying Agent or Escrow Agent on the transaction. Notwithstanding the foregoing, terms or conditions of the transaction and such appointment will remain confidential in nature.

(c)     any disclosure required by applicable law or regulation, including pursuant to a court order; or

(d)        Confidential Data which:

(1)    has become public without violation of this Agreement; or
(2)    was disclosed to the receiving party by a third party not under an obligation of confidentiality to any party; or
(3)    was independently developed by the disclosing party not otherwise in violation or breach of this Agreement or any other obligation of the parties to each other; or
(4)    was rightfully known to the receiving party prior to entering into this Agreement.

**Section 5.6. Obligations Beyond Termination or Assignment.**  The obligations of each party set forth in Sections 5.5(a), (b) and (c) above shall survive termination or assignment of this Agreement.

**Section 5.7.   Compliance:**  The Paying Agent's appointment and acceptance of its duties under this Agreement is contingent upon verification of all regulatory requirements applicable to the Company and the Surviving Corporation, including successful completion of a final background check.   These conditions include, without limitation, requirements under the USA Patriot Act Customer Identification Program (CIP), the Bank Secrecy Act (BSA), and the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC), each as may be amended from time to time.   If these conditions are not met, the Paying Agent may at its option promptly terminate this Agreement in whole or in part, and without the Paying Agent having any liability or incurring any additional costs.

Modified 2011

**IN WITNESS WHEREOF**, Parent and the Paying Agent have caused their names to be signed hereto by their duly authorized officers, all as of the date first written above.

_____

[Insert full legal name of Surviving Corporation]

By _____
Name: _____
Title: _____

**WILMINGTON         TRUST,         NATIONAL ASSOCIATION, as Paying Agent**

By _____
Name: _____
Title: _____

Modified 2011

**Schedule A**
**(Company Securityholder Records)**

**Exhibit A**
**(Letter of Transmittal)**

Modified 2011

**Exhibit B**
**(Option Cancellation Agreement)**

**Exhibit C**
**(Affidavit of Lost Certificate)**

Modified 2011

**Exhibit D**
**(Fees)**

Modified 2011

C/O Address Line

SecurityHolder Name Line 2

Securityholder Name

Amount to be reported

Internal Use Only

Date of Certificate

Certificate Number

Certificate Prefix

C E R T I F I C A T E S

Foreign

Zip

State

City

Street Address

Internal Use Only

Warrant Issuance Date

Warrant Number

Internal Use Only

Face Value of Warrant



Share Amount (Face Value)

Options Date of Issuance

Internal Use Only



Underlying Shares (if applicable)

Total Options

Underlying Shares (if applicable)

Covered Options

Internal Use Only

Internal Use Only

# ESCROW AGREEMENT

This Escrow Agreement dated this ____ day of _____, _____ (the "Escrow Agreement"), is entered into by and among _____, a _____ [insert type of legal entity and state of formation] (the "Surviving Corporation"), _____, in its/his/her capacity as Stockholders' agent under the Merger Agreement referenced below (the "Representative") (Surviving Corporation and Representative collectively, the "Parties," and individually, a "Party"), and Wilmington Trust, National Association, a national banking association, as escrow agent ("Escrow Agent").

## RECITALS

**WHEREAS**, _____, a _____ [insert type of legal entity and state of formation] (the "Company") and the Surviving Corporation have entered into a Merger Agreement dated _____, 20__ (the "Merger Agreement");

**WHEREAS**, Section ____ of the Merger Agreement provides that, at closing of the merger contemplated by the Merger Agreement, a cash amount equal to $_____ shall be deposited into escrow to be held in accordance with the terms of this Escrow Agreement for the purpose of establishing a source of funds to secure the Merger Agreement indemnification obligations of the Stockholders to the Surviving Corporation;

**WHEREAS**, the Surviving Corporation agrees to place in escrow certain funds and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement;

**WHEREAS**, pursuant to the Merger Agreement, each of the Stockholders appointed the Representative as agent and attorney-in-fact for each such Stockholder, for and on behalf of each such Stockholder, with full power and authority to represent each Stockholder and such Stockholder's successors and assigns with respect to all matters arising under this Escrow Agreement, and all actions taken by the Representative under this Escrow Agreement will be binding upon each such Stockholder and such Stockholder's successors and assigns as if expressly ratified and confirmed in writing by each of them; and

**WHEREAS,** in order to facilitate payments to the Stockholders pursuant to the Merger Agreement, the Surviving Corporation and the Representative have appointed Wilmington Trust, National Association as "Paying Agent" under that certain Paying Agent Agreement dated as of even date herewith by and among the Surviving Corporation, the Representative and the Paying Agent (the "Paying Agent Agreement").

1

**NOW, THEREFORE,** in consideration of the promises and agreements of the parties hereto and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## ESCROW DEPOSIT

**Section 1.1.** **Receipt of Escrow Property.** Upon execution hereof, the Surviving Corporation shall deposit the sum of $_____ (the "Escrow Property") into an account (the "Escrow Account") established with Escrow Agent.

**Section 1.2.** **Investments.**

(a) The Escrow Agent shall invest the Escrow Property, including any and all interest and investment income, in accordance with the written instructions provided to the Escrow Agent and signed by the _____. In the absence of written investment instructions from the _____, the Escrow Agent shall invest the Escrow Property, including any and all interest and investment income, in the M&T Bank Corporate Deposit Account which is further described herein **Exhibit C.** Any investment earnings and income on the Escrow Property shall become part of the Escrow Property, and shall be disbursed in accordance with the terms hereof.

(b) The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account. The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations or advice.

**Section 1.3.** **Procedures with Respect to Indemnification Claims.**

(a) Claim. If, at any time and from time to time from the date hereof until ___ on _____, 20___ (the "Claims Period"), the Surviving Corporation desires to make a claim against the Escrow Property pursuant to its rights under Section ___ of the Merger Agreement (each, a "Claim"), the Surviving Corporation, on its own behalf or on behalf of another indemnified party under the Merger Agreement (such claiming party, the "Claimant"), shall deliver a written notice of the Claim (a "Claims Notice") to the Escrow Agent, with a copy to the Representative, substantially in the form attached hereto as Annex I, specifying the nature of the Claim, the estimated amount of damages to which the Claimant believes it is or may be entitled to under the Merger Agreement (the "Claimed Amount") and Claimant payment delivery instructions.

(b)   Response by the Representative.  No later than _____ on the thirtieth (30th) calendar day following but not including the date of receipt by the Escrow Agent of any Claims Notice ("Response Period"), the Representative shall, with respect to such Claims Notice, by written notice to the Escrow Agent, with a copy to the Surviving Corporation (a "Response Notice"), substantially in the form attached hereto as Annex II, either (a) concede liability for the Claimed Amount in whole, or (b) deny liability for the Claimed Amount in whole or in part (it being understood that any portion of the Claimed Amount for which the Representative has not denied liability shall be deemed to have been conceded).  If the Representative denies liability in whole or in part, such Response Notice shall be accompanied by a reasonably detailed description of the basis for such denial.  The portion of the Claimed Amount for which the Representative has conceded liability is referred to herein as the "Conceded Amount."  If the Representative has conceded liability for any portion of the Claimed Amount, the Surviving Corporation and the Representative, by joint notice substantially in the form attached hereto as Annex III, shall instruct the Escrow Agent to promptly pay to the applicable Claimant the Conceded Amount (such joint notice, the "Conceded Amount Notice"); provided, however, that if the Representative fails to deliver a Response Notice within the thirty (30) calendar day period described in this subparagraph (b), the Representative shall be deemed to have conceded the Claimed Amount in full (and the Claimed Amount shall constitute the Conceded Amount) and the Escrow Agent shall promptly pay to the applicable Claimant such Conceded Amount.

(c)   Resolutions of Disputes.

(i)   If the Representative has denied liability for, or otherwise disputes, the Claimed Amount, in whole or in part, the Representative and the Surviving Corporation, on behalf of the applicable Claimant, shall attempt to resolve such dispute as promptly as possible.  If the Surviving Corporation and the Representative resolve such dispute, they shall deliver to the Escrow Agent a Conceded Amount Notice signed by each of them.  Such Conceded Amount Notice shall instruct the Escrow Agent to pay to the applicable Claimant the amount, if any, agreed to by both the Surviving Corporation and the Representative in settlement of such dispute.

(ii)   If the Surviving Corporation and the Representative fail to resolve such dispute within thirty (30) calendar days after receipt by Escrow Agent of the Response Notice corresponding to such dispute, (1) the issue of liability for any such dispute with respect to Claims made pursuant to Section ___ of the Merger Agreement may be submitted by any party to a state or federal court located and sitting in the State of Delaware that has appropriate subject matter jurisdiction chosen by either the Surviving Corporation or the Representative (such court, the "Chosen Court") for the purposes of obtaining a final, non-appealable order of such Chosen Court (an "Order") or (2) the issue of liability for any such dispute with respect to Claims made pursuant to Section ___ of the Merger Agreement may be submitted to arbitration, either by the Surviving Corporation or the Representative for the purposes of obtaining a final, conclusive and binding decision (the "Final Decision").  Such Order or Final Decision, as the case may be, shall contain the amount, if any, of the Party's liability for the Claimed

3

Amount as finally determined by such Chosen Court or arbitration, as the case may be (the "Ordered Amount").

(d)   Payment of Claims.  The Escrow Agent promptly shall pay, no later than the fifth (5th) business day following the determination of a Payment Event (as such term is defined below), to the applicable Claimant from the Escrow Property: (i) following any concession (or deemed concession) of liability by the Representative, in whole or in part, the Conceded Amount as set forth in the Conceded Amount Notice; (ii) following expiration of the Response Period (pursuant to receipt by the Escrow Agent of any Claims Notice) in which the Escrow Agent did not receive a Response Notice from the Representative, the Claimed Amount; or (iii) following receipt by the Escrow Agent of any Order or Final Decision, the Ordered Amount (collectively, clauses (i), (ii) and (iii), the "Payment Events").

## Section 1.4.      Disbursements.

(a)   Upon joint written notice from the Surviving Corporation and the Representative, the Escrow Agent shall release from the Escrow Property to the Paying Agent, any portion of the Escrow Property then remaining less the aggregate Claimed Amount for all then outstanding Claims asserted within the Claims Period.  The Parties understand that (i) any investment earnings included in such Escrow Property transferred to the Paying Agent shall have been or shall be reported for tax reporting purposes, to the extent required by applicable Internal Revenue Service ("IRS") regulations,  by the Paying Agent as provided in Section 1.5 below and (ii) such Escrow Property shall be disbursed by the Paying Agent pursuant to the terms of the Paying Agent Agreement.

(b)   Upon receipt of a Conceded Amount Notice with respect to a particular outstanding Claim, the Escrow Agent shall promptly pay to the applicable Claimant, as the case may be, the Conceded Amount.

(c)   Upon receipt of an Order or a Final Decision with respect to a particular outstanding Claim, the Escrow Agent shall promptly pay to the applicable Claimant, as the case may be, the Ordered Amount, if any.

(d)   In the event that the Parties jointly instruct the Escrow Agent to disburse the Escrow Property to any party, the Escrow Agent shall comply with such instructions, any provision herein to the contrary notwithstanding.

(e)   The Parties agree that the residual interest, if the final release of the Escrow Property is mid-month, shall be wired to or as directed by _____.

## Section 1.5.      Income Tax Allocation and Reporting.

(a)   The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the IRS, be reported as having been earned by the [Surviving Corporation, whether or not such income was disbursed during such

4

calendar year] – OR - [Stockholders as disbursed, according to their prorata percentage as provided by the [Surviving Corporation][Representative] to the Paying Agent]. The Surviving Corporation shall be responsible for paying taxes (including any penalties and interest thereon) on all interest earned on the Escrow Property and for filing all necessary tax returns with respect to such income. Neither the Representative nor the Paying Agent or Escrow Agent shall have any obligation to file or prepare any tax returns concerning matters covered by this Escrow Agreement.

(b)     The Parties agree that if all or a portion of the distributions to be made to the Stockholders by the Paying Agent constitute a return of principal such that IRS Form 1099B is required to be prepared, then the Surviving Corporation or the Representative shall provide specific instructions to the Paying Agent as to the amount and character of such distribution and the required IRS form to be used to report such distribution.

(c)     Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate form W-9 or W-8 and such other forms and documents that the Escrow Agent may request. The Parties understand that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(d)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property. The Parties, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 1.5(d) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

**Section 1.6.**     **Termination.**  This Escrow Agreement shall terminate upon the disbursement of all of the Escrow Property, including any investment earnings thereon when credited, and this Escrow Agreement shall be of no further force and effect except that the provisions of Sections 1.5(d), 3.1 and 3.2 hereof shall survive termination.

## ARTICLE 2
## DUTIES OF THE ESCROW AGENT

**Section 2.1.**     **Scope of Responsibility.**  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to any Party or any

other person under this Escrow Agreement. The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, including specifically but not limited to the Merger Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement, including specifically but not limited to the Merger Agreement.

**Section 2.2.** **Attorneys and Agents.** The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent. The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals. The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians and/or nominees.

**Section 2.3.** **Reliance.** The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns. The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority. Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 to this Escrow Agreement.

**Section 2.4.** **Right Not Duty Undertaken.** The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

**Section 2.5.** **No Financial Obligation.** No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

6

## ARTICLE 3
## PROVISIONS CONCERNING THE ESCROW AGENT

**Section 3.1.**      **Indemnification.**  The Parties hereby agree, jointly and severally, to indemnify Escrow Agent, its directors, officers, employees and agents (collectively, the "Indemnified Parties"), and hold the Indemnified Parties harmless from any and against all liabilities, losses, actions, suits or proceedings at law or in equity, and any other expenses, fees or charges of any character or nature, including, without limitation, attorney's fees and expenses, which an Indemnified Party may incur or with which it may be threatened by reason of acting as or on behalf of Escrow Agent under this Escrow Agreement or arising out of the existence of the Escrow Account, except to the extent the same shall be caused by Escrow Agent's gross negligence or willful misconduct.  Escrow Agent shall have a first lien against the Escrow Account to secure the obligations of the parties hereunder.  The terms of this paragraph shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

**Section 3.2.**      **Limitation of Liability.**  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

**Section 3.3.**      **Resignation or Removal.**  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

**Section 3.4.**      **Compensation.**  The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit B, which compensation shall be paid by the Parties. The fee agreed upon for the services

rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event. The Escrow Agent shall have, and is hereby granted, a prior lien upon the Escrow Account with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Account that remain unpaid for a period of thirty (30) days after providing the Parties with an invoice for such amounts.

**Section 3.5.** **Disagreements.** If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent is authorized to retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction, a final non-appealable arbitration decision directing delivery of the Escrow Property, or receives a written agreement executed by each of the parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the Escrow Agent shall be authorized to disburse the Escrow Property in accordance with such final court order, arbitration decision, or agreement, or (ii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. The Escrow Agent shall be entitled to act on any such agreement, court order, or arbitration decision without further question, inquiry or consent.

**Section 3.6.** **Merger or Consolidation.** Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

8

**Section 3.7.     Attachment of Escrow Property; Compliance with Legal Orders.** In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

**Section 3.8.     Force Majeure.** The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

### ARTICLE 4
### MISCELLANEOUS

**Section 4.1.     Successors and Assigns.** This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

**Section 4.2.     Escheat.** The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state. The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

**Section 4.3.     Notices.** All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, and shall be deemed to have been duly given if delivered (a) personally, (b) by facsimile transmission with written confirmation of receipt, (c) by overnight delivery with a reputable national overnight delivery service, (d) by mail or by certified mail, return receipt requested, and postage prepaid, or (e) by electronic transmission; including by way of e-mail (as long as

9

such email is accompanied by a PDF or similar version of the relevant document bearing an authorized signature, which such signature shall, in the case of each of the Parties, be a signature set forth in Exhibit A-1 or A-2, as applicable), with e-mail confirmation of receipt. If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail. Any notice given shall be deemed given upon the actual date of such delivery. If notice is given to a party, it shall be given at the address for such party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes. In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to the Surviving Corporation:

_____

_____

Attention:
Telephone:
Facsimile:
Email address:

If to the Representative:

_____

_____

Attention:
Telephone:
Facsimile:
Email address:

If to the Escrow Agent:
Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:
Telephone:
Facsimile:
Email address:

**Section 4.4.**     **Governing Law.**  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

**Section 4.5.**     **Entire Agreement.**  This Escrow Agreement sets forth the entire agreement and understanding of the parties related to the Escrow Property.

**Section 4.6.**     **Amendment.**     This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

10

**Section 4.7.**      **Waivers.**  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

**Section 4.8.**      **Headings.**  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

**Section 4.9.**      **Counterparts.**  This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.

[The remainder of this page left intentionally blank.]

**IN WITNESS WHEREOF**, this Escrow Agreement has been duly executed as of the date first written above.

[SURVIVING CORPORATION]


By:_____
    Name:
    Title:

[REPRESENTATIVE]


By:_____
    Name:
    Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION


By:_____
    Name:
    Title:

## EXHIBIT A-1

### CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of [Surviving Corporation] and are authorized to initiate and approve transactions of all types for the Escrow Account[s] established under the Escrow Agreement to which this Exhibit A-1 is attached, on behalf of [Surviving Corporation].

Name / Title                                          Specimen Signature

_____                    _____
Name                                                    Signature

_____
Title

_____                    _____
Name                                                    Signature

_____
Title

_____                    _____
Name                                                    Signature

_____
Title

_____                    _____
Name                                                    Signature

_____
Title

## <u>EXHIBIT A-2</u>

## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signature[s] shown below is[are] the specimen signature[s] of the individual[s] who has[have] been designated as the authorized Representative of the Stockholders and is[are] authorized to initiate and approve transactions of all types for the Escrow Account[s] established under the Escrow Agreement to which this Exhibit A-2 is attached, on behalf of the Stockholders.

Name / Title                                        <u>Specimen Signature</u>

---

Name                                                Signature

---

Title

---

Name                                                Signature

---

Title

---

Name                                                Signature

---

Title

---

Name                                                Signature

---

Title

## EXHIBIT B

## FEES OF ESCROW AGENT

**Acceptance Fee:**                                                      **$TBD**

Initial Fees as they relate to Wilmington Trust acting in the capacity of Escrow Agent – includes review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s). **Acceptance Fee payable at time of Escrow Agreement execution**

**Escrow Agent Annual Administration Fee:**                             **$TBD**

For ordinary administrative services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check processing); monitoring claim notices pursuant to the agreement; disbursement of funds in accordance with the agreement; and mailing of trust account statements to all applicable parties.

*Wilmington Trust's bid is based on the following assumptions:*

- Number of Escrow Accounts to be established: One (1)
- Est. Term: 15 months
- Investment in M&T Deposit Products

**Out-of-Pocket Expenses:**                                             **Billed At Cost**

## EXHIBIT C

### Agency and Custody Account Direction
### For Cash Balances
### Manufacturers & Traders Trust Company Deposit Accounts

Direction to use the following Manufacturers & Traders Trust Company (also known as M&T Bank) Deposit Account for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit C is attached.

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from time to time, all cash in the Account in the following deposit account of M&T Bank:

### M&T Corporate Deposit Account

I acknowledge that amounts on deposit in the M&T Bank Deposit Account are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $250,000 per depositor, per issued bank. This includes principal and accrued interest up to a total of $250,000.

I acknowledge that I have full power to direct investments of the Account.

I understand that I may change this direction at any time and that it shall continue in effect until revoked or modified by me by written notice to you.


_____          _____
Authorized Representative                 Authorized Representative


_____          _____
Date                                      Date

**Annex I**

### CLAIMS NOTICE

Wilmington Trust, National Association

_____

Attention:

Re:  [escrow account name]

   Your escrow account no. _____

Ladies and Gentlemen:

The undersigned, pursuant to Section 1.3(a) of the Escrow Agreement, dated as of _____, 20___, by and among [Surviving Corporation] (the "Surviving Corporation"), [Representative], in its capacity as Stockholders' agent under the Merger Agreement (the "Representative") and [Escrow Agent], as escrow agent (the "Escrow Agent") (the "Escrow Agreement") (terms defined in the Escrow Agreement have the same meanings when used herein), hereby certifies that the Surviving Corporation [if applicable, on behalf of _____] is or may be entitled to indemnification pursuant to Section ___ of the Merger Agreement in an amount equal to (a) $_____ (the "Claimed Amount") plus (b) interest accrued thereon.  The Surviving Corporation further certifies that the nature of the Claim is as follows: [_____].

Unless you receive a timely Response Notice (as defined in the Escrow Agreement) from the Representative in accordance with the Escrow Agreement, you are hereby instructed to release and pay, in accordance with the Escrow Agreement, the Claimed Amount and the interest accrued thereon from the Escrow Account to [_____] (for payment by such parties to _____) by method of [include wire instructions / check].

Dated:_____, 20___.


_____ **[Surviving Corporation]**


By:_____
   Name:
   Title:


cc:    Representative

**Annex II**

### RESPONSE NOTICE

Wilmington Trust, National Association

_____

Attention:

Re: [escrow account name]

Your escrow account no. _____

Ladies and Gentlemen:

The undersigned, in its capacity as Stockholders' agent under the Merger Agreement (the "Representative"), pursuant to Section 1.3(b) of the Escrow Agreement, dated as of _____, 20___, by and among the Representative, [Surviving Corporation] (the "Surviving Corporation"), and [Escrow Agent], as escrow agent (the "Escrow Agent") (the "Escrow Agreement") (terms defined in the Escrow Agreement have the same meanings when used herein), hereby:

(a)     concedes liability [in whole for] [in part in respect of $_____ of] the Claimed Amount (the "Conceded Amount"), plus interest accrued thereon, referred to in the Claims Notice dated _____, 20___ pursuant to Section ___ of the Merger Agreement; [and] [or]

(b)     denies liability [in whole for] [in part in respect of $_____ of] the Claimed Amount referred to in the Claims Notice dated _____, 20___ pursuant to Section ___ of the Merger Agreement.

Attached hereto is a description of the basis for the foregoing.

Dated:_____, 20___.


_____, **as Representative**


By:_____
   Name:
   Title:


cc:     Surviving Corporation

**<u>Annex III</u>**

## CONCEDED AMOUNT NOTICE

Wilmington Trust, National Association

_____

Attention: _____

Re:  [escrow account name]

     Your escrow account no. _____

Ladies and Gentlemen:

The undersigned, pursuant to Section 1.3[(b) or (c)] of the Escrow Agreement, dated as of _____, 20___, by and among [Surviving Corporation] (the "Surviving Corporation"), [Representative], in its capacity as Stockholders' agent under the Merger Agreement (the "Representative") and [Escrow Agent], as escrow agent (the "Escrow Agent") (the "Escrow Agreement") (terms defined in the Escrow Agreement have the same meanings when used herein), hereby jointly:

(a)     certify that [a portion of] the Claimed Amount with respect to the matter described in the attached in the amount of $[_____] (the "Conceded Amount"), plus interest accrued thereon, is owed to [_____]; and

(b)     instruct you to promptly pay to [_____] from the Escrow Property $_____ [insert amount pursuant to paragraph (a)] as soon as practicable following your receipt of this notice and, in any event, no later than five (5) business days following the date hereof.

Dated:_____, 20___.

_____ **[Surviving Corporation]**

By:_____
     Name:
     Title:

_____**, as Representative**

By:_____
     Name:
     Title: