# AUERBACH EXHIBIT 13

**Sara**: Alright, we can go ahead and get started guys. So hello and welcome to Midaxo's joint webinar with SRS Acquiom, A Better Way to Close: Payment and Escrow Solutions. This webinar is the first of many in Midaxo's M&A insight series. With this series, we invite prominent M&A practitioners and other M&A specific service providers to share interesting concepts and best practices with our community. In addition to bringing members of the M&A community together, Midaxo's core mission is to help thought leading companies improve their M&A process through digitization, executing Digital Playbooks, our customers reduce risks, focus on value creation, and eliminate manual work in disparate tools. The Midaxo platform supports the entire M&A process end to end from deal sourcing on to due diligence and through integration. My name is Sara Randall and I'm a marketing team member here at Midaxo. I am pleased today to introduce Alex Tsarnas, managing director of SRS Acquiom, as today's guest presenter. The webinar itself will go for about 30 minutes, with room for questions at the end. All attendees will be muted during the webinar, but your questions are welcomed in the chat feature of the go to webinar our panel at any time.  Today's webinar will be recorded if you'd like to access it later on and with that I'll hand the mic to Alex to kick us off.

**Alex**: Thanks, Sara, appreciate it.  Hi everybody, my name is Alex Tsarnas, and I lead business development and Acquiom administration for SRS Acquiom. I think in a spirit of streamlining the M&A process which is something both of our organizations are striving to do. I'd like to talk with you about a better way to close.  Specifically through our innovative payments and escrow solutions.

Just first a little bit of background on SRS Acquiom, we were established in 2007 to adjust pain points in M&A deals. Specifically and initially helping shareholders with the post-

closing process, which can be long and complicated. We're an organization of professionals with specialized M&A experience. Our team includes forensic accountants, attorneys, tax and IP specialists and has successfully achieved a 67% reduction in the value of thousands of contested claims on M&A deals post-closing. We've saved shareholders well over $400 million on those claims across all of the deals on which we've worked.  Since then we've become the global post-closing leader in private M&A with 1500 private M&A deals totaling a value of $248 billion, in which our professionals have addressed numerous types of claims and also numerous types of deal terms throughout. We've paid and work with over 135,000 shareholders across 100 countries through our Acquiom payments administration, we've paid $45 billion to shareholders over that time.  This really is giving us a unique perspective, which also enables us to bring continuous innovation to our clients and to the M&A industry. We don't do anything in our company unless we think it's going to be additive into the M&A process and really solves an inefficiency that that exists.

A general overview of our services, 3 main lines, well actually have 4 main lines of business, shareholder representation as I just discussed, and more recently, 3 business areas that address the growing M&A inefficiencies and issues in the industry.  First is M&A payments administration. Throughout our history, and evolution of products, we've received feedback from our clients about the things that they just don't like about the M&A process pre and post-closing. So after essentially inventing the category of professional shareholder representation, we'd often receive inquiries from our clients about how we could potentially pay the shareholders.  Is that something would be willing to do?  Could we facilitate that process? And developed our Acquiom payments administration business, which includes Acquiom Clearinghouse, which I will demonstrate to you later, which is the first and only online LOT presentment and payments

platform. We also developed Acquiom compensation payments, which provides a fully comprehensive payments platform that allows us to not only deliver payments of merger proceeds to shareholders, payments to vendors at closing, but also allows us to deliver all types of payments that are sort of non-traditional, including management incentive payments, option holder payments, and things like that.  So we're really the only provider that can do everything for the parties in terms of making all of those payments at closing and post-closing.  And then, lastly, we developed our escrow solutions. One of which I'll talk about today, which is called Escrow Shield Plus.  It's a proprietary escrow option that we've developed with our partners at AXA Insurance, which is designed to solve the problems associated with some of the new banking regulations that have impacted money funds and, those regulations are also making traditional banking relationships more challenging for clients in various ways. But most importantly about Escrow Shield Plus is that we've developed a proprietary escrow solution that really focuses on how M&A Escrows behave, not how banks traditionally look at them, which is as overnight money, which isn't necessarily the best way to look at and invest those escrow proceeds.  And then lastly, we recently introduced our brokerage capability for representations and warranty insurance. And where we differentiate on that front is having been involved in over 1500 private target M&A transactions and dealing with both deal terms and claims associated with those, that really allows us to deliver precise recommendations on transactional insurance policies for our clients.

     Moving on to the meat of the presentation, so let's talk about 5 easy ways to foul up M&A payments, and I realized that many of you may be listening to this thinking, how hard could it be to foul up an M&A payment?  But believe me, it's actually a common problem and why we've had so much success in this space because the traditional paying agents aren't really

completely focused on making sure that the process runs smoothly nor are they focused on getting the shareholders paid as quickly as possible.

So if we focus on bureaucracy. Let's just, let's start with traditional paying agents can take many days and even weeks to distribute funds. That's often because the LOT process isn't efficient with things. When it's a paper based process, there's an inspection that has to occur to the LOT, payment instructions have to be verified, W-9s need to be verified, and all of that can take a lot of time when it's being handled by a traditional banking administrator in an operations group, who may not be able to read what's been written, comparing signatures, validating information. All of that can be very problematic, so our solution to that was putting the whole process online to take, one, the potential in accuracies that exist out of the process, but also, to speed up the process and to make it much more of a self-serve process that has built-in security features that are appealing to both buyers and sellers.

Stock certificates and paper closing. So eluded to this, but the 20th century process still dominates the market. And what that process essentially is is: the LOT get mailed out to the shareholders, shareholders review them, they're required to complete certain information, complete other forms, send those back, typically to the law firms, who then evaluate them and prepare payment spreadsheets, that then get sent to the banks for payment for the parties. And the banks also generally require all of that tax information to be sent to them as well so they can verify that they're actually paying someone that's filled out a W-9. Well it's a 20th century process because through our outside legal opinion and under UCC 8-207, we've determine that buyers can rely on the company cap table for making payments and there really is no need to collect certificates. So without the need to collect certificates and the ability to put the LOT process and the tax information collection process online, along with collecting the payee bank

4

account information online, we can now expedite that process that has traditionally been mired in paper processing.

So the next issue that generally comes up, that's an inconvenience for the parties is compensation payments. So traditional paying agents do not offer management incentive payments or bonus participants the ability to pay. It's usually done by buyers. Buyers hate to keep track of people that are getting a one-time payment. They generally experience a high cost of adding those people to their payroll for one-time payment, and have been looking for a solution to that problem. Also, the tax reporting for compensation payments is complicated and time consuming and because we focus on this issue in particular, we've solved the complexity of the tax reporting through automating the process. And we've also taken the burden of this away from the buyer, who no longer has to worry about dealing with these compensation payments for people that really are never going to be on their payroll because they're not part of the company that they're acquiring through M&A process.

Administrative fees and bad service, I mean, I think we all know that getting trapped in the sort of large, corporate machine can be painful and potentially expensive. Banks typically charge upfront and annual fees to the dismay of deal parties, and service levels do leave a lot to be desired because banks do this business generally as an accommodation rather than as a specialty and at SRS Acquiom the business is a specialty. We pride ourselves on the speed and accuracy of our service and frankly the knowledge of all of my colleagues who are completely dedicated to the M&A business.

Lastly, some of the escrow investment dilemmas that have arisen through banking regulations. The breakdown of escrow investments over the years has typically been some percentage over 50% of the escrow deposits were put on bank balance sheets and invested as

5

overnight money with low rates of return. Some use government funds for the security of those funds and then others use prime money market funds as a means of a potentially generating higher returns on the escrow deposits for the benefits of the parties. But through the Dodd-Frank banking reforms, prime money funds are no longer an option, simply because the floating NAV requirement that was implemented by the SEC has changed the dynamic of the viability of that investment.  And what I mean by that is, used to be, when you put a dollar into a money market fund you knew that whenever you need it to pull that money out, you'd still have a dollar. Now, with a floating, daily floating NAV you may put in a dollar today, and in 2 days pull out 98 cents, and the merger parties have to deal with that. You know, if there is a payment that needs to be made to the shareholders, or a claim that needs to be paid, and the full value of the escrow isn't available, one side or the other has to absorb that, and that makes investing in prime money market funds untenable for the parties at this point.  And then lastly, most escrow banks are still offered merger parties low returns on escrow deposits.  When you think about the economics that are potentially available through the returns of the ESP investment, you then realize how valuable interest can be on a transaction.

So prior to going into a demonstration of Acquiom Clearinghouse, I'll just highlight a few of the benefits for the shareholders and the buyers.  So it's fast: payments get completed more quickly because the process is automated and once we have completed records through the platform we can pay the shareholders immediately.  The experience is streamlined: the risk of error is reduced because people are manually entering online their information and there's no handwriting that's open to interpretation. No paper or physical mailings required so that saves time as well, and lastly no stock certificates are required.  If a shareholder has misplaced their certificates, oftentimes banks will charge for a surety bond to be purchased in order to validate

that there's actually, that they have some recourse at the shares were misplaced or presented by another party.  And because of the way that we do it and take the information directly from the cap table of the selling company, there's no need to have the physical stock certificates when someone logs into the online payments platform. For buyers we pride ourselves on a fast KYC and account opening process. We provide daily, if required, paid-unpaid reporting instead of two which shareholders have been paid and which haven't, which gives them some guidance. And then lastly, we talked about compensation payments that we can do through our platform for option holders, carve-outs, bonus, and all the related tax reporting that goes with it.

So from here I am going to switch us into the demonstration of platform and start the process.  So just a couple of things here. For shareholders, whether this process is started pre closing or at closing, we will send a unique URL to all of the shareholders. We obtain that information through the cap table. We load the cap table information into our platform and we are able to then send that unique URL to each individual shareholder, so that there's no duplication and they know that we know that the link that they're getting is specific to them and their specific holdings.  Our Acquiom relationship managers typically guide the parties through the process ahead of the solicitations so they know what to expect. The shareholders are never more than 2 clicks away from any help that they may need. If you see up here the "need help" button, the various forms of help that are available, including the ability to contact us either directly in our offices in Denver or via our email support: all of our folks are very well versed in the platform and extremely responsive to all shareholder inquiries. So let's start the process. We're going to assume we've got our link here and I'm clicking start.

What happens here is at this point, the shareholder is required to enter a certificate number.  Now, what that certificate number is linked to is their shareholdings on the back end in

7

the cap table. So if I know one of my certificate numbers and I enter it into the screen, it will then bring me into the second step of the authentication login process. Which is where I select the number of shares for my holdings and I'm going to click that because I know that that's the right number of shares for my holdings and then when I see here: a number of choices to select the name of the holder. None of these names are holders of the same company, this is just meant to be a check and balance to ensure that the person that's logging into the system knows who they are in the event that that link was erroneous.

So moving on we now see that in the second screen. We're verifying in submitting our holding selections. So the system is connected. The fact that I have certificate number 4, the number of shares associated with it, the registered holder name, and if I'm in agreement with everything that I see on the screen here, I will click continue.

And I'm now creating my account online. One thing that I should mention for institutional investors is that, if you logged in because you are a venture capital or private equity firm that's been paid through the platform before, you're able to reuse the information, including your, obviously, email and password that may have been used in a previous deal where you've been paid, to log into the platform again. You don't have to remember your username and password, but for the purposes of being an individual user at this point, I'm going to do that. And I've met all the criteria as you can see the check boxes there and continue.

At this point I have to enter a phone number to receive authentication, to receive a code that allows me to authenticate that I'm the user. And let me just do that. So I'm going to input my mobile number and click send code.  And, again, if you're someone that's already logged into the platform before, a returning user, this allows you to it will automatically send you the code so that you can log in.

8

And I'm entering my code now that I've just received via text. I think I got it right and I'm submitting here.

OK, so the system is now processing and now I've validated and authenticated myself and now I'm going to actually start the process. Typically, this process takes between 5 and 8 minutes to complete, as opposed to doing it the old fashioned way.  So I'll click get started and validate my total number of holdings.

So if you see here, I initially indicated that my certificate number was 4 as a means of logging in. It has now, because of the linkage on the cap table, identified all of the shares that I'm holding on this screen and I'm able to proceed if I say that this is correct.  So I look and see that the number of shares is correct. I then go down to the contact information and validate that I am who I say I am and if the information in the system is correct.  I'm going to input any required fields that may be blank with my information here, and save that information.  As I save I can scroll down and move on to the next part of the process, which is entering tax information. One of the most challenging issues for first time users of the platform is understanding what tax form they actually fill out because if you look at the drop down menu, it indicates that there are a bunch of different kinds of they can complete.  If you use our hover over here, it just identifies to select form W-9 if you're a US citizen or other US person, because that is generally 90% of the users that will be logging in to do this process. So I'll do the same by selecting form W-9. I will input my fake social security number and indicate that I'm an individual. And at this point, I'm going to click on sign and the system will take me into the process of completing an actual electronic version of a W-9. Sorry, this is taking longer than expected. Which is typical for demonstrations that, no matter how much you plan on plan ahead, there's always a little bit of a technical glitch. But, I think we're past it.

OK. So now you'll see a form W-9 and it will prompt you to, as you click start, it will prompt you to complete fields that you may need to complete. Not all of them are required: if you actually read what the sections say, in this particular case section 2, which is the business name, disregard entity name if different from above, so we're going to just click through that, go to the next section. Not anything I need to complete, again not anything I need to complete, but just in case I did I would be able to complete it, and then I click here to sign.  So at this point I will enter my name, click apply, enter my email address, and at the bottom once I've completed that it prompts me to click to sign here.

So now that tax form is being completed and that satisfies the requirement of having a W-9 on file that's properly completed in order for us to make the payments to the shareholders at closing. I referenced before that, often times, when these forms are sent to financial institutions, they will typically reject them if there are any cross outs or other inconsistencies, and you know elongate the process, they may mail back to the shareholder and say, please complete another one, or give it to the sell-co to handle, and that really delays the process of people getting paid. But when you do it this way, it's done and dusted, and you can move on.  For payments instructions we offer ACH direct deposit to shareholders for free. And then the other options that are available are wire transfers and paper check.  So I'm going to fill out the information to complete a direct deposit. I'll say it's a consumer checking account.  Enter the ABA number. Validate that that is the right financial institution, and then I'm going to enter my bank account and click save.

At this point my banking information has been saved so it's now stored the proper information to make an ACH payment to me on the day of closing so when closing happens I will likely get paid the next business day because I selected ACH, but had I selected wire

10

transfer, I'd receive a wire transfer in the day of closing.  Next is the process of signing and submitting the letter of transmittal. But I didn't verify my holdings, so I'm going to go back, the system told me that I failed to make that confirmation, which I've now done, and I will now go to the LOT.

So what you're about to see is a fully populated letter of transmittal. The legal text is fully customizable to your transaction, and essentially this is prepared for the selling shareholders. You can see all of the information that's in the letter of transmittal.  This form also includes validation of the other information that we included earlier, which will be that address information, my holdings, and then any information I included on my payment: that I've authorized direct deposited of ACH, and my banking information, and all that.  So you can see that that's all included in this one document, the document can be downloaded and printed, if you prefer to store it that way, or just saved as a PDF.

So I'm going to click on the start button and it'll take me to where I need to sign and much like the process of signing the W-9, I am now going to complete that process. And then spell my name correctly, apply, and then enter my email address again. OK, and at this point, I'm clicking to sign. So now the information is being saved.

And I've completed the process. So essentially what I've done here in this 5 to 8 minutes is validated my holdings, completed the W-9 form, input my payments instruction, and signed off on the letter of transmittal that essentially allows me to receive the merger proceeds in exchange for my shares, and I'm done.  If I've completed this process because the company may have solicited before the merger closed so that everybody would be completed with the process or could be completed with the process before the closing date, then this all takes effect on the closing date, and as I mentioned earlier, if you selected a wire transfer you're going to get paid on

the day of closing, if you selected in ACH likely the day after closing, which is, from my experience being a former banker who worked in this industry I can tell you that, that's much, much faster than is typical. So I think it's safe to say that you know when people have the Clearinghouse experience they're generally pleased at how streamlined and quick it is. We've been doing many, many more deals with serial acquirers throughout the industry, most recently, we, well not most recently but one of the larger deals that we've done more recently was the Symantec acquisition of BlueCoat, which included 600 holders and the majority of those holders were paid on the day of closing. So it really is a better way to close and a more efficient way for all the shareholders to get paid. And for the buyers, to have their sellers, the sell-co have a really good relationship, a good experience rather, for their transaction. So now I'm going to switch us back to the presentation.

And. Just a cover our proprietary escrow option briefly, Escrow Share Plus. So a couple of things to talk about here. ESP is specifically designed for private M&A. So we've combined principle protection with a professionally managed portfolio to extract enhanced returns from this escrow investment. It's as easy to select as any other bank account. There's an escrow agent that's wrapping the investment so the fiduciary role is still intact and it's just an escrow investment that takes into account how M&A escrows really operate. The tenure that they are typically on the books and that they don't need to be managed as overnight money. But with that, said, there's full liquidity to pay claims whenever required. The way it works, the way the principle protection works, is that funds are held in the funds are held in a separate account and not subject to the claims of other creditors on the books of AXA. The separate account holds the collateral that backs the escrow investment. And the guarantee of return of principal and accrued interest are backed by AXA equitable as well. So, essentially, the securities that are used to

collateralize the escrow investment generate a return, which outperforms traditional financial institutions and the merger parties get the benefit of that outperforming interest.

A kind of an example that's useful often times to put the value of the interesting perspective: when you think about a 25 million dollar escrow for 18 months running 65 basis points. That's 243 interest, 243 thousand dollars in interest, that can be used to do all of the following: so enhance the deal value in goodwill for sellers because now they're going to be earning 243 thousand dollars, which is, you know, if you think about what banks are typically offering with somewhere in the neighborhood of 5 to 10 basis points that significantly more interest earnings and benefits of the parties. It increases the size of the escrow fund during the escrow period, so in the event that there is some significant claim, this interest actually provides a little bit more of a buffer within the escrow. You can use that interest, the parties can agree to cover extra payment administration fees with that, interest so that it winds up being a no cost transaction for payments in escrow, potentially cover the excess of rep and warranty insurance fees if that's part of the deal, and then any other transaction expenses that may be useful to cover with what is a significant dollar amount based on a much higher interest rate than is generally provided by banks and traditional escrow products.

That's the presentation that I wanted to share with you today. I do want you to just take a look at this slide and see some of the deals on which we worked and who are representative clients are. A lot of significant transactions and many serial buyers and institutional investors that have worked with us as both buyer and seller.

And then lastly I'd like to call your attention to our studies, some of which we're very well known for, including our life sciences claims and deal terms study. Those are available on

our website highlighted on this page, along with other white papers and newsletters that we've developed for our clients to take advantage of.

So with that I'm happy to open it up to questions to anyone in the audience.

**Sara**: Thank you so much Alex this is Sara coming back in for you, we've actually collected a few questions that come up in conversations with your prospects and customers as they relate to the M&A escrow and shareholder payments. The first one I've got here for you: How are you able to get shareholders paid as quickly as same day?

**Alex**: So good question. Because we use the online payments platform and collect the W-9 and banking information from the shareholders either before or at closing, once the closing proceeds are transmitted from the buyer to the seller's account or to the paying agents account that says we have that information and we can just forward on the payments to the respective parties immediately because we have everything we need at that point to make those payments.

**Sara**: Great. It makes sense. Next one up for bid then, let's see question 2: how have regulations eliminated prime funds as a viable escrow investment and what are the off balance alternatives?

**Alex**: So that's a good question. Essentially not to get to technical about this but there was a money market rule 2A7, which was modified in October of 2016 as a response to the financial crisis of 2008. And essentially what the rule change says is that prime money market funds can no longer maintain an artificial NAV of a dollar. When I talked about this a little bit before, but the kind of layman's version of this is that prime funds, which held trillions of dollars in

14

corporate assets, including escrow deposits, overnight became unusable for most of their traditional purposes because the risk of now putting certain types of funds into a prime fund that wasn't holding that stable net asset value made it an option that wasn't allowed by most corporate investment policies and certainly in merger transactions by merger parties that wouldn't want to take the risk that they may have an underfunded escrow in the event that there was a claim or final disbursement that needed to be made to the shareholders. So one of the alternatives in this space is to use treasury funds, which are used, but not that widely. I think clients that had traditionally used bank deposits are still in bank deposits, but for the 25% or so that used to use prime funds, they're still trying to figure out an escrow investment that will generate a return like prime funds used to do, but also has the safety and, with ESP we definitely have covered the safety angle, belts and suspenders, as well as the return angle, based on the example that I showed earlier.

**Sara**: Wonderful.  Thank you.  Follow up for you here: don't traditional demand deposit accounts offer full principle protection?

**Alex**: They don't.  Bank FDIC insurance only covers the first $250,000, so considering that average escrow is somewhere in the neighborhood of 11 million dollars people would be pretty disappointed if a bank fails. That's not necessarily something that would have even been on our radar before 2008, but it's something that merger party should be thinking about.  You know, depending on the relationships that they have, that any escrow that they put on a bank balance sheet is only covered for up to $250,000. So you know being responsible, you want to think about the rating strength of the financial institution that you're using, and again going back to

AXA, their a AA minus rated financial institution, one of the largest insurance companies in the world, and very much a conservative financial institution, so because ESP is guaranteed with the collateral backing insurance cap, we don't run into that issue. But it's definitely a risk, albeit a small one, to put your escrow deposit into a traditional bank account.

**Sara**: Thanks Alex. I've got one here from the audience from Maurice. He asks: I saw the file was set up for use in the United States, is it also usable in Europe or any?

**Alex**: I'm sorry, Sara could you ask that question again? You broke up just a little bit.

**Sara**: Sure, so question from Maurice. He says: saw the file was set up for the US, is it also valid for Europe?

**Alex**: Good question. It isn't currently but it will be at some point this year. So we already make payments to shareholders in foreign currency, but that is a process that we do offline, but we're aiming to have that process moved to the online process at some point in 2017.

**Sara**: Great. Thank you. One here also from the audience from Hunter: is Escrow Shield Plus a separate product from Clearinghouse? I.e., can we fund a distribution to shareholders at closing and if the deal terms so required, hold escrow somewhere else?

**Alex**: That is a possibility, but there's an inherent efficiency towards having the escrow payments provider be the same party. I realized that sounds like a self-serving comment, but it but it's also

16

true because we are able to manage the disbursement of the funds at different points in the payments process, whether it be at closing and then maybe 90 days later for a subsequent working capital release, any other payments that need to be made. Many deals have earn outs that may stretch on for a number of years and if we, as the payments administrator, also hold the escrow funds, then we can effect those payments immediately. Oftentimes, the escrow agents are slow to respond to requests for disbursements to the payments administrator and that could delay payments reaching the intended recipients.

**Sara**: Great.  Thank you Alex.  I think we might have another here see from John: what is the process for resolving discrepancies between the cap table information and the information that gets populated by the shareholders in the Clearinghouse? On a related point, what happens if a shareholder puts in bank account info that doesn't match up to the cap table? He says in that situation traditional banks require a medallion guarantee.

**Alex**: So great question. In the event that there is a mismatch or that the information that is on the cap table that's validated and then loaded into Clearinghouse doesn't match up properly with the shareholder, we will then institute a manual process, contact the shareholder. In the event that we need to get a medallion guarantee, we can facilitate that process between the shareholder and the sell-co to make sure that we handle that so that that shareholder can get paid as quickly as possible.  But that does happen, there are situations where certain information needs to be validated and in order to do that we have to take the process offline. But we do that on an individual high touch basis with their shareholders in order to see that they get paid as quickly as

17

possible, while providing the information that we need to validate any discrepancies, either with their holdings, names, married names, all of those things that can come up on a regular basis.

**Sara**: Thank you.  Wonderful.  I think I've got room for let's say one more here: How can escrow … how many escrow options offer higher returns and minimize risk at the same time?

**Alex**: It's a good question because people usually equate higher risk with higher returns, but you have to remember that we're comparing, in the case of Escrow Shield Plus, we're comparing it to a bank managed overnight deposit.  So the short answer to that question is that ESP matches the escrow deposit with high quality liquid assets, securities that are considered high quality liquid assets, which maybe treasuries, certain rated commercial paper, or certain rated bonds, and so while all of those highly rated securities are matched to the dollar value of the escrow, they generate a return that's generally higher than cash sitting in a bank account.  So, the escrow is collateralized with those securities, which provides a layer of protection.  There's also an insurance rap that's purchased with some of the return that's generated by those securities. And then the remainder is paid to shareholders in the form of higher returns. So that's how it's done: the securities generate interest, the collateralizing securities generate interest, paying for an insurance rap, providing the return, and also being sort of first in line in the event that there is a need to liquidate those securities in order to fulfill the escrow obligation.

**Sara**: Perfect. Thank you very much Alex.  It's been a pleasure hearing you present and I want to also thank all of our guests for attending, asking questions, keeping us on our toes, so to speak, as it relates to today's topic.  I'll let you all know will have more webinars for you to enjoy in the

coming months and we of course, welcome you to join us as their announced. We also welcome feedback on our webinars to be continued to provide interesting insight as it relates to M&A and if you have any feedback we welcome you to send that actually at team@midaxo.com. Alex, if you actually won't mind transitioning to our next shared slide, here.

Want to give people contact information for either of us. Perfect. Thank you so in closing to get personalized demonstration of either Midaxo or SRS Acquiom solutions for your business, please visit either of our websites or give us a call using the provided info you see here.  And I just want to say thank you again and we hope you have a great rest of your day.

**Alex**: So long and thanks everyone for joining.

**Sara**: Thank you.

19