# EXHIBIT H

Case No. 1:19-cv-02005-DDD-SKC   Document 173-3   filed 01/27/20   USDC Colorado   pg 2
of 21
Case 2:12-cv-08688-GW-JEM   Document 67   Filed 12/27/12   Page 1 of 20   Page ID #:949

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-8688-GW(JEMx) | | Date | December 27, 2012 |
|---|---|---|---|---|
| Title | *Goodness Films, LLC, et al. v. TV One, LLC, et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Kane Tien | Wil Wilcox | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Martin J. Barab | Thaddeus J. Stauber |
| | James T. Ryan |
| | Bassil Hamideh |
| | Michael O. Azat |
| | Sarah E. Andre |
| | Neville L. Johnson |

**PROCEEDINGS:**    **DEFENDANT TV ONE, LLC'S RENEWED MOTION TO DISMISS
OR TO STRIKE (filed 11/29/12)**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (filed
11/19/12)**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's final ruling. The Court **GRANTS IN PART/DENIES IN PART** Defendant TV One, LLC's motion to dismiss. The Court would **DENY** Plaintiffs' application for a preliminary injunction.

Plaintiffs shall file and serve a second amended complaint by January 22, 2013. The motion to dismiss hearing is set for February 28, 2013 at 8:30 a.m. Parties may stipulate to the briefing scheduling, except the reply, which will be filed by noon on February 19, 2013. Defendants' Nunez (Dkt. 58) and Weinberger's (Dkt. 56) motions to dismiss, set for January 10, 2013 are hereby **VACATED.**

For reasons stated on the record, Declarations of Kennedy Goldsby (dkt. 22), Paul Goldsby (dkt. 23), and Ciarra Carter (dkt. 25 and 27) are hereby ordered **SEALED** until further notice by the Court.

|  | : | 28 |
|---|---|---|
| | Initials of Preparer | KTI |

**_Goodness Films, LLC, et al. v. TV One LLC et al._**, Case No. CV-12-8688-GW(JEMx)
Tentative Rulings on: (1) Defendant TV One's Motion to Dismiss Pursuant to Fed. R. Civ. P.
12(b)(6) and Motion to Strike Pursuant to Fed. R. Civ. P. 12(f); and (2) Plaintiffs' Motion for a
Preliminary Injunction.

***\*\* This tentative ruling has been distributed only to the parties.  Some of the documentation
submitted in connection with these motions was filed under seal.  Should either party wish this
tentative ruling redacted so as to maintain the confidentiality of sealed material, such request
must be made to the Court at the hearing.  Otherwise, this ruling will publicly docketed.\*\*\****

## I. Procedural Background

Goodness Films, LLC ("Goodness Films") and individuals Herbert Hudson ("Hudson"),
Paul Goldsby and Kennedy Goldsby (collectively "Plaintiffs") filed suit on October 10, 2012
against TV One, LLC ("TV One") and individuals Miguel A. Nunez, Jr. ("Nunez"), Edwin B.
"Ed" Weinberger ("Weinberger") (collectively "Defendants") asserting a copyright infringement
claim and eight state law claims.  Docket No. 1.  Plaintiffs filed a First Amended Complaint
("FAC") on November 27, 2011, alleging additional state and federal claims such that the FAC
contains fourteen purported causes of action: (1) copyright infringement; (2) vicarious liability
for copyright infringement; (3) contributory copyright infringement; (4) breach of implied in fact
contract as against Defendants Nunez and Weinberger; (5) breach of implied in fact contract as
against Defendant TV One; (6) injunctive relief; (7) unfair competition; (8) breach of fiduciary
duty; (9) aiding and abetting breach of fiduciary duty; (10) conversion; (11) misappropriation of
intangible personal property; (12) misappropriation of corporate opportunities; (13) interference
with prospective business advantage; and (14) declaratory relief.

Before the Court now is Defendant TV One's motion to dismiss the FAC for failure to
state a claim pursuant to Fed. R. Civ. P. 12(b)(6), as well as Plaintiffs' motion for a preliminary
injunction.[1]  These motions present close questions, as well as overlapping issues.

## II. Factual Background[2]

Plaintiff Hudson founded the "iconic Southern California-based soul food restaurant"
Roscoe's Chicken and Waffles ("Roscoe's Restaurant") in 1975.  FAC ¶ 13.  In 1999, Hudson
and Plaintiffs Paul and Kennedy Goldsby allegedly "began developing the idea to turn the
legendary story of Roscoe's into a comedic television series or feature film."  FAC ¶ 17.  Those
discussions led to the production of a feature film entitled Roscoe's House of Chicken and
Waffles (the "Roscoe's Movie"), which was a "rags-to-riches" tale "loosely based on the true
story of the history of Herb Hudson and the Roscoe's House of Chicken and Waffles

---

[1]Defendants Nunez and Weinberger have joined in TV One's motion.  Docket Nos. 55, 57.

[2]The Court draws the factual summary from the FAC for ease of reference, but notes that the declarations
submitted by Plaintiffs in support of the preliminary injunction motion largely track the allegations of the FAC.

restaurants." FAC ¶ 18.[3]  Plaintiff Kennedy Goldsby wrote the screenplay for the Roscoe's Movie, and "began to undertake research in preparation for writing this script" in 1999. FAC ¶ 18. That same year, Defendant Nunez auditioned for a role in the Roscoe's Movie, but was not cast. FAC ¶ 19.  The Roscoe's Movie was released in 2002, and was re-released in 2004. FAC ¶ 20.[4]

   In 2004, Plaintiffs discussed the possibility of developing a television series (the "*Roscoe's Show*") which was "conceived as a situation comedy set at Roscoe's, and centering on the restaurant, its memorable employees and the interactions among the unique people who work and dine there." FAC ¶ 21.  Kennedy Goldsby was "slated to write the pilot for the *Roscoe's Show*," and as such spent six months to a year conducting "extensive background research" in the form of weekly visits to four Roscoe's Restaurant locations in 2005. FAC ¶ 22.  That same year, Plaintiffs "began actively seeking to identify and engage the right industry insiders for involvement" with the *Roscoe's Show*, and in particular met with "numerous potential co-executive producers" with whom "it was orally agreed" that if any were successful in finding a writer, actor, network or other participant and "getting such persons actually involved in the project, that individual would become eligible for a co-executive producer credit." FAC ¶¶ 23-24.

   It was also around 2005 that Plaintiffs approached Defendant Nunez about the *Roscoe's Show* and eventually cast him to play the role of Darell, "the simple-minded restaurant employee whose mishaps tend to wreak havoc on his employer." FAC ¶ 26.  Nunez introduced Plaintiffs to Defendant Weinberger, who they envisaged would serve as a writer for the Roscoe's Show.  FAC ¶ 27.  Kennedy Goldsby meanwhile allegedly "worked continuously and diligently to draft the pilot script" for the *Roscoe's Show*.  FAC ¶ 29.  Hudson, though, rejected multiple drafts because he was "significantly concerned with protecting the goodwill, name, and reputation of the Roscoe's [Restaurant] brand which he had carefully cultivated for decades[;]" but in 2007 Hudson approved a pilot script, a character bible, and "treatment" providing a synopsis of the *Roscoe's Show* (collectively the "*Roscoe's Show* Materials"). FAC ¶¶ 29-31.  Defendant Nunez allegedly had access to all three documents of the *Roscoe's Show* Materials.  FAC ¶ 33.

   During 2009-2012, Plaintiffs allegedly "made substantial progress in locating and securing individuals who would work both in front of and behind the cameras in bringing the show to its potential audience." FAC ¶ 36.  In 2009, for instance, over five hundred actors auditioned at casting sessions, and almost all of the roles were cast, including non-party Ciarra

---

[3]In 2009, Paul Goldsby and Hudson formed a television production company, Plaintiff Goodness Films, to which they assigned the rights to both *Roscoe's Show* and "all rights to use the Roscoe's House of Chicken and Waffles name," as well as the registered copyright. FAC ¶¶ 34, 71; Docket No. 65-1, Ex. A (assignment).  For ease of reference the Court will refer to "Plaintiffs" collectively unless discussing the actions of one or more particular individual Plaintiffs.

[4]Plaintiffs correctly note that the contents of the Roscoe's Movie are irrelevant to the instant dispute, because the "Complaint does not allege at any point that Defendants' work infringes upon the Roscoe's movie." Docket No. 53 at 15-16. Defendants submitted a copy of the film to the Court presumably to demonstrate that it is dissimilar to *Belle's* – the alleged infringing television show, *see, infra* – (*see* Docket No. 39-1 at 8 n.5; Defs.' Req. for Judicial Notice, Docket No. 40-1, Ex. A (movie)), but the Court agrees with Plaintiffs that the movie has no bearing on whether *Belle's* infringes upon the copyright Plaintiffs hold as to the *Roscoe's Show*, intended for television audiences.

Carter ("Carter") in the role of Wanda, an "opportunistic bombshell." FAC ¶ 39c. Defendant Weinberger attended some casting sessions and was "given, on various occasions, copies" of the *Roscoe's Show* Materials, and he ate and took notes at the restaurants many times during 2009 and 2010, often allegedly staying late at the restaurant after meetings concluded to make observations. FAC ¶¶ 40-41. Defendant Weinberger also had detailed discussions with Plaintiff Kennedy Goldsby concerning the script. FAC ¶ 43.

Meanwhile, Plaintiffs Hudson and Paul Goldsby had formed a television studio, Hi Point Studios, where they intended to film the *Roscoe's Show*, but Plaintiffs decided to film a different show there instead from 2009-2011, which "delayed" the filming of the *Roscoe's Show*. FAC ¶¶ 35, 44-45. In the spring of 2011, Plaintiffs met with Defendants Weinberger and Nunez, amongst others, to discuss the setting for the *Roscoe's Show*; a suggestion was put forth that the show take place at a restaurant similar to "Harold and Belle's - an upscale restaurant located in Los Angeles, California, serving Louisiana-style cuisine" but Plaintiffs allegedly rejected this suggestion. FAC ¶ 46. Later in 2011, Plaintiffs identified Defendant TV One as the "ideal target for the premiering of the *Roscoe's Show*," and thus asked Nunez to "approach his connections" there to "present the project" to TV One "in pursuit of the advancement" of the *Roscoe's Show*. FAC ¶¶ 47, 49.[5]

Defendant Weinberger and Plaintiffs negotiated Weinberger's compensation around this same time, and Hudson "orally offered" to pay Weinberger $30,000 for a "polished version of the script[,]" but refused to give him an equity stake in the show, which Weinberger had demanded. FAC ¶ 50. Defendant Weinberger thereafter became "frustrated" with the lack of progress that was taking place as to the *Roscoe's Show*, and stated to Plaintiffs when Hudson was out of earshot that "[w]e don't need Herb Hudson, we could take this to TV One ourselves and I would write it for free." FAC ¶ 51.

It is at this point that Plaintiffs allege Defendants Nunez and Weinberger "agreed to implement a scheme to misappropriate" the *Roscoe's Show*, so as to create a comedy television show called "*Belle's*" which would have various similarities to *Roscoe's Show*, but would be set at a fictional eponymous restaurant in Atlanta, Georgia. FAC ¶ 52. In January 2012, Nunez informed Plaintiffs that he had a "new" show that had been "picked up" by TV One, but Plaintiffs assumed the comments were empty boasts and did not inquire into the nature of the show. FAC ¶ 54. Nunez then asked Hudson to invest in his new show; Hudson demanded to see the script but Nunez did not show it to him, and Hudson declined to invest. FAC ¶ 55. Nunez nonetheless allegedly spread rumors that Hudson was backing Nunez's "new" project for TV One, and that it would be filmed at Hi Point Studios. FAC ¶ 55.

In early 2012, Nunez told Paul Goldsby that he was casting his new show, but did not disclose the nature of it, and indicated that the new show needed a young actress with a southern accent; Goldsby suggested Carter, who had been cast as Wanda in the *Roscoe's Show*. FAC ¶ 56. Carter then auditioned for the part of Elese in the new show, which turned out to be *Belle's*. FAC ¶ 57-58. Nunez allegedly told Carter she "would be cast" as Elese in *Belle's*. FAC ¶ 58. At that point, Carter contacted Paul Goldsby and provided him with the audition materials for

---

[5] TV One is a television station that "targets African American adults with a broad range of programming," and the casts of both television shows are predominantly African-American. FAC ¶ 8.

Case No. 1:19-cv-02005-DDD-SKC   Document 173-3   filed 01/27/20   USDC Colorado   pg 6
of 21
Case 2:12-cv-08688-GW-JEM   Document 67   Filed 12/27/12   Page 5 of 20   Page ID #:953

*Belle's*, and stated that she found *Belle's* strikingly similar to the *Roscoe's Show*. At the same time, Plaintiffs began to see ads and announcements concerning *Belle's*, a show that was set to premiere in Fall 2012 on TV One "which would center around an African American-owned soul food restaurant," which had been developed and cast by Nunez. FAC ¶ 60. In June 2012, filming for *Belle's* allegedly began. The show starred Defendant Nunez as bumbling employee Maurice, just as he had been cast as bumbling employee Darell in the *Roscoe's Show*, and non-party Keith David was cast as the restaurant owner Bill in *Belle's*, whereas Mr. David had also been cast in the role of the restaurant owner, Sam, in the *Roscoe's Show*. FAC ¶¶ 39, 63.

In May 2012, Plaintiff Paul Goldsby and Defendant Nunez held a meeting at which Nunez allegedly "admitted that . . . *Roscoe's Show* and *Belle's* are essentially the same show, and that because of his long relationship with [Plaintiffs], [Nunez] was interested in negotiating a resolution of the dispute[,]" to which Paul Goldsby allegedly responded that Nunez and Weinberger should simply cease all activity related to *Belle's*. FAC ¶ 62. On **July 22, 2012**, Plaintiffs sent a cease and desist letter to Defendant Weinberger; Weinberger and Nunez retained counsel who responded to the cease and desist letter indicating that Defendants would not comply. FAC ¶¶ 68-69 (emphasis added). On September 5, 2012, Plaintiffs sent a cease and desist letter to Defendant TV One, to which TV One responded on **September 10, 2012**, indicating that "the *Belle's* show would not be released before **mid-January 2013**" and that it had no intention of delaying the premiere. FAC ¶ 69 (emphasis added).

Plaintiffs registered the copyright for *Roscoe's Show* Materials on September 11, 2012 (*see* FAC, Ex. A), and filed suit shortly thereafter. Plaintiffs' motion for a preliminary injunction was filed on November 19, 2012. *See* Docket No. 19.

## III. <u>Legal Standards</u>
### A. *Motion to Dismiss*

Plaintiffs in federal court are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim upon which relief can be granted for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cogniz-able legal theory or sufficient facts to support a cognizable legal theory."). A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 558-59; *see also William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

In deciding a 12(b)(6) motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially

Case No. 1:19-cv-02005-DDD-SKC   Document 173-3   filed 01/27/20   USDC Colorado   pg 7
of 21
Case 2:12-cv-08688-GW-JEM   Document 67   Filed 12/27/12   Page 6 of 20   Page ID #:954

noticeable and other extrinsic documents when "the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

### B. Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is *likely* to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent that our cases have suggested a lesser standard [than that announced in *Winter*], they are no longer controlling, or even viable.").

## IV. Analysis

### A. The Court Would GRANT IN PART and DENY IN PART Defendant TV One's Motion to Dismiss

#### 1. Copyright Claims

In order to state a claim for copyright infringement a plaintiff must allege (1) ownership of a valid copyright, and (2) actionable copying by the defendant of constituent elements of the work that are original. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The second prong requires Plaintiffs to allege that "the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). Defendants do not dispute the validity of Plaintiffs' copyright.

Defendant moves to dismiss all three copyright claims (for direct, vicarious and contributory infringement) on the basis that *Belle's* is not substantially similar to *Roscoe's show*. Before analyzing the issue, the Court would take note of one area of potential tension in resolving the motion to dismiss and the preliminary injunction motion simultaneously. A court may grant a motion to dismiss a copyright claim when both works are before the Court in the record and where no reasonable jury could find that the works are substantially similar. *See Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1130-31 (C.D. Cal. 2007) (citing *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.")). Of course, the preliminary injunction analysis includes an analysis of likelihood of success on the merits, which also involves a determination of the extent there is substantial similarity between the works. As discussed in detail *infra*, the Court would find that dismissal of the copyright claim is unwarranted at this juncture, as Defendant TV One, as the moving party bearing the burden of persuasion, has not demonstrated that no reasonable jury could find substantial similarity between *Belle's* and *Roscoe's Show*. However, that finding is not inconsistent with the Court's concomitant holding that a preliminary injunction is not warranted at this time, in part because Plaintiffs

Case No. 1:19-cv-02005-DDD-SKC   Document 173-3   filed 01/27/20   USDC Colorado   pg 8
of 21
Case 2:12-cv-08688-GW-JEM   Document 67   Filed 12/27/12   Page 7 of 20   Page ID #:955

have failed to demonstrate a sufficiently strong likelihood of success on the merits. These holdings are easily reconciled. While Defendant has failed to show that no reasonable jury could find substantial similarity between *Belle's* and the *Roscoe's Show*, Plaintiffs have also failed to demonstrate that they have a high likelihood of success on the merits. To put it plainly, the Court would find that there is some similarity between the works, but not so much as to warrant preliminary injunctive relief, and not so little as to warrant dismissal of the copyright claims as a matter of law.

The Ninth Circuit has summarized the "substantial similarity" test for copyright infringement as follows:

> The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury. . . . A "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." . . . .

> Extrinsic analysis is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." . . . The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. . . . In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." . . . .

> "[P]rotectable expression includes the specific details of an author's rendering of ideas." . . . However, scenes à faire, which flow naturally from generic plot-lines, are not protectable. . . . We "must take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.'"

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citations omitted). While *Funky Films* considered a summary judgment ruling, there are no disputed facts as to the content of the works here, thus the same test applies. *See Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1111-12 (N.D. Cal. 2010) ("The 'extrinsic test' depends on specific criteria which can be analyzed and decided as a matter of law."). Thus, dismissal of Plaintiffs' copyright claim is warranted if – and only if – Defendants demonstrate that there is no substantial similarity under the extrinsic analysis. Both parties properly structure their briefs by discussing each of the factors involved in that determination: plot, themes, dialogue, mood,

setting, pace, characters, and sequence of events. The Court will consider the degree of similarity between *Belle's* and the *Roscoe's Show* according to each of these "protectable elements" in turn. *See Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985) ("The extrinsic test compares the individual features of the works; it looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."); *Campbell*, 718 F. Supp. 2d at 1112 ("The Court examines each of these criteria in turn [when ruling on a motion to dismiss a copyright claim]").

Importantly, though, "[u]nder the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a *lesser degree of similarity* between the copyrighted work and the allegedly infringing work." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) (emphasis added). Taking the allegations in the FAC as true, as the Court must at the motion to dismiss stage, Defendants clearly had access to the *Roscoe's Show* Materials. Thus, the degree of similarity Plaintiffs must show in order to state a plausible claim is lessened, which will inform the Court's analysis.[6]

### a. Plot/Sequence of Events

Two works are not substantially similar even if they "share the same basic plot premise, [if] a closer inspection reveals that they tell very different stories." *Benay*, 607 F.3d at 625. Basic plot ideas are not protectable by copyright law, nor are stories that directly flow from basic stock plot ideas. *See Campbell*, 718 F. Supp. 2d at 1112-13 ("the Court finds this young mentee-older mentor storyline to be a 'basic plot idea . . . not protected by copyright law.' . . . The idea that the older mentor is a former champion racer 'directly flows' from the racing storyline.") (citations omitted). Here, while there are some undeniable similarities in terms of the basic plot premise of a restaurant serving as a diverse community meeting-place, the Court would find that the *Roscoe's Show* and *Belle's* tell two different stories:

**Belle's Plot**: After Belle, an African-American matriarch, dies, her family continues running the upscale Atlanta soul food restaurant she made famous. One day, a white man named Tucker Crawford comes into the restaurant and asks if he can host his family reunion there, as he had enjoyed a meal he had recently eaten at the restaurant. He puts down a large deposit, and the family is excited. Mr. Crawford, though, also flirts with Elese, one of Belle's daughters, who seeks to make a name for herself as a model, and Mr. Crawford promises to help her. The family grows less disillusioned with Mr. Crawford when they seemingly discover that his family used to own members of Belle's family as slaves on a plantation. The restaurant owner and Belle's widower, Bill, grows incensed, and vows to refuse to host the Crawford family reunion no matter what price the "Crawford Clan" had committed to pay. In the midst of his angry interaction with Mr. Crawford about the matter, though, he is introduced to another Crawford Clan member,

---

[6]While the parties have submitted various materials in support of these two motions concerning each television show, the Court's comparison will largely hinge on a comparison of the pilot episode and pilot script (Decl. of Ciarra Carter, Docket No. 27, Ex. A (*Belle's* script)), and the *Roscoe's Show* Materials as defined above (Decl. of Kennedy Goldsby, Docket No. 22, Exs. A-C). *See* Docket No. 60 at 1 n. 1 (indicating that the *Roscoe's Show* Materials constitute the copywritten material).

an African-American judge, also the Crawford family historian, who provides details about how the white Crawford's past relationship with African-Americans and Belle's family in particular is not nearly as dastardly as it had initially appeared. After some hilarity and confusion, all come to realize that Belle's will be the perfect location for the multi-cultural Crawford Clan's reunion. This is lucky, as Bill's strong-minded and sassy sister-in-law Gladys, the restaurant cook, needs a new burner for the stove, and the Crawford Clan reunion will help fund that repair.

**Roscoe's Plot**: Sam is the entrepreneurial and stubborn owner of an eclectic homestyle Los Angeles restaurant. His bumbling employee Darell informs him that the tires on the wheels the store's van need to be replaced, which irks Sam. Paco, the jittery Mexican cook, has gone on a few dates with one of the restaurant's lady customers, whom he suddenly fears is actually a man. A couple of customers appear to be in the midst of a wedding proposal, but it turns out that the girl has other ideas in mind; the waitresses amuse themselves by gossiping about the situation. The customers briefly discuss issues such as race, African poverty, Hispanic immigration difficulties and relationship turmoils. Darell bungles the tire repair and ends up totaling the van - the day after the insurance had lapsed. Wanda, a sexy waitress, encounters various romantic complications, and strives to get ahead in the world. Meanwhile, Sam becomes irate that a local white politician, Senator Weir, appears to be shaking him down for cash in a corrupt manner, but it turns out to have been a misunderstanding as the Senator was only "barnstorming," *i.e.* asking for Sam's legitimate support for his reelection campaign.

The plot of the two television shows are clearly different. In *Belle's*, the episode centers almost exclusively on Tucker Crawford's offer to rent out the restaurant and the racial tensions brought about by the offer, as well as the family dynamic more generally in the wake of Belle's death (her portrait hangs in the restaurant, and she appears to look down on the proceedings sagely). The *Roscoe's Show* instead presents a comedic portrait of a bustling casual restaurant, and the sequence of events largely concerns the romantic entanglements of the staff (who are not a family) and the amusing antics of hapless employee Darell. The plots and sequences of events as between the two shows are thus not substantially similar. *See Gilbert v. New Line Prods., Inc.*, No. CV 09-02231 RGK (RZx), 2010 U.S. Dist. LEXIS 141516, at *15-16 (C.D. Cal. Aug. 13, 2010) (plot of works not similar because "Plaintiff's plot . . . features more characters and contains several subplots . . . Defendants' screenplay does not have these comparable subplots, focusing almost exclusively on [one] relationship").

That said, there are obvious similarities that preclude dismissal as a matter of law. Both shows involve restaurant owners (Bill in *Belle's* and Sam in the *Roscoe's Show*) who have a misapprehension that a white man (Mr. Crawford in *Belle's* and Senator Weir in the *Roscoe's Show*) are trying to pull one over on them, and end up being in the wrong, to their sheepish chagrin. Both involve a lovable but incompetent employee, Maurice in *Belle's* and Darell in the *Roscoe's Show*. Both shows involve attractive ladies, Elese and Wanda, who strive for something other than what they presently have in life, and have no shame about using their looks to achieve that goal.

Case No. 1:19-cv-02005-DDD-SKC   Document 173-3   filed 01/27/20   USDC Colorado   pg 11
of 21
Case 2:12-cv-08688-GW-JEM   Document 67   Filed 12/27/12   Page 10 of 20   Page ID #:958

In sum, despite the distinct storylines, the Court would not find that the plot or sequence of events in these two works are so dissimilar as to warrant outright dismissal of Plaintiffs' copyright claims as a matter of law, especially given Plaintiffs' allegations that Defendants had access to the *Roscoe's Show* Materials during the development and production of *Belle's*.

### b. Themes

Defendants argue that the only similar themes between the works are "African-Americans and restaurants," which they argue are unprotectable stock elements.   Docket No. 39-1 at 10-11. However, Plaintiffs aptly note that one common theme is also "the meaningful interactions between and among employees and clientele, at restaurants which bring together those of different backgrounds who might never have met otherwise." Docket No. 53 at 10.   The Court would generally agree that the works are thematically similar in this respect.[7]   However, a finding of substantial similarity is still not warranted as to this prong of the extrinsic test, because "the works develop those themes in very different ways." *Benay*, 607 F.3d at 627.   In *Belle's*, the restaurant's melting-pot characteristic engenders family cohesion, as *Belle's* family bond upon learning of both their error as to the true history of their family's long-ago interactions with the Crawford Clan.   The *Roscoe's Show* instead largely focuses on the social and professional aspirations of the characters, and entirely lacks the family boding component that is central to the restaurant's vibe and the show's theme in *Belle's*.   Thus, there is no substantial similarity as to themes, as the shows' themes and stories diverge from one shared, unprotectable idea of a restaurant setting. *See Funky Films*, 462 F.3d at 1079 ("Although both works explore themes of death, relationships, and sex, they do so in very different ways."); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 838 (C.D. Cal. 2010) (finding no thematic similarity because "The ideas of righting past wrongs and good things happening to good people are general storylines that have been around for thousands of years.   These ideas, standing alone, are not protectable.") (citing *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)).

### c. Dialogue

To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate "extended similarity of dialogue." *Olson*, 855 F.2d at 1450.   Here, Defendant is on firmer footing; there is basically no similarity between the dialogue in *Belle's* and that used in the *Roscoe's Show* script.   As noted by Defendants (Docket No. 39-1 at 11), the *Roscoe's Show* makes much use of slang words such as "dude" and "sista,'" whereas the *Belle's* staff and customers speak in a more formal and polished way.   These differences preclude a finding of substantial similarity as to dialogue. *See Gilbert*, 2010 U.S. Dist. LEXIS 141516 , at *24-25 (finding no similarity as to dialogue because "Plaintiff's screenplay . . . frequently uses expletives in daily conversation . . . whereas Defendants' characters use virtually none."); *Gable*, 727 F. Supp. 2d at 847 (finding no similarity as to dialogue because "hard-core street vernacular . . . has no counterpart in [Defendant's work, which is] . . . principally sarcastic and witty.   Every serious

---

[7]If such "themes" (*i.e.* restaurant, African-Americans, meaningful interactions between employees and clientele) were by themselves protectable, both *Belle's* and *Roscoe's Show* would be infringing on the 1987-88 television series *Frank's Place*.

thought is followed up with a humorous quip, geared toward keeping the mood of the series light."). While the *Roscoe's Show* script contains four lines pertaining to race, which essentially consists of one dark joke,[8] the *Belle's* dialogue pertaining to race is far more detailed and thoughtful. In sum, the works have little similarity as pertains to dialogue.

### d. Pace

As for pace, the *Roscoe's Show* is a whirlwind adventure told through snippets of conversation among a multitude characters, whereas *Belle's* features longer scenes with poignant moments among a smaller subset of characters. There is little similarity between the casual, fast-paced *Roscoe's Show*'s pace or dialogue, as compared with the more sentimental and measured *Belle's*.

### e. Mood

The two shows also display very different moods. *Belle's* features numerous bittersweet moments, such as when the family gazes at the portrait of the deceased Belle, or when Bill laments the horrors of slavery (albeit in a light-hearted manner). The use of Pam, a pre-teen member of Belle's family, as narrator, also lends *Belle's* a sentimental air that is absent in the slightly grittier **Roscoe's Show**, which is more of a madcap screwball comedy. There is thus little similarity between the works with respect to mood. *See Campbell*, 718 F. Supp. 2d at 1114 (finding the mood of two works not similar when one has "happy, upbeat overtones" and the other "contains violent overtones").

### f. Setting

Given the fact that Plaintiffs' sufficiently allege Defendants had access to the **Roscoe's Show** Materials, and thus bear a lower burden of showing similarity, substantial similarity as to this element is established merely by virtue of the fact that both shows take place at soul food restaurants with eclectic and multicultural clientele. While Defendants make much of the fact that the Roscoe's Show script, unlike the *Belle's* pilot, contains scenes outside the four walls of the restaurant, the fact remains that both shows undeniably center around a bustling community-oriented restaurant. Similarity is thus established on this front, given the parties' previous collaboration on a restaurant-themed television project. *Cf. Benay*, 607 F.3d at 628 ("Some of the settings are strikingly dissimilar. . . . The Screenplay opens at West Point with a classroom scene, a snowball fight, and a scene in Gamble's comfortable home. The Film, on the other hand, opens at a San Francisco convention hall where the drunk Algren is hawking Winchester rifles."). *But see Funky Films*, 462 F.3d at 1080 (finding no similarity "[a]lthough both works take place in a contemporary, family-run funeral home[.]").

### g. Characters

The undeniable similarity between some of the characters in *Belle's* and the *Roscoe's Show* is one of Plaintiffs' strongest arguments as to infringement. The following pairs of

---

[8]Docket No. 22, Ex. A at 16 ("OLD MAN: [t]he last time black people got together to get anything done, they had to be chained together first.").

characters are inescapably similar at least in some respects, especially given that Plaintiffs have properly alleged that Defendants had access to the *Roscoe's Show* Materials:

> **Bill/Sam**: In *Belle's*, we meet Bill, a crotchety but lovable, hardworking and respectable restaurant owner who is also stubborn and grouchy. In *Roscoe's Show*, we meet essentially the same character, named Sam, though he is considerably less dapper, given his more modest restaurant surroundings. Defendant's assertion that the characters bear "no resemblance" (Docket No. 39-1) to each other "aside from the fact that both characters are African-American" is merely arguable.

> **Gladys/Momma**: Plaintiffs accurately summarize the similarities between these characters: "Both Momma and Gladys are characterized as no-nonsense women who perform their duties at the restaurants with skill derived from years of experience." Docket No. 53 at 12. Moreover, both women have a bossy, wise tone that makes the other staff members respect them, while maintaining a warm, maternal affect. That this character may be common in African-American sitcoms does not vitiate the fact that the two characters are similar.

That said, other character pairings, while superficially similar, actually have little in common, such as Roscoe's bumbling Darell as compared with distracted playboy Maurice, the bartender in *Belle's*, not to mention Roscoe's Wanda, who has little more in common with *Belle's* Elese than the fact that both women are strikingly attractive and know it. *See Gable*, 727 F. Supp. 2d at 845 (finding no similarity between characters when "Like Tori Ann, Joy is also in her twenties, is attractive, and has a sarcastic attitude. Other those general [unprotectable] character traits, however, the women have little in common."). While *Belle's* contains many characters that do not line up to any characters in the *Roscoe's Show*, notably pre-teen narrator Pam, the fact that at least some characters in the two shows are similar renders dismissal inappropriate, given that Defendants allegedly had access to the *Roscoe's Show* material.

All in all, the shows are in some ways similar and in some ways different, according to the extrinsic test. Therefore, the Court would not find that Plaintiffs have failed to state a plausible copyright infringement claim as a matter of law. The Court would thus DENY Defendants' motion to dismiss the copyright claims.[9]

### 2. State Law Claims

Defendant also moves to dismiss many of Plaintiffs' state law claims on the grounds that they are preempted by the Copyright Act. "In order for preemption to occur under the federal Copyright Act, two conditions must be satisfied. First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the

---

[9]Given that the Court would find in Plaintiffs' favor on this motion, the Court will not yet address Plaintiffs' argument raised under *Metcalf v. Bocho*, 294 F.3d 1069 (9th Cir. 2002), concerning a pattern of generic similarities between the works, but will instead address it in section IV(B)(2) *infra*.

right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001). As to the first condition, by virtue of holding a copyright to the *Roscoe's Show*, Plaintiffs implicitly agree that to the extent their claims are based on their rights to it, those rights are within the subject matter of the Copyright Act. As to the second condition, "[t]o survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an *extra element* which changes the nature of the action." *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1116 (W.D. Wash. 2010) (emphasis added and citation omitted). In essence, "the court should engage in a fact-specific inquiry into the actual allegations underlying the claims at issue in the case, so as to determine whether the 'gravamen' of the state law claim asserted is the same as the rights protected by the Copyright Act." *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1190 (C.D. Cal. 2001) (citation omitted). The Court will consider all of Defendants' argument for dismissal of each state law claim in turn.

### a. The Court should GRANT WITHOUT PREJUDICE Defendants' motion to dismiss Plaintiffs' Unfair Competition Claim.

If a complaint "expressly bases [an] unfair competition claim on rights granted by the Copyright Act[,]" then it is preempted. *Kodadek v. MTV Networks, Inc.*, 152 F.2d 1209, 1213 (9th Cir. 1998). Here, the FAC does not contain any allegations as to unfair business practices other than the alleged copyright infringement. *Cf.* section IV(A)(2)(d), *infra*. Plaintiffs argue that the FAC contains the requisite "extra element" by virtue of Defendants' perpetration of an alleged "broader scheme that is intended to generate public confusion as to Defendants' owner-ship of the Plaintiffs' ideas and concept with respect to *Roscoe's Show*." Docket No. 53 at 20. But this is mere semantics, far from being an extra element, the gravamen of this scheme is in fact the copyright infringement itself. Plaintiffs also argue that the unfair competition claim in fact constitutes a "reverse passing off" claim, which is when "someone markets a product as their own, when the product was created by someone else." *Salim v. Lee*, 202 F. Supp. 2d 1122, 1126 (C.D. Cal. 2002). However, as discussed in *Salim*, the very case cited by Plaintiffs, reverse passing off unfair competition claims only survive a preemption challenge under the copyright law if there is an allegation of "bodily appropriation," *i.e.* allegations of wholesale copying such that the works are alleged to be "virtually identical." *Id.* at 1126-27. Yet, the FAC does not contain such broad allegations, and nor could it plausibly do so, given the obvious differences between the two shows such as, for instance, the family element present in only *Belle's*, and the contrast between the casual Los Angeles Roscoe's restaurant and the upscale Atlanta *Belle's*.

In sum, it is clear that the gravamen of the unfair competition claim consists of only the copyright allegations. Defendants' motion to dismiss would thus be GRANTED, albeit with LEAVE TO AMEND so as to allow Plaintiffs an opportunity to allege a requisite extra element to the claim.

### b. The Court Would GRANT WITH PREJUDICE Defendants' Motion to Dismiss Plaintiffs' Claims for Conversion, Misappropriation of Intangible

*Personal Property and Misappropriation of Corporate Opportunities.*
   The Ninth Circuit has stated that "[c]onversion of *tangible* property involves actions different from those proscribed by the copyright laws, and thus is not preempted." *Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir. 1984) (emphasis added and citation omitted). However, "[a] conversion claim arising from the unauthorized reproduction and distribution of a copyrighted work only interferes with the plaintiff's *intangible* property right and is equivalent to a claim for copyright infringement." *Zito v. Steeplechase Films, Inc.*, 267 F. Supp. 2d 1022, 1027 (N.D. Cal. 2003). The FAC alleges conversion of only the intangible property of "Plaintiffs' original ideas and concepts" (FAC ¶ 137), and thus is preempted.
   Similarly, Defendant assails Plaintiffs' claims for misappropriation of intangible personal property and misappropriation of corporate opportunities as lacking any additional element other than the copyright violation allegations, and the FAC bears out Defendants' argument. Plaintiffs have failed to present any substantive argument opposing dismissal of the conversion, misappropriation of intangible personal property and misappropriation of corporate opportunities claims. *See generally* Docket No. 53. Therefore, given both Plaintiffs' failure to oppose these aspects of the motion (and, as to the conversion claim, given that any amendment would be futile, as it is obvious that there are no allegations of conversion of *tangible* property involved in this case), the Court would GRANT WITH PREJUDICE Defendants' motion to dismiss Plaintiffs' conversion, misappropriation of intangible personal property and misappropriation of corporate opportunities claims.

### c. The Court Would DENY Defendants' Motion to Dismiss Plaintiffs' I interference with Prospective Business Advantage Claim.

   Defendant cites *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008), for the notion that Plaintiffs' tortious interference with prospective business advantage claim is also preempted. However, in that case the Plaintiffs "failed to plead facts either showing or allowing the inference of actual disruption to its relationship with the Customers." *Id.* Here, in contrast, the FAC alleges that Defendants knowingly interfered with Plaintiffs' relationships with "actors, showrunners, executive producers, television networks, and other members of the entertainment industry" (FAC ¶ 152), and the factual allegations of the FAC summarized in section II *supra* convey in great detail the nature of such alleged interference. Therefore, unlike with regard to the other state law claims, Plaintiffs have sufficiently alleged an "extra element" in pleading their tortious interference claim, in that it is not merely duplicative of the copyright allegations, namely the specific business relationships that were disrupted and the manner in which the disruption allegedly occurred. The Court would thus DENY Defendants' motion to dismiss Plaintiffs' interference with prospective business advantage claim.

### D. The Court Would GRANT WITHOUT PREJUDICE Plaintiffs' Implied Contract In Fact Claim.

   Defendants argue cursorily that Plaintiffs' implied in fact contract claim does not contain any additional elements other than the copyright-related allegations. Docket No. 39-1 at 19-20. However, it is clear that the implied contract claim against TV One arises out of the September 2012 communications between the parties, not merely the copyright infringement allegations.

FAC ¶¶ 103-109. Therefore, the claim is not preempted. *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 ("Most courts have held that the Copyright Act does not preempt the enforcement of contractual rights.").

Defendants, though, also move to dismiss the breach of implied contract claim on the grounds that it does not state a plausible claim for relief under the familiar *Iqbal/Twombly* standard, and this argument is availing. The FAC alleges that Defendant TV One "refused to agree to not release" *Belle's*. FAC ¶ 104. Then, the FAC alleges that merely because TV One was allegedly "on notice of the infringing nature" of *Belle's*, it "expressly or impliedly agreed to credit or compensate Plaintiffs[.]" FAC ¶¶ 105-06. Defendants argue persuasively that these alleged facts do not state a plausible claim for breach of implied contract, given that there must be a "meeting of minds" involved. *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996). Plaintiffs respond by arguing that the FAC alleges a particular sort of implied contract claim: "copyright law does not preempt a contract claim where plaintiff alleges a bilateral expectation that he would be compensated for use of the idea, the essential element of a *Desny* claim that separates it from preempted claims for the use of copyrighted material.'" *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 977 (9th Cir. 2011) (referring to *Desny v. Wilder*, 46 Cal. 2d 715 (1956)). While Plaintiffs' argument is theoretically viable, the FAC fails to allege that TV One voluntarily agreed to compensate Plaintiffs for their idea by virtue of their promotion of *Belle's*, which appears to be the crux of Plaintiffs' argument in briefing. *See* Docket No. 53 at 18. Thus, the Court should GRANT WITHOUT PREJUDICE Defendant TV One's motion to dismiss the breach of implied contract claim, so that Plaintiffs may attempt to amend the FAC to properly plead a *Desny* claim, if they can do so.[10]

### e. Plaintiffs' Concede that Dismissal is Warranted as to their Declaratory and Injunctive Relief Claims

Defendants move to dismiss the declaratory and injunctive relief claims on the grounds that they are remedies, not freestanding causes of action. Plaintiffs expressly "concur with the proposition that injunctive relief and declaratory relief are remedies rather than Claims for Relief." Docket No. 53 at 24. Therefore, the Court GRANTS Defendants' motion to dismiss these claims but only insofar as granting Plaintiffs' request for leave to amend so as to replead these items in the Prayer for Relief.

To summarize the holdings insofar as Defendants' motion to dismiss is concerned, the Court would GRANT WITHOUT PREJUDICE Defendants' motion to dismiss Plaintiffs' unfair competition and implied in fact contract (as against Defendant TV One), claims. The Court would GRANT WITH PREJUDICE Defendants' motion to dismiss Plaintiffs' conversion, misappropriation of intangible personal property, misappropriation of corporate opportunities claims, declaratory relief and injunctive relief claims. The Court would DENY Defendants'

---

[10]Of course, while Defendants Weinberger and Nunez have joined in TV One's motion, that is not sufficient grounds to dismiss the breach of implied contract claim as against them, and their own motions to dismiss will be heard and considered in due course.

motion to dismiss Plaintiffs' interference with prospective business advantage claim.[11]  As a result of these holdings, Defendants' arguments as to alternative bases for dismissal need not be considered, and Defendants' motion to strike is rendered moot as it concerns only claims now dismissed from the action.[12]

The Court would also discuss with the parties whether the Court would vacate the hearings set for Defendants' Nunez and Weinberger's motions to dismiss, set for January 10, 2013, given that an amended pleading will be filed in conformance with this Order.

### B. The Court Would DENY Plaintiffs' Motion for a Preliminary Injunction
#### 1. Likelihood of Irreparable Harm

In light of the Supreme Court's holdings in *Winter*, 555 U.S. 7*, and *eBay v. MercExchange, LLC*, 547 U.S. 388 (2006), the Ninth Circuit recently held:

> our long-standing precedent finding a plaintiff entitled to a *presumption* of irreparable harm on a showing of likelihood of success on the merits in a copyright infringement case, as stated in *Elvis Presley* [*Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003)]. . . has been effectively overruled.  In other words, 'Elvis has left the building.'  Accordingly, we hold that even in a copyright infringement case, the plaintiff *must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief*, whether preliminary or permanent.

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) (footnote omitted) (emphasis added).

Plaintiffs erroneously state that copyright claims give rise to a presumption of irreparable harm, despite citing *Flexible Lifeline*.  Docket No. 18 at 21; *see Leatherman Tool Grp., Inc. v. Coast Cutlery, Inc.*, 823 F. Supp. 2d 1150, 1157 (D. Or. 2011) ("[in *Flexible Lifeline* the Ninth Circuit] reversed its long-standing precedent that irreparable harm may be presumed in copyright infringement cases once there was a showing of a likelihood of success on the merits").

Next, Plaintiffs assert that they are likely to suffer irreparable harm in the absence of injunctive relief because they "stand to lose prospective customers, resources invested in the copyrighted work, income, future licensing income, and potential income related to the copyrighted materials [sic] long term value." *Id.*  However, "showing monetary injuries, without more, will not justify granting a preliminary injunction. *InstantCert.com, LLC v. Advanced Online Learning, LLC*, No. 2:11-cv-1833-MMD-GWF, 2012 U.S. Dist. LEXIS 121103, at *15 (D. Nev. Aug. 27, 2012) (citing *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)).  While Plaintiffs cite a case indicating that a loss of goodwill could potentially constitute irreparable harm, Plaintiffs do not argue that they stand to lose goodwill in any way due to the release of *Belle's*. *See* Docket No. 18 at 21-22.  Nor do Plaintiffs allege that the scale

---

[11]Defendants did not here move to dismiss either of the two breach of fiduciary duty claims because those claims are not pled against TV One, the moving Defendant here.  *See* FAC ¶¶ 122-135.

[12]Moreover, Defendants' motion to strike would have been unavailing, as Defendants have not demonstrated that the material identified was redundant, immaterial, impertinent, or scandalous.  Fed. R. Civ. P. 12(f); *see Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973-74 (9th Cir. 2010).

of the alleged infringement is so enormous that it "has and will continue to induce far more infringement than it could ever possibly redress with damages" or that its copyrighted material is so popular that it is "particularly vulnerable to continuing infringement on an enormous scale," which could provide a basis for a potential irreparable harm injury. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007).

In sum, Plaintiffs have failed to show irreparable harm because they have only alleged that they will suffer monetary injuries, which are compensable by damages and do not support the grant of preliminary injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (citation omitted). While Plaintiffs' motion for a preliminary injunction could be denied on this basis alone, the Court will briefly analyze the other elements.

## 2. Likelihood of Success on the Merits

As discussed *supra*, the parties are in apparent agreement for purposes of these motions that: (1) Plaintiffs hold a valid copyright to the *Roscoe's Show* Materials; and (2) Defendants had access to them. Thus, Plaintiffs' likelihood of success on the merits hinges on whether Plaintiffs will be able to show that the two works are substantially similar, taking into account the lesser burden borne by Plaintiffs considering that Defendants had access to Plaintiffs' protected work. The Court will not reiterate the entire analysis of similarity set forth *supra*, other than to emphasize that reasonable minds could disagree as to whether the works are substantially similar.

However, the Court would here address an argument raised by Plaintiffs in connection with both this motion and the motion to dismiss (*see* note 9, *supra*): Plaintiffs argue that just as in *Metcalf v. Bocho*, 294 F.3d 1069 (9th Cir. 2002), despite the fact that many elements of the *Roscoe's Show* are not protectable, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element." *Id.* at 1074 ("Each note on a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection."). In *Metcalf*, though, the works were nearly identical as to plot.[13]  Further,

---

[13] The Ninth Circuit summarized the similarities between the works:

> Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

*Id.* at 1075.

"courts have been reluctant to expand this concept beyond the clear-cut case presented in *Metcalf*." *Zella*, 529 F. Supp. 2d at 1138 (listing cases rejecting *Metcalf* claims). Plaintiffs present a helpful chart summarizing the similarities between the shows in support of this argument. *See* Docket No. 18 at 18-19. However, the similarities between *Belle's* and the *Roscoe's Show* do not, even in the aggregate, amount to anything akin to the striking similarities between the works at issue in *Metcalf*, and are much more generalized, such as the fact that both shows feature irresponsible employees, African-American lead characters of the same ages, and involve issues of race.

In sum, then, incorporating the Court's discussion of the small (though extant) degree of substantial similarity between the works in section IV(A)(1), *supra*, Plaintiffs have failed to demonstrate a sufficiently strong likelihood of success on the merits to support the issuance of a preliminary injunction.

### 3. Balance of the Equities

Plaintiffs argue that Defendants will suffer no hardship other than "that they will not be able to continue to infringe nor profit off their infringement[.]" Docket No. 18 at 22. This argument oversteps the mark. *Belle's* is set to premiere in January 2013, and Defendants have invested large sums into its creation and marketing. Docket No. 51 at 21-22; Decl. of Toni Judkins, Docket No. 51-2, ¶¶ 10, 15, 19 (executive vice president of TV One testifying that TV One has nearly completed production of six episodes, have invested $80,000 into the show's marketing and advertising and will soon invest millions, and would have trouble replacing the show in a financially feasible manner).

Moreover, Defendants allege that Plaintiffs were in possession of the script for *Belle's* as early as April 2012, since Carter, an actress who auditioned for roles in both shows, supposedly provided it to Plaintiffs at that time. Docket No. 51 at 20. However, Carter's declaration does not make clear precisely when she gave the script to Plaintiffs, only that she gave a copy to Plaintiff Paul Goldsby sometime "after attending the casting session for *Belle's* show" on April 3, 2012. Decl. of Ciarra Carter ¶¶ 14-15, Docket No. 27. Defendants argue that since Plaintiffs knew about *Belle's* since April 2012, but waited until October 2012 to file suit and November 2012 to file a preliminary injunction motion, Plaintiffs have not demonstrated irreparable injury or that the balance of the hardships tilts in their favor. If Plaintiffs did in fact have the script in April 2012, the Court would agree, but that fact appears to be disputed. That said, Plaintiffs did send a cease and desist letter to Defendants concerning *Belle's* in July 2012, which strongly suggests they had sufficient facts to be on notice of *Belle's* imminent premiere at that time. *See* Decl. of Herb Hudson ¶ 27, Ex. A, Docket No. 21. While not weighing heavily in the Court's analysis, it does appear that Plaintiffs could have filed suit sooner than they did, were the situation as grave as they now claim.

All in all, the balance of the hardships appears to tilt in Defendants' favor, as TV One has clearly invested significant resources in promoting and creating *Belle's*, which would all be for naught were the preliminary injunction motion granted.

### 4. Public Interest

Both parties acknowledge that the public interest prong of the analysis is largely deriva-

-17-

tive of the likelihood of success on the merits, as there is a clear public interest in protecting copyrighted material, but no public interest in enjoining the dissemination of non-infringing artistic works.  Given that the Court has found that Plaintiffs do not have an overwhelming likelihood of success on the merits, the public interest factor does not strongly count in Plaintiffs' favor.

All in all, primarily because Plaintiffs have failed to demonstrate a likelihood of irreparable harm in the absence of injunctive relief, the Court would DENY Plaintiffs' motion for a preliminary injunction.[14]

### C. Evidentiary Objections and Objection to Notice of Filing of Article

Plaintiffs have submitted evidentiary objections to an expert report submitted by Defendants in support of their opposition to the Preliminary Injunction, that of Loyola Law School intellectual property law professor Jennifer E. Rothman.  Docket Nos. 61, 62.  Plaintiffs argue that the report contains inadmissible speculation and subjective beliefs, and that Ms. Rothman, as an intellectual property law professor, is not an expert in screenwriting.  The Court agrees to the extent that the report was unhelpful, as it largely constituted legal argument mirroring that which Defendants presented to their briefs.  In addition, Ms. Rothman's report included irrelevant derisive comments as to the quality of the *Roscoe's Show*, calling the script "chaotic and difficult to follow . . . [using a] scattershot approach" and stating her opinion that the "plot points in the script come and go without development, progression, build or resolution." Rothman Decl. ¶¶ 32, 35, Docket No. 51-4.

In addition, Defendants filed two articles with the Court on December 18, 2012, five days after submitting its final briefs in connection with the instant motions, one drawn from the Hollywood Reporter website and one from Ebony magazine's website.  Docket No. 63.[15]  The articles report that Tyler Perry, an African-American actor/writer/director/producer unrelated to the instant action, has created a television show that takes place in a diner, which is set to premiere on Oprah Winfrey's network (again unrelated to the instant dispute).  Plaintiffs object that the articles are irrelevant; the Court would agree, as their only apparent purpose is to notify the Court that other television shows exist that are set in a restaurant, a fact of which the Court is obviously aware.

All that said, "[i]n ruling on a preliminary injunction, the court may consider evidence that would be inadmissible at trial and, in its discretion, accords the appropriate weight to that evidence." *Signeo USA, LLC v. SOL Republic, Inc.*, No. 5:11-cv-06370-PSG, 2012 U.S. Dist. LEXIS 79356, at *10 (N.D. Cal. June 6, 2012) (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d

---

[14]Given the Court's tentative holding denying the requested relief, the Court need not address Plaintiffs' arguments as to the bond posting requirements concomitant to such relief.  Should the Court's final ruling grant a preliminary injunction the Court will address the issue at that time. *See* Fed. R. Civ. P. 65(c).

[15]While a very minor matter, the Court notes that a number of Defendants' submissions, including this document, included hyperlinks to either other documents or the email addresses of Defendant TV One's counsel, which is not permitted under the local rules.  C.D. Cal. L.R. 5-4.3.3 ("Hyperlinks to other documents, websites, source documents, or citations are not permitted.").

1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.")).  Thus, while the Court largely agrees with the substance of Plaintiffs' concerns and has not accorded the objected-to material significant weight in this analysis, the objections are deemed MOOT at the present juncture.

## V. Conclusion

The Court would GRANT WITHOUT PREJUDICE Defendants' motion to dismiss Plaintiffs' unfair competition and implied in fact contract (as against Defendant TV One) claims.

The Court would GRANT WITH PREJUDICE Defendants' motion to dismiss Plaintiffs' conversion, misappropriation of intangible personal property, misappropriation of corporate opportunities claims, declaratory relief and injunctive relief claims.

The Court would DENY Defendants' motion to dismiss Plaintiffs' interference with prospective business advantage claim.

Defendants' motion to strike is rendered MOOT.

Plaintiffs' evidentiary objections are generally rendered MOOT, though the Court has accorded little weight to the objected-to material for the reasons set forth in Plaintiffs' objections.

The Court would discuss with the parties whether the Court should vacate the hearings set for Defendants' Nunez and Weinberger's motions to dismiss, set for January 10, 2013, given that an amended pleading will be filed in conformance with this Order.

The Court would DENY Plaintiffs' application for a preliminary injunction.