**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 1:19-cv-02005-DDD-SKC

SRS ACQUIOM INC., and
SHAREHOLDER REPRESENTATIVE SERVICES LLC,

      Plaintiffs,

v.

PNC FINANCIAL SERVICES GROUP, INC.,
PNC BANK, N.A.,
HEATHER KELLY, and
ALEX TSARNAS,

      Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

---

Plaintiffs SRS Acquiom Inc. and Shareholder Representative Services LLC (together, "SRSA") created and developed a successful suite of online products to process some of the paperwork and payments involved in mergers and acquisitions. These products' success led to profits, which inevitably led to competition. Most of that competition has apparently failed to dent SRSA's position in the business, but one product has: PNC Paid. And SRSA brought this case because it alleges Defendants PNC Financial Services Group, Inc. and PNC Bank N.A. (together, "PNC") took an illegal shortcut in creating PNC Paid. SRSA alleges that, rather than developing its own product with its own work, PNC hired former SRSA employees, Defendants Heather Kelly and Alex Tsarnas, and built PNC Paid from confidential information those employees brought from SRSA.

Among other claims, SRSA alleges that Defendants have misappropriated SRSA's trade secrets in violation of the Colorado Uniform Trade Secrets Act and the Federal Defense of Trade Secrets Act. Currently before the Court is SRSA's motion for preliminary injunction. Doc. 86.[1] The motion asks the Court to enjoin Defendants' alleged misappropriation of five trade secrets: a contact list Ms. Kelly updated with SRSA customer information shortly before she left for PNC; SRSA's custom Excel spreadsheet it uses to gather shareholder information; SRSA's pricing strategies; SRSA's product strategies; and two procedural documents Ms. Kelly took with her to PNC. Having reviewed the record and the evidence and arguments presented at a hearing held on March 11, 2020, the Court **DENIES** the motion. SRSA has failed to make the difficult showing that it is entitled to an injunction at this time.

## BACKGROUND

As the fees bankers and attorneys can charge for them show, mergers and acquisitions are complicated affairs. Even the payments-and-escrow aspect of an acquisition, by which the actual purchase funds are transferred among entities and shareholders, is surprisingly complex. On the payment side of an acquisition or merger, the target company must collect consents from its shareholders. Doc. 66, ¶ 23. Post-merger or acquisition, the buyer must obtain key tax and contractual forms from its shareholders, which it does by sending a "letter of transmittal" to shareholders of the acquired company. *Id.* ¶ 27. A letter of transmittal contains essential tax and contract forms that each shareholder must fill out and return to receive payment. *Id.* The buyer must also pay for the acquired company. *Id.* ¶ 28. To do this, the buyer often hires a paying

---

[1]   The public entry for the motion is Document 88.

agent to create and collect the paperwork necessary to facilitate payment. *Id.* Historically, this process was done manually, on paper. *Id.* ¶ 30.

SRSA, however, has over the last decade developed a suite of products that allow much of this payments-and-escrow business to be done online. *Id.* ¶¶ 23, 32. In 2012, SRSA developed a product they call Acquiom Clearinghouse. *Id.* ¶ 33. Clearinghouse is an electronic platform that collects and processes the shareholder information needed for payment in a merger or acquisition. *Id.* Around the same time, SRSA developed Acquiom Compensation Payments, which is an electronic platform for the post-merger payments process. *Id.* ¶ 36. SRSA's suite of relevant products is rounded out by Deal Dashboard, an online site where a buyer or seller can see in one place the status of all of its deals being facilitated by SRSA, and Pre-Closing Solicitation, an automated system for distributing and recording shareholder consents and agreements. *Id.* ¶ 39.

PNC is a large international bank based in Pittsburgh. One of its subsidiaries, Defendant PNC Financial Services Group, Inc., is a financial-services business with hundreds of billions of dollars in assets and deposits. Doc. 134, ¶ 2. In 2018, PNC acquired Fortis Advisors, LLC, ("Fortis"). *Id.* ¶ 3. Among other services, Fortis offered shareholder services in mergers and acquisitions. *Id.* ¶ 4. PNC says that its main purpose in acquiring Fortis was to offer PNC clients a full suite of payment-and-escrow services so that it could obtain the escrow deposits during a merger or acquisition. *Id.* ¶ 5.

Defendants Heather Kelly and Alex Tsarnas were employees of SRSA until they left to join PNC in March 2018. Ms. Kelly is a veteran of the payments-and-escrow services industry. Doc. 130, ¶¶ 3–5. Before joining SRSA, she served in payments-and-escrow leadership positions

- 3 -

at Wells Fargo Bank and Wilmington Trust. *Id.* ¶¶ 3–4. In 2014, SRSA successfully recruited Ms. Kelly to leave Wilmington Trust. *Id.* ¶ 5. Also in 2014, SRSA hired Mr. Tsarnas as its managing director of global business development. Doc. 74, ¶ 25. Ms. Kelly and Mr. Tsarnas were heavily involved in developing and marketing SRSA's payment-and-escrow products. Mot. at 6–7.

Both Ms. Kelly and Mr. Tsarnas entered into written employment agreements with SRSA. Among other provisions, their contracts prohibit them from misappropriating SRSA's trade secrets, confidential and proprietary information, and company property; competing with SRSA while employed there; and soliciting customers of SRSA for one year after termination from SRSA. Doc. 74, ¶¶ 5, 7; Doc. 75-2, at 3, 6–8. Ms. Kelly's non-solicitation agreement included an exception for approximately 40 customers she had pre-existing relationships with before she joined SRSA. Doc. 75-1, at 16.

SRSA fired Mr. Tsarnas in January 2018, and Ms. Kelly quit in March 2018. The details surrounding Ms. Kelly's departure are important to understanding this case. Ms. Kelly resigned from SRSA on March 8, and her last day was March 9. Mot. at 8. On the last two days of Ms. Kelly's employment with SRSA, she created a document entitled "HK Contacts.xlsx," in which she input contact information of client representatives and other industry contacts from her SRSA email and an SRSA database. Doc. 73, ¶¶ 27–31. SRSA says that she used this list at PNC to update a target list for PNC Paid. Mot. at 11. On April 2, 2018, Ms. Kelly's counsel informed SRSA that Ms. Kelly had numerous SRSA documents in her possession, including the payments spreadsheet discussed below. Doc. 136-3. SRSA did not respond to the letter.

- 4 -

When Ms. Kelly and Mr. Tsarnas left SRSA to join PNC in March 2018, PNC had just begun developing a competing suite of online payment-and-escrow products that ultimately became PNC Paid. Thirteen months later, in April 2019, PNC publicly launched PNC Paid. Doc. 82, ¶ 5. PNC executed its first deal on PNC Paid in January 2019. Doc. 94-7, at 1207. The basis of Plaintiffs' motion for preliminary injunction is that Ms. Kelly and Mr. Tsarnas misappropriated five SRSA trade secrets, giving PNC an unlawful head start on PNC Paid. The five alleged trade secrets are: (1) Ms. Kelly's contact list; (2) an Excel spreadsheet known as the "payments spreadsheet," which SRSA uses to gather and input shareholder information; (3) SRSA's pricing strategies; (4) SRSA's product-development strategies; and (5) two procedural documents taken by Ms. Kelly.

Plaintiffs filed suit on July 11, 2019. In exchange for not seeking a temporary restraining order, the Defendants agreed to engage in expedited discovery. Plaintiffs allege numerous claims in their complaint, only three of which are at issue in their motion for preliminary injunction. Plaintiffs seek to enjoin Defendants' alleged violation of the Colorado Uniform Trade Secrets Act and the federal Defense of Trade Secrets Act, as well as Ms. Kelly's and Mr. Tsarnas's alleged breach of their employment contracts. The Court held a hearing on the motion for preliminary injunction on March 11, 2020.

## DISCUSSION

### I.   Preliminary Injunction Standard Generally

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller

& M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995)). Courts are reminded that this remedy is "the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). This heavy burden requires plaintiffs to demonstrate (1) that they are substantially likely to succeed on the merits of their claims, (2) that they will suffer irreparable injury absent a preliminary injunction, (3) that their "threatened injury" without the injunction outweighs the opposing party's injury if the Court grants the injunction, and (4) that the injunction isn't adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (right to preliminary injunction must be "clear and unequivocal").

If the injunction sought is of a "disfavored" type, the moving party must make an especially "strong showing" that the likelihood of success and balance of harms factors weigh in its favor. *Free the Nipple*, 916 F.3d at 797. A disfavored preliminary injunction is one that: (1) mandates action (rather than prohibiting it); (2) changes the status quo; or (3) grants all the relief that the moving party could expect from a successful trial. *Id*. The injunction requested here does not grant all the relief SRSA could expect from a win at trial, but the parties disagree about the other two possibilities.

The Court admits that in many cases trying to resolve what constitutes a mandatory injunction versus a prohibitory one, or which side is seeking to alter the status quo feels more metaphysical than legal or

factual.[2] Both sides in most disputes can make a relatively persuasive case, as the parties do here. PNC argues, for example, that SRSA seeks a mandatory injunction because the result of the requested injunction would be to require PNC to stop ongoing marketing of PNC Paid, hire new developers and marketing teams to create and sell a replacement, and take other actions it currently has no plans to take. SRSA responds that all it seeks is an order prohibiting the Defendants from continuing to illegally use its trade secrets, not to mandate anything. SRSA argues this would simply reinstate the status quo as of the moment before PNC began misappropriating SRSA's proprietary information, while PNC contends the injunction seeks to effectively turn back the clock over a year, undoing millions of dollars' and countless hours' worth of its time and effort.

Ultimately, the Court concludes that this is the sort of injunction that should have to meet the elevated standard. SRSA isn't simply asking the Defendants to wait a few months to do something. PNC Paid has been up and running for nearly a year. Ms. Kelly and Mr. Tsarnas have been working in their roles at PNC for two years. SRSA knew about most if not all of the information they allegedly took with them, either when they left of immediately afterwards. The Court does not agree completely with PNC that the injunction should be rejected entirely because SRSA did not file suit or seek the injunction for more than a year after that. *But see Deer Valley Resort Co. v. Christy Sports, LLC*, No. 2:07-CV-00904DAK, 2007 WL 4570664, at *4 (D. Utah Dec. 21, 2007) (one-year delay weighs against a finding of irreparable harm). But the Court does

---

[2]    Indeed, this endeavor often has a chicken-or-the-egg feel to it, which perhaps could be considered the most enduring form of the debate over what to consider the status quo and what to consider a change to it. *See e.g.*, Plutarch, *The Symposiacs*, Question III ("Which was first, the Bird or the Egg?").

find that this fact means the injunction seeks to undo much more than it would have if issued earlier, and undermines whatever argument SRSA might have had that it was on the side of preserving, rather than upsetting, the status quo. Even the narrower relief SRSA has suggested the Court might alternatively enter would not merely "prohibit" the Defendants from doing anything; it would also effectively require them to undo ongoing contracts and negotiations, shut down PNC Paid to at least some extent, hire new developers and other staff, and create portions of their technology from scratch. Such relief would not merely preserve the relationship among the parties pending trial, it seeks to pump water back over the dam. The injunction therefore can only issue if SRSA has made a particularly strong showing that it is likely to succeed on the merits and that the balance of harms is in its favor.

## II.   Plaintiffs' Trade-Secrets Claims

Plaintiffs claim that Defendants misappropriated five separate trade secrets—SRSA's customer list, payments spreadsheet, pricing strategies, product-development strategies, and several of SRSA's internal procedure documents—and they seek to enjoin Defendants from using these trade secrets. After careful consideration of the record, and with the benefit of oral argument, the Court concludes that Plaintiffs have failed to establish that an injunction is necessary at this time. While there are certainly issues on which Plaintiffs could prevail at trial, they have failed to make the difficult showing that they are clearly and unequivocally entitled to such a drastic remedy rather than an award of damages.

### A.  The Colorado Uniform Trade Secrets Act and the Federal Defense of Trade Secrets Act

Plaintiffs assert two claims for misappropriation of trade secrets: one under Colorado law, the other under federal law.

A claim for violation of the Colorado Uniform Trade Secrets Act requires a plaintiff to prove three elements. First, the plaintiff must establish that they "possessed a valid trade secret." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). The Colorado Uniform Trade Secrets Act defines a trade secret as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4). To be a trade secret, the plaintiff-owner "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.* Colorado courts consider additional factors in determining whether a trade secret exists, including:

> 1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business, i.e., by the employees; 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; 4) the savings effected and the value to the holder in having the information as against competitors; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990). Second, a plaintiff must establish that the trade secret was disclosed without its consent. *Gates Rubber*, 9 F.3d at 847. And third, the plaintiff must prove that the defendant knew or should have known that the trade secret was acquired by improper means. *Id.*

- 9 -

A claim for violation of the federal Defense of Trade Secrets Act has similar elements to the Colorado Act. A plaintiff must first establish "the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce." *Arctic Energy Servs.*, LLC v. Neal, No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018). And the Defense of Trade Secret Act likewise defines trade secret broadly to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if the owner thereof has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C § 1839(3). Second, a plaintiff must prove that the defendant acquired, used, or disclosed the trade secret without consent. *Arctic Energy*, 2018 WL 1010939, at *2. And third, the plaintiff must establish that "the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Id.* Neither party has suggested that there is any meaningful difference between the two laws, at least as is relevant for purposes of assessing the preliminary injunction.

In evaluating whether a preliminary injunction is proper for Plaintiffs' trade-secrets claims, the Court is mindful that the purpose of trade-secrets law is to protect and encourage lawful competition. *Am. Can Co.*

*v. Mansukhani*, 742 F.2d 314, 329 (7th Cir. 1984). Given this, "trade secret protection should not extend beyond the limits needed to protect genuine trade secrets." *Id.* "Broader protection would stifle legitimate competition by prohibiting competitors from using their own independent discoveries, public information and reverse engineering." *Id.*

## B. Likelihood of Success on the Merits

To be entitled to a preliminary injunction, a movant is not required to establish that it is certain to prevail, or even that it has an "overwhelming likelihood" of success. *See Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) ("It is only necessary that plaintiffs establish a reasonable probability of success … ."). Nevertheless, even though it is possible that SRSA could prevail on some of its claims at trial, that is not enough to justify a preliminary injunction unless, as explained above, Plaintiffs have made such a "strong showing" that they are likely to succeed that the Court is convinced they are clearly and unequivocally entitled to this extraordinary remedy. *See* Part I, *supra*. For the reasons explained below, and based on the evidence before the Court at this time, SRSA has failed to make the necessary showing.

### 1.    Ms. Kelly's Contact List

Plaintiffs argue that Ms. Kelly misappropriated SRSA's customer lists and customer information. Mot. at 13–17. The parties don't dispute that, in the days before Ms. Kelly left SRSA, she updated a spreadsheet Ms. Kelly titled "HK Contacts" using her SRSA email and an SRSA database. Mot. at 15; Resp. at 6. The contacts spreadsheet contained fields for each contact's name, company, email, phone number, and a notes column. Doc. 73-5. Ms. Kelly offered undisputed testimony that this contacts spreadsheet contains contacts that pre-existed her employment as

SRSA, "purely personal" contacts, and contacts she developed while at SRSA. Doc. 130, ¶ 24. Plaintiffs seek to enjoin Defendants' use of this spreadsheet on the ground that it is an SRSA customer list and thus a trade secret that Ms. Kelly misappropriated.

While it's true that, as Plaintiffs point out, a business's customer lists can be trade secrets,[3] SRSA has not convinced the Court that Ms. Kelly's full contact list is a trade secret. Unlike most of the documents involved in the cases SRSA cites, the HK Contacts document itself was not created by SRSA for its use, but by Ms. Kelly for hers. Had she merely saved a copy of the SRSA database, Plaintiffs' claim would be stronger. But instead, she created her own document, in which she combined some information from that database with contacts that are either personal to Ms. Kelly or preexisted her relationship with SRSA. And there does not appear to be any claim that Ms. Kelly used the database or her email to take information about other SRSA employees' contacts; even when she did access the database, it was apparently to find the relevant contact information for individuals she, herself, had a relationship with. To be sure, the spreadsheet contains contacts Ms. Kelly developed while she was employed at SRSA, but the information about these contacts is of a kind that is readily ascertainable within her trade: names, emails, phone numbers, and job titles. *See Fox Sports Net N., L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003) ("Further, [the] knowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade."); *see also CDI Energy Servs. v. W. River Pumps,*

---

[3]   *See, e.g., Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009); *Haggard v. Spine*, No. 09-CV-00721CMAKMT, 2009 WL 1655030, at *9 (D. Colo. June 12, 2009); *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1106 (D. Kan. 2000) (enjoining use of customer list "compiled over many years and thousands of hours").

*Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (determining that the plaintiff's customer list was not protectable as a trade secret where the potential customers were a small group of easily identifiable locally operated oil field companies and could easily be attainable by those in the local oil field service and equipment industry); *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (Easterbrook, J.) (determining that the plaintiff's customer information was not a trade secret because the customers' identities were well known in the industry).

Plaintiffs attempt to recast Ms. Kelly's contact list as a "customer list" that includes information on "customer relationships," the identity of key "decision-makers," and "customer preferences." Mot. at 14. The problem with this argument is that Ms. Kelly's contact spreadsheet itself contains little if any of this information. It merely identifies the names and contact information of her contacts, which isn't trade-secret material.

Plaintiffs also argue that Ms. Kelly used her contacts spreadsheet to develop a target customer list for PNC Paid and that this is evidence of misappropriation. Mot. at 15. Indeed, while it is the HK Contacts list that SRSA claims is a misappropriated trade secret, it is apparent that their real complaint is not really with Ms. Kelly's creation of the list itself. A departing employee's updating of a contacts list is hardly the sort of unusual thing that would warrant the extraordinary relief requested here. The actual source of SRSA's ire is not the list itself, but the fact that some parts of it were merged with the broader PNC target list, and that simply knowing that a particular person is, for example, the right employee at Apple to pitch for M&A payments escrow products, is a valuable bit of information that should be protected.

- 13 -

Plaintiffs assert that this target customer list is evidence of misappropriation because many of the potential customers on the list are or were SRSA customers. Mot. at 15–16. And for a few of the potential customers, Ms. Kelly included notes that appear to reference information she gleaned while an employee of SRSA, *e.g.*, that a client "just started doing deals when I left." Doc. 100-12, at 40.

The Court agrees that such insights and targeted contact information about who, exactly, at a particular potential customer may be the best contact is valuable. It is possible that, if it was developed and curated by the plaintiff company, such information could be a trade secret in certain circumstances. *Hertz*, 576 F.3d at 1114 ("A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available."). And it may well be that there is some such information that SRSA developed and that Ms. Kelly took from SRSA and gave to PNC, rather than information that Ms. Kelly or PNC developed on their own or found in public sources. At trial, SRSA may well be able to prove as much to a jury. But given the elevated standards for the extraordinary relief sought here, the Court is unable to say that the record before it establishes with particularity which, if any, of the entries that were transported from the HK Contacts list to the PNC target list[4] would qualify as trade secrets rather than information Ms. Kelly previously knew, was publicly available, or that PNC learned from other sources. Simply that the HK Contacts list matches

---

[4]   The record as supplemented by the evidence presented at the hearing does support that this is what happened.

some entries on the PNC target list does not establish that the information in any particular entry was trade secret.[5] And certainly the record cannot support the broad injunction SRSA seeks against the sale or marketing of PNC Paid to any of the 35 entities mentioned on the HK Contacts list.

To the extent Ms. Kelly relied on her experience with SRSA to help develop the PNC target customer list, she appears to have taken steps to ensure that she complied with her contractual obligation not to solicit certain SRSA customers within one year of leaving SRSA—the spreadsheet includes a field to identify those companies Ms. Kelly couldn't solicit under her SRSA contract. Doc. 130, ¶ 26. Ms. Kelly's employment agreement also undermines the idea that she would have understood any knowledge she gained about potential customers to be SRSA's trade secret in two ways. One, its non-competition clause only applied during her employment with SRSA, not after. And two, its non-solicitation clause only applied to certain companies, and only for one year. This implies that any other companies could be solicited, even during the first year, and that others could be solicited after. Much of what SRSA claims is a trade secret here, such as customer preferences about general things

---

[5]    Nearly all the information on the relevant entries from the HK Contacts list is about Ms. Kelly's own relationship, or about PNC's efforts with, the target in question. Only a few comments include information that seems to directly relate to SRSA, including, *e.g.*, entries stating, "Was very close to being a client. The concept of non-bank bothered them. Big on payment platform"; "Just started doing deals when I left. Assuming bank client here?"; "Big user of payroll"; "Small Escrows"; "They only do payments. No Escrow"; and "had terrible fall out on SunTrust [sic] escrow." Doc. 100-12, at 40. These statements could be the result of improper use of SRSA information, but they could also be developed in other ways that are not improper. Without a particularized showing, the Court cannot say that SRSA has met its burden at the preliminary injunction stage, even as to these statements.

like needing a payments product or which law firms served which companies, Ms. Kelly would not be able to "unlearn" if she left. If this information were truly a trade secret, allowing Ms. Kelly to solicit companies about which she knew such information either immediately or at most in one year, is not a reasonable means of protecting it.[6]

And although Ms. Kelly's notes in the PNC spreadsheet are perhaps a closer call, Plaintiffs have not shown how any individual comment is a trade secret. Many of the comments, like the basic contact information, appear innocuous. Take Ms. Kelly's repeated notation that she had a "strong relationship" with individual contacts. Ms. Kelly's own characterization of her relationship with a customer, by itself, isn't a trade secret. Other comments contain information that could, in theory, be a trade secret. But the Court lacks a basis to conclude as much. Was it, for example, publicly known that the SRSA client referenced above had "just started doing deals" when Ms. Kelly left SRSA? SRSA failed to answer this question in its motion papers and hearing evidence. Without a more particularized showing, the Court cannot enjoin the use of Ms. Kelly's contacts.

The decisions that Plaintiffs rely on to support their argument that Ms. Kelly's contact list is a trade secret are distinguishable. *Hertz v. Luzenac Group*; *Haggard v. Spine*; *Xantrex Technology Inc. v. Advanced Energy Industries, Inc.*; *R & D Business Systems v. Xerox Corp.*; and *Morlife, Inc. v. Perry* all stand for the unremarkable proposition that detailed customer lists, developed by the employer over a long period of

---

[6]   The Court is aware that SRSA likely understood that an employment agreement that sought to extend these prohibitions indefinitely would likely be illegal as against public policy. But that only highlights the point that trade secret law should not be read as doing what is against public policy if done by contract.

time, are trade secrets.[7] Had Ms. Kelly taken a copy of SRSA's database, these cases would be more apt. But she didn't. She updated her own list of contacts that pre-existed her employment with contact information from her time at SRSA. Some of that information came from SRSA's database, but the basic information that she copied from that database does not amount to a trade secret. The HK Contacts list itself contains no more than basic contact information, not detailed customer preferences or other information that might give Defendants an unlawful leg up on its competition. The information Ms. Kelly apparently added to the PNC target list from her recollection is also not a protected trade secret for the reasons stated above—SRSA hasn't shown how the comments individually or collectively are confidential trade secrets.

---

[7]    *See Hertz*, 576 F.3d 1103, 1114 (10th Cir. 2009) ("A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available."); *Haggard*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *9 (D. Colo. June 12, 2009) ("Plaintiff developed detailed information regarding his customers (doctors and hospitals within his sales territory) that meets the standard for trade secret protection. He developed information regarding his customers' surgical specialties, business preferences, and contact people within their hospitals or physician groups."); *Xantrex*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *18 (D. Colo. May 23, 2008) ("Detailed customer information is a trade secret."); *R & D Bus. Sys.*, 152 F.R.D. 195, 197 (D. Colo. 1993) (detailed customer lists are trade secrets); *Morlife*, 56 Cal. App. 4th 1514, 1521 (1997) ("[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers.").

## 2. The SRSA Payments Spreadsheet

Plaintiffs seek to enjoin the use of the SRSA payments spreadsheet that Ms. Kelly took from SRSA before her departure. Because the evidence adduced at this stage of the proceedings shows that the spreadsheet wasn't confidential, the Court concludes that SRSA has not shown a likelihood of success on the merits.

It is undisputed that before she left SRSA, Ms. Kelly emailed herself a copy of the SRSA payments spreadsheet. Doc. 73, ¶ 59. Indeed, on April 2, 2018, her counsel informed SRSA that she did so. Doc. 136-3. In that letter, her counsel wrote that Ms. Kelly had the payments spreadsheet on her personal e-mail. *Id.* at 3. PNC used the spreadsheet as the foundation to create its own spreadsheet for PNC Paid. Doc. 73, ¶¶ 59–64. Metadata analyzed by SRSA confirms that the SRSA spreadsheet is the foundation for the PNC spreadsheet.

Yet it is also undisputed that SRSA freely shared the spreadsheet with parties to mergers and acquisitions, on which SRSA was engaged to provide payments-and-escrow services. Indeed, PNC produced numerous emails showing SRSA had forwarded copies of the spreadsheet to deal parties without requiring confidentiality commitments from them. *E.g.*, Doc. 120-6; Doc. 120-7; Doc. 120-8; Doc. 120-9.

The Court concludes that Plaintiffs are not likely to succeed on the merits of their trade-secrets claims as they pertain to the spreadsheet. The Court does not agree with Defendants' characterization of the document as a "blank spreadsheet"—while the data cells are indeed blank, for purposes of creating PNC Paid, the important information was in the 100-plus items the spreadsheet lists to be collected. Those "heading" cells are not blank, and SRSA produced evidence that it spent significant time and money developing that particular spreadsheet. Even so, the

Court cannot agree that the spreadsheet is a trade secret. As SRSA conceded, though the spreadsheet contains valuable business information used to sync client information with the SRSA algorithms, SRSA shares that information in every deal it does without any agreement requiring clients to keep the spreadsheet confidential. A party can't claim trade-secret protections over an alleged trade-secret that is shared widely in the industry without protection. *Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 411 P.3d 1126, 1130 (Colo. App. 2016) ("The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business."), *as modified on denial of reh'g* (Jan. 12, 2017).

SRSA's only argument on this point is that while there are no explicit or written confidentiality agreements, the spreadsheets are shared under an implied duty of confidentiality. Resp. at 5. It is true that in some circumstances, such an implied duty can be enough to protect a trade secret. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.'"). But the evidence here simply does not support the conclusion that SRSA shared the spreadsheet with the understanding that it was a confidential trade secret that could not be used or shared.

Just the opposite: Defendants produced testimony at the evidentiary hearing that they received the spreadsheet under the assumption it wasn't confidential. Such spreadsheets, in some form, are used in every M&A transaction. Adam Lezack of Fortis testified that he had received numerous copies of the SRSA spreadsheet over his years in the payments-and-escrow industry and had them in his files along with similar documents from others in the industry. This is quite different from the

cases SRSA relies on, where, for example, a plaintiff shared a product with a single company for the limited purpose of testing it, which the defendant then went on to copy, *see Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988), or an inventor pitched his invention to a single potential buyer under an alleged confidentiality agreement, *see Gronholz v. Sears, Roebuck and Co.*, 869 F.2d 390, 393 (8th Cir. 1989). SRSA offered testimony that these deals are too fast-moving and involve too many documents to require a nondisclosure agreement for each one. This is true in general, and the Court agrees that not everything disclosed in an acquisition loses its trade-secret status without one. But it is also true that a confidentiality agreement is a fairly common part of corporate deals, and if a company knows that a particular document that it believes is a trade secret will be part of every deal it does, there is no reason it cannot include that document as a covered item under the confidentiality agreement.[8] When it does not, and instead provides hundreds of clients, banks, and third parties with copies of the document with no explicit protection, the Court cannot find that reasonable steps were taken to protect its secrecy.

SRSA seeks an injunction that would prohibit PNC from using the spreadsheet that it concedes it built starting with the SRSA version as its base. This would in turn prevent PNC Paid from functioning until PNC developed a new payments spreadsheet of its own. And SRSA asks the Court to require PNC to create a "clean room" in which nobody who

---

[8]   SRSA also elicited testimony from a PNC product and software engineer that he believes it would be unethical to use another company's spreadsheet or to share PNC's with others. Mot. at 18. A product engineer's duties would not include sharing company documents, so that is understandable. But this testimony does not overcome the fact that SRSA consistently *did* share the document with others and never sought nondisclosure agreements.

had worked on the current version of PNC's payments spreadsheet could assist in the creation of the new spreadsheet. This would effectively shut down PNC Paid for a significant period of time, which the Court cannot justify doing on the thin basis that a document that has been shared hundreds of times with hundreds of different companies and individuals should be covered by an implied duty of confidentiality.

### 3. SRSA's Pricing Information

Plaintiffs next seek to enjoin Defendants from using SRSA's pricing strategies. Mot. at 19–20. According to their proposed injunction, this would entail enjoining Defendants from "using … SRSA's pricing strategies" and prohibiting Ms. Kelly and Mr. Tsarnas from working on PNC Paid. Doc. 88-1, ¶¶ 1, 6. Plaintiffs point to no specific data or document that Defendants misappropriated in support of this request. They instead argue that Mr. Tsarnas must be enjoined from using his "ready recollection" of SRSA's pricing strategies. *Id.* at 20. According to Plaintiffs, Mr. Tsarnas' misappropriation of the pricing strategies is apparent from the fact that PNC has undercut SRSA on price several times. *Id.* at 20. The Court cannot enjoin the alleged use of SRSA's pricing strategies on this basis.

Initially, while certain specifics about how SRSA arrives at a particular price for a particular deal might be a trade secret, neither its prices nor its general pricing strategies can be considered trade secrets. As Defendants point out, SRSA's pricing information is well known in the industry, shared with customers without confidentiality or other similar agreements, and easily ascertainable by third parties. Resp. at 13–15. And "pricing information shared freely with customers without confidentiality requirements is insufficiently secret to garner protection." *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at

*4 (N.D. Ill. Oct. 25, 2018). SRSA does not dispute this, but says it is not the prices themselves, but the strategies and formulas used to arrive at them that it seeks to protect.

But from the robust information about SRSA's actual prices, which they acknowledge is public, it would not be hard to reverse engineer the general strategies used to arrive at them. Even so, it would perhaps be troubling if it seemed PNC was consistently setting its prices just below SRSA's, and thereby using detailed knowledge about SRSA to set its prices. But to the contrary, the evidence supports PNC's argument that it sets its prices on an entirely different basis than SRSA. PNC appears to use PNC Paid as something of a loss leader, pricing it well below SRSA, because as a bank, PNC profits more by getting the escrow accounts themselves than it does by charging for PNC Paid.[9] Thus, even if Mr. Tsarnas has detailed knowledge of how SRSA sets prices (over a year after his departure), it does not appear to play much role in PNC's business.

In any event, Plaintiffs' requested injunction is overbroad: it would effectively prevent Mr. Tsarnas, a pricing specialist, from working in the payments-and-escrow industry because he would always be able to recollect SRSA's pricing strategies. *See Mulei v. Jet Courier Serv., Inc.*, 739 P.2d 889, 892–93 (Colo. App. 1987) (The "general ability and know-how an employee brings into employment, and the skill and experience acquired during it, are not the employer's property; the right to use and expand these powers remains the employee's."), *rev'd in part on other*

---

[9]   Certain of the evidence, particularly Ms. Kelly's text messages, also seem to hint that PNC may hope to use its low prices to drive SRSA out of business, or perhaps into a sale. But that is not of any real relevance to the trade secret matters at issue here.

*grounds*, 771 P.2d 486 (Colo. 1989). Again, SRSA did not seek such limits by agreement, and it could not have. This kind of injunction is anti-competitive and thus contrary to the purpose of the Colorado Uniform Trade Secrets Act and the Defense of Trade Secrets Act. *ClearOne Commc'ns, Inc. v. Chiang*, 608 F. Supp. 2d 1270, 1282 (D. Utah 2009) (refusing to enjoin defendant from working in relevant industry in trade-secrets dispute because such an injunction would be "anticompetitive"), *aff'd in part*, *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735 (10th Cir. 2011).

### 4.   SRSA's Product-Development Strategies

Plaintiffs contend that Ms. Kelly and Mr. Tsarnas misappropriated the product-development strategies of three SRSA products: Deal Dashboard, Acquiom Compensation Payments, and Pre-Closing Solicitation. Mot. at 21–24. As explained, Deal Dashboard is an electronic portal that permits a repeat customer to see the status of their deals being facilitated by SRSA. *Id.* at 22. Acquiom Compensation Payments facilitates payments to former employees or option-holders of an acquired company. *Id.* at 23. And Pre-Closing Solicitation facilitates gathering shareholder signatures and consents prior to a deal's closing. *Id.* Plaintiffs contend that the development strategies surrounding these products are trade secrets, which Ms. Kelly and Mr. Tsarnas had access to by dint of their employment. *Id.* at 21–24. According to Plaintiffs, the fact that Ms. Kelly and Mr. Tsarnas left SRSA and helped PNC develop similar products necessarily constitutes evidence of misappropriation. *Id.*

Plaintiffs have failed to demonstrate a likelihood of success on the merits that knowledge of these products is a trade secret. SRSA advertised the functionalities of Acquiom Compensation Payments and Pre-Closing Solicitation long before Ms. Kelly and Mr. Tsarnas left SRSA.

And "the copying of a product design, already on the market, cannot give rise to a claim of misappropriation of a trade secret." *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 608 (S.D.N.Y. 2004). This is because "a product design that has been embodied in a product and held out to the public for sale loses whatever secrecy it had and, with that loss, whatever trade secret protection it once may have been entitled to claim." *Id.* at 607. Deal Dashboard fares no better. Even though Deal Dashboard was still in development when Ms. Kelly and Mr. Tasrnas left SRSA, it isn't clear that a portal allowing a user to see its active deals is a trade secret. There is nothing about PNC's version of this portal that reflects any particular secret. Defendants introduced evidence that other payment-and-escrow businesses, including Fortis, had developed similar products. The Court agrees with Defendants that an online platform to view deal information is hardly a novel idea. *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 378 (2d Cir. 2000) (noting that trade secret protection "cannot be found where the idea consists of nothing more than a variation on a basic theme.").

Similar to their argument about pricing, Plaintiffs argue that they seek to enjoin the use of their product *strategies*, not knowledge of the products themselves. But product strategies are embodied in the products themselves. And in any event, Plaintiffs' proposed injunction belies this argument. They seek to enjoin Defendants use of PNC's Buyer Portal, Compensation Payments product, and PNC's Pre-Closing Solicitation product. Doc. 86-1, ¶ 5. That is, they seek to enjoin the use of the products themselves, not the product strategies. Plaintiffs' argument suffers from the same flaw as their request to enjoin the use of pricing strategies: it would effectively ban Ms. Kelly and Mr. Tsarnas from working in the industry. That anti-competitive result runs counter to the purposes of trade-secret law.

PNC also produced significant evidence, including videos produced and promoted by SRSA, showing that SRSA was publicly revealing the salient aspects of Deal Dashboard before it was released. In any event, it is publicly available now, and thus not a secret. To the extent SRSA can prove information about it was misappropriated at trial, that may justify damages, but it does not justify a preliminary injunction.

### 5. SRSA's Procedure Documents

Plaintiffs last seek to enjoin Ms. Kelly's alleged misappropriation of two of SRSA's technical documents: a document titled "Payment Product Specifications" that details "operational processes used to implement SRSA's" products, and a document titled "Imports process and proce-dures.docx" that details "SRSA's processes for integrating shareholder and payment data into its back-end database." Mot. at 24. The parties don't dispute that Ms. Kelly took these documents. Ms. Kelly's attorney informed SRSA on April 2, 2018 that she had forwarded a copy of these documents to him without retaining a copy. Doc. 136-3, at 1.

Plaintiffs have failed to carry their burden regarding these proce-dural documents. They have not established that Ms. Kelly obtained these documents by improper means: theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espi-onage. *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 525 (Colo. App. 2011) (claim of misappropriation of trade secrets requires evidence that defendants' obtained trade secrets through improper means). They knew that the documents were in Ms. Kelly's possession on April 2, 2018 but waited more than a year to seek an injunction of their use. Ms. Kelly kept the documents (apparently to help facilitate her transition, *see* Doc. 136-3 at 3), told SRSA that she did so, and despite this, SRSA failed to

request she return the documents for nearly a year.[10] And again, to the extent they were misappropriated, SRSA can obtain damages to compensate for the harm that misappropriation caused; an injunction at this point seems intended more to punish than to prevent harm prior to trial.

## C. Irreparable Harm

"A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quoting *Heideman*, 348 F.3d at 1189 (alteration adopted)).

SRSA has failed to do so here. Take, for example, Ms. Kelly's contact list and Defendants' alleged use of it to solicit SRSA customers. This might very well be a breach of her employment contract with SRSA—but that suggests that, as a breach-of-contract claim, SRSA's injury can

---

[10]   While Ms. Kelly's attorney did inform SRSA that she would comply with the obligations of her employment agreement with SRSA, she did not declare that any such documents would be or had been destroyed or deleted, and SRSA did not demand that she do so. Indeed, as PNC pointed out at the hearing, SRSA's evidence of PNC's follow up was a letter regarding Mr. Tsarnas that made no mention of Ms. Kelly or the documents she acknowledged having.

be cured by a damages award. *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) ("Loss of business can be compensated in money damages."); *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984) ("The essence of the concept requires a substantial threat of harm to the movant that cannot be compensated by money."). Similarly, for the payments spreadsheet and procedure documents, SRSA was on notice a year before it filed suit that Ms. Kelly had multiple copies of the spreadsheet in her private email and had kept copies of the procedure documents. A delay like this weighs against a finding of irreparable harm. *See* 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 n.13 (3d ed.) (collecting cases). And in any event, there is no discernible irreparable harm for alleged misappropriation of the payments spreadsheet, as well as SRSA's pricing and product information, because, as explained, these items were public. Indeed, the alleged bad acts all happened in the past, and thus an injunction is not the appropriate remedy for the alleged harm suffered. *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) ("The harm that had already occurred could be remedied through damages."); *Mountain Med. Equip.*, 582 F. Supp. at 848 ("Harm that has already occurred cannot be remedied by an injunction.").

The idea of using an online platform to do what had generally been done through burdensome physical paperwork was a good one, and SRSA profited by being the first to develop it well. But, as PNC points out, once the products in those platforms were launched, others could and did seek to emulate them, as is typically the case. The basic ideas and techniques behind SRSA's products are now all public, and competition for a profitable product was inevitable. SRSA does not dispute this. Instead, its primary counterargument is that, by virtue of Defend-

ants' misappropriation, PNC received an "unlawful head start" on creating PNC Paid. Mot. at 26. Unlawful head starts are, according to SRSA, categorically irreparable injuries because it is difficult to calculate how a head start affects lost sales. *Id.* at 26–27. The Court disagrees. Damages are often hard to calculate precisely, in all sorts of cases, but lost profits from lost sales are the kind of harm that is capable of monetary calculation and compensation. *E.g.*, *Cent. Transp. Servs., Inc. v. Cole*, No. CIV.A. 13-1295, 2013 WL 5938102, at *7 (D. Kan. Nov. 6, 2013) (damages due to "unfair head start" can be quantified); *Ice Corp. v. Hamilton Sundstrand Corp.*, 615 F. Supp. 2d 1256, 1263 (D. Kan. 2009) (approving award of damages for misappropriation claims based on lost sales as a result of misappropriation). The irreparable-injury factor weighs against granting an injunction.

### D. Balance of Harms

The balance-of-harms analysis "involves an evaluation of the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied." 11A Wright & Miller, *Federal Practice and Procedure* § 2948.2 (3d ed.); *see also Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1226 (10th Cir. 2009) (same).

Here, the balance of harms favors Defendants. If the Court grants SRSA's proposed injunction, Defendants will effectively be forced to stop PNC Paid operations until PNC has hired and trained an entirely new PNC Paid team, and redeveloped many of the PNC Paid products anew. SRSA seeks a "cleanroom" injunction, which seeks to enjoin any PNC employee who has had access to or was influenced by the allegedly misappropriated trade secrets from working on any such redevelopment. By

contrast, even though SRSA has known about much of the alleged mis-appropriation since the spring of 2018, it nevertheless waited to file suit for a year, and any continuing harm it may suffer during the pendency of this case is compensable with money damages. And in any event, the proposed injunction largely covers information that is publicly known. Thus, this factor favors Defendants.

### E. Public Interest

Both Plaintiffs and Defendants say the public interest favors their side. Indeed, trade secret law is meant to encourage and foster competition, but as is typical, in this case both the Plaintiffs and Defendants claim that the other is taking an anti-competitive position. Plaintiffs claim Defendants are effectively stealing the investments of time and money Plaintiffs put into developing a profitable product, which discourages competition by making such investments less profitable, while Defendants claim Plaintiffs are seeking to use the courts to stifle a new, competitive product. There is probably some truth to both positions. And the Court agrees that both parties have implicated a real public interest at issue—promoting and protecting competition. But because Plaintiffs have failed to convince the Court of their likelihood of success on the merits of their trade secrets claims, as discussed above, competition is best served by not granting Plaintiffs' motion. To grant the motion, would, in the Court's view, enjoin information that at this point is mostly public and thus not trade-secret material. Accordingly, the public interest favors Defendants.

### III.   Plaintiffs' Breach-of-Contract Claim

Plaintiffs also seek an injunction based on Ms. Kelly's and Mr. Tsarnas' alleged breach of their contracts with SRSA. Mot. at 25. Ms. Kelly's contract requires her to keep all "Proprietary Information" confidential

and to return any such information to SRSA upon termination. Doc. 75-1 at 26330. Under her contract, "Proprietary Information includes but is not limited to, Trade Secrets, Inventions, marketing plans, product plans, business strategies, financial information, forecasts, personnel information and customer lists." *Id.* And significantly, "Proprietary Information does not include information generally known or that is or becomes public information." *Id.* Ms. Kelly's contract is governed by Colorado law. *Id.* at 26328. Mr. Tsarnas' contract contains materially identical provisions, with the exception that his contract is governed by New York law. Doc. 75-2 at 88315, 88319. Both Colorado and New York recognize claims for a breach of a confidentiality provision like those at issue here. *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1115 (10th Cir. 2009) ("Colorado recognizes a claim for breach of contract regarding an employee who was bound to confidentiality."); *Second Source Funding, LLC v. Yellowstone Capital, LLC*, 144 A.D.3d 445, 446, 40 N.Y.S.3d 410, 411 (N.Y. App. Div. 2016) (recognizing claim for breach of contractual confidentiality provision under New York law).

The Court concludes that a preliminary injunction for breach of contract is inappropriate for the largely the same reasons detailed above with respect to Plaintiffs' trade-secrets claims. Plaintiffs have failed to demonstrate a likelihood of success on the merits of their breach of contract claim as to Ms. Kelly's contact list, the payments spreadsheet, SRSA's pricing information, and product strategies because those items are all non-confidential, publicly available information. Ms. Kelly's and Mr. Tsarnas' contracts expressly exclude "information generally known or that is or becomes public information" from the confidentiality provisions. Doc. 75-1, at 26330; Doc. 75-2 at 88315, 88319. And as to the procedural documents retained by Ms. Kelly, plaintiffs have, for the reasons above, failed to show irreparable harm. And in any event, it's not clear

that Ms. Kelly breached her confidentiality agreement by retaining these documents. Her lawyer informed SRSA that Ms. Kelly forwarded the documents to him without retaining a copy. Doc. 136-3 at 2. Her lawyer's letter indicates that Ms. Kelly initially took these documents with SRSA's consent. *Id.* The Court will not enjoin the use of these alleged trade secrets based on breach of contract.

## CONCLUSION

Plaintiffs' motion for preliminary injunction (Doc. 86) is **DENIED**.

Dated: March 26, 2020.

BY THE COURT:

_____
Daniel D. Domenico
United States District Judge