# PX4 – Lee PI Decl.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02005-DDD-SKC

SRS ACQUIOM INC., a Delaware corporation, and
SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company,

       Plaintiffs,

  v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania corporation,
PNC BANK, N.A., a national association,
HEATHER KELLY, an individual, and
ALEX TSARNAS, an individual,

       Defendants.

**DECLARATION OF HANNAH LEE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Hannah Lee, hereby declare and state:

1. I am over 18 years of age and submit this declaration on behalf of Plaintiffs SRS Acquiom Inc. and Shareholder Representative Services LLC (collectively, "SRSA") in connection with SRSA's Motion for Preliminary Injunction. Unless otherwise stated, the facts I set forth in this declaration are based on my personal knowledge. If called upon as a witness, I would testify to these facts competently under oath.

2. I am currently the Executive Director and Head of Human Resources at SRSA. From October 2017 to January 2019, I was a Director of Human Resources at SRSA.

3. In my capacity at SRSA, I lead all of SRSA's human resources initiatives and am familiar with all of SRSA's employee policies and procedures. I manage the onboarding process for all of SRSA's employees, and I manage all employee departures.

*Heather Kelly*

4. In June 2014, Heather Kelly joined SRSA as a Senior Vice President and Relationship Manager. Attached as **Exhibit 1** to this Declaration is a true and correct copy of Heather Kelly's June 9, 2014 employment agreement, which included an Employee Invention Assignment and Confidentiality Agreement (the "EIAC"). As a condition of their employment, all SRSA employees are required to sign the EIAC agreement.

5. Ms. Kelly's EIAC included multiple provisions aimed at protecting SRSA's confidential information and trade secrets, and ensuring that, upon an employee's departure, all SRSA employees return all SRSA property and confidential information in their possession. Those are reflected in paragraphs seven, eight, nine and twelve of the EIAC:

> 7. Trade Secrets. During and after my employment, I will hold all Trade Secrets of Company in confidence; I will not disclose these Trade Secrets to anyone. . . . "Trade Secrets" means the information described in the Description of Trade Secrets (Attachment A hereto), as pertaining to SRS or any of its affiliates, and any other information that from time to time may be identified by Company as confidential or is otherwise known to me as being

1

> confidential, whether embodied in memoranda, manuals, letters, or other documents, computer disks, tapes or other information storage devices, hardware, or other media or vehicles.
>
> 8. <u>Proprietary Information</u>.  I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to me by the Company that relates to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence ("Proprietary Information").  Such Proprietary Information includes but is not limited to Trade Secrets, Inventions, marketing plans, product plans, business strategies, financial information, forecasts, personnel information and customer lists.  Proprietary Information does not include information generally known or that is or becomes public domain information through no fault of mine.
>
> 9. <u>Confidentiality</u>. At all times, both during my employment and after its termination, I will keep and hold all such Proprietary Information in strict confidence and trust, and I will not use or disclose any of such Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company.  Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company and I will not take with me any documents or materials or copies thereof containing any Proprietary Information.
>
> 12. <u>Return of Company Documents</u>. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Proprietary Information of the Company.  I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement.

6. ATTACHMENT A to the EIAC lists out specific categories of "Trade Secrets and Proprietary Information." Those include, among other items: customer and prospective customer lists; marketing plans and strategies; SRSA income statements and financial information;

technical methodologies; research and development projects; SRSA operating procedures and systems; and software and hardware documentation.

7. Ms. Kelly's EIAC agreement also includes a one-year non-solicitation provision. The clause is aimed at protecting SRSA's customer relationships and, when an SRSA employee leaves the company for a competitor, ensuring that employee does not use insider knowledge of SRSA's customers and employees to compete unfairly. Ms. Kelly's non-solicitation provision included an exception for customers listed in "Schedule 1" of the agreement. Specifically, paragraph 17 provides:

> 17. Non-Solicitation. During, and for a period of one year after termination of, my employment with the Company, I will not directly or indirectly solicit or take away suppliers, customers, employees or consultants of the Company other than those set forth on Schedule 1 below for my own benefit or for the benefit of any other party.

8. In addition, paragraph 18 of the EIAC further recognizes that in the event of a breach of the EIAC, SRSA "may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement."

9. Throughout her tenure, SRSA permitted Ms. Kelly to work remotely from her Wisconsin residence. To allow her to work efficiently, SRSA provided her with a remote office and an SRSA corporate laptop. Although she was based remotely, Ms. Kelly was expected to, and did in fact, travel to Denver on a regular basis to attend SRSA meetings and transact SRSA business. She was paid by SRSA from Denver.

10. SRSA provided Ms. Kelly with a laptop and furnished a remote office for her with the understanding, as reflected in the EIAC and her employment agreement, that when she departed from the company, she would return her laptop and all other corporate equipment and property to SRSA, along with all SRSA materials in her possession. As a matter of policy and practice, SRSA requires all of its departing employees to promptly return to SRSA any SRSA

property and materials they possess. This policy exists in large part to prevent confidential SRSA information from falling into the hands of a competitor.

11. On or about March 7, 2018, I understand that Ms. Kelly informed Eric Martin—another senior SRSA employee and her current supervisor— that she intended to resign from her position. I was concerned about Ms. Kelly's departure because I understood that she was leaving to join PNC Bank ("PNC"). PNC had recently acquired Fortis, a competitor of SRSA's in its shareholder-representative business.

12. Attached as **Exhibit 2** to this Declaration is a true and correct copy of a March 9, 2018 email I sent to other SRSA employees confirming that Ms. Kelly had formally resigned from the company on that day. As reflected in this email, after Ms. Kelly resigned, her access privileges to SRSA's corporate email were disabled, and other online cloud accounts were transferred over to Mr. Martin. In order to support the coordinated hand-off of her accounts, SRSA did not terminate her access to certain SRSA files when she first announced her resignation.

13. On March 12, 2018, I personally conducted an exit interview with Ms. Kelly. In this interview, Ms. Kelly indicated that although she was grateful for her experience at SRSA, she was frustrated with some parts of her role at the company and wished to move on in her career. She expressed that she wanted more autonomy and control than SRSA was willing to provide her, and that she desired a new role where she had more direct control over managing client relationships and negotiating deal terms. She also indicated that she was aware that her personal work style had likely damaged many peer relationships at SRSA.

14. During our exit interview, Ms. Kelly informed me that she had been in recent communication with Alex Tsarnas. Mr. Tsarnas was the former head of SRSA's sales organization, and, as discussed below, had been terminated for cause in January 2018. Specifically, Ms. Kelly informed me that in February 2018, she received a call from PNC about a

job opening. Ms. Kelly told me that Mr. Tsarnas had informed her that he had been having discussions with PNC about a job opportunity and encouraged Ms. Kelly to "hear them out" on a job offer. Ms. Kelly stated that PNC had made her an offer roughly two weeks before the date of the interview, and that she intended to start at PNC on March 19, 2018.

15. Ms. Kelly also informed me that she had been displeased about Mr. Tsarnas's departure from SRSA, as she believed that Mr. Tsarnas contributed positively to the morale of other employees.

16. During this exit interview, as is SRSA's practice, I specifically reminded Ms. Kelly that she was obligated under her employment agreement to immediately return all SRSA equipment, materials, and proprietary information she had in her possession and was obligated not to disclose proprietary SRSA information to any future employer. All departing SRSA employees are reminded of these duties, either by myself or, with my approval, by another high-level executive at the company. If SRSA is concerned about a potential breach, SRSA may also send a letter to the employee and the employee's future employer reminding the employee of the post-separation obligations. It is also SRSA's regular practice to expedite the offboarding process for employees who are leaving to work for a competitor.

17. Paragraph 4 of Ms. Kelly's employment agreement expressly required the return, upon her departure from the company, of all "SRS Property," including all SRSA "documents" and "computers":

> During and after your employment, you will not use any SRS Property for any purpose other than for the benefit of SRS . . . In the event of your termination of employment, or at any time at the request of SRS, you will return all SRS Property. You will also return all copies of SRS Property, and any work product derived from SRS Property.

(Kelly's Employment Agreement ¶ 4, Exhibit 1).

18. During my exit interview with Ms. Kelly, I went over SRSA's inventory of SRSA equipment and proprietary information (notebooks, printed presentations and client lists are the

5

examples I usually give) in her possession and asked her to confirm that the list was accurate. Ms. Kelly did not question or deny her obligations to return SRSA property and instead informed me of all of the SRSA property she had in her possession that she intended to return. While doing so, she did not mention the existence of another SRSA laptop or printed documents in her possession. At the end of the conversation, Kelly confirmed that she had provided a complete and accurate list of SRSA property in her possession.

19.     As discussed below, between March 13 and March 15, 2018, I had a series of email exchanges and a telephone call with Ms. Kelly concerning her departure and the return of her SRSA laptop. Attached as **Exhibit 3** to this Declaration is a true and correct copy of email correspondence between myself and Ms. Kelly, dated March 13-15, 2018.

20.     First, on March 13, 2018, Ms. Kelly asked where her laptop should be sent. This was surprising, given that I had told her on March 12 to send it to SRSA's Denver headquarters. I responded the next day and informed her (again) that she should return the laptop to SRSA's Denver headquarters.

21.     On March 15, Ms. Kelly abruptly changed her mind regarding her obligation to return all SRSA equipment and proprietary information. Ms. Kelly emailed me stating that she would not return her SRSA laptop unless SRSA would agree to pay her additional salary and commissions she believed she was entitled to. I had respectfully discussed this compensation issue with Ms. Kelly before, and I was surprised that she would condition the return of SRSA property on this issue. Later that day, I responded to Ms. Kelly and informed her that, according to her compensation plan, she was not owed any further compensation.

22.     That same morning, I had a telephone conversation with Ms. Kelly. The call was extremely memorable. Ms. Kelly insisted that she be paid additional salary and commissions. She launched into a profanity-laced tirade against SRSA that included vulgar personal attacks on

SRSA's founders Paul Koenig and Mark Vogel. I had never heard Ms. Kelly speak in such an unprofessional way and was highly unsettled by the conversation.

23. Later that evening, although she did not withdraw her request for further payment, Ms. Kelly agreed to return her SRSA laptop and phone by mail. That evening, Heather also sent me an email with pictures of her SRSA office and noted, "attached are pictures of the office as I am leaving it with SRS's supplies . . . I understand I was authorized to take the printer and the other desk." Exhibit 3 at 7. Ms. Kelly did not state that she was also retaining another SRSA MacBook laptop. The next day, on March 16, 2018, Ms. Kelly emailed me pictures of a FedEx tracking number and her SRSA-provided office equipment indicating that she had shipped her corporate laptop and other office supplies back to SRSA's Denver headquarters.

24. I am informed and believe that Ms. Kelly's SRSA computer was received at SRSA's Denver headquarters on March 19, 2018. To the best of my knowledge, Heather never returned any hard-copy SRSA documents to SRSA following her departure.

### *Alex Tsarnas*

25. In September 2014, Alex Tsarnas joined SRSA as the company's Managing Director – Global Business Development. Mr. Tsarnas was responsible for the development of SRSA sales strategies and the management of SRSA's business development team. In addition, I am informed that during most of his time at SRSA, Mr. Tsarnas was Ms. Kelly's direct supervisor. His employment letter also indicated that he would be a member of SRSA's senior management team and a member of the Management Committee. Attached as **Exhibit 4** is a true and correct copy of Mr. Tsarnas's employment agreement dated August 23, 2014. As was the case for Ms. Kelly, Mr. Tsarnas's employment agreement included SRSA's standard EIAC, with the same confidentiality and non-solicitation provisions spelled out in paragraphs 5 and 7 of this Declaration.

26. In December 2017, while training a new employee on how to process employee-expense reports and to reconcile our corporate credit-card accounts, SRSA discovered serious discrepancies in Mr. Tsarnas's expense reporting. After further investigation, SRSA concluded that Mr. Tsarnas had intentionally and repeatedly defrauded SRSA by using SRSA-issued corporate credit cards for various expenses, and then submitting falsified expense reports claiming that he had paid those expenses himself and seeking reimbursement. On other occasions, he had also submitted duplicate requests for reimbursement of the same expense. SRSA's investigation determined that, over the two-year period spanning December 2015 through December 2017, Mr. Tsarnas embezzled more than $35,000 from SRSA through these practices. Attached as **Exhibit 5** to this Declaration is a true and correct copy of an investigative report I prepared in connection with Mr. Tsarnas's expense reporting.

27. On January 17, 2018, SRSA's General Counsel Sean Arend and I confronted Mr. Tsarnas with our findings over a telephone call. When I described what we had uncovered with respect to his expense accounts, Mr. Tsarnas admitted to the conduct and described it as "terribly careless." When I later presented the findings of this discussion to Chief Executive Officer Paul Koenig and senior executive Mark Vogel, I also learned that prior to my joining SRSA, Mr. Tsarnas had falsely claimed in his SRSA job application that he graduated from Fordham University in 1993, a falsehood that was uncovered during a routine background check.

28. Following this conversation, and after further evaluating and considering Mr. Tsarnas's conduct and explanation, SRSA elected to terminate his employment on January 23, 2018. I understand and am informed that Mr. Koenig traveled to New York to meet with Mr. Tsarnas, and that after terminating Mr. Tsarnas, Mr. Koenig immediately took possession of Mr. Tsarnas's SRSA laptop. While Mr. Koenig met with Mr. Tsarnas, I coordinated the immediate shut-down of Mr. Tsarnas's access to SRSA's online systems. Attached as **Exhibit 6** to this Declaration is a true and correct copy of a January 22, 2018 email I sent to other SRSA

employees confirming that Mr. Tsarnas's access had been severed.  We have no records or Mr. Tsarnas returning a USB to the company following his termination. Attached as **Exhibit 7** is a true and correct copy of the termination letter delivered to Mr. Tsarnas.

29. On or about February 28, 2018, Mr. Tsarnas repaid the full $35,050.98 that had been uncovered through the investigation of his expense reporting.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 25, 2019 in Broomfield, Colorado.

*s/ Hannah Lee*
Hannah Lee