# PX15 – Lezack Dep. Excerpts

```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3

 4   Civil Action No. 1:19-cv-02005-DDD-SKC

 5   SRS ACQUIOM INC., a Delaware
     corporation, and SHAREHOLDER
 6   REPRESENTATIVE SERVICES LLC,
     a Colorado limited liability
 7   company,

 8             Plaintiffs,

 9             v.

10   PNC FINANCIAL SERVICES GROUP,
     INC., a Pennsylvania
11   corporation, PNC BANK, N.A.,
     a national association,
12   HEATHER KELLY, an individual,
     and ALEX TSARNAS, an
13   individual,

14             Defendants.

15   _____

16      VIDEOTAPED DEPOSITION OF ADAM LEZACK AND AS A

17         30(b)(6) REPRESENTATIVE FOR PNC BANK

18                SAN DIEGO, CALIFORNIA

19                  OCTOBER 28, 2019

20

21

22   Reported By:
     PATRICIA Y. SCHULER
23   CSR No. 11949

24   Job No. 47863

25
```

Adam Lezack                                                                             October 28, 2019

## Page 2

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLORADO
 3
 4   Civil Action No. 1:19-cv-02005-DDD-SKC
 5   SRS ACQUIOM INC., a Delaware
     corporation, and SHAREHOLDER
 6   REPRESENTATIVE SERVICES LLC,
     a Colorado limited liability
 7   company,
 8         Plaintiffs,
 9         v.
10   PNC FINANCIAL SERVICES GROUP,
     INC., a Pennsylvania
11   corporation, PNC BANK, N.A.,
     a national association,
12   HEATHER KELLY, an individual,
     and ALEX TSARNAS, an
13   individual,
14         Defendants.
15   _____
16       Videotaped deposition of ADAM LEZACK, taken on
17   behalf of the PLAINTIFFS at Cordero Executive
18   Boardroom at the Marriott Del Mar, 11966 El Camino
19   Real, San Diego, California, beginning at 9:16 a.m.
20   and ending at 8:00 p.m., on October 28, 2019, before
21   PATRICIA Y. SCHULER, Certified Shorthand Reporter
22   No. 11949.
23
24
25
```

## Page 3

```
 1   APPEARANCES:
 2   ATTORNEYS FOR PLAINTIFFS SRS ACQUIOM INC. AND
 3   SHAREHOLDER REPRESENTATIVE SERVICES LLC:
 4         KEKER, VAN NEST & PETERS LLP
 5         BY:  WARREN A. BRAUNIG, ESQ.
 6         633 Battery Street
 7         San Francisco, California 94111-1809
 8         (415) 391-5400
 9         wbraunig@keker.com
10   FOR DEFENDANTS:
11         BALLARD SPAHR LLP
12         BY:  SARAH B. WALLACE, ESQ.
13         1225 17th Street, Suite 2300
14         Denver, Colorado 80202
15         (303) 292-2400
16         wallaces@ballardspahr.com
17   Also Present:
18         Natalie Moritz
19   Videographer:
20         Jake Thompson
21
22
23
24
25
```

## Page 4

```
 1                    I-N-D-E-X
 2   WITNESS:                          EXAMINATION
 3   ADAM LEZACK                              PAGE
 4   MR. BRAUNIG                                 8
 5
 6              E-X-H-I-B-I-T-S
 7   PLAINTIFF'S                              PAGE
 8   Exhibit 1    Document entitled "Project Bison   57
                  - Diligence Session 11.28.17,"
 9                Bates stamped PNC_00043772
                  through 43780
10
     Exhibit 2    Emails Bates stamped PNC_00054817   95
11                through 54861
12   Exhibit 3    Plaintiffs' Second Revised Notice  106
                  of Rule 30(B)(6) Deposition to
13                Defendants PNC Financial Services
                  Group, Inc. and PNC Bank, N.A.
14
     Exhibit 4    Emails Bates stamped PNC_00039113  113
15                through 39116
16   Exhibit 5    Emails Bates stamped PNC_00050874  130
                  through 50881
17
     Exhibit 6    Document Bates stamped             133
18                PNC_00047114 through 47116
19   Exhibit 7    Emails Bates stamped PNC_00049117  137
                  through 39118
20
     Exhibit 8    Emails Bates stamped PNC_00049491  139
21                through 49495
22   Exhibit 9    Document Bates stamped             158
                  PNC_00047099 through 47103
23
     Exhibit 10   Emails Bates stamped PNC_00039354  171
24                through 39380
25
```

## Page 5

```
 1              E-X-H-I-B-I-T-S (CONTINUED)
 2   PLAINTIFF'S                              PAGE
 3   Exhibit 11   Emails Bates stamped PNC_00007154  189
 4   Exhibit 12   Emails Bates stamped PNC_00048349  193
                  through 48352
 5
     Exhibit 13   Emails Bates stamped PNC_00038190  197
 6
     Exhibit 14   Emails Bates stamped PNC_00037740  201
 7                through 37744
 8   Exhibit 15   Document Bates stamped             204
                  PNC_00037745 through 37748
 9
     Exhibit 16   Email with attachment Bates        211
10                stamped PNC_00053021 through
                  53046
11
     Exhibit 17   Email Bates stamped PNC_00040496   238
12
     Exhibit 18   Emails Bates stamped PNC_00044012  244
13                and 44013
14   Exhibit 19   Emails Bates stamped PNC_00038770  248
                  through 38772
15
     Exhibit 20   Email with attachment Bates        251
16                stamped PNC_00008410 through 8496
17   Exhibit 21   Emails Bates stamped               260
                  CGI_SRS_00001824 through 1828
18
     Exhibit 22   Email with attachment Bates        267
19                stamped PNC_00008797
20   Exhibit 23   PNC Marketing Information          277
21   Exhibit 24   Email with attachment Bates        283
                  stamped PNC_00038102 through
22                38106
23   Exhibit 25   Emails Bates stamped PNC_00037507  288
                  through 37512
24
25
```

```
 1           E-X-H-I-B-I-T-S (CONTINUED)
 2   PLAINTIFF'S                                        PAGE
 3   Exhibit 26    Emails Bates stamped PNC_00037366    295
                   through 37388
 4
     Exhibit 27    Email with attachment Bates          301
 5                 stamped PNC_00048288 through
                   48291
 6
     Exhibit 28    Email with attachment Bates          311
 7                 stamped PNC_00051176 through
                   51184
 8
     Exhibit 29    Document Bates stamped               322
 9                 PNC_00047093 through 47098
10   Exhibit 30    Document Bates stamped               326
                   PNC_00052755 through 52757
11
     Exhibit 31    Document Bates stamped               329
12                 PNC_00047104 through 47107
13   Exhibit 32    Emails Bates stamped PNC_00043688    335
                   through 43689
14
     Exhibit 33    Emails Bates stamped PNC_00038773    351
15                 through 38774
16   Exhibit 34    Emails Bates stamped PNC_00038609    355
                   through 38610
17
     Exhibit 35    Email Bates stamped PNC_00037864     358
18                 through 37865
19   Exhibit 36    Email Bates stamped PNC_00038531     361
20   Exhibit 37    Emails Bates stamped PNC_00040208    364
                   through 40211
21
     Exhibit 38    Emails Bates stamped PNC_00043003    366
22                 through 43004
23   Exhibit 39    Email with attachment Bates          370
                   stamped PNC_00041007
24
25
                                                     Page 6
```

```
 1        SAN DIEGO, CALIFORNIA; MONDAY, OCTOBER 28, 2019
 2                         9:16 a.m.
 3           THE VIDEOGRAPHER:  Good morning.  Here
 4   begins Media No. 1 in the deposition of Adam Lezack
 5   in the -- in both his personal capacity and as
 6   30(b)(6) for PNC Bank in the matter of SRS Acquiom,
 7   Inc., et al., v. PNC Financial Services Group,
 8   Inc., et al.
 9           This case is in the United States
10   District Court for the District of Colorado.  The
11   case number is 1:19CV02005-DDD-SKC.  Today's date
12   is October 28, 2019.  The time is 9:16 a.m.  The
13   deposition is taking place at 11966 El Camino Real,
14   San Diego, California.
15           The legal videographer is Jake Thompson,
16   and the court reporter is Patricia Schuler, here on
17   behalf of Litivate Reporting and Trial Services.
18           Counsel, please be aware your microphones
19   are sensitive and may pick up whispers, private
20   conversations, and cellular interference, which may
21   be captured on the video as well as taken down by
22   the court reporter as part of the record of these
23   proceedings.
24           Would counsel please identify yourselves
25   and state whom you represent.
                                                     Page 7
```

```
 1           MR. BRAUNIG:  Warren Braunig, Keker, Van
 2   Nest & Peters for the SRS Acquiom parties.
 3           MS. WALLACE:  Sarah Wallace with the law
 4   firm of Ballard Spahr on behalf of PNC, as well as
 5   Alex Tsarnas and Heather Kelly.  And with me is
 6   Natalie Moritz of PNC.
 7           THE VIDEOGRAPHER:  Would you please swear
 8   in the witness.
 9
10                     ADAM LEZACK,
11    having been administered an oath, was examined and
12                  testified as follows:
13
14                      EXAMINATION
15   BY MR. BRAUNIG:
16      Q.   Good morning, Mr. Lezack.
17      A.   Good morning, Warren.
18      Q.   We met prior to going on the record, but
19   I am Warren Braunig, and I represent SRS Acquiom in
20   this matter.
21           Have you ever been deposed before?
22      A.   I have never been deposed before.
23      Q.   Have you attended depositions as an
24   attorney?
25      A.   Yes.  I did.
                                                     Page 8
```

```
 1      Q.   I'll just give you kind of the quick
 2   background so that you're familiar with the
 3   procedure.
 4           I am going to ask you questions.  You
 5   will give me answers.  Your counsel may object, but
 6   unless you are instructed not to answer, you will
 7   provide an answer.
 8           Do you understand that?
 9      A.   Okay.
10      Q.   One of the most important things is that
11   we've got a court reporter here who is taking down
12   everything we say.  She can't accurately reflect
13   nods and shakes of the head, so you'll need to make
14   sure that you answer audibly with a "yes" or a "no"
15   or a spoken answer.
16           Do you understand that?
17      A.   Okay.
18      Q.   Good.  Off to a good start.
19           It will also be really important that you
20   and I don't speak over each other.  So I will try
21   to wait until you've finished an answer before I
22   start a new question.  And if you can wait until I
23   finish my question to start your answer, that will
24   make life a lot easier for her.
25           Understood?
                                                     Page 9
```

**Page 34**

1  right?
2      A.   Not -- so I am not really sure what you
3  are driving at.  If -- I will answer it this way.
4  So a transaction -- once again, let's say Company A
5  is buying Company B.  We certainly aren't saying
6  anything in public, unless that deal is
7  announced -- that Company A is buying Company B.
8  Much like you practicing as a lawyer, you keep that
9  quiet.  That is what we do.
10     Q.   Would you keep -- would you keep
11 information confidential in the course of those
12 transactions, regardless of whether or not there
13 was a formal NDA?
14     A.   So I will repeat it again.  Like, to the
15 extent that information is confidential that we had
16 that we otherwise think is confidential, we employ
17 the same procedure.
18          So I am not really sure what you are
19 driving at.  We don't -- unless a deal is publicly
20 announced, we are not announcing our deals.
21     Q.   From whom would you -- in the ordinary
22 course of business, from whom would you learn
23 confidential information?  Would you learn
24 confidential information from the seller in a
25 transaction?

**Page 35**

1      A.   If we were to learn confidential
2  information, which, in my mind, the primary thing
3  is the existence of a deal, you would learn it from
4  the seller in the transaction.
5      Q.   Could it also come from the buyer, the
6  confidential information?
7      A.   Well, we're engaged on the sell side.  So
8  I will give you -- an example of confidential
9  information could be related to drug development on
10 a milestone.  That would be something that could be
11 confidential in nature and would not be disclosed
12 to the public.
13     Q.   That is something you might learn from
14 the buyer's counsel or the buyer's side as well?
15     A.   You would typically learn that from a
16 milestone report.
17     Q.   Which would be generated by whom?
18     A.   I don't generate them.  So I could guess
19 if you want me to guess.
20     Q.   No, I don't want you to guess.
21     A.   Okay.
22     Q.   Was 2017 the last year that Fortis was a
23 stand-alone company?
24     A.   2018.
25     Q.   Was the last full year of Fortis

**Page 36**

1  operations 2017?
2      A.   Sorry.  You didn't say full year.  The
3  deal closed in January 31 or February 1 of 2018.
4  So the last full calendar year would have been
5  2017.
6      Q.   About how much profit did Fortis generate
7  in 2017?
8      A.   Profit?
9      Q.   Yes.
10     A.   Do you mean net income?
11     Q.   Net income.
12     A.   I don't remember.  Do you want me to
13 guess?
14     Q.   Give me your best estimate.
15     A.   Directionally?  For the calendar year of
16 2017, 4- or $5 million.
17     Q.   Who were Fortis's competitors for
18 shareholder rep services?
19     A.   So Fortis had and has a few competitors;
20 one of which is your client.  There is a few
21 small -- let's call it mom-and-pop shops that
22 provide the service.  But by far the biggest
23 competitor to SRS and to Fortis is the individual
24 shareholder who decides to do it themselves.
25     Q.   For professional shareholder services,

**Page 37**

1  the two big players are SRS and Fortis, correct?
2      A.   That is correct.
3      Q.   Prior to the PNC acquisition, had Fortis
4  considered getting into making a bigger play within
5  the payments and escrow business?
6      A.   Yes.
7      Q.   Why is that?
8      A.   Why did Fortis consider --
9      Q.   Yes.
10     A.   You said make a play?  What did you say?
11     Q.   Make a bigger entry into the payments and
12 escrow side of the business.
13     A.   Well, so simple business reason.  When
14 you have a business that has complimentary services
15 that you otherwise have deep subject matter
16 expertise in, to the extent that you can build out
17 those businesses and gain additional revenue --
18 that is a reasonable thing to do versus going down
19 a path that you have no understanding of.
20     ==Q.   Prior to 2018, did Fortis have any sort==
21 ==of online payment software that it had built?==
22     ==A.   Online payment software?==
23     ==Q.   Yes.==
24     ==A.   So we had multiple online products.  We==
25 ==did not have an online payment software.  We had an==

Adam Lezack                                                                October 28, 2019

**Page 38**

 1  online portal which we developed and built.  We had
 2  an online M&A marketing tool which we developed and
 3  built.
 4     Q.   But not an online paying agent software?
 5     A.   Actually, we also helped customize for
 6  our own use, you know, payment platforms within
 7  financial institutions.
 8          But we did not market an online payment
 9  whatever you called it.  I mean, you would have to
10  repeat whatever you called it.
11     Q.   Did Fortis, prior to 2018, have the
12  ability to do letters of transmittal in an online
13  process?
14     A.   What do you mean by that?
15     Q.   Did you have -- did Fortis have a
16  technology that allowed people to execute letters
17  of transmittal in an online format or an online
18  process?
19     A.   Did we have the technology?  Absolutely.
20  I had a DocuSign account.  I could have done that
21  in about one minute.  Did we do it?  No.
22     Q.   What about compensation payments for
23  employees?  Is that something that Fortis did prior
24  to 2018?
25     A.   Yes.

**Page 39**

 1     Q.   In what capacity?
 2     A.   So let's -- it is really important to
 3  answer your question in a comprehensive manner.  So
 4  when you say "compensation payment," can you tell
 5  me what you mean by that?
 6     Q.   Did Fortis handle compensation payments
 7  for non -- for people who were -- in addition to
 8  shareholder payments, did Fortis handle
 9  compensation payments, for example, to option
10  holders?
11     A.   Okay.  I think I understand your
12  question.  So there is -- I am going to assume, you
13  know -- do you need me to explain to you what a
14  compensation payment is and the underlying
15  characterization from a tax perspective?
16     Q.   Why don't you go ahead and do that.
17     A.   So you have security holders on the deal.
18  Warren is a security holder in Warren's company.
19  Warren invests $10.  You're a hard-money investor,
20  right?  You don't work at the company.  Sarah works
21  at the company.  She's an employee.  Sarah really,
22  really wants to be paid $300,000 a year, but you
23  don't have $300,000 a year to pay Sarah.  You have
24  $100,000 a year to pay Sarah.
25          But Warren, you're a really persuasive

**Page 40**

 1  guy, super persuasive, and you tell Sarah "Come
 2  join the company.  We are going to build a great,
 3  great exit here.  And when we exit the company, you
 4  are going to make a lot of money."  So the question
 5  is, how?  You are going to grant Sarah an option,
 6  right?
 7          And I will just tell you that there are
 8  ISOs, there's MSOs.  And that is neither here nor
 9  there for the purposes.  But let's just go down the
10  ISO path.  You are going to grant Sarah an
11  incentive stock option.  And that is an exercisable
12  security pursuant to which there is a price on it.
13  And Sarah does not own that security until she
14  exercises it.  It is contractual.
15          So what is happening now is Sarah has
16  been granted -- in exchange for her as an employee,
17  in the course and scope of her employment, that is
18  part of her compensation, right?  So she has her
19  paycheck that comes every two weeks that is subject
20  to FICA and withholding, but she also has this
21  option that you granted her.
22          And I'm not going to go down the path of
23  83-B elections.  It's sort of not important for
24  what I think you are asking.  So now you get to an
25  exit event; a liquidity event.  Okay.

**Page 41**

 1          And so at that liquidity event, you have
 2  to look at all of the security holders on -- I
 3  refer to them as cap tables or payment
 4  spreadsheets.  You have to look at all of the
 5  security holders and how that security was granted
 6  to that individual or institution and for what
 7  reason and at what time.
 8          So we know that Sarah was granted an ISO
 9  in exchange for her working at the company.  Okay.
10  So we can put everything else aside.  So now the
11  deal closes.  That ISO, because it was granted to
12  her in the course and scope of her employment in
13  exchange for her working, is no different than the
14  cash that showed up on her W-2.
15          So what has to happen is, the company has
16  a legal obligation, pursuant to the IRS regs, to
17  treat it as compensation, meaning that that payment
18  has to go through a payroll process.  There has to
19  be the calculation of the applicable withholding
20  taxes.  There has to be the respective tax filings
21  at the respective institution, whatever that may be
22  at the time.
23          And so back to your original question.
24  Yes, we have done that before on a Fortis deal.
25     Q.   Was that something that Fortis did in the

Adam Lezack                                                                 October 28, 2019

```
 1      Q.   Did Fortis evaluate what it would cost to
 2   work with an outside technical expert in order to
 3   build an online paying agent product?
 4      A.   Did we get a quote to build an online
 5   paying product?  Is that what you are asking?
 6      Q.   Did you get a quote?
 7      A.   Nope.
 8      Q.   Did you scope it out in terms of what the
 9   cost would be?
10      A.   It sounds like that is the same thing.
11      Q.   You could scope it out -- you could scope
12   it out without getting a quote, right?
13      A.   I don't know how you would do that.  But
14   if your question is did we scope out the cost but
15   not get the quote, I don't think so.
16      Q.   Did Fortis make a determination of how
17   much it would cost from an investment perspective
18   to develop an online paying agent product?
19      A.   No.  That was not our goal.  As I have
20   mentioned, we know what we are really good at and
21   what we are experts in.
22           And so to the extent we ever would have
23   gone down that path, we would always have paired
24   with folks that that is their inherent line of
25   business, such as a bank that is a global leader in
                                                 Page 50
```

```
 1   making payments.
 2      Q.   Did Fortis make a determination of how
 3   long it would take to develop an online paying
 4   agent product?
 5      A.   Did Fortis determine --
 6           MS. WALLACE:  This is prior to being
 7   acquired by PNC?
 8   BY MR. BRAUNIG:
 9      Q.   Yes.
10      A.   One more time.  You threw me off.
11      Q.   Before the PNC acquisition, did Fortis
12   make a determination of how long it would take to
13   develop an online paying agent capability?
14      A.   Yes.  In the course and scope of
15   conversations I had, I had a sense in my mind as to
16   how long it would take.
17      Q.   What was your sense of how long it would
18   take?
19      A.   So roughly four to six months.
20      Q.   What was that based on?
21      A.   A conversation I had with someone at
22   SecondMarket about how long it took them.
23      Q.   What had SecondMarket built?
24      A.   An online payment system.
25      Q.   For what purpose?
                                                 Page 51
```

```
 1      A.   To distribute funds to recipients via an
 2   online portal.
 3      Q.   Was there anyone at Fortis who was
 4   employed by Fortis who had built an online payment
 5   platform?
 6      A.   No one at Fortis that is employed by
 7   Fortis has historically built an online payments
 8   platform.
 9      Q.   We have kind of talked about this a
10   little bit.  Why didn't Fortis build a payment --
11      A.   Just one second, please.  Is it working?
12           Okay.  Sorry.
13      Q.   That's okay.
14           Why didn't Fortis build an online
15   payments platform before 2018?
16      A.   So as I have already mentioned, we
17   have -- in any given day when you're running a
18   business, you can't just do everything.  I would
19   like to do everything in life.  I'd like to become
20   a basketball player and I'd like to learn how to
21   fly a plane.  I just -- we can't do everything as
22   much as we'd like to in life.
23           And so when you are making business
24   decisions, when you're running a business, there
25   are things you have to decide.  And so, for
                                                 Page 52
```

```
 1   whatever it was at the time, we did not decide to
 2   pursue doing that.
 3      Q.   How did the PNC acquisition of Fortis
 4   come about?
 5      A.   In what respect?
 6      Q.   Was there -- did they just make a cold
 7   offer one day?  Was there an investment bank pitch
 8   that was sent out to various people?  What was the
 9   process by which PNC came to acquire Fortis?
10      A.   So we had an investment bank that was
11   engaged.  And the investment banking process --
12   typical investment banking process, an investment
13   bank puts together what is called a CIM, a
14   confidential information memorandum.
15           And then, you know, an investment bank,
16   hopefully, a good investment bank, has contacts
17   within their respective niche area, financial
18   industry, and they reach out to their respective
19   contact saying "We think we have something that may
20   be of interest to you."  And then you have multiple
21   parties provide bids on the acquisition of the
22   company.
23           So that was the process pursuant to which
24   our investment bank worked with us in order to
25   introduce us to PNC.
                                                 Page 53
```

Adam Lezack                                                                      October 28, 2019

```
 1  image?
 2      A.   You're talking about before closing, at
 3  closing, after closing?
 4      Q.   Yeah.
 5      A.   I see this concept of a timeline.
 6      Q.   Does PNC use the same kind of timeline to
 7  convey how its products fit into the MNA process?
 8      A.   Can I look at a PNC piece of marketing
 9  material?
10      Q.   You could look at Lezack 23.
11      A.   The one you just gave me?  Let's take a
12  peek.  So there is a timeline on the back of this
13  document.
14      Q.   Does PNC have the same products as SRS in
15  each step of the timeline here?
16      A.   Does PNC have the same products -- so
17  pre-closing solicitation.  I see that, although I'm
18  just looking at this little box you've got on the
19  left here.  On payments and escrows.  I don't see
20  compensation payments here.
21      Q.   Did PNC have versions of Exhibit Lezack
22  23 that also included compensation payments?
23      A.   I'm sure.
24      Q.   And where would compensation payments fit
25  into that process?
                                                Page 286
```

```
 1      A.   So in MNA, the timeline of compensation
 2  payments is either whenever someone is subject to
 3  compensatory payments and applicable withholding
 4  would be paid on a deal.  So it could be at
 5  closing, post-closing, every deal is different.
 6      Q.   And does that happen at the same time as
 7  reflected in the SRSA document?
 8      A.   Start again.  I didn't hear you over
 9  Natalie.
10      Q.   Is the time at which compensation
11  payments are made consistent with what is in the
12  SRSA language?
13      A.   Can you ask that a different way?  I
14  don't follow you.
15      Q.   Yeah.  Does PNC provide compensation
16  payments at the same type as SRSA provides
17  compensation payments?
18      A.   I have no idea when SRS provides
19  compensation payments, but I would hope it's to
20  comply with applicable IRS regulations and when you
21  otherwise need to pay an employee.
22      Q.   In its marketing materials, does PNC try
23  to convey that it has the same products and
24  features as SRSA?
25      A.   In PNC's marketing materials it tries to
                                                Page 287
```

```
 1  convey what it has.
 2      Q.   And what it has is the same as what SRSA
 3  has, at least as much as you know what SRSA has,
 4  right?
 5      A.   So once again, I can't tell you what SRS
 6  has.  I don't work there.  What I can tell you is
 7  if you are comparing those boxes, I can agree with
 8  you that, yes, a box matches as far as words on a
 9  piece of paper are concerned.
10      Q.   Do you recall that Heather Kelly at one
11  point suggested to PNC that it not call pre-closing
12  solicitation by that name because that was SRSA's
13  terminology?
14      A.   She may have said that to me.
15      Q.   You don't recall as you sit here?
16      A.   Well, she would generally come to me
17  about a lot of things, so I don't specifically
18  recall, but if she said that to me, it wouldn't
19  surprise me.
20           Okay.  I have this document.
21           (Exhibit 25 was marked for
22           identification.)
23  BY MR. BRAUNIG:
24      Q.   Okay.  Lezack 24, PNC 37507 --
25      A.   It's 25.
                                                Page 288
```

```
 1      Q.   What did I say?
 2      A.   You said 24.
 3      Q.   Okay, Lezack 25 is PNC 37507.  I want to
 4  just draw your attention to the interlineated
 5  comments on 37509.
 6      A.   Okay.
 7      Q.   And you see that Heather Kelly asks you
 8  and others, can we use another term here?  SRS'
 9  marketing refers to these types of docs/services as
10  pre-closing solicitation?
11      A.   Let me just find where you are.
12      Q.   Near the top of the page, 375.
13      A.   Got it.  Okay.  Okay.  And these are my
14  interlineated comments is what you're saying?
15      Q.   Well, I can ask you that.
16      A.   Okay.
17      Q.   Do you recognize that these are your
18  interlineated comments?
19      A.   Well, I'm just reading the email.  It
20  looks like those would be my interlineated
21  comments, and like I said, I wouldn't be surprised,
22  and I can see what my response here is.
23      Q.   And what was your response?
24      A.   "That's okay.  Not sure why we need to
25  call it anything other than what it is."
                                                Page 289
```

Adam Lezack                                                October 28, 2019

**Page 374**

1  get the deal?"  That's what you would do.
2     Q.   Does PNC track, for each one of these
3  deals that's listed in Lezack 39, track who at PNC
4  brought in each of those deals?  Who's responsible
5  for bringing it in?
6     A.   So it's a little nuanced.  It would be
7  who's otherwise working on it or participated in
8  the process.  We would -- we would know that for
9  each deal because it could be tied to compensation
10 for these individuals.
11    Q.   Where is that information reflected, the
12 information about which deals are tied to which --
13 to someone for compensation purposes?
14    A.   It would be in a finance -- finance
15 document like -- what do they call it?  Like HR
16 compensation group maybe?  I'm making the title up
17 of whatever group that is within PNC.
18    Q.   And provides the input for that file?
19    A.   So it's a collective effort.  A lot of
20 the times I end up having to take the laboring or
21 at the end of the day, to hand it to that finance
22 group.
23    Q.   And do you do that in a spreadsheet or do
24 you do that in a -- do you handwrite it on?
25    A.   No.  It's all done in a finance

**Page 375**

1  spreadsheet.
2     Q.   And that's information that you
3  individually go through and collect and provide to
4  finance?
5     A.   I'm not the only person.  It's a big
6  team.  It takes a lot of effort, but at the end of
7  the day, you know, we all take responsibility for
8  that list.
9     Q.   Who else contributes to that list?
10    A.   Well, all of the teammates on the team.
11    Q.   Do you know what the document is called
12 at finance?
13    A.   I don't.
14    Q.   How often is it updated?
15    A.   Every quarter.
16         MR. BRAUNIG:  I am going to keep this
17 deposition open with respect to Topic 6 because we
18 are still waiting for information about the
19 solicitation of customers that we've -- there was a
20 court order on and we've been negotiating about.
21 So with respect to Topic 6, whether it's this
22 witness or some other witness, we reserve the right
23 to take additional 30(B)6 testimony once we have
24 that information.  But otherwise, I have no further
25 questions at this time, and I thank you for this

**Page 376**

1  very long day.
2         THE WITNESS:  Thank you.
3         MS. WALLACE:  And we will likely object
4  to that reservation, but we don't need to discuss
5  or decide that on the record.
6         THE VIDEOGRAPHER:  Off the record?
7         MS. WALLACE:  Off the record.
8         THE VIDEOGRAPHER:  This concludes today's
9  testimony given by Adam Lezack.  The number of
10 media used was 11.  We are off the record at
11 8:00 p.m.
12         (The videotaped deposition of ADAM LEZACK
13         concluded at 8:00 p.m.)

**Page 377**

9  I, ADAM LEZACK, do hereby declare under the penalty
10 of perjury that I have read the foregoing
11 transcript; that I have made any corrections as
12 appear noted, in ink, initialed by me, or attached
13 hereto; that my testimony as contained herein, as
14 corrected, is true and correct.
15      EXECUTED this _____ day of _____,
16 20____, at _____, _____.
17              (City)                  (State)

                    _____
                            ADAM LEZACK

```
 1         I, PATRICIA Y. SCHULER, a Certified
 2   Shorthand Reporter of the State of California, do
 3   hereby certify:
 4         That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were duly sworn; that a
 8   verbatim record of the proceedings was made by me
 9   using machine shorthand which was thereafter
10   transcribed under my direction; that the foregoing
11   transcript is a true record of the testimony given.
12         Further, that if the foregoing pertains
13   to the original transcript of a deposition in a
14   Federal Case, before completion of the proceedings,
15   review of the transcript [X] was [ ] was not
16   requested.
17         I further certify I am neither
18   financially interested in the action nor a relative
19   or employee of any attorney of party to this
20   action.
21         IN WITNESS WHEREOF, I have this date
22   subscribed my name.
23   Dated:  October 31, 2019
24                 _____P.Y.S.Duler_____
                     PATRICIA Y. SCHULER
25                   CSR NO. 11949
```
Page 378

```
 1              DEPOSITION ERRATA SHEET
 2   CASE NAME:  SRS ACQUIOM INC.  v.  PNC FINANCIAL
     DEPOSITION DATE:  OCTOBER 28, 2019
 3   WITNESS NAME:    ADAM LEZACK
 4   Reason Codes:  1. To clarify the record.
 5                  2. To conform to the facts.
 6                  3. To correct transcription errors.
 7   Page _____ Line _____ Reason Code _____
 8   From _____ to _____
 9   Page _____ Line _____ Reason Code _____
10   From _____ to _____
11   Page _____ Line _____ Reason Code _____
12   From _____ to _____
13   Page _____ Line _____ Reason Code _____
14   From _____ to _____
15   Page _____ Line _____ Reason Code _____
16   From _____ to _____
17   Page _____ Line _____ Reason Code _____
18   From _____ to _____
19   Page _____ Line _____ Reason Code _____
20   From _____ to _____
21   Page _____ Line _____ Reason Code _____
22   From _____ to _____
23   Page _____ Line _____ Reason Code _____
24   From _____ to _____
25   Page _____ Line _____ Reason Code _____
```
Page 379

```
 1   From _____ to _____
 2   Page _____ Line _____ Reason Code _____
 3   From _____ to _____
 4   Page _____ Line _____ Reason Code _____
 5   From _____ to _____
 6   Page _____ Line _____ Reason Code _____
 7   From _____ to _____
 8   Page _____ Line _____ Reason Code _____
 9   From _____ to _____
10   Page _____ Line _____ Reason Code _____
11   From _____ to _____
12   Page _____ Line _____ Reason Code _____
13   From _____ to _____
14   Page _____ Line _____ Reason Code _____
15   From _____ to _____
16
     _____Subject to the above changes, I certify that
17   the transcript is true and correct.
18   _____No changes have been made. I certify that the
     transcript is true and correct.
19
20
21                  _____
22                          ADAM LEZACK
23
24
25
```
Page 380