# PX106 – 2020.08.19 Letter

# DOWD BENNETT LLP

**Matthew E. Johnson**             Mobile:  (303) 725-5771             Email:  mjohnson@dowdbennett.com

August 19, 2020

*Via Email*

Warren Braunig
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
wbraunig@keker.com

Re:   *SRS Acquiom, Inc., et al. v. PNC Financial Services Group, Inc., et al.*, No. 19-cv-2005—Continued Meet and Confer Regarding Discovery Issues

Dear Warren:

I write in response to your July 28, 2020 letter regarding Defendants' objections and responses to SRSA's discovery requests, and to follow up on our various meet and confer telephone conferences.  As Plaintiffs are aware, the parties have already briefed to Magistrate Judge Crews the issues of (1) whether SRSA is entitled to PNC's complete transaction and customer information; and (2) whether SRSA is entitled to the broad financial discovery it seeks from PNC, and thus this letter does not address those matters in detail.[1]

**The Court's Order on Plaintiffs' Motion for Preliminary Injunction**

As a general matter, part of the breakdown between the parties seems to be that we do not agree regarding the effect of the preliminary injunction order on what reasonable discovery is left to be completed in this case.  While it is sometimes true that orders on motions for preliminary injunctions are not final rulings on the merits, in this instance, the Court held that SRSA's purported trade secrets are not trade secrets at all, or, alternatively, that any purported confidentiality has been waived because SRSA routinely shared the purported trade secrets with the public.

Thus, for example, with respect to SRSA's Payments Spreadsheet, the Court held that it is not a trade secret because SRSA routinely shared it with third parties without requiring they first sign an NDA or any other form of confidentiality agreement.  ECF No. 207 at 18-19.  As to SRSA's customer information, the Court concluded this information was not a trade secret because Defendant Heather Kelly had a contractual right to solicit her Schedule 1 customers immediately upon her departure from SRSA, and all customers after the expiration of the one-

---

[1] In Defendants' view, this encompasses, at a minimum, RFP Nos. 14 and 15 to PNC Bank, RFP Nos. 11 and 16 to PNC Financial, and Interrogatory No. 2 to PNC Bank.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **2** of **10**

year period.  ECF No. 207 at 15-16.  The Court also recognized that contact information is not a trade secret in this industry.  ECF No. 207 at 12.  Regarding SRSA's pricing, the Court held that "neither its prices nor its general pricing strategies can be considered trade secrets."  ECF No. 207 at 21-22.  And, as to SRSA's product development strategies, the Court held that any SRSA product development strategies are embodied in SRSA's publicly available products themselves, which cannot be trade secrets as a matter of law.  ECF No. 207 at 24.  The Court's holding also demonstrates the impropriety of SRSA's discovery requests regarding the purported "similarities of SRSA's and PNC's products."  *See* W. Braunig July 28, 2020 Letter, at 2.

These holdings from the Court squarely foreclose SRSA's misappropriation claims based on these purported trade secrets because no amount of discovery could alter the Court's application of the law to these undisputed facts.  For example, no amount of discovery can undo SRSA's disclosure of its payments spreadsheets in the manner the Court found precluded trade secret protection as a matter of law.  As a result, any discovery premised on these claims[2] is disproportional to the needs of the case, especially when PNC has already produced nearly 12,000 documents to SRSA regarding these issues.  Further, Defendants moved for summary judgment on the trade secret claims, and the inefficiencies of addressing facially overbroad discovery requests in a situation where the case could be substantially narrowed are glaring.  Therefore, in light of the Court's holdings in ECF No. 207, and given that dispositive motions that are pending, as a general matter, Defendants stand on their objections to the document requests that relate to SRSA's alleged trade secrets.  However, in order to provide the utmost clarity as part of this meet and confer process, Defendants further respond below regarding various specific requests.

**RFP Nos. 16 and 17 to PNC Bank**

It is our understanding that there is no allegation in this case that software development codes or other software development information was taken from SRSA nor is there any allegation that Ms. Kelly or Mr. Tsarnas were involved in any coding for SRSA (or PNC for that matter).  In fact, as you know from discovery, there would be no merit to such a software development misappropriation claim because PNC's M&A Payment & Escrow products are developed using a completely different software than that used by SRSA.  This is supported not only by lengthy deposition testimony, but from the numerous technical and workflow documents concerning PNC Paid that Defendants have already produced.  That fact, which has been known to SRSA for many months, underscores why RFP Nos. 16 and 17 are not relevant in this case.

Additionally, PNC's third-party software developer, CGI, produced over 2,000 documents related to technical specifications and product development.  Therefore, SRSA has

---

[2] This includes RFP Nos. 13, 15, 16, 17, 18, 21, 24, and 25 to PNC Bank; Interrogatory No. 6 to PNC Bank; and RFA Nos. 3-5, and 12 to Ms. Kelly.  Certain of these discovery requests are nonetheless further addressed herein.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **3** of **10**

beyond sufficient information that cuts right to the heart of the subject matter of RFP Nos. 16 and 17 to PNC Bank.

Moreover, your suggestion that RFP Nos. 16 and 17 "do not got to strategies" means that it goes directly to how the software was developed, which is not relevant in this case for the reasons stated above. "Similarities at the core of SRSA's and PNC's products, and how they came to be," is not a legal claim in the case and it is belied by the facts, namely the software platform used by PNC to develop its products, and by the Court's prior holdings. To the extent the reference to "similarities" is merely another way of phrasing SRSA's alleged trade secret "product development strategies," the Court has already held that these publicly-released products cannot form the basis of a trade secret claim. PNC Bank stands by its objections to these two RFPs and otherwise refers SRSA to the more than 2,000 documents produced by CGI.

**RFP No. 18 to PNC Bank**

This RFP is addressed by the briefing that was recently submitted to Magistrate Judge Crews. However, it bears repeating that this RFP is completely untethered to the claims in the case. It is so overbroad that it could include every single communication from every PNC employee across the entirety of the bank whether those people have ever heard of SRSA or even know the names Alex Tsarnas (who never had a sales role at PNC), or Heather Kelly. This RFP is a classic example of abuse of the discovery process by SRSA and it ignores the proportionality requirements in Fed. R. Civ. 26. Defendant PNC Bank stands on its objections to this RFP.

Relatedly, RFP Nos. 15 and 21 are overbroad and now irrelevant in light of the Court's holding at ECF No. 207, and they are disproportional to the needs of the case in light of the pending motions for summary judgment. Further, they are generally encompassed within the briefing about financial issues that is now before Magistrate Judge Crews.

**RFP No. 13 to PNC Bank**

This request is incredibly overbroad as written, and apparently seeks to encompass any document where any person or entity from the "HK Contacts" document is listed. Not only is the HK Contacts document irrelevant in light of the Court's holding, but the broad nature of the request is simply impossible to answer. If Plaintiffs want to revise the request to something more customary in litigation, like "all versions of the HK Contact document," or something along those lines, Defendants can reconsider whether the RFP can be answered.

**RFP No. 24 to PNC Bank**

Your letter is hard to follow in that page 3 discusses "SRSA customer lists" yet there are no such "SRSA customer lists" at issue in this litigation, and the Court rejected SRSA's attempt to label Ms. Kelly's "contact list" as such. The Court has addressed Plaintiffs' contentions on the HK Contacts document, and otherwise, this effort to obtain virtually every single file in PNC's file cabinet is now before the Court and need not be further debated here.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **4** of **10**

**RFP No. 25 to PNC Bank**

Defendants are at a loss as to how PNC's decisions to include certain products in its product offering is relevant. Generally, the answer is that PNC chose to use those products because they felt it made sense from a business perspective. PNC is unclear how these types of documents could be relevant to the claims in the case, especially in light of the Court's Preliminary Injunction Order. If you would like to set a telephone call to explain why PNC's choices of which products to offer are relevant in this case, we are happy to discuss this RFP further.

**Interrogatory No. 6 to PNC Bank**

This type of wholesale, disproportional discovery request is also pending before Magistrate Judge Crews as it essentially seeks information about every M&A transaction PNC has worked on. The parties need not further debate Interrogatory No. 6 here.

**Requests for Admission Nos. 3 – 5 and 12 to Ms. Kelly**

Respectfully, Defendants do not think the objections are "non-sensical." But in any event, Ms. Kelly will revise her responses to RFA Nos. 3 – 5 and 12 and we'll therefore be issuing amended responses in due course.

**Interrogatory No. 12 to PNC Bank**

As you know, under the Colorado Trade Secrets Act, a party has a duty to attempt to maintain the confidentiality and proprietary nature of its alleged trade secrets, and to prove as much to the Court. *See e.g., Rumnock v. Anschutz*, 384 P.3d 1262, 1265 (Colo. 2016) (affirming trial court's statement that it was "leaning" towards determining a party "waived its ability to seek a protective order for trade secrets" where the party introduced no evidence and made no offer of proof of alleged trade secrets); *Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990) (a key factor in determining whether a trade secret exists is "3) the precautions taken by the holder of the trade secret to guard the secrecy of the information").

Clearly SRSA understood that legal test for the five trade secrets on which it sought injunctive relief and failed. By not including more than a dozen other supposed trade secrets, SRSA has demonstrated to Defendants and the Court that it does not view those additional alleged trade secrets as actual trade secrets under Colorado law, and it has failed to take *any* precautions to guard the supposed secrecy of such information. If SRSA truly believed the other alleged trade secrets were protectable under the Colorado Uniform Trade Secrets Act, SRSA would have sought injunctive relief for those as well. Obviously Defendants challenge the notion that any item in the case is a trade secret, and that is certainly true as to the alleged trade secrets on which SRSA failed to move for injunctive relief.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **5** of **10**

But in any event, as stated in the objection, Interrogatory No. 12 is not the type of interrogatory that is permitted in this judicial district, and thus Defendants stand by their objections.

**Pages 3 – 4 of Your Letter**

The bottom half of page 3 and the entirety of page 4 address alleged "critical damages discovery." That dispute is now pending with Magistrate Judge Crews and Defendants need not revisit those arguments here. However, we do take the opportunity to address "licensing-related information" in RFP Nos. 17 – 18 to PNC Financial. In your letter you state that discovery regarding PNC's efforts to "purchase, obtain a license, or sell a license to the technology at issue" is relevant because "Plaintiffs have requested, as one form of damages, a reasonable royalty." Yet, an examination of Plaintiffs' Second Amended Complaint reveals that Plaintiffs have not, in fact, requested damages in the form of a reasonable royalty. *See generally* ECF No. 61-1 at 61, Prayer for Relief. As such, these requests are not relevant to this action. However, upon investigation, Defendants are not aware of any responsive documents. Therefore, because no such documents exist, we trust you will consider this issue resolved.

**Purported Kelly and Tsarnas Communications with Customers**

Ms. Kelly and Mr. Tsarnas have participated in extensive discovery in this lawsuit. Both of those Defendants have been deposed at length, both testified in court and could have been asked about alleged communications with customers, and both people had their cell phones confiscated and the contents examined by a third-party computer forensics firm. Moreover, as Mr. Tsarnas explained in his discovery responses, he did not have a customer-facing job while he worked at PNC. Plaintiffs' challenges to verified interrogatory responses amounts to unwarranted harassment of Mr. Tsarnas.

As to Ms. Kelly and RFP No. 7 and Interrogatory No. 4, the Defendants have already produced what they believe to be all documents and communications that involve the Defendants, any customer or potential customer, and that mention SRSA or SRSA's products. Ms. Kelly has been in this industry for decades and has many friends, colleagues, and customers in this industry, as SRSA well knows—it is why they lured her away from her prior employer to join SRSA. Thus, it is harassing and overly burdensome to demand that Ms. Kelly turn over every single communication with any customer or potential customer, and SRSA's request seeks wholly irrelevant information. To the extent SRSA is able and willing to identify specific customers it believes are at issue in this litigation, Kelly and her counsel would then be able to better analyze whether she has any responsive documents or information she would be willing to produce.

Regarding RFP No. 8, there is no basis to request all communications between Mr. Kingsley or Mr. Miller that have no relevance to the case. But in any event, SRSA is in the midst of a third-party subpoena process with Blackberry and with Mr. Kingsley, and it is receiving documents and communications from those parties. In fact, it is my understanding that

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **6** of **10**

Mr. Kingsley has produced documents to Sheridan Ross in response to the subpoena efforts as long ago as a week ago that have not been provided to Defendants' counsel. *See e.g.,* F.R.C.P. 45(a) Committee Notes on Rules—2013 Amendment ("The party serving the subpoena should in any event make reasonable provision for prompt access.").

RFP No. 6 to Tsarnas is similarly overbroad. Further, your query "how could such communications be privileged?" ignores the terms of your extremely overbroad request, which seeks, among other things, "[a]ll communications … between you and any … law firm … relating to SRSA, SRSA's M&A Payments and Escrow Products, or PNC's Payments & Escrow Products." In light of the present lawsuit, there are, of course, privileged communications between Tsarnas and "law firms" "relating to" SRSA and its products—namely, Dowd Bennett LLP and Ballard Spahr LLP. And, in any event, as set forth in his objections and responses to this RFP, Tsarnas has conducted a reasonably diligent search and determined there are no non-privileged, responsive documents. This is no surprise, as Tsarnas's role at PNC was not customer-facing. To the extent SRSA wants to revise RFP No. 6 to clearly exclude Mr. Tsarnas' counsel, then Mr. Tsarnas will withdraw the attorney-client privilege objection.

With respect to Interrogatory No. 4 to Tsarnas, as stated in his objections and response, "he does not recall any such communications because he was not involved in sales or marketing during his time at PNC."

**Compensation and Employment Information for Kelly and Tsarnas**

In Interrogatory Nos. 8 and 9 to PNC Bank, PNC asked whether SRSA would accept W-2s from Mr. Tsarnas and Ms. Kelly, and SRSA refused that offer of compromise. The granular detail under which SRSA is demanding to invade the personal finances of Mr. Tsarnas and Ms. Kelly is not within the scope of discovery in this case, and it is not proportional to the needs of the case. PNC Bank therefore stands by its substantive Interrogatory response and its offer of compromise, which was to produce the W-2s for each individual Defendant.

Similarly, RFP No. 23 is simply a fishing expedition into every single transaction Mr. Tsarnas or Ms. Kelly worked on at PNC. This is not targeted discovery, but is instead designed to fish for a claim that SRSA has no good-faith basis to believe exists in the first place. PNC Bank stands by its objections in RFP No. 23. RFP No. 13 to PNC FSG is similarly untethered to any claim in the case. Even if documents like the examples used in your letter existed, they do not create actionable claims because SRSA does not possess any trade secrets as the Court held in its preliminary injunction Order.

Finally, Mr. Tsarnas' departure from PNC is irrelevant to the claims in the case, the facts in the case, and has no bearing on SRSA's lawsuit. PNC FSG, Ms. Kelly, and Mr. Tsarnas stand by their objections to these RFPs.

**Alleged Document Deletions**

Plaintiffs' discovery requests and queries regarding Kelly's and Tsarnas's purported deletion of text messages, emails, and other communications reflect a blatant effort to conjure up the appearance of impropriety to bolster SRSA's meritless claims in this action. These discovery requests amount to a sideshow that lack any relevance to the claims at issue, and any time spent responding to them or discussing them is unduly burdensome.

To address your specific queries, as to Interrogatory No. 2 to Tsarnas, Tsarnas admits he routinely deletes text messages as a matter of course, but that once the prospect of litigation arose in this matter, i.e., July 12, 2019, when SRSA filed its Complaint following a year of no correspondence between the Parties, he ceased deleting any messages relating to the subject matter of this action. If SRSA wishes, Tsarnas is willing to amend to clarify his response to this Interrogatory.

Regarding Interrogatory No. 3 to Tsarnas, your assertion that "Kelly testified that she and Tsarnas communicated about deleting text messages because she feared SRSA would be reading their emails" is incorrect. Kelly testified that she was "scared to text" (not that she and Tsarnas were "deleting text messages") because she was apprehensive that SRSA, and Paul Koenig in particular, was able to "read my texts or E-mails" based on the fact that Koenig appeared to know things from her text messages and e-mails. *See* Kelly Oct. 23, 2019 Dep. Tr. at 27:16-28:12. As a result, Tsarnas and Kelly instead corresponded through WhatsApp and such communications have been produced. In any event, she never testified that Tsarnas had ever deleted text messages with her. Tsarnas stands on his response to this Interrogatory stating that he is not aware of any non-privileged, responsive communications with respect to this Interrogatory.

As to Interrogatory No. 2 to Kelly, we disagree that "[h]er testimony on document deletion is muddled and inconsistent." But, to the extent SRSA found her testimony to be "muddled and inconsistent," it had every opportunity to further question her at her deposition or at the Hearing to clarify this supposedly "muddled" or "inconsistent" testimony. Moreover, and to the contrary, Kelly clearly and repeatedly stated (in response to counsel's repetitive and badgering questions) that although she sometimes deletes text messages, she did not specifically recall whether she had deleted certain text messages or categories of text messages, including text messages with Tsarnas or anyone else. *See id.* at 28:13-18, 29:14-30:16, 32:25-33:20, 36:10-20, 294:22-25. In any event, as with Tsarnas, once the prospect of litigation arose in this matter, *i.e.,* July 12, 2019, when SRSA filed its Complaint, Kelly ceased deleting any messages relating to the subject matter of this action. If SRSA wishes, Kelly is willing to amend to clarify her response to this Interrogatory. As to Interrogatory No. 3 to Kelly, Kelly stands by her response that she "is not aware of any responsive communications other than any responsive communications that may have occurred during her deposition in this case" and that "[t]he only other communications responsive to this Interrogatory are attorney-client privileged communications that arose after Plaintiffs raised this non-event in litigation."

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **8** of **10**

      Finally, we reject your assertion that Kelly's responses to RFA Nos. 7-11 and Tsarnas's responses to RFA Nos. 4, 6, 7, and 8 are "evasive." Rather, their responses reflect a good-faith attempt to respond to Plaintiffs' irrelevant, vague, and overbroad requests regarding a topic that has no relevance to this action. As stated in these responses, both Tsarnas and Kelly routinely delete communications such as text messages and email communications as a matter of course, but they cannot recall whether any specific communications responsive to these requests were deleted.[3] And, in any event, neither Kelly nor Tsarnas have deleted any communications relevant to the subject matter of this action once the prospect of litigation arose, *i.e.,* July 12, 2019, when SRSA filed its Complaint. If SRSA wishes, Kelly and Tsarnas are willing to amend to clarify their responses to these Requests.

**Blockbuster Interrogatories**

      As conceded in your letter, Interrogatory Nos. 12 and 13 to PNC Bank are so-called "blockbuster" interrogatories that are not permitted in the District of Colorado. As such, PNC Bank stands on its objections to these interrogatories. Regarding your request that PNC Bank "agree to produce the documents you were asked to identify in response to the interrogatories," i.e., "documents that you contend show that SRSA's alleged trade secrets are not confidential and documents that you contend support your affirmative defenses," this request is extremely vague and overbroad, and PNC Bank therefore cannot agree. PNC Bank will certainly produce, and has already produced, any documents it "may use to support its claims or defenses, unless the use would be solely for impeachment," pursuant to its obligations under Fed. R. Civ. P. 26(1)(A)(ii) and 26(e).

      Defendants do not agree that Interrogatory No. 5 to Kelly and Tsarnas are not "blockbuster" interrogatories. If Plaintiffs are able to identify any authority supporting Plaintiffs' position that these interrogatories are proper, Defendants would consider it to determine whether they would be willing to amend their responses.

      As for SRSA's responses to Defendants' interrogatories, Defendants will follow up by separate communication to address deficiencies in Plaintiffs' responses to discovery.

**Other Issues**

RFP No. 11 to PNC Bank: Your assertion that PNC Bank's prior production only encompassed "email involving Kelly and Tsarnas" is incorrect. PNC Bank already conducted a "broader search for documents and communications" referencing SRSA and produced those non-privileged, responsive documents in its possession, custody, or control. *See e.g.,* PNC_00043319, as just one example.

---

[3] With respect to RFA No. 7 to Tsarnas, Tsarnas clearly responded that he "admits that he deleted the WhatsApp application from his phone," which necessarily would have resulted in the deletion of *all* WhatsApp communications, including any Tsarnas may have had with Kelly from March 5, 2018 to March 21, 2019.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **9** of **10**

Further, if SRSA identifies specific entities it believes constitute its "potential, actual, or former" customers, PNC Bank would be much better positioned to consider whether it can conduct further searches to determine whether it has additional documents in its possession, custody, or control.

RFP No. 12 to PNC Financial:  PNC Financial will conduct a reasonably diligent search and produce documents responsive to this request but it is not waiving its argument that these documents are irrelevant in this case.

RFP No. 15 to PNC Financial:  PNC Financial disagrees that "demand letters draft complaints and other documents reflecting PNC's efforts to enforce its own intellectual property rights" are relevant to this case.  Moreover, this request is extremely overbroad, insofar as it seeks such documents relating not only to PNC's M&A payments and escrow services, but "any of PNC's products or services."  This request is a fishing expedition, and PNC Financial stands on its objections.

Interrogatory No. 7 to PNC Bank:  On its face, this request is unduly burdensome, as it purports to require PNC Bank to identify every single document in its possession that originated with SRSA or "any" SRSA employee – a universe of individuals that PNC does not even possess. It appears that you are willing to narrow this request based on your statement that SRSA is not seeking the identification of email communications or public marketing materials.  PNC Bank is willing to meet and confer further regarding this request to determine if an agreement can be reached that would sufficiently narrow this Interrogatory.

Interrogatory No. 11 to PNC Bank:  PNC Bank continues to investigate the date it first provided a customer with pre-closing solicitation services, but current investigation reveals that PNC first worked with a third-party using that feature in May of 2019.  With respect to the customer information sought in this interrogatory, this information is irrelevant and disproportionate to the needs of the case.  To the extent SRSA is able and willing to identify specific customers it believes are at issue in this litigation, PNC Bank would then be able to determine whether it would be willing to provide additional responsive information.

RFA No. 1 to Kelly:  Kelly stands on her response to this request stating that she "does not have any specific recollection of communications about their potential employment between March 9, 2018, and March 8, 2019, and on that basis she can neither admit or deny this request."  If you have a specific document(s) you would like us to review with Ms. Kelly, we are happy to do so.

We are willing to meet and confer further regarding these requests to determine if any agreement can be reached.  Please let us know your availability for a follow up teleconference.

Warren Braunig
Keker, Van Nest & Peters LLP
August 19, 2020
Page **10** of **10**

                                        Sincerely,

                                        */s/ Matthew E. Johnson*

                                        Matthew E. Johnson

cc:    James Bennett
        Hara Jacobs
        Noah Robbins
        Scott Bialecki
        Matt Miller