# EXHIBIT 1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY

# PRELIMINARY EXPERT REPORT

of

Greg J. Regan, CPA/CFF, CFE

*SRS Acquiom, Inc.*

*v.*

*PNC Financial Services Group, Inc., et al*

Civil Action No. 1:19-cv-02005-DDD-SKC

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



3. As of the date of this report, the production of documents by the Defendants relevant to an analysis of SRSA's lost profits and/or the Defendants' unjust enrichment has

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY

been significantly limited, which has precluded a complete damages analysis. For example, the Defendants have not produced complete data regarding:[4]

- Merger and acquisition (M&A) transactions for which PNC has been, or is expected to be, engaged to provide payments-and-escrow services;

- Communications with customers and potential customers, including communications by Mr. Tsarnas and Ms. Kelly in the twelve months following the termination of their employment at SRSA;

- PNC's revenues and profits associated with such transactions;

- Compensation PNC paid to Mr. Tsarnas and Ms. Kelly in connection with the sale of PNC products and services at issue in the litigation; and

- PNC's costs associated with its payments-and-escrow business.

4. The consequences of this data limitation can be seen in the chart below. Specifically, to date, SRSA has identified evidence of twenty-three transactions from August 2018 to September 2020 that were lost due to the Defendants' alleged improper conduct (*see* blue bars). Conversely, the data produced by PNC to date identifies partial information about ninety-four transactions that it won from August 2018 through approximately May 2019 and no information thereafter (*see* red bars).[5]

---

[4] For example, these types of information were requested by SRSA in its June 22, 2020 requests for production (RFPs). I have reviewed the Defendants' July 22, 2020 response to the Plaintiff's' RFPs and documents referenced therein. I have also reviewed Plaintiffs' August 11, 2020 Discovery Brief regarding Plaintiffs' Motion to Compel Defendants' Discovery Responses, ECF No. 234, and the appendices attached thereto.

[5] The PNC data in the chart was obtained from PNC_0041008. This file is identical to PNC_0040778 except it includes one additional transaction ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ - Project Twin_PA). PNC_0040778 was attached to PNC_00040776, an email to Mr. Tsarnas dated June 8, 2019. Mr. Tsarnas had requested "quick count of the total number of closed deals in 2019." The report that Mr. Tsarnas received in response was incomplete, as the report author explained: "I took the report that I am doing for the team and ***filtered it***. I am ***missing a few deals*** that just closed in the past two weeks. Is this helpful? If this is what you want ***I can look back and fill in the rest*** in the morning." (emphasis added) Thus, in addition to being temporally limited, PNC's data from August 2018 to May 2019 is incomplete.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



5. The chart above indicates that the maximum number of transactions SRSA has identified as lost in any month after June 2019 is one (*i.e.*, a reduced frequency of lost transactions even as PNC's sales were growing rapidly). It is likely that PNC continued to win transactions after May 2019 at SRSA's expense but that the Defendants have not produced sufficient information to identify those transactions or to allow SRSA to adequately assess whether the transactions were lost due to PNC's alleged improper conduct.

6. PNC's failure to produce meaningful financial information has further precluded SRSA from identifying any lost transactions after February 2020, to the extent they exist. While COVID-19 is likely to have impacted the number of available transactions during this time, M&A activity has continued.[6] For example, as described in further detail below, SRSA monitors transaction activity in its Salesforce customer relationship management (CRM) database.[7] The chart below summarizes the outcomes of SRSA's monthly transaction activity from January 2018 through July 2020 related to the subset of customers for which SRSA's Salesforce data was produced for purposes of this matter:[8]

---

[6] Indeed, COVID-19 may accelerate demand for online services such as those offered by SRSA.

[7] *See, e.g.*, SRSAvPKT00091349.

[8] SRSAvPKT00091349 includes SRSA's available Salesforce data for 1) all lost customers and transactions identified in Plaintiff SRS Acquiom Inc.'s Objections and Responses to Defendant PNC Financial Services Group, Inc.'s First Set Of Interrogatories (Rog 1), 2) all customers on the HK Contacts document (SRSAvPKT00089461), and 3) all customers on the "Strategic Buyers" tab of PNC_00056592.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



7. In combination, the charts above indicate that SRSA does not have sufficient data from PNC to identify all customer transactions lost for reasons attributable to the Defendants' alleged improper conduct. However, as presented in §3 below, I have calculated SRSA's lost profits based on currently available information and data, mostly from SRSA, and discussed how the quantum of damages may change when the Defendants produce the relevant information that has been requested. Additionally, §4 below presents my present calculation of the Defendants' unjust enrichment,[9] as well as additional considerations for a complete calculation when the Defendants produce additional data. Additionally, I have analyzed other economic remedies, such as disgorgement of Ms. Kelly's and Mr. Tsarnas's compensation and SRSA's out-of-pocket costs to investigate the Defendants' actions.

---

[9] Under the DTSA and the Colorado UTSA, a plaintiff who prevails on a claim for trade-secret misappropriation is entitled to damages measured by the plaintiff's losses and/or the defendant's profits. Lost profits are a typical measure of actual damages in trade secret misappropriation cases. *See* AICPA Practice Aid, *Calculating Damages in Intellectual Property Disputes*, pp.21 and 42, including, "In copyright, trademark, and trade secret cases, lost profits represent those profits that the intellectual property owner failed to earn as a result of the infringement. The lost sales measure attempts to equate the intellectual property owner's damages with the profits that would have been earned from each lost sale due to the infringer's misconduct." SRSA may also be able to recover unjust enrichment damages, measured by the Defendants' profits to the extent they are not duplicative of SRSA's lost profits. *See* AICPA Practice Aid, *Calculating Damages in Intellectual Property Disputes*, p.102.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



63.     The lack of data produced by the Defendants to date, however, has limited my ability to identify transactions that SRSA has lost, or, alternatively, transactions that SRSA ultimately won but had to lower its bid to do so as a result of PNC's conduct. As an example, I would have anticipated additional data from the Defendants identifying completed customer transactions, as well as the related products sold, and revenue generated. I would have compared the Defendants' data to SRSA's data and conducted an analysis of changes in SRSA's transaction frequency and volume with those customers. Moreover, the Defendants are likely to have additional data and/or communications regarding the reason PNC won transactions, including data that shows SRSA might have otherwise won the transaction. As a result of Defendants' failure to make a production of

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY

this kind of information to date, the findings expressed in this report are preliminary and subject to modification as additional information becomes available.





### vii. Other Lost Transactions

91. Presently, it is not possible to identify all of SRSA's lost transactions. First, the individuals responsible for monitoring SRSA's sales pipeline data, including SRSA's Salesforce database, may not have been aware that a transaction was lost to PNC and flagged the data accordingly.



92. Second, the Defendants may have, for example, used SRSA's trade secrets or confidential information in such a way that SRSA has not become aware that it was a candidate for other transactions. This circumstance is evident from a review of data

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY

sources identifying M&A transactions such as S&P Capital IQ ▮▮▮▮▮

93. Third, SRSA alleges that PNC continues to engage in improper conduct. Thus, SRSA is likely to continue to lose transactions to PNC, at least through trial (*i.e., see* the charts and discussion presented in § 1.a above).

94. I anticipate that analysis of PNC's data and other ongoing discovery may enable a determination regarding whether additional transactions are relevant to SRSA's lost profits. If such additional evidence emerges, I anticipate supplementing this analysis.



97. As described above, the lack of data produced by the Defendants has hindered my ability to identify transactions relevant to the calculation of lost profits. The lack of data produced by the Defendants has further hindered my ability to calculate lost

profits. For example, the Defendants have not produced data regarding the specific services provided and the prices the services were provided for, the size and duration of the escrow, the number of payees, etc.



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



ii. <u>Escrow Amount</u>

106. Data exists concerning the expected escrow amount for many of SRSA's lost transactions described above. The source of this data includes SRSA's contemporaneous monitoring in Salesforce and PNC documents related to the transactions. In these situations, I have used this transaction-specific data to estimate the quantum of the escrow. When this data has not presently been identified, I estimated the escrow size based upon the overall transaction deal size. Specifically, the median escrow size in SRSA's 2020 M&A Deal Terms Study was approximately 10% of the transaction size.[196]

> **Indemnification terms:**
> - The **median general survival period** for indemnity escrows remains 15 months, but there is more variability in lengths than last year (slide 60). **Median escrow size** for the year was 9.9% of transaction value, with an average of 8.9% (slide 75). The average and median escrow/holdback size for non-RWI deals ticked up to 12.5% and 10.5%, respectively, in 2019 (slide 76).

107. There are, however, circumstances where I do not presently have information about the deal size (*e.g.*, private-to-private transactions). In these instances, I have not been able to estimate SRSA's float revenue. I reserve the right to update my analysis when additional data becomes available to do so. I expect this information to be readily available for all transactions that PNC won.



---

[196] *See* pages 11 and 77 therein.

Preliminary Expert Report of Greg J. Regan, CPA/CFF, CFE                Page **36** of **49**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY

[REDACTED]

c. *Other Lost Deals*

112. As of the date of this report, SRSA has identified three transactions for which insufficient information is presently available to calculate lost profits. [REDACTED] I anticipate reviewing additional information concerning these transactions, including any data produced by PNC related to these transactions, and supplementing my analysis if that information is adequate to do so.

113. In addition, I intend to supplement my analysis when information becomes available to identify additional lost transactions and the related lost revenues.

[REDACTED]

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



        *i. PNC's Revenues*

             1. PNC's Revenues Associated with Specific Deals

128. Similar to SRSA, PNC charges fees to customers for PNC Paid-related sales.[211] The data produced by PNC is particularly limited with respect to such fees. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Therefore, PNC's data is likely to be incomplete. I anticipate updating this analysis after PNC produces relevant data.

             2. PNC's Net Interest Income

                *a. PNC Net Interest Income Associated with SRSA's Lost Transactions*

129. PNC has not produced adequate data to determine its net interest income (NII)[213] associated with SRSA's lost transactions as described above. Thus, for consistency, I have assumed that PNC would have generated the same NII as the float revenue that I have estimated for SRSA. This assumption is reasonable because PNC anticipated similar effective interest rates to the rates realized by SRSA (*see* § 3.b.ii.1).

                *b. PNC's Other Transactions*

130. PNC's data as of approximately May 2019 indicates that it had won seventy-nine transactions to provide escrow services that SRSA has not presently identified as lost

---

[211] *See, e.g.*, PNC_00018521, PNC_00005864, and CGI_SRS00002715. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[213] Because PNC is a banking institution, I have used the term NII to refer to PNC's revenue measure that is comparable to SRSA's float revenue. PNC's documents also use this term. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

transactions.[214] I calculated PNC's NII for these transactions when information regarding the escrow duration and escrow amount was available.[215] Because PNC has not produced information regarding the interest rates it realized, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

131.    In addition, as described above (*see* § 1), PNC has not produced any data regarding its transactions after May 2019. Thus, the calculations of PNC's unjust enrichment understate PNC's NII. I intend to update my analysis when PNC produces additional information enabling me to do so.



### ii.   PNC's Costs

133.    PNC has not produced sufficient data to enable an estimation of the costs it incurred to generate to calculate revenues associated with its payments-and-escrow services.[219] For present purposes, I have estimated that PNC incurred costs consistent with the rate of SRSA's variable costs.



---

[214] *See* Schedule 3.4.

[215] My analysis includes NII totaling approximately ▮▮▮▮▮▮▮▮▮▮ associated with escrow-related transactions that PNC originated through November 2018 (*i.e.*, prior to the time that PNC Paid was capable of providing online payment functionality). If additional information becomes available to conclude whether these escrow amounts or the related revenue should be treated differently for purposes of calculating damages, I intend to supplement my analysis.



[219] Although the Defendants generally are responsible for proving costs that should be deducted from sales in an unjust enrichment claims, I have identified and deducted certain applicable costs in my analysis. *See* AICPA Practice Aid, *Calculating Damages in Intellectual Property Disputes*, p.87.



141. Due to PNC's limited production of data, I have not separately calculated the benefit to PNC of avoiding a ramp-up period. Indeed, as described above, PNC does not appear to have produced data to enable a complete measurement of its profits during the entirety of the headstart period (*i.e.*, at least transaction data for June and July 2019 or for any periods thereafter). I intend to supplement my analysis when additional information becomes available to do so and reserve the right to modify and/or supplement this report accordingly.

142. The absence of this data allows PNC to retain the benefit of an immediate and full entry into the payments-and-escrow market in approximately June 2019. In other words, PNC's position in June 2019 has not been adjusted to reflect the fact that it would have been a new market participant at that time. The chart below illustrates the hypothetical impact of this limitation:

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY





HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER – ATTORNEYS EYES ONLY



_____
Greg J. Regan, CPA/CFF, CFE
September 25, 2020

