**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02005-DDD-SKC

SRS ACQUIOM INC., a Delaware corporation, and
SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company,

      Plaintiffs,

   v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania corporation,
PNC BANK, N.A., a national association,
HEATHER KELLY, an individual, and
ALEX TSARNAS, an individual,

      Defendants.

---

**PLAINTIFFS' POST-HEARING BRIEF REGARDING DEFENDANTS'
SPOLIATION OF TEXT MESSAGES (ECF 113)**

---

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTS ESTABLISHED AT THE EVIDENTIARY HEARING ......................................2

    A.    January – March 2018: Kelly and Tsarnas plot to compete unfairly against SRSA and subsequently destroy contemporaneous text messages.........................2

    B.    March – June 2018: SRSA threatens legal action; PNC "anticipates litigation" but fails to preserve documents. ............................................4

    C.    March 2018 – July 2019: Over 18 critical months, Defendants repeatedly deleted their text messages with each other.............................................5

    D.    Kelly and Tsarnas destroyed text messages *after* receiving notice of SRSA's Complaint.................................................................................8

III.   ARGUMENT ......................................................................................................8

    A.    Defendants had a duty to preserve at the time they destroyed text messages. ............................................................................................9

    B.    Defendants spoliated critical text-message evidence willfully and in bad faith. ................................................................................................13

    C.    Defendants' spoliation has irremediably prejudiced SRSA and warrants an adverse inference. .....................................................................17

IV.   CONCLUSION..................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...............................................................11

*Asher Assocs., LLC v. Baker Hughes Oilfield Operations, Inc.*,
2009 WL 1328483 (D. Colo. May 12, 2009) ...........................................................9

*Beaven v. U.S. Dep't of Justice*,
622 F.3d 540 (6th Cir. 2010) ...............................................................................12

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
2016 WL 6609208 (C.D. Cal. July 12, 2016) ................................................12, 18

*Brewer v. Leprino Foods Co.*,
2019 WL 356657 (E.D. Cal. Jan. 29, 2019) .........................................................16

*Goodman v. Praxair Servs., Inc.*,
632 F. Supp. 2d 494 (D. Md. 2009) ................................................................11, 20

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) .....................................................................13, 16, 18

*McCargo v. Texas Roadhouse, Inc.*,
2011 WL 1638992 (D. Colo. May 2, 2011)...............................13, 14, 15, 16, 18, 20

*Micron Tech., Inc. v. Rambus Inc.*,
645 F.3d 1311 (Fed. Cir. 2011)..............................................................................11

*Philips Elecs. N. Am. Corp. v. BC Tech.*,
773 F. Supp. 2d 1149 (D. Utah 2011)....................................................................14

*Resendez v. Smith's Food & Drug Ctrs., Inc.*,
2015 WL 1186581 (D. Nev. Mar. 16, 2015) .........................................................12

*Session v. Romero*,
2019 WL 324777 (D. Colo. Jan. 25, 2019).............................................................9

*Silvestri v. Gen. Motors Corp.*,
271 F.3d 583 (4th Cir. 2001) ................................................................................20

1655932

*Stevenson v. Union Pacific. R.R. Co.*,
    354 F.3d 739 (8th Cir. 2004) ..............................................................13, 14, 16, 20

*Thompson v. U.S. Dep't of Hous. and Urban Dev.*,
    219 F.R.D. 93 (D. Md. 2003)..................................................................................10

*Turner v. Pub. Serv. Service Co. of Colo.*,
    563 F.3d 1136 (10th Cir. 2009) ..............................................................................8

*United States v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) .................................................................................13

*Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*,
    2014 WL 6851607 (S.D. Cal. June 16, 2014)..................................................11, 20

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) .......................................................................9, 10

**Rules**

Fed. R. Civ. P. 37..................................................................................................8

## I.     INTRODUCTION

SRSA seeks the imposition of sanctions, including an adverse inference, to remedy Defendants' intentional destruction of case-critical evidence. *See* ECF No. 113. Defendants committed at least four intentional acts of spoliation over the course of sixteen months:

- *First*, Heather Kelly manually deleted all of her 1:1 text messages[1] with Alex Tsarnas on or about February 7, 2019, and continued to delete select text messages with Tsarnas through June 2019.

- *Second*, ***after learning of the Complaint but before her phone was imaged***, Kelly manually deleted all of her then-existing texts with Luda Semenova, a former SRSA employee Kelly and Tsarnas recruited to PNC.

- *Third,* Tsarnas regularly deleted text messages (including with Kelly and with Semenova) throughout the period from March 2018, when SRSA first threatened him with suit, and July 13, 2019, when his phone was imaged, ***again including after he had notice of the Complaint***.

- *Fourth*, Tsarnas deleted the WhatsApp messaging application from his phone, deleting his WhatsApp messages with Kelly during the critical time period.

As a result, thousands of text messages between Kelly and Tsarnas, as well as messages they exchanged with Semenova, are forever lost.[2] Although Kelly and Tsarnas took these affirmative steps to destroy evidence, PNC is no less responsible. Despite receiving multiple letters from

---

[1] "1:1 text messages" means messages solely between two individuals, such as Kelly and Tsarnas, as opposed to "group text messages" involving three or more people.

[2] SRSA's original motion, filed 14 months ago, was primarily focused on texts spoliated between January and June 2018. Since then, SRSA has learned of significant additional spoliation, including of messages Kelly and Tsarnas sent or received between July 2018 and July 2019. It was no surprise to PNC that SRSA's argument at the hearing, and the evidence adduced in support thereof, addressed this broader timeframe: the full scope of Defendants' deletion efforts was detailed in Mr. Crain's expert report served in September 2020 (and corrected on January 2021). *See* Ex. 104. Defendants deposed Mr. Crain in November 2020. Both sides had the opportunity to take, and did take, testimony concerning all of the alleged spoliation at the evidentiary hearing; and Defendants will have two more briefs to address it.

1

SRSA threatening to sue more than a year before the Complaint was filed—which would have put any reasonable party on objective notice of a duty to preserve—PNC failed to take any steps to preserve Kelly's and Tsarnas's messages until after the Complaint was filed. Just as PNC was willfully blind to Kelly's and Tsarnas's use of SRSA information, PNC looked the other way as crucial text messages were destroyed.

Defendants' conduct requires a finding of spoliation and an adverse inference instruction. The limited 1:1 text messages that Defendants *did* preserve underscore the prejudice caused by their spoliation. These texts show that Kelly and Tsarnas texted frequently; that they used text messages to discuss their plans to steal SRSA's customers and employees; and that they engaged in unguarded, unfiltered text discussions about their desire to cause damage to SRSA—all crucial issues for trial. Defendants' bad faith is apparent from the intentional nature of their spoliation, and the fact that they engaged in other, independent acts to prevent SRSA from learning of their conduct. Because Defendants' spoliation has irreparably damaged SRSA's ability to present its case at trial, an adverse inference instruction is warranted and appropriate.

## II.    FACTS ESTABLISHED AT THE EVIDENTIARY HEARING

### A.    <u>January – March 2018</u>: Kelly and Tsarnas plot to compete unfairly against SRSA and subsequently destroy contemporaneous text messages.

SRSA terminated Tsarnas in January 2018 after discovering that he had embezzled more than $35,000. Tr. 33:2-5 (Tsarnas).[3] Over the next two months, Tsarnas and Kelly sought out opportunities to compete with SRSA, even though Tsarnas (falsely) told SRSA he was not looking to do so. *See* Tr. 35:9-36:18 (Tsarnas); 122:20-123:25 (Kelly). Kelly engaged in

---

[3] Tr. refers to the combined transcript of the evidentiary hearing, dated February 2 and February 17, 2021. The name in parentheses is the witness, if referring to testimony.

significant misconduct around the time of her resignation from SRSA on March 8, 2018: (1) two weeks before resigning from SRSA, Kelly printed SRSA trade-secret documents; (2) two days before resigning, she used SRSA confidential customer lists and emails to develop the "HK Contacts" spreadsheet; (3) shortly after resigning, she emailed herself multiple SRSA documents; and (4) afterwards, she tried to cover this all up by wiping her SRSA computer. *See* Tr. 145:20-148:16, 158:1-13 (Kelly); Ex. 104 ¶¶ 12-18, 20-30, 46-48. Kelly and Tsarnas joined PNC in March 2018, though only after seeking assurances from PNC that any legal threats from SRSA would be managed by PNC's counsel. *See* Tr. 36:23-25 (Tsarnas); 123:20-123:22, 126:1-126:5 (Kelly).

Kelly and Tsarnas acknowledge that, in the January-March 2018 period, they texted each other frequently. *See* Tr. 46:7-21 (Tsarnas); 122:13-16, 127:1-13, 151:10-14 (Kelly). On March 5, 2018—seven weeks after SRSA fired Tsarnas, and over a month after Kelly and Tsarnas began plotting to compete with SRSA—they also began using WhatsApp to communicate. Tr. 122:11-123:25, 127:20-128:5 (Kelly). The WhatsApp messages produced from March 2018 showed that Kelly and Tsarnas messaged each other copiously while planning their effort to build a copycat platform and to target SRSA customers and employees (including Ali Bryson and Amanda Jackson). *See, e.g.*, A-1 to A-4, A-7; Tr. 144:24-145:5, 145:21-146:5 (Kelly).[4]

But, while some of these WhatsApp messages could be located and produced from Kelly's phone (Tsarnas deleted WhatsApp from his phone, *see* Tr. 50:2-50:4), Kelly's and Tsarnas's **text** messages with each other from this time period were destroyed. Those texts—

---

[4] In order to better direct the Special Master to relevant passages from lengthy text message threads, SRSA has created an Appendix containing excerpts of those text threads.

which coincided with Tsarnas's termination and Kelly's and Tsarnas's plans to stockpile SRSA

information while shopping a competing platform to SRSA's competitors—are gone forever. *See*

Ex. 104 ¶¶ 66, 69; 103:16-20 (Tsarnas); 152:7-15 (Kelly).

     **B.**     <u>March – June 2018:</u> **SRSA threatens legal action; PNC "anticipates litigation" but fails to preserve documents.**

Immediately following Kelly's resignation, SRSA sent a series of legal warning letters to

Defendants. On ***March 9, 2018***, SRSA informed PNC of Kelly's and Tsarnas's non-solicitation

obligations and access to confidential and trade secret SRSA information, and warned that SRSA

would "vigorously monitor their behavior over the coming year and will aggressively pursue

legal remedies." Ex. 13 at 1. On ***March 20, 2018***, SRSA wrote to PNC and Tsarnas, separately,

flagging for PNC concerns about Kelly's and Tsarnas's conduct (Ex. 17 at 1), and reiterating for

Tsarnas his non-solicitation, confidentiality, and trade secret obligations. Ex. 16 at 3-5. SRSA

expressly warned that "[u]nless SRS becomes convinced that [Tsarnas had] not violated [his]

legal obligations, it intends to immediately pursue all available remedies against [him] and, if

appropriate, against the entity on whose behalf [he is] acting." Ex. 16 at 4. SRSA also informed

PNC that Kelly and Tsarnas were at risk of "inevitably disclosing" trade secret information, *see*

Ex. 13 at 1, and that Kelly "appear[ed] to be also be in contact with SRS employees" in violation

of her employment agreement, *see* Ex 17 at 1. On ***May 15, 2018***, SRSA again demanded that

Tsarnas cease his unlawful conduct, and provided a draft complaint that included claims against

Tsarnas for (1) breach of contract (confidentiality and retention), (2) breach of contract (non-

solicitation), and (3) misappropriation of trade secrets. Ex. 22 ¶¶ 16-18.

Defendants' conduct confirms that they anticipated litigation from SRSA at least as early

as receipt of SRSA's March 2018 correspondence. Defendants retained outside litigation

counsel, Walter DeForest, in connection with their dispute with SRSA. *See* Exs. 18, 19, 20, 24. PNC's privilege log shows that, between March and June 2018, Defendants had **over 70** privileged communications in "anticipation for litigation" or about "threatened litigation." *See* Ex. 54 at 2-29, 77. In his letters to SRSA, DeForest repeatedly represented that Kelly and Tsarnas had not solicited SRSA employees and would not share SRSA confidential information with PNC. *See* Exs. 18, 19, 20, 24. Following Mr. DeForest's vigorous (but ultimately false) assurances that Kelly and Tsarnas would abide by their obligations to SRSA, SRSA sent a June 15, 2018 letter stating, without *any time limitation*, that it would "continue to closely monitor" the situation, while reserving the right to file suit "without further notice." Ex. 26 at 2.

Despite SRSA's persistent and serious legal threats, PNC did not issue ***any*** instruction to Kelly or Tsarnas to retain potentially relevant documents, including text messages; nor were they instructed to suspend any auto-delete policies on their devices. Tr. 115:21-116:12 (Tsarnas); 152:2-15 (Kelly); 351:16-22, 363:21-25 (Derk).[5] Defendants' testimony at the hearing confirmed that Defendants took no steps to preserve text messages until after SRSA filed its Complaint on July 11, 2019. Tr. 115:2-15 (Tsarnas); 154:17-19, 155:5-8 (Kelly).

C.   **March 2018 – July 2019: Over 18 critical months, Defendants repeatedly deleted their text messages with each other.**

Upon starting at PNC, Kelly and Tsarnas played an essential role in building a platform to compete with SRSA's and identifying potential customers for it. Tr. 52:5-54:10 (Tsarnas); Ex. 34. They guided PNC's software developers, "had significant influence over which features to

---

[5] Kelly testified that DeForest orally instructed her not to destroy certain SRSA emails in her possession. *See* Tr., 152:21-153:2 (Kelly). But the instruction was limited to those emails, and no such instruction was given to Tsarnas.

prioritize," helped set PNC's "baseline prices and pricing guidelines," and identified and targeted SRSA's "high priority" customers. *See* Tr. 52:5-54:10 (Tsarnas); Ex. 34 at 10; Ex. 48. Kelly and Tsarnas also solicited SRSA employees, including Semenova, who joined PNC in April 2019. Tr. 62:24-63:1 (Tsarnas). Upon joining PNC, Semenova immediately helped Defendants solicit SRSA's customers. *See, e.g.*, App. A-10 (Kelly texting that a key SRSA customer "wouldn't have moved so quickly" to PNC without Semenova's efforts).

Kelly and Tsarnas texted each other from March 2018 through July 2019, when the lawsuit was filed. *See* Tr. 46:13-46:21 (Tsarnas). During this period, Tsarnas admitted that he regularly deleted his text messages with Kelly, a practice he claims was standard for him but should have been halted in light of SRSA's legal threats. Tr. 47:11-48:24 (Tsarnas). In March 2019, Tsarnas removed WhatsApp from his phone, thereby deleting all of his WhatsApp messages. Tr. 50:2-14 (Tsarnas). At the time his phone was imaged, Tsarnas had no active text messages with Kelly. Tr. 239:4-6, 240:7-11 (Crain). Meanwhile, on or around February 7, 2019, Kelly **deleted all of her 1:1 text messages with Tsarnas**, destroying the entire history of their communication from shortly after Tsarnas was fired, through their hiring at PNC, development of PNC PAID, and solicitation of SRSA customers. *See* Ex. 160, Tr. 244:13-14; 245:8-12, 253:19-22 257:1-11 (Crain).[6] ***Kelly also manually deleted specific individual 1:1 iMessages with Tsarnas on a periodic basis all the way up through June 2019***. Tr. 152:2-15 (Kelly); 253:19-256:21 (Crain); Ex. 104 ¶¶ 70-71 (Crain Report). Both Kelly and Tsarnas deleted nearly

---

[6] At the hearing, PNC repeatedly emphasized that many text strings involving Kelly were not deleted. *See, e.g.*, Tr. 302:1-3 (Crain); 388:6-13 (Derk). But that only makes the deletion of these particular 1:1 text messages more egregious.

all of their text messages with Semenova. 240:3-240:11; 258:6-259:10 (Crain); Ex. 104 ¶¶ 66-67

(no text messages with Semenova on Tsarnas's phone); ¶ 72 (only two text messages with

Semenova on Kelly's phone); Ex. 161.

Extrapolating from the message data that does exist between February 7, 2019 and July

14, 2019, when their phones were imaged, Kelly and Tsarnas likely deleted ***thousands of text***

***messages*** from precisely the period when they are accused of using SRSA trade secrets and

soliciting SRSA employees and customers. Tr. 46:10-21 (Tsarnas); 244:10-14; 245:8-12, 253:19-

256:1(Crain); Ex. 104 ¶¶ 66-72 (Crain Report); Ex. 160. The gap in 1:1 messages between

March 2018 and February 2019 is striking:



Ex. 160. PNC does not dispute these numbers, or the implication that months and months of text

messages between Kelly and Tsarnas were permanently deleted. *See* Tr. 392:18-23.

**D.      Kelly and Tsarnas destroyed text messages *after* receiving notice of SRSA's Complaint.**

It is also undisputed that Kelly and Tsarnas continued to delete text messages after they received notice of this lawsuit. Tsarnas admitted that he deleted text messages with Kelly after learning of the Complaint but before his phone was imaged, and further testified that he may have deleted text messages with Semenova during the same period. Tr. 49:20-50:1, 64:23-65:16 (Tsarnas). And while Kelly initially testified three separate times that she did "not destroy any texts after [she was] on notice of litigation[,]"[7] Defendants' counsel later notified the Special Master that her testimony was false. Ex. 161. Instead, *after* Kelly received notice of the Complaint, she apparently deleted 3,000 1:1 text messages with Semenova, including seven messages exchanged with Semenova on July 12, 2019. Ex. 161; Tr. 336:6-337:14.[8]

**III.      ARGUMENT**

"Spoliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Turner v. Pub. Serv. Service Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (citations omitted). "[I]f the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Id.*; *see also* Fed. R. Civ. P.

---

[7] Tr. 172:17-19 ("Q. Did you destroy any texts after you were on notice of litigation? A. I did not."); 171:1-6  ("Everything [on my devices] was retained in its state as of the date I was told to retain it."); 170:11-17 ("I didn't delete anything from my phone or any of my personal computers.")

[8] Defense counsel claimed that Kelly's texts with Semenova were preserved on Semenova's phone, Ex. 161, but Defendants have failed to produce them, despite multiple requests to do so.

37(e) (for electronically stored information, adverse inference instruction requires "finding that the party acted with the intent to deprive another party of the information's use in the litigation"). The burden of proof on a spoliation sanctions motion is preponderance of the evidence. *Session v. Romero*, 2019 WL 324777, at *4 (D. Colo. Jan. 25, 2019).

Here, Defendants do not meaningfully dispute the *facts* of spoliation. Instead, Defendants argue that they had no duty to preserve, that they did not act intentionally or in bad faith, and that SRSA has not been prejudiced. Those arguments fail, as explained below.

### A.   Defendants had a duty to preserve at the time they destroyed text messages.

Defendants acknowledge that they were obligated to preserve documents, including text messages,[9] but they dispute that their preservation duty arose in March 2018. The law says otherwise. The duty to preserve arises when a "party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

Here, Defendants had a duty to preserve starting in March 2018, when SRSA sent a series of threatening letters, followed by a draft complaint to Defendants.  *See Asher Assocs., LLC v. Baker Hughes Oilfield Operations, Inc.*, 2009 WL 1328483, at *8 (D. Colo. May 12, 2009) (letter identifying "specific claims for relief" and threatening "such legal or other action to enforce [plaintiff's] rights" trigged duty to preserve). On March 9, 2018, SRSA admonished Tsarnas and Kelly that it would closely monitor their activities and was prepared to "aggressively pursue legal remedies." Ex. 13 at 1. SRSA then wrote that PNC may be "complicit" in Tsarnas's

---

[9] PNC's July 2019 litigation hold instructed Kelly and Tsarnas not to delete text messages and to suspend any then-existing deletion practices. *See* Tr. 360: 16-360:22, 400:1-400:15 (Derk).

conduct, Ex. 17 at 1, demanded that Tsarnas "immediately cease and desist any violations of [his] contractual obligations," and threatened to "vigorously enforce its legal rights," Ex. 16 at 4-5. SRSA's May 2018 draft complaint alleged breach of Tsarnas' non-solicitation agreement and trade-secret misappropriation. *See* Ex. 25.

SRSA's letters identified Kelly as a "key player" to any future litigation. *Zubulake*, 220 F.R.D. at 218 (the duty to preserve attaches to communications with key individuals relevant to any potential action). SRSA informed PNC that *both* Kelly and Tsarnas "had access to substantial amounts of SRS's confidential and trade secret information," and that SRSA would "vigorously monitor" her conduct. Ex. 13 at 1. SRSA alleged that Kelly may "be in contact with SRS employees" in violation of her contract. Ex. 17 at 1. And SRSA's draft complaint identified Kelly and Tsarnas's communications as relevant to anticipated litigation. *See, e.g.*, Ex. 25 ¶¶ 7, 49. Kelly herself agreed: she reviewed SRSA's letters when they came in and recognized that SRSA threatened to sue her. *See* Tr. 132:1-5, 133:21-22, 138:2-139:9 (Kelly).[10]

Defendants' objective duty to preserve text messages extended through to SRSA's July 2019 Complaint and never dissipated. SRSA repeatedly emphasized that it would be monitoring both Kelly and Tsarnas on an ongoing basis. Ex. 13 at 1; Ex. 17 at 1; Ex. 26 at 1. SRSA threatened, and Tsarnas understood, that SRSA could file suit against Tsarnas at any time without notice. Tr. 43:5-43:10 (Tsarnas). Likewise, Kelly understood that "not abiding by my contract" would land her in litigation with SRSA. Tr. 190:19-22 (Kelly); App. A-26 (admitting

---

[10] Defendants wrongly argue that SRSA's failure to expressly demand preservation of text messages relieved Defendants' of any obligation. The lack of a preservation demand "does not vitiate the independent obligation of an adverse party to preserve such information." *Thompson v. U.S. Dep't of Hous. and Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003).

that SRSA would "sue the crap of out us" and "rightly so" if she violated her non-solicit). Other courts have held that similar threats required ongoing preservation of documents even if months or years elapse before the plaintiff brings a complaint. *See, e.g.*, *Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*, 2014 WL 6851607, at *9-10 (S.D. Cal. June 16, 2014) (letter sent 19 months before complaint triggered duty); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509-12 (D. Md. 2009) (defendant's duty to preserve triggered by letter threatening litigation 3.5 years before complaint).

Defendants argue that their (alleged) skepticism of SRSA's seriousness at the time SRSA threatened litigation justifies Defendants' subsequent deletion activity. *See, e.g.*, Tr. 133:15-20 (Kelly). The duty to preserve does not turn on Defendants' subjective beliefs though, but rather on whether "a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech., Inc. v. Rambus Inc*., 645 F.3d 1311, 1320 (Fed. Cir. 2011). Here, the answer, undoubtedly, is yes. For the same reason, the supposedly friendly interactions between Kelly and SRSA's employees in late 2018 and early 2019 (Tr. 207:5-207:23, 174:5-174:24 (Kelly)) did not release Defendants from their duty to preserve. *See Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012) (Defendants' "subjectively held" beliefs that threats would result in "a license or other non-suit resolution" did not dissipate duty to preserve due to plaintiff's earlier threat of suit).[11]

---

[11] At the time of Kelly's supposedly friendly interactions, SRSA's employees did not have knowledge of Defendants' ongoing unlawful conduct. Tr. 225:18-226:12 (Kelly) (admitting she did not tell SRSA she was using their information to aid PNC). In any event, the evidence strongly suggests that Kelly's testimony that her February 2019 conversation with SRSA CEO Paul Koenig caused her no concern about future litigation is false. Within 48 hours of meeting with Koenig, Kelly deleted all of her existing 1:1 texts with Tsarnas in February 2019. *See* Tr. 257:4-25 (Crain); Tr. 206:22-207:3 (Kelly); Ex. 140 at 3. And regardless, Defendants presented

In any event, as explained below, Defendants' own actions confirmed that a duty to preserve had been triggered. *First*, Defendants retained outside counsel and—as reflected in their privilege log (Ex. 54 at 2, 29, 77)—engaged in numerous privileged conversations in "anticipation for litigation." *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 2016 WL 6609208, at *11 (C.D. Cal. July 12, 2016) (privilege log demonstrated that party anticipated litigation and was obligated to preserve documents ); *Resendez v. Smith's Food & Drug Ctrs., Inc.*, 2015 WL 1186581, at *1, 5, 8 (D. Nev. Mar. 16, 2015) (same). Defendants' communications with outside counsel "in anticipation for litigation" continued into February 2019—***eleven months after*** SRSA's initial letter—leaving no doubt as to Defendants' ongoing obligation to preserve.

*Second*, Defendants' reliance on communications involving Tsarnas and Kelly in responding to SRSA's 2018 letters, made it essential to preserve such communications. *Cf. Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010) (Defendants' failure to preserve folder with "direct evidence" of unlawful disclosure while asserting that plaintiff lacked "actual evidence" of disclosure violated duty to preserve). For example, Defendants' counsel represented that Tsarnas "did not solicit Ms. Kelly to leave [SRSA]" (Ex. 18 at 1, Ex. 19); that "Mr. Tsarnas's new phone would not contain ***contact information of any customers of SRS***" or SRS "***employee contact information***" (Ex. 19 at 2); that Kelly had "forwarded" numerous SRSA documents, including its payments spreadsheet, "***without retaining a copy***" (Ex. 20 at 1)—a claim that turned out to be false; and that Tsarnas "***did not solicit*** SRS' chief data scientist" (Ex.

---

no evidence at the hearing that SRSA had softened its view towards *Tsarnas and PNC*.

24 at 1). Defendants cannot claim that Kelly and Tsarnas had no incriminating communications, on one hand, while failing to preserve those messages on the other. In sum, the unrefuted evidence confirms that Defendants had an objective duty to preserve text messages as early as March 2018, yet failed to do so.

  **B.**  **Defendants spoliated critical text-message evidence willfully and in bad faith.**

  As courts in this district have explained, spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *McCargo v. Texas Roadhouse, Inc.*, 2011 WL 1638992, at *3 (D. Colo. May 2, 2011). Spoliation is deemed willful if the offending party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). "The intentional destruction of relevant records—either paper or electronic—is clearly willful conduct." *McCargo*, 2011 WL 1638992, at *8; *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (employee's "wiping" of 2,200 files was "indisputably intentional"). For purposes of deciding an adverse inference, bad faith "may not mean evil intent, but may simply signify responsibility and control." *McCargo*, 2011 WL 1638992, at *8; *see also Stevenson*, 354 F.3d at 748 ("routine" destruction of voice recording was done in bad faith where party knew recording "would be important in any litigation"). The evidence that Defendants destroyed text messages willfully and in bad faith is overwhelming.

  ***Tsarnas destroyed texts willfully and in bad faith.*** Immediately before Tsarnas turned his phone over for imaging, he deleted all 1:1 texts with Kelly that were on his phone at the time—including numerous texts exchanged hours *after* Kelly and Tsarnas received notice of

SRSA's Complaint. *See* Tr. 48:11-48:19; 65:7-65:14 (Tsarnas); 319:12-320:5 (Crain). Tsarnas also admitted that he deleted his texts with Semenova at the same time, after reviewing them and deciding they were not relevant. Tr. 65:7-65:14; 49:20-50:1 (Tsarnas). But the spoliator is not entitled to make such determinations. *See McCargo*, 2011 WL 1638992, at *9 ("[I]t is not for the spoliator to determine what documents are relevant."); *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1157 (D. Utah 2011) (same).

Tsarnas also manually deleted text messages with Kelly from his iPhone on numerous other occasions between March 2018 and July 2019, and he deleted the entire WhatsApp application—including all the messages sent and received through it—from his phone in March 2019. Tr. 47:11-48:24, 49:11-50:1 (Tsarnas); Ex. 65. Tsarnas claimed that he manually deleted messages during this period to manage his to-do list, rather than with a specific intent to destroy evidence. Tr. 99:3-20. But routine deletion *is still bad faith spoliation* when done with knowledge that the deleted content would be important to litigation. *See Stevenson*, 354 F.3d at 748. Tsarnas was aware, as of spring 2018, that SRSA was threatening him with litigation and had reserved the right to file suit against him at any time, and without further notice. *See* Tr. 43:14-20 (Tsarnas). In any event, Tsarnas's "task-list" practices don't explain why he deleted the entire messaging application he used to communicate with Kelly in the weeks between his termination from SRSA and her joining him at PNC.

**Kelly destroyed texts willfully and in bad faith.** Kelly's willful deletion of text messages with critical witnesses is clear and undisputed. **First**, on or shortly before February 7, 2019, Kelly manually destroyed her entire 1:1 iMessage conversation with Tsarnas. Tr. 245:8-12, 257:1-11 (Crain); *see* Ex. 160. This means Kelly manually deleted, at that time, *at least* all of the

14

1:1 iMessages between her and Tsarnas in the 365-day period between February 7, 2018 and February 7, 2019. Since Tsarnas also willfully deleted his entire text thread with Kelly, Kelly's deletion of the thread on February 7, 2019 creates an enormous and permanent gap in the evidentiary record of this case. The circumstances surrounding this deletion activity show her bad faith. On February 5, 2019, Kelly had lunch with SRSA's CEO Paul Koenig. Tr. 206:11-208:14 (Kelly). Within 48 hours of that lunch, Kelly destroyed her entire text thread with Tsarnas.[12] **Second**, forensic evidence shows that Kelly continued to delete specific individual 1:1 iMessages between herself and Tsarnas in the months *after* she destroyed the entire thread, through at least June 2019. Tr. 245:8-12 (Crain). Defendants have offered no rebuttal to this evidence whatsoever; to the contrary, Kelly admitted that she periodically deleted texts throughout the period. Tr. 152:7-10, 155:5-8 (Kelly). **Third**, Kelly manually deleted her entire 1:1 text message conversation with Semenova. Tr. 341:25-342:8 (Crain). On February 16, 2021, Kelly's counsel disclosed that she deleted her texts with Semenova *after* receiving notice of this lawsuit—despite Kelly testifying unequivocally on February 2 that she did not "destroy any texts after [she was] on notice of litigation." *See* Ex. 161; Tr. 172:17-19.  These intentional acts of deletion, on their own, establish bad faith. *Cf. McCargo*, 2011 WL 1638992, at *9 (deletion of recording despite knowledge of duty to preserve was bad faith).

In an effort to rehabilitate Kelly, Defendants repeatedly pointed out that Kelly was able to produce from her phone numerous texts with *other* witnesses, and group text threads that also

---

[12] Also on February 7, 2019—the same exact day as the last preserved 1:1 iMessage between Kelly and Tsarnas—Tsarnas emailed DeForest in "anticipation of litigation" for the first time in seven months to discuss his Employee Invention Assignment and Confidentiality Agreement with SRSA. Tr. 257:4-25 (Crain); Ex. 54 at 77.

included Tsarnas. *See, e.g.*, Tr. 387:24-388:13 (Derk); Tr. 220:6-23 (Kelly). But this argument merely highlights the fact that she deleted *only* her 1:1 text messages with Tsarnas and Semenova, which reinforces that she did so in bad faith.

Kelly's repeated efforts to impede the investigation of this case and cover her tracks further demonstrates her bad faith. In addition to recently lying about her deletion of texts with Semenova (a misstatement so significant that her counsel felt compelled to inform the Special Master), like the employee in *Leon*,[13] Kelly intentionally and improperly wiped her computer before returning it to SRSA, which she admitted during her testimony Tr. 158:6-13 (Kelly). Only through extensive forensic analysis could SRSA identify the acts she had engaged in using her SRSA computer, including: printing SRSA trade-secret documents two weeks before she resigned; sending herself numerous SRSA documents after she resigned; and using SRSA confidential customer lists to assemble a customer list that she then took with her to PNC. *See, e.g.*, Ex. 104 ¶¶ 12-18, 20-30, 46-48.  In addition, Kelly instructed her former SRSA colleague Amanda Jackson to delete evidence if SRSA ever confiscated Ms. Jackson's phone. App. A-23. This history, along with the undisputable evidence that she intentionally deleted messages, establishes Kelly's bad faith. *See, e.g.*, *Brewer v. Leprino Foods Co.*, 2019 WL 356657, at *10 (E.D. Cal. Jan. 29, 2019) (finding bad faith where party's "pattern of conduct suggests intentional spoliation"); *Stevenson*, 354 F.3d at 748.[14]

---

[13] *See Leon*, 464 F.3d at 959 (deletion of files plaintiff asserted were merely "personal" was bad faith when plaintiff was on notice they were potentially relevant to litigation).

[14] In addition to being vicariously liable for the conduct of its agents, PNC's conduct is independently sanctionable as spoliation because, despite SRSA's multiple threatening letters, PNC failed "to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *McCargo*, 2011 WL 1638992, at *3.

***The "Keep Messages" settings do not exculpate Defendants.*** Against the strong

evidence of intentional misconduct and bad faith, Defendants have argued the individual

Defendants' iPhones' "Keep Messages" setting *may* be responsible for at least *some* of the

destroyed text messages. This is a red herring. SRSA's expert Andy Crain confirmed that the

default setting on iPhones, including the specific version of iOS on Kelly's and Tsarnas's phones

at the time they were imaged, was to retain messages "forever," and that one could only change

that setting manually. Tr. 259:11-261:3 (Crain).[15]

But more importantly, the "Keep Messages" setting cannot explain the overwhelming

majority of Kelly's and Tsarnas's deletion activity. Defendants cannot refute the proof that Kelly

deleted her entire 1:1 iMessages with Tsarnas in February 2019 (meaning she manually deleted

at least the missing messages from February 2018 to February 2019); that Kelly continued to

delete individual 1:1 messages with Tsarnas between February-June 2019; that Tsarnas regularly

deleted messages throughout 2018 and 2019; or that both Kelly and Tsarnas deleted messages

*after* receiving notice of the Complaint. *See* Ex. 104 ¶¶ 66-72; 242:15-243:4; 244:10-14, 245:8-

12, 253:19-23, 254:12-255:15 (Crain); 48:11-48:19; 65:7-14, 114:9-14 (Tsarnas); Ex. 161.

### C.    Defendants' spoliation has irremediably prejudiced SRSA and warrants an adverse inference.

The prejudice to SRSA from Defendants' conduct is undeniable: Defendants have

permanently deprived SRSA of contemporaneous text messages between Kelly, Tsarnas, and

---

[15] The opinion offered by Eric Derk (PNC's witness), that the factory default "Keep Messages" setting is 365 days, was not credible.  Derk claimed that his knowledge was based on looking at "P-LIST" read-outs from iPhones, but he admitted that those read-outs reflect the devices' settings at the time of preservation, not the factory default. Tr. 401:18-24 (Derk); 404:10-17 (Derk). Then he claimed his opinion was supported by "articles and release notes," but was unable to identify a single specific document supporting his opinion. *Id.* 407:13-408:16 (Derk).

Semenova during the most critical time period in the case. In so doing, Defendants have distorted the record for trial, and interfered with SRSA's ability to fully and fairly present its case.

To establish prejudice, SRSA only needs to show "***a reasonable possibility***, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *McCargo*, 2011 WL 1638992, at *5 (emphasis added). SRSA need not show the "specific details of contents" to establish prejudice, but only "some evidence tending to show" that the destroyed evidence would have been favorable. *Id.* at *6 (quoting 2 *Wigmore on Evidence* § 291 at 228). Here, prejudice is apparent not only from the volume of deleted texts (thousands) and the critical time period they originated, but from the content of the limited texts that *were* produced between Kelly and Tsarnas.

The limited 1:1 texts between Kelly and Tsarnas preserved on Kelly's iPhone (covering only February 7, 2019 to July 14, 2019), and the WhatsApp messages from her phone (almost all from March 2018), are more than sufficient "concrete evidence" that the ***twelve additional months*** of deleted 1:1 text messages would have "produced evidence favorable" to SRSA. *McCargo*, 2011 WL 1638992, at *5; *see also Leon*, 464 F.3d at 960 (finding prejudice based on the "types of files" deleted); *Blumenthal*, 2016 WL 6609208, at *17, *20 (finding "substantial prejudice"  based on the content of the limited emails that could be recovered through forensics). In the limited 1:1 messages between Kelly and Tsarnas that were produced, they discussed—in candid, unguarded and often profane terms—their efforts to take business opportunities from SRSA and to recruit SRSA employees, including Semenova and Jackson.[16] Apps. A-2 to A-4, A-

---

[16] In one particularly devious maneuver, Kelly and Tsarnas attempted to convince a third bank to hire away Ali Bryson, a valuable SRSA employee who worked with Ms. Jackson, in order to

8, A-9, A-11 to A-20, A-21, A-22. In particular, Kelly and Tsarnas expressed delight over their successful efforts, with Semenova's help, to interfere with and steal long-standing SRSA customers. They write, for example:

- "I think it's so exciting that acquiom is going to start bleeding key clients.  I love it."

- "I can't even stand how happy I am.  It's going down the list now and it's what we've been waiting for.  To take SRS down."

- "The sheer joy of knowing that that the [SRSA customer 1] transaction and the [SRSA customer 2] transaction will likely sign and be announced within one week of each other…The fact that within one week SRS will realize they lost two of their three biggest clients that type of shit gets me up in the morning I am so excited to do what I can to do which is destroyed [SRSA employee] Christa [Fancher]. Snarky bitch. (ellipsis in original)

Apps. A-15, A-16, A-18. In addition, their deletion completely erased evidence of at least Tsarnas's improper solicitation of Semenova, and possibly Kelly's.[17] SRSA is left to imagine what other gems were in the 12 months of texts Kelly and Tsarnas deleted, now gone forever.

Moreover, a key portion of the period of missing text messages between them (January 21, 2018 to February 7, 2019) encompasses nearly all of the most important events in the case, including Defendants' taking of SRSA information, their hiring by PNC, their efforts to help design and refine PNC's competing products, their disclosure of SRSA trade-secret customer information to target SRSA customers (*see, e.g.*, Ex. 34), and the entire period of their

---

induce Ms. Jackson to leave SRSA and follow them to PNC. Apps. A-1 to A-4, A-6, A-8.

[17] Texts that have been made available suggest the recruiting of Semenova was a lengthy, multi-faceted process that began while Tsarnas and Kelly were still under contractual non-solicit restrictions. *See, e.g.*, Apps. A-9, A-11, A-22; *cf.* A-21. They also show damages to SRSA flowing from Semenova's improper recruitment. *See* Ex. 21 at 5 (Kelly texting in June 2019 that "Luda deserves cred too. . . . [one of SRSA's repeat customers] wouldn't have moved so quickly after she came and Anson loves her.").

contractual non-solicit provisions. By destroying the record of their candid 1:1 correspondence during this time period, Kelly and Tsarnas closed a critical window into their activity and state of mind during that period. When a party destroys evidence generated during an important time period in the case, and that evidence likely would have shed additional light on events occurring during that time, the prejudice is apparent. *See, e.g.*, *McCargo*, 2011 WL 1638992, at *6 (destruction of video recordings that directly captured critical events and individuals prejudiced plaintiff); *Stevenson v. Union Pacific. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004) (prejudice existed when the deleted evidence was "contemporaneous with the accident," even though there was "no indication" that destroyed evidence was "a smoking-gun").

Courts confronted with similar (or even less extensive) spoliation routinely impose adverse inference instructions such as the one SRSA requests here. *See Goodman*, 632 F. Supp. 2d at 522-23 (granting adverse inference for failure to preserve); *Zest*, 2014 WL 6851607, at *13-16 (granting adverse inference sanction and adverse jury instruction re: spoliation); *cf. Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) (sanctioning party for failing to preserve damaged vehicle because it should have known that the vehicle would be directly relevant to any later tort action). Moreover, Defendants' repeated acts of willful and bad faith misconduct confirm that no lesser sanction will suffice. Absent an adverse inference instruction, Defendants will undoubtedly point to the absence of evidence as proof of their innocence and seek to profit from their misconduct. Only an adverse inference instruction will ensure otherwise.

## IV.    CONCLUSION

For the foregoing reasons, SRSA respectfully requests the Special Master GRANT the relief described in the Proposed Order, filed concurrently herewith.

20

Respectfully submitted,

Dated: March 2, 2021

By:  *s/ Warren A. Braunig*
Warren A. Braunig
*wbraunig@keker.com*
Michelle S. Ybarra
*mybarra@keker.com*
Benjamin D. Rothstein
*brothstein@keker.com*
Katie Lynn Joyce
*kjoyce@keker.com*
Victor H. Yu
*vyu@keker.com*

KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:      415-391-5400
Facsimile:      415-397-7188

SHERIDAN ROSS P.C.
Scott R. Bialecki
*sbialecki@sheridanross.com*
Matthew C. Miller
*mmiller@sheridanross.com*
1560 Broadway, Suite 1200
Denver, Colorado 80202
Telephone:      303 863 9700
Facsimile:      303 863 0223
Email:      *litigation@sheridanross.com*

Attorneys for Plaintiffs
SRS ACQUIOM INC. AND
SHAREHOLDER REPRESENTATIVE
SERVICES LLC