1     IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2

3     Civil Action No. 19-cv-02005-DDD

4     SRS ACQUIOM, a Delaware corporation, and
      SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited
      liability company,
5

6         Plaintiffs,

7     vs.

8     PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania Corporation,
      PNC BANK, N.A., a Pennsylvania Corporation,
      HEATHER KELLY, an individual, and
9     ALEX TSARNAS, an individual,

10        Defendants.

11

12    _____

13                    **REPORTER'S TRANSCRIPT**
                     (Preliminary Injunction)

14    _____

15

16        Proceedings before the HONORABLE DANIEL D. DOMENICO,

17    Judge, United States District Court for the District of

18    Colorado, commencing at 9:05 a.m., on the 11th day of March,

19    2020, in Courtroom A702, United States Courthouse, Denver,

20    Colorado.

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
          Produced via Computer by Tracy Weir, 901 19th Street,
25        Room A258, Denver, Colorado 80294, (303) 298-1207

1        **APPEARANCES**

2            SCOTT BIALECKI, Sheridan Ross, P.C., 1560 Broadway,

3    Suite 1200, Denver, Colorado 80202, appearing for the

4    plaintiffs.

5            WARREN BRAUNIG, MICHELLE YBARRA, BENJAMIN ROTHSTEIN,

6    PUJA PARIKH, and VICTOR YU, Keker Van Nest & Peters LLP, 633

7    Battery Street, San Francisco, California 94111, appearing for

8    the plaintiffs.

9            JAMES BENNETT and MEGAN HEINSZ, Dowd Bennett LLP-St.

10   Louis, 7733 Forsyth Boulevard, Suite 1410, St. Louis, Missouri

11   63105, appearing for the defendants.

12           MATTHEW JOHNSON, Dowd Bennett LLP-Denver, 1775 Sherman

13   Street, Suite 2010, Denver, Colorado 80203, appearing for the

14   defendants.

15           HARA JACOBS and NOAH ROBBINS, Ballard Spahr

16   LLP-Philadelphia, 1735 Market Street, 51st Floor, Philadelphia,

17   Pennsylvania 19103, appearing for the defendants.

18                          *   *   *   *   *

19                       **PROCEEDINGS**

20           (In open court at 9:05 a.m.)

21           *THE COURT:*  Good morning.  Please take your seats.

22           This is case 19-cv-02005, SRS Acquiom, Inc., et al.,

23   versus PNC Financial Services Group, Inc., et al.

24           We are here for an evidentiary hearing from

25   plaintiffs' motion for a preliminary injunction.

**Ex. B**

1  lawsuit back in May 2018 where SRSA was going to bring a count

2  against him for misappropriation of trade secret, and when

3  Ms. Kelly notified SRS that she had what they are now claiming

4  trade secrets, we can look at a couple different things they

5  specifically were told.

6        She was specifically told that this procedure document

7  that they're contending is a trade secret is something that she

8  had, and, again, the payment spreadsheet is something they had.

9  No response given.

10        Ms. Kelly is going to say, I told them I had the

11  spreadsheet.  Not only did they not respond by saying I want it

12  back, they didn't say, destroy it.  They didn't say anything.

13        Again, Mr. DeForest has a very insightful declaration.

14  No irreparable injury because of the delay.  Again, money

15  damages are sufficient and available.  I expect Mr. Lane or

16  Mr. Koenig and Ms. Kelly and PNC to all acknowledge that the

17  deals are known.  We know what business we've had.  We know the

18  business we've received.  The reality is this isn't a

19  preliminary injunction case even if there were merit to the

20  claims because it's a damages case.

21        We look forward to showing at some point in time there

22  is no damages and no liability.

23        This is an extreme remedy.  It is a mandatory

24  injunction.  They have to show it by clear and unequivocal

25  evidence that they're entitled to it.

**Ex. B**

1          Finally, I expect Ms. Kelly to testify about the

2  public interest, which is another factor.  Before I get into

3  what each individual witness will say, Ms. Kelly will say that

4  she started in this business when she was 18 years old

5  answering phone calls in a call center.  She's going to testify

6  that she couldn't get to college because when she was 19 she

7  had her first child; that for 12 years she went from the call

8  center to running these deals at Wells Fargo.

9          Then she'll say that she did that two more years at

10  Wilmington Trust, and she's going to describe to you how on one

11  of the deals they claim she inappropriately stole her █████

12  ████, that that customer she closed the deal previously for

13  that customer, she had a child six weeks early, and she

14  actually closed the deal from her hospital room.

15          She has intense loyalty.  It is her whole life, and an

16  injunction would harm her.

17          Mr. Tsarnas is entitled to work as well.  PNC's

18  product is exactly what was described earlier, which is a

19  product that came into the market that's added competition.

20  It's a good product that people want.

21          There's some degree of consumer harm as well, Your

22  Honor.  I find it remarkable that in-house attorneys at

23  BlackBerry and Google both sign declarations in support of

24  Ms. Kelly.  I think these are really important for our case.

25  It is Exhibit 543, which is Mr. Kingsley's declaration.  A

**Ex. B**

1    Google lawyer signed a declaration here explaining he did not

2    go to Ms. Kelly because of some secret computer plan or other

3    service, but just because of her wonderful service.

4    BlackBerry's lawyer signed a very similar affidavit.  That's

5    Mr. Dennis Miller, which is Exhibit 539.  They explain why

6    consumers benefit from PNC's offering.

7             In terms of our evidence that we're going to offer

8    today, it's going to come in the form of our witnesses.

9    Mr. Lang is sitting back here at the table.  He's the chief

10   operating officer of the treasury management business.  He is

11   the man who decided to buy Fortis and get into this business.

12   He is going to explain why it is a great strategic fit for PNC

13   and why PNC has strategic structural advantages that give it a

14   good position in the marketplace.  He's the person who

15   assembled the team.

16            What he will explain is that he has a lot of

17   technology experience, and the amount of time it took to get

18   this business to market is not quicker than expected; that he

19   invested $5 million in it; that they used the computer

20   programming people to connect these payment functions to the

21   PNC infrastructure, and he did it with experienced people that

22   knew how to do it.

23            Mr. Lezack is in the back sitting on the far right as

24   the Court looks out.  He is going to describe how in 2011 he

25   founded Fortis, which was a shareholder representative service

 1    which acts on behalf of buyers, shareholders in these deals.

 2    He's going to explain that while he was an independent party at

 3    Fortis, while he had no association with PNC, that he did a

 4    thousand deals involving $150 billion in transactions and a

 5    hundred thousand shareholders involved.  He will describe, Your

 6    Honor, how in this business things are known.  He will go

 7    through why these are not trade secrets at all.

 8            He will explain how Fortis was in the same deal with

 9    SRS and other competitors.  He will explain how customers come

10    to him at Fortis and say, hey, your bid was X.  The competitor

11    is X minus 10%.  Can you meet that?  He will explain when you

12    do these deals, the pricing schedule sometimes gets attached to

13    documents provided to them, and that that's totally normal.

14            He will say he had copies of the spreadsheet.  He

15    signed a declaration explaining he had that spreadsheet; that

16    he has numerous copies of the spreadsheet, and he will so

17    testify.

18            I provided an example here, which I mentioned earlier,

19    Exhibit 357, which is where the spreadsheet is getting sent to

20    Fortis and Wilmington Trust.  He will explain the customer base

21    is not secret in any way; that SRS not only lists some

22    customers or identifies some deals, but lists many, many of

23    them.

24            We have a video presentation that Mr. Tsarnas actually

25    gave that he will describe in detail where SRS -- when he was

1    at SRS where they identify 50 different customers.  He will say

2    that people know the pricing.  He will say that people

3    understand the business processes, and when he wanted to know

4    what SRS was offering, he could simply go on to YouTube, and in

5    YouTube -- and he has a declaration where he gives the links

6    where you can go on and watch exactly what they do when they do

7    it and they make no secret of it whatsoever.

8         Deal Dashboard is a product that SRS has described in

9    some detail.  It is on the Internet as well.  If we page down,

10   Your Honor, you can see on the screenshots they show exactly

11   what it is they will do.

12        I really look forward to presenting Ms. Kelly's

13   evidence.  Her personal story is compelling and remarkable.

14   She worked at Wells Fargo for 12 years, worked at Wilmington

15   Trust for two.  She learned this business before SRSA.  This is

16   not a case where SRSA taught her this business.

17        In fact, she will describe her recruitment, how she

18   was recruited by Mr. Vogel and Mr. Koenig and what they said to

19   her they wanted was her relationships, her customer base, her

20   knowledge of the industry, how to price this, how do you

21   develop these products.  She did it for 14 years.  She has

22   those relationships that are so deep that lawyers at big

23   companies are signing declarations for her.

24        She has signed a contract that is really important.

25   She has no noncompete after she left.  I think the Court

40

1    observed that at the beginning.  This is a case where there's a

2    noncompete that's in her contract that only applies during her

3    employment.  She can't be put out of work because they did not

4    sign a noncompete that put any limitations on it.

5         The absence of a noncompete also refutes any idea

6    there's some inevitable disclosure or it's necessary to protect

7    it.  Her confidentiality provisions were limited, and they were

8    limited to items not known in the industry.  They specifically

9    exempted from her contract information generally known.

10        Her nonsolicitous is also extremely significant.  SRSA

11   agreed one year after termination she could solicit whoever she

12   wanted, whoever she met at SRSA, and whatever information she

13   learned she could use to solicit.

14        So one year she could use all of those relationships.

15   There's no noncompete, and the contract is structured to allow

16   her to use the relationships.  More specifically, it had a

17   large exemption.  It listed 50 companies she had strong

18   relationships with she could target the day she left.

19        If we could, let's look at the deals SRS complains

20   about, Exhibit 337.  They have provided us information that

21   says they're worried about ███████████████████████ --

22        *MR. BRAUNIG:*  Your Honor, I'm sorry.  I think we're

23   talking about these particular deals.  This is something we do

24   consider -- this slide has confidential information.  If we

25   could not.