# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF COLORADO
 3
     SRS ACQUIOM, INC., a Delaware
 4   corporation, and SHAREHOLDER
     REPRESENTATIVE SERVICES, LLC,
 5   a Colorado limited liability
     company,
 6
                 Plaintiffs,
 7
     vs.                             No.  1:19-cv-02005-DDD-SKC
 8
     PNC FINANCIAL SERVICES GROUP,
 9   INC., a Pennsylvania corporation,
     PNC BANK, N.A., a national
10   association, HEATHER KELLY, an
     individual, and ALEX TSARNAS, an
11   individual,
12              Defendants.
     ------------------------------/
13
14
15                    REMOTELY CONDUCTED
16   EVIDENTIARY HEARING REGARDING SPOLIATION OF EVIDENCE
17                        VOLUME 1
18              TUESDAY, FEBRUARY 2, 2021
19
20
21
22   Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
23   California CSR No. 10523
     Washington CSR No. 3318
24   Oregon CSR No. 19-0458
     Texas CSR No. 11318
25   Job No. SF 4444893
```

Page 1

```
 1   Q.  You testified earlier -- you testified
 2  earlier about locations on other devices where you
 3  sometimes find copies of text messages.
 4       What other locations did you search for
 5  copies of the text messages that Ms. Kelly deleted?
 6   A.  So like we discussed with Mr. Tsarnas, we
 7  requested reporting that would have -- if there had
 8  been backup on computers, other Apple devices,
 9  things like that.
10   Q.  And did you find anything?
11   A.  I believe on one of Ms. Kelly's computers,
12  there are a small amount of messages from a backup,
13  but those are from -- all from, like, April 2016, so
14  not really what we're talking about here.
15   Q.  And did you --
16       SPECIAL MASTER TENNER:  Mr. Rothstein, I
17  can give you about three or four more minutes, but
18  stop whenever --
19       MR. ROTHSTEIN:  I think I can finish in
20  three or four minutes, Mr. Tenner.
21       SPECIAL MASTER TENNER:  Okay.
22       BY MR. ROTHSTEIN:
23   Q.  Did you find any text messages between
24  Ms. Kelly and Ms. Seminova on Ms. Kelly's iPhone?
25   A.  I believe Ms. Kelly's iPhone had two text
                                            Page 258
```

```
 1  running iOS 12.3.1.  I factory reset it.  I
 2  initialized the device.  I copied it with
 3  Cellebrite, and I examined the artifacts that
 4  contain that retention setting, and it was set to
 5  forever.
 6   Q.  What does "forever" mean?
 7   A.  That the phone wouldn't auto delete text
 8  messages.
 9       SPECIAL MASTER TENNER:  I'm sorry.  Whose
10  phone are we talking about now?
11       THE WITNESS:  I examined the test phone for
12  this question of what is the factory default setting
13  in iOS 12.3.1.
14       SPECIAL MASTER TENNER:  And the factory
15  default setting is unlimited or no --
16       THE WITNESS:  Forever.  What is called
17  forever.
18       BY MR. ROTHSTEIN:
19   Q.  If a user changes the message retention
20  setting from forever to 30 days or to 365 days, will
21  that automatically delete text messages outside of
22  the new message retention window?
23   A.  Yes, it will.  And, in fact, the phone will
24  prompt you that it's going to do that, and you have
25  to confirm.
                                            Page 260
```

```
 1  message records involving Ms. Seminova.  Although,
 2  to be clear, I believe one of them is a one-to-one
 3  message, and the second one is a group message also
 4  involving Mr. Tsarnas.
 5   Q.  You testified earlier -- sorry.
 6       You've heard -- and did you find any of
 7  those -- did you find any text messages between
 8  Ms. Kelly and Ms. Seminova on any of Ms. Kelly's
 9  other devices?
10   A.  No.  I believe those two are the only two.
11   Q.  You testified earlier, and I think there's
12  been other testimony in the case from other
13  witnesses, that Ms. Kelly's iPhone had a 365-day
14  retention setting at the time it was preserved, in
15  July of 2019, and Mr. Tsarnas's phone had a 30-day
16  retention setting at the time it was preserved, in
17  July of 2019.
18       Are either of those settings the factory
19  default setting for iPhones?
20   A.  That is not the factory default for
21  Version 12.3.1 of the iOS operating system, and that
22  is the exact version that was on both of their
23  phones as copied in July of 2019.
24   Q.  What's the basis for that conclusion?
25   A.  I tested that.  I procured test device
                                            Page 259
```

```
 1   Q.  Is changing the message retention setting
 2  from forever to 30 days or 365 days something a user
 3  could do accidentally?
 4   A.  I don't think so.  It requires a number of
 5  clicks in the settings.  I don't think it's
 6  something that you would accidentally get.
 7   Q.  Is it possible to determine when a user
 8  changes the setting -- the message retention setting
 9  from forever to something else based on a forensic
10  analysis of that phone?
11   A.  No.  Unfortunately, that setting file that
12  stores that retention information does not record
13  when the retention setting was changed.
14       MR. ROTHSTEIN:  No further questions.
15       SPECIAL MASTER TENNER:  All right.  We will
16  pick this up -- first, I need to ask Mr. Crain, are
17  you available on February the 17th to continue your
18  testimony?
19       THE WITNESS:  I think I can make that work,
20  yes.
21       SPECIAL MASTER TENNER:  All right.  And is
22  Mr. Derk available on February the 17th for
23  testimony?
24       MS. JACOBS:  Yes, Mr. Tenner, he is.
25       SPECIAL MASTER TENNER:  All right.  We'll
                                            Page 261
```

66 (Pages 258 - 261)

**Page 262**

1  pick this up as our first item of business on
2  February the 17th.
3      The other things I have for February 17th
4  is we're going to be arguing legal argument on the
5  motion for sanctions which is included in
6  Docket 145, that motion for sanctions.  We're going
7  to talk about the status of your discussions about
8  AEO designations, and we're going to talk about the
9  Keyvou (phonetic) subpoena.
10     And then in addition, we're going to be
11 doing this.  Do we have enough time starting at
12 11:00?
13     MR. BRAUNIG:  I would think so, but
14 obviously, you know, I've been wrong before about
15 how long these things are going to take.  So we'd be
16 talking about 11:00 o'clock Mountain Time?
17     SPECIAL MASTER TENNER:  Right.  That's what
18 it's currently scheduled for.
19     MR. BRAUNIG:  I mean, if you're asking
20 should we be done 4:00 or 5:00 o'clock Mountain
21 Time, I would certainly hope so.
22     SPECIAL MASTER TENNER:  All right.  Anybody
23 disagree about the defendants' side?
24     MR. BENNETT:  I just have a question,
25 Mr. Tenner.  This is Jim.  I have to argue two cases

**Page 263**

1  in the A circuit the next day -- actually, the same
2  day.  Are you going to have closing on this issue,
3  or is it just going to be the completion of the
4  testimony with some briefing, or have you made a
5  decision on that regard?
6      SPECIAL MASTER TENNER:  Yeah.  What's going
7  to happen is I'm going to ask you when we're done if
8  any party wants briefing, a post-hearing briefing.
9  And if any party wants post-hearing briefing, I'm
10 going to permit it.  And if both parties don't want
11 post-hearing briefing, then I'll make a judgment
12 after I've heard all the testimony about whether I
13 need it.
14     MR. BENNETT:  Okay.  Great.  Specifically,
15 I would say it does not sound like you need closing
16 argument right at the conclusion of the evidence,
17 then.  Is that correct?
18     SPECIAL MASTER TENNER:  Correct.  If we did
19 post-hearing -- if we're not going to do
20 post-hearing briefing, then I'm going to want
21 closing argument.  If we do post-hearing briefing,
22 then I will not -- we won't do closing argument.
23     There's the potential, after reading the
24 briefing, that I may want argument after reading the
25 briefing.

**Page 264**

1      MR. BENNETT:  Okay.  Thank you.
2      SPECIAL MASTER TENNER:  All right.  With
3  that, we are -- it is 3:08, and we are adjourned.
4      This is kind of an unusual circumstance for
5  Mr. Crain.  This is a long period of time between
6  when you're going to be testifying.  Because of that
7  long period of time, it is okay for you to talk to
8  the lawyers and for the lawyers to talk to you.
9      Understand that if you do talk to the
10 lawyers, you're going to be questioned about that at
11 the February 17th hearing.  But I'm going to not
12 impose the rule that witnesses be entirely
13 sequestered while they're testifying because it's
14 just too long a period of time.
15     And so with that, any other questions?
16     MR. BRAUNIG:  Safe travels, Mr. Tenner.
17     SPECIAL MASTER TENNER:  All right.  We are
18 off the record at 3:09.
19     (Hearing adjourns at 3:09 p.m.)
20         ---oOo---

**Page 265**

1  STATE OF CALIFORNIA )
                        ) ss.
2  COUNTY OF SONOMA    )
3
4      I do hereby certify that the foregoing
5  proceedings were reported by me to the best of my
6  ability and thereafter transcribed into typewriting
7  under my direction.
8      I further certify that I am not of counsel
9  nor attorney for either or any of the parties
10 hereto, nor in any way interested in the outcome of
11 the cause named in the caption.
12 Dated:  February 9, 2021
13
14
15  *[signature: Lorrie J. Marchant]*
16
17 LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
18 California CSR No. 10523
19 Washington CSR No. 3318
20 Oregon CSR No. 19-0458
21 Texas CSR No. 11318

67 (Pages 262 - 265)