**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02005-DDD-SKC

SRS ACQUIOM INC., a Delaware corporation, and
SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company,

       Plaintiffs,

  v.

PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania corporation,
PNC BANK, N.A., a national association,
HEATHER KELLY, an individual, and
ALEX TSARNAS, an individual,

       Defendants.

**PLAINTIFFS' OBJECTION TO SPECIAL MASTER'S ORDER RE: WRITTEN DISCOVERY DISPUTES RAISED AT APRIL 21 AND APRIL 28, 2021 STATUS CONFERENCES (ECF NO. 400)**

1692727

**TABLE OF CONTENTS**

I. SRSA'S OBJECTION REGARDING INTERROGATORY NO. 44 ............................... 2

    A. Background ........................................................................................................ 2

    B. Argument ........................................................................................................... 5

II. SRSA'S OBJECTION REGARDING INTERROGATORY NO. 23 ............................... 7

    A. Background ........................................................................................................ 7

    B. Argument ........................................................................................................... 9

III. CONCLUSION ................................................................................................................ 13

COMPLIANCE WITH TYPE-VOLUME LIMITATION ........................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Albert v. Regents of Univ. of Calif.*,
   No. CIV 06-1158 LH/LFG, 2007 WL 9709929 (D.N.M. July 5, 2007) ....................................11

*Geiger v. Z-Ultimate Self Defense Studios, LLC*,
   No. 14-cv-00240-REB-NYW, 2016 WL 11697106 (D. Colo. June 7, 2016) ...........................11

*GSL Grp., Inc. v. Travelers Indem. Co.*,
   No. 18-cv-00746-MSK-SKC, 2020 WL 4282291 (D. Colo. July 24, 2020).............................12

*Haggard v. Spine*,
   No. 09-cv-00721-CMA0KMT, 2009 WL 1655030 (D. Colo. June 12, 2009).........................12

*Lipari v. U.S. Bancorp, N.A*,
   No. 07-2146-CM-DJW, 2008 WL 4642618 (D. Kan. Oct. 16, 2008).......................................10

*Mattel, Inc. v. MGA Ent., Inc.*,
   No. CV-04-9049-DOC, 2010 WL 11463990 (C.D. Cal. Nov. 12, 2010)....................................7

*Tulsa Zoo Mgmt., Inc. v. Peckham Guyton Albers & Viets, Inc.*,
   No. 17-CV-644, 2019 WL 1562039 (N.D. Okla. Mar. 6, 2019) .................................................6

*Yousefi v. Delta Elec. Motors*,
   No. 13-cv-01632, 2015 WL 11217257 (W.D. Wash. May 11, 2015) .........................................6

**Rules**

Fed. R. Civ. P. 26...............................................................................................................................12

Fed. R. Civ. P. 53.................................................................................................................................5

Plaintiffs SRS Acquiom, Inc. and Shareholder Representative Services LLC (collectively, "SRSA") respectfully object to the portions of the Special Master's Order Re: Written Discovery Disputes Raised at April 21 and April 28, 2021 Status Conferences (ECF No. 400) regarding Defendants' Interrogatories Nos. 23 and 44 to SRSA (Sections IV and VIII of the Order).

After representing to the Special Master last December that the "vast majority of the discovery in this case has been complete" and that discovery "needs to be narrowed and tailored,"[1] Defendants served two dozen wide-ranging interrogatories, many of which have little (if any) relevance to the case and instead appear aimed at burdening SRSA. The parties litigated numerous issues arising from Defendants' new discovery before the Special Master. Of the fifteen new discovery requests decided by the Special Master, SRSA objects to his ruling regarding only two.

First, the Special Master erred in compelling SRSA to provide a full disclosure of its CEO Paul Koenig's stockholding in SRSA, because the Special Master based his Order on an unsupported and incorrect assumption: that Mr. Koenig will directly receive a percentage of any recovery in this lawsuit that corresponds to his percentage ownership of SRSA. On the contrary, all evidence indicates that he would not receive any direct benefit from a recovery in this lawsuit. To the extent PNC wishes to make an argument based on his potential bias because he is a shareholder, the precise *amount* of his stockholding is not relevant and does not justify the invasion of Mr. Koenig's privacy interest.

Second, the Special Master erred when compelling SRSA's further response to Interrogatory No. 23. Although the Special Master recognized that SRSA had already provided a

---

[1] *See* Declaration of Katie Lynn Joyce ("Joyce Decl."), Ex. 1 at 19:11-13, 20:15-17.

1

"great deal" of responsive information in its response, he ordered SRSA to comply with aspects of the request that are plainly overbroad, unduly burdensome, and disproportionate. SRSA's objections to the Special Master's Order should be sustained.

I.     SRSA'S OBJECTION REGARDING INTERROGATORY NO. 44

   A.     Background

   PNC's Interrogatory No. 44 states:

   Identify W. Paul Koenig's financial interest in the outcome of this litigation. As used herein, to "identify" requires SRSA, at a minimum, to describe whether Koenig would stand to personally benefit from the outcome of the litigation, including, but not limited to, additional amounts due under the agreement whereby Lovell Minnick obtained an interest in SRSA, the amount of such compensation, and the correlation between the size of the award SRSA may obtain and the amount of compensation that Koenig would ultimately receive.

*See* Joyce Decl., Ex. 2 at 43. As SRSA made clear in its initial response to this interrogatory, Mr. Koenig does not have any direct financial interest in the outcome of this litigation: "W. Paul Koenig is a stockholder of SRSA. Other than his generalized interest as a stockholder, which is no different than any other stockholder, Mr. Koenig has no financial interest in this litigation." *Id*. at 44.

   SRSA's interrogatory response is consistent with the Lovell Minnick purchase agreement mentioned in the interrogatory—which SRSA has produced, and which makes clear that Mr. Koenig will not receive any additional amount under that agreement based on the outcome of this case—as well as the testimony of SRSA's board chairman who led the Lovell Minnick investment. Joyce Decl., Ex. 3 at 3:9-4:12, 22:11-18. Simply put, Mr. Koenig will not be entitled to any compensation or other financial benefit based on the outcome of this litigation.

2

Pivoting from that reality, Defendants shifted to simply asking the Special Master to force SRSA to disclose the number of shares Mr. Koenig owns in SRSA. In their April 16, 2021 written argument to the Special Master—which is only a half-page long—Defendants argued (1) that Mr. Koenig is an important witness (which is true), (2) that "SRSA seeks tens of millions of dollars in damages in this action" (which is also true), and (3) the jury should therefore know that Mr. Koenig's "personal net worth would correspondingly increase by millions in the event his testimony convinces a jury to award SRSA the relief it seeks" (which is *not* true). ECF No. 387 at 38-39.

At the April 28, 2021 oral argument, Defendants argued from the same baseless assumption: "We are entitled to explore the extent of [Mr. Koenig's stock ownership in SRSA], given that *the recovery by SRS would ultimately benefit Mr. Koenig in proportion to his shareholder ownership*. We are entitled to know . . . How many shares or what percentage of shares in SRS does Mr. Koenig own?" Joyce Decl., Ex. 4 at 93:1-8 (emphasis added). In questioning SRSA's counsel, the Special Master assumed this premise and speculated without any supporting evidence: "[I]f it is a $150 million case and Mr. Koenig is a 25 percent shareholder of SRS – I hate math, and I'm not going to do the math – but that is a lot of money." *Id.* at 88:25-89:3. In response, SRSA's counsel explained that there is no evidence in the record supporting "that whatever Mr. Koenig's percentage ownership in SRSA is that he just gets that percentage of whatever recovery SRSA receives in connection with this lawsuit." *Id.* at 89:9-15.

On April 30, 2021, the Special Master adopted Defendants' assumption that Mr. Koenig will personally receive a percentage of any favorable damages award in this lawsuit that equals

his percentage ownership in SRSA. The Special Master's complete reasoning, as stated in his Order, is as follows:

> First, I reject the statement that Mr. Koenig has a generalized interest which is no different than any other stockholder. By definition, the more stock a person owns in a closely held corporation (or any corporation for that matter), the greater his or her financial interest in the outcome of litigation the company is pursuing.
>
> Second, the amount of stock owned by Mr. Koenig bears directly on what he personally has at stake in this litigation and, as a result, his credibility. The damage request in this case is roughly $150 million. If Mr. Koenig owns even a small fraction of the company's stock, his credibility could be questioned. The greater the fraction of the company's stock that he owns, the greater his credibility could be questioned. I reject SRSA's argument that the amount of stock he owns has no bearing on his credibility. Common sense dictates that it does.

ECF No. 400 at 8-9. Based on this analysis, the Special Master ordered SRSA to "provide a response [to Interrogatory No. 44] that fully discloses Mr. Koenig's stockholding and any other financial interest he has in the outcome of this litigation within 14 days of this Order." *Id*. at 9.

The Special Master's reasoning, and Defendants' argument on which it is based, is simply not correct. There is no evidence in the record that a damages award to SRSA in this lawsuit would "correspondingly increase" the value of Mr. Koenig's stock in the company. To the contrary, the value of Mr. Koenig's shares in SRSA has no direct correlation to, and will not be directly affected by, any damages award in this case—regardless of the size. SRSA is a privately held corporation. There is no market for shares in SRSA. The value of equity ownership in SRSA is based on the amount that potential investors are willing pay for a stake in the company, which in turn is based on the company's revenue—not any one-off litigation recovery. This concept was recently explained by Steve Pierson—the chairman of SRSA's board of directors and a partner at the private equity firm that invested a large amount in SRSA in November 2018. Mr. Pierson testified that the value ascribed to SRSA is based on the cash flows

4

*generated by the business*. *See* Joyce Decl., Ex. 3 at 27:16-28:19. Mr. Pierson also unequivocally testified that Mr. Koenig does not stand to receive *any* recovery based on the outcome of this litigation. *Id.* at 22:11-18.

**B.    Argument**

When a party objects to the Special Master's order in this case, the Court reviews the Special Master's findings of fact and conclusions of law *de novo*. Fed. R. Civ. P. 53(f); ECF No. 329. The Court should sustain SRSA's objection to the Special Master's ruling on PNC's Interrogatory No. 44 because the Special Master improperly and incorrectly assumed the premise that a damages award in this case will line Mr. Koenig's pockets in proportion to his stock ownership in SRSA. There was no evidence before the Special Master from which he could make that determination, and it simply isn't true.

The argument that Defendants rely on, and that the Special Master erred in adopting, assumes that the value of equity in SRSA is akin to a very basic partnership model—*i.e.*, that equity owners pay out the business's expenses and then, every so often, divide the business's leftover income pro rata based on the percentages of their ownership shares. *But that is not how it works*. SRSA is a privately held corporation, not a partnership. As SRSA's chairman of the board testified, the value of equity in SRSA is subjective: it is based on valuing the company itself, which in turn is based on analyzing the company's earnings, and *not* based on a one-off litigation recovery. *See* Joyce Decl., Ex. 3 at 27:16-28:19. Defendants have presented no evidence, nor can they, that the specific amount of Mr. Koenig's stockholdings in SRSA correlates to the size of any financial interest in the litigation, and therefore they cannot connect the details of Mr. Koenig's stock portfolio to a plausible theory of relevance.

5

The analysis in *Tulsa Zoo Mgmt., Inc. v. Peckham Guyton Albers & Viets, Inc.*, No. 17-CV-644, 2019 WL 1562039, at *1 (N.D. Okla. Mar. 6, 2019), is instructive. In that case, the plaintiff corporation sought to exclude evidence showing that the former chairman of its board of directors (a key witness) was also a shareholder at the plaintiff's law firm. In opposition, the defendant argued—like Defendants here—that "evidence of Mr. Dale's relationship with GableGotwals and potential financial interest in the outcome of this litigation are relevant to Mr. Dale's credibility as a witness[.]" *Id.* But in *Tulsa Zoo*, the court refused to take "judicial notice" of the premise that a law firm partner stands to gain financially based on the outcome of the firm's plaintiff-side representations "whether or not the matter is handled on an hourly fee, contingent fee or 'mixed' fee basis[,]" and granted the motion in limine. *Id.*; *see also Yousefi v. Delta Elec. Motors*, No. 13-cv-01632, 2015 WL 11217257, at *2 (W.D. Wash. May 11, 2015) ("Whether plaintiff is funding this litigation through savings, insurance proceeds, a kickstarter campaign, or contributions from the union is not relevant to any claim or defense at issue. If, however, [the witness] . . . has an expectation of payment if and only if plaintiff prevails, evidence of that financial interest may be relevant to determining the credibility and potential bias of Local 46 witnesses."). The same reasoning applies here. There is no evidence that Mr. Koenig's equity ownership will be directly affected "if and only if" SRSA prevails. *Yousefi*, 2015 WL 11217257, at *2. The Court should not require further disclosure from SRSA in response to Interrogatory No. 44 by essentially taking judicial notice of a contrary and incorrect assumption about how Mr. Koenig's shares in SRSA are valued.

Mr. Koenig is Plaintiffs' CEO, that signed the verified First Amended Complaint, and that, as Defendants themselves have argued, is a "central witness." ECF 387 at 39. It is no secret

6

that Mr. Koenig would prefer for SRSA to prevail in this lawsuit. On top of that, SRSA has already disclosed that Mr. Koenig owns equity in SRSA, and Defendants know that Mr. Koenig is a minority shareholder (as evidence produced by SRSA shows that Lovell Minnick is now the majority owner). Thus, the ***specific number of shares*** Mr. Koenig owns has zero marginal relevance to the issue of Mr. Koenig's bias—particularly given that, as explained above, the amount of Mr. Koenig's equity does not impact whether and to what extent a recovery in this lawsuit benefits him financially. *See Mattel, Inc. v. MGA Ent., Inc.*, No. CV-04-9049-DOC, 2010 WL 11463990, at *3 (C.D. Cal. Nov. 12, 2010) (argument that plaintiff could not show corporate defendants' CEO's bias "without resort to his stock portfolio is specious at best").

The Special Master has reviewed an enormous amount of paper in this case, has conducted numerous hearings, and has issued orders on dozens of individual discovery disputes. SRSA has not objected to the large majority of adverse rulings by the Special Master. SRSA objects here because the financial privacy of an individual witness is at stake. There is no reason, in law or logic, why SRSA should be forced to disclose private details regarding Mr. Koenig's equity ownership in the company, because there is no relationship between the value of that equity stake and the outcome of this lawsuit.

**II.    SRSA'S OBJECTION REGARDING INTERROGATORY NO. 23**

    **A.    Background**

Interrogatory No. 23 states:

> For each item of customer information in the HK Contact List or Strategic Buyers Tab that SRSA contends reflects SRSA confidential or trade secret information, identify how SRSA acquired the information. As used herein, to "identify" requires SRSA, at a minimum, to identify the SRSA employee(s) that learned the information, the date on which he/she learned the information, the means by which he/she learned the information, the efforts expended in order to learn the

7

>information, the efforts expended to keep the information confidential, and whether the information was provided to SRSA subject to a confidentiality agreement.

*See* Joyce Decl., Ex. 2 at 3-4. This interrogatory refers to two detailed customer lists containing SRSA trade secret information—HK Contacts and the Strategic Buyers Tab.

**HK Contacts:** Defendant Kelly created HK Contacts (a spreadsheet) during her last two days of employment at SRSA. *See, e.g.*, ECF No. 229-11 at ¶¶ 12(iii), 31; ECF No. 262 at 3-4, ¶¶ 8-14. HK Contacts contains information regarding 71 different customers, including the names, email addresses, and phone numbers for key contacts at each customer, as well as notes referring to, for example, the project names for prior transactions involving the customer, the outside counsel previously used, and the quality of their prior experiences. *See* ECF 266-7 (HK Contacts, attached as an exhibit to Ben Lane's September 15, 2020 Declaration). HK Contacts contains more than 100 rows of information, across several different columns. *See id.*

**Strategic Buyers Tab:** While at PNC, Defendants Kelly and Tsarnas relied on SRSA trade secret information to create another customer list, which is referred to as the Strategic Buyers Tab (it is a "tab" because it is one page of a multi-page Microsoft Excel spreadsheet). *See, e.g.*, ECF No. 266 at ¶¶ 25-29; ECF No. 262 at 4, ¶¶ 15-17. The Strategic Buyers Tab contains additional information about 37 of the customers on HK Contacts, including whether the customer "needs payments" (*i.e.*, an online paying agent platform), the importance of the customer, the customer's location, and additional notes that, for example, elaborate on customers' relationships with outside counsel and their prior experiences with SRSA. *See* ECF No. 266-8 (Strategic Buyers Tab, attached as an exhibit to Ben Lane's September 15, 2020 Declaration). The Strategic Buyers Tab also contains similar information for dozens of other

8

prospective or current SRSA customers. *See id.*; ECF No. 266 ¶ 26. In total, the Strategic Buyers Tab contains 89 rows of information, spanning numerous columns. *See* ECF No. 266-8.

In response to Interrogatory No. 23, SRSA provided detailed information about how it collects, stores, and protects the trade secret information contained in HK Contacts and the Strategic Buyers Tab. *See* Joyce Decl., Ex. 2 at 5-10. For example, SRSA's response describes the development and maintenance of several customer-information repositories where the trade secret information resides. *Id.* And for each customer repository, SRSA explains what customer information is retained in the repository, how the information is generated and accessed, which employees may access the information, and the efforts expended to keep it confidential. *See id.* The Special Master recognized that SRSA's response provided a "great deal of information" and that "most" of SRSA's detailed response is "responsive to the Interrogatory." ECF No. 400 at 3-4. Nonetheless, while noting that a granularized response to each of Defendants' numerous subparts would require a "great deal of effort," the Special Master ordered SRSA to further respond. *Id.*

**B.   Argument**

As mentioned above, the Court's review is *de novo*. Fed. R. Civ. P. 53(f); ECF No. 329. Interrogatory No. 23 is overbroad, unduly burdensome, and disproportionate, and SRSA's Objection to the Special Master's Order requiring a further response should therefore be sustained.

Given the volume of data contained in HK Contacts and the Strategic Buyers Tab, and the numerosity of subparts in Defendants' request, Interrogatory No. 23 is plainly overbroad and unduly burdensome. HK Contacts and the Strategic Buyers Tab, collectively, contain roughly

9

1,000 discrete pieces of customer information. *See* ECF Nos. 266-7 and 266-8. In turn, for "each item" in HK Contacts and the Strategic Buyers Tab, the interrogatory asks SRSA to identify all of the following:

- The SRSA employee(s) that learned the information;

- The date on which he/she learned the information;

- The means by which he/she learned the information;

- The efforts expended in order to learn the information;

- The efforts expended to keep the information confidential; and

- Whether the information was provided to SRSA subject to a confidentiality agreement.

In short, this interrogatory asks SRSA to find thousands of needles, in hundreds of haystacks, and is facially improper. *See, e.g.*, *Lipari v. U.S. Bancorp, N.A*, No. 07-2146-CM-DJW, 2008 WL 4642618, at *3 (D. Kan. Oct. 16, 2008) (holding that the "requests are, on their face, so broad and open-ended that Defendants cannot possibly fully determine—without undue burden—which [information] would be responsive").

Taking but one example, the Strategic Buyers Tab contains a column in which Defendant Kelly identified whether each customer "needs payments"—meaning that the customer requires an online paying agent platform. *See, e.g.*, ECF No. 266 at ¶ 27. Using SRSA trade secret information, Kelly identified 37 customers as requiring online payments functionality. *See id.* SRSA has disclosed, in response to this interrogatory, the documents and databases in which it tracks which customers and potential customers have expressed willingness to use SRSA's

online payments platform.[2] Among those databases, SRSA's response identifies a detailed customer spreadsheet (Acquiom Intake Dashboard), which Kelly reviewed *while compiling HK Contacts during her last two days of employment at SRSA—see* ECF No. 229-11 at ¶¶ 27, 31— and describes the measures SRSA takes to gather information for the Acquiom Intake Dashboard and to keep it confidential. *See* Joyce Decl., Ex. 2 at 8. But it would be a Herculean task for SRSA to also track down precisely when, and how, SRSA first learned that each customer requires online paying agent technology, the name of the employee who first obtained such information, and whether the information was provided subject to a confidentiality agreement— for 37 different customers—over the course of many years. Of course, this exercise would then have to be repeated for more than a dozen columns of information contained in HK Contacts and the Strategic Buyers Tab, meaning the burden described in this example is multiplied hundredfold. *See* ECF Nos. 266-7 and 266-8.

Courts routinely shut down interrogatories that would require such excruciating level of investigation. *See, e.g.*, *Geiger v. Z-Ultimate Self Defense Studios, LLC*, No. 14-cv-00240-REB-NYW, 2016 WL 11697106, at *8 (D. Colo. June 7, 2016) (rejecting interrogatory for which "an exhaustive response is unreasonable, if not impossible"); *Albert v. Regents of Univ. of Calif.*, No. CIV 06-1158 LH/LFG, 2007 WL 9709929, at *4 (D.N.M. July 5, 2007) (rejecting interrogatory

---

[2] *See, e.g.*, Joyce Decl., Ex. 2 at 8 ("[T]he Acquiom Intake Dashboard contains . . . the specific products and services SRSA contracted to provide (e.g., paying agent, payroll compensation payments, enhanced document collection) . . . and details about the customer's preferences and the customer's experience with SRSA."); *id.* at 8-9 ("For each SRSA deal listed on All Acquiom Business, the document reflects . . . the specific products and services SRSA contracted to provide in connection with a deal, and whether the customer had previously used an online payments platform.").

as overbroad due to the "Herculean task" implicated by the interrogatory).[3] When, as here, the value of the information derives in part from being part of a compilation of customer information, the Court should be especially wary of requiring excessive detail. *See Haggard v. Spine*, No. 09-cv-00721-CMA0KMT, 2009 WL 1655030, at *7 (D. Colo. June 12, 2009) ("[A] court should not isolate each piece of information when deciding whether to afford it trade secret protection.").

The request, as written, is also disproportionate under Rule 26. "[A]ny proportionality review must begin with a determination of the relevance of the requested discovery, as the degree of relevance of the requested discovery will necessarily drive the remaining questions of how many resources should reasonably be expended in pursuit of it." *GSL Grp., Inc. v. Travelers Indem. Co.*, No. 18-cv-00746-MSK-SKC, 2020 WL 4282291, at *11 (D. Colo. July 24, 2020). Here, when arguing the relevance of this interrogatory, Defendants relied on three factors that Colorado courts consider in determining whether a trade secret exists: (1) "the precautions taken by the holder of the trade secret to guard the secrecy of the information," (2) "the amount of effort or money expended in obtaining and developing the information," and (3) "the amount of time and expense it would take for others to acquire and duplicate the information." *See* ECF No. 387 at 24 (citing ECF No. 207 at 9).

---

[3] As is the case here, the requests in *Albert* and *Geiger* asked for similarly sweeping amounts of information. In *Albert*, the interrogatory sought a description of "each [] instance" in which managers or supervisors were provided certain instruction, including specific information such as "the name of the person receiving the information, the date the information was provided, and the substance of the information provided." *See* 2007 WL 9709929, at *3-4. And in *Geiger*, one of the improper interrogatories asked for the disclosure of "all communications oral or otherwise from any Z-Ultimate or Defendant agent or representative to any Plaintiff. Include the date of communication, specifically what was communicated, and what medium it was communicated through (i.e. email, telephone, in person, letter, etc.)." *See* 2016 WL 11697106, at *8.

But SRSA's response already fully satisfies Defendants' theory of relevance. SRSA's response details the source of the trade secret information in HK Contacts and the Strategic Buyers Tab, describes the development and maintenance of its customer-information repositories where such information resides, identifies the efforts SRSA has taken to keep the information confidential, and explains who generated and has access to the information. *See* Joyce Decl., Ex. 2, at 5-10. Requiring SRSA to go through the additional task of responding to each subpart, for each item of customer information, is unduly burdensome make-work with little (if any) added benefit to Defendants. *See, e.g.*, *Geiger*, 2016 WL 11697106, at *8 (given the "breadth of information" sought by interrogatory, finding it "unequivocally disproportionate to the needs of the case.").

Given the ample detail that SRSA has already provided in response to this interrogatory, which fully satisfies Defendants' theory of relevance, their complaint over the adequacy of SRSA's response rings hollow. Further, the request is plainly overbroad and unduly burdensome considering the substantial volume of information in HK Contacts and the Strategic Buyers Tab, and the numerous subparts to Defendants' request.

### III. CONCLUSION

For the foregoing reasons, SRSA respectfully requests that the Court sustain its objections to the Special Master's rulings with respect to Interrogatories 23 and 44.

13

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: May 21, 2021 | By: *s/ Warren A. Braunig* <br> Warren A. Braunig <br> *wbraunig@keker.com* <br> Michelle S. Ybarra <br> *mybarra@keker.com* <br> Benjamin D. Rothstein <br> *brothstein@keker.com* <br> Katie Lynn Joyce <br> *kjoyce@keker.com* <br> Victor H. Yu <br> *vyu@keker.com* <br><br> KEKER, VAN NEST & PETERS LLP <br> 633 Battery Street <br> San Francisco, CA 94111-1809 <br> Telephone:     415-391-5400 <br> Facsimile:      415-397-7188 <br><br> SHERIDAN ROSS P.C. <br> Scott R. Bialecki <br> *sbialecki@sheridanross.com* <br> Matthew C. Miller <br> *mmiller@sheridanross.com* <br> 1560 Broadway, Suite 1200 <br> Denver, Colorado 80202 <br> Telephone:     303 863 9700 <br> Facsimile:      303 863 0223 <br> Email:     *litigation@sheridanross.com* <br><br> Attorneys for Plaintiffs <br> SRS ACQUIOM INC. AND <br> SHAREHOLDER REPRESENTATIVE <br> SERVICES LLC |

## **COMPLIANCE WITH TYPE-VOLUME LIMITATION**

As required by this Court's Practice Standard III(A)(4), above-signed counsel hereby certifies that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).