# Exhibit H

Transcript of Proceedings Volume A.M. Session
January 27, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

BEFORE SPECIAL MASTER DAVID M. TENNER

---oOo---

SRS ACQUIOM INC., a Delaware
corporation; and SHAREHOLDER
REPRESENTATIVE SERVICES LLC, a
Colorado limited liability company,

               Plaintiffs,
    vs.                     No. 1:19-cv-02005-DDD-SKC

PNC FINANCIAL SERVICES GROUP, INC.,
a Pennsylvania corporation, PNC BANK,
N.A., a national association, HEATHER
KELLY, an individual, and ALEX TSARNAS,
an individual,

               Defendants.
_____/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Via Zoom)

Morning Session, Pages 1-63

Wednesday, January 27, 2021

Stenographically Reported by:

Peggy Tsujimoto, RPR, CSR No. 5229

U.S. Legal Support | www.uslegalsupport.com

Page 2

1  A P P E A R A N C E S  O F  C O U N S E L:
2  (All appearances via Zoom)
3  For the Plaintiffs:
4  KEKER, VAN NEST & PETERS LLP
5  BY:  WARREN A. BRAUNIG, Attorney at Law
6  KATIE LYNN JOYCE, Attorney at Law
7  VICTOR H. YU, Attorney at Law
8  633 Battery Street
9  San Francisco, California 94111-1809
10  415-391-5400
11  Wbraunig@keker.com
12  Kjoyce@keker.com
13  Vyu@keker.com
14
15  SHERIDAN ROSS P.C.
16  BY:  SCOTT R. BIALECKI, Attorney at Law
17  1560 Broadway, Suite 1200
18  Denver, Colorado 80202
19  303-863-9700
20  Sbialecki@sheridanross.com
21
22  For the Defendants:
23  BALLARD SPAHR LLP
24  BY:  NOAH S. ROBBINS, Attorney at Law
25  1735 Market Street, 51st Floor

Page 3

1  Philadelphia, Pennsylvania 19103-7599
2  215-665-8500
3  Robbinsn@ballardspahr.com
4
5  DOWD BENNETT LLP
6  BY:  MATTHEW E. JOHNSON, Attorney at Law
7  1775 Sherman Street, Suite 2010
8  Denver, Colorado 80203
9  303-353-4361
10  Mjohnson@dowdbennett.com
11
12  Also Present:  Natalie Chetlin Moritz (partial time)
13
14  ---o0o---

Page 4

1  PROCEEDINGS
2  Wednesday | January 27, 2021 | 11:02 a.m. (PST)
3  ---o0o---
4  SPECIAL MASTER:  We are on record in
5  1:19-cv-02005-DDD-SKC, SRS Acquiom, et al., versus PNC
6  Financial Services Group, Inc.
7  Since we are on the record and for the benefit
8  of the court reporter, let's take appearances starting
9  with plaintiff.
10  MR. BRAUNIG:  Good afternoon, Mr. Tenner.
11  Warren Braunig of Keker, Van Nest & Peters for
12  plaintiffs.
13  MS. JOYCE:  Good morning, Katie Lynn Joyce of
14  Keker, Van Nest & Peters also for plaintiffs.
15  MR. YU:  Victor Yu of Keker, Van Nest & Peters
16  for plaintiffs.
17  MR. BIALECKI:  Good afternoon, everyone.  Scott
18  Bialecki of Sheridan Ross on behalf of plaintiffs.
19  SPECIAL MASTER:  And for defendants.
20  MR. JOHNSON:  Good afternoon, Mr. Tenner.  My
21  name is Matt Johnson from Dowd Bennett LLP on behalf of
22  the defendants.
23  MR. ROBBINS:  Good afternoon, Noah Robbins of
24  Ballard Spahr also on behalf of defendants.
25  SPECIAL MASTER:  The first item that's

Page 5

1  scheduled for hearing today for oral argument is
2  defendants' motion to compel text, which is item 3 on
3  docket 113.
4  I guess for the record, I should state that we
5  had set for this hearing item 2 on docket 113, which was
6  the dispute concerning alleged defendants' failure to
7  produce customer list.  That dispute has been withdrawn,
8  and so the only item left concerning docket 113 is item
9  3, which is defendants' motion to compel text.
10  Let me tell you where I'm at, having reviewed
11  what has been filed already.  I understand that the
12  briefing was done when the case was under expedited
13  discovery as opposed to the broader discovery that we
14  have now, but the defendants argued that basically the
15  defendants searched text messages, so the plaintiff
16  should search text messages as well.
17  I did not find that very persuasive.  Basically
18  this case, it seems to me, is about the conduct of
19  Ms. Kelly and Mr. Tsarnas, so it would be obvious that
20  their text messages would need to be searched.  It's
21  less obvious to me whether or not representatives of the
22  plaintiffs or employees of the plaintiffs' text messages
23  would need to be searched.  That is obviously something
24  we're going to have to decide today.
25  The plaintiffs argued that the defendants

Page 30

1   And then with respect to other people, I think
2   that's more akin to identifying with them with specific
3   issues in the case, but there are a key set of SRS
4   individuals who do have knowledge regarding all of the
5   issues in the case.
6   SPECIAL MASTER:  I'm sure you'll pitch that to
7   Mr. Braunig.  And if you have disputes about it, that's
8   what I'm here for.
9   MR. ROBBINS:  Okay.
10  SPECIAL MASTER:  It sounds to me -- I want to
11  see how we're going to handle this in terms of the
12  order.  It sounds to me like the parties have agreed to
13  meet and confer about witnesses who should have inquiry
14  made about text messages.  And based on that meet and
15  confer, we'll hours all the disputes that arise out of
16  it.  Is that a fair summary of where we're at?
17  I'm not going to grant or deny any particular
18  motion.  That's just the order you're going to get.
19  The next item is request for production number
20  8 to Kelly, which are the communications with Miller and
21  Kingsley from January 1, 2016, until the present.  This
22  is another one that I can't believe got out the door.
23  It is facially overly broad.  It could be talking about
24  we had a great vacation, Hawaii is great, you should go.
25  They could be talking about, man, my teenager is driving

Page 31

1   me nuts.  Obviously those kinds of communications would
2   not be discoverable and no attempt has been made to
3   narrow the request.
4   Having said that, it looks like Mr. Kingsley
5   has already produced all of the texts.  At least that's
6   what has been represented to me.  And Mr. Miller, it's
7   unclear whether all of the texts have been produced.  A
8   lot of documents were produced, but nobody said all of
9   the texts with Ms. Kelly have been produced.  Surely,
10  there was an opportunity to ask Mr. Miller to produce
11  all of his texts.
12  I've got to assume that Mr. Miller was asked to
13  produce all of his texts with Ms. Kelly.  My thinking
14  going into this is that perhaps this is an issue which
15  has already been addressed that you've got all --
16  everything that you're asking for because due to the
17  process of asking Mr. Kingsley and Mr. Miller for their
18  documents, you got what you needed.
19  So let's start with defendants on this.
20  Somebody tell me what happened with Kingsley and Miller.
21  MR. JOHNSON:  I can take a stab at it.
22  SPECIAL MASTER:  For the court reporter, this
23  is Mr. Johnson.
24  MR. JOHNSON:  Thank you.  I think you're
25  exactly right.  We don't have a problem with producing

Page 32

1   the communications that have already been produced that
2   relate to the declarations in this lawsuit and to this
3   lawsuit.  Those have all been produced.  Where we drew
4   the line was relevance.  And like you mentioned, and I
5   know you haven't had a chance to see the texts between
6   Kingsley and Ms. Kelly that were produced, but it's all
7   about what's a good bar to dine at, what's the best lake
8   to rent a boat on.
9   All that stuff, while it has already been
10  produced, it's not relevant to the case, and we believe
11  that it's an appropriate objection to not go back and
12  search four or five years of communications that are
13  completely irrelevant.  We have done the legwork to
14  produce the relevant communications about the
15  declarations, about any issues in the lawsuit, and those
16  have been produced to plaintiffs' counsel.
17  I would just point, Mr. Tenner, that I think
18  you hit the nail on the head.  I will point you to a
19  case, Betts v. Work Zone Traffic Control.  It's a 2017
20  case from Magistrate Judge Watanabe.  He explained,
21  "Texts that do not relate to plaintiff and/or his
22  termination are not relevant to this lawsuit.  Further,
23  it is not plaintiff's place to require production of
24  irrelevant documents so that his counsel may decide
25  which texts are relevant to this case.  The Federal

Page 33

1   Rules of Civil Procedure only require production of
2   relevant information.  Irrelevant information may be
3   properly withheld."
4   So it's our position that all of the relevant
5   documents have been produced, and I think to the extent
6   that plaintiffs are even still going to make an argument
7   here today, the argument will be that somehow
8   Ms. Kelly's communications about her kids, and she has
9   six or seven of them, or about Lake Minnetonka with
10  Mr. Kingsley are somehow --
11  SPECIAL MASTER:  By the way, Lake Minnetonka is
12  the best lake in Minnesota to boat on, probably the best
13  bar to dine on.  I couldn't tell you if it's survived
14  COVID or not.
15  MR. JOHNSON:  She did mention that to
16  Mr. Kingsley in a text that they already have.  The
17  general point is there is no relevance to those, and we
18  believe that the objection as to relevance for documents
19  that don't relate to the declarations or the issues in
20  the lawsuit should be sustained.
21  And I'll just close by saying that the citation
22  that was given to you in the very short briefs that we
23  submitted by the plaintiffs, which was Casaretto v.
24  Geico, is a motion in limine about whether one expert
25  can use, quote, propaganda, generalizations, and

Transcript of Proceedings Volume A.M. Session
January 27, 2021

Page 34

1  personal attacks on the defendants' expert.
2          It has nothing to do with what this issue is,
3  and there is just no relevance under Rule 26 or under
4  relevant cases to force the defendants to produce
5  completely irrelevant documents.
6          SPECIAL MASTER:  Have all of the emails between
7  Mr. Miller and Ms. Kelly been produced?
8          MR. JOHNSON:  They have had a year's long
9  professional relationship.  So if they related to the
10 declaration in this case or any issue in this case, then
11 yes.
12         SPECIAL MASTER:  My understanding is the
13 vehicle by which that happened was a subpoena on
14 Mr. Miller; is that correct?
15         MR. JOHNSON:  No.  Defendants also produced
16 emails with Blackberry of Mr. Miller about his
17 declaration.  They have, like, emails between
18 defendants' counsel and Mr. Miller related to the
19 drafting of declarations.  They have all that.  That's
20 already been produced.
21         SPECIAL MASTER:  How was Mr. Kingsley's email
22 obtained?  By subpoena to Mr. Kingsley or production by
23 one of the parties?
24         MR. JOHNSON:  Both.  We've also produced --
25 defendants have also produced communications with

Page 35

1  Mr. Kingsley about his declaration, and they also
2  subpoenaed him, and he produced much more than is
3  relevant in the case, but that was his prerogative, and
4  we didn't feel the need to throw out a whole bunch of
5  roadblocks.
6          SPECIAL MASTER:  Has there been a subpoena for
7  Mr. Miller?
8          MR. JOHNSON:  Absolutely.  He has counsel for
9  Blackberry.
10         SPECIAL MASTER:  I'm seeing the shaking of
11 heads no.
12         MR. JOHNSON:  I don't how they got the
13 documents.  He produced 500-and-some pages of documents.
14         SPECIAL MASTER:  Okay.  I appreciate it.  Can
15 somebody enlighten me about Mr. Miller and how those
16 documents were obtained?
17         MS. JOYCE:  Yes.  I'll speak for plaintiffs,
18 and I'll start by noting I grew up in Wisconsin and have
19 strong feelings about preferable lakes.
20         SPECIAL MASTER:  I was limiting my comment to
21 Minnesota.
22         MS. JOYCE:  Okay, much appreciated.
23         I would like to back up just a little bit
24 because I think that the relevance of these documents is
25 extraordinarily important to our case.  What we're

Page 36

1  talking about here is Kelly's communications with
2  Kingsley and Miller, who submitted declarations that
3  supported the defendants' preliminary injunction
4  opposition and their summary judgment motions.
5          The declarations are essentially character
6  declarations endorsing Kelly.  They praise her
7  excessively for her talent, talk about how fantastic she
8  is.  And defendants' used that in support of their
9  claims that relationships rather than technology to
10 drive customer decisions.
11         These are very slanted and character-focused
12 declarations, which changes the inquiry about what is
13 relevant here.  We are entitled to know the full extent
14 of her relationship with them, which may have caused
15 them to slant their testimony.  And from the limited
16 documents that we have -- and I'll get to just how
17 limited that is.
18         SPECIAL MASTER:  Help me get to where we got
19 the Miller documents.
20         MS. JOYCE:  I can answer that question first,
21 if you'd like.  The Miller documents we got from
22 Blackberry, his employer.  We subpoenaed Blackberry
23 instead of Miller because Miller lives in Canada and is
24 outside the subpoena power.
25         Blackberry responded with a limited set of

Page 37

1  documents.  It does not include any text messages.  It
2  does not include any emails from his personal accounts,
3  and Blackberry limited its response to communications
4  between Kelly and Blackberry from only a nine-month
5  period, March 2018 to January 2019.
6          So the idea that we have all of these
7  communications is just false.  And the place that we can
8  get them is a party in this case, Ms. Kelly, which is
9  what we have requested here.
10         Similarly for Mr. Kingsley, we subpoenaed him.
11 He produced some text messages, but he did not search
12 all of his emails.  He did not search everything in his
13 possession that would show communications with Kelly,
14 and his counsel explicitly told us they were limiting
15 the searches in those ways.
16         When we reviewed the text messages he did
17 produce, there's also very significant time gaps,
18 including one that's 22 months and is unexplained as to
19 whether he deleted text messages that Kelly may very
20 well have, and so we don't have the documents yet.
21 These are highly relevant.
22         SPECIAL MASTER:  You're talking about
23 documents, but this dispute is only about texts; right?
24         MS. JOYCE:  No, it's about any communications
25 between Kelly and Miller or Kelly and Kingsley.

Page 38

1    SPECIAL MASTER:  When I saw it framed, it was
2  about texts.  I'm sorry.  This one is about
3  communications.
4    MS. JOYCE:  Yes.
5    SPECIAL MASTER:  Okay, my mistake.
6    MS. JOYCE:  So what I would like to point out
7  here that's different about Kelly's relationships with
8  these individuals is from the limited documents we do
9  have, it is apparent that Kelly had an unusually
10 personal relationship with Kingsley that likely caused
11 him to slant his testimony.
12    We have seen text messages of Ms. Kelly writing
13 to Mr. Kingsley asking if he wants to get coffee and he
14 responds with, quote, "Hell, yeah, but why do coffee
15 when we can do shots."
16    And in a different text, Kingsley asks her,
17 quote, "Want to go out tonight?  Drinks?  Clubs?
18 Spearmint Rhino?"
19    To be clear, Mr. Tenner, Spearmint Rhino is a
20 strip club.  And then in another thread, Kingsley asks
21 her to meet him for dinner.  She responds by asking if
22 she can bring her husband, and Kingsley replies, quote,
23 "Yup, unless you don't want to.  Hahaha."
24    So this is not a typical business relationship,
25 and we have reason to believe that because of what we

Page 39

1  have seen that he may have slanted his testimony in
2  talking about Ms. Kelly.
3    With Miller, we know less about because we have
4  seen less, but we have tried to get what we can from
5  Blackberry, and the remainder rests with the party in
6  this case, Ms. Kelly.  The request is limited in time.
7  It dates back to 2016.  It pertained only to her
8  communications with these two individuals, and as a
9  result, should not be hard to search and likely isn't
10 voluminous.
11    If it is voluminous, that would show that
12 they're potentially very biased.  So we don't think
13 that -- we think this is highly relevant as impeachment
14 evidence, and it has not been produced, and it does not
15 pose a particular burden on defendants to do this.
16    SPECIAL MASTER:  Mr. Johnson.
17    MR. JOHNSON:  Yes, Mr. Tenner, thank you.
18    First of all, I think the insinuation that I
19 hope counsel is not making that there's some illicit
20 affair or some extramarital situation going on here is,
21 one, offensive and, two, the text messages are
22 abundantly clear that they're joking back and forth.
23    More importantly, what you didn't hear,
24 Mr. Tenner, is any argument as to how these are relevant
25 under Rule 26 or the case law in this district.  The

Page 40

1  Betts v Work Zone Traffic case from Judge Watanabe is
2  directly on point.
3    The defendants, including Ms. Kelly, have
4  already produced -- searched for and produced documents
5  relevant to his declaration in this case and relevant to
6  any claims in the case.  They have all those.  That's
7  where the line was drawn.
8    In fact, I've been on calls with Mr. Braunig
9  and their third-party attorney declarant where they take
10 the position that only documents relevant to his
11 declaration are relevant in the case.
12    So what you don't hear is any legal authority.
13 You didn't hear any reference to how they can possibly
14 fall within the bounds of Federal Rule of Civil
15 Procedure 26 and why Judge Watanabe didn't have it
16 exactly right when he said it's not plaintiff's place to
17 require production of irrelevant documents so that
18 counsel may decide which texts are relevant to this
19 case.
20    What they're doing is undertaking a fishing
21 expedition.  And if they want to ask Ms. Kelly if she
22 has a friendship with Mr. Kingsley or Mr. Miller, they
23 can do that at trial, if the judge allows the question,
24 but to try to skirt Rule 26 and the relevant case law in
25 this district, we think, is inappropriate, and the

Page 41

1  relevant text messages -- excuse me, relevant emails,
2  there are no texts, that are relevant to the claims or
3  to the declaration have already been produced, and
4  because Mr. Kingsley chose to produce his entire text
5  chain with Ms. Kelly, that doesn't give the plaintiffs
6  grounds to then force Ms. Kelly to go on a goose chase
7  searching for completely irrelevant messages.
8    SPECIAL MASTER:  What about the argument that
9  this isn't a fishing expedition or a wild goose chase
10 because based on what they have already seen, there is
11 reason to inquire further about the nature of the
12 relationship and that she's got the emails and those
13 emails will answer that question?
14    MR. JOHNSON:  That doesn't fit within the
15 bounds of Rule 26.  I mean, what they're trying to make
16 is some sort of bias argument.  They don't have a single
17 case that supports that argument.  They can't tell you
18 how bias is relevant.  That's not what the case law
19 says.  Again, I would direct you to the Betts case from
20 Judge Watanabe.
21    Until they come to you, Mr. Tenner, with some
22 sort of legal authority, I don't think that you could
23 overrule these objections in light of the fact that
24 there is no relevance.  You hit the nail on the head at
25 the beginning of this.  There is no relevance to text

Page 42

1  messages about which bar they went to in 2017 or the
2  fact that Ms. Kelly is on maternity leave or any of
3  that.  None of that is relevant.
4        Quite frankly, I don't think Judge Domenico is
5  going to let any of that into this case anyway, despite
6  the fact that they have a few text messages.  So until
7  they articulate or present you with a case that is
8  different than the case that we believe is directly on
9  point, I can't see how they can meet their burden that
10 anything that they're asking for is relevant under
11 Rule 26.
12       SPECIAL MASTER:  They haven't presented me with
13 case law, but they have presented me with some facts
14 which make me concerned that the nature of the
15 relationship is something which needs to be inquired
16 into, that it's not like two people who would say, hey,
17 you know, we're going out with our family.  Where should
18 we go to dinner?
19       I just heard a couple of emails which suggest
20 to me that they may have a relationship which is
21 different than what you described, Mr. Johnson.  I'll
22 just use those words.  And that is relevant to the
23 credibility of the witness.
24       If he's got a very close personal relationship,
25 I'll just say, with Ms. Kelly, the question then to me

Page 43

1  is, you know, granted, there may also be a ton of other
2  emails in there which are irrelevant, like what's the
3  best school to send our kids to or all kinds of stuff
4  like that.
5        How do we go about making sure that the
6  irrelevant stuff is whittled out but the relevant stuff
7  comes -- they get and comes in.  Just thinking out loud,
8  it seems to me that the only way to do that is to do an
9  in-camera inspection where some neutral person decides
10 whether or not it's relevant to the case.
11       Any other suggestions about how we resolve that
12 tension between producing clearly irrelevant stuff and
13 producing stuff which may very well reveal a
14 relationship which is more than just friends chatting
15 about coffee?
16       MR. JOHNSON:  I think to respond to that, you
17 need to better understand.  I mean, is the
18 insinuation -- I think I'm pretty clear on what
19 plaintiffs' counsel is insinuating, which is irrelevant,
20 but is the question you're asking that you're driving at
21 whether or not there is some relationship beyond
22 friendship and professional colleagues between Ms. Kelly
23 and Mr. Kingsley?
24       SPECIAL MASTER:  No.  I thought I was talking
25 about Mr. Miller.  I thought Kingsley produced

Page 44

1  everything and we weren't dealing with Kingsley.
2        MR. JOHNSON:  My understanding is he has
3  produced everything.
4        SPECIAL MASTER:  Ms. Joyce, were you reciting
5  from Miller text or Kingsley text?
6        MS. JOYCE:  I was reciting from Kingsley texts.
7  We don't have any texts from Mr. Miller.  But if I could
8  just respond --
9        SPECIAL MASTER:  If you're reciting from
10 Kingsley, you already have everything from Kingsley?
11       MS. JOYCE:  No.
12       SPECIAL MASTER:  Okay.  You only have texts.
13 You don't have all their communications.
14       MS. JOYCE:  Correct.  We only have some texts.
15       SPECIAL MASTER:  What texts are you missing?
16 It was represented that it was all.
17       MS. JOYCE:  It was represented that it was all
18 in Kingsley's possession at the time when he collected
19 them.  He was not under the same duty to preserve as
20 Ms. Kelly.  He's an outside third party.  There are
21 significant -- almost two-year-long gaps in certain
22 portions of the text messages that he produced where we
23 think there could be deleted text messages that, of
24 course, we hope Ms. Kelly has properly preserved.
25       So in the text message category, we have what

Page 45

1  he had at the time we subpoenaed him, and we don't have
2  a vast amount of his emails because he limited his
3  searches.
4        To be clear, defendants have never taken the
5  position that she doesn't have more than what's already
6  been produced.  To the contrary, they keep pointing out,
7  oh, Kingsley gave you some text messages and you got
8  some stuff from Blackberry, but they're not taking the
9  position that there is not more out there.  And that's
10 what we are going after.
11       In the worst case scenario, their production is
12 duplicative, but it's from the party, and as you
13 commented earlier, that's not particularly concerning.
14       The other thing I would like to note is the
15 declarations that were submitted talk about Ms. Kelly's
16 character, and the issue of bias is relevant in that
17 context.  That's why the case we cite talking about
18 impeachment and how parties are given wide latitude to
19 impeach witnesses is relevant.
20       The way that we are able to do that in this
21 circumstance is by getting her social communications
22 with these two individuals.  And so I don't think that
23 there's going to be a lot that is swept up that is
24 irrelevant.
25       To the extent she was talking to them and

Transcript of Proceedings Volume A.M. Session
January 27, 2021

Page 50

1  that contained SRS confidential or trade secret
2  information on them.  That was the role of Forensic
3  Pursuit.
4         Certainly, we'll get to that in a later issue
5  as to the way in which SRS is using it now.  But when it
6  comes to the production of documents in this case, that
7  is not Forensic Pursuit's role.  That is the role of
8  defendants and their counsel.  We are the ones producing
9  documents outside of the forensic context.
10        SPECIAL MASTER:  I want to talk about the
11 burden.  Unfortunately, you didn't answer my question,
12 which is:  Does Forensic Pursuit have these
13 communications?  Because if Forensic Pursuit has these
14 communications, all we have to do is type in key words
15 or search for Kingsley and Miller for all of whatever it
16 is they mirror imaged.  It's not a lot of burden there.
17 It doesn't require Ms. Kelly to do much, if anything.
18        I need a straight answer to that question.  Do
19 they have it?
20        MR. ROBBINS:  Forensic Pursuit imaged devices
21 in July of 2019.  For some of that, they would have up
22 until that date.  Now, obviously, communications
23 subsequent to that image, Forensic Pursuit is not in
24 possession of the phone or the computer now.  They only
25 have a copy of the image that was created in July of

Page 51

1  2019.
2         SPECIAL MASTER:  From the plaintiffs'
3  perspective, would that be a sufficient response to just
4  go through what Forensic Pursuit has, take a look at it,
5  and then see if there's a reason to get communications
6  since that date in 2019?
7         MS. JOYCE:  I don't think that that's
8  necessarily what needs to be done here because I would
9  imagine that defendants have already collected
10 Ms. Kelly's data themselves, and so this is something
11 that counsel can do apart from Forensic Pursuit.
12        I don't know for a fact, but my experience in
13 most cases, counsel collects data from custodians and
14 has it and can run searches on it.  So to the extent
15 they have it, there is no reason for us to run Forensic
16 Pursuit, and I think Mr. Braunig might want to weigh in
17 on this point.
18        MR. BRAUNIG:  Just to be clear, Mr. Robbins is
19 right about this.  The purpose of Forensic Pursuit was
20 to identify non -- not to sort of gather data for
21 production but to be able to tell what forensic things
22 were done on these various machines and the existence of
23 certain things.
24        So this would be normal.  I don't think we
25 would have to go through -- the parties would have to go

Page 52

1  through the forensic neutral in order to do this.  I
2  think the question of burden is simply, do they have
3  these messages and could they simply run a search for
4  communications between Kelly and each of these two
5  individuals and produce them.
6         SPECIAL MASTER:  Then the first question is to
7  Mr. Robbins.  Do you have the communications?
8         MR. ROBBINS:  We certainly have them as of the
9  last collection.  I can't tell you right now the date of
10 that.  The burden has to be addressed.  It's a sliding
11 scale.  It's undue burden in light of the relevance of
12 the information requested.
13        So we're not trying to mislead you, Mr. Tenner,
14 to say this would cost us $300,000 to produce the
15 information.  The issue from our perspective, as my
16 colleague, Mr. Johnson, said, is it's entirely
17 irrelevant and they want all texts regardless, no
18 limitation on that whatsoever, despite the fact that
19 they acknowledge they already have a lot of text.
20        Their concern is they think there might be some
21 missing.  They want all texts, every communication with
22 Mr. Miller and Mr. Kingsley, while at the same time
23 refusing to produce texts to us.  I think that's the
24 issue from our perspective.
25        We're not saying that this would be a herculean

Page 53

1  effort for the burden.  We're saying it's still undue
2  because there is no relevance to the information that
3  they're requesting.
4         SPECIAL MASTER:  I think what I'm telling you
5  is that Ms. Joyce has convinced me that there could be
6  some relevance, and I disagree with the notion that -- I
7  understand your argument, Mr. Johnson, but credibility
8  is always at issue, and discovery which is targeted to
9  credibility is always within the scope of discovery.
10 Otherwise, how do you find out about -- how do you
11 impeach credibility?  Credibility is always an issue.
12        MR. JOHNSON:  Where do we draw the line,
13 though?  Do we get every single --
14        SPECIAL MASTER:  I have to draw that line.  I
15 have to draw the line between what is really needed to
16 determine whether or not these people have a
17 relationship which would result in bias, which would
18 result in Mr. Kingsley or Mr. Miller shading their
19 testimony and being more favorable to Ms. Kelly than
20 they otherwise would if they had not this relationship.
21        That is a reasonable area to inquire into.  The
22 problem is that in inquiring into that, I'm sure we're
23 going to get all kinds of communications that are
24 irrelevant, which you're right; they are irrelevant.
25        So how do we -- I'm back to the same problem.

Page 62

1  correct that it's not an exact match because it's
2  outside the PNC Paid, but that doesn't mean that it's
3  irrelevant because it very well could be analogous.
4        SPECIAL MASTER:  Okay.  I'm ready to rule on
5  this.  The request is overly broad and it's limited to
6  PNC Paid products.  Based on that limitation, the
7  request for production has been answered.  They don't
8  have any documents.
9        Ms. Joyce, if you come up with some evidence
10 that some other part of PNC does comparable work, I
11 don't know why there would be duplication.  They already
12 have PNC Paid.  I don't know why other entities within
13 the PNC world would do the same thing, but if you come
14 up with that, I'll -- you can pitch this again.
15       But I can't authorize discovery based on we
16 think there might be other entities within PNC that do
17 this.  That's going to be the order for RFP 15.
18       The next item is the --
19       MR. BRAUNIG:  Mr. Tenner, before we move on to
20 the next item, for the sake of the court reporter, we've
21 been going about an hour and a half.  Might want to just
22 check with her to make sure she's okay.
23       SPECIAL MASTER:  How are you doing?
24       (Discussion off the record)
25       (Lunch recess taken at 12:35 p.m.)

Page 63

1  UNITED STATES DISTRICT COURT    )
                                   )
2  DISTRICT OF COLORADO            )
3
4        I, PEGGY TSUJIMOTO CSR No. 5229, do hereby
5  certify:
6        That I was present at the time of the above
7  proceedings via Zoom;
8        That I took down in machine shorthand notes all
9  proceedings had and testimony given;
10       That I thereafter transcribed said shorthand
11 notes with the aid of a computer;
12       That the above and foregoing transcript is a
13 full, true, and correct transcription of said shorthand
14 notes taken by such reporter of the proceedings in the
15 above-entitled matter;
16       That I am not a party to the action or related
17 to a party or counsel;
18       That I have no financial or other interest in
19 the outcome of the action.
20
21 February 8, 2021
22                    *Peggy Tsujimoto* (signature)
23                    _____
24                    Peggy Tsujimoto, CSR #5229
25