# EXHIBIT 12

FILED LEVEL 1 RESTRICTED

# SRS ACQUIOM INC

# VS.

# PNC FINANCIAL SERVICES GROUP

<u>Deposition</u>

## LON P. LECLAIR

*10/30/2019*

_____

## AB Court Reporting & Video

*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**FILED LEVEL 1 RESTRICTED**

CONFIDENTIAL

Page 113

1   Q. But is it limited to that data that
2 someone has determined is necessary for the
3 performance of their functions?
4   A. So in NetSuite, I believe there are
5 certain limitations relating to how you're able to
6 lock certain people in and out of certain parts of it.
7 So typically, yes, people have access to those things
8 that they need to perform their jobs.
9   Q. And that's something that's directed by
10 the company, correct?
11   A. Yes.
12   Q. And NetSuite is an Oracle product?
13   A. It is.
14   Q. And has the company modified the Oracle
15 product for its particular uses?
16   A. It has.
17   Q. And is that done -- does the company
18 have an in-house IT group that does that?
19   A. It does.
20   Q. Does its also engage outside consultants
21 to help with any modifications to NetSuite?
22     MR. ROTHSTEIN: Objection, form.
23   A. Yes.
24   Q. (BY MR. PETRIE) Do you have access to
25 everything that's on NetSuite?

Page 114

1   A. I don't know.
2   Q. Never tried?
3   A. I have never tried.
4   Q. The next item listed here under this top
5 risk that's progressing, according to the upward
6 arrow, is "Google Drive permissions and backups." Do
7 you see that?
8   A. Yes.
9   Q. Are those two separate things so we
10 should discuss them separately?
11   A. So Google Drive permissions are ability
12 to get into various document repositories and other
13 things at the company; the backups that are the --
14 call it physical backup of the environment. So are
15 they different things? Yeah, they're different
16 things.
17   Q. So the --
18   A. They're related, but interconnected, but
19 I think different.
20   Q. So the Google Drive permissions would be
21 when employee X wants to access the Google Drive, what
22 does employee X need to do in order to do that?
23   A. Yes. Now, permissions, backups, I'm not
24 an IT person. So I have a general understanding of
25 what I think these things mean, but if you're going to

Page 115

1 ask specific questions about how certain fields work
2 or how certain things work, I have a general -- just
3 so you know, I have a general view of how they work,
4 but not a very specific one.
5   Q. Well, is it your understanding that the
6 Google Drive permissions will vary depending upon a
7 particular employee's job function?
8   A. They can, yes.
9   Q. And do they?
10   A. Yes. As far as I know, yes.
11   Q. And is the company's general philosophy
12 that people should have access to information on a
13 need-to-know basis?
14     MR. ROTHSTEIN: Objection, form.
15   A. Generally, yes.
16   Q. (BY MR. PETRIE) And does the company
17 structure its systems so that people's access to
18 information is limited to those things that the
19 company has determined they need to know?
20     MR. ROTHSTEIN: Objection, form.
21   A. I think what I had sort of said before
22 is it does when it can, so I think that there are
23 certain parts of -- at least my understanding, there
24 are certain parts of NetSuite that are sort of
25 difficult to lock down in that way. So that's where

Page 116

1 you have to be thoughtful about how you do things.
2   Q. (BY MR. PETRIE) Okay. What parts of
3 NetSuite are difficult to lock down?
4   A. I wouldn't be able to give you a
5 specific example.
6   Q. Does it --
7   A. It is something I have -- I'm
8 knowledgeable about its existence, that that is one of
9 the limitations of NetSuite.
10   Q. So without having a specific example,
11 the limits of your information is there are parts of
12 NetSuite that are difficult to block people from?
13   A. Yes.
14   Q. Do you have even a general topic of the
15 types of things on NetSuite that can't be blocked, as
16 you understand it?
17   A. No. So NetSuite is interwoven into much
18 of the company's operations and finance, and there are
19 vast numbers of that. It sort of goes back to -- I'm
20 not a huge user of NetSuite, so I have some idea of
21 what the limitations of the system are, but with
22 specificity, none that I'm remembering right now.
23   Q. Well, do you know that there are
24 limitations on employees' ability to access company
25 financial information?

**CONFIDENTIAL**

Page 253

1  for a legal conclusion.
2      A.  Well, I think the information and its
3  development is certainly -- how a client feels about
4  it and what they do, again, I don't know that there's
5  anything legally that prevents that.
6      Q.  (BY MR. PETRIE)  Well, you've told me
7  you're not a lawyer.
8      A.  Internally, I would say, yeah, that
9  would be for us, in terms of the development of our
10 product, something pretty guarded.
11     Q.  Since you're not a lawyer, I'm not
12 asking you for legal opinions or what a legal
13 obligation is or might be or is not.
14     A.  Sure.
15     Q.  I'm asking you as a businessperson, as
16 the COO and the president of the company.  So setting
17 aside anything about legal schmegal, okay?
18     A.  All right.
19     Q.  When you say in terms of the development
20 of our product in the context of a salesperson
21 explaining generically that's in the pipeline, that
22 it's pretty guarded, what do you do to guard that
23 information if as a salesperson she's provided that to
24 a customer?
25         MR. ROTHSTEIN:  Objection; form,

Page 254

1  incomplete hypothetical.
2      A.  And the information you're talking about
3  is the existence of the product?
4      Q.  (BY MR. PETRIE)  We'll just take the
5  information she relayed through in the email strings
6  that we were looking at in February.
7          MR. ROTHSTEIN:  Objection, form.
8      A.  Well, I don't know that she in those
9  emails says that she relayed any information to the
10 clients.  I think that was basically feedback she was
11 receiving from clients.
12     Q.  (BY MR. PETRIE)  Okay.  And is that
13 confidential information for SRS?
14     A.  Internally along with other things that
15 we may be working on?  Yeah, that could rise to the
16 level of confidential information.
17     Q.  But it's not confidential in the sense
18 of whether that customer or the deal parties that she
19 referenced could share that with someone else?
20         MR. ROTHSTEIN:  Objection; form, calls
21 for a legal conclusion.
22     Q.  (BY MR. PETRIE)  Is that correct?
23     A.  Well, I think that goes to what I was
24 trying to describe before, where we had been working
25 on something and then a client sort of turned around

Page 255

1  and had similar conversations with competitors.  I'd
2  find that disappointing.  Are they prevented from
3  doing that, to use that word?  In no way that I know
4  of.
5      Q.  (BY MR. PETRIE)  Did you have a lunch
6  with Mark Vogel in January of 2018 where he was trying
7  to learn information about the PNC acquisition of
8  Fortis?
9      A.  So the lunch that I had with Mark, I
10 don't remember discussing Fortis with Mark at that
11 lunch.  That was mostly about our lawsuit and sort of
12 then after other things.
13     Q.  So the meeting that you described for me
14 in Baltimore was a luncheon meeting?
15     A.  The meeting in Baltimore didn't occur in
16 January.
17     Q.  I'm sorry.  The meeting in Minneapolis.
18     A.  So the meeting with Mark was in
19 Baltimore and was a breakfast.  And I don't recall
20 Mark sort of in that conversation in Baltimore asking
21 anything about Fortis.
22     Q.  Okay.  At that point in time, would it
23 be accurate to describe your position at Wilmington
24 Trust as being the head of the corporate trust area
25 and capital markets group?

Page 256

1      A.  So the corporate trust group, that would
2  have been my boss' title.  Mine would have been a head
3  of a division within that called CMAS, Corporate
4  Municipal and Agency Services.
5      Q.  Do you know if Mr. Vogel met with anyone
6  else at Wilmington Trust, save the two gentlemen you
7  referred to as being your bosses?
8      A.  Not that I'm aware of.
9      Q.  Do you know one named Tom Hutchins at
10 Lovell Minnick?
11     A.  I do.
12     Q.  How are you acquainted with
13 Mr. Hutchins?
14     A.  So Mr. Hutchins is a vice president at
15 Lovell Minnick Partners, and as part of their company,
16 he is somebody who is responsible for the SRS Acquiom
17 investment.
18     Q.  Did Mr. Hutchins provide SRS with any
19 information about the PNC acquisition of Fortis?
20     A.  He may have.
21     Q.  As you sit here today, did he?
22     A.  Specifically, I don't recall.
23     Q.  Is it accurate that SRS was very
24 interested in what was going on with PNC's acquisition
25 of Fortis?

**FILED LEVEL 1 RESTRICTED**