# EXHIBIT 19

```
                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLORADO

 Civil Action No. 19-cv-02005-DDD

 SRS ACQUIOM, a Delaware corporation, and
 SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited
 liability company,

       Plaintiffs,

 vs.

 PNC FINANCIAL SERVICES GROUP, INC., a Pennsylvania Corporation,
 PNC BANK, N.A., a Pennsylvania Corporation,
 HEATHER KELLY, an individual, and
 ALEX TSARNAS, an individual,

       Defendants.
```

___

**REPORTER'S TRANSCRIPT**
(Preliminary Injunction)

___

Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, commencing at 9:05 a.m., on the 11th day of March, 2020, in Courtroom A702, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Tracy Weir, 901 19th Street, Room A258, Denver, Colorado 80294, (303) 298-1207

1   *Q*   That's what I asked.  He said the information in the
2   spreadsheet is not confidential, secret, not of value, or both?
3   *A*   That's what it says.
4   *Q*   Let's talk about the spreadsheet.  I think I wrote this
5   down.  The people who are involved in these deals involve
6   buyers, lawyers, investment bankers, and sellers, and there are
7   so many people involved it would grind to a halt if you had
8   them sign NDAs.  Did I write that down right from your
9   direct?
10  *A*   I don't know it's verbatim.  The gist is right.
11  *Q*   You would forthrightly acknowledge this spreadsheet in
12  blank form has been sent to hundreds of people with no
13  confidentiality restriction, correct?
14  *A*   Only people we needed to interact with to effect
15  transactions.
16  *Q*   I'm going to try to be precise.  You acknowledge without
17  confidentiality restrictions SRSA people with authority sent
18  this spreadsheet to people without signed confidentiality
19  agreements or statements in e-mails to keep them secret,
20  correct?
21  *A*   We are engaged on a large volume of transactions that all
22  have industry-wide understandings of confidentiality.  We don't
23  always get NDAs.
24  *Q*   Have you sent this spreadsheet to hundreds of people
25  without any restriction?

1   *A*   Because we're involved on a large volume of deals, we have.
2   *Q*   Okay.  Then we can move on since that's an undisputed fact.
3   Let's talk about this exchange with Ms. Kelly's attorney.
4   Let's look at Exhibit 451 at tab 12.  You do acknowledge on
5   April 2, 2018, SRS's attorney received a description of what
6   Ms. Kelly had, correct?
7   *A*   On April 2, 2018, our attorney received this letter.
8   *Q*   And one of the things that is discussed in there are the
9   red line procedure documents at issue in this case, right?
10  *A*   Yes.
11  *Q*   All right. Let's go to the next page.  You were told
12  through your lawyer that one of the documents that she had in
13  her personal e-mail account was the form of payment
14  spreadsheet, correct?
15  *A*   I understand this letter to say appropriate steps had been
16  taken to safeguard all the documents, and they would only be
17  used for the proper purposes designated in this letter.
18  *Q*   I'm trying to be precise.  The letter says that Ms. Kelly
19  had the form of payment spreadsheet on her personal e-mail
20  account, correct?
21  *A*   Again, I understood it to be that safeguards had been taken
22  and that she was going to use this for limited purposes
23  designated.
24  *Q*   Mr. Koenig, I'd like you to try to do yes or no if you can.
25  Did the letter your lawyer got say Ms. Kelly had in her

1  looks more like a download from --
2  *Q*  The information here is information from your virtual
3  Rolodex, right?
4  *A*  Yes.
5  *Q*  Your virtual Rolodex includes hundreds, maybe thousands, of
6  names?
7  *A*  No. I don't use a virtual Rolodex. Yes, this is what was
8  called the virtual Rolodex. It is definitely not where my
9  contacts are from.
10  *Q*  You refer to it yourself as your virtual Rolodex, right?
11  *A*  It is in my deposition, yes.
12  *Q*  When you joined SRSA, there was a Schedule 1 to your
13  employment agreement that was a list of companies you would not
14  be -- that would not be part of a contractual nonsolicit,
15  correct?
16  *A*  Correct.
17  *Q*  Let's turn back to Exhibit 3, page 15. These were clients
18  you had existing relationships with prior to joining SRSA?
19  *A*  These were strategic buyers that I had strong relationships
20  with before SRSA.
21  *Q*  You asked they be included in this list?
22  *A*  I did.
23  *Q*  On the day before you resigned from SRSA, you created a new
24  document you saved as HK contacts, correct?
25  *A*  I did.

1  *Q*  When you went to Wilmington Trust, was there any issue with
2  using your customer relationships you earned at Wells Fargo in
3  your new position?
4  *A*  There was not.
5  *Q*  Did you join SRS in 2014?
6  *A*  I did.
7  *Q*  Would you describe to the Court the recruitment process?
8  *A*  Sure. A second attempt at recruit led me to a breakfast
9  with Mr. Vogel where he shared with me their plan. I had
10 questions about why the stockholder representative historically
11 on the sell side wanted me to join their team. He said there
12 had been challenges getting their Clearinghouse offering off
13 the ground, and they needed me to come in so I could add some
14 credibility to their product and they asked me specifically to
15 be moving clients. Buy-side clients was the hold they weren't
16 able to currently fill.
17 *Q*  When you entered your contract with SRS, did you provide a
18 list of clients you were bringing with you?
19 *A*  I did.
20 *Q*  Describe that for the Court. We'll look at it in a second.
21 *A*  Given the base of what Mr. Vogel provided to me in terms of
22 the current client base it seemed like it was fairly
23 nonexistent. I thought if I would bring my buy-side client
24 base to a company that, by all means, I should be able to bring
25 that client base with me when I left.

1  Q   At SRS when you started were there restrictions placed on
2  use of your knowledge from Wilmington Trust about pricing?
3  A   No.
4  Q   What about -- did SRSA or Mr. Koenig put restrictions on
5  your ability to use your existing customer relationships?
6  A   On the contrary.
7  Q   What about all the knowledge that you had acquired
8  regarding what customers wanted and what could be built?  Were
9  any restrictions placed on your ability to use that at SRSA?
10 A   No.
11 Q   Did you have clients, then, that followed you from Wells to
12 Wilmington to SRS?
13 A   I did.
14 Q   All right. Let's talk about your employment agreement.  I
15 think the Court has probably seen it enough now that maybe we
16 can talk about some of the terms.  If we need to look at it, it
17 is in your binder.
18 A   Okay.
19 Q   Did you sign an employment and then a confidentiality
20 agreement?
21 A   I did.
22 Q   Describe the nature of the noncompete you were asked to
23 sign.
24 A   Noncompete terminated upon termination of my employment.
25 Q   Did you ever agree at SRSA to not compete once you left?

1    From Mr. Koenig's testimony it appears to be a good part of the
2    list.
3    Q   Did you learn this from a person who was a customer of SRSA
4    or contact of your own?
5    A   A contact of my own.
6    Q   And in terms of your discussions with clients about what
7    they might want, were you ever asked by anyone at SRSA to bind
8    them to some either formal or informal understanding of
9    confidentiality?
10   A   No.
11   Q   All right.  I would like now to talk to you, if I could,
12   about marketing at SRSA.  Was a client list used frequently to
13   market to people?
14   A   Yes.  Tombstones are required for marketing at SRSA.
15   Q   Have you seen the exhibits we've shown of representative
16   clients and so on?
17   A   I have.
18   Q   Did you have information about SRSA's procedures in the
19   context of deals with no confidentiality restrictions placed on
20   them?
21   A   I did.
22   Q   And do you understand that one issue in the case relates to
23   this payment spreadsheet?
24   A   I do.
25   Q   So would you describe for the Court how the payment

1  spreadsheet issue was exchanged in the context of deals?

2  A   We sent the payment spreadsheet out to any party on the

3  deal.

4  Q   Let's look at some examples.  369, page 2.  At the top.

5  Look at the attachment.  Is this an e-mail that you're on while

6  you were at SRSA providing the payment spreadsheet to third

7  parties?

8  A   Yes.

9  Q   All right.  Let's look at Exhibit 418, page 2.  Is this an

10 example of you being involved in e-mail traffic where the SRSA

11 spreadsheet is being sent around without paying restriction?

12 A   Yes.

13 Q   How many people would you say get the payment spreadsheet

14 in any deal that you do?

15 A   On a particular deal, it would be maybe average between six

16 to ten.

17 Q   How many deals are done?

18 A   Hundreds.

19 Q   And let's take a look at Exhibit 417, page 2.  Is this yet

20 another example of an e-mail you were on?

21 A   Yes, it is.

22 Q   Let's go to Exhibit 386, page 2.  Is this another example?

23 A   Yes, it is.

24 Q   Is it safe to say there are many, many, many examples like

25 this?

1  A   These are my contacts. It is not a customer list. The
2  only thing on this list that the people on it have in common
3  are that I have worked with them. I don't know if there are
4  additional large customers at SRS that should be on here and
5  aren't. I only compiled what were my contacts.
6  Q   Are there customers on here who are on your nonsolicit
7  list?
8  A   There are.
9  Q   Are there lawyers on here?
10 A   There was a second tab of lawyers, yes.
11 Q   All right. Are there people on here who weren't even SRSA
12 clients?
13 A   Yes, there are.
14 Q   Did anybody at SRSA say whatever you do now that you've
15 said you're leaving you can't take your contacts with you?
16 A   No.
17 Q   When you came to SRS, did you take contacts with you from
18 Wilmington Trust?
19 A   I did. I had them in paper form and keyed them into Google
20 Drive.
21 Q   In terms of another document that's come up, Exhibit 558,
22 which is a process document?
23 A   Yes.
24 Q   Are you familiar with that document?
25 A   I am.

1  *Q*  I'd like to show you Exhibit 445, page 2, which is your
2  letter -- your lawyer's letter and response on March 20. Do
3  you see that letter?
4  *A*  I do.
5  *Q*  Now, let's go down to "as for your concerns" in the bottom
6  paragraph. Your attorney writes here as to you that you are a
7  business manager with considerable industry knowledge that is
8  in the public domain. Is that truthful?
9  *A*  That is truthful.
10 *Q*  And in terms of that sentence, how do you believe that that
11 applies to what you did at PNC after you were gone?
12 *A*  I completely complied with all my covenants.
13 *Q*  Did you comply with a nonsolicit provision?
14 *A*  I did.
15 *Q*  As to the documents you had at this point in time, what did
16 you do with them?
17 *A*  The -- I turned over the hard copy document that I found
18 after this letter, that procedure document, to my attorney.
19 That was covered in the letter to indicate she had it, here it
20 is. I hadn't seen it until the depo after that.
21         Second, there was a list of documents that were in my
22 e-mail. We told them I had them. As a response they confirmed
23 my assumption they weren't confidential documents.
24 *Q*  Let's talk about letter which is Exhibit 451, dated
25 April 2, 2018. Let's first start off with the first page

1  *Q*  How come you couldn't schedule that?
2  *A*  She was five weeks early.  I didn't have opportunity to get
3  someone up to speed on the transaction.  They would have been
4  drastically let down if I was to have been out of pocket.
5  *Q*  Given that relationship, do you believe that that first
6  company listed came to PNC because of some technical product?
7  *A*  No.
8  *Q*  Let's talk about the second one listed there.  Is that
9  company on your schedule from Wilmington Trust days?
10 *A*  They are.  They are one of my longest standing.
11 *Q*  Do you have a personal relationship with the people who
12 make decisions there?
13 *A*  Very much so.
14 *Q*  Do you know their names, know a lot about them?
15 *A*  I do.  I attended a wedding early January with them.
16 *Q*  What about the third one there?  Could you describe your
17 relationship with that client?
18 *A*  That's another long-standing client of mine that I worked
19 with at Wells Fargo, Wilmington, SRS, and now at PNC.
20 *Q*  Do these customers come to you because of some trade secret
21 theft you did?
22 *A*  No.
23 *Q*  One of the things you may have heard at the beginning when
24 I was talking is about the customers who actually signed
25 declarations in the case?

1  this. Your lawyer never told SRSA that you were going to use
2  the payment spreadsheet at PNC, did it?
3  *A*  It doesn't appear so.
4  *Q*  He never disclosed to anyone at SRS that you had copied a
5  list of SRS customers that you were going to use at PNC, did
6  he?
7  *A*  I didn't copy a list of SRS customers. I have a contact
8  list that's mine that I brought to SRSA that they still have
9  the benefit of using, and I took it with me the same I did from
10 Wells Fargo to Wilmington and Wilmington to SRS.
11 *Q*  Mr. DeForest never said anything about this list of what
12 you're calling contacts, did he?
13 *A*  He did not.
14              *MR. BRAUNIG:*  Nothing further.
15              *MR. BENNETT:*  I'm not going to recross on anything.
16              *THE COURT:*  So we're done -- both sides are done with
17 Ms. Kelly?
18              *MR. BENNETT:*  Yes. Since she's a defendant she'll
19 probably stay.
20              *THE COURT:*  Understood. Thank you. You may step
21 down.
22              I want to take a five-minute break. We have an IT
23 person here. It seems like one of our problems may have fixed
24 itself. I still want to see if he can troubleshoot it. Let's
25 not go anywhere. If anyone needs to run to the restroom,

1    *Q*   Was Alex Tsarnas at the meeting you just described?
2    *A*   No.
3    *Q*   Why weren't they there?
4    *A*   They didn't work for us.
5    *Q*   When did Mr. Tsarnas and Ms. Kelly first participate in a
6    meeting regarding the development of PNC Paid?
7    *A*   That was about a month later, the end of March 2018.
8    *Q*   What role did Ms. Kelly and Mr. Tsarnas have in the
9    development of PNC Paid?
10   *A*   So Ms. Kelly and Mr. Tsarnas were no different than myself
11   and the other folks in the room. Everyone is lending their
12   years of experience -- I call them subject-matter experts,
13   SMEs. Everyone is lending their experience in the business
14   to the developer so they can translate those words into
15   functionality.
16   *Q*   In all of the meetings that you attended with Mr. Tsarnas
17   and Ms. Kelly during development of PNC Paid, did either of
18   them ever describe how SRS's online product worked?
19   *A*   No.
20   *Q*   Mr. Lezack, are you familiar with SRS's payment form
21   spreadsheet?
22   *A*   Yes.
23   *Q*   How did you become familiar with SRS's payment form
24   spreadsheet?
25   *A*   I've seen it many, many times. We possessed it at Fortis

1  for years.
2  *Q*  How did Fortis acquire SRS's payment spreadsheet?
3  *A*  So SRS would send it to us much like all the other paying
4  agents.
5  *Q*  Mr. Lezack, would you turn to Exhibit 357 in your binder.
6  *A*  Okay. I'm there.
7  *Q*  Could we turn to --
8  *A*  I'm looking at something different than you are.
9  *Q*  Could we turn to page 26?
10 *A*  Okay. I'm looking at the same thing.
11 *Q*  Can you identify what's being shown on this page of
12 Exhibit 357?
13 *A*  I can. This is an e-mail from SRS to Fortis, to the law
14 firm Cooley, to the law firm Venable. That's what that is.
15 What this e-mail is, it's an e-mail attaching their form
16 payment spreadsheet and a whole bunch of other forms letting
17 people know this is what we need to set up an account.
18 *Q*  Did Fortis agree to keep to SRS's payment spreadsheet
19 confidential prior to SRS agreeing to provide it to Fortis who
20 is a competitor?
21 *A*  No.
22 *Q*  Did SRS ask Fortis to keep SRS's payment spreadsheet
23 confidential?
24 *A*  No.
25 *Q*  Do you consider a payment spreadsheet to be confidential?