# EXHIBIT 49

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Wilmington Trust, N.A., | Case No. 18-cv-3299 (PJS/DTS) |
| Plaintiff, | |
| vs. | **DECLARATION OF**<br>**GREGORY NELSON** |
| Gregory Nelson, | |
| Defendant. | |

Gregory Nelson makes the following Declaration pursuant to 28 U.S.C. § 1746:

1.     I am the Defendant in the above-captioned case.  I submit this Declaration in opposition to the Motion for Temporary Restraining Order and Expedited Discovery brought by Plaintiff Wilmington Trust, N.A. ("Plaintiff" or "WT").

## SUMMARY

2.     From the beginning of my employment at WT through to the very end, I put forth my best efforts on behalf of the company. Indeed, even after discussions were initiated in late May 2018 with my current employer, SRS Acquiom ("SRS"), about potentially leaving WT to work at SRS, I continued to put forth my best efforts for WT. My hard work is reflected in my sales numbers:  my third quarter sales at WT for 2018 were my highest to date, and my fourth quarter sales for 2018 were on track to be even higher.

3.      While employed at WT, I never worked against the company, never competed against the company, never redirected or attempted to redirect WT business or potential business to SRS or to any other company, and never disclosed confidential WT information to people or entities outside of WT.  Nor did I tell any WT clients or referral sources that I was leaving WT.

4.      I have complied with the terms of my non-solicitation covenant with WT and intend to continue to comply for the duration of the restricted period.

5.      I and a few other WT employees chose to leave WT and work for SRS, but I did not convince or encourage them to do so.  I did not lead any "lift out" of WT employees. At no time during or after my employment at WT, have I solicited employees to leave WT and work for SRS.

6.      Since my employment at WT ended, I have not solicited, directly or indirectly, WT clients or potential clients whose identities I learned during my employment at WT.  My post-WT contacts with the Mergers and Acquisitions ("M&A") attorneys who serve as our primary referral sources have been general in nature, simply letting them know that I am now with SRS.  I have not inquired about any WT client or potential client who I learned of during my employment at WT or suggested in any way that such business should be redirected from WT to SRS.

7.      I no longer have any WT-related documents.  Per WT's request, I conducted a search for all WT emails and documents.  I returned all hard copies I found, and

2

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 4
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 3 of 25

permanently deleted all WT emails forwarded to personal email accounts. At no time have I disclosed or provided confidential WT information or documents to SRS or anybody outside of WT. I did not use the documents and/or confidential information in furtherance of my employment at SRS, and SRS never requested them. In fact, SRS specifically instructed me not to provide any WT information or use any WT information in furtherance of my employment at SRS, to the extent I had any.

8.      Finally, I had no ill intent in wiping my WT-issued cell phone or deleting emails from my WT account. I performed a factory reset on my phone because it contained personal information, including photos, text messages, and banking and credit card information. I did not attempt to delete a PST file of my work emails, at least not intentionally. The emails I did delete were, to my knowledge, emails that were personal or no longer of any use to anybody, and I deleted them because I thought it would be helpful to WT to limit the amount of data it was maintaining from my old emails. I had no intent to cover up any wrongdoing—there was no wrongdoing.

9.      There is thus no legitimate basis in fact for WT's lawsuit or its motion for a temporary restraining order.

### MY EMPLOYMENT AT WT

10.     I started working for WT as a Client Development Officer in or around September 2011. I was recruited by WT's Senior Vice President and Sales Manager Patrick Trainor ("Trainor"), who I had met in my previous position at Wells Fargo.

3

11.     I brought significant experience and knowledge to the position, including an undergraduate degree in Finance and Accounting, a Master of Business Administration from the University of St. Thomas, and several years of working in finance and accounting, including as a controller/treasurer for Universal Cooperatives, Controller of the Corporate Trust Group at Wells Fargo, and as a Regional and then National Manager for a Wells Fargo business line.

12.     The position at WT was my first position in sales.  My primary responsibility was to sell escrow and paying agent services to companies engaging in mergers or acquisitions.  I was assigned to the Midwest Region, and while I worked out of an office in the Twin Cities area, I often worked from home instead.  I reported to Trainor, who was located in Maryland.

13.     I worked hard in the position and was successful.  Much of the job involved striking up and maintaining good relationships with the M&A attorneys who referred us over 90% of our business, which I was good at doing.  I received nothing but great performance reviews from Trainor.  I was selected for the President's Award dinner in two of the past three years, which was a great honor.  I also made the company a lot of money. In fact, I believe I was in the top 3 to 5 salespeople toward the end of my tenure at WT.

14.     In the booklet for the President's Council Awards Recognition Dinner dated April 12, 2018, a portion of which is attached hereto as **Exhibit 1**, WT speaks of me and my accomplishments as follows:

4

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 6
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 5 of 25

- Greg sold $6.4MM, nearly $2MM over his goal and $2.4MM above the prior year. This continues a remarkable streak of increasing annual sales that dates back to his start with Wilmington Trust in 2011.

- Greg was instrumental in helping to recruit and build the team in Minneapolis and Chicago with whom he works—including several relationship managers in both our M&A practice and our public finance practice. This has unquestionably made our overall team better.

- Greg is quite simply one of the most likable and trustworthy people you will ever meet. He enjoys working with people and has a natural ability to connect.

- Greg is an exemplary employee who makes our team and our business better.

## SRS RECRUITS WT RELATIONSHIP MANAGERS

15.    One of the primary reasons I excelled in sales at WT is that I had excellent administrators, known as "Relationship Managers," who handled the work after I made the sales. The value my clients received, and the value I sold, was the efficiency, effectiveness, timeliness, and accuracy of the Relationship Managers. It was thus critical to my success that WT do whatever it could to retain the Relationship Managers as employees.

16.    In May 2018, I learned that former WT employee Ken Newcomer ("Newcomer") had reached out to Relationship Manager Andrew Wassing ("Wassing") about leaving WT to work for SRS. My email to Trainor about the situation is attached as Exhibit F to Trainor's affidavit submitted to the Court. In the email, I asked if Newcomer had signed a non-solicitation agreement, as he had only recently left WT (I later found out he had not signed a non-solicitation agreement). I also suggested to Trainor that management might "sweeten the pot" for the Relationship Managers, *i.e.*, increase the

compensation for the Relationship Managers or provide a retention bonus to encourage them to stay on with WT, because I was very concerned about them leaving.

17.     Later in May 2018, I learned of rumors through a source that SRS was recruiting yet another Relationship Manager, Aaron Soper ("Soper"). I discussed the issue with Trainor on the evening of May 17, 2018. I told him how SRS was attempting to recruit our Relationship Managers and told him it would be best for WT to take steps to ensure that the Relationship Managers would not leave WT. I suggested to him that the company offer them a retention bonus. Trainor liked the idea and said he would talk to his supervisor Jack Beeson ("Beeson") about it. Trainor later told me Beeson rejected the idea, however, and I am unaware of any steps that were taken to retain the Relationship Managers.

## PRELIMINARY DISCUSSIONS WITH SRS

18.     In the meantime, I had received a LinkedIn message in March 2018 from a recruiter for SRS. I am aware that others from WT received the same message. I disclosed it to Trainor and then ignored it as I was not interested in leaving WT at the time. I later received a follow-up email on or about May 7, 2018 and maybe a phone call from an SRS recruiter. I brought this to Trainor's attention as well. I recall joking about it to Trainor, as again I had no intention of leaving WT at the time.

19.     But WT's failure to take action in May 2018 to retain Wassing and Soper left me feeling vulnerable, because without them, I would have a much harder time selling

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 8
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 7 of 25

WT's services.  For this reason, when I received a call from an SRS recruiter on or about May 24, 2018, I expressed a willingness to learn more about the open role with SRS.

20.     The recruiter then shared with me a copy of the job description for the open position: Managing Director, Business Development.  The position would in essence be a promotion, where instead of engaging in direct sales, I would be managing a team of salespeople.

21.     In late May or early June, I had informal preliminary discussions with people from SRS about the position and the company.  No commitments or offers came from these discussions and I was a long way from giving up a job that I liked and was performing at a high level.

22.     Around this same time in late May or early June, I learned that in addition to Soper and Wassing, SRS was having discussions with another Relationship Manager, Tim Martin ("Martin").

23.     I formally interviewed with individuals at SRS in Colorado on or about August 8, 2018.  Again, no commitments or offers came from these discussions.

24.     WT has alleged that as part of SRS's recruitment efforts, I met with Amanda Jackson in Boston in August 2018, and that I told Stuart Landucci ("Landucci") the same. That allegation is false.  I may have mentioned to Landucci that she was one of the participants in the interview process, which is true, but that occurred in Denver, not Boston. In fact, to my memory, I have not been to Boston since 1987.  WT also seems to imply that

I provided confidential WT information to Ms. Jackson. That did not happen. I provided her no confidential WT information.

25.     On September 28, 2018, SRS made an initial written offer, which I did not accept. I was hesitant to leave my job at WT. I enjoyed the work of a salesperson at WT, and I enjoyed the people I worked with and for. Additionally, I was neither interested in opening an office in Minneapolis on my own nor moving to Denver. Furthermore, the offer was less than I had expected.

26.     Throughout this entire timeframe, from late May 2018 through the end of my employment, I continued to work hard and put forth my best efforts on behalf of WT. I did not attempt to divert any business away from WT to SRS or any other company, I did not tell anybody I was leaving WT (indeed, I did not make the decision until early November), and I did not engage in covert efforts to squirrel away or disclose WT's confidential information. As mentioned previously, my efforts on behalf of WT are reflected in my results. My third-quarter 2018 sales were my highest ever, and I believe the highest in the company, or close to the highest. My fourth-quarter 2018 sales were on track to be even higher, and my October sales were the highest in the company.

## WT DOES NOT TAKE NEWS OF MY DEPARTURE WELL

27.     On or around November 2, 2018, I learned that Martin and Soper had decided to accept offers from SRS and leave WT. They did so independently and without any encouragement from me.

8

28.     It was only at this point that I determined I would leave WT to work for SRS. I signed SRS's offer letter for the position of Managing Director, Business Development, which was returned to me fully-executed on November 8, 2018.  Attached hereto as **Exhibit 2** is a redacted copy of my employment agreement with SRS and related paperwork.

29.     During the week of November 5th, I also learned that Wassing had decided to accept an offer from SRS and leave WT.

30.     On Friday, November 9, 2018, I called Trainor and verbally submitted my two-week notice.  Trainor did not take it well.  First, he asked to meet with me on Tuesday to see if he could talk me out of leaving (we were off November 12th for Veteran's Day), but then called back later telling me he learned that other people were leaving.  He asked me whether he could entice me to stay by possibly giving me stock options or some other form of compensation.  I responded to the effect that I was not interested in using the situation to squeeze more compensation from WT.  Trainor remarked that it sounded like I had made up my mind and said we would not be meeting on Tuesday.  But then the next day he emailed me saying he would be in town on Tuesday and looked forward to seeing me.

31.     I came into the office on Tuesday November 13th and talked to a few people who all seemed to know I was leaving the company even though I had not told them.  I

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 11
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 10 of 25

proceeded to enter all my pending deals into WT's Sales Logix system so they could be considered and approved during the upcoming Thursday sales meeting, as was my practice.

32.     Around 11 or 11:30 am, I met with Trainor.  Trainor made no effort to convince me to stay with WT.  Instead, he complained that he had never been treated so poorly, and that he was upset I had not told him I was considering leaving for SRS and had not allowed WT to counter SRS's offer.  I told him that under the circumstances I did not know how it could have been done any differently, because I was not leaving for money, I was leaving because my team of Relationship Managers was leaving and because I was looking forward to getting back into a management role.  Trainor then instructed me to pack up my personal effects and turn in my phone, laptop, key fobs and badges, to the Minneapolis administrative assistant.  He further told me I was not to return to the office after that day.  I asked whether I was being terminated and he said I was not; I was to remain an employee until November 23, 2018, and I would be "on call" to help them work through any issues.  I had no conversation with human resources that day except for a brief conversation about COBRA continuing benefits.

33.     I turned in WT's property to the administrative assistant, and as I packed up my personal effects I tried to speak to Beeson.  I shook his hand and thanked him for my time at WT, but he simply let go and turned around without a word.  I also attempted to speak to Trainor a few times, but he ignored me, so I left.

10

34.     I remained on call for WT until November 23, 2018, and later commenced employment at SRS.

## SOLICITATION OF EMPLOYEES

35.     WT's accusation that I have violated my duty of loyalty and/or the terms of my non-solicitation agreement (Trainor Affidavit Exhibit D, p. 8) by soliciting employees to leave WT is false.

36.     I have at no time encouraged, attempted to convince, or otherwise solicited WT employees to leave their employment.  I did not lead any "lift out" of employees from WT.   To the contrary, I followed the Relationship Managers out.   They decided independently from me that they would leave their employment at WT and go to work for SRS.  When I learned they were leaving, I decided I would follow them, as their departure was going to directly and negatively affect me in my role at WT.

37.      I understand some other WT employees outside my team left for SRS around the same time.  I did not orchestrate their departures either.  I had no involvement or knowledge of SRS's attempts to recruit those other individuals.

38.     When I started at SRS, I was specifically instructed not to solicit WT employees for the 6-month restricted period set forth in my non-solicitation agreement.  I have complied with that instruction and will continue to comply.

39.     Regarding my November 13th conversation with WT employee Brandon Horak ("Horak"), I do not recall telling him to "be sure to pick up your phone."  When I

11

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 13
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 12 of 25

first arrived in his office that morning, I apologized for not letting him know that I was leaving WT.  At this point, Horak proceeded to write something, which I perceived to be his personal cell number, on the back of his business card and hand it to me.  I joked that I would not be able to call him for at least 6 months.  I had no idea whether an SRS representative would be calling him, had no inside information from SRS or its recruiters about plans for recruiting Horak, and had never encouraged SRS to recruit Horak.  I later disposed of the card and do not have it in my possession.

40.    Regarding my conversations with Nicholas Adams ("Adams"), WT has taken my comments completely out of context.  I reached out to Adams to say goodbye to him because he was a good colleague who I considered to be a friend.  During that conversation I talked to him about how SRS had courted me.  I did this not to brag, but because I felt the need to explain to him why I was leaving WT.  Adams stated that if somebody asked him or others at the company, they would have thought SRS was most interested in Soper and Wassing.  I thought that was rude, and I jokingly responded, "I hope that's what people think."  I did not tell him that I had led a "lift-out" of WT employees because I had not.  Adams also made a comment that SRS "must have backed up the money truck."  I responded that SRS was certainly not paying me less.  This was not an effort to brag or convince Adams to leave; it was just a fact I provided in response to what seemed like an inquiry from him about my compensation at SRS.

41.     As to my November 13th conversation with Landucci, I may have mentioned that I met with the SRS CEO, but I said nothing from which anybody could reasonably infer that I had coordinated the departures of the other WT employees who resigned around the same time, because I had not done so.  Landucci also told me I should be careful about who I contact when I leave, including clients and lawyers.  I responded that I was fine to speak with M&A lawyers, who are not considered clients of the bank, and let them know I had moved to SRS.  This is consistent with my non-solicitation agreement with WT.  I said nothing to Landucci suggesting I planned to contact M&A lawyers to indirectly solicit in violation of my non-solicitation agreement.

## SOLICITATION OF CLIENTS

42.     The allegation that I have violated my duty of loyalty and/or the terms of my non-solicitation agreement by soliciting clients is also false.

43.     I did not tell any clients I was leaving WT.  Nor have I attempted to solicit away any WT clients or potential clients who I learned of through my work at WT.

44.     I fully intend to abide by the terms of my non-solicitation agreement with WT, as set forth on the 8th page of Trainor's Affidavit Exhibit D, for the duration of the 6-month restricted period.

45.     Horak asserts in his affidavit that he and I ran into a representative of one of WT's larger clients, and that he found it strange when I declined to introduce him to some other people who worked for the same client.  I do not recall whether I introduced him to

13

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 15
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 14 of 25

others or not.  I did introduce him to the first representative, and if I did not introduce him

to others then it was not intentional, and not designed to impede a relationship with the

client.  Notably, I did not tell that client (or any other) that I was leaving WT.

46.     Horak also asserts in his affidavit that after he told me he would be going

after that same larger client, I responded "Good luck with that.  It isn't happening."  This

is partially accurate.  Horak and I had a friendly, joking relationship.  He told me during

the November 13th conversation that he would be taking over the large client.  I jokingly

responded, "Good luck with that."  This was merely friendly banter.  I have not solicited,

and have no intent of soliciting, this client during the restricted period of my non-

solicitation agreement, and I made no preparations to do so while employed at WT.

47.     WT's contention that my contact with M&A attorneys, which it refers to as

"referral sources," violated the non-solicitation agreement is false.

48.     The non-solicitation agreement states:

> In consideration for your participation in this incentive plan, you agree that
> for a period of six (6) months immediately following termination of your
> employment for any reason, you will not . . . directly or indirectly solicit
> business from any of clients, customers, or prospective customers of M&T
> Bank or any of its affiliates and/or subsidiaries whose identity became known
> to you during your employment with M&T.

49.     Nobody at WT explained to me whether there was any difference between

"clients" and "customers," so I have and continue to interpret them the same: the parties to

M&A transactions that pay for WT's services.  The M&A attorneys who refer the parties

to WT did not pay for the services, and were not, to my knowledge, "clients" or

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 16
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 15 of 25

"customers."  From my review of WT's motion papers, it does not appear to contend otherwise.

50.     Instead, WT argues in its motion papers that contacting M&A attorneys constitutes indirect solicitation of WT's clients.  This is false.  While I have contacted M&A attorneys, I have only done so to let them know I have moved from WT to SRS.  I have made no inquiries of these attorneys about WT's clients or prospective clients whose identity became known to me during my employment, nor have I tried to persuade or otherwise attempt to have the M&A attorneys steer any of that business to SRS.

51.     When I started at SRS, I was specifically instructed that I was not to solicit WT clients.  I am free, however, to contact M&A lawyers who refer us business so long as I do not ask about clients or potential clients whose identity became known to me during my employment at WT.  I have complied with that instruction, and will continue to do so throughout the remainder of the restricted period in my non-solicitation agreement with WT.

52.     My understanding of the non-solicitation agreement as it relates to contact with M&A attorneys tracks WT's approach in dealing with its new employees subject to non-solicitation agreements from former employers.  For example, in or around April 2012, WT hired Soper and Heather Kelly ("Kelly") away from Wells Fargo.  Soon after, it came to my attention that Soper had received a letter from Wells Fargo reminding him of his obligations under a non-solicitation agreement he had apparently signed with Wells Fargo.

15

53.     I thereafter participated in a meeting with Soper, Kelly, Trainor, John Deleray and Greg Hasty.  It is my recollection that during the meeting, we discussed the letter about non-solicitation, and that Trainor or somebody else at the meeting explained Soper and Kelly were not to contact clients they had serviced while working for Wells Fargo, meaning the companies engaging in mergers and/or acquisitions.  However, they were free to contact M&A attorneys they had previously worked with so long as they did not contact the M&A attorneys to solicit their former clients.

### THE "VERY LARGE REVENUE-PRODUCING DEAL"

54.     WT's speculation that I colluded with Martin to try and hide a "very large revenue-producing deal" from WT so we could redirect it to SRS is false.  It did not happen. In fact, nearly every allegation WT makes about that deal is inaccurate or fails to provide proper context.

55.     I believe the transaction in question was a referral from a source in Denver, Colorado.  This was a large transaction, though not my largest over the last year of my employment at WT (as WT incorrectly contends).

56.     The transaction was brought to my attention in mid-September through an email from the contact in Denver asking for a bid on an escrow and paying agent services.

57.     I provided an informal bid, and I am fairly certain I mentioned it during a phone call with Trainor, though the phone call was focused on other issues.  I believe I told him we had received an inquiry about a large M&A, but that it seemed like a long-shot.

My instincts proved correct, because after a couple weeks of not hearing anything, the contact in Denver told me the deal had died (though not because of anything I did or did not do).

58.    I later received an email from the contact in Denver toward the end of October, I believe on the 30th.  He stated the deal was back on and asked if the pricing still held true for the transaction even though the escrow amount decreased from the original amount.  I concurred that the pricing still held and asked him to contact us if he got push-back that the pricing was too high.

59.    I did not at that point enter the deal into WT's Sales Logix system because it was my typical practice, with few exceptions, to wait until I knew the identities of the parties to the transaction, and at that point I did not know the identities of the parties. Further, this was a merger-related transaction which I believe had not yet been signed, and the closing on most merger-related transactions occurs 60-120 days after signing.  It was also my typical practice to not enter deals into WT's Sales Logix system until I had reasonable certainty that the deal would go forward.  I did not have that certainty yet on this deal because the deal had fallen apart previously, I had not seen the purchase agreement, and, again, I did not even know the names of the parties.

60.    We received the first draft of the escrow agreement on I believe November 12th, still without the parties identified.  Contrary to Beeson's affidavit in this matter, I have no recollection of receiving notice that we had formally been awarded the business.

17

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 19
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 18 of 25

61.     The 12th was a holiday, and the deals needed to be in the system by Tuesday so they could be reviewed and approved in the Thursday sales meeting, so on the morning of the 13th, I entered or caused to be entered I believe eight to eleven deals into the Sales Logix system, including the deal from the contact in Denver, even though the parties to the transaction had yet to be identified. Having turned in my notice, I thought it was important to enter all my pending and potential deals into the Sales Logix system so WT would have the necessary information to handle the business without me.

62.     I did not enter the deal from the contact in Denver into the system because of anything Martin told me.  My intention was to enter all of my deals in that day.  Martin called me that morning and told me Beeson had asked him about a "Project Cabo," and Martin asked me whether I knew anything about that project.  I honestly answered no, as I had not heard of a "Project Cabo."  I did mention in the conversation with Martin that I needed to enter the deal from the contact in Denver, and we talked about other deals that needed to be entered.  I had similar conversations with Soper, Wassing, and Horak that same morning so I could make sure all the deals we knew of were entered.  I later learned that management was referring to the deal from the contact in Denver as "Project Cabo," but that had nothing to do with the timing of when I entered it into the system.

63.     I made no attempt to hide this deal and made no attempt to solicit it or otherwise let it lie so SRS could get the deal.  To my knowledge, neither did Martin.  I did

not violate my duty of loyalty or my non-solicitation agreement in connection with this deal.

## MY COMPANY CELL PHONE

64.     There was no ill intent with regard to my company cell phone.

65.     When I started with WT, I was issued a company cell phone.  I asked Trainor whether I needed to also have a personal cell phone to handle personal or family business. Trainor told me no, it was fine to use the WT cell phone for personal and family business.

66.     I accordingly had a lot of personal information on the cell phone, including personal pictures, text messages with my wife and family, banking information, apps with my personal credit card information, and so forth.

67.     Before I turned in the phone, I went into the phone's settings and did a factory reset to wipe my personal data from the phone.  I did not do this to hide any supposed wrongdoing—there was no wrongdoing to hide.

68.     When I went to turn in the phone, an assistant named Dottie asked me if I had wiped the phone yet, supporting that my conduct was typical and in line with the company's expectations.

## DELETING WORK EMAILS

69.     Over my last few months at WT, I realized that I had a very large number of emails dating back years that I never referenced.  I decided I would clean up my work email by deleting personal emails, old emails, or emails in folders I had not referenced in years.

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 21
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 20 of 25

I did not do this to hide wrongdoing or for any nefarious purpose, but rather just to clean up my email.  I am no IT expert, but I recalled that my previous employer Wells Fargo had a policy of deleting emails after a certain duration of time.  WT had no such policy, nor to my knowledge any policy against deleting emails.  I thought that having excess data in my email account might bog down WT's system.  I would not have deleted the emails if I thought they were of use.

70.     I understand WT is contending that I attempted to delete a PST file.  I do not know what a PST file is and certainly did not intend to delete one.  All I recall is deleting old or personal emails or email folders.

## WT ELECTRONIC AND PHYSICAL DOCUMENTS

71.     During my employment with WT, I occasionally sent emails from my work email to my personal email address.  To my knowledge, I was never told not to, and I know from conversations with other WT employees that they had done the same.

72.     Regarding the cybersecurity training referenced in Trainor's Affidavit (Trainor Aff. Ex. C), I do not dispute that I took and passed the test, but I do not recall reviewing the content of the training carefully, and it is likely I skipped past the content and took (and passed) the associated test.

73.     I had several reasons for sending work emails to my personal email address.  Sometimes it was easier to access or search information on my personal Macintosh PC because it often took an inordinate amount of time to log in to WT's system, and there were

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 22
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 21 of 25

reliability problems that would require me to log out and then again spend an inordinate amount of time logging back in. Sales Logix would sometimes freeze up when I accessed it remotely, particularly when searching through data, such as finding the name of a contact. I also sometimes did it for convenience when working from home. At the office I had two screens, so to replicate that at home, I would sometimes email a document to my personal email and then pull it up on my personal laptop to use while entering information into the system using my work laptop.

74.     I made no effort to hide this conduct. I had no reason to, because I was doing nothing wrong, and I am still unaware of WT having any policy against it. The personal email address I sent these documents to is greg.p.nelson@comcast.net, which is obviously not an email address I would choose to forward emails to if I thought I was doing something wrong.

75.     I had no intention of keeping these emails or using them or any other WT document in connection with my new position at SRS. Nor have I. Nobody at SRS has asked me to send them confidential WT documents or information, and I have not done so at anytime.

76.     When I was told on November 13th that I was not to return to the office and was to remain only "on call," nobody asked me to return company documents or delete any emails I may have forwarded to myself. I was not even offered an exit interview. If WT had asked at that point, I would have searched my home office and emails then.

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 23
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 22 of 25

77.     Before receiving the November 15, 2018 letter from Sean Ronan attached as Exhibit G to Patrick Trainor's affidavit (the "Ronan Letter"), I had not even considered that I might have WT emails in my personal email account.  The thought simply had not crossed my mind.

78.     After I received the Ronan Letter, I conducted a search of my personal emails for all emails involving my work from WT and I permanently deleted them as instructed in the Ronan Letter.  This includes deleting them from whatever inbox or folder they were in, and then going to the email "trash bin" and deleting them from there.  I also searched my home for any hard copies of documents relating to my work at WT and returned what I found through my attorney.  (See Trainor Aff. Ex. H.)  To my knowledge, I no longer have any WT documents in my possession, either in electronic or hard copy form.

79.     Again, SRS has never requested WT documents from me, and it also specifically instructed me that I am not to use confidential WT information in connection with my work for SRS.  I signed an agreement with SRS saying I would not.  The agreement states in relevant part:

> I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of a former employer that are not generally available to the public or have not been legally transferred to the Company.

(**Exhibit 2**, p. 7, ¶ 12.)  I have complied with this provision of my agreement with SRS.

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 24
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 23 of 25

80.     Turning to the specific documents to which WT has referred, I am not certain of the dates of the emails they reference because I no longer possess them or the documents attached to them, but it is likely I sent those emails to my personal email address.

81.     Regarding the list of deals to which WT refers, I maintained a running spreadsheet with information from all my deals dating back to probably 2012.  The data I tracked included the client, the referring M&A attorney, an estimated amount of the cash to be exchanged in the transaction, the total fees, perhaps the closing date, and the internal reference number assigned to the deal, so this is probably the document that was attached to the August 15, 2018 email (assuming the date is correct).

82.     I used this document to double-check quarterly incentive payouts.  Each month, WT would provide me with a report identifying my deals from the month prior and how much I would receive from those deals in my quarterly incentive payment.  I would then cross-check those numbers against the data in my spreadsheet so I could address any errors, hopefully before payment was issued.  I had identified such errors multiple times in the past, and to its credit, WT had always corrected them when I brought the errors to its attention.

83.     Trainor and many others knew I maintained this list and were fine with it. Maintaining it violated no rule or policy of which I was aware.  I created this spreadsheet in the course of, and in connection with, my employment at WT, using data WT made

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 25
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 24 of 25

available to me in furtherance of my job duties.  And as mentioned, I no longer possess the document.

84.     Much of the information in this document was not confidential.  M&A Attorney information is all public and available on the internet.  Any deals involving public companies would be public record.  The vast majority of private deals involved private equity companies, the contact information for which is publicly available.  The amount of cash exchanged varies from deal to deal and is not necessarily indicative of the any future deals.  Competitors know how much we charge in fees, just as we know how much they charge, and fees do not vary much from deal to deal or among competitors.  I fail to see what a competitor would gain by knowing WT's internal reference numbers for each deal.  Most of the information on the spreadsheet is not confidential, and to the extent it is not generally known, it is not of any value.

85.     Regarding the document WT states I sent to my personal email address on October 24, 2018, I believe this was a document largely consisting of contact information for mainly M&A attorneys.  The other information would consist mainly of Public Finance, Private Equity, and client contacts.

86.     I was working to catch up on entering my sales calls into WT's system, as I had fallen behind due to a recent surgery.  I emailed the list to my personal email address so I could have the list open on my personal computer as I entered the sales calls into the

Case No. 1:19-cv-02005-DDD-SKC   Document 492-50   filed 07/28/21   USDC Colorado   pg 26
of 28
CASE 0:18-cv-03299-PJS-DTS   Document 24   Filed 12/13/18   Page 25 of 25

system using my work laptop.  I used the list to help me reconstruct my memory of who I talked to at which firms and when as I entered the sales calls.

87.    I was authorized to have the information in the spreadsheet, which was emailed to me on occasion by WT.  I accessed and used the data in the spreadsheet in the course of, and only in the furtherance of my work for WT.

88.    Moreover, the information in the spreadsheet is either not confidential or secret, not of any value, or both.  All or nearly all of the information in the spreadsheet is readily available on public websites.  In fact, I could recreate most of the list from memory and a few simple internet searches for M&A attorneys.  The major M&A firms are well-known in the industry, and M&A attorneys and all their contact information can be easily found through simple internet searches.  Private equity firms are all easy to identify and contact.  The other major M&A clients are well-known in the industry, and many of them are public companies, so details of any of their mergers or acquisitions are also public.  The public finance contacts are all publicly available and no secret.  There are a host of other smaller M&A clients, but they typically have rare or one-off deals, so their contact information or information about their deals are not valuable.

89.    Even so, I no longer have the document.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _12-13-18_                 By:    _/s/ Gregory Nelson_____
                                        Gregory Nelson

25

**WISD Institutional and Business Partners**

**President's Council**

**Awards Recognition Dinner**

**Four Seasons
200 International Drive
Baltimore, Maryland**

**April 12, 2018**





### *Greg Nelson*
### *Client Development*

- Greg sold $6.4MM, nearly $2MM over his goal and $2.4MM above the prior year. This continues a remarkable streak of increasing annual sales that dates back to his start with Wilmington Trust in 2011.
- Greg was instrumental in helping to recruit and build the team in Minneapolis and Chicago with whom he works—including several relationship managers in both our M&A practice and public finance practice. This has unquestionably made our overall team better.
- Greg is quite simply one of the most likeable and trustworthy people you will ever meet. He enjoys working with people and has a natural ability to connect.
- Greg is an exemplary employee who makes our team and our business better.

7



8