# Exhibit K

May 15, 2018 Correspondence from Jonathan A. Patchen to Walter P. DeForest

JONATHAN A. PATCHEN
ATTORNEY
jpatchen@taylorpatchen.com

## TAYLOR & PATCHEN, LLP

May 15, 2018

**VIA E-MAIL & FEDEX**

Walter P. DeForest
DeForest Koscelnik Yokitis & Berardinelli
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA 15219

Re:   Alex Tsarnas

Dear Walter:

Following our exchange of letters and our telephone call at the end of March 2018, SRS obtained additional information that leads it to reasonably suspect and believe that Mr. Tsarnas is in violation of multiple contractual and legal obligations he owes SRS. This newly discovered information, in conjunction with Mr. Tsarnas's history of dishonesty and his more recent default on a promissory note he owes SRS, gives SRS reason to doubt Mr. Tsarnas's prior assurances.

In particular, we want to highlight Mr. Tsarnas's abuse of SRS's expense reimbursement program—which is a fundamental breach of trust—as emblematic of the basis for our concern, and we attach for your review documents demonstrating Mr. Tsarnas's misconduct. In particular, the attached Excel spreadsheets highlight the extent of Mr. Tsarnas's actions, and the attached September 2017 expense report, the relevant portions of the corresponding SRS credit card statement, and the receipts submitted by Mr. Tsarnas demonstrate one instance of Mr. Tsarnas's fraudulent activity. Although we provide Mr. Tsarnas's September 2017 expense reimbursement request as one example of his misconduct, SRS possesses this documentation for each improper expense report submitted by Mr. Tsarnas. Given the extent of SRS's confidential, proprietary, and trade secret information known by Mr. Tsarnas, the urgency created by Mr. Tsarnas's actions cannot be understated.

ONE FERRY BUILDING, SUITE 355, SAN FRANCISCO, CA 94111   T 415.788.8200   F 415.788.8208

SRSAvPKT00074637

TAYLOR & PATCHEN, LLP

Walter P. DeForest
May 15, 2018
Page 2

Based on the information learned to date, SRS intends to remedy Mr. Tsarnas's violations to the fullest extent possible. SRS has prepared and is ready to file the attached complaint against Mr. Tsarnas. Should that take place, discovery will certainly extend to Mr. Tsarnas's interactions with SRS employees and PNC Bank. However, before we do so, we welcome an opportunity to speak with you, before Friday, May 18, 2018, to determine if we can arrive at a resolution that does not involve legal action.

Please contact me if your client is willing to discuss such matters.

Sincerely,

Jonathan A. Patchen

Enclosure

cc: Michael A. Rollin

Nonconfidential - No Stamp

SRSAvPKT00074638

# ATTACHMENTS

Nonconfidential - No Stamp



**DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO**
1437 Bannock Street, Room 256
Denver, CO 80202

**Plaintiff:** SHAREHOLDER REPRESENTATIVE SERVICES LLC,

v.

**Defendant:** ALEX P. TSARNAS.

ROLLIN BRASWELL FISHER LLC
Michael A. Rollin (No. 34847)
Maritza Dominguez Braswell (No. 45492)
8340 E. Crescent Pkwy, Suite 100
Greenwood Village, CO 80111
Phone:    (303) 945-7415
Fax:       (303) 974-7468
E-mail:   mrollin@rbf.law;
             mbraswell@rbf.law

TAYLOR & PATCHEN, LLP
Jonathan A. Patchen (*Pro hac vice* to be filed)
Yesica Hernandez (*Pro hac vice* to be filed)
One Ferry Building, Suite 355
San Francisco, California 94111
Phone:    (415) 788-8200
Fax:       (415) 788-8208
E-mail:   jpatchen@taylorpatchen.com
             yhernandez@taylorpatchen.com

▲ COURT USE ONLY ▲

Case No.

Division:

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff Shareholder Representative Services LLC ("SRS" or the "Company"), by and through its counsel, brings this action against Defendant Alex P. Tsarnas ("Mr. Tsarnas") and alleges the following:

Nonconfidential - No Stamp

## NATURE OF THE ACTION

1.     This case arises from Mr. Tsarnas's multiple breaches of contract and other legal duties owed to his former employer, SRS, including breach of contractual non-solicitation and intellectual property provisions, breach of the fiduciary duty of loyalty, violations of state trade secret law, conversion of property, fraud, and breach and default of a $200,000 promissory note. Mr. Tsarnas's actions against SRS demonstrate a complete disregard of his contractual and other legal obligations, and are intended to harm SRS for his own benefit and for the benefit of an SRS competitor.   SRS thus seeks all damages available at law and all equitable remedies, including preliminary and permanent injunctive relief, as well as all attorney's fees and costs allowed by law.

2.     In 2014, SRS sought a manager for its business development group.  Mr. Tsarnas was one of the candidates considered for the role.  As part of Mr. Tsarnas's background check, SRS discovered that Mr. Tsarnas misrepresented that he graduated from Fordham University in 1993.  When confronted about this, Mr. Tsarnas expressed dismay and confusion and said it was an honest mistake.  SRS relied on Mr. Tsarnas's explanation and hired him in September 2014. As a condition of his employment, Mr. Tsarnas entered into SRS's Employee Invention Assignment and Confidentiality Agreement (the "EIAC Agreement").   Pursuant to the EIAC Agreement and as a condition of his employment, Mr. Tsarnas agreed to protect and never disclose SRS's "Proprietary Information," as that term is defined in the EIAC Agreement, and agreed that he would not—for a one-year period after his separation from SRS—solicit or take away any SRS employees, consultants, suppliers, or customers.  But for these promises, SRS would not have employed Mr. Tsarnas in any capacity.

3.     During his employment, Mr. Tsarnas was the head of sales for SRS, a critical and sensitive role at SRS.  As such, Mr. Tsarnas participated in and was aware of strategic Company decision-making, product development and sales, marketing and market differentiation, strategic partner relationships, client contacts, and client development, among other things.  Mr. Tsarnas had special access to SRS's most secret and critical business information, including innovative and market differentiating Inventions, as that term is defined in the EIAC Agreement.  This business information gives SRS a competitive advantage in the marketplace.

4.     On January 23, 2018, SRS terminated Mr. Tsarnas after discovering that he intentionally and repeatedly defrauded SRS by abusing SRS's expense reimbursement program. Specifically, Mr. Tsarnas submitted expense reports representing that he had used personal methods of payment for business expenses when, in fact, he had used credit cards issued and paid for by SRS.  Mr. Tsarnas's use of multiple SRS credit cards demonstrates his conscious decision to charge his expenses using Company payment methods.  As Mr. Tsarnas became more aggressive in his behavior, his improper reimbursement amounts gradually increased.   In December of 2017, he explicitly noted (in a text message) that his paycheck was $4,400 short, indicating his awareness of the amounts he sought reimbursement for.  On some expense reports submitted by Mr. Tsarnas, nearly the entire amount of expenses submitted were paid for using SRS's credit cards and were thus not subject to reimbursement.

2

                                                                                          SRSAvPKT00074641

5.     When confronted about his improper reimbursement requests, Mr. Tsarnas feigned confusion (as he had when confronted years prior about misrepresenting his educational background). Despite his denials regarding intent, he could not have completed years' worth of expense reports without knowing that the credit card receipts he consulted and enclosed were for expenses paid with Company-issued credit cards. The frequency and duration of the abuse underscore Mr. Tsarnas's intentions. After Mr. Tsarnas was confronted with proof, he ultimately agreed to repay the fraudulent reimbursements. SRS has nevertheless suffered damage as a result of Mr. Tsarnas's fraud and conversion.

6.     After his termination, Mr. Tsarnas sought employment with several SRS competitors, including PNC Financial Services Group, Inc. or its affiliates ("PNC"). During this period, Mr. Tsarnas had active and on-going communications with many SRS employees, and he affirmatively represented—in blatant disregard of his obligations to SRS—to at least one potential employer that, if he were hired, he could bring other SRS employees with him.

7.     Following his termination from SRS, Mr. Tsarnas communicated with Heather Kelly who was then an SRS employee. In an email to Ms. Kelly, Mr. Tsarnas shared his PNC salary negotiation strategy and outlined his plans to request a joint defense for himself and Ms. Kelly for any claims brought by SRS should they both join PNC. Mr. Tsarnas thus coordinated and communicated with Ms. Kelly in an effort to solicit her to join him at PNC. Mr. Tsarnas's email also demonstrates he was aware of, and concerned about, the legal exposure created by the wrongful behavior he had engaged in, was engaging in, and intended to continue.

8.     On information and belief, Mr. Tsarnas denied to Ms. Kelly that his improper expense reimbursements were intentional. This misrepresentation materially induced Ms. Kelly to join him at PNC.

9.     On March 8, 2018, Ms. Kelly resigned from SRS.

10.     On March 9, 2018 and March 20, 2018, after SRS became aware that PNC was considering employing Mr. Tsarnas, SRS's counsel notified PNC of Mr. Tsarnas's and Ms. Kelly's contractual obligations to SRS. SRS further informed PNC of its concern that Mr. Tsarnas would not honor his obligations since Mr. Tsarnas was terminated by SRS due to his intentional and fraudulent expense report submission.

11.     Mr. Tsarnas was offered employment with PNC and is currently employed by PNC as a Senior Vice President, Escrow and Payments. PNC's recent acquisition of Fortis Advisers is a direct effort on the part of PNC to compete directly with SRS, as Fortis is SRS's only competitor in the shareholder representative space. Fortis, however, only had limited capability relative to SRS and did not have the SRS know-how that Mr. Tsarnas now possesses and which PNC has acquired or seeks to acquire through his employment. Mr. Tsarnas's new role at PNC necessarily (and intentionally) crosses over with the duties—and more importantly, the Proprietary Information—he held at SRS, including SRS's most valuable business information. Indeed, there can be little doubt that PNC hired Mr. Tsarnas precisely because it seeks to break into the particular area of the M&A space Mr. Tsarnas helped manage for SRS and to replicate SRS's proprietary

3

Nonconfidential - No Stamp

SRSAvPKT00074642

systems, processes, and business model. The threat presented by Mr. Tsarnas's employment in this role cannot be overstated—SRS's proprietary payment and escrow products and services are market differentiators, and his possession of that information while in the service of a competitor is definitionally an act of misappropriation and a breach of his EIAC Agreement.

12.     In an effort to stop any misconduct and avoid litigation, SRS sent several cease and desist letters to Mr. Tsarnas and his lawyer. Mr. Tsarnas's lawyer was retained by and also represents PNC. In the letters, SRS expressly placed Mr. Tsarnas and PNC on notice of its concerns and requested assurances that Mr. Tsarnas will comply with his legal and contractual obligations to SRS.

13.     Mr. Tsarnas's (and PNC's) counsel responded with a carefully-worded letter purporting to give SRS the requested assurances, but the hypertechnical language in that letter indicates that Mr. Tsarnas does <u>not</u> intend to comply with his contractual and other state law obligations. For instance, the representation that Mr. Tsarnas does not "know SRS's code or any similar knowledge about SRS," suggests that only "code" or "technical knowledge" is protected Proprietary Information or trade secret. This is not the case. Both the EIAC Agreement and state law protect categories of information that Mr. Tsarnas's counsel's letter is silent on. Counsel's letter is also counterfactual as Mr. Tsarnas possesses SRS's technical knowledge and Proprietary Information, and Mr. Tsarnas necessarily draws on that information in his current position at PNC. Indeed, counsel's letter confirms that Mr. Tsarnas continues to possess client information and reveals that Mr. Tsarnas failed to return all SRS information in his possession upon termination (although he claims to have destroyed the latter, which, even if true, violates the EIAC Agreement).

14.     Importantly, by placing Mr. Tsarnas in a role intended to build a competing suite of M&A products and services, PNC has obtained or will inevitably obtain SRS's trade secret and Proprietary Information. In light of PNC's business objectives and Mr. Tsarnas's particular roles at SRS and PNC, it is inescapable that PNC's decision to hire and place Mr. Tsarnas in a position to use SRS's innovative Proprietary Information was intentional. This is underscored by PNC's decision to hire Mr. Tsarnas even after it received notice of SRS's heightened concerns due to the wrongful conduct that lead to Mr. Tsarnas's termination, as well as its decision to hire Heather Kelly consistent with Mr. Tsarnas's plan to have her join him at PNC.

15.     Since joining PNC, Mr. Tsarnas has continued to recruit or attempt to recruit, solicit, or otherwise influence or induce SRS's employees to leave SRS for PNC. Mr. Tsarnas made a thinly-veiled solicitation call to SRS's Chief Data Scientist, who is intimately involved in building much of SRS's technology, stating, without any basis, that he heard the Chief Data Scientist had left SRS. Mr. Tsarnas had minimal communication with SRS's Chief Data Scientist while employed by SRS but nevertheless initiated this communication contemporaneously with his decision to join PNC.

16.     In light of PNC's efforts to replicate SRS's business model, technology and systems, the Chief Data Scientist would be an ideal recruit for PNC, and Mr. Tsarnas's call was an attempt to solicit that executive. Mr. Tsarnas's counsel appears to acknowledge that conversation, as he concedes in his letter that Mr. Tsarnas called an SRS employee with whom

4

SRSAvPKT00074643

Mr. Tsarnas had little prior contact. Notably, early in 2018, PNC acquired Fortis Advisers, an SRS competitor that provides certain M&A services. Upon information and belief, PNC's acquisition is part of an effort to use the combination of Fortis and PNC to replicate SRS's business model. Upon information and belief, Mr. Tsarnas was attempting to recruit SRS's Chief Data Scientist to have him replicate his work at SRS for PNC.

17.     In light of these actual, threatened, and inevitable violations, SRS brings this action for damages and injunctive relief to stop and prevent any further harm.

18.     SRS also brings this action to recover the losses it suffered from Mr. Tsarnas's fraud and conversion of SRS's assets through his abuse of SRS's expense reimbursement program, and to recover on a $200,000 promissory note between SRS and Mr. Tsarnas which Mr. Tsarnas has defaulted on. The promissory note given to SRS by Mr. Tsarnas became due on April 23, 2018. Mr. Tsarnas's failure to make the required April 23, 2018, payment constitutes a default under the promissory note. Full payment, plus interest (which as of this writing exceeds $50,000 and continues to accrue), is due.

## THE PARTIES

19.     Plaintiff SRS is a Colorado limited liability company. Its principal place of business is in the City and County of Denver, Colorado. SRS's sole member is a resident of the state of Colorado.

20.     Defendant Mr. Tsarnas is an individual. He is a resident of the state of New Jersey. At all relevant times, Mr. Tsarnas was employed and committed misconduct in the states of New York and Colorado.

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over Mr. Tsarnas, and venue is proper in this Court, because Mr. Tsarnas expressly agreed that "[a]ny legal action or other legal proceeding relating to [the promissory note] or the enforcement of any provision of [the promissory note] may be brought or otherwise commenced in any state or federal court located in the County of Denver."

22.     This Court also has personal jurisdiction over Mr. Tsarnas—and venue is proper in this Court—because this action arises out of Mr. Tsarnas's purposeful and continuous contacts within the City and County of Denver, Colorado and the State of Colorado, including, but not limited to the following:

> a.   From September 15, 2014 to January 23, 2018, Mr. Tsarnas was employed by SRS. SRS's principal place of business is—and at all times relevant to this action was—in the City and County of Denver, Colorado. Accordingly, critical aspects of Mr. Tsarnas's recruitment, hiring, employment, training, and supervision occurred in the City and County of Denver, Colorado, and Mr.

5

SRSAvPKT00074644

Tsarnas's employment contract and contractual obligations to SRS were formed in the City and County of Denver, Colorado.

b. Mr. Tsarnas communicated on a continual and regular basis with supervisors and colleagues in the City and County of Denver, Colorado, and Mr. Tsarnas traveled to and worked in SRS's Colorado headquarters on numerous occasions.

c. During his employment with SRS, Mr. Tsarnas regularly accessed and used SRS's digital platforms and electronic systems, including SRS's email and cloud storage accounts that are maintained and/or operated out of SRS's Colorado headquarters

d. During his employment with SRS, Mr. Tsarnas routinely received SRS's confidential and Proprietary Information, which he knew originated and was developed in the City and County of Denver, Colorado, and in connection with his new employment with PNC, Mr. Tsarnas has and/or is threatening to misappropriate SRS's trade secrets and Proprietary Information that are housed and maintained in the City and County of Denver, Colorado.

e. After his termination from SRS, Mr. Tsarnas contacted SRS employees based in SRS's various offices, including its Colorado headquarters, in violation of his non-solicitation agreement and other state law duties.

f. Mr. Tsarnas defrauded SRS and converted SRS property located in the City and County of Denver, Colorado when he submitted expense reports to SRS to improperly obtain cash reimbursements for expenses that he also charged to SRS-issued credit cards.

g. The harm arising from the actions set forth herein was felt in the City and County of Denver, Colorado by Colorado residents.

23. In addition to the foregoing, venue is proper in this Court because Mr. Tsarnas is a nonresident of the State of Colorado and venue in the City and County of Denver, Colorado is designated in this Complaint.

## FACTUAL ALLEGATIONS

### A. Shareholder Representative Services LLC

24. Among other services, SRS provides post-closing, transaction process management services for selling shareholders' interests in private company M&A.

25. SRS occupies a special niche in the M&A space by providing professional shareholder representative services, cutting-edge escrow and payment systems and technologies,

6

SRSAvPKT00074645

and other products and services for M&A transaction participants. SRS constantly innovates and invents new systems, technologies, and techniques to streamline and simplify these vital M&A functions.

26.     Also key to SRS's success is its detailed understanding of clients' and potential clients' M&A-related needs, preferences, and propensities. This constantly evolving body of knowledge and regular contact with key client personnel allow SRS to maintain a competitive advantage over other firms, who offer only limited M&A services and/or lack SRS's depth and breadth of client-specific knowledge and innovative impetus.

**B. Mr. Tsarnas's employment with SRS and concomitant obligations**

27.     On August 20, 2014, SRS offered Mr. Tsarnas the position of Managing Director of Global Business Development (the "Offer"). The Offer included SRS's General Employment Terms & Conditions.

28.     On August 23, 2014, Mr. Tsarnas accepted by signing the Offer and accepting SRS's General Employment Terms & Conditions. Mr. Tsarnas also signed SRS's EIAC Agreement.

29.     The EIAC Agreement contains the following provisions, which bar Mr. Tsarnas from using or disclosing SRS's confidential and Proprietary Information or retaining any SRS property after his separation:

    a.     Section 8 of the EIAC Agreement provides as follows: "**Proprietary Information**. I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to me by the Company that relates to the business of the Company or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence ("Proprietary Information"). Such Proprietary Information includes but is not limited to Trade Secrets, Inventions, marketing plans, product plans, business strategies, financial information, forecasts, personnel information and customer lists. Proprietary Information does not include information generally known or that is or becomes public domain information through no fault of mine."

    b.     Section 9 of the EIAC Agreement provides as follows: "**Confidentiality**. At all times, both during my employment and after its termination, I will keep and hold all such Proprietary Information in strict confidence and trust, and I will not use or disclose any of such Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company for the benefit of the Company. Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the

7

SRSAvPKT00074646

Company and I will not take with me any documents or materials or copies thereof containing any Proprietary Information."

c.  Section 12 of the EIAC Agreement provides as follows: "**Return of Company Documents**. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Proprietary Information of the Company.  I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement."

30.     Section 17 of the EIAC Agreement further bars Mr. Tsarnas from directly or indirectly soliciting or taking away SRS's employees, consultants, suppliers, or customers for his own benefit or for the benefit of any other party for a one-year period.

31.     After accepting the Offer, Mr. Tsarnas served as SRS's Managing Director of Global Business Development from September 15, 2014 to January 23, 2018.

### C.  Mr. Tsarnas's conversion of expense reimbursements and subsequent termination

32.     Mr. Tsarnas frequently incurred expenses for business purposes, including travel, meals, and entertainment.  Many of these required a thoughtful act of determining which payment method to use.  For instance, when booking plane tickets, one of the steps a user must take is to select which credit card to use.  During the period in question, Mr. Tsarnas—on more than one occasion—obtained new Company credit card numbers, which would then require further affirmative effort of entering the new card information when making charges.  Many of these charges were for material expenses, such as plane tickets.

33.     To receive reimbursement, an employee must complete a form in which he or she describes the expenditure and attaches a receipt evidencing the transaction.  Neither Mr. Tsarnas nor anyone else could receive reimbursement for any expense unless they proactively requested it and engaged in the appropriate steps.  Thus, there is no way that Mr. Tsarnas could have accidentally obtained reimbursement for charges made on the Company's credit card.  Indeed, Mr. Tsarnas admitted during an interview that he paid close attention to the forms of payment used when booking travel so he could maximize reward points.  His knowledge of payment methods was so detailed that he had memorized the last four digits of both his personal cards and the Company's credit cards.

34.     Between at least December 2015 and November 2017, Mr. Tsarnas submitted fraudulent expense reports to SRS and obtained reimbursement for business expenses as though he had used personal methods of payment when, in fact, he had already charged SRS for those

8

SRSAvPKT00074647

same expenses by using Company-issued credit cards. Mr. Tsarnas attempted to do the same in December 2017; however, SRS only reimbursed Mr. Tsarnas for legitimate expenses incurred in that month.

35.     Written communications with Mr. Tsarnas show that he was aware of the specific amounts for which he was seeking reimbursement. In some months, charges to Company credit cards would exceed 90% of the total amount he sought to be paid. This cash into his bank account exceeded any liabilities he personally incurred.

36.     Once Mr. Tsarnas realized his fraudulent behavior was undetected, he became more aggressive in the amounts he improperly sought for reimbursement.

37.     Specifically, Mr. Tsarnas submitted expense reports on the following dates, in which he fraudulently sought and obtained reimbursements in the amounts set forth in the following table:

| Year | Quarter | Corporate Card Charges Wrongfully Requested |
|---|---|---|
| 2016 | 1 | $ 2,759.86 |
|  | 2 | $ 595.39 |
|  | 3 | $ 3,192.90 |
|  | 4 | $ 3,185.62 |
| 2016 Total |  | $ 9,733.77 |
| 2017 | 1 | $ 7,231.92 |
|  | 2 | $ 7,985.84 |
|  | 3 | $ 4,653.43 |
|  | 4 | $ 5,446.02 |
| 2017 Total |  | $ 25,317.21 |
| Grand Total |  | $ 35,050.98 |

38.     Considering the frequency, severity and duration of the fraud, and the manner in which the expense reports were prepared and receipts assembled, Mr. Tsarnas's abuse of the expense reimbursement program was knowing and intentional.

Nonconfidential - No Stamp

SRSAvPKT00074648

39.     Nevertheless, when confronted by SRS, Mr. Tsarnas feigned confusion.

40.     Upon discovering and investigating Mr. Tsarnas's conduct, SRS terminated Mr. Tsarnas's employment.  In so doing, SRS requested that Mr. Tsarnas return all property belonging to SRS and reminded Mr. Tsarnas of his on-going obligations under the EIAC Agreement.

**D.  In an effort to compete with SRS, PNC employs Mr. Tsarnas to perform the same or similar duties he held at SRS**

41.     Upon information and belief, after SRS terminated Mr. Tsarnas's employment, PNC hired Mr. Tsarnas as a Senior Vice President, Escrow and Payments despite PNC being made aware of the reason for Mr. Tsarnas's termination and with full knowledge of SRS's concerns related to Mr. Tsarnas's obligations under the EIAC Agreement.

42.     Escrow and payments were within Mr. Tsarnas's area of responsibility when he worked at SRS, and Mr. Tsarnas has substantial, secret, and detailed information about SRS's market differentiating escrow and payment products and services.

43.     Through its recent acquisition of Fortis Advisers, PNC provides limited M&A products and services, specifically shareholder representative services.

44.     On information and belief, through its hiring of Mr. Tsarnas, PNC, in order to compete directly with SRS, added or intends to add M&A escrow and payment services to replicate SRS's suite of products and services.

**E.  Mr. Tsarnas's actual, threatened, and/or inevitable misappropriation of SRS's Proprietary Information and trade secrets and his breach of the non-solicitation provision of his EIAC Agreement**

45.     Solely because of his employment with SRS, Mr. Tsarnas possesses at least the following categories of SRS's Proprietary Information and trade secrets:

     a.  SRS's enterprise strategy;

     b.  SRS's product pipeline;

     c.  SRS's pricing strategies;

     d.  SRS's target account lists of priority targets;

     e.  SRS's employee compensation;

     f.  SRS's employee performance and performance reports;

     g.  SRS's client performance;

10

SRSAvPKT00074649

h.  SRS's financial performance and balance sheet;

i.  SRS's on-line payment platforms, technologies, systems, and know-how, including, without limitation, SRS's electronic document exchange and payment processing, workflows, custom records, organization, procedures, and security;

j.  SRS's structures, relationships, and processes to manage functions such as compensation payments, electronic shareholder consent solicitation and additional document collection and related reporting, data rooms, automated paid/unpaid reporting;

k.  SRS's data compilations and information about how to use data to create escrow products;

l.  SRS's client access portals and systems;

m.  The identity of key client and perspective client personnel, including decision-makers;

n.  Prior transaction terms for clients and prospective clients;

o.  SRS's client and prospective client preferences, priorities, and propensities;

p.  The terms of SRS's strategic partnership agreements; and

q.  SRS's proprietary escrow solution designed for M&A and how SRS was able to structure this unique investment option with a specific counterparty.

46.  These categories qualify as Proprietary Information and trade secrets on their own and/or in combination, where two or more trade secrets, elements of trade secrets, or categories of trade secrets are integrated to provide products and services to SRS's clients.

47.  To the extent not specifically referenced above, Proprietary Information subject to protection under the EIAC Agreement may also include, without limitation, the following:

a.  Trade Secrets, as that term is defined in the EIAC Agreement;

b.  Inventions, as that term is defined in the EIAC Agreement;

c.  Marketing plans;

d.  Product plans;

e.  Business strategies;

11

SRSAvPKT00074650

       f.   Financial information;

       g.  Forecasts;

       h.  Personnel information; and

       i.   Customer lists.

48.     In Section 11 of the EIAC Agreement, Mr. Tsarnas affirmed that he brought no Prior Inventions to SRS. Prior Inventions is defined broadly enough in Section 2 of the EIAC Agreement to embrace any industry knowledge Mr. Tsarnas may now argue he acquired prior to joining SRS.

49.     In violation of his contractual obligations to SRS, Mr. Tsarnas—in attempts to directly or indirectly solicit or take away SRS's employees—contacted SRS employees in at least the following ways:

       a.   Mr. Tsarnas coordinated aspects of his future PNC employment with Heather Kelly in February 2018. Heather Kelly has since left and joined PNC.

       b.   In early 2018, Mr. Tsarnas attempted to contrive a workaround of his non-solicitation agreement by calling SRS's Chief Data Scientist and stating that he heard the SRS executive had left SRS. This was a thinly-veiled solicitation attempt.

       c.   In attempting to procure other employment, Mr. Tsarnas represented to potential employers that he would be able to recruit other SRS employees to join him if hired.

50.     In light of the circumstances of Mr. Tsarnas's termination, his offer of employment with PNC, and his improper communications with SRS's employees, SRS sent a series of cease and desist letters to both Mr. Tsarnas and PNC. Both were thus placed on notice of Mr. Tsarnas's obligations to SRS as well as SRS's concerns that Mr. Tsarnas's then-contemplated employment with PNC would necessarily threaten the disclosure of SRS's Proprietary Information and trade secrets. Neither Mr. Tsarnas nor PNC heeded SRS's requests to stop Mr. Tsarnas's misconduct or mitigate the harm suffered by SRS.

51.     Mr. Tsarnas and PNC responded to SRS's cease and desist letters with a carefully-worded letter tacitly conceding Mr. Tsarnas's intention to retain and use Proprietary Information and trade secrets, and revealing that Mr. Tsarnas did not return all SRS information upon his separation (although Mr. Tsarnas claims he destroyed this information).

52.     Based on the foregoing and upon information and belief, Mr. Tsarnas has, in violation of his EIAC Agreement and legal duties owed to SRS, used or disclosed and/or threatens

Nonconfidential - No Stamp

SRSAvPKT00074651

to or will inevitably use or disclose SRS Proprietary Information and trade secrets and has violated his non-solicitation agreement.

**F. Mr. Tsarnas's default under and breach of a $200,000 promissory note owed to SRS**

53.     On September 30, 2014, Mr. Tsarnas entered into a promissory note with SRS in the amount of $200,000.

54.     Full payment under the promissory note was due on or before April 23, 2018.

55.     Mr. Tsarnas failed to make the required payment on April 23, 2018, constituting an Event of Default under the terms of the promissory note with SRS.

56.     Mr. Tsarnas is in breach of the promissory note.

57.     Full payment, plus interest, is due.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract (Confidentiality and Retention))

58.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

59.     A contract existed between SRS and Mr. Tsarnas, as reflected in the EIAC Agreement, attached as Exhibit 1 to this Complaint.

60.     SRS has performed, or was excused from performing, all of its obligations under that contract.

61.     Mr. Tsarnas has unjustifiably and inexcusably breached his obligations under his EIAC Agreement by using or disclosing SRS's Proprietary Information.

62.     Mr. Tsarnas has unjustifiably and inexcusably breached his obligations under his EIAC Agreement by failing to return all SRS property upon his separation from SRS.

63.     As a proximate result of Mr. Tsarnas's breach of his EIAC Agreement, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

64.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's breach, as well as specific performance of his EIAC Agreement.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract (Non-Solicitation))

65.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

13

66.     A contract existed between SRS and Mr. Tsarnas, as reflected in the EIAC Agreement, attached as Exhibit 1 to this Complaint.

67.     SRS has performed, or was excused from performing, all of its obligations under that contract.

68.     Mr. Tsarnas has unjustifiably and inexcusably breached his obligations under his EIAC Agreement by directly and/or indirectly contacting SRS's employees in attempts to directly or indirectly solicit or take away SRS's employees.

69.     As a proximate result of Mr. Tsarnas's breach of his EIAC Agreement, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

70.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's breach, as well as specific performance of his EIAC Agreement.

### THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

71.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

72.     SRS's Proprietary Information and trade secrets, including, without limitation, the Proprietary Information and trade secrets set forth above, together with any compilations thereof, qualify for protection as trade secrets because they are:

    a.  Not known outside of SRS.

    b.  Only disclosed to SRS's employees on a need-to-know basis.

    c.  Are the subject of reasonable efforts to guard their secrecy, including need-to-know limitations, password protected electronic storage media, locked offices and filing cabinets, confidentiality agreements such as the EIAC Agreement, cease and desist letters such as those referenced herein, and enforcement actions such as the instant action.

    d.  Have competitive value by virtue of their secrecy, including the ability to develop and provide unique M&A products and services to clients and to develop and retain client and strategic partner relationships.

    e.  Are developed, assembled, maintained, and used at significant expense to SRS.

    f.  Would be difficult if not impossible for a competitor to acquire or replicate by proper means.

14

SRSAvPKT00074653

73.     Mr. Tsarnas has used or disclosed, threatens to use or disclose, and/or will inevitably use or disclose SRS's Proprietary Information and trade secrets in violation of state law.

74.     As a proximate result of Mr. Tsarnas's actual, threatened, and/or inevitable misappropriation of trade secrets, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

75.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's actual, threatened, and/or inevitable misappropriation of trade secrets, as well as preliminary and/or permanent injunctive relief.

76.     To the extent Mr. Tsarnas's misappropriation was done willfully or maliciously, SRS seeks and is entitled to exemplary damages and an award of attorney's fees.

### FOURTH CLAIM FOR RELIEF
### (Breach of Duty of Loyalty)

77.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

78.     Mr. Tsarnas owes a duty of loyalty to SRS, which includes the duty not to unfairly compete with SRS by use or disclosure of SRS's Proprietary Information, whether or not such information is found to be a "trade secret" under state law.

79.     Mr. Tsarnas used or disclosed, threatens to use or disclose, and/or will inevitably use or disclose SRS's Proprietary Information to unfairly compete with SRS, including by using or disclosing SRS's Proprietary Information to aid PNC in its development, expansion, and/or marketing of competing M&A products and services.

80.     As a proximate result of Mr. Tsarnas's breach of his duty of loyalty, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

81.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's breach of his duty of loyalty.

### FIFTH CLAIM FOR RELIEF
### (Conversion)

82.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

83.     Mr. Tsarnas exercised dominion or control over money belonging to SRS and to which Mr. Tsarnas had no right by falsely submitting requests for and accepting expense reimbursements to which he was not entitled.

15

SRSAvPKT00074654

84.     Mr. Tsarnas's improper exercise of dominion or control over SRS's money was knowing and intentional.

85.     As a proximate result of Mr. Tsarnas's conversion, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

86.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's conversion.

### SIXTH CLAIM FOR RELIEF
### (Fraud)

87.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

88.     Mr. Tsarnas defrauded SRS by knowingly and intentionally submitting false expense reports to SRS for reimbursement of money Mr. Tsarnas was not entitled to.

89.     Mr. Tsarnas's false representations were material and they induced SRS to pay him more than $35,000.

90.     SRS was ignorant of the falsity of the representations at the time they were made.

91.     SRS reasonably and justifiably relied on the expense reports submitted by Mr. Tsarnas in approving the reimbursements.

92.     As a proximate result of Mr. Tsarnas's fraud, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

93.     SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's fraud.

### SEVENTH CLAIM FOR RELIEF
### (Breach of Promissory Note)

94.     The allegations of paragraphs 1-57 are herein realleged and incorporated by reference as if set forth in full below.

95.     On September 30, 2014, Mr. Tsarnas entered into a promissory note with SRS in the amount of $200,000.

96.     SRS has performed, or was excused from performing, all of its obligations under that promissory note.

97.     Full payment under the promissory note was due on or before April 23, 2018.

16

98.     Mr. Tsarnas failed to make the required payment on April 23, 2018, constituting an Event of Default under the promissory note.

99.     Mr. Tsarnas is in breach of the promissory note.

100.    Full payment, plus interest, is due.

101.    As a proximate result of Mr. Tsarnas's breach of his promissory note, SRS has suffered, and will continue to suffer, general damages in an amount to be proved at trial.

102.    SRS seeks compensation for all damages and losses proximately caused by Mr. Tsarnas's breach of his promissory note.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SRS prays for relief as follows:

A.      For equitable relief, including an injunction prohibiting Mr. Tsarnas from continuing to disclose SRS's Proprietary Information and trade secrets to third parties or retaining or in any way using SRS's Proprietary Information and trade secrets, and specific performance of Mr. Tsarnas's EIAC Agreement in the form of an Order requiring Mr. Tsarnas to cease all direct and indirect attempts to solicit SRS's employees;

B.      For compensatory damages;

C.      For other damages and an award of attorney's fees and costs to the maximum extent allowed by law; and

D.      For such other and further relief as this Court deems to be just and proper.

17

**JURY DEMAND**

Plaintiff SRS seeks a trial by jury of matters so triable.

Respectfully submitted this ___ day of May, 2018.

**ROLLIN BRASWELL FISHER LLC**

_____

Michael A. Rollin (No. 34847)
Maritza Dominguez Braswell (No. 45492)
8340 E. Crescent Pkwy, Suite 100
Greenwood Village, CO 80111
Phone:    (303) 945-7415
Fax:        (303) 974-7468
E-mail:    mrollin@rbf.law
                mbraswell@rbf.law

**TAYLOR & PATCHEN, LLP**
Jonathan A. Patchen (*Pro hac vice* to be filed)
Yesica Hernandez (*Pro hac vice* to be filed)
One Ferry Building, Suite 355
San Francisco, California 94111
Phone:    (415) 788-8200
Fax:        (415) 788-8208
E-mail:    jpatchen@taylorpatchen.com
                yhernandez@taylorpatchen.com

*Attorneys for Plaintiff*
*Shareholder Representative Services LLC*

Plaintiff's address:
Shareholder Representative Services LLC
950 17th Street
Suite 1400
Denver, CO 80202

18

SRSAvPKT00074657

## Alex Tsarnas Investigation Summary

March 5, 2018

### Summary

- For a period of at least two years Alex knowingly submitted various charges for expense reimbursement to which he was not entitled, due to booking expenses on one of multiple corporate cards and then requesting a personal reimbursement.

- In some cases Alex has submitted multiple receipts for a singular charge, collecting duplicate monies.

- In some cases Alex submitted receipts and received reimbursement for expenses that he later cancelled/didn't use.

- In some cases Alex requested reimbursement for amounts in excess of the receipts provided.

- From the period of January 2016 – November 2017 Alex received $35,050.98 for illegitimate expenses (i.e., expenses that were either paid on our corporate card, were a duplicate submission, etc.). These funds were paid to him along with other legitimate reimbursement expenses, and his regular wages/commissions via payroll.

- When confronted about these issues, Alex claimed this was an honest mistake due to being sloppy, but the facts as outlined below indicate that is nearly impossible.

- Ultimately the decision was made to termination Alex Tsarnas on January 23, 2018.

- On or around February 28, 2018, Alex Tsarnas did repay $35,050.98 to the company. The fact that he returned money after being caught, however, does not change that he knowingly and intentionally took money to which he was not entitled over a period of years.

/1

SRS **ACQUIOM**

## Alex Tsarnas Investigation Methodology

January 11, 2018

Initial identification of violation

- On or around the week of December 18, 2017, the Finance team trained an employee how to process payments on the corporate credit cards and how to process employee expense reports. This training coincidentally occurred on the same day. While processing the expense report for Alex Tsarnas, this employee noticed that several of the receipts submitted for reimbursement had the same last 4-digit card number as the one of the corporate cards. Further credit card statements were reviewed and multiple instances were found where Alex Tsarnas had submitted charges for expense reimbursement to which he was not entitled, due to booking expenses on a corporate card.

- After the Finance team confirmed that several receipts from Alex's December 2017 Expense Report aligned with his travel that was booked on the corporate card, the CFO initiated a detailed review of all his expense reimbursements going back into 2015.

- Expense reports and related receipts that were submitted were compared to corporate credit card statements/receipts within the month of every submission from August 2015 to December 2017, to see if in fact the company had already paid for charges on the corporate card. Many cases were identified where the expense report included a line item for travel expenses paid on the corporate card (validated by tying this back to the American Express statement for related air fare or other travel charges, wifi charges, Uber/Lyft rides, etc.

/2

SRS**ACQUIOM**

Nonconfidential - No Stamp

## Alex Tsarnas Investigation Findings

January 17, 2018

### 2015

- In 2015 it appears that Alex Tsarnas did not have access to a corporate card. In the course of reviewing receipts and submitted expense reports, it was determined that Alex did not submit for reimbursement any expenses that were separately paid on the corporate card.

- The review of his expense reports did confirm one occasion of duplicate billing where Alex submitted the same receipt twice for reimbursement. This amount was not included in the overall amount due, as it could have been an isolated error.

### 2016

- In 2016, it appears that Alex Tsarnas obtained the credit card information for two (2) corporate credit cards. At this time Alex's expense report records indicate that he began submitting receipts as part of his expense report, where the charges were paid for on the corporate cards and therefore not owed to him, on a more regular basis.

- In 2016, one (1) expense report that Alex Tsarnas submitted was found to contain a high majority (>90%) of the requested expenses were also corporate credit card charges.

- Throughout 2016 there were several occasions in which a line item on the expense report listed a dollar amount in excess of $100.00, but no proof/receipt was submitted. This demonstrates that Alex was directly aware and involved in the expense report submission as an Administrative Assistant or other individual supporting him would not know the exact dollar amount Alex requested.

- A total of $9,733.77 in expense reimbursements for items that were already paid for on the corporate card were identified. This equates to 18.3% of his total requests for reimbursement for the 2016 calendar year.

/3

SRS**ACQUIOM**

Nonconfidential - No Stamp

SRSAvPKT00074660

## Alex Tsarnas Investigation Findings (cont.)

January 17, 2018

### 2017

- In every month in 2017, Alex Tsarnas included expenses that were already paid on the corporate card within his individual expense reimbursement reports. Furthermore, the amounts requested were greater that those requested in 2016.

- In 2017, it appears that Alex Tsarnas obtained the credit card information for a total of four (4) corporate credit cards. He utilized these cards, including the information from one (1) previously cancelled card, to pay for expenses that he also requested for reimbursement.

### 2018

- In total, it was determined that Alex Tsarnas received $35,050.98 for illegitimate expenses (i.e., expenses that were either paid on our corporate card, were a duplicate submission, etc.).

- Alex Tsarnas was questioned about these charges on January 17, 2018 by the Head of Legal and HR Director. He admitted to this behavior and described it as "terribly careless." Not surprisingly, Alex denied that his actions were intentional; however, the fact pattern makes this nearly impossible to believe.

/4

SRS**ACQUIOM**

Nonconfidential - No Stamp

SRSAvPKT00074661

## Alex Tsarnas Investigation Additional Factors

January 17, 2018

- This is not a situation in which an individual had a single personal card and a single company card and may have accidentally used the wrong one or not noticed which was included in an expense report.  As shown on the spreadsheet included with this submission, Alex was very thoughtful and purposeful about what he charged to which account.  He used four different corporate cards and upwards of ten different personal cards in connection with expenses.  He also repeatedly asked for and obtained different corporate card numbers, so he knew he was charging expenses to company accounts.  Alex knew exactly what he was charging to which accounts whether they were company or personal.  Alex admitted that he was very thoughtful about which card he used and when because he wanted points or rewards when possible.

- Alex became increasingly aggressive in this behavior.  Early expense reports from a couple years ago included relatively modest amounts to which he was not entitled.  Once he realized he was getting away with this, he became increasingly aggressive in the amount he wrongfully included for reimbursement.  For example, in both January and April of 2017, more than 90% of the expenses he submitted for reimbursement were in fact charges on a corporate credit card and therefore monies that were not owed to him.

- During the period in question, Alex appeared to be financially distressed and repeatedly asked for accommodations such as changes to the terms of repayment of his outstanding loan to the company.  It appears he had so many personal cards in part because of this distress.

- On many of the sites that he used to make charges, an affirmative election must be made on which payment method to use.  For instance, when booking plane tickets on travel sites, one of the steps is to select your payment method, and the user must choose which card they want to use to complete the transaction.  This further indicates it was not possible that Alex repeatedly made mistakes about not realizing he was charging these expenses to the company.

- The amounts involved are significant enough that Alex has to have known that he was receiving considerably more in payment from the company than he was paying on his personal cards.  Modest discrepancies could be missed in a person's reconciliation of accounts, but Alex was receiving thousand more per month than he was paying out.  It is not possible that this was lost on him, especially in light of the fact that he was financially distressed as indicated above.  Alex was aware of every dollar coming in and out and must have known he was getting paid for expenses he did not incur.

/5

SRS **ACQUIOM**

Nonconfidential - No Stamp

SRSAvPKT00074662

Tab: exp#2972

| | | Corp SRSA Cards Ending In | | | Other Payment Types (NON-SRSA) | | | | | | | | | | | | | Exp Report #2972 | Exp Report #0076 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C 5125 | D 6123 | E 2148 | F 4843 | G 1008 | H 9423 | I 9361 | J 5445 | K 6000 | L 9133 | M cash | N NON SRS Payor Acct | O Cel Phone Reim | P Reason doesn't include anti info but expense was reimbursed | Q True Up | R MEMO | S Total of original exp report submitted | T Actual amount reimbursed |
| Month | | | | | | | | | | | | | | | | | | | |
| Dec | | | | | | | | | | 197.1 | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | 338.62 | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | 5.25 | | | | 0.5 | exp line 55.03 but actual reimbursement was 5.75 | | |
| Dec | Expense Report Line Item | | | | | | | | 66.79 | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | 17 | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | 44.92 | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | 53 | | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | 12 | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | 11.73 | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | | 16.38 | | | | |
| Dec | Expense Report Line Item | | | 262.41 | | | | | | | | | | 64.99 | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | 40 | | | | | |
| Dec | Expense Report Line Item | | | 419 | | | | | | | | | | | | both are on AMEX and one is on exp report, believe the other is the $419.00 charge on row 42 | | |
| Dec | Expense Report Line Item | | | 419.2 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 579.4 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 140.4 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 70.45 | | | | | | | | 347.6 | | | | | | |
| Dec | Expense Report Line Item | | | 40.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 101.05 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 65.45 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 65.94 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 97.8 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 35.63 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 103.75 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 52.13 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | 68.2 | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | | | | 41.80 | | | | | |
| Dec | Expense Report Line Item | | | 42.64 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 29.17 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 26.32 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 21.79 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 15.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 12.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 8.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 8.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 9.99 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 33.95 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | 262.44 | | | | | | | | | | | | | | |
| Dec | Expense Report Line Item | | | | | | | | | 10 | | | | | | | | |
| Dec | Total Expense Report #2972 | 0 | 0 | 2025.63 | 1418.2 | 0 | 51 | 168.44 | 535.72 | 0 | 17.25 | 164.35 | 40 | 81.47 | 0.5 | | $ 4,464.58 | $ 2,459.47 |
| | | | | | | | | | | | | | | | | | UNPAID | PAID |

Nonconfidential - No Stamp

SRSAvPKT00074663

Feb 2017

2 of 36

SRSAvPKT00074664

Tab 2017

| | | Gap MSA Costs Ending In | | | Other Payment Types (NON-MSA) | | | | | | | | | | | | | Receipt doesn't include pre-wrk but expense was reimbursed | No receipt submitted but expense was reimbursed | NON-SRS Payroll Acct | Cell Phone Reimb | Amt / Dall on Cap Report | Total of New items | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 5120 | 6103 | 3148 | 5500 | | | | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $19.62 | | | | | | | | | | | 8.2 | | | | | | | | | | | |
| March | Includes the exp report line item Total $19.62 | | | | 8.75 | | | | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $5.71 | | | 169.16 | | | | | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $5.71 | | | 13.92 | | | | | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $5.71 | | | | | | | | | | | | | 13.22 | | | | | | | | | |
| March | Includes the exp report line item Total $5.71 | | | | | | | | | | | | | 36.84 | | | | | | | | | |
| March | Includes the exp report line item Total $5.71 | | | | | | | | | | | | | 34.00 | | | | | | | | | |
| March | Expense Report Line Item | | | | | | | | | | 238.25 | | | | | | | | | | | | |
| March | Includes the exp report line item Total $155.38 | | | 1.78 | | | | 18.05 | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $155.38 | | | | | | | | | | | | | | | 55.91 | | | | | | |
| March | Includes the exp report line item Total $155.38 | | | | | | | 17.39 | | | | | | | | | | | | | | | |
| March | Includes the exp report line item Total $155.38 | | | 113.2 | | | | | | | | | | | | | | | | | | | stand alone expense reimbursement with communication item 4Mar - 100% of amount on our card. See line 98 |
| March | Includes the exp report line item Total $155.38 | | | | | | | | | | | | | | 9.99 | | | | | | | |
| March | Expense Report Line Item | | | 149.4 | | | | .26 | | | | | | | | | | 98 | | | | |
| March | **Total Expense Report #4027** | | | | | | | | | | | | | | | | | | $ 3,835.34 | $ 3,835.34 | | |
| March | Expense Report Line Item | | | 113.2 | | | | | | | | | | | | | | | | | | double payment. Originally paid on exp report 4/5/17 |
| **March** | **Total Expense Report #3947** | | | | | | | | | | | | | | | | | | $ 553.20 | $ 553.20 | | |
| April | Includes the exp report line item Total $8.01 | | | | | | | | 12.14 | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $8.01 | | | | | | | | 15.87 | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $3.16 | | | | | | | | .38 | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $3.16 | | | | 7.14 | | | | | | | | | | .3 | | | | | | | |
| April | Expense Report Line Item | | | 170.4 | | | | | | | | | | | | | | | | | | |
| April | **Total Expense Report #25.16** | | | | | | | | | | | | | | | | | | $ 580.37 | $ 580.37 | | |
| April | Includes the exp report line item Total $915.17 | | | 50.9 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 91.98 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 82.0 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 52.46 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 119.2 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 176.2 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 105.0 | | | | | | | | | | | | | | | | | | |
| April | Includes the exp report line item Total $915.17 | | | 147.5 | | | | | | | | | | | | | | | | | | |
| | **Total Expense Report #3513** | | | | | | | | | | | | | | | | | | $ 3,915.17 | $ 3,915.17 | | |
| May | Includes the exp report line item Total $76.16 | | | | | | | | | | | | | | | 51.31 | | | | | | |

Nonconfidential - No Stamp

SRSAvPKT00074665

Nonconfidential - No Stamp

SRSAvPKT00074666

Tab 2057

1 of 46

Nonconfidential - No Stamp

SRSAvPKT00074667

Tab 2017



6 of 81

Nonconfidential - No Stamp

SRSAvPKT00074668

Tab 2057

Nonconfidential - No Stamp

SRSAvPKT00074669

Nonconfidential - No Stamp

SRSAvPKT00074670

Tab 2016



Nonconfidential - No Stamp

SRSAvPKT00074671

Nonconfidential - No Stamp

SRSAvPKT00074672

Noncidential - No Stamp

SRSAvPKT00074673

Tab 2016

Nonconfidential - No Stamp

SRSAvPKT00074675

Tab 3532

Nonconfidential - No Stamp

SRSAvPKT00074676

Tab: 2015

|    | A     | B       | C      | D     |
|----|-------|---------|--------|-------|
| 1  | Month | unknown | 5001   | 1002  |
| 2  | Dec   |         | 39.02  |       |
| 3  | Dec   |         | 100.83 |       |
| 4  | Dec   |         | 56.51  |       |
| 5  | Dec   |         | 56.68  |       |
| 6  | Dec   |         | 5.44   |       |
| 7  | Dec   |         | 5.71   |       |
| 8  | Dec   |         | 31.26  |       |
| 9  | Dec   |         | 109.47 |       |
| 10 | Dec   |         |        | 36.51 |
| 11 | Dec   |         | 10.8   |       |
| 12 | Dec   |         | 33     |       |
| 13 | Dec   |         | 38.54  |       |
| 14 | Dec   |         | 97.27  |       |
| 15 | Dec   |         | 172.13 |       |
| 16 | Dec   |         | 88.48  |       |
| 17 | Dec   |         | 455.24 |       |
| 18 | Dec   | 455.24  |        |       |

Nonconfidential - No Stamp

SRSAvPKT00074677

Tab: qtrly

|    | A           | B       | C           |
|----|-------------|---------|-------------|
| 1  | **Year**    | **Quarter** | **Amount** |
| 2  | 2016        | 1       | $ 2,759.86  |
| 3  |             | 2       | $ 595.39    |
| 4  |             | 3       | $ 3,192.90  |
| 5  |             | 4       | $ 3,185.62  |
| 6  | 2016 Total  |         | $ 9,733.77  |
| 7  |             |         |             |
| 8  | 2017        | 1       | $ 7,231.92  |
| 9  |             | 2       | $ 7,985.84  |
| 10 |             | 3       | $ 4,653.43  |
| 11 |             | 4       | $ 5,446.02  |
| 12 | 2017 Total  |         | $ 25,317.21 |
| 13 |             |         |             |
| 14 | **Grand Total** |     | **$ 35,050.98** |

Nonconfidential - No Stamp

SRSAvPKT00074678

May 15, 2018

Key:

- The letter and number, e.g. I1, will correspond to a line item on the expense report, line item on our bank statement, and a receipt.

- "I" correlates to the month of September, 2017.

SRSAvPKT00074679

1/5/2018                                    Expense Report - NetSuite (SRS Acquiom Inc.)

## Expense Report

### 2803 Alex Tsarnas   PAID IN FULL

Actions

**Primary Information**

| | |
|---|---|
| EXP. REPT #<br>2803 | COMPLETE |
| | DATE DUE |
| EMPLOYEE<br>Alex Tsarnas | |
| PURPOSE | SUPERVISOR APPROVAL |
| | ACCOUNTING APPROVAL |
| DATE<br>9/22/2017 | |
| POSTING PERIOD<br>Sep 2017 | |

| | |
|---|---|
| EXPENSES TOTAL | 3,693.40 |
| NON-REIMBURSABLE EXPENSES (TAX EXCL.) | 0.00 |
| REIMBURSABLE EXPENSES | 3,693.40 |
| ADVANCE TO APPLY | |
| TOTAL REIMBURSABLE AMOUNT | 3,693.40 |

**Classification**

DEPARTMENT
Global Business Development

ENTITY
SRS Acquiom Inc : SRS Acquiom Holdings LLC ; SRS LLC

USE MULTI CURRENCY

| REF<br>NO. | DATE | EXCHANGE<br>RATE | CATEGORY | FOREIGN<br>AMOUNT (CURRENCY) | AMOUNT (TEND) | DEPARTMENT | REAL PROJECT | BILLABLE | ATTACH<br>FILE | LOCATION | RECEIPT | NON-<br>REIMBURSABLE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/22/2017 | 1.00 | Meals and Entertainment | 1,250.40 USD | 1,250.40 | Global Business Development | | | Alex.pdf | | Yes | |
| 2 | 9/22/2017 | 1.00 | Mileage & Parking | 30.00 USD | 30.00 | Global Business Development | | | Alex 2.pdf | | Yes | |
| 3 | 9/22/2017 | 1.00 | Internet, Network & Telephone Expense | 39.95 USD | 39.95 | Global Business Development | | | | | | |
| 4 | 9/22/2017 | 1.00 | Lodging | 43.22 USD | 43.22 | Global Business Development | | | | | | |
| 5 | 9/22/2017 | 1.00 | Airfare | 1,856.20 USD | 1,856.20 | Global Business Development | | | | | | |
| 6 | 9/22/2017 | 1.00 | Ground Transportation & Rental Cars | 433.63 USD | 433.63 | Global Business Development | | | | | | |
| 7 | 9/22/2017 | 1.00 | Employee Cell Phone Reimbursement | 40.00 USD | 40.00 | Global Business Development | | | | | | |

Actions

*(handwritten annotations)*

737.40  I2
306.46  I3
411.20  I4

39.80  I5
44.16  I6
22.55  I7
68.67  I8
39.52  I9
399.08  I10

Nonconfidential - No Stamp                                                                                 SRSAvPKT00074680

MARK B VOGEL                        Account Ending 1-43005                        p. 16/33

## Detail Continued



| Date | Description | | | Foreign Spend | Amount | |
|---|---|---|---|---|---|---|
| 09/12/17 | LYFT *RIDE TUE 3PM (NONE) 94104 LEDGER | SAN FRANCISCO | CA | | $44.16 | I6 |
| 09/13/17 | LYFT *RIDE TUE 6PM (NONE) 94104 LEDGER | SAN FRANCISCO | CA | | $89.80 | I5 |
| 09/14/17 | LYFT *RIDE THU 5AM (NONE) 94104 LEDGER | SAN FRANCISCO | CA | | $22.55 | I7 |
| 09/14/17 | HTTP://WWW.GOGOAIR.C INTERNET ACC | 877-350-0038 | IL | | $39.95 | I1 |

Continued on next page

Nonconfidential - No Stamp

SRSAvPKT00074681



**Business Platinum Card®**
SHAREHOLDER REP SVCS
MARK B VOGEL
Closing Date 09/25/17

OPEN

p. 17/33

Account Ending 1-43005

| Detail Continued |
|---|

| | | | | | | Foreign Spend | Amount |
|---|---|---|---|---|---|---|---|
| 09/15/17 | UNITED AIRLINES | | HOUSTON | | TX | | $306.40 |
| | UNITED AIRLINES | | | | | | |
| | From: | To: | Carrier: | Class: | | | |
| | NEW YORK LA GUARDI | DENVER INTL APT | UA | 00 | | | |
| | | NEW YORK LA GUARDI | UA | 00 | | | |
| | | N/A | YY | 00 | | | |
| | | N/A | YY | 00 | | | |
| | Ticket Number: 0162365529320 1 | | Date of Departure: 10/11 | | | | |
| | Passenger Name: TSARNAS/ALEXPETER | | | | | | |
| | Document Type: PASSENGER TICKET | | | | | | |

*I3*

| 09/19/17 | LYFT  *RIDE TUE 4AM | SAN FRANCISCO | CA | | $68.67 |
|---|---|---|---|---|---|
| | (NONE) 94104 | | | | |
| | LEDGER | | | | |

*I8*

| 09/19/17 | LYFT  *RIDE TUE 8AM | SAN FRANCISCO | CA | | $39.52 |
|---|---|---|---|---|---|
| | (NONE) 94104 | | | | |
| | LEDGER | | | | |

*I9*

Continued on reverse

Nonconfidential - No Stamp

SRSAvPKT00074682

MARK B VOGEL                    Account Ending 1-43005                    p. 18/33

## Detail Continued



|          |                                                      | Foreign Spend | Amount |
|----------|------------------------------------------------------|---------------|--------|
| 09/20/17 | LYFT *RIDE WED 11PM (NONE) 94104 LEDGER              | SAN FRANCISCO    CA | $10.00 |
| 09/20/17 | LYFT *RIDE WED 11PM (NONE) 94104 RIDEREQUEST         | SAN FRANCISCO    CA | $89.08 |

| 09/22/17 | UNITED AIRLINES UNITED AIRLINES | HOUSTON    TX | $411.20 |

From:                  To:
N.Y. NEWARK INTL A     LOS ANGELES INTERN
                       N/A
                       N/A
                       N/A

Carrier:    Class:
UA          00
YY          00
YY          00
YY          00
Date of Departure: 09/27

Ticket Number: 01 623665256872
Passenger Name: TSARNAS/ALEXPETER
Document Type: PASSENGER TICKET

Continued on next page

Nonconfidential - No Stamp



**Business Platinum Card®**
SHAREHOLDER REP SVCS
MARK B VOGEL
Closing Date 09/25/17



p. 19/33

Account Ending 1-43005

## Detail Continued

| | | | | | | Foreign Spend | Amount |
|---|---|---|---|---|---|---|---|
| 09/22/17 | UNITED AIRLINES | | HOUSTON | | TX | | $737.40 |
| | UNITED AIRLINES | | | | | | |
| | From: | To: | Carrier: | Class: | | | |
| | NEW YORK LA GUARDI | DENVER INTL APT | UA | 00 | | | |
| | | N.Y. NEWARK INTL A | UA | 00 | | | |
| | | N/A | YY | 00 | | | |
| | | N/A | YY | 00 | | | |
| | | | Date of Departure: 10/02 | | | | |
| | Ticket Number: 01623665265504 | | | | | | |
| | Passenger Name: TSARNAS/ALEXPETER | | | | | | |
| | Document Type: PASSENGER TICKET | | | | | | |



Continued on reverse

Nonconfidential - No Stamp

SRSAvPKT00074684

From: **Gogo** gogo@e gcgoair com
Subject: Here's Your Gogo Receipt and Feedback - Check Out Your Purchase Details! - Order #119175737SPUA
Date: September 14, 2017 at 10:36 AM
To: atsarnas@srsacquiom com

Purchase Details - Order #119175737SPUA
To ensure you receive emails from Gogo add UnitedWFi@gogoair com to your email address book.

Mobile device | Web browser

My Account | Contact

  **UNITED**

Purchase details

# Thank you for your Purchase!

You can view your purchase history at any time by visiting My Account. For more information about Gogo, visit our Privacy Policy and Terms of Use.

### Purchase Summary

Customer. alex tsarnas
Email Address. atsarnas@srsacquiom.com
Order # 119175737SPUA
9/14/2017 PDT

| Product | Quantity | Price |
|---|---|---|
| Gogo Flight Pass | 1 | $39.95 |

### Payment Info

Tax : $0.00

Total: $39.95

After using our Wi-Fi service, please take a moment to tell us about your Wi-Fi experience. Click Here to take a quick survey

We are expanding our Inflight Wi-Fi network. Learn more at united com/WIFI

My Account     Customer Service     Terms of Use     Privacy Policy

This email was sent to atsarnas@srsacquiom com because you have made a Gogo purchase.
If you would like to change your email preferences or unsubscribe, please click here

Nonconfidential - No Stamp

From: United Airlines, Inc. unitedairlines@united.com
Subject: eTicket Itinerary and Receipt for Confirmation K1E8FY
Date: September 22, 2017 at 4:06 PM
To: ATSARNAS@SHAREHOLDERREP.COM

## Receipt for confirmation K1E8FY

# UNITED
A STAR ALLIANCE MEMBER

**Confirmation: K1E8FY**
Check-In >

Issue Date: September 22, 2017

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| TSARNAS/ALEXPETER | 0162366526550 | UA-XXXXX772 Premier 1K / *G | 23A/8D |

**FLIGHT INFORMATION**

| Day, Date | Flight Class | Departure City and Time | Arrival City and Time | |
|---|---|---|---|---|
| Mon, 02OCT17 | UA745L | NEW YORK, NY (LGA - LAGUARDIA) 2:30 PM | DENVER, CO (DEN) 4:58 PM | Aircraft Meal 737-800 Purchase |
| Tue, 03OCT17 | UA329E | DENVER, CO (DEN) 11:35 PM | NEWARK, NJ (EWR - LIBERTY) 5:21 AM (04OCT) | 737-900 Purchase |

**FARE INFORMATION**

**Fare Breakdown**

| | |
|---|---|
| Airfare: | 659.54USD |
| U.S. Transportation Tax: | 49.46 |
| U.S. Flight Segment Tax: | 8.20 |
| September 11th Security Fee: | 11.20 |
| U.S. Passenger Facility Charge: | 9.00 |
| Per Person Total: | 737.40USD |

**Form of Payment:**
AMERICAN EXPRESS
Last Four Digits 2148

*I 2*

| | |
|---|---|
| eTicket Total: | 737.40USD |

The airfare you paid on this itinerary totals: 659.54 USD

**The taxes, fees, and surcharges paid total: 77.86 USD**

Fare Rules:

Additional charges may apply for changes in addition to any fare rules listed.

NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

**Baggage allowance and charges for this itinerary.**

**Baggage fees are per traveler**

| Origin and destination for checked baggage | 1st bag | 2nd bag | Max wt / dim per piece |
|---|---|---|---|
| 10/2/2017 New York, NY (LGA - LaGuardia) to Denver, CO (DEN) | 0.00 USD | 0.00 USD | 70.0lbs (32.0kg) - 62.0in (157.0cm) |
| 10/3/2017 Denver, CO (DEN) to Newark, NJ (EWR - Liberty) | 0.00 USD | 0.00 USD | 70.0lbs (32.0kg) - 62.0in (157.0cm) |

Baggage check-in must occur with United or United Express, and you must have valid MileagePlus Premier® 1K® membership at time of check-in to qualify for waiver of service charges for up to three checked bags (within specified size and weight limits).

Nonconfidential - No Stamp

From: United Airlines, Inc. unitedairlines@united.com
Subject: eTicket Itinerary and Receipt for Confirmation C5QQX5
Date: September 15, 2017 at 3:26 PM
To: ATSARNAS@SHAREHOLDERREP.COM

## Receipt for confirmation C5QQX5

**UNITED**  A STAR ALLIANCE MEMBER

**Confirmation: C5QQX5**
Check-In >

Issue Date: September 15, 2017

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| TSARNAS/ALEXPETER | 0162365529320 | UA-XXXXX772 Premier 1K / *G | 8D/7C |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Wed, 11OCT17 | UA405 | T | NEW YORK, NY (LGA - LAGUARDIA) 12:00 PM | DENVER, CO (DEN) 2:21 PM | A-320 | Purchase |
| Fri, 13OCT17 | UA1858 | K | DENVER, CO (DEN) 5:35 PM | NEW YORK, NY (LGA - LAGUARDIA) 11:07 PM | A-320 | Purchase |

**FARE INFORMATION**

**Fare Breakdown**

| | | Form of Payment: |
|---|---|---|
| Airfare: | 258.61USD | AMERICAN EXPRESS Last Four Digits 2148 |
| U.S. Transportation Tax: | 19.39 | |
| U.S. Flight Segment Tax: | 8.20 | |
| September 11th Security Fee: | 11.20 | |
| U.S. Passenger Facility Charge: | 9.00 | |
| Per Person Total: | 306.40USD | |

I3

eTicket Total:     306.40USD

The airfare you paid on this itinerary totals: 258.61 USD

The taxes, fees, and surcharges paid total: 47.79 USD

Fare Rules:

Additional charges may apply for changes in addition to any fare rules listed.

NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

**Baggage allowance and charges for this itinerary.**

Baggage fees are per traveler

| Origin and destination for checked baggage | 1st bag | 2nd bag | Max wt / dim per piece |
|---|---|---|---|
| 10/11/2017 New York, NY (LGA - LaGuardia) to Denver, CO (DEN) | 0.00 USD | 0.00 USD | 70.0lbs (32.0kg) - 62.0in (157.0cm) |
| 10/13/2017 Denver, CO (DEN) to New York, NY (LGA - LaGuardia) | 0.00 USD | 0.00 USD | 70.0lbs (32.0kg) - 62.0in (157.0cm) |

Baggage check-in must occur with United or United Express, and you must have valid MileagePlus Premier® 1K® membership at time of check-in to qualify for waiver of service charges for up to three checked bags (within specified size and weight limits).

SRSAvPKT00074687

From: **United Airlines, Inc.** unitedairlines@united.com
Subject: eTicket Itinerary and Receipt for Confirmation K05EV2
Date: September 22, 2017 at 4:00 PM
To: ATSARNAS@SHAREHOLDERREP.COM

## Receipt for confirmation K05EV2

# UNITED

A STAR ALLIANCE MEMBER

Confirmation: **K05EV2**

Issue Date: September 22, 2017

| Traveler | eTicket Number | Frequent Flyer | Seats |
|----------|---------------|----------------|-------|
| TSARNAS/ALEXPETER | 0162366525687 | UA-XXXXX772 Premier 1K / *G | 10A |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|-----------|--------|-------|------------------------|----------------------|----------|------|
| Wed, 27SEP17 | UA758 | Q | NEWARK, NJ (EWR - LIBERTY) 6:05 AM | LOS ANGELES, CA (LAX) 9:10 AM | 757-200 | Purchase |

**FARE INFORMATION**

**Fare Breakdown**

Airfare:                             369.30U
                                           S
                                           D

U.S. Transportation Tax:             27.70
U.S. Flight Segment Tax:              4.10
September 11th Security Fee:          5.60
U.S. Passenger Facility Charge:       4.50
Per Person Total:                    411.20U
                                           S
                                           D

eTicket Total:                       411.20U
                                           S
                                           D

**Form of Payment:**
AMERICAN EXPRESS
Last Four Digits 2148

$I4$

The airfare you paid on this itinerary totals: 369.30 USD

The taxes, fees, and surcharges paid total: 41.90 USD

Fare Rules:

Additional charges may apply for changes in addition to any fare rules listed.

NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

Baggage allowance and charges for this itinerary.

Baggage fees are per traveler

| Origin and destination for checked baggage | 1st bag | 2nd bag | Max wt / dim per piece |
|---|---|---|---|
| 9/27/2017 Newark, NJ (EWR - Liberty) to Los Angeles, CA (LAX) | 0.00 USD | 0.00 USD | 70.0lbs (32.0kg) - 62.0in (157.0cm) |

Baggage check-in must occur with United or United Express, and you must have valid MileagePlus Premier® 1K® membership at time of check-in to qualify for waiver of service charges for up to three checked bags (within specified size and weight limits).

MileagePlus Accrual Details

Nonconfidential - No Stamp

SRSAvPKT00074688

From: **Lyft Ride Receipt** no-reply@lyftmail.com
Subject: **Your ride with Harutyun on September 12**
Date: **September 13, 2017 at 1:22 PM**
To: artsarnes@srsacquiom.com







## Thanks for riding with Harutyun!

September 12, 2017 at 6:58 PM

### Ride Details

| | |
|---|---|
| Premier fare (14.14mi, 53m 28s) | **$89.80** |

| | |
|---|---|
| American Express *2148 | **$89.80** |

$I S$



⬤ Pickup    6:58 PM
888 World Way, Los Angeles, CA

⬤ Dropoff    7:51 PM

Nonconfidential - No Stamp

From: **Lyft Ride Receipt** no-reply@lyftmail.com
Subject: Your ride with Michael on September 12
Date: September 12, 2017 at 6:48 PM
To: atsarnas@srsacquiom.com





## Thanks for riding with Michael!

September 12, 2017 at 3:35 PM

### Ride Details

| | |
|---|---|
| Lyft fare (23.36mi, 42m 15s) | $44.16 |
| American Express *2148 | **$44.16** |

$I6$

●  Pickup   3:35 PM
    1666 Curtis St, Denver, CO

●  Dropoff   4:17 PM

From: **Lyft Ride Receipt** no-reply@lytmail.com
Subject: Your ride with L on September 14
Date: September 14, 2017 at 9:05 AM
To: atsamas@sisacquiom.com





## Thanks for riding with L!

September 14, 2017 at 5:33 AM

### Ride Details

| | |
|---|---|
| Lyft fare (13.00mi, 20m 41s) | $20.55 |
| Tip | $2.00 |

| | |
|---|---|
| American Express *2148 | **$22.55** |

I ]



● Pickup   5:33 AM
487 S la Clenega Blvd, Los Angeles, CA

SRSAvPKT00074691

From: **Lyft Ride Receipt** no reply:@lyftmail.com
Subject: Your ride with Eddy on September 19
Date: September 19, 2017 at 5:21 AM
To: atsamas@srsacquiom.com



# lyft



## Thanks for riding with Eddy!

September 19, 2017 at 4:39 AM

### Ride Details

| | |
|---|---|
| Lyft fare (29.23mi, 40m 21s) | $58.67 |
| Tip | $10.00 |
| American Express *2148 | **$68.67** |



●  Pickup      4:39 AM
70 Heights Rd, Allendale, NJ

Nonconfidential - No Stamp

From: **Lyft Ride Receipt** no-reply@lyftmail.com
Subject: Your ride with Stephen on September 19
Date: September 19, 2017 at 8:43 PM
To: atsarnas@srsacquirm com



## lyft



# Thanks for riding with Stephen!

September 19, 2017 at 8:59 AM

### Ride Details

Since you updated your stop or destination, your fare
reflects actual time and distance

Learn more

| | |
|---|---|
| Base fare | $0.75 |
| 33m 53s | $4.40 |
| 24.32 mi | $24.32 |
| Service fee | $2.45 |
| DEN Airport - Airport Fee | $2.60 |
| Tip | $5.00 |
| American Express *2148 | **$39.52** |

I9





Nonconfidential - No Stamp

From: Lyft Ride Receipt no-reply@lyftmail.com
Subject: Your ride with Friley on September 20
Date: September 21, 2017 at 12:45 AM
To: disarans@sesecupion.com





## Thanks for riding with Friley!

September 20, 2017 at 11:28 PM

### Ride Details

| | |
|---|---|
| Lyft fare (32.08mi, 71m 43s) | $86.91 |
| Black Car Fund Surcharge | $2.17 |
| Tip | $10.00 |
| American Express *2148 | **$10.00** |
| American Express *2148 (Upfront Fare) | **$89.08** |

