**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:19-cv-02005-DDD-SKC

SRS Acquiom Inc.; and
Shareholder Representative Services LLC,

      Plaintiffs,

v.

PNC Financial Services Group, Inc.; and
PNC Bank, N.A.; and
Heather Kelly; and
Alex Tsarnas,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

---

SRS Acquiom, Inc. and Shareholder Representative Services LLC (collectively, "SRSA") sued two former employees, Defendants Heather Kelly and Alex Tsarnas, and their subsequent employers, PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC"), for misappropriation of trade secrets. The defendants filed a motion for summary judgment. Doc. 492. For the reasons described below, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

SRSA's operative complaint asserts nine causes of action: (1) misappropriation of trade secrets in violation of the federal trade-secrets statute, 18 U.S.C. § 1836; (2) misappropriation of trade secrets in violation of the Colorado trade-secrets statute, Colo. Rev. Stat. §§ 7-74-101 to 110; (3) breach of the confidentiality obligation in Ms. Kelly's and Mr.

Tsarnas's employment contracts, (4) breach of the contracts' non-solici-tation obligation; (5) intentional interference with contractual relations; (6) unfair competition; (7) violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (8) intentional interference with prospec-tive economic advantage; and (9) breach of the duty of loyalty. Doc. 66.

I previously denied a motion to dismiss and a motion for a prelimi-nary injunction to enjoin the defendants' alleged misappropriation of five trade secrets. Docs. 206, 207. I also denied without prejudice the defendants' previous motions for summary judgment. Doc. 315.

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law; a dispute of fact is gen-uine if a rational jury could find for the nonmoving party on the evidence presented. *Adamson*, 514 F.3d at 1145. If a reasonable juror could not return a verdict for SRSA, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145.

In deciding whether the movants have carried their burden, a court does not weigh the evidence and instead must view it and draw all rea-sonable inferences from it in the light most favorable to the nonmoving party (here, SRSA). *Id.* at 1145. But unsupported or conclusory allega-tions or mere traces of evidence are not sufficient to demonstrate a gen-uine dispute of material fact on summary judgment. *Maxey v. Rest.*

*Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

**DISCUSSION**

## I.   Misappropriation of Trade Secrets

### A.   Applicable Law

SRSA asserts two claims for misappropriation of trade secrets: one under Colorado law, the other under federal law.

A claim for violation of the Colorado Uniform Trade Secrets Act requires a plaintiff to prove three elements. First, the plaintiffs must establish that they "possessed a valid trade secret." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). The Colorado Uniform Trade Secrets Act defines a trade secret as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4). To be a trade secret, the plaintiff-owner "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." *Id.* Colorado courts consider additional factors in determining whether a trade secret exists, including:

> 1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business, i.e., by the employees; 3) the precautions

> taken by the holder of the trade secret to guard the secrecy of the information; 4) the savings effected and the value to the holder in having the information as against competitors; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990). Second, a plaintiff must establish that the trade secret was disclosed without its consent. *Gates Rubber*, 9 F.3d at 847. And third, the plaintiff must prove that the defendant knew or should have known that the trade secret was acquired by improper means. *Id.*

A claim for violation of the federal Defense of Trade Secrets Act has similar elements to the Colorado Act. A plaintiff must first establish "the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce." *Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018). The Defense of Trade Secret Act likewise defines trade secret broadly to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if the owner thereof has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C.A. § 1839(3). Second, a plaintiff must prove that the defendant acquired, used, or disclosed the trade secret without consent. *Arctic*

*Energy*, 2018 WL 1010939, at *2. And third, the plaintiff must establish that "the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Id.* Neither party has suggested that there is any meaningful difference between the Colorado and federal laws, and I therefore consider both claims in tandem.

### B. Payments Spreadsheet and Master-Services Agreements

Summary judgement is granted on SRSA's trade-secrets claim with respect to its payments spreadsheet and its master-services agreements because SRSA has not shown that it took explicit measures to preserve their secrecy. SRSA sends its payment spreadsheet to "deal parties and lawyers in order to fulfill its duties as paying agent." Doc. 521 at 28 (emphasis omitted). The master-services agreements are contracts between SRSA and its counterparties. Docs. 492-53, 492-54. SRSA does not require the recipients of its spreadsheet to sign an NDA or otherwise take measures to keep the spreadsheet confidential. *See* Docs. 120-6, 120-7, 120-8, 120-9. Likewise, SRSA's master-services agreements do not contain an NDA. Docs. 492-53, 492-54. SRSA argues that the industry has strong confidentiality norms such that the recipients of the spreadsheet and master-services agreements understand that they are not to disseminate them, and that it only shared the spreadsheet and agreements with entities with whom it was in a position of trust. *See* Doc. 269 at 1-2; Doc. 228-4 at 4; Doc. 256-12 at 4; Doc. 256-10 at 15; Doc. 257 at 8; Doc. 526 at 5.

This is insufficient to justify trade-secret protection. SRSA cites the Supreme Court's characterization of Ohio's trade-secrets statute, which is not at issue in this case, for the proposition that trade-secrets protection may exist when a party was "under an implied obligation not to use

- 5 -

or disclose" the secret, but even that case requires that the trade secret was shared "in confidence." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974). None of the cases that SRSA cites support the proposition that an industry norm on its own—absent any efforts to maintain the secret by its holder—is sufficient to justify trade-secret status. *See* Doc. 521 at 29, 42.

Both the federal and Colorado trade-secrets statutes expressly limit trade-secrets protection to information that trade-secret holders have taken explicit measures to keep confidential. 18 U.S.C. § 1839(d), Colo. Rev. Stat. § 7-74-102(4). Since SRSA has not produced any evidence to show that it took express measures to keep its payments spreadsheet and master-services agreements confidential, summary judgment is warranted.

### C.   Customer Information

Summary judgment is denied with respect to SRSA's customer information because SRSA has produced sufficient evidence for a reasonable juror to conclude that this information was a trade secret and that PNC misappropriated it. SRSA has shown that when Defendant Kelly left SRSA, she compiled a list of SRSA customer contacts ("HK Contacts"), which she brought with her to PNC. Doc. 521 at 23; Doc. 266-7. SRSA has also shown that Defendant Kelly used this information, along with other information she had gleaned from her time at SRSA, to create the "Firms by Segement" [sic] document, a more detailed list of SRSA customers. Doc. 521 at 24; Doc. 266-8. The latter list contains information about SRSA's customers that was derived from Defendant Kelly's work there and that was not widely known to the public. Doc. 521 at 24. A reasonable juror could conclude based on this evidence that Defendant Kelly and PNC misappropriated customer information from SRSA.

The defendants argue that summary judgment is warranted because customer information cannot be a trade secret. *See* Doc. 492 at 18; Doc. 550 at 14. This statement is too broad. The defendants are right that much of the information in the spreadsheet is readily obtainable in the public record. That these organizations were customers of SRSA, however, was secret, as were the key personnel to contact and their specific experiences with SRSA. The defendants argue that the identity of major repeat customers was widely known in the industry, and that of minor customers was of limited value. Doc. 550 at 14-15. Perhaps, but that is a fact question and therefore inappropriate for resolution at the summary-judgment stage. The defendants bear the burden at this stage, and the plaintiffs have produced sufficient evidence for a reasonable juror to conclude that their customer information was a trade secret.

### D.    Pricing Strategy

Summary judgment is denied with respect to SRSA's pricing strategy because SRSA has produced sufficient evidence to conclude that its strategy was a trade secret and that the defendants misappropriated it. SRSA has produced deposition transcripts and declarations indicating that its pricing strategy relies on profit margins, discount limits, customer-class-based pricing, pricing history, and the amounts earned from bank partners on deposits. *See* Doc. 268 at 2-5; Doc. 522-9 at 6; Doc. 257 at 8-10. SRSA has also produced evidence indicating that Defendant Tsarnas was aware of this strategy, Doc. 256-2 at 7, and that he advised PNC on its own pricing strategy, Docs. 258-9, 258-10. A reasonable juror could infer, based on the above evidence, that the defendants are responsible for theft of trade secrets.

PNC argues that it is not liable because the underlying pricing strategy is "obvious." Doc. 492 at 22. According to PNC, SRSA had no pricing

strategy at the time Tsarnas and Kelly resigned from the company, its strategy relied on obvious factors, and individual sales representatives could "apply its pricing strategy subjectively to each transaction." *Id.* at 22-26. While this characterization may be accurate, it is genuinely disputed. At this stage of the proceedings, it is sufficient for SRSA to show a material factual dispute. It has done so.

### E.   Product-Development Strategy

Summary judgment is denied with respect to SRSA's product-development strategy because there remains a material factual dispute as to whether the product-development strategy was a trade secret and whether the defendants misappropriated it. SRSA has produced evidence showing that it had detailed plans for product development, covering avenues for improvement, timelines to achieve results, and projected costs. *See* Docs. 256-15, 256-16, 257-16, 257-17, 257-19, 258-1; Doc. 521 at 39-41. SRSA has also produced evidence showing that Defendants Kelly and Tsarnas were aware of these plans, Doc. 256-15 at 5; Doc. 257 at 16; Doc. 257-17, and that they advised PNC on setting its own strategies, Docs. 258-16, 258-17, 295-7. This evidence is sufficient to allow a reasonable juror to conclude that the defendants misappropriated PNC's trade secrets.

PNC echoes its pricing-strategy contention and argues that the product strategies are common sense and therefore not protected as trade secrets. According to PNC, SRSA's strategy amounted to developing products that "fill a customer need, increase loyalty, or introduce products to assist in cross-selling," all of which are "common sense business strategies." Doc. 492 at 28. SRSA's evidence shows far more than that, however, and includes timelines for execution and recommended expenditures. *See*, *e.g.*, Doc. 256-15. This evidence shows that there exists

a genuine factual dispute over whether SRSA's product strategies are a protected trade secret.

## F.   Deal Dashboard

Summary judgment is denied with respect to SRSA's Deal Dashboard claim because there remain factual disputes as to whether the Deal Dashboard was protected as a trade secret and whether the defendants misappropriated it. The defendants argue that the Deal Dashboard was not protected as a trade secret because it was publicly disclosed in a trademark application, and that they did not misappropriate it since Defendant Kelly was aware of its features from her industry experience. Doc. 550 at 17, Doc. 492 at 20 n.6. SRSA has produced evidence sufficient to conclude that the Deal Dashboard contained features that were not previously public, *see, e.g.*, Doc. 256-10 at 16-20, and that Defendants Kelly and Tsarnas shared non-public information about it with PNC, *see, e.g.* Docs. 523-2, 523-3, 527-7. Whether Defendant Kelly's knowledge of the Deal Dashboard came from her experience in the industry or her time at SRSA is an inherently fact-specific question. These remaining genuine factual disputes prevent summary judgment as to the Deal Dashboard.

## G.   Payment Methods

Summary judgment is denied with respect to SRSA's payment methods because there remain factual disputes as to whether the payment methods are a protected trade secret. The defendants argue that I "should not even consider this undisclosed alleged trade secret" because it is "in violation of the Court's [scheduling] Order," Doc. 550 at 10, but I find that SRSA duly disclosed this alleged secret. *See* Doc. 492-3 at 2-4. SRSA described the payment methods with enough generality to encompass the items at issue here and to comply with the scheduling order.

PNC argues that the payment methods are not protected as a trade secret, since they are "common sense," "statutorily required," publicly disclosed by SRSA, or attributable to a third party. Doc. 550 at 10-15. These are fact-specific contentions, and it is sufficient for SRSA to show that they are in dispute to prevail at this stage. SRSA's evidence that its payment methods were developed internally, and contained features not required by statute and not publicly disclosed is sufficient to show a genuine factual dispute as to whether they are protectable as trade secrets. *See, e.g.*, Doc. 295-1 at 4; Doc. 531 at 3-5. SRSA has also produced evidence showing that Defendant Kelly asked for information on SRSA's payment methods (which were outside her responsibilities at SRSA) shortly before leaving, and that she transmitted this information to PNC, enabling PNC to develop its product more rapidly than otherwise possible. *See, e.g.*, Doc. 433-1 at 26-36; Doc. 525-6 at 4-5. The remaining factual disputes surrounding misappropriation of SRSA's payment methods prevent summary judgment.

## H.   Legal and Financial Structure of Compensation

Summary judgment is denied with respect to SRSA's compensation structure because there remain factual disputes as to whether the compensation structure was a trade secret and whether the defendants misappropriated it. SRSA has produced evidence sufficient to conclude that Defendant Tsarnas shared information regarding the compensation structure to PNC. Doc. 522-8 at 15; Docs. 523-4, 523-5. Whether the compensation structure was a trade secret to begin with is a closer call. SRSA argues that the compensation structure had confidential features, such a subsidiary with "its own Employer Identification Number for tax purposes" that "interfaces with a third-party payroll company to determine the withholding calculations, then provides information to SRSA to enable after-tax payments to shareholders, while itself performing tax

reporting functions and sending tax payments to federal and state tax authorities." Doc. 256-10 at 17. SRSA also points to confidential elements of the payments workflow, which "required new types of information from employee-shareholders than traditional shareholders," and required "a new tab . . . on the Payments Spreadsheet." *Id.* As PNC observes, SRSA's website publicizes much of this information, including the new Employer Identification Number and specific treatment of employee shareholders. Doc. 550 at 13. At this stage, though, I must draw all reasonable inferences in favor of the nonmoving party, and I find that there remains a genuine factual dispute over whether the compensation structure incorporated features that were not publicly advertised.

## I.  Customized Document-Distribution Method

Summary judgment is denied with respect to SRSA's customized document-distribution method because there remain factual disputes as to whether the method was a trade secret and whether defendants Kelly and Tsarnas conveyed that secret to PNC. SRSA has produced evidence sufficient to conclude that its customized document-distribution method contained features that were protected as a trade secret: (1) a "customized, deal-specific repository of documents," (2) a "picklist" that "sort[s] shareholders into customized, deal-specific distribution groups, assign[s] specific subsets of documents to each group, and adjust[s] the order in which those sets are presented to shareholders," (3) a feature that "embed[s] select documents with 'required' fields that, if left unfilled, will automatically prevent the shareholder from becoming eligible for payment," and (4) automatic tabulation of returned signed documents. Doc. 531 at 6. As PNC notes in its reply brief, much of the evidence that SRSA has produced is insufficient to show that Defendants Kelly and Tsarnas conveyed a protected trade secret, and instead shows that they conveyed non-protected information about the general

- 11 -

product. Doc. 550 at 20. Nonetheless, SRSA has produced a transcript of PNC's Rule 30(b)(6) witness deposition showing that PNC's product developed many of the same features as SRSA's after Defendants Kelly and Tsarnas joined. Doc. 522-2 at 6. While SRSA's evidence is not overwhelming, at this stage I cannot weigh the evidence myself. This transcript is sufficient for a reasonable juror to infer that a trade secret was misappropriated, so summary judgment must be denied.

### J.   Forfeited Claims

SRSA has not mounted a defense to the defendants' summary-judgment motion with respect to its mutual authentication and individual deal pricing; enhanced document collection; customized, pre-populated documents; and Deal Dashboard back-end operation. *See* Doc. 521 at 61 n.21. SRSA's misappropriation claims are forfeited and PNC's motion for summary judgment is granted as to these alleged trade secrets. *See* Fed. R. Civ. P. 56(e).

## II.   Breach of Contract (Confidentiality)

Summary judgment is denied with respect to SRSA's breach-of-contract (confidentiality) claim because there remain genuine factual disputes as to whether Defendants Kelly and Tsarnas breached their confidentiality obligations. Ms. Kelly's and Mr. Tsarnas's employment contracts with SRSA stated that they would "not use or disclose any . . . Proprietary Information without the prior written consent of the Company, except as may be necessary to perform my duties as an employee of the Company." Doc. 66-1 at 7. According to the contract, "Proprietary Information" means "information of a confidential or secret nature that may be disclosed to me by the Company that relates to the business of the Company or to the business of . . . any other party with whom the Company agrees to hold information of such party in confidence." *Id.* As

discussed above in Section I, SRSA has produced sufficient evidence that Defendants Kelly and Tsarnas disclosed proprietary information to PNC. At this stage, all inferences must be drawn in favor of SRSA, so summary judgment is denied.

## III.   Breach of Contract (Non-solicitation)

Summary judgment is denied with respect to SRSA's claim against Defendant Kelly and granted with respect to its claim against Defendant Tsarnas. Their employment contracts provide that "[d]uring, and for a period of one year after termination," they may not "directly or indirectly solicit or take away . . . customers [or] employees . . . of the Company for [their] own benefit or for the benefit of any other party." Doc. 66-1 at 8. SRSA has produced evidence showing that Defendant Kelly actively solicited SRSA employees Luda Semenova and Ali Bryson to leave SRSA. *See generally* Doc. 528-2. SRSA has also produced evidence showing that Defendant Kelly actively solicited SRSA customer Blackberry. Doc. 524-2 at 3. SRSA has not, however, produced evidence showing that Defendant Tsarnas actively solicited SRSA employees or customers, so summary judgment is warranted with respect to its claim against him.

## IV.   Unfair Competition

Summary judgment is denied with respect to SRSA's unfair-competition claim because there remains a genuine factual dispute over whether PNC copied SRSA's products in a way that is likely to deceive the public. "Unfair competition is a question of fact and no inflexible rule can be stated as to what conduct will constitute unfair competition. The universal test is whether the public is likely to be deceived." *Swart v. Mid-Continent Refrigerator Co.*, 360 P.2d 440, 442 (Colo. 1961). In *Swart*, the Colorado Supreme Court held that to constitute unfair

competition in use of a trade name, a party must show that "the name acquired a secondary meaning or significance that identifies the plaintiff" and that "the defendant must have unfairly used the name or a simulation of it against the plaintiff." *Id.*

Outside of the trade-names context, federal courts in this district have defined unfair competition as where (1) "the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard," and (2) "this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services." *NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1131 (D. Colo. 2007); *see also Benton v. Avedon Eng'g, Inc*, No. 10-cv-01899-RBJ-KLM, 2012 WL 5869126, at *17 (D. Colo. Nov. 19, 2012); *Amazon, Inc. v. Cannondale Corp.*, Nos. 99 CV 00571 EWN PAC, 00 CV 02063 EWN PAC, 2006 WL 650682, at *11 (D. Colo. Mar. 10, 2006).

SRSA has produced evidence showing that PNC copied the names of its services and images of its documents. Doc. 260-10 at 4; Doc. 521 at 55. At the summary-judgment stage, I find that this is sufficient to show a material factual dispute both as to copying, and as to the likelihood of deceiving or confusing the public—the public is likely to be deceived by products with the same names that are marketed using the same images.

In its motion for summary judgment, PNC, citing two District of Colorado cases, argues that SRSA has not shown that the public was in fact deceived by its alleged copying of SRSA's products. Doc. 492 at 44 (citing *Wells Fargo Inv. Servs. USA v. McQuate*, 276 F. Supp. 63d 1089, 1117 (D. Colo. 2016); *Benton*, 2012 WL 5866303, at *7). But the Colorado Supreme Court's characterization of this claim, which is controlling,

specifies conduct that is *likely to deceive*, even if has not in fact deceived. *Swart*, 360 P.2d at 442. PNC then argues that the names of SRSA's products are so generic that they are not generally associated with SRSA. Doc. 492 at 46. In its reply, SRSA points out that the names of its Pre-Closing Solicitation, Compensation Payments, and Deal Dashboard services, Doc. 521 at 54, are terms that even a PNC employee believed to be associated with SRSA. *See* Doc. 260-10 at 4. For purposes of summary judgment, there remains a genuine factual dispute here. Finally, PNC argues that these terms have not acquired a "secondary meaning such that customers of payments services would associate them with SRSA," Doc. 550 at 23, but even if the "secondary meaning" requirement applies outside trade name cases, again, the factual dispute as to whether Pre-Closing Solicitation, Compensation Payments, and Deal Dashboard have acquired secondary meanings remains.

## V.   Intentional Interference with Contract

Summary judgment is granted with respect to SRSA's intentional interference with contract claim because SRSA has not shown intentional disruption of a contractual relationship. "To be liable for intentional interference with contract, a defendant must 1) be aware of a contract between two parties, 2) intend that one of the parties breach the contract, 3) and induce the party to breach or make it impossible for the party to perform the contract." *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004). SRSA raises two grounds for liability: PNC's interference with SRSA's contracts with customers, and PNC's interference with Ms. Kelly's and Mr. Tsarnas's employment contracts. Doc. 521 at 48-50.

PNC's motion for summary judgment is granted with respect to SRSA's claim that PNC interfered with SRSA's customer contracts,

since SRSA has not shown that any of its customers breached their contracts. SRSA, citing federal district court and Colorado appellate court precedent, argues that it does not need to show that its customers breached and that it is sufficient for it to show that PNC "disrupt[ed] the plaintiff's flow of expected but *non-guaranteed* benefits under an existing contractual relationship." Doc. 521 at 49. Its motion shows that PNC lured away repeat customers, but it does not show that those customers breached contractual obligations toward SRSA. *C.f. infra* Section VI.

The Colorado case that SRSA cites, *Slater Numismatics, LLC v. Driving Force, LLC*, contradicts *Krystkowiak* and instead adopts the definition of intentional interference with contractual relations from the Restatement (Second) of Torts. 310 P.3d 185, 189 (Colo. App. 2012). That definition provides that

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person *by inducing or otherwise causing the third person not to perform* the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id.* (citing Restatement (Second) of Torts § 766 (Am. L. Inst. 1977)). Even applying the Restatement's definition of the tort, as urged by *Slater*, SRSA must show that PNC induced or otherwise caused a third person not to perform an existing contract. Since it has not done so, summary judgment is justified with respect to SRSA's claim that PNC interfered with its customer contracts.

Summary judgment is also granted with respect to SRSA's claim that PNC interfered with Defendant Kelly's and Defendant Tsarnas's contracts with SRSA, since SRSA has not shown that PNC induced them to

breach their contracts. At best, SRSA's evidence shows that Defendant Kelly breached her contract with SRSA while she was employed by PNC and that other PNC employees were aware of this. *See* Doc. 521 at 50. But even drawing all reasonable inferences in its favor, SRSA falls short of producing evidence from which a jury could find that PNC induced her to breach this contract. SRSA has not produced evidence showing that Defendant Tsarnas breached his contract.

## VI.   Intentional Interference with Prospective Economic Advantage

Summary judgment is denied with respect to SRSA's claim for intentional interference with prospective economic advantage because there remain genuine factual disputes as to whether PNC misappropriated SRSA's trade secrets. "Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995). A competitor may "interfere intentionally in another competitor's prospective business relations so long as . . . the competitor does not employ wrongful means." *Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1285 (D. Colo. 2003) (citing *Amoco*, 908 P.2d at 501-02). "The Tenth Circuit has determined that the majority of courts . . . hold 'wrongful means' defeating the competitor's privilege is conduct that is itself capable of forming the basis for liability of the actor." *Id.* (citing *DP-Tek, Inc. v. AT&T Global Info. Sols. Co.*, 100 F.3d 828, 834-35 (10th Cir. 1996)).

SRSA argues that the defendants' "breaches of SRSA confidentiality and non-solicitation agreements enabled their interference with SRSA's potential deals," as did their general misappropriation of SRSA's trade secrets. Doc. 521 at 53. This allegation is intertwined with SRSA's trade-secrets and breach-of-contract claims. *See supra* Sections II, III, IV. The

defendants' liability for the underlying trade-secrets and breach-of-contract claims would be a sufficient basis to find for SRSA on its claim for intentional interference with prospective business relationships. Since material factual disputes over the underlying liability remain, summary judgment is unwarranted.

## VII.   Computer Fraud and Abuse Act

Summary judgment is denied with respect to SRSA's Computer Fraud and Abuse Act claim. The CFAA provides a civil cause of action against someone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," or "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(2)(C), (a)(5)(C), (g). A civil action is only available if the offense caused specified consequences, one of which is "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(a)(i)(I), (g). SRSA has produced evidence showing that Defendant Kelly accessed SRSA's computer without permission after her termination, causing SRSA to incur more than $5,000 in damages. *See* Doc. 255 at 7; Doc. 259 at 4; Doc. 229 at 27; Doc. 256-3.

PNC raises two grounds for granting summary judgment: (1) that Defendant Kelly merely continued to passively receive documents from SRSA, and (2) that SRSA has not shown requisite damages. Neither are sufficient for PNC to prevail under its burden. As to the first point, SRSA has produced evidence showing that Defendant Kelly did not just receive unsolicited documents from SRSA, but she erased more than 74,000 files from SRSA's MacBook when she no longer was allowed to access it. Doc. 229 at 27. As to the second point, SRSA has produced

invoices showing nearly $150,000 in bills for investigations. Doc. 256-3. PNC contends that that those are immaterial to a damages analysis because they are litigation costs. Doc. 550 at 26-27. While this may be true, it is not necessarily so. A reasonable juror could infer that SRSA was harmed either by Defendant Kelly's unauthorized access to the documents, her deletion of the documents, its need to investigate the extent of her unauthorized deletion, or all of the above. Since I must draw all factual inferences in favor of SRSA, summary judgment is inappropriate.

## VIII. Violation of Duty of Loyalty

Summary judgment is denied with respect to SRSA's claim for breach of the duty of loyalty because there remain factual disputes as to whether Defendant Kelly competed against SRSA during her employment. An employee has a "duty not to compete with the principal concerning the subject matter of his agency." *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 492-93 (Colo. 1989) (citing Restatement (Second) of Agency § 393 (Am. L. Inst. 1957)). Colorado law distinguishes "preparation" to compete, which is permitted, from "active competition," which is not. *Id.* at 493. Whether Ms. Kelly crossed that line is in dispute. SRSA has produced evidence sufficient to conclude that Defendant Kelly actively competed against SRSA while employed by that company. Specifically, it points to evidence that she arranged a meeting under false pretenses to find out about SRSA technology for the purpose of competing, Doc. 532 at 2-3, that she downloaded secret customer information before leaving, Doc. 229-11 at 15; Doc. 266 at 10-11, that she attempted to induce her coworkers to leave, Doc. 528-1, and that she provided input on a proposal to Western Alliance on how to compete against SRSA. Doc. 229-15 at 5. Whether Ms. Kelly competed against SRSA while employed remains in dispute, so summary judgment is unwarranted.

## CONCLUSION

It is **ORDERED** that Defendants' Motion for Summary Judgment, **Doc. 492**, is:

**GRANTED** on SRSA's trade-secrets claims with respect to SRSA's Payments Spreadsheet; Master Services Agreement; Mutual Authentication and Individual Deal Pricing; Enhanced Document Collection; Customized, Pre-Populated Documents; and Deal Dashboard Back-End Operation trade secrets;

**DENIED** on SRSA's trade-secrets claims with respect to its Customer Information; Pricing Strategy; Product-Development Strategy; Deal Dashboard; Payment Methods; Legal and Financial Structure of Compensation; and Customer Document-Distribution Methods trade secrets;

**DENIED** with respect to SRSA's Breach of Contract (Confidentiality) Claim;

**GRANTED** with respect to SRSA's Breach of Contract (Non-Solicitation) Claim against Defendant Tsarnas, and **DENIED** with respect to SRSA's Breach of Contract (Non-Solicitation) Claim against Defendant Kelly;

**DENIED** with respect to SRSA's Unfair Competition Claim;

**GRANTED** with respect to SRSA's Intentional Interference with Contract Claim;

**DENIED** with respect to SRSA's Intentional Interference with Prospective Economic Advantage Claim;

**DENIED** with respect to on SRSA's Computer Fraud and Abuse Act Claim; and

**DENIED** with respect to SRSA's Duty of Loyalty Claim.

It is **FURTHER ORDERED** that, to facilitate the Court's just, speedy, and inexpensive determination of this action, on or before July 21, 2023, the parties must file a Joint Status Report not to exceed 1,400 words, identifying the following: (1) the prospects for settlement; (2) three mutually agreeable alternative dates for trial to commence in December 2023, January 2024, or February 2024, and the anticipated length of trial; and (3) any other issues the parties wish to bring to the Court's attention

DATED: July 7, 2023                     BY THE COURT:

                                        _____
                                        Daniel D. Domenico
                                        United States District Judge